UNITED STATES DISTRICT COURT
IN THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EIGHT MILE STYLE, LLC and
MARTIN AFFILIATED, LLC,

       Plaintiffs

vs.

APPLE COMPUTER, INC. and
AFTERMATH RECORDS d/b/a
AFTERMATH ENTERTAINMENT,

       Defendants.

_____/

Case No. 2:07-CV-13164
Honorable Anna Diggs Taylor
Magistrate Judge Donald A. Scheer

## DEFENDANTS AFTERMATH RECORDS' AND APPLE INC.'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT THEREOF

Daniel D. Quick (P48109)
Dickinson Wright PLLC
38525 Woodward Avenue
Suite 2000
Bloomfield Hills, MI 48304
(248) 433-7200
dquick@dickinsonwright.com

Kelly M. Klaus
Munger, Tolles & Olson LLP
355 South Grand Avenue
Suite 3500
Los Angeles, CA 90071-1560
(213) 683-9238
kelly.klaus@mto.com

Attorneys for Defendants

4959865.1

# MOTION FOR SUMMARY JUDGMENT

Defendants Aftermath Records, doing business as Aftermath Entertainment ("Aftermath") and Apple Inc. ("Apple"), through their counsel, Dickinson Wright PLLC and Munger, Tolles & Olson LLP, hereby move for an order granting summary judgment on Plaintiffs' complaint alleging copyright infringement, 17 U.S.C. § 101 *et. seq.*

In support of its Motion, Aftermath and Apple rely upon the facts, law and argument contained within the accompanying Brief in Support and the exhibits to this Motion, all pleadings filed in this action, and any further submissions or arguments of counsel as may properly come before this Court.

Pursuant to Local Rule 7.1(a), concurrence in the relief requested in this Motion was sought, but not obtained.

4959865.1

WHEREFORE, Aftermath and Apple respectfully request that this Court grant its

Motion, pursuant to Fed. R. Civ. P. 56, and enter an Order granting summary judgment in their

favor on Plaintiffs' Complaint.

s/Daniel D. Quick
Daniel D. Quick (P48109)
Dickinson Wright PLLC
38525 Woodward Avenue
Suite 2000
Bloomfield Hills, MI 48304
(248) 433-7200
dquick@dickinsonwright.com

Kelly M. Klaus
Munger, Tolles & Olson LLP
355 South Grand Avenue
Suite 3500
Los Angeles, CA 90071-1560
(213) 683-9238
kelly.klaus@mto.com
Attorneys for Defendants

4959865.1

UNITED STATES DISTRICT COURT
IN THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EIGHT MILE STYLE, LLC and
MARTIN AFFILIATED, LLC,

       Plaintiffs

vs.

APPLE COMPUTER, INC. and
AFTERMATH RECORDS d/b/a
AFTERMATH ENTERTAINMENT,

       Defendants.

_____/

Case No. 2:07-CV-13164
Honorable Anna Diggs Taylor
Magistrate Judge Donald A. Scheer

## BRIEF IN SUPPORT OF AFTERMATH RECORDS'
## AND APPLE INC.'S MOTION FOR SUMMARY JUDGMENT

Daniel D. Quick (P48109)
Dickinson Wright PLLC
38525 Woodward Avenue
Suite 2000
Bloomfield Hills, MI 48304
(248) 433-7200
dquick@dickinsonwright.com

Kelly M. Klaus
Munger, Tolles & Olson LLP
355 South Grand Avenue
Suite 3500
Los Angeles, CA 90071-1560
(213) 683-9238
kelly.klaus@mto.com

Attorneys for Defendants

i

# CONCISE STATEMENT OF ISSUES PRESENTED

Whether summary judgment should be granted to Aftermath and Apple on Plaintiffs' claim for copyright infringement, on the grounds that (a) Aftermath's and Apple's ("Defendants") use of the musical compositions in issue was authorized expressly through "Controlled Composition" clauses in the contracts pursuant to which the compositions were created and provided to Aftermath for distribution, and (b) Defendants' use, even if not authorized expressly, has been impliedly licensed by Plaintiffs, who delivered the compositions for distribution and who to this day have continuously accepted and retained payment on account of Defendants' use?

Defendants' answer: "Yes."

4959865.1

# CONTROLLING AUTHORITIES

17 U.S.C. §§ 106, 115, 204

*Bridgeport Music, Inc. v. Dimension Films*, 410 F.3d 792 (6th Cir. 2005)

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)

*Effects Associates, Inc. v. Cohen*, 908 F.2d 555 (9th Cir. 1990)

*I.A.E., Inc. v. Shaver*, 74 F.3d 768, 776 (7th Cir. 1996)

*John G. Danielson, Inc. v. Winchester-Conant Properties, Inc.*, 322 F.3d 26 (1st Cir. 2003)

*Johnson v. Jones*, 149 F.3d 494 (6th Cir. 1998)

*Lulirama Ltd., Inc. v. Axcess Broadcast Servs., Inc.*, 128 F.3d 872 (5th Cir. 1997)

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)

*Oddo v. Ries*, 743 F.2d 630 (9th Cir. 1984)

*Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446 (6th Cir. 2001)

2 Melville B. Nimmer and David Nimmer, *Nimmer on Copyright* (2007)

Donald S. Passman, *All You Need to Know About the Music Business* (6th ed. 2006)

Sidney Shemel & M. William Krasilovksy, *This Business of Music* (5th ed. 1985)

4959865.1

**BRIEF IN SUPPORT OF AFTERMATH RECORDS' AND APPLE INC.'S MOTION FOR SUMMARY JUDGMENT**

## I.    INTRODUCTION.

For many years prior to this litigation and continuing throughout this litigation, Plaintiffs have received and retained royalty payments totaling more than $647,600 based on the sale through Apple Inc.'s ("Apple") iTunes Store of sound recordings embodying musical compositions in which the Plaintiffs claim a copyright interest.  Notwithstanding their collection of these royalties, Plaintiffs now say that Apple and Aftermath Records (the record label that owns the recordings) ("Aftermath") are liable for copyright infringement because Plaintiffs supposedly never authorized the distribution of their works through the form of digital downloads.

The problem with Plaintiffs' theory of infringement, however, is that Defendants' use was expressly authorized in the underlying contracts that were the genesis for the delivery of the works in the first place, with the full understanding and express agreement that they "will" – not might – "be licensed" to Aftermath and to its "distributors/licensees," which includes Apple. This express authorization bars Plaintiffs' claim for copyright infringement.  But even if Defendants' use had not been authorized expressly (which it was), well-established law and the undisputed record show that the use was authorized impliedly by operation of law.  Indeed, Plaintiffs have manifested the objective intent of authorizing the nonexclusive use of their works, by receiving royalty statements that reflect payments for digital downloads and then cashing the checks that accompanied the statements – something the Plaintiffs have done every quarter for years and continue to do right up through the present day.  The underlying contracts and the copyright laws do not allow Plaintiffs to now turn around and claim infringement.

## II.    SUMMARY OF ARGUMENT.

The copyrighted works in issue are musical compositions written in whole or in part by the popular recording artist Marshall B. Mathers III (p/k/a "Eminem") that are embodied in

1

Eminem sound recordings that Aftermath owns pursuant to its written agreements with Eminem. Those agreements (negotiated and/or signed by the individuals who own the Plaintiff LLC corporations in this case) contain "Controlled Composition" clauses which provide that any compositions written in whole or in part by Eminem (in other words, all of the compositions at issue in this case) "will be licensed to Aftermath and its distributors/licensees" for use in phonorecords in exchange for a fixed royalty. Controlled Composition clauses exist for a number of purposes, not the least of which is to ensure that the record company will be able to distribute not just the sound recordings it owns pursuant to the record company's agreement with the artist, but the musical compositions embodied in those recordings as well that were created in whole or in part by the artist.[1]

It is undisputed that Aftermath has lived up to its end of the bargain by paying the contractual royalty rate (and, in some cases, a higher rate fixed pursuant to statute) for its sale of recordings that embody the compositions. The Controlled Compositions clauses clearly encompass the distribution through iTunes that Plaintiffs now claim to be infringing. Yet, Plaintiffs assert that the Controlled Compositions clauses do not mean what they say, and that Aftermath was required to go back to Eminem and to Plaintiffs every time it wanted to sell a sound recording through some new type of distributor. Plaintiffs are wrong, and their reading would render the contractual agreement illusory.

But *even if* Plaintiffs were right (and they are not), Defendants *still* are entitled to summary judgment because Plaintiffs have also impliedly licensed the challenged uses. The compositions were delivered to Aftermath to be exploited and Plaintiffs have received (and are continuing to receive) substantial royalties for the very rights they now say they never granted.

---

[1] "Sound recordings and their underlying musical compositions are separate works with their own distinct copyrights." *Bridgeport Music, Inc. v. Dimension Films*, 410 F.3d 792, 796 n.3 (6th Cir. 2005).

As a matter of a law and without anything more, this creates an implied license. The implied license protects uses that were plainly contemplated and paid for from opportunistic, after-the-fact infringement claims by plaintiffs seeking to multiply their returns. And, as the Sixth Circuit and other courts have held, a plaintiff's after-the-fact claim that it did not *subjectively* intend to allow the uses is both insufficient and irrelevant. What matters is whether the plaintiff's course of conduct *objectively* manifests an intent to allow the use in issue. In this case, all of the objective evidence – including the contracts, Plaintiffs' delivery of the compositions knowing and intending they would be recorded and distributed, and their *continuing* acceptance of payment for these uses – demonstrates an unmistakable intent to permit exactly the uses that Plaintiffs now challenge.[2]

Plaintiffs' copyright claim fails as a matter of law, and Defendants' motion should be granted in its entirety.

## III. UNDISPUTED FACTS.

### A. Plaintiffs and the Musical Compositions in Issue.

The Plaintiffs in this case are Eight Mile Style, LLC ("Eight Mile") and Martin Affiliated, LLC ("Martin Affiliated"). Compl. ¶¶ 1-2. The Plaintiffs claim to have ownership interests in 93 musical compositions that are "written and composed, in part, by Marshall B. Mathers, III, professionally known as 'Eminem.'" *Id.* ¶ 8; Exs. 1 & 2 (Plaintiffs' Responses to Interrogatories 1, Schedule 1). Plaintiffs' claim that all of the compositions in issue are copyrighted works under the Copyright Act, 17 U.S.C. § 101 *et seq.*

---

[2] Plaintiffs also pleaded four ancillary causes of action in their Complaint: unfair competition under the federal Lanham Act, tortious interference, unfair competition, and violation of the Michigan Consumer Protection Act, MCL 445.903. *See* Compl. ¶¶ 20-22, 23-26, 27-32. During the meet and confer process on this Motion, Plaintiffs agreed to dismiss those claims with prejudice. That dismissal was filed on April 29, 2008.

4959865.1

**B.     The Compositions Are Controlled Compositions Under Eminem's Artist Recording Agreements.**

The works in issue were written in part by Eminem as part of his commitment under two artist recording agreements to deliver sound recordings to Aftermath.[3]  Compl. ¶ 8; *See* Declaration of Rand Hoffman ("Hoffman Decl.") Exs. A & D.[4]  Those recording agreements are dated March 9, 1998 (the "1998 Agreement") and July 2, 2003 (the "2003 Agreement"). Hoffman Decl. Exs. A & D (jointly, the "Agreements").

The 1998 and 2003 Agreements set forth various terms and conditions relating to the creation and exploitation of sound recordings that embody the musical compositions in issue. The Agreements provide, among other things, for the creation of sound recordings, the payment of specified royalties for Aftermath's exploitation of those recordings, and payments and advances against those royalties.  Hoffman Decl. Exs. A ¶¶ 3A, 4 (1998 Agreement) & D ¶¶ 4, 5 (2003 Agreement).  The Agreements further provide that all of master sound recordings created by Eminem during the terms of the Agreements "shall be Aftermath's property and Aftermath shall be the copyright proprietor thereof (specifically excluding the copyright in the underlying musical compositions)." *Id.* Exs. A ¶ 8 (1998 Agreement) & D ¶ 8 (2003 Agreement).  The Agreements make it clear that "Aftermath and its distributors/licensees shall have the exclusive right to exploit all such masters in any and all forms of media now known and hereinafter developed ...." *Id.*

As noted above, the sound recordings and the underlying musical compositions embodied in them are covered by separate copyrights. *See* n.1, *supra*.  The copyright in compositions includes, *inter alia*, the rights to reproduce and distribute copies of the same as embodied in

---

[3] Aftermath is a joint venture whose partners include UMG Recordings, Inc. ("UMG"); Interscope Records, a California general partnership, whose general partner is UMG; and ARY, Inc.  Hoffman Decl. ¶ 2. The UMG in UMG Recordings is an acronym for Universal Music Group.

[4] The Hoffman Declaration is Exhibit 9 to this Motion.

4959865.1

recordings. 17 U.S.C. § 106(1), (3). The Agreements reserve ownership of the composition copyrights to their owners, but do not thereby leave Aftermath powerless to exploit the recordings that embody those compositions. On the contrary, each Agreement contains a provision, entitled "Mechanical Royalties," that authorizes the exploitation of Controlled Compositions embodied by the recordings, and establishes the rate for the same:

> *All Controlled Compositions (i.e., songs written or controlled, directly or indirectly, in whole or in part, by F.B.T., Artist [Eminem], any affiliated company of F.B.T., Artist, any producer or any affiliated company of any producer) will be licensed to Aftermath and its distributors/licensees* and Aftermath and its distributors'/licensees' Canadian licensee for the U.S. and Canada, respectively, at a rate equal to 75% (the "Controlled Rate") of the minimum statutory rate (i.e., without regard to the so-called "long-song formula").

Hoffman Decl. Ex. A ¶ 6(a) (1998 Agreement) (emphasis added). *See also id.* Ex. D ¶ 6 (2003 Agreement).[5]

Controlled composition clauses are commonplace in artist recording agreements. Hoffman Decl. ¶ 5; Sidney Shemel & M. William Krasilovksy, *This Business of Music* at 19 (5th ed. 1985) ("A common paragraph in record contracts relates to 'controlled compositions.'").[6] As described in a leading text, "[t]hese clauses are one of the most significant provisions in [artist] recording arrangement[s]." Donald S. Passman, *All You Need to Know About the Music Business* at 214 (6th ed. 2006).[7] Another leading text describes a controlled composition clause

---

[5] The reference to "F.B.T." in the Controlled Composition clause of the 1998 Agreement is to F.B.T. Productions, LLC a Michigan limited liability company that is owned by the same two individuals – Jeff and Mark Bass – who own Plaintiff Eight Mile. Ex. 3 at 10 (Plaintiffs' Opp. to Mot. to Transfer Venue, filed Oct. 9, 2007). Along with Joel Martin, and two LLC corporations that he owns, Plaintiff Martin Affiliated, LLC and Em2M, LLC, *see id.*, F.B.T., Eight Mile and the Basses all are producers and/or affiliates of Eminem and/or Eminem's producers. F.B.T. was a party to the 1998 Agreement, and Jeff Bass (on behalf of F.B.T.) and Joel Martin are both signatories to the 2003 Agreement. *See* Hoffman Decl. Exs. A at 15 (1998 Agreement) & D at 24 (2003 Agreement).

[6] Portions of the Shemel & Krasilovksy text cited herein are attached as Exhibit 4 to this Motion.

[7] Portions of the Passman text cited herein are attached as Exhibit 5 to this Motion.

4959865.1

as a "mechanical license" granting "the right to record and distribute any composition written or owned, in whole or in part, by the artist." Shemel & Krasilovsky, *supra*, at 19. The controlled composition clause also "puts a limit on how much the [record] company has to pay for each controlled composition" and fixes the mechanical royalty rate *between the parties*, either as a percentage of the statutory rate, at the statutory rate as of a fixed date, or both. Passman, *supra*, at 215.

Plaintiffs admit in their Complaint that all of the musical compositions in issue were "written and composed, in part, by [Eminem]." Compl. ¶ 8. Accordingly, there can be no dispute that all of the compositions in issue are Controlled Compositions within the meaning of the Controlled Composition clauses of the 1998 and 2003 Agreements. Consistent with the terms of the Controlled Composition clauses, Aftermath (through its distributors and licensees) has been distributing sound recordings embodying the Controlled Compositions in issue, and Plaintiffs have consistently been paid royalties for the distribution of these recordings in compact disc ("CD") form and for digital downloads at the Controlled Rate (or higher).[8] Declaration of Wenchan Wang ("Wang Decl.") ¶¶ 4, 5.[9]

### C. UMG's Distribution of the Recordings Embodying the Compositions.

UMG is responsible for the distribution of sound recordings in Aftermath's catalogue, including the Eminem sound recordings. Hoffman Decl. ¶ 2. UMG has distributed the Eminem recordings and others through numerous channels – for example, by manufacturing and selling

---

[8] Although the 1998 and 2003 Agreements set forth Controlled Rates to be paid for the sales of recordings embodying the Controlled Compositions, UMG has paid Plaintiffs at the statutory rate for the sale of digital download recordings that embody the compositions in issue. Wang Decl. ¶ 5. This is because the Copyright Act provides that, notwithstanding such contractual provisions entered into after June 22, 1995, the statutory rate is to be paid for "digital phonorecord deliveries," which include the sale of permanent digital downloads through iTunes. *See* 17 U.S.C. § 115(c)(3)(E).

[9] The Wang Declaration is Exhibit 10 to this Motion.

compact discs through brick and mortar retailers and by selling copies of the recordings in digital format through online services such as Apple's iTunes store. *Id.* ¶ 6. Plaintiffs, as publishers, have had no role in the actual distribution of the Eminem sound recordings. *Id.*

**D.    Plaintiffs' Receipt and Retention of Payment for the Distribution of the Sound Recordings Embodying the Musical Compositions in Issue.**

UMG accounts to Plaintiffs and others entitled to receive royalties on the sale of sound recordings embodying their musical compositions by paying royalties. *See* Wang Decl. ¶ 4. The royalties paid to the publishers of musical compositions for the sale of sound recordings embodying those compositions are commonly referred to as "mechanical royalties." *Id.* ¶ 3. As discussed above, the applicable mechanical royalty rate is determined either by reference to a statutory rate, as set forth pursuant to 17 U.S.C. § 115, or pursuant to a contractually agreed upon rate, such as the "Controlled Rate" referenced in the Controlled Composition clauses discussed above. *See* Wang Decl. ¶ 5. The calculation of mechanical royalties is summarized in periodic royalty statements that UMG has sent to Plaintiffs for nearly a decade. *Id.* ¶ 4.

UMG has paid mechanical royalties to the Plaintiffs for the sale of sound recordings embodying all of the musical compositions in issue. *Id.* UMG has paid these royalties to Plaintiffs based on the sales of compact discs that contain recordings that embody those compositions, as well as royalties based on the sales of permanent digital downloads. *Id.* UMG has paid mechanical royalties to Plaintiffs on the sale of digital download recordings embodying the compositions in issue every quarter for over four years. The mechanical royalties paid on the sales of permanent digital downloads have been specifically identifiable as such on the royalty statements that UMG has sent to Plaintiffs. *Id.* ¶ 8 & Exs. E & F (royalty statements).

Exhibits E and F to the Wang Declaration contain the royalty statements sent from UMG to Plaintiffs for the second quarter of 2007 (April 2007 to June 2007) and the fourth quarter of 2007 (October 2007 to December 2007), respectively. The second quarter of 2007 immediately

preceded the filing of this lawsuit, and the fourth quarter statements are the most recently issued

royalty statements. However, UMG has been selling digital downloads of recordings embodying

the compositions in issue through iTunes and other digital download providers from 2003 right

through to 2007.[10] *Id.* ¶ 4. During that entire time, UMG has paid Plaintiffs in excess of

$647,600 in royalties on the sale of digital download recordings that embody the compositions in

issue in this case. *Id.* ¶ 9. And, *during that entire time – including as recently as February 25,*

*2008 – Plaintiffs have accepted payment and never once refused to accept payment for the sales*

*of such digital download recordings. Id.* Ex. G.

###    E.    Plaintiffs' Complaint.

Plaintiffs filed their Complaint in this Court on July 30, 2007. Plaintiffs claim Apple

does not have the right to sell through its iTunes store "digital downloading of recordings" of the

sound recordings that embody the compositions in issue. Compl. ¶¶ 9-12. Plaintiffs contend

Apple's sale of those recordings without authorization amounts to infringement of the copyrights

they claim to hold in the underlying compositions. *Id.* ¶ 13.

Plaintiffs' Complaint expressly alleges that Apple has distributed the Eminem sound

recordings with the authorization of UMG. According to Plaintiffs at paragraph 12 of their

Complaint:

> Apple has reproduced and distributed the digital transmissions, and continues to
> reproduce and distribute the digital transmissions, pursuant to a purported license
> with Universal. But Eight Mile and Martin have never authorized Universal to
> license the works to Apple; Eight Mile and Martin have never authorized
> Universal to engage in reproduction or distribution of the digital transmissions

---

[10] In order not to burden the Court, Defendants have submitted royalty statements showing
payments for digital downloads of recordings embodying the compositions in issue for only the
two quarters. The statements for the over four years of digital distribution total over 1,000
pages. All of these royalty statements have been produced to Plaintiffs in this lawsuit.
Defendants will make all of these statements available if the Court requests it, and will make
them available at the hearing on this Motion.

through third parties or otherwise; Universal has never obtained the permission of Eight Mile and Martin to do so[.][11]

## IV.    ARGUMENT.

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "The moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-moving party's case." *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 452-53 (6th Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)). Once the moving party satisfies its burden, "the burden shifts to the nonmoving party to set forth specific facts showing a triable issue." *Id.* at 453 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)).

### A.    Defendants Are Entitled to Summary Judgment on Plaintiffs' Copyright Infringement Claim Because Defendants' Conduct Is Expressly Authorized or, at a Minimum, Impliedly Authorized.

To prevail on their copyright claim, Plaintiffs are required to prove ownership of a valid copyright and a violation by Defendants of one or more of the exclusive rights secured by the Copyright Act, 17 U.S.C. § 106. *See Bridgeport Music, Inc. v. WB Music Corp.*, 508 F.3d 394, 398 (6th Cir. 2007). If Defendants have been granted permission – or a "license" – covering the use in question, there is no claim for copyright infringement. *See, e.g., Johnson v. Jones*, 149 F.3d 494, 500 (6th Cir. 1998); *Lulirama Ltd., Inc. v. Axcess Broadcast Servs., Inc.*, 128 F.3d 872, 879 (5th Cir. 1997); *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 776 (7th Cir. 1996). Defendants have raised license as their fourth affirmative defense to the Complaint. *See* Answer at 7 (Docket Entry No. 9) (filed Sept. 14, 2007). The challenged use is authorized expressly by the "Controlled Composition" clauses. *Even if* the Controlled Composition clauses did not authorize

---

[11] Plaintiffs' reference to "Universal" is to UMG Recordings, Inc.

the use expressly (which they do), Plaintiffs' own conduct establishes they have impliedly licensed the challenged uses.

1. **The Controlled Composition Clauses Expressly License the Challenged Uses.**

Plaintiffs expressly allege that each composition in issue was "written and composed, in part" by Eminem. Compl. ¶ 8. Therefore, as defined in the 1998 and 2003 Agreements, each of the compositions is a Controlled Composition, which are defined in the Agreements as "*songs written or controlled, directly or indirectly, in whole or in part, by F.B.T., Artist [Eminem], any affiliated company of F.B.T., Artist, [and] any producer or any affiliated company of any producer....*" Hoffman Decl. Exs. A ¶ 6(a) (1998 Agreement) & D ¶ 6 (2003 Agreement). The Agreements further provide that all such Controlled Compositions "*will be licensed* to Aftermath and its distributors/licensees," and that in exchange Aftermath will pay the Controlled Rate fixed by contract. *Id.* (emphasis added).[12] Plaintiffs do not dispute the authority of Eminem (and the other signatories to the Agreement, including Plaintiffs' owners, Jeff Bass and Joel Martin) to grant the rights conveyed by the Controlled Composition clauses. They simply contend that the provision means something other than "will" and that the Controlled Composition clauses are inapplicable because "digital uses were not contemplated or covered under" those clauses." *See* Exs. 1 at 15 (Eight Mile Responses) & 2 at 14 (Martin Affiliated Responses) (Plaintiffs' Responses to Interrogatories No. 15).

Plaintiffs' contentions are unfounded and seek a *post hoc* rewriting of the Agreements. There is no basis for excising the word "will" and there is no basis for claiming that Agreements

---

[12] Whether Apple is a distributor or a licensee (Aftermath contends the former, Plaintiffs the latter) is not relevant to this case since "distributors" and "licensees" are both covered by the Controlled Composition clauses. In any event, the argument that Apple would need a separate mechanical license is counter not only to the terms of the Controlled Composition clause, but also to the established practice that a mechanical license covers the record company's manufacturer of physical product and the brick and mortar reseller. Best Buy does not get its own mechanical licenses, and no publisher has contended that it should.

executed in 1998 and 2003 did not contemplate "digital uses." Not only were such uses either readily foreseeable (in 1998) or actually occurring (in 2003), but the Agreements themselves expressly provide that "Aftermath and its distributors/licensees shall have the exclusive right to exploit all such masters *in any and all forms of media now known and hereinafter developed ....*" Hoffman Decl. Exs. A ¶ 8 (1998 Agreement) & D ¶ 8 (2003 Agreement) (emphasis added).

Another federal court has recently dismissed a copyright infringement claim by the owner of musical compositions against Apple and other defendants based on similar facts. *Reinhardt v. Wal-Mart Stores, Inc.*, No. 07 Civ. 8233 (SAS), 2008 WL 1781232, at *5 (S.D.N.Y. Apr. 18, 2008).[13] In *Reinhardt*, the copyright claimant was a member of the band the "Ramones" and wrote several compositions recorded by the band. The plaintiff claimed the defendants had infringed his copyright through exploitation in "digital formats."[14] *Id.* at *4. The plaintiff's recording agreement with one defendant, Ramones Productions, provided that Ramones Productions had the right to "'create physical sound recordings embodying the Compositions.'" *Id.* at *1. Ramones Productions was further authorized "'to manufacture, advertise, sell, distribute, lease, license or otherwise use or dispose of the Masters and phonograph records embodying the Masters, in any or all fields of use, *by any method now or hereafter known*." *Id.* at *4 (emphasis added). The recording agreement defined "phonograph records" to include "all *forms of reproduction . . . now or hereafter known*." *Id.* (emphasis in original). The court held that this language in the recording agreement clearly and unambiguously authorized the digital distribution of the recordings and dismissed the copyright infringement claim as a matter of law.

---

[13] Defendants attach *Reinhardt* as Exhibit 6 to this Motion.

[14] The defendants in *Reinhardt* included digital download retailers Apple Inc., Wal-Mart Stores, Inc., and RealNetworks, Inc.; Ramones Productions, Inc., the production company that had a recording agreement with the Ramones to exploit their sound recordings and other products; Taco Tunes, Inc., the company engaged in the exploitation of the musical compositions owned by members of the Ramones; and the entities and/or individuals that controlled, in whole or in part, the policies and operations of Taco Tunes, Inc.

4959865.1

*Id.* at \*5.  In particular, the use of the expansive language "now of hereafter known" covered the "digital download form."  *Id.*  Here, the 1998 and 2003 Agreements are equally clear that the compositions in issue "will be licensed" to Aftermath, and that digital uses are covered by the phrase "*any and all forms of media now known and hereinafter developed*" in the Agreements.[15]  Plaintiffs' claim that digital uses are not contemplated or covered by the Agreements is contrary to this clear language of the Agreements.

Plaintiffs' litigation-inspired view that the Controlled Composition clauses do not cover "digital uses" is also contrary to an express Congressional statute, 17 U.S.C. § 115(c)(3)(E).  As noted above, Section 115(c)(3)(E) establishes rates paid on "digital phonorecord deliveries" – which indisputably are "digital uses" – notwithstanding the provisions of controlled composition clauses, which Congress recognized were commonplace.  *See generally* 2 Nimmer, *supra*, § 8.23[E] (discussing Congressional recognition of § 115(c)(3)(E) and its effect on rates established by controlled composition clauses).  If controlled composition clauses did not already apply to "digital uses," then this provision – added to the law in *1995*, three years *before* the 1998 Agreement – would have been unnecessary.  Plaintiffs' reading of the Controlled Composition clauses cannot be squared with Congress's adoption of this statute.

Plaintiffs' reading of the Controlled Composition clauses also cannot be squared with what they are telling another Federal Court.  While Plaintiffs are telling this Court that digital uses are not covered by the 1998 and 2003 agreements, Plaintiffs, through their affiliated LLC corporations, have been pursuing a breach of contract claim in another federal court that is

---

[15] Even in the absence of this phrase, digital uses would still have been covered since they are considered phonorecords under the Copyright Act.  17 U.S.C. § 115(d) ("A 'digital phonorecord delivery' is each individual delivery of a phonorecord by digital transmission of a sound recording which results in a specifically identifiable reproduction by or for any transmission recipient of a phonorecord of that sound recording, regardless of whether the digital transmission is also a public performance of the sound recording or any nondramatic musical work embodied therein.")

premised on Aftermath having *precisely* that right.[16]  In that case, F.B.T. Productions, LLC and Em2M, LLC sued Aftermath and the three entities that own the Aftermath joint venture for breach of the same 1998 and 2003 Agreements ("F.B.T. case").  Plaintiffs do *not* contend in the F.B.T. case, however, that Aftermath lacked the right to authorize Apple to distribute digital downloads of those sound recordings.  Far from it.  The Plaintiffs instead claim that Aftermath has not calculated the royalties owed to them on the sales of digital downloads through iTunes and other digital retailers under the correct contractual rate.  *See* Ex. 7 ¶¶ 1, 4, 5, 29, 31-33, 35. While the merits of the Plaintiffs' contract claim will be litigated directly in the F.B.T. case, the important point for purposes of this motion is that the Plaintiffs' claim in the F.B.T. case is premised on Aftermath *having* the right pursuant to the 1998 and 2003 Agreements to sell through iTunes the same sound recordings embodying the same compositions that Plaintiffs, in this case, contend that Aftermath does not have.  Being in two different Courts does not entitle Plaintiffs to make inconsistent arguments, particularly when they are based on the same agreements.

Plaintiffs' efforts to wipe away the effect of the Controlled Composition clauses fail at every level.  Defendants' challenged uses have been expressly authorized, and the Court should grant summary judgment on Plaintiffs' copyright claim.[17]

---

[16] *See* Ex. 7 (First Amended Complaint in *F.B.T. Productions, LLC and Em2M, LLC v. Aftermath Records et al.*, Case No. CV-07-03314 PSG (C.D. Cal.)).

[17] Left without a legal argument, Plaintiffs try to claim that UMG's "subsequent conduct" shows that it did not believe the Controlled Composition clauses covered digital uses.  *See* Exs. 1 at 15 (Eight Mile Responses) and 2 at 14 (Martin Affiliated Responses) (Plaintiffs' Responses to Interrogatories No. 15).  What Plaintiffs refer to here is the fact that Interscope Records (a division of UMG Recordings) entered into a "Mastertone Agreement" with Plaintiffs in 2005 relating to the use of the compositions in recordings announcing cell phone calls.  Plaintiffs are wrong.  In 2005, there was a controversy regarding whether mastertones were eligible for a mechanical license pursuant to 17 U.S.C. § 115.  Record companies claimed they were and music publishers claimed they were not.  Music publishers claimed that the mechanical license provisions did not apply to mastertones because, *inter alia*, they included only a portion of the composition.  *See* 2 Nimmer, *supra*, § 8.23[A][5].  The Mastertone Agreement resolved issues

13

### 2. Plaintiffs Have Also Impliedly Licensed the Challenged Uses.

*Even if* the "Controlled Composition" clauses did not grant Aftermath an *express* license, Defendants still win since, as a matter of law, an *implied* license was created by Plaintiffs' overall conduct. This implied license operates to authorize all of the uses of the compositions complained of and defeats Plaintiffs' claim of copyright infringement.

#### a. A Party's Course of Conduct May Imply an Objective Intent to Grant a Nonexclusive License.

"Courts have held that the existence of an implied license to use the copyright for a particular purpose precludes a finding of infringement." *Johnson*, 149 F.3d at 500. "It is also well-settled that a non-exclusive license is not a transfer of ownership, and is not, therefore, subject to the writing requirement of [17 U.S.C.] § 204." *Id.* "'A non-exclusive license may be granted orally, *or may be implied from conduct.*'" *Id.* (quoting 3 Nimmer on Copyright § 10.03[A], at 10-38 (1994)) (emphasis added). *See also, I.A.E.*, 74 F.3d at 775 (courts "universally have recognized that a nonexclusive license may be implied from conduct"). "A nonexclusive license may be irrevocable if supported by consideration." *Lulirama*, 128 F.3d at 882.

The dispositive issue on implied license is whether "the copyright owners intended that their copyrighted works be used in the manner in which they were eventually used." *Johnson*, 149 F.3d at 502. The test is not whether the plaintiff says during litigation that it had no intent to grant a license. The test instead focuses on "*objective fact[s]*" that demonstrate the plaintiff's intent. *Id.* at 500 (emphasis added). As the First Circuit put it, the inquiry is *not* "into the mind

---

between UMG and Plaintiffs regarding the uncertainty over the rates for mastertones. Thereafter, the Copyright Office, in a Memorandum Opinion of October 16, 2006, held that mastertones were in fact phonorecords and that the delivery of the same by wire or wireless technology met the definition of digital phonorecord delivery as set forth in the Copyright Act. As a result of this ruling, mastertones are subject to the mechanical license provisions of 17 U.S.C. § 115 and the rate for compositions embodied in mastertones is statutorily the same as for any digital phonorecord delivery. *See id.*; *see also* Ex. 8 (Copyright Office Decision).

of the putative licensor. Rather, it is an objective inquiry into facts that manifest such contractual intent." *John G. Danielson, Inc. v. Winchester-Conant Properties, Inc.*, 322 F.3d 26, 42 (1st Cir. 2003) (citing *I.A.E.*, 74 F.3d at 777 (relevant intent "is not the parties' subjective intent but their outward manifestation of it")).

The most important facts concerning the objective evidence of the copyright plaintiff's intent are: (1) whether the plaintiff handed over its work to the defendant with the expectation (and result) of the defendant's subsequent distribution or other contemplated use; and (2) whether the plaintiff was paid and accepted monetary compensation for that use. *See Johnson*, 149 F.3d at 501; *I.A.E.*, 74 F.3d at 777; *Effects Associates, Inc. v. Cohen*, 908 F.2d 555, 558-59 (9th Cir. 1990). *Both of these facts are indisputably present in this case.* The significance of these factors is clear from the leading cases in this area, including the leading decision of the Sixth Circuit.

In *Effects Associates, Inc. v. Cohen*, the plaintiff created special effects footage for defendant's motion picture (called "The Stuff"). The defendant was dissatisfied with the plaintiff's work, and only paid it half the contract price, which the plaintiff retained. *Effects Associates,* 908 F.2d at 556. The defendant nevertheless incorporated plaintiff's special effects into the final film and proceeded to distribute it through a motion picture company, also a defendant. *Id*. Affirming the district court's grant of summary judgment of non-infringement to all defendants, the Ninth Circuit held that "'every objective fact concerning the transaction at issue supports a finding that an implied license existed.'" *Id*. at 559 n.6 (quoting District Court opinion).

> *Effects [the plaintiff] created a work at defendant's request and handed it over, intending that defendant copy and distribute it. To hold that Effects did not at the same time convey a license to use the footage in "The Stuff" would mean that plaintiff's contribution to the film was "of minimal value," a conclusion that can't be squared with the fact that Cohen [a defendant] paid Effects almost $56,000 for this footage.* Accordingly, we conclude that Effects impliedly granted nonexclusive licenses to Cohen and his production company to incorporate the

special effects footage into "The Stuff" and to New World Entertainment [another defendant] to distribute the film.

*Id.* at 558-59 (quoting *Oddo v. Ries*, 743 F.2d 630, 634 (9th Cir. 1984)) (emphasis added).

The Seventh Circuit followed *Effects Associates* in *I.A.E.* There, the copyright claimant was an architect, who had been retained to do preliminary designs for a cargo handler at an airport. *I.A.E.*, 74 F.3d at 772. (The architect was the nominal defendant in a suit for a declaratory judgment of non-infringement.) The builder of the airport (plaintiff in the suit) paid the architect his $10,000 fee, but did not continue to use him through completion of the project. The builder did, however, incorporate the designs into the final building. The architect contended this infringed his copyright in the design. *Id.* The Seventh Circuit held that the architect's course of conduct manifested an objective intent to create an implied license. The court focused on the fact that the architect's written agreement with the builder did not mention any "expectation of a further role in the Project .... [A]lthough [the architect] tells us that he anticipated he would be the architect to take the Project to completion, nothing in his contract gives the slightest indication of that belief." *Id.* at 776-77. The court emphasized that "[t]he plain language of the contract is supported by common sense. *As we have already pointed out, [the architect] created a work – preliminary architectural drawings – and handed them over to the [builder] for use on the Airport Project. For that work the architect received $10,000 compensation.*" *Id.* at 777 (emphasis added).

The Sixth Circuit in *Johnson* followed the legal analysis of *Effects Associates* and *I.A.E.* but reached a different result because *the defendant in Johnson never paid the plaintiff a dime for his work*. The plaintiff in *Johnson* also was an architect. The defendant had hired Johnson not only to design but also to serve as the "contractor in charge of the renovation" of a house that defendant wanted to make her "dream house." *Johnson*, 149 F.3d at 497-98. From the outset of the project, including when he provided the defendant with initial plans for her house, the architect asked the defendant to execute standard form architecture agreements that expressly

16

reserved the architect's copyrights and forbade defendant from allowing others to use the architect's plan to complete the project. *Id.* The parties subsequently had disputes about the project; the defendant fired the architect but proceeded to rely on his preliminary work in building the house. *Id.* at 499. The Sixth Circuit held that "almost every objective fact in the present case points away from the existence of an implied license." *Id.* at 500. The court focused, in particular, on the lack of "payment" to the architect. Based on the absence of that payment, along with other objective facts showing a lack of intent to license the copyright work, the Sixth Circuit affirmed the District Court's finding that there was no implied license.

> **b.** **Plaintiffs' Overall Course of Conduct Regarding the Challenged Uses Show an Objective Intent to Grant a Nonexclusive License as a Matter of Law.**

In contrast to *Johnson*, every "objective fact" in this case points to the existence of an implied contract.

*First*, the plain language of the 1998 and 2003 Agreements shows that all parties understood the compositions in issue were going to be embodied into sound recordings, and that Aftermath and its distributors were going to sell those recordings, including the compositions. *See* Hoffman Decl. ¶¶ 5, 6. The Agreements provide, among other things, that Eminem and F.B.T. will create, record, and deliver sound recordings embodying musical compositions to Aftermath, and provide for the payment of royalties by Aftermath based upon its sale of those recordings. *Id.* ¶ 5. Nothing in the Agreements envisions the participation of the Plaintiff songwriters in the actual distribution of the sound recordings delivered pursuant to the Agreements. On the contrary, the Agreements expressly state that "Aftermath and its distributors/licensees shall have the exclusive right to exploit all such masters in any and all forms of media now known and hereinafter developed ...." *Id.* Exs. A ¶ 8 (1998 Agreement) & D ¶ 8 (2003 Agreement). These facts are completely the opposite of *Johnson*, where, when the creator of the copyrighted work delivered that work, he *simultaneously* delivered a standard form

contract that restricted *any* further use of that work without his consent. *Johnson*, 149 F.3d at 497-98. The facts here, as in *Effects Associates*, demonstrate that Plaintiffs "handed over" their compositions with the intent that Aftermath utilize them in its sound recordings and distribute those recordings – *which Aftermath has done. Effects Associates,* 908 F.2d 558-59; Hoffman Decl. ¶¶ 5, 6.

     *Second*, and critically, *Plaintiffs have been paid – continuously – mechanical royalties for precisely the digital distribution that they challenge in this case.* The undisputed facts show that Plaintiffs have been paid in excess of $647,600 over a more than four-year period for the sale of the compositions through digital downloads. Wang Decl. ¶¶ 4, 8, 9; *id.* Exs. E & F. Indeed, the most recent payment was received and deposited by Plaintiffs during this litigation. *Id.* ¶ 9. During this time, Plaintiffs have accepted every single payment, and have *never* rejected a payment – not one. *Id.* What is more, Plaintiffs have been paid at the higher statutory rate for these mechanical royalties, not at the lower Controlled rate set forth in the 1998 and 2003 Agreements. Plaintiffs' unbroken and continuing receipt and acceptance of payment provides overwhelming (indeed, dispositive) proof of Plaintiffs' objective intent to license the uses they now claim were unauthorized.

     *Third*, throughout the same four-year period that Plaintiffs have accepted mechanical royalties on the uses they now challenge, Plaintiffs also have accepted royalties for the sales of the *sound recordings* containing the same compositions. *See* Ex. 7 (First Amended Complaint in F.B.T. Case). As with the mechanical royalties, Plaintiffs have never objected to those sound recording royalties as being paid on unauthorized transactions. Plaintiffs' *only* objection concerning the sound recording royalties is that Aftermath allegedly has not paid Plaintiffs at a high enough royalty rate. This is the essence of Plaintiffs' claim in the F.B.T. case. *See id.* ¶ 35. The fact that Plaintiffs are suing to extract higher royalties on the same uses that they contend in this case are unauthorized provides further objective proof of Plaintiffs' intent to impliedly

18

license the uses they challenge in this case.

All of the objective evidence in this case shows an unmistakable intent by Plaintiffs to authorize exactly the uses they challenge in their Complaint as copyright infringement.

### c. Plaintiffs' Attempt to Contradict the Overwhelming Evidence of Their Objective Intent Fails.

Plaintiffs' interrogatory responses indicate they will respond to the overwhelming objective evidence of their intent to create an implied license with a hodge-podge of arguments concerning inapposite issues. None of Plaintiffs' assertions has any merit.

Plaintiffs have said in their interrogatory responses that, "with respect to the granting of mechanical licenses for physical product, Plaintiffs have used their own license forms with terms and conditions that are acceptable to them." Exs. 1 at 15 (Eight Mile Responses) & 2 at 14 (Martin Affiliated Responses) (Plaintiffs' Responses to Interrogatories No. 15). Plaintiffs also have stated that they "would only enter into licenses for digital uses (i.e. the mastertone agreement)" on terms that Plaintiffs found acceptable. *Id.* Of course, by saying this, Plaintiffs are trying to replace the word "will" from the Controlled Composition clauses with the word "might." But the clauses are not so easily manipulated – "will" is mandatory and "might" is not. Plaintiffs had (and have) no choice but to grant mechanical licenses. In any event, Plaintiffs' newly minted contentions are irrelevant to whether they have impliedly licensed the digital distribution uses that are at issue in this case. That analysis is based solely on Plaintiffs' objective conduct, which all points to Plaintiffs' manifestation of an unmistakable intent to authorize the uses at issue here.[18]

---

[18] Plaintiffs cannot argue that their filing of this lawsuit has manifested an intent not to authorize the use at issue here. The filing of a lawsuit cannot be used to erase the objective evidence of a plaintiff's conduct. If it did, there would never be an implied license. A plaintiff before the Fifth Circuit tried this very argument and lost: "Lulirama's argument that it revoked any implied license that might have arisen by filing the present lawsuit is tantamount to an argument that it had a unilateral right of rescission without notice – an argument entirely inconsistent with the existence of a contract between the parties. If Lulirama had the ability to terminate the license at

19

\*   \*   \*

All of the objective evidence of Plaintiffs' intent – the 1998 and 2003 Agreements; Plaintiffs' delivery of the compositions for use in the sound recordings with the expectation the same would be sold; their continuous *and still continuing* acceptance of royalty payments for the use they say they did not authorize; and their attempt in a parallel lawsuit to secure even higher royalties on the sale of sound recordings whose distribution is plainly authorized under the Agreements – manifests an objective (indeed, unmistakable) intent to license the uses challenged here. Plaintiffs' copyright claim fails as a matter of law, and the Court should grant summary judgment in Aftermath's and Apple's favor on that claim.

## V.    CONCLUSION.

For the foregoing reasons, Aftermath and Apple respectfully request that the Court grant summary judgment in their favor.

s/Daniel D. Quick
Daniel D. Quick (P48109)
Dickinson Wright PLLC
38525 Woodward Avenue
Suite 2000
Bloomfield Hills, MI 48304
(248) 433-7200
dquick@dickinsonwright.com
Attorneys for Defendants

Kelly M. Klaus
Munger, Tolles & Olson LLP
355 South Grand Avenue
Suite 3500
Los Angeles, CA 90071-1560
(213) 683-9238
kelly.klaus@mto.com
Attorneys for Defendants

---

will, then no contract could exist because Lulirama's obligation under the contract would be illusory." *Lulirama*, 128 F.3d at 882.

## CERTIFICATE OF SERVICE

I hereby certify that on 5/5, 2008, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to the all counsel.

s/Daniel D. Quick
Daniel D. Quick (P48109)
Dickinson Wright PLLC
38525 Woodward Avenue
Suite 2000
Bloomfield Hills, MI 48304
(248) 433-7200
dquick@dickinsonwright.com

4959865.1