# Exhibit 5

# Excerpts from Donald S. Passman, *All You Need to Know About the Music Business* (6th ed. 2006)

# All You Need to Know About the Music Business

**Sixth Edition**

## DONALD S. PASSMAN

*Illustrations by Randy Glass*

FREE PRESS
*New York   London   Toronto   Sydney*

to 75% of the amount earned, as opposed to 30% to 50% for record royalties.

Why such a huge amount? Remember, as we discussed, that reserves protect the record company against overshipping (i.e., shipping more records than it can sell). If a company overships and therefore overpays a publisher, the only way it can get the money back is to offset the overage against future royalties for *that specific composition*. (Once, in 1911, a publisher actually repaid an overpayment, but he was executed by his fellow publishers.) This is different from record royalty overpayments, which can be charged against royalties on *any* records.

For example, suppose a publisher issues two licenses to the same record company, one for Song A and the other for Song B (written by two different songwriters). If the record company overpays on Song A, it has no right to offset this amount against royalties for Song B. The reason is that, even though the overpayment was made to the same publisher, it's a different song and there are different songwriters involved. This is not the case with an artist, where, if the record company overpays on the first album, it can take the excess out of royalties payable on the second, third, fourth, and later albums (because it's dealing with the same artist and one royalty account). Accordingly, a record company can take smaller reserves in record deals than it can on publishing licenses, because it has more ways to get back an overpayment.

## CONTROLLED COMPOSITION CLAUSES

Congratulations! You now know enough to talk about **controlled composition clauses** in record deals. These clauses are one of the most significant provisions in your recording arrangement, and you needed to understand both record deals and publishing to grasp the concepts. Since now you've got 'em both, let's do it.

A **controlled composition** is a song written, owned, or controlled by the artist (in whole or in part). However, it's usually defined more broadly than that, and includes:

1. Any song in which the artist has an income or other interest. This means that, even if the artist doesn't own or control it, it's a *controlled composition* if he or she wrote it or otherwise gets a piece of its earnings.

2. Sometimes, the definition also includes (depending on the record company) compositions owned or controlled by the *producer* of the recordings. You really have little, if any, control over a producer's publishing, and thus you should try hard to knock this provision out. (You'll see why the producer won't like it in a minute.) It's hard to get rid of this, except at superstar levels, but do your best. I say this not only because it's difficult to get a producer to comply with it, but also because, with a producer of any importance, you could end up blowing your producing deal over it.

## The Controlled Composition Clause

The *controlled composition clause* (also known to its buddies as a **controlled comp clause,** although it has no "buddies" except record companies) puts a limit on how much the company has to pay for each controlled composition. See, unlike with artist royalties, the companies don't recoup advances, recording costs, or anything else from mechanicals. And since this is money going out before they break even, they're very touchy about the amount.

You have to be just as touchy about your mechanicals, because they may be the only money you're going to see for a while. As we discussed earlier, you only get artist royalties after you've recouped recording costs, video costs, etc. (which means they may never come, or if they do, it may be a couple of years). And as we'll discuss in Chapter 23, you won't be making any money from touring in your early stages. So take extremely good care of your mechanical royalties—they may have to last you through some cold winters.

Companies limit mechanical royalties in two ways:

1. **Rate per Song**
   The ink was hardly dry on the 1976 Copyright Act, raising the statutory rate from 2¢ to 2.75¢, when the record companies hit upon the idea that they should require their artists to license controlled compositions at 75% of the statutory rate, with further reductions (to 50%) for record club or budget records. (Controlled composition clauses existed before the 1976 Copyright Act, but they didn't reduce the rate below statutory.) To a large degree, the companies have been successful in getting these 75% and 50% rates with almost all new, and many midlevel, artists. Even the biggest superstars have some form of