**Exhibit 8**

**In the Matter of Mechanical and Digital Phonorecord Delivery
Rate Adjustment Proceeding, Docket No. RF 2006-1 (Oct. 16, 2006)
("Copyright Office Decision")**

Dockets.Justia.com

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| **Mechanical and Digital Phonorecord** | ) | **Docket No. RF 2006-1** |
| **Delivery Rate Adjustment Proceeding** | ) | |
| | ) | |

## MEMORANDUM OPINION

## I.    Introduction

On September 14, 2006, the Copyright Royalty Board ("Board"), acting on a request by the Recording Industry Association of America, Inc. ("RIAA"), and pursuant to 17 U.S.C. § 802(f)(1)(B), referred two novel questions of law[1] to the Register of Copyrights ("Register"). Specifically, the Board requested a decision by the Register as to the following:

1.    Does a ringtone, made available for use on a cellular telephone or similar device, constitute delivery of a digital phonorecord that is subject to statutory licensing under 17 U.S.C. § 115, irrespective of whether the ringtone is monophonic (having only a single melodic line), polyphonic (having both melody and harmony), or a mastertone (a digital sound recording or excerpt thereof)?

2.    If so, what are the legal conditions and/or limitations on such statutory licensing?[2]

In sum, and as stated more fully below, we believe that ringtones (including monophonic and polyphonic ringtones, as well as mastertones) qualify as digital phonorecord deliveries ("DPDs") as defined in 17 U.S.C. § 115. Apart from meeting the formal requirements of Section 115 (*e.g.*, service of a notice of intention to obtain a compulsory license under Section 115(b)(1), submission of statements of account and royalty payments, etc.), whether a particular ringtone falls within the scope of the statutory license will depend primarily upon whether what is performed is simply the original musical work (or a portion thereof), or a derivative work (*i.e.*, a musical work based on the original musical work but which is recast, transformed, or adapted in such a way that it becomes an original work of authorship and would be entitled to copyright protection as a derivative work).

---

[1]  A "novel question of law" is a question of law that has not been determined in prior decisions, determinations, and rulings described in Section 803(a) of the Copyright Act. *See* 17 U.S.C. § 802(f)(1)(B)(ii).

[2]  *See Mechanical and Digital Phonorecord Delivery Rate Adjustment Proceeding*, Order Granting in Part the Request for Referral of a Novel Question of Law, Docket No. 2006-3 CRB DPRA (Aug. 18, 2006) ("Order").

*Procedural Background.* On August 1, 2006, the RIAA requested that the Copyright Royalty Board refer a question to the Register of Copyrights regarding the eligibility of a mastertone, a short digital sound recording file distributed for use in a cellular telephone or similar device, for statutory licensing under 17 U.S.C. § 115.[3] An opposition to the RIAA's referral motion was submitted, collectively, by the National Music Publishers Association, Inc., the Songwriters Guild of America, and the Nashville Songwriters Association International ("Copyright Owners"). After considering the arguments of the parties, the Board agreed that the matters raised by the RIAA motion did present novel questions of law and agreed to submit the questions to the Register.

Accordingly, on September 14, 2006, the Board transmitted to the Register of Copyrights the following: (1) the Order, dated August 18, 2006, referring two novel questions of law; and (2) the Initial and Reply Briefs filed with the Board by RIAA and the Copyright Owners. The Board's transmittal triggered the 30-day decision period prescribed in Section 802(f)(1)(B) of the Copyright Act. This statutory provision states that the Register of Copyrights "shall transmit his or her decision to the Copyright Royalty Judges within 30 days after the Register of Copyrights receives all of the briefs or comments of the participants."[4]

In addition to reviewing the Initial Briefs and Reply Briefs filed in this proceeding, the Office concluded that it would be helpful to conduct oral argument relating to the novel questions of law.[5] On October 4, 2006, the Copyright Office convened a hearing and questioned counsel on matters raised in the briefs filed by RIAA and Copyright Owners.[6]

*Summary of Arguments.* RIAA argues that ringtones are digital phonorecord deliveries as that term is defined in the Copyright Act and are subject to statutory licensing under the plain language of Section 115, without limitation. It argues that ringtones in general and mastertones,[7] in particular, contain no new original material, are not protectable as derivative works, and therefore cannot infringe on the derivative work rights of the Copyright Owners. Moreover,

---

[3] The Copyright Royalty Board is currently conducting a proceeding to determine the reasonable rates and terms for the making and distribution of phonorecords under the Section 115 license. *See Adjustments or Determination of Compulsory License Rates for Making and Distributing Phonorecords,* 71 Fed. Reg. 1454 (Jan. 9, 2006). The answers to the two questions referred to the Register will help determine the scope of the ratesetting proceeding before the Board.

[4] 17 U.S.C. § 802(f)(1)(B).

[5] *See In the Matter of Mechanical and Digital Phonorecord Delivery Rate Adjustment Proceeding,* Notice of Oral Argument, Docket No. RF 2006-1 (Sept. 28, 2006).

[6] We note that for demonstration purposes at the oral argument, RIAA and Copyright Owners have created CDs containing many examples of ringtones as well as full length versions of some of the musical works from which the ringtones were based. Copyright Owners' CD also contains ringtones downloaded from specific mobile phone operators. These CDs are now part of the record in this proceeding as is the oral testimony of the parties.

[7] These types of ringtones are described in more detail below.

even if they were derivative works, RIAA argues that Section 115(a)(2), the arrangement privilege, expressly authorizes their creation. In any event, RIAA argues that once the copyright owner of a musical work distributes a new ringtone to the public, anyone can obtain a statutory license to use the musical work in that ringtone. RIAA concludes that the Register should find that ringtones are subject to statutory licensing under Section 115 of the Copyright Act, and all of the conditions under the provision should apply.

Copyright Owners assert that all ringtones are excluded from the Section 115 statutory license. They argue that the statutory license for making and distributing phonorecords of musical works is narrow in scope and does not encompass ringtones. They argue that ringtones are not covered by Section 115 because they involve only a portion of the underlying composition, not the entire musical work. Copyright Owners argue that ringtones are derivative works and thus fall outside the express language of the statute. As for Section 115(a)(2), they argue that ringtones cannot be considered "arrangements" as that term is understood in the music industry, and in any event, ringtones change the basic melody and fundamental character of the musical work. Copyright Owners also argue that ringtones fail to satisfy Section 115's requirement that the phonorecords be distributed for private use. Copyright Owners conclude that although variations exist among ringtones, none of them fit within the Section 115 licensing scheme.

*Summary of Decision.* We find that ringtones (including monophonic and polyphonic ringtones, as well as mastertones) are phonorecords and the delivery of such by wire or wireless technology meets the definition of DPD set forth in the Copyright Act. However, there are a variety of different types of ringtones ranging from those that are simple excerpts taken from a larger musical work to ones that include additional material and may be considered original musical works in and of themselves. Ringtones that are merely excerpts of a preexisting sound recording fall squarely within the scope of the statutory license, whereas those that contain additional material may actually be considered original derivative works and therefore outside the scope of the Section 115 license.[8] Moreover, we decide that a ringtone is made and distributed for private use even though some consumers may purchase them for the purpose of identifying themselves in public. We also conclude that if a newly created ringtone is considered a derivative work, and the work has been first distributed with the authorization of the copyright owner, then any person may use the statutory license to make and distribute the musical work in the ringtone. For those ringtones that are covered by Section 115 of the Copyright Act, all of the rights, conditions, and requirements in the Act would apply. For those ringtones that fall outside the scope of Section 115, the rights at issue must be acquired through voluntary licenses. While

---

[8] We note that Section 115 permits the creation of derivative works, but this privilege under the statutory license is limited to making musical arrangements necessary to conform it to the style or manner of interpretation of the performance involved. 17 U.S.C. §115(a)(2). For purposes of our discussion in this proceeding, when we refer to derivative works not covered by Section 115, we mean those types of works that exhibit a degree of "originality" as that term is defined in court precedent. The addition of original material would not only take a ringtone outside the scope of the privilege of making arrangements, it would also take the ringtone outside the Section 115 license altogether.

the Copyright Royalty Judges need not know which specific ringtones fall within/outside the scope of the license for the purpose of setting rates, and the parties have not asked the Register to undertake such a granular analysis here, we nevertheless offer some guidance on the legal matters raised in this proceeding.

## II.      Section 115 of the Copyright Act

Almost a century ago, Congress added to the Copyright Act the right for copyright owners to make and distribute, or authorize others to make and distribute, mechanical reproductions (known today as phonorecords) of their musical compositions. Due to its concern about potential monopolistic behavior, Congress also created a statutory license, Section 115 of the Act, to allow anyone to make and distribute a mechanical reproduction of a musical composition without the consent of the copyright owner provided that the person adhered to the provisions of the license, most notably paying a statutorily established royalty to the copyright owner. Although originally enacted to address the reproduction of musical compositions on perforated player piano rolls, the statutory license has for most of the past century been used primarily for the making and distribution of phonorecords and, more recently, for the digital delivery of music online.[9]

In 1995, Congress recognized that "digital transmission of sound recordings [was] likely to become a very important outlet for the performance of recorded music."[10] Moreover, it realized that "[t]hese new technologies also may lead to new systems for the electronic distribution of phonorecords with the authorization of the affected copyright owners."[11] For these reasons, Congress made changes to Section 115 to meet the challenges of providing music in a digital format when it enacted the Digital Performance Right in Sound Recordings Act of 1995 ("DPRA")[12] which also granted copyright owners of sound recordings an exclusive right to perform their works publicly by means of a digital audio transmission subject to certain limitations[13]. Specifically, Congress wanted to reaffirm the mechanical rights of songwriters and music publishers in the new world of digital technology. The changes to Section 115 were also designed to minimize the burden on transmission services by placing record companies in the position to license not only their own rights, but also, if they chose to do so, the rights of writers

---

[9]   Statement of Marybeth Peters, Register of Copyrights, Before the Subcommittee on Intellectual Property: Music Licensing Reform, U.S. House of Representatives, 109th Cong., 1st Sess. at 20 (June 21, 2005).

[10]   S. Rep. No. 104-128, 104th Cong., 1st Sess. at 14 (1995).

[11]   *Id.*

[12]   Pub. L. No. 104-39, 109 Stat. 336 (1995).

[13]   *See* 17 U.S.C. § 114.

and music publishers to authorize digital phonorecord delivery.[14] It is the DPRA amendments to Section 115 that are of particular interest here.

## III.     Ringtone Types

Before addressing the questions raised by the Copyright Royalty Judges, we must first determine the scope of the subject matter in this proceeding. According to RIAA, a ringtone is a digital file, generally no more that 30 seconds in length, played by a cellular phone or other mobile device to alert the user of an incoming call or message.[15] RIAA states that, initially, mobile carriers and other ringtone vendors distributed synthesized ringtones that embodied versions of musical works, but not recorded performances by featured recording artists. It states that these earlier forms of ringtones are commonly known as "monophonic" ringtones (having only a single melodic line) and "polyphonic" ringtones (having both melody and harmony). RIAA explains that typical commercial monophonic and polyphonic ringtones consist of a segment of the musical work representing its "hook," or most memorable portion of the melody, with little or no revision.[16]

RIAA states that advances in technology now allow mobile devices to play digital copies of commercial sound recordings. As a result, mobile phone manufacturers are incorporating the functionality of stand-alone portable digital music players, thus permitting consumers to download sound recordings via the Internet or a computer connected to the Internet. RIAA states that, in addition to full song downloads of commercial recordings to such phones, there is consumer demand for downloads of shorter (partial-copy) excerpts of sound recordings for use as ringtones. These ringtones are commonly referred to as "mastertones."[17] RIAA asserts that mastertones are displacing monophonic and polyphonic ringtones as the ringtone of choice amongst consumers.[18] RIAA acknowledges that record companies and ringtone vendors must

---

[14]   S. Rep. No. 104-128, at 37 (1995).

[15]   Cellular phones typically have the ability to accept downloads of ringtones, usually directly over the cellular telephone network. Over the last decade, a new consumer market has developed for musical ringtones. According to RIAA, the vast majority of ringtones (99 percent) now in the marketplace consist of excerpts from sound recordings. Oral Argument Transcript at 7, 10.

[16]   RIAA Initial Brief at 3-4; *see also* Neil J. Rosini and Michael I. Rudell, *Ring Tone Revenues Foster Copyright Detente*, 234 N.Y.L.J. 3, col. 1 (2005) ("Originally, musical ring tones were only available in 'monophonic' form: a simple series of tones–each a single note–that might remind one of several bars from a favorite CD as performed by a very simple computer. Technology then advanced to the 'polyphonic' level, which are like monophonic ring tones with multiple notes played at the same time, creating harmonies. They sound closer to that favorite CD, but without original instrumentation or vocals.")(Hereinafter "Rosini and Rudell").

[17]   RIAA explains that record companies hire contractors to select hooks from popular sound recordings and then create ringtones including these hooks. Oral Argument Transcript at 10.

[18]   *See* Rosini and Rudell (Mastertones "not only sound like a favorite CD but are that favorite CD.").

obtain licenses to reproduce and distribute the relevant musical works in ringtones and that Section 115 exists to enable use of musical works when licenses are not otherwise available.[19]

Copyright Owners describe ringtones as ten-to-thirty-second "snippets" of full-length musical works that are created to serve as ringers on cell phones and other mobile devices.[20] Copyright Owners alternatively describe a ringtone as a ten-to-thirty-second derivation of a musical work, sometimes repeated in a "looping" sequence and sometimes not.[21] Copyright Owners assert that the creation of ringtones, including mastertones, involves "substantial" creativity and "significant" changes to the underlying work. They state, for example, that making a ringtone requires creative determinations as to which portions of the work should be selected to best capture the "hook" of the full length recording and also to be most appealing as ringtones. They further state that many mastertones are designed to be looped, repeating the selected portions of the song multiple times until the phone or mobile device is answered.[22] Some songs have multiple hooks, each of which can be made into a separate ringtone. Other ringtones, they assert, include new content not present in the underlying work.[23]

_Analysis._ While RIAA and the Copyright Owners may disagree as to the amount of creativity it takes to create a ringtone, they do agree that, in general, ringtones are a unique category of sound recordings that are used to announce an incoming call. The most rudimentary ringtone, in musical terms, is the monophonic ringtone that only contains a musical work's melody (or a portion of the melody). One level up the musical hierarchy is the polyphonic ringtone that contains a work's melody and harmony (or a portion thereof). The most musically complex ringtones are mastertones. A mastertone is a portion of a pre-existing full length musical work that may play sequentially or is looped in a sequence. A mastertone could also contain a portion of a musical work combined with a message from the recording artist designed specifically for the ringtone user. It is important to note that there are also non-musical ringtones

---

[19] RIAA Initial Brief at 4-5.

[20] Copyright Owners Initial Brief at 1-2.

[21] _Id._ at 9. We note that looping involves a portion of a musical performance that is then sequenced in a repetitive manner.

[22] RIAA states that ringtone producers do not intentionally create looping sequences; instead, looping is the product of cellphones that do not have adequate storage capacity (memory). Oral Argument Transcript at 13-14.

[23] Copyright Owners Reply Brief at 5, 7.

that are becoming increasingly popular with consumers.[24] As discussed below, different types of ringtones may be treated differently for Section 115 purposes.

## IV. The Applicability of Section 115 to Ringtones

*Statutory Language.* Section 115 of the Copyright Act provides a "compulsory license to make and distribute phonorecords" of any musical work previously recorded once a phonorecord of a nondramatic musical work has been "distributed to the public in the United States under authority of the copyright owner."[25] Such a license "includes the right of the compulsory licensee to distribute or authorize the distribution of a phonorecord of a nondramatic musical work by means of a digital transmission which constitutes a digital phonorecord delivery.[26] The term "digital phonorecord delivery" or "DPD" is defined, in part, as "each individual delivery of a phonorecord by digital transmission of a sound recording which results in a specifically identifiable reproduction by or for any transmission recipient of a phonorecord of that sound recording."[27]

Congress created the statutory mechanical license, as part of the Copyright Act of 1909, to prevent monopolistic control over musical works while ensuring that music publishers and songwriters receive an appropriate royalty.[28] Congress revisited the issue of statutory licensing in 1976 and 1995 and has reaffirmed these same purposes.[29] Congress added the DPD provisions to Section 115, as part of the DPRA of 1995, with support of the music publishers, noting: "The

---

[24] *See* Rosini and Rudell ("[C]onsumers aren't settling merely for musical ringtones and ringbacks. Audio clips from films and television programs; comic routines from Comedy Central; pithy observations by Donald Trump; and announcement of baseball plays are also available as ring tones."); *see also* http://cyberextazy.wordpress.com/2006/09/01/ringtones-in-mtvs-video-music-awards/, *Ringtones in MTV's Video Music Awards* (Sept. 1, 2006) (stating that ringtones are evolving into watchtones, which are ringtones combined with video clips).

[25] 17 U.S.C. § 115(a)(1).

[26] 17 U.S.C. § 115(c)(3)(A).

[27] 17 U.S.C. § 115(d). The legislative history accompanying this provision states, *inter alia*, that: (1) the phrase "specifically identifiable reproduction" should be understood to mean a reproduction specifically identifiable to the transmission service; and (2) a transmission by a noninteractive subscription transmission service that transmits in real time a continuous program of music selections chosen by the transmitting entity, for which the consumer pays a monthly fee would generally not be considered a DPD.

[28] *See* H. R. Rep. No. 60-2222, at 7 (1909) ("The main object to be desired in expanding copyright protection accorded to music has been to give to the composer an adequate return for the value of his composition, and it has been a serious and difficult task to combine the protection of the composer with the protection of the public, and to so frame an act that it would accomplish the double purpose of securing to the composer an adequate return for all use made of his composition and at the same time prevent the formation of oppressive monopolies, which might be founded upon the very rights granted to the composer for the purpose of protecting his interests.)"

[29] *See* H. R. Rep. No. 94-1476, at 107 (1976) ("[A] compulsory licensing system is still warranted as a condition for the rights of reproducing and distributing phonorecords of copyrighted music.").

intention in extending the mechanical compulsory license to digital phonorecord deliveries is to maintain and reaffirm the mechanical rights of songwriters and music publishers as new technologies permit phonorecords to be delivered by wire or over the airwaves rather than by the traditional making and distribution of records, cassettes, and CDs."[30] The question presented here is whether ringtones qualify as digital phonorecord deliveries within the scope of Section 115.[31]

RIAA argues that, under the plain language of the Copyright Act, a distribution of a ringtone is a DPD subject to statutory licensing under the Copyright Act. RIAA asserts that a ringtone results from the fixation of a series of musical, spoken, or other sounds and therefore meets the definition of a "sound recording" in Section 101 of the Copyright Act; its fixation in a material object is a "phonorecord." According to RIAA, it is a phonorecord of the relevant musical work as well. In the case of a mastertone, the sound recording is a clip of the commercially distributed recording. In the case of monophonic and polyphonic ringtones, the fixed sounds are rendered by a synthesizer in the telephone and so do not represent ambient sound in a recording studio.[32]

RIAA asserts that downloads of ringtones are DPDs because, when a ringtone is downloaded, there is a digital transmission of the sound recording that results in a specifically identifiable reproduction for the transmission recipient. RIAA argues that the statutory license under Section 115 includes the right of the licensee to distribute ringtones just as it includes the right of the licensee to make and authorize other kinds of downloads.[33] RIAA asserts that statutory licensing of ringtones is consistent with Congressional intent, as they are just the type of new technology contemplated by Congress to be included within the scope of the DPRA.[34]

Copyright Owners do not argue that ringtones are not DPDs, stating instead that since ringtones are not covered by Section 115, there is no need to address the question.[35] Rather, Copyright Owners argue that the statutory license for making and distributing phonorecords or musical works is narrow in scope and does not encompass uses such as ringtones. They assert that the inclusion of ringtones within the statutory license would contravene Congress' intent that

---

[30] *See* S. Rep. No. 104-128, at 37 (1995).

[31] We note that the Harry Fox Agency, Inc., a subsidiary of the National Music Publishers Association and the leading musical work licensing agency, released a notice in 2004 informing all licensees of its stated position that Section 115 does not cover ringtones or mastertones. *See* Mario F. Gonzales, *Are Musical Compositions Subject to Compulsory Licensing for Ringtones?*, 12 UCLA Ent. L. Rev. 11, 11-12 (2004). RIAA asserts that its dispute with the Harry Fox Agency over the interpretation of Section 115 remains unresolved and "has cast a pall of legal uncertainty over the ringtone market." RIAA Initial Brief at 6.

[32] *Id.* at 6-7.

[33] *Id.* at 8.

[34] *Id.* at 21, 23.

[35] Oral Argument Transcript at 55.

Section 115 be a narrowly construed exception to certain exclusive rights of the musical work copyright owner. Copyright Owners state that, as a "limited exception" to certain exclusive rights granted to copyright owners, courts consistently have held that the statutory license "be construed narrowly, lest the exception destroy, rather than prove, the rule."[36]

With regard to the DPRA of 1995, Copyright Owners assert that Congress' clarification that Section 115 covered not only "brick and mortar" sales did not extend the license to cover any and all digital uses. They state that the existing limitations on the scope of the license did not change and that use of a work prior to publication, the creation of derivative works, and the synchronization of a musical work, are uses that remain outside of the license, whether in digital or physical form.[37]

Copyright Owners assert that RIAA's interpretation of Section 115 would "potentially open the door" to licensing of snippets of musical works used to enhance all sorts of other consumer products and devices, such as musical car alarms or doorbells. They state that the licensing of musical works for functional uses in consumer products is not what Congress intended when it enacted Section 115.[38]

RIAA, in its Reply, asserts that the statutory mechanical license has been a fixture of U.S. copyright law for nearly a century and argues that it should be construed in accordance with its terms. RIAA contests Copyright Owners' view that Section 115 should be construed narrowly, noting that the legislative history accompanying the 1976 Copyright Act states: "The fundamental question of whether to retain the compulsory license or do away with it altogether was a major issue during earlier stages of the program for general revision of the copyright law. At the hearings it was apparent that the argument on this point had shifted, and the real issue was not whether to retain the compulsory license but how much the royalty rate under it should be . . . . The Committee's conclusion on this point remains the same as in 1967: 'that a compulsory license system is still warranted as a condition for the rights of reproducing and distributing phonorecords of copyrighted music.'"[39] RIAA adds that Congress did not narrow the license through adoption of the DPRA in 1995, but rather stated that it was "extending the mechanical compulsory license to digital phonorecord deliveries" and that its purpose was to "maintain and reaffirm" that the Section 115 license would apply to "new technologies."[40] RIAA concludes that although some details of the Section 115 license have changed over the years, nothing in

---

[36] Copyright Owners Initial Brief at 5, citing *Fame Publishing Co. v. Alabama Custom Tape, Inc.*, 507 F. 2d 667, 670 (5th Cir. 1975)(noting that the compulsory license provision of the 1909 Copyright Act is a limited exception to the copyright holder's exclusive right to decide who shall make use of his composition).

[37] Copyright Owners Initial Brief at 7-8.

[38] Copyright Owners Reply Brief at 14-15.

[39] RIAA Reply Brief at 3, citing H.R. Rep. No. 94-1476, at 107 (1976).

[40] *Id.* at 4, citing S.Rep. No. 104-128, at 37 (1995).

these enactments or the legislative history thereof suggests that Congress intended a narrow reading of the statute.

      <u>Analysis</u>. We find that ringtones meet the definition of DPDs. The issue presented is one of pure statutory construction and there is no actual dispute on this point.[41] Based on the language of the statute, ringtones easily meet the requisite definitions under the Copyright Act to be included in the Section 115 licensing scheme. First, we hold that a ringtone meets the definition of "sound recording" under Section 101 of the Act as a work that results from "the fixation of a series of musical, spoken, or other sounds,"[42] and that the sound recording is fixed in the form of a "phonorecord," defined in the statute as a "material object in which sounds are fixed by any method now known or later developed."[43] The phonorecord here is the actual sound recording file stored as a "download" on either the cell phone's hard drive or on a cell phone's removable memory storage disk.[44] When downloaded through the Internet or by wireless transmission, a ringtone is part of a "digital phonorecord delivery" and a digital transmission of a sound recording which results in a "specifically identifiable reproduction" by or for any transmission recipient of a phonorecord of that sound recording.[45] We also believe that our statutory analysis comports with Congressional intent. Ringtones are delivered by means of the type of "new technologies" Congress intended to be included when it enacted the DPRA in 1995.[46]

---

[41]   *Id.* at 2, citing *Doyle v. Huntress, Inc.*, 419 F.3d 3, 7-8 (1st Cir. 2005) ("A question of statutory construction presents a purely legal question."); *Blackman v. District of Columbia*, 2006 WL 2034355, *6 (D.C. Cir. 2006) (statutory construction begins with "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole[.]").

[42]   17 U.S.C. § 101 ("'Sound recordings' are works that result from the fixation of a series of musical, spoken, or other sounds, but not including the sounds accompanying a motion picture or other audiovisual work, regardless of the nature of the material objects, such as disks, tapes, or other phonorecords, in which they are embodied.").

[43]   17 U.S.C. § 101 ("'Phonorecords' are material objects in which sounds, other than those accompanying a motion picture or other audiovisual work, are fixed by any method now known or later developed, and from which the sounds can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. The term 'phonorecords' includes the material object in which the sounds are first fixed.").

[44]   *See* S. Rep. No. 104-128, at 39 (1995) (stating that storage of data in a "computer memory" is "technically the making of a phonorecord.").

[45]   17 U.S.C. § 115(d).

[46]   *See* S. Rep. No. 104-128, at 37 (1995).

We disagree with Copyright Owners that Congress did not intend for ringtones to be the kind of use of musical works contemplated for inclusion under the Section 115 license.[47] While we adhere to the general proposition that statutory licenses are to be construed narrowly,[48] we find that Section 115, as amended by the DPRA, purposefully broadened the scope of the statutory license to cover DPDs, and ringtones appear to fit comfortably within the definition of DPDs. On this note, we recognize that Copyright Owners have cited *Fame Publishing Co. v. Alabama Custom Tape, Inc.*, 507 F. 2d at 670, to support their narrow construction argument. However, we find this citation is inapt because the case arose out of a dispute concerning statutory language found in the 1909 Act that is not present in the current version of Section 115. In any event, the legislative history of the Copyright Act of 1909 states that from its inception, this compulsory license was intended to include all "mechanical reproductions" and that one of its purposes was "to secure to the composer an adequate return for *all use* made of his composition[.]"[49] (emphasis added). While the concept of the cellular phone ringtone undoubtedly would have astonished the members of the 1909 Congress, the license they devised was broad enough to include ringtones. Whether our interpretation "opens the door" to licensing of snippets of musical works to be used in car alarms or doorbells is a question that is outside the scope of this proceeding.

*Works or Portions of Works.* According to Copyright Owners, Section 115 is expressly limited to the making and distributing of phonorecords of "works," not portions of works such as ringtones. Copyright Owners argue that because a ringtone is not a reproduction of the entire musical work, it is not subject to the statutory license. They argue that Section 115 throughout its provisions makes clear that a "work," and not a "portion" of a work, is its subject. Copyright Owners state that this result was not an accident of drafting nor is it an unintended source of statutory ambiguity. They state that Congress had no difficulty using the term "portions" where in fact that concept was intended, such as in Sections 108(h)(1) and 110(2) of the Copyright Act.[50]

---

[47] We are not saying that Congress specifically contemplated ringtones and their inclusion in the Section 115 license. Rather, ringtones generally fall into the class of "new technologies" that Congress concluded should be included within the expanded statutory license.

[48] *See Public Performance of Sound Recordings: Definition of a Service*, Docket No. RM 2000-3B, 65 Fed. Reg. 77,292, 77,297 (Dec. 11, 2000) (noting that the Copyright Office has historically construed limitations on copyright narrowly, especially those constrained by a compulsory license.).

[49] *See* H. R. Rep. No. 60-2222, at 7 (1909).

[50] Section 108(h)(1) states in part "a library or archives. . .may reproduce, distribute, display, or perform in facsimile or digital form a copy or phonorecord of such work, or portions thereof, for purposes of preservation, scholarship, or research." Section 110(2) refers to "the performance of a nondramatic literary or musical work or reasonable and limited portions of any other work, or display of a work in an amount comparable to that which is typically displayed in the course of a live classroom session, by or in the course of a transmission."

Copyright Owners assert that this interpretation is confirmed by Section 115's legislative history which mentions "cover records" as well as cassettes and CDs.[51]

Copyright Owners remark that it is obvious that the Section 115 license applies only to physical or digital phonorecords of complete works since industry practices have developed on the basis of this interpretation of Section 115. They state, for example, that partial uses of compositions, such as medleys and samples, are licensed in market transactions. They further state that legal commentators have recognized that the Section 115 license does not apply to digital sampling and that it would have to be modified in order to include sampling within its scope.[52]

RIAA asserts that Section 115 applies to whole musical works as well as portions of musical works, and that any other reading would be inconsistent with other provisions of the Copyright Act.[53] RIAA states that if the Copyright Owners are correct that the Copyright Act distinguishes between "works" and "portions of works," then reproduction and distribution of ringtones would be permissible without a license as the provisions under Section 106 granting the exclusive rights to reproduction and distribution only refer to "works," not "portions of works." RIAA remarks that the Copyright Owners do not intend that interpretation nor is it a correct one. RIAA adds that Copyright Owners' approach to what constitutes a "work" would make other phrases in the statute superfluous. It notes, for example, that one of the factors used in determining whether a use of a work is a fair use under Section 107(3) is the "amount and substantiality of the portion used in relation to the copyrighted work as a whole." The phrase "as a whole" would be superfluous if a "work" in the Act must always be the whole work and not a portion thereof.[54] RIAA asserts that although unstated, Copyright Owners apparently are relying on the canon of statutory construction *expressio unius est exclusio alterius*, which provides a general inference that omissions in statutory text are intentional.[55] RIAA notes, however, that this maxim "requires great caution in its application" and should be disregarded where "its application

---

[51] Copyright Owners Initial Brief at 9-11, citing *Supplementary Register's Report on the General Revision of the U.S. Copyright Law: 1965 Revision Bill*, House Comm. on the Judiciary, 89th Cong., Copyright Law Revision Part 6, at 54 (Comm. Print 1965) (discussing "cover" records); H.R. Rep. No. 90-83, at 67 (1967) (referring to "disks and audio tapes"); S. Rep. No. 104-128, at 37 (1995) ("extending the mechanical compulsory licenses. . .as new technologies permit phonorecord to be delivered by wire or over airwaves rather than by traditional making and distributing of record, cassettes and CDs").

[52] *Id.* at 11, citing Jennifer R.R. Mueller, *Note: All Mixed Up: Bridgeport Music v. Dimension Films and De Minimis Digital Sampling*, 81 IND. L.J. 435, 461 (Winter 2006).

[53] RIAA Reply Brief at 7.

[54] *Id.* at 9, citing 17 U.S.C. § 107(3).

[55] *Id.* at 8, citing 2A Sutherland, *Statutes and Statutory Construction*, § 47:25 (Norman Singer ed., 6th ed. 2005).

would thwart the legislative intent made apparent by the entire act."[56] It states that such caution should be exercised here because, unlike most of the relevant language in Section 115, the references to "portions" of works that Copyright Owners cite did not appear in the 1976 Act and were only added years later. RIAA asserts that there is no indication that either amendment was intended to affect the interpretation of the provisions of the Copyright Act enacted more that twenty years before. RIAA concludes that two isolated references in the Copyright Act to "portions of works" cannot imply that the hundreds of unadorned references to "works" apply only to works in their entirety.[57]

RIAA notes that Copyright Owners' argument that ringtones are analogous to sampling is equally misplaced. It states that ringtones are excerpts that are taken from musical works and distributed as such; samples, however, are short excerpts that are blended into what are clearly new creative works. RIAA asserts that the fact that the latter are licensed apart from Section 115 does not imply that the former should be.[58]

Analysis. The Section 115 license is not limited to the reproduction and distribution of phonorecords of the entire musical work, and an excerpt may qualify for the statutory license if all other requirements are met. We believe that the Copyright Act's language and purpose are broad and that "portions of works" should be treated the same as any other type of work under Section 115. This provision of the Act does not expressly exclude "portions of works" from its scope and we cannot assume that such treatment was intended in the absence of clear statutory language to that effect.[59] Contrary to Copyright Owners' assertion, we cannot find support for such a limited and narrow reading of the Act in the legislative history they cite.[60]

Moreover, we believe that Copyright Owners' citations to Sections 108 and 110 are inapt as these provisions were not enacted contemporaneously with Section 115 and cannot be read to provide any guidance as to Congressional intent or the purpose of the statutory license. We note, in particular, that their interpretation of Section 110(2) defies legislative intent as well as common sense.[61] Under Copyright Owners' interpretation, educators using the distance education exemption could transmit limited portions of works other than nondramatic literary or musical works, but if they transmit a performance of a nondramatic literary or musical work, they would

---

[56] *Id.*

[57] *Id.* at 7, 9.

[58] *Id.* at n.8.

[59] We agree with RIAA that Section 115 makes no distinction between downloads of song excerpts and full songs delivered by online music services such as Apple's iTunes Music Store and Verizon Wireless' V Cast Music Store. *See* RIAA Initial Brief at 1.

[60] *See* n. 51, *supra*.

[61] *See* 17 U.S.C. § 110(2) (discussing works "produced or marketed primarily for performance or display as part of mediated instructional activities transmitted via digital networks . . .").

have to transmit the entire work as a transmission of a portion of the work would not be permitted. Congress certainly did not intend this result.

We also find that Copyright Owners' reading of the Copyright Act, if adopted, would render certain provisions of the statute superfluous. For example, well-settled interpretation of and practice under Section 118 of the Act would be undermined if Copyright Owners' interpretation were correct. Under this provision, licensing agreements and related fees negotiated between noncommercial broadcasting entities and copyright owners of published nondramatic musical works are subject to ratesetting by the Copyright Royalty Board.[62] While Section 118 expressly refers to "works," it has been understood to include portions of works as well. For example, under 37 C.F.R. § 253.7(b)(3), which implements the rates set for the Section 118 statutory license, "a 'Concert Feature' shall be deemed to be the nondramatic presentation in a program of all *or part of* a symphony, concerto, or other serious work originally written for concert performance or the nondramatic presentation in a program of *portions* of a serious work written for opera performances."[63] (emphasis added). If we were to accept Copyright Owners' argument that the Act covers only full musical works, and not portions of musical works, then the Board could never set such rates pursuant to Section 253.7. This result, we believe, was not intended by Congress.

We also believe that Copyright Owners analogy to sampling is inapt. Sampling generally refers to the appropriation of sounds from an existing sound recording for transformative use along with other sounds in a new work. A mastertone, in contrast, is taken from a single work, in the form of an excerpt.

*Marketplace Developments.* According to Copyright Owners, the statutory license was instituted to ensure a market where none existed, but there is an active market for freely negotiated licenses already in place. They assert that the Register of Copyrights has stated that ringtones are a subject more appropriately left to market forces than government regulation and that "there is no need for Government to legislate what the parties can negotiate themselves."[64] They state that Copyright Owners and record labels, recognizing that ringtones are not DPDs subject to the statutory license, have entered into voluntary license agreements granting the labels

---

[62] *See* 17 U.S.C. § 118. Section 118(d) gives public broadcasters permission to engage in certain "activities with respect to published nondramatic musical works and published pictorial, graphic, and sculptural works . . ." Under Section 118(d)(1), one of the activities is "the performance or display of a work." 17 U.S.C. § 118(d)(1).

[63] *See* 37 C.F.R. § 253.7(b)(3).

[64] Copyright Owners Initial Brief at 8, citing *Copyright Office Views on Music Licensing Reform.* Hearings Before the Subcomm. on Courts, the Internet, and Intellectual Property. House Comm. on the Judiciary, 109th Cong., at 20 (2005) (Statement of Marybeth Peters, Register of Copyrights).

the right to create ringtones at specified mutually-negotiated royalty rates.[65] Copyright Owners assert that these voluntary licenses provide further support that ringtones are outside the narrow scope of Section 115. They conclude that there exists a vibrant and growing market for ringtones, which makes it unnecessary and inappropriate to include ringtones within Section 115.[66]

According to RIAA, Copyright Owners mischaracterize current marketplace conditions and the Register's prior testimony, which, in any instance, are both irrelevant. RIAA asserts that the Register's testimony was in the context of an express legislative invitation to explore revision of the statute. The reform proposal presented by the Register, if adopted by Congress, would have repealed the statutory license and omitted from a successor licensing system the statutory treatment of "ringtunes" and certain other types of works. RIAA notes that the Register's reform proposal is not law, but Section 115 is.[67]

RIAA disputes Copyright Owners' claims that the purpose of the statutory license was to ensure a market where none existed and that the ringtone market is thriving. As to the former point, RIAA asserts that Section 115 was enacted to protect the market from a "great music monopoly," not to create a market.[68] With regard to the latter point, RIAA asserts that although the U.S. has the world's largest music market, the U.S. ringtone market represents only a fraction of worldwide sales, with the bulk of the market in Europe and Asia. Moreover, aside from the EMI agreement cited by Copyright Owners, there are no other major ringtone licensing agreements of importance. RIAA states that with tens of thousands of music publishers, the need to clear all these rights through negotiation is a burden on the market and it is not surprising that the U.S. offerings lag behind other parts of the world. RIAA concludes that some mastertone agreements are no substitute for the Section 115 license.[69]

In Reply, Copyright Owners reiterate that the market for ringtones is thriving and no compulsory license is needed to ensure its continued growth. The suggestion by RIAA that, absent compulsory licensing, music publishers will "prevent the commercialization" of ringtones is belied by the years of voluntary licensing of compositions by music publishers for such uses.[70]

---

[65] For example, Copyright Owners cite the November 1, 2004 Sony BMG/EMI Music Publishing Agreement that granted the former the right to create ringtones embodying EMI compositions.

[66] Copyright Owners Initial Brief at 4.

[67] RIAA Reply Brief at 4, citing *Music Licensing Reform.* Subcomm. on Intellectual Property, Senate Comm. on the Judiciary, 109th Cong. (July 12, 2005) (Statement of Marybeth Peters, Register of Copyrights).

[68] RIAA Reply Brief at 5, citing Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 8.04[A] (2004).

[69] *Id.* at 6-7.

[70] Copyright Owners Reply Brief at 15-16, citing Rudell and Rosini, (noting that U.S. ringtone sales in 2005 was approximately $500 million).

*Analysis*. The general success, or lack thereof, of the marketplace for ringtones is not dispositive, or even necessarily relevant, in this analysis. Commercial negotiations involving the use of copyrighted works cannot annul the force and effect of existing law, unless Congress explicitly so states. We in fact note that, despite the existence of the Section 115 license, the vast majority of sound recordings are made pursuant to direct licenses from music publishers or the Harry Fox Agency rather than under the provisions of the statute. These commercial agreements, however, do not negate the existence of the statutory license. Moreover, reliance on the statements made by the Register of Copyrights is both inappropriate and inapt. These statements were proposals for revising the law, not interpretations of the existing regulatory regime.

## V. Derivative Works

*Section 115 and Derivative Works.* Section 101 of the Copyright Act defines a derivative work as a "work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgement, condensation, or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications, which as a whole, represent an original work of authorship, is a derivative work."[71] Congress used one defined term, "derivative work," to specify both that derivative works are protectable under Section 103 of the Copyright Act and that the copyright owner has the exclusive right to prepare derivative works under Section 106(2) of the Copyright Act.[72] According to the Act's legislative history, Section 115 exists to permit artists and record companies to create sound recordings, which are a type of derivative work.[73]

Copyright Owners generally assert that ringtones fall outside the ambit of the statutory license because they are derivative works. They argue that ringtones exceed the scope of the Section 115 license by infringing the copyright owners' exclusive right to prepare derivative works. They assert that Section 115 subjects only the rights to reproduce and distribute phonorecords of works to the statutory license, leaving derivative works outside its scope. Copyright Owners argue that ringtones fit squarely within the derivative work definition because

---

[71]   17 U.S.C. § 101.

[72]   Section 103 states that "the copyright in a compilation or derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material." 17 U.S.C. § 103(b). Section 106 states that "[s]ubject to sections 107 through 122, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following. . . (2) prepare derivative works based upon the copyrighted work. . ." 17 U.S.C. § 106(2).

[73]   *See* H. R. Rep. No. 94-1476, at 108-09 (1976) (noting that a Section 115 license permits either the creation of a new sound recording or a duplication of an existing one with the consent of the sound recording copyright owner).

they are based on pre-existing works, and typically reduce a three-to-five minute work to an abridged ten-to-thirty second work.[74]

RIAA asserts that the legal tests for protection of derivative works and infringement of the derivative work right are identical and, in any event, require originality.[75] It states that "[F]or the derivative work right to be infringed, the defendant must have created a derivative work, and for the derivative work to have been created, the Act requires the contribution of expressive content capable of standing on its own as a copyrightable work.[76] RIAA cites a string of precedent to support its position that derivative works must be original to be afforded copyright protection.[77] RIAA states that for mastertones, the trivial action of copying a clip from an existing sound recording does not stand on its own as meriting copyright protection.[78] RIAA also asserts that there is no precedent in copyright law for the proposition that every partial reproduction of a work constitutes a separate derivative work.[79] RIAA concludes that ringtones are nothing more than partial copies that lack sufficient originality to be protected as derivative works or to infringe the derivative works right. RIAA concludes that because ringtones do not fit under the definition of

---

[74] Copyright Owners Initial Brief at 12-13. Copyright Owners note that the Copyright Board of Canada recently observed in a proceeding to set the rates for ringtones that "mastertones are created by taking an actual segment of a sound recording after determining which number of seconds out of a work will be most appropriate for the market." *Id.*, citing Copyright Board of Canada, Collective Administration of Performing Rights and of Communications Rights, *Statement of Royalties to be Collected by SOCAN for the Communication to the Public by Telecommunication, In Canada, of Musical or Dramatico-Musical Works*, Tariff No. 24-Ringtones (2003-2005) (Aug. 18, 2006) at 13. In response, RIAA notes that this statement by the Copyright Board confirms its supposition that the selection of a mastertone from the underlying musical work is a "trivial omission." RIAA Reply Brief at n. 10.

[75] RIAA Initial Brief at 11, citing *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 346 (1991) ("Originality is a constitutional requirement.").

[76] *Id.* at 11-12, citing 2 Paul Goldstein, *Copyright* § 7.3 (3d ed. 2005).

[77] *See id.* at 12-14, 20, citing *Woods v. Bourne Co.*, 60 F.3d 978, 989 (2d Cir. 1995)(holding that a musical work must have "substance added making the piece to some extent a new work" and that only the "addition of such new material would entitle the creator to a copyright on the new material."); *Lee v. Deck the Walls, Inc.*, 925 F. Supp. 576 (N.D. Ill 1996), *aff'd on other grounds sub nom., Lee v. A.R.T. Co.*, 125 F.3d 580 (7th Cir. 1997)(holding that notecard art image deposited on tile and covered with epoxy is not copyrightable because the work does not contain any original artistic expression); *Peker v. Masters Collection*, 96 F. Supp. 2d 216 (E.D.N.Y. 2000) (holding that an oil painting reproduction, made by transfer of a copy of a copyrighted painting from a poster to a canvas with the addition of resin to create a brushed-on look of the original was not a derivative work because there was no originality that would be considered copyrightable); *Precious Moments, Inc. v. La Infantil, Inc.*, 971 F. Supp. 66, 67 (D. Puerto Rico, 1997) (stating that originality is required for a derivative work to be copyrightable).

[78] *Id.* at 2.

[79] *Id.* at 10, citing *Nimmer on Copyright* § 8.09[A] (noting that no reported case finds the holder of a reproduction license barred from making trivial changes to a work even without a separate license to make derivative works).

derivative works in Section 101 of the Act, the making of a ringtone cannot be excluded under Section 115 on this basis.

Analysis. As an initial matter, we agree with Copyright Owners' assertion that Section 115, by its terms, concerns only the rights to reproduce and distribute phonorecords of works, leaving derivative works outside its confines. Thus, consideration of the derivative work right is important only to the extent that a ringtone which is adjudged to be a derivative work cannot be licensed under Section 115. To be considered a derivative work, a ringtone must exhibit a degree of originality sufficient enough to be copyrightable.[80] With regard to the appropriate legal test regarding copyrightability, we believe that *Feist* is controlling precedent here.[81] In *Feist*, the Supreme Court observed that "as a constitutional matter, copyright protects only those constituent elements of a work that possess more than a *de minimis* quantum of creativity," and that there can be no copyright in work in which "the creative spark is utterly lacking or so trivial as to be virtually nonexistent."[82] As illustrated below, there are ringtones that may be considered derivative works because they exhibit a degree of originality and creativity. However, there are many other ringtones that would not be considered derivative works because they exhibit only trivial changes from the underlying work. Those ringtones would not be considered derivative works and would be within the scope of the statutory license.

*Court Precedent.* Copyright Owners argue that caselaw compels a conclusion that ringtones are derivative works. They argue that ringtones satisfy any creativity requirement for the copyrightability of a derivative work.[83] They additionally argue that the selection process involved in the creation of ringtones meets the creativity standard for copyrightability under

---

[80] We recognize that in one sense, every ringtone will be a derivative work, in that every sound recording of music is a derivative work; the underlying work is the musical composition itself. *See* H. R. Rep. No. 94-1476, at 108-109 (1976) The issue before us is not whether a ringtone is a derivative work; by definition it is. Rather, the question is whether a musical composition as recorded in a ringtone infringes the derivative work right in the original musical composition. When we refer to ringtones as "derivative works" in this Memorandum Opinion, we are referring not to the sound recording, but to the musical composition recorded in the ringtone. *See also*, n. 8, *supra*.

[81] *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340 (1991). Original, as the term is used in copyright, means that: (1) the work was independently created by the author (as opposed to copied from other works); and (2) it possesses at least some minimal degree of creativity. *Id.* at 345. When we refer to "originality" in this Memorandum Opinion, we are referring not to independent creation, but to creativity.

[82] *Id.* at 359, 363; *see also Woods v. Bourne Co.*, 841 F. Supp. 118, 122 (S.D.N.Y. 1994) (quoting *Fred Fisher, Inc. v. Dillingham*, 298 F. 145, 148 (S.D.N.Y. 1924) (holding that a derivative work must be "substantially a new and original work, not a copy of a piece already produced, with additions and variations, which a writer of music with experience and skill might readily make").

[83] Copyright Owners Reply Brief at 8, citing *Video Pipeline, Inc. v Buena Vista Home Entm't, Inc.* 192 F. Supp. 2d 321 (D.N.J. 2002), *aff'd on other grounds*, 342 F.3d 191 (3d Cir. 2003); *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 109 (2d Cir. 2001) (stating that "Under the Constitution and by statute, copyright validity depends upon originality"), citing *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991).

settled law.[84] Copyright Owners also assert that the courts have routinely held that shortened versions of a variety of different copyrighted works constitute derivative works under the Copyright Act. They note, for example, that courts have found that clips from full-length copyrighted works, such as movie trailers, constitute derivative works.[85]

RIAA cites cases contrary to Copyright Owners' position. For example, it cites precedent holding that the use of copyrighted music excerpts in the background of a television show did not infringe the derivative work right because the inclusion of the music did not create a new derivative work that warrants copyright protection.[86] It also refers to another case where the district court denied a claim that adding local commercials to rental videos was an infringement of the derivative work right because there was no evidence that "the mere addition of a commercial to the front of a videocassette recasts, transforms, or adapts the motion picture in what could represent an original work of authorship."[87] Relying on the district court's determination in *Agee* that copying an excerpt of a musical work does not infringe the derivative work right, RIAA argues that the creation of a ringtone does not infringe the exclusive right to prepare derivative works of the underlying musical work.[88]

RIAA argues that the cases involving the creation of unauthorized trailers through editing and condensing of motion pictures are inapt. According to RIAA, such cases involve claims of unauthorized reproduction, and that is a sufficient basis on which to decide them. Moreover, in the few instances where those cases address the derivative work right, they point in conflicting

---

[84]  *Id.*, citing *U.S. Payphone, Inc. v. Executives Unlimited of Durham, Inc.*, 18 U.S.P.Q. 2d 2049, at *8 (4th Cir. 1991) (finding that a section of a reference guidebook was a protectable compilation because the author collapsed voluminous tariff information into an easily usable guidebook); *Caffey v. Cook*, 409 F. Supp. 2d 484, 497 (S.D.N.Y. 2006) (finding a protectable compilation in the selection and ordering, for a musical show, of thirty two songs from a universe of possible musical compositions based on the compiler's sense of musicality).

[85]  Copyright Owners Initial Brief at 13, citing *Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*, 192 F. Supp. 2d 321, 330 (D.N.J. 2002), *aff'd on other grounds*, 342 F.3d 191, 197 (3rd Cir. 2003); *John Lamb d/b/a Alpha Production v. Michael Starks 3D TV Corp.*, 949 F. Supp. 753, 755-56 (N.D. Cal. 1996)(finding that use of a portion of a full length movie to create a trailer, without permission, was infringing and not fair use).

[86]  *See* RIAA Initial Brief at 15, citing *Agee v. Paramount Commc'ns, Inc*, 853 F. Supp. 778 (S.D.N.Y. 1994), *aff'd in part rev'd in part on other grounds*, 59 F.3d 317 (2d Cir. 1995) (holding that "copying a sound recording for use in a broadcast television program does not create a derivative work which warrants protection under the Copyright Act of 1976"). The Second Circuit found it unnecessary to reach the derivative works question. *See id.* at 324 (stating that "Although the interspersing and abridgement of a sound recording may not, strictly speaking, involve sampling or amount to the traditional creation of a derivative work, such use of a recording appears to fall within the language of section 114(b), perhaps constituting a rearrangement or alteration in sequence. We need not determine the extent to which the recording was altered, however, because the finding that Paramount created a derivative work is unnecessary to a finding of infringement in light of Paramount's reproduction of Agee's recording.).

[87]  *See id.* at 14, citing *Paramount Pictures Corp. v. Video Broad. Sys., Inc.*, 724 F. Supp. 808, 821 (D. Kan. 1989).

[88]  *Id.* at 8, 15.

directions depending on whether or not the court follows Ninth Circuit precedent.[89] RIAA argues that the Register should decline to follow the Ninth Circuit's holding that the derivative work right may be infringed without a finding of originality. RIAA explains that in the Ninth Circuit, all one must show to prove infringement of the derivative work right is substantial similarity between the derivative work and the underlying work and that, under this reasoning, there is no legal distinction between infringing the reproduction right and infringing the derivative work right.[90] RIAA submits that such an interpretation is wrong because it is contrary to the plain language of the statute and contrary to the weight of authority.[91] RIAA states that, in any event, the trailer cases are of marginal relevance here because they involve a greater degree of editorial judgment than copying a single clip for distribution as a mastertone or other typical commercial ringtone.

Copyright Owners assert that to the extent there is a dispute among the circuits as to whether creativity sufficient for copyright protection is required for a work to be a derivative work for purposes of infringement, that dispute is not appropriate for resolution by the Register and is, in any event, irrelevant to the Register's analysis here since ringtones satisfy the test for creativity in any circuit.[92]

<u>Analysis</u>. Given the wide range of ringtones available in the marketplace, and understanding that a derivative work analysis is factually intensive, our task here is not to provide a comprehensive analysis of the caselaw. However, we do need to address whether a musical excerpt, in the form of a ringtone, is a derivative work because it is a central issue in this proceeding. First, consideration of the derivative work right issue is important to the extent that a ringtone which is adjudged to be a derivative work cannot be licensed under Section 115. Second, we agree with RIAA that the Ninth Circuit's more lenient test for infringement of derivative works, which seemingly ignores the originality requirement, appears to be in error as it

---

[89] *Id.* at 15, comparing *Clean Flicks of Colo. v. Soderbergh*, 433 F. Supp. 2d 1236, 1242 (D. Colo. 2006) (holding that "family friendly" edited versions of movies "are not derivative works and do not violate § 106(2)") with *Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*, 192 F. Supp. 2d 321, 330 (D.N.J. 2002), *aff'd on other grounds*, 342 F.3d 191 (3d Cir. 2003).

[90] RIAA cites *Mirage Editions, Inc. v. Albuquerque A.R.T. Co.*, 856 F. 2d 1341 (9th Cir. 1988) where the Ninth Circuit affirmed a district court finding that mounting legally purchased copies of copyrighted artworks on ceramic tiles infringed the right to prepare derivative works. The court found that appellant "made another version" of the artwork that amounted to the preparation of a derivative work because it " recast or transformed the individual images by incorporating them into its tile-preparing process." This decision has been followed in subsequent cases within the Ninth Circuit. *See, e.g.*, *Micro Star v. Formgen, Inc.*, 154 F.3d 1107, 1112 (9th Cir. 1998); *Sobhani v. Radical Media, Inc.*, 257 F. Supp. 2d 1234 (C.D. Cal. 2003). *See id.* at 16-17.

[91] *Id.* at 16. In its Reply Brief, RIAA again argues that mastertones and other typical commercial ringtones are not derivative works. It states that the cases cited by Copyright Owners all rely on Ninth Circuit precedent, and given that it is the lone Federal circuit in holding that there is a more lenient test for infringement of derivative works, that approach should be rejected. RIAA Reply Brief at 11.

[92] Copyright Owners Reply Brief at n. 13.

runs contrary to all other Circuit Court precedent.[93] Third, we agree with RIAA that reliance on derivative works precedent involving movie trailers, such as *Video Pipeline, Inc.*, is inapt because the creating and editing process involved in making those trailers required much more originality than simply shortening an existing musical work to create a ringtone.[94] Fourth, *Woods v. Bourne* is guiding precedent for determining the derivative work right in musical compositions.[95] Under *Woods*, an excerpt of a musical work made into a ringtone without original embellishments likely would not be considered a derivative work because nothing of substance has been added and the ringtone is merely a copy of a work (albeit a portion) already produced, without additions or variations. Fifth, as for those mastertones that contain new words in the lyrics not found in the underlying musical works, we draw no conclusions based on precedent because they involve factual issues and potentially close questions that need not be resolved here. A court of competent jurisdiction would be the appropriate forum to make the necessary determinations.

    *Copyright Office Precedent.* The Copyright Office has made certain pronouncements as to the registrability of derivative works in sound recordings and other works in various publications. For example, Section 408.07 of Compendium II of Copyright Office Practices states that "An abridgement of a musical work may be registrable provided that there is a substantial amount of selectivity, for example, more than merely omitting a section from the beginning or end." Copyright Office Circular No. 14 (2006), *Copyright Registration for Derivative Works*, states that "When the collecting of preexisting material that makes up the compilation is a purely mechanical task with no element of editorial selection or when only a few minor deletions constitute an abridgment, copyright protection for the compilation or abridgment

---

[93] We note that there is widespread disapproval of the Ninth Circuit's approach to derivative works. *See, e.g., Lee v. A.R.T*, 125 F.3d 580, 582 (7th Cir. 1997) (noting that if the Ninth Circuit is "right about what counts as a derivative work, then the United States has established through the back door an extraordinarily broad version of the authors' moral rights."); *Precious Moments, Inc. v. La Infantil, Inc.*, 971 F. Supp. 66, 69 (D. Puerto Rico 1997) (agreeing with the Seventh Circuit that *Mirage* and its progeny read the originality requirement out of the definition of derivative works and "open[s] the door for the most trivial modifications to generate an infringing derivative work."); *Goldstein* § 5.3 at 5:81-82; *Nimmer on Copyright* § 3.03. Although Copyright Owners assert that "to the extent that there is a dispute among the circuits as to whether creativity sufficient for copyright protection is required for a work to be a derivative work for purposes of infringement, that dispute is not appropriate for resolution by the Register," the positions taken by the parties on this issue require the resolution of that issue. Having concluded that many ringtones do not exhibit sufficient creativity to qualify for copyright protection as derivative works, it is necessary to determine whether the derivative work right nevertheless could be infringed by making and distributing such ringtones.

[94] There are marked differences between the making of ringtones and the making of movie trailers in the cited cases. For example, the trailers at issue in *Video Pipeline* were 120 seconds in length and included the display of the movie studio's trademark, title of the motion picture, and two or more scenes from the film. *See* 342 F.3d at 195. In any event, the Third Circuit found that the trailers at issue were essentially copies of the original work that lacked "any significant transformative quality" and any "creative ingenuity." *Id.* at 199-200. The trailer at issue in *John Lamb*, another case cited by Copyright Owners, was 2 minutes and 40 seconds in length and included individual images and scenes, among other things. Further, the original trailer was transformed into a 3-D format for use with specially engineered eyeglasses. *See* 949 F. Supp. at 755.

[95] *See* n. 77, 82, *supra.*

as a new version is not available." Copyright Office Circular No. 56 (2006), *Copyright Registrations for Sound Recordings*, states, in part that "[I]f only a few slight variations or purely mechanical changes (such as declicking or remastering) [of a work] have been made, registration is not possible."

RIAA argues that mastertones and other typical commercial ringtones do not stand on their own as separately copyrightable works under the Copyright Office's interpretations. RIAA cites Section 408.07 of the Compendium II of Copyright Office Practices as support for its argument.[96] RIAA argues that a partial copy of a commercial sound recording distributed as a mastertone or a partial copy of a musical work distributed as a monophonic or polyphonic ringtone is not separately protectable as a derivative work under Copyright Office standards.[97] To the extent that it may be desirable to make technical adjustments to the commercial sound recording to improve playability on phones, RIAA asserts that process is in the nature of remastering and would not affect the underlying musical work.[98]

As for RIAA's reliance on Copyright Office precedent, Copyright Owners refer to Copyright Office Circular No. 14 which states that "a few minor deletions" to a work will not suffice for a work to be protectable as a derivative work. Copyright Owners respond that ringtones do not involve the mere omission of portions of a work, but involve the creative selection of portions of a work and often more. They assert that the process used to construct a thirty second ringtone from a three-to-five minute work involves the "substantial amount of selectivity" acknowledged by the Copyright Office to suffice for the creation of a protectable work.

*Analysis.* The Copyright Office documents, noted above, are instructive. We note that the Circulars are designed to inform members of the public about how to register works with the Copyright Office offering guidelines for instructional purposes. The Compendium, generally used by the Copyright Office staff, serves as an internal manual detailing what works are copyrightable, and therefore registrable. Here, the cited materials are based on, and to a large extent, mirror judicial precedent on the subject of derivative works. Essentially, making "minor deletions" or "slight variations" to an original work will not result in the creation of a derivative work because there is no originality involved in the new work. Using the cited materials as references, then, the Copyright Office would refuse registration of a mastertone that is merely an excerpt of a full musical work because the new work lacks the requisite originality.

*Examples in the Record.* Copyright Owners state that creating ringtones involves making alterations to the underlying work that require skill, judgment, and creativity. According to Copyright Owners, all ringtones require the exercise of creative judgment in determining the

---

[96] Compendium II of Copyright Office Practices, § 408.07 (1984).

[97] RIAA Reply Brief at 13.

[98] RIAA Initial Brief at 21.

points in the composition where the ringtone should begin and end so as to maximize appeal to consumers. They state that the decision as to what portion of a work to use in the ringtone is not trivial; shorter ringtones are sometimes designed to "loop" to achieve the appropriate length to function as a ringer, with the result that a musical phrase is repeated in a sequence unintended by the author of the work. They add that other mastertones involve the addition of new lyrics, spoken-word interludes, and other material designed to enhance sales. Copyright Owners conclude that, for a derivative work to be copyrightable under the copyright laws, the "requisite level of creativity is extremely low" and the alterations of ringtones in the manner described meet this test.[99]

RIAA disagrees and asserts that ringtones are nothing more than partial copies that lack sufficient originality to be protected as derivative works or to infringe the derivative works right. It states that copying a clip to distribute as a ringtone does not involve the addition of any new material. RIAA argues that because the definition of the term "derivative work" applies to both protection and infringement, and because the definition requires originality in both contexts, copying a single short clip from a sound recording and/or musical work to distribute as a mastertone or other ringtone does not meet the requirements for copyright protection as a derivative work or infringement as a derivative work.[100] RIAA has submitted, into the record, a CD with relevant examples of mastertones, that are simply partial copies of the underlying musical work.

In their Reply Brief, Copyright Owners reiterate that the creation of ringtones involves substantial creativity and that ringtones do not only feature the hook of a particular musical work. Moreover, they assert, there is no such thing as a "typical commercial ringtone," as RIAA seems to suggest. Rather, they vary in kind and length. They note the following examples: (1) the ringtone for Leonard Cohen's "Everybody Knows" recording comprises nine seconds of the approximately five and a half minute full length work and the ringtone commences seven seconds into the song; (2) Britney Spears " . . . Baby One More Time" ringtone consists of a fifteen-second snippet of the recording that begins two and half minutes into the three and a half minute song; and (3) the mastertone for Jay Z's "Change Clothes," consists of excerpts of two separate hooks repeated twice (even though these hooks are separated in the full-length song by other musical content), and then these two snippets are further repeated if the caller fails to answer the phone. Copyright Owners also note that some songs result in multiple ringtones, each focusing on different elements of the same underlying composition. They state, for example, that the Bubba Sparxx/Ying Yang Twins hit, "Ms. New Booty," has spawned two ringtones–one featuring the lyric "I found you"and the other emphasizing the lyric "get it right."[101]

---

[99]   Copyright Owners Initial Brief at 14-15, citing *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 109 (2d Cir. 2001) (quoting *Feist*, 499 U.S. at 345).

[100]   RIAA Initial Brief at 19-20.

[101]   Copyright Owners Reply Brief at 5-6.

They also assert that other ringtones include new content not present in the underlying work. Copyright Owners note, for example, that the Pussycat Dolls' mastertone derived from the best-selling song "Don't Cha" features the lyrics, "Don't cha wish your girlfriend was hot like me. Don't cha wish your girlfriend was a freak like me," which are part of, but not all of the lyrics of the song. This ringtone, which is eleven seconds, as compared to the four and a half minute full length work, also includes new material different from those of the underlying work: "Come on boy, don't cha wanna pick up? We're ready for ya." These additional words are spoken, not sung, and are not accompanied by music. Likewise, Copyright Owners note that in Beyonce's mastertone "Let Me Cater 2 You," the ringtone contains a portion of the song, with an extra line added at the end: "What's up, this is Beyonce from Destiny's Child and this call is for you." Again, the additional words are spoken, unaccompanied by music. Copyright Owners have submitted a CD, included in the record, that contains many more examples of ringtones that they assert support their case.

Analysis. The ringtone samples provided by the parties are instructive. The record evidence demonstrates that not all ringtones are the same. While we need not decide whether all of the ringtones presented to us are within the scope of Section 115, we observe that some undoubtedly are not. For example, the 16 second mastertone, *Grind With Me*, by performing artist, Pretty Rickey, was created solely for ringtone use and the lyrics used therein are not found in the 4:02 minute full length version of the work. This ringtone is likely copyrightable as a derivative work because it is original and demonstrates a "creative spark." In any event, there are likely to be many ringtones, such as the mastertone that uses a portion of Otis Redding's classic "*Sittin' On the Dock of the Bay*," that simply copy a portion of the underlying musical work and cannot be considered derivative works because such excerpts do not contain any originality and are created with rote editing. There are also ringtones that contain a portion of the full length musical work and additional spoken material such as the Pussycat Dolls example, above. The determination of whether such a ringtone, or one that includes the addition of some new lyrics, results in a copyrightable derivative work is a mixed question of fact and law that is beyond the scope of this proceeding.

In sum, there is a broad spectrum of ringtones, and whether one would be considered a derivative work depends upon the nature of the ringtone. At one end of the spectrum are those ringtones that are simple excerpts of larger musical works. This type of ringtone is not a derivative work. At the other end of the spectrum are ringtones that contain additional original authorship. These would be considered derivative works if there was a sufficient amount of creative authorship in the new material. In between are ringtones that may include some new material (spoken words or music) in addition to the excerpt. Those ringtones cannot be properly analyzed in a factual vacuum and their status as derivative works need not be determined in this proceeding, but are more appropriately determined on a case-by-case basis by the courts.

## VI. The "Arrangement Privilege"

Section 115(a)(2) of the Copyright Act states that the "compulsory license includes the privilege of making a musical arrangement of the work to the extent necessary to conform it to

the style or manner of interpretation of the performance involved, but the *arrangement* shall not change the *basic melody* or *fundamental character of the work*, and shall not be subject to protection as a derivative work under this title, except with express consent of the copyright owner."[102] (Emphasis added) According to the Act's legislative history, the purpose of the limitations in Section 115(a)(2) was to prevent the musical composition from being "perverted, distorted, or travestied."[103]

*Arrangements.* RIAA argues that ringtones are authorized by the arrangement privilege set forth in Section 115. RIAA argues that even if the Register were to determine that the creation of mastertones or other ringtones necessarily involves preparation of a derivative work, Congress specifically authorized the creation of certain derivative works under the express terms of the Copyright Act. RIAA asserts that creating arrangements by changing the length of musical works has been an accepted part of industry practice since before creation of the mechanical license. It states that shortening a musical work is necessary to conform the song to the style or manner of the performance involved because ringtones necessitate brevity.[104]

Copyright Owners take issue with RIAA's stance. They state that RIAA's argument rests on a false premise–that changing the length of a musical work necessarily results in an arrangement. They assert that arrangements are adaptations of whole works and involve changes to the style and interpretation of the underlying work. They conclude that a portion of a musical work for inclusion in a ringtone is not an arrangement of the underlying work.[105]

Copyright Owners strongly assert that a ringtone is not a musical arrangement as that term is understood in the music business. They state that it is well settled in the music industry that arrangements, intended to permit alterations solely in interpretation and style, are adaptions of entire works.[106] They note that an arrangement, as defined by the American Federation of Musicians, is "the art of preparing and adapting an already written composition for presentation in other than its original form. An arrangement may include reharmonization, paraphrasing, and/or

---

[102]  17 U.S.C. § 115(a)(2).

[103]  H. R. Rep. 94-1476 at 62 (1976) ("The second clause of subsection (a) is intended to recognize the practical need for a limited privilege to make arrangements of music being used under a compulsory license, but without allowing the music to be perverted, distorted, or travestied. Clause (2) permits arrangements of a work "to the extent necessary to conform it to the style or manner of interpretation of the performance involved," so long as it does not "change the basic melody or fundamental character of the work." The provision also prohibits the compulsory licensee from claiming an independent copyright in his arrangement as a "derivative work" without the express consent of the copyright owner."); *see also*, *Nimmer on Copyright* § 8.04[F] (noting in reference to Section 115(a)(2) that "Such respect for the integrity of a musical composition evinces Congressional regard for the moral rights of composers [.]").

[104]  RIAA Initial Brief at 23-25.

[105]  Copyright Owners Reply Brief at 12.

[106]  *Id.* at 3.

development of a composition, so that it fully represents the melodic, harmonic, and rhythmic structure."[107] They assert that, by definition, there cannot be a ten-second arrangement of a three minute composition and a ringtone is no more of an arrangement of a song than the selection of four notes out of all the others is an arrangement of a song.[108]

RIAA asserts that the definitions of "arrangement" that Copyright Owners provide are unconvincing. It states that the only definition that even remotely suggests that an arrangement must always embody the full work and never a partial copy of that work is the definition from answers.com, but even that definition is not particularly instructive.[109] RIAA also argues that there is nothing in the Copyright Act, its legislative history, or the common usage of these terms to suggest that, by employing the phrase "musical arrangements" in either Section 101 or Section 115(a)(2), Congress was distinguishing between "musical arrangements" as a class and musical arrangements that happen to shorten versions of the underlying work. RIAA asserts that there are innumerable arrangements of a particular work and a shorter version of such a work is still referred to as an arrangement.[110]

*Analysis.* For purposes of our discussion here, "arrangement" pertains to the musical aspect of the work, and not to changes in lyrics. Even so, defining the parameters of Section 115(a)(2) is difficult because there is no precedent and there is no common ground among the parties regarding the appropriate definition of "arrangement"for Section 115 purposes. Here, the parties have used various dictionaries and web sites to support their definitional argument, but there is no consensus on what sources are valid and reliable. While Copyright Owners' definition is appropriate to use in this context, we believe that the definition found in the *New Encyclopedia of Music and Musicians* ("NEMM") is as reliable, if not more comprehensive.[111] NEMM defines

---

[107] Copyright Owners Initial Brief at 16, citing http://www.answers.com/topic/arrangement. They also cite the Oxford English Dictionary (an arrangement is "[t]he adaptation of a composition for voices or instrument for which it was not originally written.") and the Cambridge Advanced Learner's Dictionary (an arrangement is "[a] piece of music that has been changed so that it can be played in a different way, especially by a different instrument").

[108] *Id.* at 15-16.

[109] RIAA Reply Brief at 15, and n. 11, citing www.answers.com/topic/arrangement (stating that an arrangement "fully represents the melodic, harmonic, and rhythmic structure" of the work," but also stating that an arrangement "may specify or vary some or all of . . . [the] sequence, including the order and number of repeats of sections such as verses and choruses. . .introduction, coda, modulations, and other variations."

[110] *Id.* at 16.

[111] We note that when examining musical works for the purpose of copyright registration, the Performing Arts Section of the Copyright Office defines "arrangement" as "harmony added to an existing melody, or a transcription, such as a band arrangement of a piano piece." Copyright Office examiners also rely on the definition of "arrangement" in Section 408.01 of Compendium II of Copyright Office Practices which states that: "A musical arrangement is a work that results from the addition of new harmony to a preexisting work. The standard of originality for arrangements takes into consideration the fact that a melody carries with it a certain amount of implied (continued...)

an arrangement as "The process or result of readjusting a work for performance by different artistic means from that originally intended. Also, a relatively close or literal rendering of the substance and form of a work with only those modifications demanded by the limitations or peculiarities of the medium in view."[112] We can make three general observations based on the definitions and the law. First, the user's right to make a melodic arrangement should be limited so that the basic character of the musical work is preserved.[113] Second, a mastertone that merely shortens the full length work to conform it to the physical limitations of the cellphone does not affect the musical work's arrangement. Finally, a ringtone that makes minor changes to lyrics of the underlying musical work generally does not affect its arrangement.[114] There may be other ringtones that are substantially different from the underlying musical work, but whether such changes impinge upon the arrangement of the work is a factual question, which goes beyond the scope of this proceeding.

Copyright Owners assert that ringtones are actually abridgements, not arrangements, of a musical work, and therefore they fall outside the Section 115 license.[115] While Copyright Owners do not fully state what constitutes an abridgement for the purposes of Section 115(a)(2), RIAA takes issue with this conclusion and cites a litany of definitions, references, and examples to support its case[116]. In this context, and without adequate explanation from the Copyright Owners, we surmise that the gist of their argument is that a ringtone abridges a full length musical work, and as such, should be considered a derivative work. If that is the case, we need not re-examine the matter as it is analyzed and discussed in detail in the derivative work section above. Our conclusion here is bolstered by the fact that the term abridgement does not appear in Section 115(a)(2), but it does appear in the definition of derivative works in Section 101 of the Copyright Act.

*Fundamental Character of the Work.* Copyright Owners state that even assuming, for argument's sake, that ringtones qualify as musical arrangements, Section 115 is inapplicable

---

[111] (...continued)
harmony." Compendium II of Copyright Office Practices, § 408.07 (1984).

[112] *See* Waldo Selden Pratt, *The New Encyclopedia of Music and Musicians*, Macmillan (1929).

[113] *See* Preliminary Draft for Revised U.S. Copyright Law and Discussion and Comments on the Draft. House Comm. on the Judiciary, 88th Cong., Copyright Revision Part 3, at 444 (1964).

[114] *See Shapiro, Bernstein & Co., Inc. v. Jerry Vogel Music Co., Inc.* (S.D.N.Y. 1947) (holding that a new version of copyrighted song "Melancholy" under the title "My Melancholy Baby" with an additional chorus in march time, but using identical lyrics except for a slight variation in the base of the accompaniment, did not constitute a copyrightable new work).

[115] Copyright Owners Initial Brief at n. 6.

[116] RIAA Reply Brief at 15. For example, referring to Cambridge Advanced Learner's Dictionary, RIAA states that an abridgment is "to make a book, play or piece of writing shorter by removing details and unimportant information."

because the basic melody and fundamental character of the underlying work has been changed. They assert that ringtones delete large portions of the underlying works including much of the melody, verses, bridges, codas, and instrumental interludes. They conclude that the reduction of a work to a short refrain excludes all of the other elements that make up the overall character of the work.[117]

Copyright Owners assert that ringtones change the character of the underlying work in other ways as well. They assert that ringtones transform artistic works into utilitarian substitutes for the ring of the telephone; the character of a musical work fundamentally changes when the "original artistic vision expressed by the work in the form of a full-length song is superseded by a new purpose of serving as a thirty second mobile phone ringer." Copyright Owners argue that the use of a musical work as a ringtone departs from the integrity of the original composition, "a result that Congress properly avoided" by excluding such uses from the Section 115 scheme.[118]

RIAA asserts that typical commercial ringtones do not change the basic melody of a musical work; to the contrary, ringtones by their very nature seek to accurately reproduce the basic melody with little or no alteration. RIAA asserts that the limitations in Section 115(a)(2) to prevent changes to the "basic melody and fundamental character of the work" were added specifically to address the objections of the copyright owners that the arrangement privilege would otherwise allow "radical alterations" to the "material detriment of the work."[119] RIAA states that in the case of mastertones, the melody is exactly the same as in the commercial sound recording release and distributing a clip does not radically alter, pervert, distort, or travesty the musical work in contravention of Congressional intent. RIAA asserts that since Copyright Owners frequently license large parts of their catalogs for use as ringtones, that use cannot be said to be to the material detriment of the work.[120] RIAA concludes that creating a partial copy of the work does not constitute a radical alteration, and if it did, mastertones would not be commercially successful.

Analysis. Before discussing the "fundamental character" issue, we must note that the arrangement privilege does not represent the outer limit of what other kinds of changes (apart from what is conventionally understood as an arrangement) may be made to a musical work within the scope of the Section 115 statutory license. In this sense, an analysis of the arrangement privilege as it applies to mastertones is irrelevant except to the extent that some of these types of ringtones may actually tinker with the style and interpretation of the underlying work. Mastertones are taken from commercially released sound recordings which may involve arrangements, but for purposes of this proceeding, we assume that the commercially released

---

[117] Copyright Owners Initial Brief at 16-17.

[118] *Id.* at 17.

[119] RIAA Reply Brief at 14, citing *Goldstein*, § 7.4.2, n. 7.

[120] RIAA Initial Brief at 26.

sound recording was licensed (either by means of a voluntary license or the statutory license), and that the arrangement in the sound recording was within the scope of the license. In such cases, which we will assume to be the norm, the use of the same arrangement in the mastertone would not be in contravention of the limitations of Section 115(a)(2). Given this conclusion, we need not specifically address whether mastertones change the fundamental character of the work, but a statutory analysis is still necessary to determine the legal status of monophonic and polyphonic ringtones under Section 115.

As stated above, Section 115(a)(2) of the Copyright Act permits statutory licensees to make a musical arrangement of the work "to the extent necessary to conform it to the style or manner of interpretation of the performance involved," but the arrangement shall not "change the basic melody or fundamental character of the work."[121] The Act's legislative history states that the provision was enacted to prevent the music from being "perverted, distorted, or travestied."[122] The language of the statute was meant to avoid the desecration of the underlying musical work.[123] Under the statute, it is reasonable to conclude that a portion of a pre-existing musical work truncated to ringtone length does not change the basic melody and fundamental character of the work. Certainly, this conclusion applies to mastertones, and it would almost always apply to monophonic or polyphonic ringtones that preserve the basic melody of the underlying musical work. As such, we cannot conclude that the musical work customized for ringtone purposes has been perverted, distorted, or travestied, as those terms are commonly defined, as no changes have been made to the melody of the original work.[124] In sum, we do not believe, as Copyright Owners argue, that the reduction of a work to a short excerpt fundamentally changes the overall character of the work or impugns the integrity of the work.

In the absence of a case directly addressing the scope of Section 115(a)(2), it is useful to examine precedent involving the derivative work rights in a musical composition. For example,

---

[121] 17 U.S.C. § 115(a)(2).

[122] *See* H. R. Rep. No. 94-1476, at 109 (1976). Congress did not define the terms "perverted," "distorted," or "travestied." However, the America Heritage Dictionary defines "perverted" as "Deviating from what is considered right and correct." It defines "distorted" as "to give a false or misleading account of." And, it defines "travestied" as "An exaggerated or grotesque imitation, such as a parody of a literary work." *See* http://dictionary.reference.com for these definitions.

[123] *See* Preliminary Draft for Revised U.S. Copyright Law and Discussion and Comments on the Draft. House Comm. on the Judiciary, 88th Cong., Copyright Law Revision Part 3, at 444 (1964) (noting the concern of composers: "We have had numerous instances where a record manufacturer has taken a sacred or serious composition and without authority changed it into a Rock and Roll or jazz arrangement in such a manner as to constitute a desecration. We have also had instances of unauthorized adaptations which are beyond the limits of reason and good taste; the writing and recording of lyrics to instrumental compositions; the making and recording of burlesque versions and the recording of salacious versions.").

[124] The legislative history notes that the statutory licensee should have some latitude, but not complete freedom, to alter the character of the work. *See Further Discussions and Comments on the Preliminary Draft for Revised U.S. Copyright Law*. House Comm. on the Judiciary, 88th Cong., Copyright Law Revision Part 4, at 430 (Comm. Print 1964).

in *Woods v. Bourne*, the Second Circuit discussed the factors upon which a derivative musical work may be considered an original work for copyrightability purposes:

> "something of substance added making the piece to some extent a new work with the old song embedded in it but from which the new has developed. It is not merely a stylized version of the original song where the major artist may take liberties with the lyrics or the tempo, the listener hearing basically the original tune. It is, in short, the addition of such new material as would entitle the creator to a copyright on the new material."[125]

Under *Woods*, a typical monophonic or a polyphonic ringtone would be considered a mere "stylized version" of the original musical work with no changes to the melody, but perhaps some changes to the tempo. In such cases, an electronic synthesizer may generate a monophonic or polyphonic adaptation of the underlying musical work for play on a cellphone, and the ringtone may have been conformed to fit within the parameters of its intended use. However, where the ringtone has added non-trivial "new material," such that it would be considered a derivative work, the Section 115 license may not be available because the ringtone was not changed simply to conform it for use in a cellphone.[126]

## VII. Private Use

Section 115 states that "a person may obtain a compulsory license only if his or her primary purpose in making phonorecords is to distribute them to the public for private use including by means of a digital phonorecord delivery."[127] According to the Act's legislative history, the "private use" limitation was added to Section 115 to clarify that manufacturers of

---

[125] *Woods*, 60 F.3d at 991 (quoting *Woods v. Bourne Co.*, 841 F. Supp. 118, 121 (S.D.N.Y. 1994)). In *Woods*, the District Court decided the novel issue of whether any musical additions or variations to the preexisting melody and lyrics of a song resulted in a derivative work that was entitled to copyright protection. In order to qualify as a derivative musical work, the court found that "there must be present more than mere cocktail pianist variations of the piece that are standard fare in the music trade by any competent musician. . . . [There must be] something of substance added making the piece to some extent a new work with the old song embedded in it but from which the new has developed. . . . It is, in short, the addition of such new materials as would entitle the creator to a copyright in the new material." *See Agee v. Paramount Commc'ns, Inc*, 853 F. Supp. 778, 788 (S.D.N.Y. 1994), *aff'd in part, rev'd in part on other grounds*, 59 F.3d 17 (2d Cir. 1995); *see also, Shapiro, Bernstein & Co. v. Jerry Vogel Music Co.*, 73 F. Supp. 165, 167 (S.D.N.Y. 1947) (finding changes in the rhythm and accompaniment, without changes in the tune or lyrics, were not protectable as a derivative work).

[126] *See Gilliam v. American Broadcasting Comp., Inc.*, 583 F. 2d 14, 20-21 (2d Cir. 1976) (holding that a licensee infringes a copyright where it publishes the protected work after making extensive, unauthorized changes which impair the integrity of the original work).

[127] 17 U.S.C. § 115(a)(1).

specialty recordings for use in jukeboxes and business music services could not rely on the mechanical license in their use of musical works.[128]

Copyright Owners assert that ringtones fail to satisfy Section 115's requirement that the phonorecords be distributed for private use. They argue that the "private use" limitation contemplated by Congress includes only ordinary listening use for private enjoyment of music. To bolster their argument that a ringtone serves only public functions, Copyright Owners assert that a ringtone: (1) is no substitute for enjoyment of the full length musical work; (2) provides the notification functions of a phone ring; and (3) is marketed as a lifestyle accessory. They conclude that ringtones provide mobile phone users a means to publicly identify and express themselves to their friends, colleagues and the public at large.[129]

RIAA asserts that ringtones are distributed to individual consumers for private use. It states Copyright Owners' arguments ignore common sense, the relevant statutory language, and the legislative history of the Copyright Act. RIAA states that although ringtones do provide users a means to identify and express themselves, that is true for any phonorecord. RIAA asserts that all kinds of phonorecords distributed and sold to private customers are sometimes used in public, yet no one argues that such uses make the Section 115 license inapplicable. It argues that uses of CDs in public places, for example, do not make the Section 115 license unavailable to distributors for the simple reason that it is the primary purpose of the distributor, not the use by the consumer, that is relevant. According to RIAA, the phrase "private use" is not the opposite of "public performance," but means "personal" or "noncommercial use." RIAA asserts that ringtones satisfy the private use requirement because the primary purpose of the distributor is to distribute them to individual consumers for their own personal use and enjoyment, on those consumers' cell phones, in whatever manner the consumer sees fit, not to distribute them for commercial use such as public broadcasting, in motion pictures, business music services or jukeboxes.[130]

---

[128] *See Supplementary Register's Report on the General Revision of the U.S. Copyright Law: 1965 Revision Bill*, House Comm. on the Judiciary, 89th Cong., Copyright Law Revision Part 6, at 55 (Comm. Print 1965) ("[T]he provision would not apply, for example, to reproduction in a motion picture sound track or recording primarily for use in broadcasts, wired music transmissions, or jukeboxes."). *See also* H. R. Rep. No. 94-1476, at 108 (1976) ("The second sentence of clause (1), which has been the subject of some debate, provides that 'a person may obtain a compulsory license only if his or her primary purpose in making phonorecords is to distribute them to the public for private use.'" This provision was criticized as being discriminatory against background music systems, since it would prevent a background music producer from making recordings without the express consent of the copyright owner; it was argued that this could put the producer at a great competitive disadvantage with performing rights societies, allow discrimination, and destroy or prevent entry of businesses. The committee concluded, however, that the purpose of the compulsory license does not extend to manufacturers of phonorecords that are intended primarily for commercial use, including not only broadcasters and jukebox operators but also background music services.").

[129] Copyright Owners Initial Brief at 17-19, citing H.R. Rep. No. 90-83, at 68 (1967).

[130] RIAA Reply Brief at 17.

Analysis. We believe that Copyright Owners' arguments are inconsistent with the law and ignore common uses of music by individuals. The controlling language here is "for private use." It is undisputed that the term is directed at individual consumers who use music for personal enjoyment. However, Copyright Owners seem to suggest that once an individual takes the music out of the home, the statutory provision becomes null and void.[131] This cannot be what Congress intended. Here, we note that traditional phonorecords are used in public (*e.g.*, in boom boxes in public parks, in a car stereo while the automobile is driving down the street, etc.), but that does not disqualify them from the statutory license by violating their primary purpose of being for private use. While it may be true that some mobile phone users purchase ringtones to identify themselves in public, this use most likely would not be considered a public use as Congress intended that term to be understood in the Section 115 context, and in any event, there is no basis to conclude that the *primary purpose* of the ringtone distributor is to distribute the ringtone for "public"use. The legislative history accompanying Section 115(a)(1) does not contradict this conclusion. In fact, it clarifies that "the purpose of the compulsory license does not extend to manufacturers of phonorecords that are intended primarily for commercial use, including not only broadcasters and jukebox operators but also background music services."[132] Section 115 does not, however, impose any limitations on the use of a phonorecord once it is purchased by the consumer. As such, Section 115(a)(1) is not a bar to the inclusion of ringtones under the statutory license.

## VIII. First Use

The Section 115 license is available "[w]hen phonorecords of a nondramatic musical work have been distributed to the public in the United States under authority of the copyright owner." According to the Act's legislative history, once a musical work has been recorded and "distributed to the public," any person may obtain a compulsory license by complying with the provisions of Section 115.[133]

RIAA argues that a ringtone would be subject to statutory licensing after first use even if it were not otherwise covered by Section 115(a)(2). RIAA explains that even if certain musical works may be outside the scope of the statute in the first instance, Section 115 nonetheless would apply to the new musical work once that version was first distributed under the authority of the copyright owner. RIAA states that assuming for the sake of argument that a ringtone-length version of a musical work is a derivative work outside the scope of the Section 115 license, the

---

[131] *See* Copyright Owners Initial Brief at 19 ("In sum, far from being used for private musical entertainment in one's home, ringtones provide mobile phone users a means to identify themselves to their friends, colleagues and the public at large.").

[132] *See* n.128, *supra*.

[133] 17 U.S.C. § 115(a)(1). Mirroring the statutory language, the provision's legislative history states that the Section 115 license is "available to anyone as soon as 'phonorecords of a nondramatic musical work have been distributed to the public in the United States under the authority of the copyright owner.'" *See* H. R. Rep. No. 94-1476 (1976).

music publisher would have the right to prevent distribution of that ringtone-length work. However, once the publisher allowed one record company or ringtone distributor to distribute phonorecords of that ringtone-length work, the ordinary operation of Section 115 would then allow any person to obtain a statutory license with respect to the "new"ringtone version in question.[134]

Copyright Owners disagree that ringtones are subject to Section 115 after the public distribution by the copyright owner. They state that RIAA's argument is "premised on the inaccurate assumption that Section 115 applies to every digital transmission of a copyrighted phonorecord." They reiterate that ringtones are not subject to Section 115 because they are not complete musical works as required by Section 115, and in any event, the license is narrow and does not apply to works that are not distributed for private use.[135]

Analysis. We find that RIAA's reading of the statute is a reasonable one. The issue arises only if a particular ringtone qualifies as a derivative work due to the presence of copyrightable derivative work authorship in the ringtone. If, as we expect will usually be the case, the ringtone is not a derivative work, there will be no reason to reach this issue; the ringtone will be within the scope of the Section 115 license for the reasons stated above. However, if a particular ringtone, released with the permission of the copyright owner of the underlying musical work, does constitute a derivative work, then once that derivative work has been distributed under the authority of the copyright owner, anyone else may, by complying with the formal requirements of Section 115, obtain a compulsory license to make and distribute copies of that derivative work.

## IX.    Conditions and Limitations

As noted above, the Copyright Royalty Board asked the Register to address the legal conditions and/or limitations that would apply to ringtones if such works were found to DPDs under Section 115 of the Act.

RIAA asserts that the same conditions and limitations that apply to other phonorecords apply to ringtones. It posits that first use of the song under the authority of the copyright owner, notice, and payment of royalties, would be among the statutory conditions that would apply to the licensing of ringtones.[136]

Copyright Owners assert that there is no need for any limitations or conditions on the licensing of ringtones under Section 115, as all ringtones are excluded from the reach of the statute as a matter of law. They note, however, that if the Register were to conclude that some ringtones are subject to statutory licensing, the appropriate scope of such licensing would involve

---

[134]    RIAA Initial Brief at 26-27.

[135]    Copyright Owners Reply Brief at 17-18.

[136]    RIAA Reply Brief at 19, *citing* 17 U.S.C. §§ 115(a)(1), 115(b), and 115(c)(2).

factual issues. Copyright Owners state that in this case, the Copyright Royalty Boards' August 18, 2006 Order prohibited the submission of factual material that is required to make a reasoned determination of conditions on the licensing of ringtones within Section 115. They assert that the Copyright Royalty Boards' decision not to permit the submission of factual materials makes it "impossible to delineate" any informed conditions or limitations on the statutory licensing of ringtones.[137]

Analysis. We believe that Section 115's general requirements are applicable to all types of ringtones (monophonic, polyphonic, or mastertone). This applies to mastertones that are simple excerpts of the underlying musical work, ringtones (monophonic, polyphonic, and mastertones) that are not adjudged to be derivative works, and those ringtones that do not change the basic melody or fundamental character of the work. For newly created ringtones that have not been distributed to the public, and that fall outside the scope of the statute because they are derivative works or for any other reason outlined above, the Section 115 provisions do not apply. A commercial license is required to make and distribute those types of ringtones. There will, of course, be some instances where the status of a ringtone (monophonic, polyphonic, and mastertones) for Section 115 purposes is unclear. A judicial determination would be required where such mixed question of fact and law are present.

While we cannot delineate a litmus test that will in every case determine specifically whether a particular ringtone is or is not within the scope of the statutory license, the guidance offered above is sufficient for purposes of this proceeding. In general, a ringtone will fall within the scope of the compulsory license unless it has so altered the musical composition as to constitute a derivative work. Simply excerpting a single portion of a licensed sound recording of a musical composition will not constitute the making of a derivative work. It is clear that many, but not all, ringtones will fall within the scope of the Section 115 license. Therefore, it is appropriate for the Copyright Royalty Judges to determine royalties to be payable for the making and distribution of ringtones under the compulsory license.

October 16, 2006

*Marybeth Peters*

Marybeth Peters,
Register of Copyrights.

---

[137] Copyright Owners Reply Brief at 20 and n. 7.

34