UNITED STATES DISTRICT COURT
IN THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EIGHT MILE STYLE, LLC and
MARTIN AFFILIATED, LLC,

      Plaintiffs

vs.

APPLE COMPUTER, INC. and
AFTERMATH RECORDS d/b/a
AFTERMATH ENTERTAINMENT,

      Defendants.

_____/

Case No. 2:07-CV-13164
Honorable Anna Diggs Taylor
Magistrate Judge Donald A. Scheer

## DEFENDANTS AFTERMATH RECORDS' AND APPLE INC.'S REVISED MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT THEREOF

Daniel D. Quick (P48109)
Dickinson Wright PLLC
38525 Woodward Avenue
Suite 2000
Bloomfield Hills, MI 48304
(248) 433-7200
dquick@dickinsonwright.com

Kelly M. Klaus
Munger, Tolles & Olson LLP
355 South Grand Avenue
Suite 3500
Los Angeles, CA 90071-1560
(213) 683-9238
kelly.klaus@mto.com

Attorneys for Defendants

5640031.1

**REVISED MOTION FOR SUMMARY JUDGMENT**

Defendants Aftermath Records, doing business as Aftermath Entertainment ("Aftermath") and Apple Inc. ("Apple") (jointly "Defendants"), through their counsel, Dickinson Wright PLLC and Munger, Tolles & Olson LLP, hereby move for an order granting summary judgment on Plaintiffs' Complaint.

In support of their Motion, Defendants rely upon the facts, law and argument contained within the accompanying Brief in Support and the exhibits to this Motion (including those exhibits filed as part of the motions originally filed separately at Docket Nos. 34-39 and 53-64), all pleadings filed in this action, and any further submissions or arguments of counsel as may properly come before this Court.

Pursuant to Local Rule 7.1(a), concurrence in the relief requested in this Motion was sought, but not obtained.

5640031. 1

WHEREFORE, Defendants respectfully request that this Court grant their Motion.

s/Daniel D. Quick
Daniel D. Quick (P48109)
Dickinson Wright PLLC
38525 Woodward Avenue
Suite 2000
Bloomfield Hills, MI 48304
 (248) 433-7200
dquick@dickinsonwright.com

Kelly M. Klaus
Munger, Tolles & Olson LLP
355 South Grand Avenue
Suite 3500
Los Angeles, CA 90071-1560
 (213) 683-9238
kelly.klaus@mto.com
Attorneys for Defendants

5640031. 1

UNITED STATES DISTRICT COURT
IN THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EIGHT MILE STYLE, LLC and
MARTIN AFFILIATED, LLC,

        Plaintiffs

vs.

APPLE COMPUTER, INC. and
AFTERMATH RECORDS d/b/a
AFTERMATH ENTERTAINMENT,

        Defendants.

_____/

Case No. 2:07-CV-13164
Honorable Anna Diggs Taylor
Magistrate Judge Donald A. Scheer

**BRIEF IN SUPPORT OF AFTERMATH RECORDS'
AND APPLE INC.'S REVISED MOTION FOR SUMMARY JUDGMENT**

Daniel D. Quick (P48109)
Dickinson Wright PLLC
38525 Woodward Avenue
Suite 2000
Bloomfield Hills, MI 48304
(248) 433-7200
dquick@dickinsonwright.com

Kelly M. Klaus
Munger, Tolles & Olson LLP
355 South Grand Avenue
Suite 3500
Los Angeles, CA 90071-1560
(213) 683-9238
kelly.klaus@mto.com

Attorneys for Defendants

## CONCISE STATEMENT OF ISSUES PRESENTED

Whether complete or partial summary judgment should be granted to Aftermath and Apple ("Defendants") on Plaintiffs' claim for infringement of copyrights in 93 musical compositions on the grounds that:

(1)     Defendants' use of the compositions has been expressly authorized pursuant to one or more agreements with persons with the undisputed right to convey such express authorization, specifically:

(a)     Through "controlled composition" clauses in artist recording agreements between F.B.T. Productions, LLC (a company owned by the same individuals as Plaintiffs) and Marshall B. Mathers III (p/k/a "Eminem") and Aftermath, which clauses expressly state that compositions authored "in whole or in part" by Eminem – *i.e.*, *all* compositions at issue in this case – "will be licensed to Aftermath and its distributors/licensees";

(b)     As to the eight compositions at issue that appear on the soundtrack album for the motion picture, "Eight Mile," through Eminem's express agreement with Shady Records that those compositions are "hereby license[d]" for distribution and through co-author Obie Trice's specific authorization with regard to the composition "Love Me";

(c)     As to the 33 compositions at issue that were produced by Eminem appearing on albums by Shady Records, through Eminem's express agreement to "hereby grant" to Interscope and its designees "the irrevocable, nonexclusive right to reproduce" any such composition;

(d)     As to the 53 compositions at issue written with co-authors who are themselves recording artists, through those co-authors' own controlled composition clauses

and/or through mechanical license agreements that expressly authorize the dissemination in issue;

    (e)  As to the composition for the song, "Lose Yourself," through an express license from Plaintiffs that Plaintiffs have *admitted* authorizes the dissemination of that song that Plaintiffs challenge in this case.

    (2)  Defendants' use, even if not authorized expressly, has been impliedly licensed by Plaintiffs, who have been responsible for delivering the compositions embodied in sound recordings to Defendant Aftermath for widespread dissemination, and who *to this day* have continuously accepted and retained payment on account of Defendants' use?

    Defendants' answer: "Yes."

## CONTROLLING AUTHORITIES

**Cases**

*Allman Bros. v. Sony BMG Music Entertainment,*
   No. 06 Civ. 3252 (GBD), 2008 WL 2477465 at *2 (S.D.N.Y. June 18, 2008)

*Bridgeport Music, Inc. v. WB Music Corp.,*
   508 F.3d 394 (6th Cir. 2007)

*Cambridge Literary Properties, Ltd. v. W. Goebel Porzellanfabrik G.,*
   510 F.3d 77 (1st Cir. 2007)

*Desir v. Spano,*
   687 N.Y.S.2d 411 (N.Y. App. Div. 1999)

*Effects Associates, Inc. v. Cohen,*
   908 F.2d 555 (9th Cir. 1990)

*Foster-Gardner, Inc. v. Nat'l Union Fire Ins. Co.,*
   959 P.2d 265 (Cal. 1998)

*Fred Ahlert Music Corp. v. Warner/Chappell Music, Inc.,*
   155 F.3d 17 (2d Cir. 1998)

*Graham v. James,*
   144 F.3d 229, 236 (2d Cir. 1998)

*I.A.E., Inc. v. Shaver,*
   74 F.3d 768 (7th Cir. 1996)

*John G. Danielson, Inc. v. Winchester-Conant Properties, Inc.,*
   322 F.3d 26 (1st Cir. 2003)

*Johnson v. Jones,*
   149 F.3d 494 (6th Cir. 1998)

*Lulirama Ltd., Inc. v. Axcess Broadcast Servs., Inc.,*
   128 F.3d 872 (5th Cir. 1997)

*McKay v. Columbia Broadcasting Sys.,*
   324 F.2d 762 (2d Cir. 1963)

*Murray Hill Publ'ns, Inc. v. ABC Comm'ns, Inc.,*
   67 F. Supp. 2d 754 (E. D. Mich. 1999)

*Newton v. Diamond,*
   388 F.3d 1189 (9th Cir. 2004)

*Oddo v. Ries,*
   743 F.2d 630 (9th Cir. 1984)

*Peer Int'l Corp. v. Pausa Records, Inc.,*
   909 F.2d 1332 (9th Cir. 1990)

*Reinhardt v. Wal-Mart Stores, Inc.,*
   547 F. Supp. 2d 346 (S.D.N.Y. 2008)

*Roger Miller Music, Inc. v. Sony/ATV Publishing, LLC,*
   477 F.3d 383 (6th Cir. 2007)

*Tang v. Putruss,*
   521 F. Supp. 2d 600 (E. D. Mich 2007)

*Wrench LLC v. Taco Bell Corp.,*
  256 F.3d 446  (6th Cir. 2001)

## Statutes

17 U.S.C. § 106
17 U.S.C. § 115 (c) (3)(A)
17 U.S.C. § 115(c)(3)(E)
17 U.S.C. § 201(a)
17 USC § 401(c)

## Federal Rules

Fed. R. Civ. P. 56(c)

## Other Authorities

H.R. Rep. No. 94-1476 at 121 (1976)
Melville Nimmer & David Nimmer, *Nimmer on Copyright*, § 8.04 (2007)
Melville Nimmer & David Nimmer, *Nimmer on Copyright*, § 8.23[E] (2007)
Donald S. Passman, *All You Need to Know About the Music Business* at 214 (6th ed. 2006)
Sidney Shemel & M. William Krasilovksy, *This Business of Music* at 19 (5th ed. 1985)

**BRIEF IN SUPPORT OF AFTERMATH RECORDS' AND APPLE INC.'S REVISED MOTION FOR SUMMARY JUDGMENT**[1]

## I.   INTRODUCTION

For many years prior to and continuing throughout this litigation, Plaintiffs have received and retained royalty payments totaling more than $647,600 based on the sale through Apple Inc.'s ("Apple") iTunes Store of sound recordings embodying musical compositions in which the Plaintiffs claim a copyright interest. Notwithstanding their collection of these royalties, Plaintiffs now say that Apple and Aftermath Records (the record label that owns many of the recordings) ("Aftermath") are liable for copyright infringement because the distribution of the compositions through the form of digital downloads supposedly was not authorized. Plaintiffs' claim fails, and summary judgment should be granted to Defendants, because the undisputed facts show their use has been authorized, either expressly or by implied license.

*Express Licenses*:  Defendants are entitled to summary judgment or partial summary judgment on Plaintiffs' complaint based on express licenses authorizing the challenged uses.

The works in issue are musical compositions written in whole or in part by the popular recording artist Marshall B. Mathers III (p/k/a "Eminem") that are embodied in sound recordings that Aftermath (or related companies) owns or distributes pursuant to written agreements with Eminem and other artists.[2] These compositions were expressly licensed in these written agreements through what are called "controlled composition" clauses. Controlled composition clauses exist for a number of purposes, not the least of which is to ensure that the record

---

[1] Per the Court's July 25, 2008 Order, this Revised Brief contains all of Defendants' arguments in support of full or partial summary judgment based on express or implied license grounds. To distinguish among the sets of exhibits previously filed with separate motions on May 4, 2008 and July 16, 2008, citations to the May 4, 2008 exhibits (Docket Nos. 34-39), now include a lower case letter a (i.e., Ex. 1a), and citations to the July 16, 2008 exhibits (Docket Nos. 53-64), now include a lower case letter b (i.e., Ex. 1b). Defendants are lodging concurrent with this Revised Motion and Brief a Revised Exhibit 1b and eight additional exhibits, numbered 14-21.

[2] "Sound recordings and their underlying musical compositions are separate works with their own distinct copyrights." *See, e.g., Newton v. Diamond*, 388 F.3d 1189, 1191 (9th Cir. 2004).

company will be able to distribute not just the sound recordings it owns pursuant to its agreement with the artist, but the musical compositions embodied in those recordings that were created in whole or in part by the artist.  Here, the controlled composition clauses in Eminem's artist agreements with Aftermath expressly state that all compositions written "in whole or in part" by Eminem – which includes *all* compositions at issue here, Compl. ¶ 8 – "will be licensed to Aftermath and its distributors/licensees," indisputably including Apple and its iTunes service.

Plaintiffs have put forth a number of specious arguments to avoid the dispositive force of the express authorization in Eminem's controlled composition clauses.  Even if those arguments could avoid summary judgment (and they cannot), Defendants *still* would be entitled to summary judgment on the compositions at issue pursuant to *other grants of express authorization* that Plaintiffs cannot challenge.  These other grants of express authorization are:

- Eminem's express authorization for the dissemination of the eight compositions that appear on the soundtrack album for the motion picture, "Eight Mile";

- Eminem's express authorization for the dissemination of 33 compositions he produced that appear on albums released by Shady Records;

- The express authorization by co-authors of 53 of the compositions in issue, through those co-authors' own controlled composition clauses and/or "mechanical license" agreements executed by them or their publishers; and

- As to one composition – "Lose Yourself" – through an express license from Plaintiffs that Plaintiffs have *admitted* authorizes the dissemination challenged here.

***Implied License***:  Even if Defendants' use had not been authorized expressly (which it was), well-established law and the undisputed record show that the use was authorized impliedly by operation of law.  Indeed, Plaintiffs have manifested the objective intent of authorizing the nonexclusive use of their works, by receiving royalty statements that reflect payments for digital downloads and then cashing the checks that accompanied the statements – something the Plaintiffs have done every quarter for years and continue to do right up through the present day.

The underlying contracts and the copyright laws do not allow Plaintiffs to now turn around and claim infringement.

## II.     UNDISPUTED FACTS

### A.     The Compositions At Issue

Plaintiffs Eight Mile Style, LLC ("Eight Mile") and Martin Affiliated, LLC ("Martin Affiliated") claim ownership interests in the copyrights for 93 musical compositions "written and composed, in part, by Marshall B. Mathers, III, professionally known as 'Eminem.'"  Compl. ¶ 8.  The compositions are embodied in sound recordings released on albums.  For purposes of the issues herein, the compositions are embodied on one of three different groups of albums: albums that Eminem recorded pursuant to his agreements with Aftermath (the "Eminem Albums"); the soundtrack album for the film "Eight Mile" (the "Eight Mile Soundtrack"); and other artists' albums that include recordings embodying compositions in issue (the "Co-Authors' Albums").[3]

### 1.     Compositions On The Eminem Albums[4]

Forty-nine of the compositions are embodied in recordings on albums delivered by Eminem pursuant to the artist recording agreements between Aftermath and F.B.T. Productions, LLC (a company wholly-owned by the same individuals that own Plaintiffs) or Eminem.[5]

---

[3] One composition identified by Plaintiffs – "Couch Potato" by Weird Al Yankovic – is a parody of the song, "Lose Yourself."  This recording was not released by Aftermath or its affiliates, and Aftermath therefore cannot be liable based on this work.

[4] For the Court's ease of reference, the compositions and their corresponding grant of license are set out on the Revised Exhibit 1b, submitted with this Revised Motion.  All citations herein to Ex. 1b are to the Revised Exhibit.  As this chart indicates, the Eminem Albums are "The Eminem Show," "Encore," and "Curtain Call."

[5] Aftermath is a joint venture whose partners include UMG Recordings, Inc. ("UMG"); Interscope Records, a California general partnership, whose general partner is UMG; and ARY, Inc.  Ex. 9a (Hoffman Decl. ¶ 2.) The UMG in UMG Recordings is an acronym for Universal Music Group.  Universal Music Group distributes through various channels sound recordings on

Compl. ¶ 8; Ex. 9a (Hoffman Decl. Exs. A & D). Those agreements are dated March 9, 1998 (the "1998 Agreement") and July 2, 2003 (the "2003 Agreement"). *Id.* (jointly, the "Agreements").

The 1998 and 2003 Agreements provide, among other things, for the creation of sound recordings, the payment of specified royalties for Aftermath's exploitation of those recordings, and payments and advances against those royalties. Ex. 9a (Hoffman Decl. Exs. A ¶¶ 3A, 4 (1998 Agreement) & D ¶¶ 4, 5 (2003 Agreement)). The Agreements further provide that all master sound recordings created by Eminem during the terms of the Agreements "shall be Aftermath's property and Aftermath shall be the copyright proprietor thereof (specifically excluding the copyright in the underlying musical compositions)." *Id.* (Exs. A ¶ 8 (1998 Agreement) & D ¶ 8 (2003 Agreement)). The Agreements make clear that "Aftermath and its distributors/licensees shall have the exclusive right to exploit all such masters in any and all forms of media now known and hereinafter developed ...." *Id.*

The sound recordings and the underlying musical compositions embodied in them are covered by separate copyrights. *See* n.2, *supra.* The copyright in compositions includes, *inter alia*, the rights to reproduce and distribute copies of the same as embodied in recordings. 17 U.S.C. § 106(1), (3). The Agreements reserve ownership of the composition copyrights to their owners, but do not thereby leave Aftermath powerless to exploit the recordings that embody those compositions. On the contrary, each Agreement contains a provision, entitled "Mechanical Royalties," that authorizes the exploitation of controlled compositions embodied by the recordings, and establishes the rate for the same:

> *All Controlled Compositions (i.e., songs written or controlled, directly or indirectly, in whole or in part, by F.B.T., Artist [Eminem], any affiliated company of F.B.T., Artist, any producer or any affiliated company of any producer) will be licensed to Aftermath and its distributors/licensees* and Aftermath and its

behalf of various record labels, such as G-Unit Records, Aftermath, and Shady Records, Inc. Ex. 5b (Hoffman Decl. ¶¶ 2-4.)

distributors'/licensees' Canadian licensee for the U.S. and Canada, respectively, at a rate equal to 75% (the "Controlled Rate") of the minimum statutory rate (i.e., without regard to the so-called "long-song formula").

Ex. 9a (Hoffman Decl., Ex. A ¶ 6(a) (1998 Agreement) (emphasis added).[6]

Controlled composition clauses are common and important provisions in artist recording agreements. Ex. 9a (Hoffman Decl. ¶ 5); Ex. 4a (Sidney Shemel & M. William Krasilovksy, *This Business of Music* at 19 (5th ed. 1985)) (describing such clauses as common); Ex. 5a (Donald S. Passman, *All You Need to Know About the Music Business* at 214 (6th ed. 2006))(describing controlled composition clauses as among the "most significant" in artist recording agreements). Controlled composition clauses provide for a "mechanical license," granting "the right to record and distribute any composition written or owned, in whole or in part, by the artist." Ex. 4a (Shemel & Krasilovsky, *supra*, at 19). Controlled composition clauses also set the rate for payment of royalties for the reproduction of compositions on phonorecords, usually by reference to a rate defined in the Copyright Act.[7] *See* Ex. 5b (Hoffman Decl., ¶ 7)

---

[6] The above-quoted language is taken from the 1998 Agreement. The 2003 Agreement contains the same language as to the grant of license, but increases the Controlled Rate and removes the reference to F.B.T. *See* Ex. 9a (Hoffman Decl.. Ex. D ¶ 6 (2003 Agreement)). "F.B.T." is F.B.T. Productions, LLC, owned by Jeff and Mark Bass, who also own Eight Mile. Ex. 3a at 10. Martin Affiliated is owned by Joel Martin, who is Eight Mile's manager. F.B.T. was a party to the 1998 Agreement, and Jeff Bass (for F.B.T.) and Joel Martin both signed the 2003 Agreement. *See* Ex.9a (Exs. A at 15 (1998 Agreement) & D at 24 (2003 Agreement)).

[7] The Copyright Act has a compulsory license provision, 17 U.S.C. § 115, which provides that the owner of a composition copyright must license its composition for making and distributing phonorecords, at a defined statutory rate, if certain criteria are established. Melville Nimmer & David Nimmer, *Nimmer on Copyright*, § 8.04 (2007). The statutory compulsory scheme is generally modified through mechanical licenses entered into between the parties, with the statutory rate used as a benchmark. *Peer Int'l Corp. v. Pausa Records, Inc.,* 909 F.2d 1332, 1337 (9th Cir. 1990). A mechanical license thus "allows the licensee to use a song in the manufacture and sale of phonorecords" in the same way the statutory compulsory license does. *Fred Ahlert Music Corp. v. Warner/Chappell Music, Inc.,* 155 F.3d 17, 20 n.1 (2d Cir. 1998).

5640031.1

### 2.    Compositions On The Eight Mile Soundtrack

As noted, *all* of the musical compositions in issue are specifically alleged to have been "written and composed, in part, by [Eminem]," Compl. ¶ 8.  Hence, *all* are "controlled compositions" under the 1998 and 2003 Agreements.  Aftermath has *additional* express authorization to disseminate the eight compositions embodied in sound recordings on the Eight Mile Soundtrack pursuant to a separate written agreement that Eminem executed in favor of Shady Records ("Shady"), a label distributed by Interscope (one of the owners of Aftermath). Ex. 14 (the "Soundtrack Agreement").  *See* Exs. 1b (identifying compositions) & 2b (list of compositions and corresponding albums provided by Plaintiffs); Ex. 5b (Hoffman Decl. ¶ 4). The Soundtrack Agreement has its own controlled composition clause, providing that Eminem "hereby license[s]" to Shady the compositions on that record that he co-authors.  Ex. 14 ¶ 6.

Aftermath also has express authorization from Eminem to disseminate the compositions appearing on the Eight Mile Soundtrack that Eminem co-wrote and *produced*.  In an amendment to an agreement between Shady and Aftermath's co-owner Interscope (the "Shady-Interscope Amendment"), Eminem "hereby grant[ed]" to Interscope and its designees "the irrevocable, nonexclusive right to reproduce each Controlled Composition recorded" in any master Eminem produces for Shady.  *See* Ex. 17 ¶ 14 at 2(f)(viii).  This controlled composition clause grants the right to distribute the 33 compositions embodied in sound recordings produced by Eminem that appear on Shady-released albums, including the Eight Mile Soundtrack and four of the Co-Author Albums.  *See* Ex. 1b (identifying compositions) 2b (list of compositions and corresponding albums provided by Plaintiffs); Ex. 17 ¶ 15, 2B.

### 3.    Compositions On The Co-Authors' Albums[8]

The compositions in issue indisputably have multiple co-authors. Compl. ¶ 8; Ex. 4b

---

[8] The Co-Author Albums include "Get Rich or Die Trying" and "The Massacre" by 50 Cent, "Cheers" by Obie Trice, "D12 World" by D12 and "Hunger for More" by Lloyd Banks.  *See* Ex. 1b (identifying compositions).

(copyright registrations).[9]  Co-authors have authorized the dissemination of 53 of the compositions at issue in one or both of the following ways:

First, several of the co-authors are recording artists:  Obie Trice, Christopher Lloyd p/k/a Lloyd Banks, Andre Young p/k/a Dr. Dre, Curtis Jackson p/k/a 50 Cent, Rufus Johnson, Von Carlisle, Deshawn Holton, Ondre Moore, and Denaun Porter (collectively, for purposes of this motion, the "Artist Co-Authors").  The Artist Co-Authors have their *own* agreements whereby Aftermath, Interscope (a co-owner of Aftermath) or G-Unit Records (another label co-owned by Aftermath) acquired the rights to their exclusive recording services (the "Co-Author Agreements").  The Co-Author Agreements also include controlled composition clauses.  Such clauses in the Co-Author Agreements expressly "grant . . . an irrevocable license" to Aftermath, Interscope or G-Unit to reproduce and distribute the compositions in issue that appear on the Co-Authors' Albums.  *See* Ex. 5b (Hoffman Decl., ¶ 7).[10]

Second, publishers for the Artist Co-Authors and other co-authors have entered into separate mechanical licenses for 36 of the compositions.  *See* Ex. 1b (summarizing compositions for which mechanical licenses were granted).  These mechanical licenses expressly authorize Defendants to exploit the compositions in the exact manner Plaintiffs here challenge.  *See* Ex. 1b (identifying compositions); Ex. 6b (mechanical licenses).  Plaintiffs have acknowledged that the publishers who issued these mechanical licenses are copyright co-owners or co-publishers.  *See*

---

[9] The copyright registrations for the 53 compositions with licenses granted by co-authors are compiled alphabetically by composition as Exhibit 4b.  These registrations are excerpted from those that were attached as Exhibit A to Plaintiffs' Complaint.

[10] In addition to the songs on the Co-Authors' Albums, the controlled composition clause in the artist agreement of Andre Young p/k/a Dr. Dre, whose company ARY, Inc. is a co-owner of Aftermath, authorizes the distribution of the 16 compositions co-written and produced by Dr. Dre, regardless of which album those compositions appear on.  See Ex. 5b (Hoffman Decl. Ex. B at 11); Ex. 1b (identifying compositions).  In the Aftermath Joint Venture Agreement, Dr. Dre agreed to apply the controlled composition clause in his artist agreements to compositions that he co-writes and produces for artists signed to Aftermath, Shady, and G-Unit, which includes Eminem and the Artist Co-Authors.  See Ex. 5b (Hoffman Decl., Ex. B-1 at 5(d)(iv) & (e)).

5640031.1

Ex. 2b (Responses to Interrogatories 1 and 2, with attached Schedule 1 listing copyright claimants); Ex. 3b, Martin Dep. Tr. 115:11-116:15. The co-authors whose works are subject to these mechanical licenses are the Artist Co-Authors listed above, and additional co-authors or their publishers.[11]

In addition to these grants from co-authors, Eminem expressly granted the rights to distribute the 33 compositions that are embodied in sound recordings that he produced for Shady. Ex. 17 ¶ 14 at 2(f)(viii). All of the Co-Author Albums are Shady releases except Lloyd Banks' "Hunger for More." *See* Ex. 1b.

### B.      Plaintiffs' Admitted Express License For "Lose Yourself"

The composition for the song "Lose Yourself", the sound recording of which was recorded for the Eight Mile Soundtrack, is covered by the controlled composition clauses in both Eminem's recording agreements and the Soundtrack Agreement. Plaintiffs also have admitted that they expressly issued a mechanical license to distribute that composition in permanent download form. *See* Ex. 12b ("Lose Yourself" license); Ex. 13b, Martin Dep. Tr. 479:20. Based on their admitted express license, Plaintiffs have no possible claim for infringement based on "Lose Yourself."[12]

### C.      Plaintiffs' Receipt and Retention of Payment for the Distribution of the Sound Recordings Embodying the Musical Compositions in Issue

Consistent with the terms of the controlled composition clauses, Aftermath (or related companies) have been distributing sound recordings embodying the compositions in issue, and

---

[11] These additional co-authors and co-publishers include Mark Batson (Bat Future Music, Inc.), Mike Elizondo (Music of Windswept), Emile Haynie (Reach Global Music), Conrad Alomancy (Headrush Music), and others. *See* Ex. 4b (copyright registrations listing co-authors); Ex. 2b (listing claimants); Ex. 6b (mechanical licenses for compositions).

[12] Plaintiff Eight Mile also expressly licensed the challenged use of the composition "Lose Yourself" to Zomba Recording Corp. for reproduction and distribution of the sound recording of the parody "Couch Potato." Ex. 21.

Plaintiffs have consistently been paid royalties for the distribution of these recordings in compact disc ("CD") and digital download format at the Controlled Rate (or higher).[13]  Ex. 10a (Declaration of Wenchan Wang ("Wang Decl.") ¶¶ 4, 5).  Aftermath has distributed these sound recordings through numerous channels – for example, by manufacturing and selling CDs through "brick and mortar" retailers and by selling copies of the recordings in digital format through online services such as Apple's iTunes store.  *Id.* ¶ 6.  Plaintiffs have had no role in the actual distribution of these sound recordings.  *Id.*

Mechanical royalties were paid to Plaintiffs and others who have an interest in the musical compositions embodied in sound recordings.  *See* Ex. 10a ¶ 4.  As discussed above, the applicable mechanical royalty rate is determined either by reference to a statutory rate, as set forth pursuant to 17 U.S.C. § 115, or pursuant to a contractually agreed upon rate, such as the Controlled Rate.  *See* n. 7 *infra* and 12, *supra*.  The calculation of mechanical royalties is summarized in periodic royalty statements that have been sent to Plaintiffs for nearly a decade. Ex. 10a ¶ 4.

Every quarter for over four years, Plaintiffs have received mechanical royalties on the sale of digital download recordings embodying the compositions in issue.  *Id.*  The mechanical royalties paid on the sales of permanent digital downloads have been specifically identifiable as such on the royalty statements sent to Plaintiffs.  *Id.* ¶ 8 & Exs. E & F (royalty statements).

Exhibits E and F to the Wang Declaration contain the royalty statements sent to Plaintiffs for the second quarter of 2007 (April 2007 to June 2007) and the fourth quarter of 2007 (October

---

[13] Although the 1998 and 2003 Agreements set forth Controlled Rates to be paid for the sales of recordings embodying the controlled compositions, Plaintiffs have been paid at the statutory rate for the sale of digital download recordings that embody the compositions in issue.  Wang Decl. ¶ 5.  This is because the Copyright Act provides that, notwithstanding such contractual provisions, for agreements entered into after June 22, 1995, the statutory rate is to be paid for "digital phonorecord deliveries," which include the sale of permanent digital downloads through iTunes.  *See* 17 U.S.C. § 115(c)(3)(E).

5640031.1

9

2007 to December 2007), respectively.  Ex. 10a (Wang Decl. Exs. E, F).  The second quarter of 2007 immediately preceded the filing of this lawsuit, and the fourth quarter statements were the most recently issued royalty statements as of the time that Defendants filed their earlier motion for summary judgment.  However, Aftermath has been selling digital downloads of recordings embodying the compositions in issue through iTunes and other digital download providers from 2003 right through to the present.[14]  *Id.* ¶ 4.  During that entire time, Plaintiffs received in excess of $647,600 in royalties on the sale of digital download recordings that embody the compositions in issue in this case.  *Id.* ¶ 9.  And, *during that entire time – including as recently as this year – Plaintiffs have accepted payment and never once refused to accept payment for the sales of such digital download recordings.*  *Id.* Ex. G.

> **D.     Plaintiffs' Complaint**

Plaintiffs' single claim for relief in this action is that Apple does not have the right to distribute through its iTunes music store "digital downloading of recordings" that embody these compositions.  Compl. ¶¶ 9-12.[15]  Plaintiffs contend that Apple's sale of those recordings on iTunes without authorization infringes Plaintiffs' claimed copyrights in the compositions.  *Id.* ¶ 13.  Plaintiffs expressly allege they have not authorized the distribution of their works through permanent downloads.  *Id.* ¶ 12.

## III.   ARGUMENT

Summary judgment is appropriate where "the pleadings, the discovery and disclosure

---

[14] In order not to burden the Court, Defendants have submitted royalty statements showing payments for digital downloads of recordings embodying the compositions in issue for only the two quarters.  The statements for the over four years of digital distribution total over 1,000 pages and have been produced to Plaintiffs in this lawsuit.  Defendants will make all the statements available if the Court requests it, and will make them available at the hearing on this Motion.

[15] Plaintiffs dismissed their ancillary Lanham Act and state law claims.  *See* Docket No. 52, Stipulated Order for Voluntary Dismissal of Counts 2-5, entered on July 11, 2008.

materials on file, and any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "The moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-moving party's case." *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 452-53 (6th Cir. 2001).[16]   Once the moving party satisfies its burden, "the burden shifts to the nonmoving party to set forth specific facts showing a triable issue." *Id*. at 453.

A.  **Defendants Are Entitled to Summary Judgment Because Their Dissemination Of The Compositions In Issue Was Expressly Authorized By Parties With The Right To Grant Such Authorization**

To prevail on their copyright claim, Plaintiffs are required to prove ownership of a valid copyright and a violation by Defendants of one or more of the exclusive rights secured by the Copyright Act, 17 U.S.C. § 106.  *See Bridgeport Music, Inc. v. WB Music Corp.*, 508 F.3d 394, 398 (6th Cir. 2007).  If Defendants have been granted permission – or a "license" – covering the use in question, there is no claim for copyright infringement.  *See, e.g.*, *Johnson v. Jones*, 149 F.3d 494, 500 (6th Cir. 1998); *Lulirama Ltd., Inc. v. Axcess Broadcast Servs., Inc.*, 128 F.3d 872, 879 (5th Cir. 1997); *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 776 (7th Cir. 1996).

1.  **Controlled Composition Clauses in the 1998 and 2003 Agreements Expressly License the Challenged Uses**

Plaintiffs expressly allege that each composition in issue was "written and composed, in part" by Eminem.  Compl. ¶ 8.  Therefore, as defined in the 1998 and 2003 Agreements, each of the compositions is a Controlled Composition, which are defined in the Agreements as "*songs written or controlled, directly or indirectly, in whole or in part, by F.B.T., Artist [Eminem], any affiliated company of F.B.T., Artist, [and] any producer or any affiliated company of any producer….*"  Ex. 9a (Hoffman Decl. Exs. A ¶ 6(a) (1998 Agreement) & D ¶ 6 (2003 Agreement)).  The Agreements further provide that all such Controlled Compositions "*will be*

---

[16] In this Brief, internal citations and quotations are omitted unless otherwise indicated.

*licensed* to Aftermath and its distributors/licensees," and that in exchange Aftermath will pay the Controlled Rate fixed by contract.[17] *Id.* (emphasis added).  Plaintiffs do not dispute the authority of Eminem (and the other signatories to the Agreement, including Plaintiffs' owners, Jeff Bass and Joel Martin) to grant the rights conveyed by the controlled composition clauses.  Rather, Plaintiffs contend that (1) the language "Controlled Compositions … will be licensed" meant that the Agreements did not constitute a license and somehow gave Plaintiffs the right to refuse to issue a license and (2) even if the language "Controlled Compositions … will be licensed" conveyed authority, "digital uses were not contemplated or covered under" those clauses."  *See* Exs. 1a at 15 & 2a at 14 (Plaintiffs' Responses to Interrogatory 15).  Plaintiffs' contentions are unfounded and constitute a *post hoc* rewriting of the Agreements.

>     a.    **Plaintiffs Are Wrong That The Phrase "Controlled Compositions … Will Be Licensed" Gives Them Any Room To Deny A License**

Plaintiffs first argue that the phrase "Controlled Compositions … will be licensed to Aftermath and its distributors/licensees" somehow gave Plaintiffs room to say that Aftermath and their distributors/licensees did not have a license, would *not* be licensed, or would be licensed only for some purposes and not others.  This argument ignores the plain language that such compositions "*will be licensed.*"  There is no basis for excising the word "will" and replacing it with the word "might."  Under California law, which is controlling here,[18] the plain

---

[17] Whether Apple is a distributor or a licensee is irrelevant since "distributors" and "licensees" are both covered by the controlled composition clauses.  Any argument that Apple needs a separate mechanical license is counter not only to the terms of the controlled composition clauses, but also to the Copyright Act, which provides that the license obtained includes the right of the licensee "to distribute *or authorize the distribution*" as a digital phonorecord delivery (17 U.S.C. § 115 (c) (3)(A)) (emphasis added), as well as the established practice that a mechanical license covers the record company's manufacturer of physical product and the "brick and mortar" reseller.  Best Buy and Wal-Mart do not obtain separate mechanical licenses, and no published decision has held (nor has any publisher contended) that they should.

[18] The Agreements are both governed by California law.  Ex. 9a (Hoffman Decl. at Ex. A ¶ 21, Ex. D ¶ 22).

language of the contract ends the inquiry.  *See Foster-Gardner, Inc. v. Nat'l Union Fire Ins. Co.*,
18 Cal. 4th 857, 868 (1998) ("If contractual language is clear and explicit, it governs.").

At deposition, Plaintiffs waffled on the meaning of "will be licensed."  Joel Martin (Eight
Mile's manager and Martin Affiliated's owner) testified that Plaintiffs "would have to agree ... to
issue licenses."  Ex. 8b, p. 321; l. 11-13.  Martin nevertheless claimed that he refused to execute
mechanical licenses requested by Aftermath to cover permanent downloads, and that this refusal
somehow confirms Plaintiffs' reading of the contract.  *See* Ex. 2a, p. 14-15.  Plaintiffs'
imaginative attempt to rewrite the contract's plain language ultimately gains them nothing.  If, as
Plaintiffs admit, the controlled composition clauses at a minimum require Plaintiffs to "agree to
agree" to a license, then it is clear they must grant a license.  Ex. 8b, p. 320; l. 4-5.  Plaintiffs'
own breach of the agreements cannot create an infringement claim. *Graham v. James*, 144 F.3d
229, 236 (2d Cir. 1998) ("A copyright owner who grants a nonexclusive license to use his
copyrighted material waives his right to sue the licensee for copyright infringement.")

> b. **Plaintiffs Are Wrong That The Controlled Composition
> Clauses Do Not Cover "Digital Uses"**

Plaintiffs' alternative argument that the controlled composition clauses somehow fail to
cover "digital uses" is wrong for multiple reasons.

First, the 1998 and 2003 Agreements expressly provide that "Aftermath and its
distributors/licensees shall have the exclusive right to exploit all such masters *in any and all
forms of media now known and hereinafter developed ....*"  Ex. 9a (Hoffman Decl. Exs. A ¶ 8
(1998 Agreement) & D ¶ 8 (2003 Agreement)) (emphasis added).  This indisputably includes
digital uses.

Second, Plaintiffs' argument is contrary to an express Congressional statute, 17 U.S.C.
§ 115(c)(3)(E).  Section 115(c)(3)(E) establishes mechanical royalty rates paid on "digital
phonorecord deliveries" – which are "digital uses" – notwithstanding rates set forth in the

provisions of controlled composition clauses, which Congress recognized were commonplace. *See* Melville Nimmer & David Nimmer, *Nimmer on Copyright*, § 8.23[E] (2007)(discussing Congressional recognition of § 115(c)(3)(E) and its effect on rates established by controlled composition clauses). If controlled composition clauses did not already apply to "digital uses," then this provision – added to the law in *1995*, three years *before* the 1998 Agreement – would have been unnecessary. Plaintiffs' reading of the controlled composition clauses cannot be squared with Congress's adoption of this statute.

Third, Plaintiffs' argument is inconsistent with decided cases. Another federal court recently dismissed a copyright infringement claim by the owner of musical compositions against Apple and other defendants based on similar facts. *Reinhardt v. Wal-Mart Stores, Inc.*, 547 F. Supp. 2d 346, 354-55 (S.D.N.Y. 2008). The copyright claimant there was a member of the recording artist The Ramones who wrote several compositions recorded by the band. Plaintiff claimed that defendants, including digital download retailers, infringed his copyright through exploitation in "digital formats." *Id.* at 354. Plaintiff's recording agreement with one defendant, Ramones Productions, provided that Ramones Productions had the right to "'create physical sound recordings embodying the Compositions.'" *Id.* at 350. Ramones Productions was further authorized "'to manufacture, advertise, sell, distribute, lease, license or otherwise use or dispose of the Masters and phonograph records embodying the Masters, in any or all fields of use, *by any method now or hereafter known*." *Id.* at 354 (emphasis added). The recording agreement defined "phonograph records" to include "all *forms of reproduction . . . now or hereafter known*." *Id.* (emphasis in original). The court held that this language in the recording agreement clearly and unambiguously authorized the digital distribution of the recordings and dismissed the copyright infringement claim as a matter of law. *Id.* at 354-55. In particular, the use of the expansive language "now or hereafter known" covered the "digital download form." *Id.* at 355. Here, the 1998 and 2003 Agreements are equally clear that the compositions in issue "will be

licensed" to Aftermath, and that digital uses are covered by the phrase "*any and all forms of media now known and hereinafter developed*" in the Agreements.  *See also Allman Bros. v. Sony BMG Music Entertainment*, No. 06 Civ. 3252 (GBD), 2008 WL 2477465 at *2 (S.D.N.Y. June 18, 2008) (similarly construing such language to anticipate digital uses).[19]

Finally, Plaintiffs' assertion that the 1998 and 2003 Agreements somehow overlook digital uses cannot be squared with what Plaintiffs are telling another federal court.  While Plaintiffs are telling this Court that digital uses are not covered by the 1998 and 2003 agreements, Plaintiffs, through their affiliated LLCs, are pursuing a breach of contract claim in another federal court that is premised on Aftermath having *precisely* that right.[20]  In that case, F.B.T. and Em2M, LLC sued Aftermath and the three entities that own Aftermath for breach of the same 1998 and 2003 Agreements ("F.B.T. case").  Plaintiffs' affiliated LLCs do *not* contend in the F.B.T. case, however, that Aftermath lacked the right to authorize Apple to distribute digital downloads of those sound recordings.  Far from it.  They instead claim that Aftermath has not calculated the royalties owed to them on the sales of digital downloads through iTunes and other digital retailers under the correct contractual rate.  *See* Ex. 15 ¶¶ 1, 4, 5, 29, 31-33, 35.  While the merits of that contract claim will be litigated directly in the F.B.T. case, the important point here is that Plaintiffs' claim in the F.B.T. case is premised on Aftermath *having* the right pursuant to the 1998 and 2003 Agreements to sell through iTunes the same sound recordings embodying the same compositions that Plaintiffs, in this case, contend that Aftermath does not have.  Being in two different Courts does not entitle Plaintiffs to make inconsistent arguments, particularly when they are based on the same agreements.[21]

---

[19] *Allman Bros*. and *Reinhardt* are attached as Exhibits 10b and 11b for the Court's reference.

[20] *See* Ex. 15 (Second Amended Complaint in *F.B.T. Productions, LLC and Em2M, LLC v. Aftermath Records et al.*, Case No. CV-07-03314 PSG (C.D. Cal.)).

[21] Plaintiffs also claim that Defendants' "subsequent conduct" shows that they did not believe the Controlled Composition clauses covered digital uses.  *See* Exs. 1a at 15 and 2a at 14 (Plaintiffs' Responses to Interrogatory 15).  What Plaintiffs refer to here is the fact that Interscope Records,

    **2.**    **Controlled Composition Clauses in Separate Agreements with Eminem Expressly License the Challenged Uses of Compositions Embodied on the Eight Mile Soundtrack and Other Shady Releases.**

By their plain terms, the controlled composition clauses in the 1998 and 2003 Agreements provide express authorization for all of the compositions at issue in this case. Even if summary judgment is not granted as to the entirety of the complaint based on the controlled composition clauses in those agreements, Defendants nevertheless are entitled to partial summary judgment as to the compositions embodied in sound recordings on the Eight Mile Soundtrack and other Shady releases pursuant to two separate agreements with Eminem.

First, Eminem expressly licensed the compositions he co-wrote that appear on the Eight Mile Soundtrack in the Soundtrack Agreement, which states that Eminem "hereby license[s]" to Shady the compositions he wrote or co-wrote for that album. Ex. 14 ¶6. As Plaintiffs concede, all eight of the compositions at issue that appear on the Soundtrack Album were written, in part, by Eminem. Compl. ¶ 8. The Soundtrack Agreement provides that recordings embodying those licensed compositions would be included on the Eight Mile Soundtrack "in any and all media now known or hereafter devised," which indisputably includes permanent downloads. Ex. 14 ¶ 2. Whatever Plaintiffs claim with regard to the significance or meaning of the language "will be licensed" in the 1998 and 2003 Agreements, it has no bearing on the compositions provided as

---

a division of UMG Recordings, Inc., entered into a "Mastertone Agreement" with Plaintiffs in 2005 relating to the use of the compositions in recordings announcing cell phone calls. Plaintiffs are wrong. In 2005, there was a controversy regarding whether mastertones were eligible for a mechanical license pursuant to 17 U.S.C. § 115. Many music publishers claimed that Section 115 of the Copyright Act did not apply to mastertones because, *inter alia*, they included only a portion of the composition. *See* 2 Nimmer, *supra*, § 8.23[A][5]. In order to enable Interscope to exploit mastertones embodying Plaintiffs' compositions before the controversy was resolved, Interscope and Plaintiffs entered into the Mastertone Agreement. Thereafter, the Copyright Office, in a Memorandum Opinion of October 16, 2006, held that mastertones were in fact phonorecords and that the delivery of the same by wire or wireless technology met the definition of digital phonorecord delivery as set forth in the Copyright Act, confirmed that mastertones are subject to the mechanical license provisions of Section 115, and held that the rate for compositions embodied in mastertones is statutorily the same as for any digital phonorecord delivery. *See id.*; *see also* Ex. 8a (Copyright Office Decision).

5640031.1

part of the Eight Mile Soundtrack, which were indisputably licensed for the challenged use. *See* Ex. 14.

Second, Plaintiffs' contentions regarding the 1998 and 2003 Agreements also are irrelevant to the grant of license for any compositions co-written and produced by Eminem that appear on Shady releases, including the Eight Mile Soundtrack and four of the Co-Author Albums.  In the Interscope-Shady Amendment, Eminem "hereby grant[s]" to Interscope and its designees "the irrevocable, nonexclusive right to reproduce" controlled compositions embodied in sound recordings that he produces.  The clause authorizes the reproduction "on phonograph records," as defined by the applicable artists' agreement.  Ex. 16 ¶ 1(m); 17 ¶ 14.  As explained below in section 4, all of the Co-Author Agreements define phonograph records to include permanent downloads.  *See* Ex. 5b (Hoffman Decl. ¶¶ 8, 10-14 (and Exhibits)).  This agreement indisputably grants a license from Eminem himself to distribute in the challenged format compositions embodied by recordings which he produced.

### 3.  Plaintiffs Themselves Issued a Valid License for the Distribution of "Lose Yourself" through Sales of Permanent Downloads

Plaintiffs themselves issued a mechanical license specifically authorizing the distribution of sound recordings in permanent download form for one of the compositions appearing on the Eight Mile Soundtrack: "Lose Yourself."  That license, signed by Plaintiffs' manager and owner, Joel Martin, "grants to Licensee, its distributors and affiliated companies, the non-exclusive right, privilege and license, to mechanically reproduce and to make Permanent Downloads. . ." of the composition "Lose Yourself."  Ex. 12b.  Martin testified that he intended for this license to be effective when issued, and has never contended that it is not effective. Ex. 13b. Martin Dep. Tr. 479: 20-23.  Because the precise use Plaintiffs complain about here was a licensed use, summary judgment for Defendants is appropriate for "Lose Yourself". *See Murray Hill Publ'ns, Inc. v. ABC Comm'ns, Inc.*, 67 F. Supp. 2d 754, 758 (E. D. Mich. 1999) ("A copyright owner

who grants a nonexclusive license to use his copyrighted material waives his right to sue the licensee for copyright infringement.") *aff'd in part, rev'd in part on other grounds*, 264 F.3d 622 (6th Cir. 2001).[22]

### 4.      Co-Authors Have Expressly Licensed The Challenged Uses

A license defeating a claim of infringement may be from the Plaintiff or *from any co-author. See McKay v. Columbia Broadcasting Sys.*, 324 F.2d 762, 763 (2d Cir. 1963) ("[A] license from a co-holder of a copyright immunizes the licensee from liability to another co-holder for copyright infringement.").

Co-authors have the right to authorize a third party's use because "authors of a joint work are co-owners of a copyright in the work," 17 U.S.C. § 201(a), each having "an independent right to use or license the use of a work." H.R. Rep. No. 94-1476 at 121 (1976). A co-author may license the work without the permission or consent of another co-author, the latter's exclusive remedy being limited to the possibility of seeking an accounting from the other co-author for the proceeds from such a license. *See Tang v. Putruss,* 521 F. Supp. 2d 600, 604 (E. D. Mich 2007) ("[E]ach joint author has the right to use or to license the work as he or she wishes, subject only to the obligation to account to the other joint owner for any profits . . .").

It is undisputed that the Artist Co-Authors are co-authors under the Copyright Act. The copyright registrations that Plaintiffs attach to their Complaint list multiple co-authors for each composition. Ex. 4b. This inclusion creates a presumption that those authors are, in fact, co-authors. *See* 17 U.S.C. § 401(c); *Cambridge Literary Properties, Ltd. v. W. Goebel Porzellanfabrik G.,* 510 F.3d 77, 94 n. 16 (1st Cir. 2007). The copyright registrations for the compositions covered by Co-Author Agreements list the Artist Co-Authors as co-authors, and thus establish the joint authorship of those works. *See* Ex. 1b (listing compositions covered by

---

[22] Plaintiff Eight Mile also expressly licensed the challenged use of the composition "Lose Yourself" to Zomba Recording Corp. for reproduction and distribution of the sound recording of the parody "Couch Potato." Ex. 21.

the Co-Author Agreements); Ex. 4b (copyright registrations for these compositions).  Co-Authors have expressly authorized the dissemination of numerous of the compositions through (a) Co-Author Agreements with controlled composition clauses and (b) mechanical licenses.

### a. Controlled Composition Clauses In Co-Author Agreements Authorize The Challenged Dissemination

The Artist Co-Authors expressly licensed Aftermath (through affiliate labels) to disseminate the compositions on the Co-Authors' Albums, including through Apple and its iTunes store   With minor exceptions in wording that are not material, the controlled composition clauses in the Co-Author Agreements provide:

> You grant to the Company, Company's Licensees and their designees, an irrevocable license, under copyright, to reproduce each Controlled Composition on Phonograph Records of Master Recordings made under this Agreement . . . and to distribute them in the United States and Canada.

Ex. 5b (Hoffman Decl. ¶¶ 7-14 (and Exhibits)).  The Artist Co-Authors thus "grant . . . an irrevocable license, under copyright" to reproduce and distribute controlled compositions "on Phonograph Records of Master Recordings made under this Agreement."  *Id.*  Plaintiffs cannot dispute that this grant of rights encompasses the right to reproduce and distribute the Artist Co-Author's compositions in permanent download form. *Id.*

First, Plaintiffs cannot dispute that the plain language of the controlled composition clauses in the Co-Author Agreements grants a license.  The very purpose of a controlled composition clause is to grant rights to exploit the embodied composition.  *See* Ex. 5b (Hoffman Decl. ¶ 7). The plain language of these clauses —*"You grant . . . an irrevocable license"* —does exactly that.  Under established contract law, clear contractual language ends the inquiry into what a particular provision means.  *See Foster-Gardner, Inc.,* 18 Cal. 4th 868 ("If contractual language is clear and explicit, it governs."); *Desir v. Spano*, 687 N.Y.S.2d 411, 412 (N.Y. App. Div. 1999)

("Contract interpretation is the province of the court, and an unambiguous contract is to be interpreted in accordance with its clear language so as to effectuate the intent of the parties.").[23]

Even if Plaintiffs' litigation-inspired interpretation of "Controlled Compositions … will be licensed" in the 1998 and 2003 Agreements is given any credence, it is irrelevant to whether the Co-Author Agreements grant a license. Those Co-Author Agreements provide: "*You grant . . . an irrevocable license.*" Ex. 5b (Hoffman Decl. ¶¶ 10-14 (and Exhibits)). Eight Mile's own form licenses—which Plaintiffs must concede are effective and intended to grant a license—use the same language: "Licensor grants to Licensee … the non-exclusive right, privilege and license." Ex. 12b (license for "Lose Yourself"). Plaintiffs cannot with a straight face contend that the language of the Artist Co-Authors' controlled composition clauses does not grant a license. In contrast to Plaintiffs' tortured reading of the phrase "Controlled Compositions … will be licensed," the phrase "*You grant . . . an irrevocable license*" indisputably is in the present tense. That phrase must create an immediate license, even under Plaintiffs' theory.

Second, the license granted in the Co-Author Agreements unquestionably applies to the compositions co-written by the Artist Co-Authors. The Co-Author Agreements define a "Controlled Composition" as "a composition wholly or partly written, owned or controlled" by the artist. Ex. 5b (Hoffman Decl. ¶¶ 8, 10-14 (and Exhibits)). Plaintiffs' own copyright registrations list the Artist Co-Authors as co-authors of the subject compositions. Ex. 4b. The subject compositions are thus "Controlled Compositions" because they are "wholly or partly written, owned or controlled" by the Artist Co-Authors.

Third, the grant of rights in the Co-Author Agreements encompasses the reproduction and distribution of the compositions in permanent download form. The controlled composition

_____

[23] The Co-Author Agreements are governed by either California law (Ex. 5b, Hoffman Decl. Exs. A, B, C-2, D-2 at ¶ 19.08) or New York law (*Id.* at Exs. C-1, D-1, E ¶19.08). As the cases cited above demonstrate, the established contract law of either jurisdiction provides that the Court should interpret contracts in accordance with their plain language.

clause in the Co-Author Agreements grants the right to reproduce and distribute the subject compositions on "Phonograph Records." Ex. 5b (Hoffman Decl. ¶¶ 8, 10-14 (and Exhibits)). The Co-Author Agreements define "Phonograph Record" broadly as "all forms of reproductions . . . now or hereafter known. . ." *Id*. As Courts have recognized, this broad definition includes digital uses like the permanent downloads sold in Apple's iTunes store. *See Allman Bros. v.* 2008 WL 2477465 at *2 (construing the same definition and concluding that the "plain language" encompasses digital music files); *Reinhardt*, 547 F. Supp. 2d at 354-55 (construing the same definition to include digital downloads).

If this broad definition were not enough to encompass permanent downloads—and it plainly is—the Co-Author Agreements expressly incorporate digital uses, including downloads, into the distribution right granted by the controlled composition clauses. The Co-Author Agreements state: "All references in this Agreement to the 'distribution' of Records, unless expressly provided otherwise, shall be understood to include the distribution of records by way of Electronic Transmission thereof." Ex. 5b (Hoffman Decl. ¶ 8; 10-14 (and Exhibits)). An "Electronic Transmission" specifically includes digital downloads. *Id*. at ¶ 8. Because the controlled composition clause grants the right to "distribute" Records, the Electronic Transmission provision incorporates the right to distribute Records in permanent download form. *Id*.; ¶¶ 10-14 (and Exhibits).

        b.      **Mechanical Licenses Granted by Co-Authors' Publishers Specifically Authorize the Challenged Uses for 36 of the Total Compositions**

Summary judgment also must be granted for the compositions at issue where authorization was obtained from co-authors' publishers in separately issued mechanical licenses which expressly provide for distribution by way of digital downloads. Specifically, mechanical licenses were obtained from co-authors and their publishers to distribute at least 36 of the total compositions in permanent download form. *See* Ex. 1b (listing compositions); Ex. 6b

5640031.1

21

(mechanical licenses).  Those mechanical licenses authorize precisely the use for which Plaintiffs here complain.  As with the grant of rights pursuant to the controlled composition clauses of the Co-Author Agreements, the grant of rights by a co-author's publisher in a mechanical license precludes Plaintiffs' infringement action.  *See McKay*, 324 F.2d at 763; *Roger Miller Music, Inc. v. Sony/ATV Publishing, LLC*, 477 F.3d 383, 395 (6th Cir. 2007).

### B. Plaintiffs Impliedly Licensed The Challenged Use Of All Of The Compositions In Issue

As demonstrated above, Defendants' challenged uses have been expressly authorized, and the Court should grant summary judgment on Plaintiffs' copyright claim.  But *even if* the agreements discussed in the preceding Section did not grant Aftermath an *express* license, summary judgment must be granted because, as a matter of law, an *implied* license was created by Plaintiffs' conduct.  This implied license operates to authorize all of the uses of the compositions complained of and defeats Plaintiffs' claim of copyright infringement.

### 1. A Party's Course of Conduct May Imply an Objective Intent to Grant a Nonexclusive License

"Courts have held that the existence of an implied license to use the copyright for a particular purpose precludes a finding of infringement."  *Johnson*, 149 F.3d at 500.  "It is also well-settled that a non-exclusive license is not a transfer of ownership, and is not, therefore, subject to the writing requirement of [17 U.S.C.] § 204."  *Id.*  "'A non-exclusive license may be granted orally, *or may be implied from conduct*.'"  *Id.* (emphasis added).  *See also, I.A.E.*, 74 F.3d at 775 (courts "universally have recognized that a nonexclusive license may be implied from conduct").  "A nonexclusive license may be irrevocable if supported by consideration."  *Lulirama*, 128 F.3d at 882.

The dispositive issue on implied license is whether "the copyright owners intended that their copyrighted works be used in the manner in which they were eventually used."  *Johnson*, 149 F.3d at 502.  The test is *not* whether the plaintiff says during litigation that it had no intent to

5640031.1

22

grant a license, but whether "*objective fact[s]*" demonstrate the plaintiff's intent. *Id.* at 500 (emphasis added). As the First Circuit put it, the inquiry is *not* "into the mind of the putative licensor. It is an objective inquiry into facts that manifest such contractual intent." *John G. Danielson, Inc. v. Winchester-Conant Properties, Inc.*, 322 F.3d 26, 42 (1st Cir. 2003) (relevant intent "is not the parties' subjective intent but their outward manifestation of it")).

The most important facts concerning the objective evidence of the copyright plaintiff's intent are: (1) whether the plaintiff handed over its work to the defendant with the expectation (and result) of the defendant's subsequent distribution or other contemplated use; and (2) whether the plaintiff was paid and accepted monetary compensation for that use. *See Johnson*, 149 F.3d at 501; *I.A.E.*, 74 F.3d at 777; *Effects Associates, Inc. v. Cohen*, 908 F.2d 555, 558-59 (9th Cir. 1990). *Both of these facts are indisputably present in this case*. The significance of these factors is clear from the leading cases in this area.

In *Effects Associates*, the plaintiff created special effects footage for defendant's motion picture (called "The Stuff"). The defendant was dissatisfied with the plaintiff's work, and only paid it half the contract price, which the plaintiff retained. *Effects Associates,* 908 F.2d at 556. The defendant nevertheless incorporated plaintiff's special effects into the final film and proceeded to distribute it through a motion picture company, also a defendant. *Id.* Affirming the district court's grant of summary judgment of non-infringement to all defendants, the Ninth Circuit held that "'every objective fact concerning the transaction at issue supports a finding that an implied license existed.'" *Id.* at 559 n.6 (quoting District Court opinion).

> *Effects [the plaintiff] created a work at defendant's request and handed it over, intending that defendant copy and distribute it. To hold that Effects did not at the same time convey a license to use the footage in "The Stuff" would mean that plaintiff's contribution to the film was "of minimal value," a conclusion that can't be squared with the fact that Cohen [a defendant] paid Effects almost $56,000 for this footage.* Accordingly, we conclude that Effects impliedly granted nonexclusive licenses to Cohen and his production company to incorporate the special effects footage into "The Stuff" and to New World Entertainment [another defendant] to distribute the film.

5640031.1

23

*Id*. at 558-59 (quoting *Oddo v. Ries*, 743 F.2d 630, 634 (9th Cir. 1984)) (emphasis added).

The Seventh Circuit followed *Effects Associates* in *I.A.E.* There, the copyright claimant was an architect, who had been retained to do preliminary designs for a cargo handler at an airport. *I.A.E.*, 74 F.3d at 772. (The architect was the nominal defendant in a suit for a declaratory judgment of non-infringement.) The builder of the airport (plaintiff in the suit) paid the architect his $10,000 fee, but did not continue to use him through completion of the project. The builder did, however, incorporate the designs into the final building. The architect contended this infringed his copyright in the design. *Id*. The Seventh Circuit held that the architect's course of conduct manifested an objective intent to create an implied license. The court focused on the fact that the architect's written agreement with the builder did not mention any "expectation of a further role in the Project .... [A]lthough [the architect] tells us that he anticipated he would be the architect to take the Project to completion, nothing in his contract gives the slightest indication of that belief." *Id*. at 776-77. The court emphasized that "[t]he plain language of the contract is supported by common sense. *As we have already pointed out, [the architect] created a work – preliminary architectural drawings – and handed them over to the [builder] for use on the Airport Project. For that work the architect received $10,000 compensation*." *Id*. at 777 (emphasis added).

The Sixth Circuit in *Johnson* followed the legal analysis of *Effects Associates* and *I.A.E.* but reached a different result because *the defendant in Johnson never paid the plaintiff a dime for his work*. The defendant had hired Johnson (also an architect) not only to design but also to serve as the "contractor in charge of the renovation" of a house that defendant wanted to make her "dream house." *Johnson*, 149 F.3d at 497-98. From the outset of the project, including when he provided the defendant with initial plans for her house, the architect asked the defendant to execute standard form architecture agreements that expressly reserved the architect's copyrights and forbade defendant from allowing others to use the architect's plan to complete the project.

5640031.1

24

*Id*.  The parties subsequently had disputes about the project; the defendant fired the architect but proceeded to rely on his preliminary work in building the house.  *Id*. at 499.  The Sixth Circuit held that "almost every objective fact in the present case points away from the existence of an implied license."  *Id*. at 500.  The court focused, in particular, on the lack of "payment" to the architect.  Based on the absence of that payment, along with other objective facts showing a lack of intent to license the copyright work, the Sixth Circuit affirmed the District Court's finding that there was no implied license.

### 2.     Plaintiffs' Course Of Conduct Shows An Objective Intent To Grant A Nonexclusive License

In contrast to *Johnson*, every "objective fact" in this case points to the existence, at a minimum, of an implied contract authorizing the distribution Plaintiffs now challenge.

First, the plain language of the applicable agreements shows that all parties understood the compositions in issue were going to be embodied into sound recordings, and that Aftermath or its distributors were going to sell copies of those recordings, including the compositions.  *See* Ex. 9a (Hoffman Decl. ¶¶ 5, 6); Ex. 5b (Hoffman Decl. ¶¶ 5, 6).  The 1998 and 2003 Agreements provide, among other things, that the artists would create, record, and deliver sound recordings embodying musical compositions to Aftermath and provide for the payment of royalties based upon their sale of those recordings.  Ex. 9a (Hoffman Decl. ¶ 5).  Nothing in any of the agreements envisions the participation of the Plaintiff in the actual distribution of the sound recordings so delivered.  On the contrary, the 1998 and 2003 Agreements expressly state that "Aftermath and its distributors/licensees shall have the exclusive right to exploit all such masters in any and all forms of media now known and hereinafter developed ...."  *Id.* Exs. A ¶ 8 (1998 Agreement) & D ¶ 8 (2003 Agreement).

These facts are completely the opposite of *Johnson*, where, when the creator of the copyrighted work delivered that work, he *simultaneously* delivered a standard form contract that

restricted *any* further use of that work without his consent.  *Johnson*, 149 F.3d at 497-98.  Here, as in *Effects Associates*, the facts show that all parties with the power to do so (Eminem, his co-authors, and Plaintiffs as producers) "handed over" the compositions with the intent that Aftermath or an affiliated label embody them in sound recordings and distribute those recordings – *which they have done*.  *Effects Associates,* 908 F.2d 558-59; Ex. 9a (Hoffman Decl. ¶¶ 5, 6).

Second, and critically, *Plaintiffs have been paid – continuously – mechanical royalties for precisely the digital distribution that they challenge in this case*.  The undisputed facts show that Plaintiffs have been paid in excess of $647,600 over a more than four-year period for the sale of the compositions through digital downloads.  Ex. 10a (Wang Decl. ¶¶ 4, 8, 9; *id.* Exs. E & F).  Indeed, payment has been received and deposited by Plaintiffs *during the pendency of this litigation*.  *Id.* ¶ 9.  During this time, Plaintiffs have accepted every single payment, and have *never* rejected a payment – not one.  *Id.*  What is more, Plaintiffs have been paid at the higher statutory rate for these mechanical royalties, not at the lower Controlled Rate set forth in the 1998 and 2003 Agreements.  Plaintiffs' unbroken and continuing receipt and acceptance of payment provides overwhelming (indeed, dispositive) proof of Plaintiffs' objective intent to license the uses they now claim were unauthorized.  *See I.A.E.*, 74 F.3d at 775 (a "lack of objection is . . . equivalent to an implied license").

Third, throughout the same four-year period that Plaintiffs have accepted mechanical royalties on the uses they now challenge, Plaintiffs (through F.B.T., their record production company) also have accepted royalties for the sales of the *sound recordings* containing the same compositions embodied in the Eminem recordings.  *See* Ex. 15 (Second Amended Complaint in F.B.T. Case).  As with the mechanical royalties, Plaintiffs have never objected to those sound recording royalties as being paid on unauthorized transactions.  Plaintiffs' *only* objection concerning the sound recording royalties is that Aftermath allegedly has not paid Plaintiffs at a high enough royalty rate.  This is the essence of Plaintiffs' claim in the F.B.T. case.  *See id.* ¶ 35.

The fact that Plaintiffs are suing to extract higher royalties on the same uses that they contend in this case are unauthorized provides further objective proof of Plaintiffs' intent to impliedly license the uses they challenge in this case.

All of the objective evidence in this case shows an unmistakable intent by Plaintiffs to authorize exactly the uses they challenge in their Complaint as copyright infringement.

### 3.   Plaintiffs' Attempt to Contradict the Overwhelming Evidence of Their Objective Intent Fails

Defendants anticipate that Plaintiffs will respond to the overwhelming objective evidence of their intent to create an implied license with a hodge-podge of arguments concerning inapposite issues.  None of those assertions has any merit.

Plaintiffs claim that, "with respect to the granting of mechanical licenses for physical product, Plaintiffs have used their own license forms with terms and conditions that are acceptable to them."  Exs. 1a at 15 & 2a at 14 (Plaintiffs' Responses to Interrogatories No. 15). Plaintiffs also assert that they "would only enter into licenses for digital uses (i.e. the mastertone agreement)" on terms that Plaintiffs found acceptable.  *Id.*  Of course, as discussed above, by saying this, Plaintiffs are trying to replace the word "will" from the controlled composition clauses with the word "might."  But the clauses are not so easily manipulated – "will" is mandatory and "might" is not.  Plaintiffs had (and have) no choice but to grant mechanical licenses.  *See* Ex. 8b (conceding that Plaintiffs would have to grant a license).  In any event, Plaintiffs' newly minted contentions are irrelevant to whether they have impliedly licensed the digital distribution uses that are at issue in this case.  That analysis is based on the objective facts of Plaintiffs' conduct, which all points to Plaintiffs' manifestation of an unmistakable intent to authorize the uses at issue here.  *Effects Associates*, 908 F.2d at 558-59 (determining that conduct created an implied license through an analysis of the "objective fact[s]").[24]

_____

[24] The filing of this lawsuit cannot be used to erase the objective evidence of Plaintiffs' conduct. If it did, there would never be an implied license.  A plaintiff before the Fifth Circuit tried this

All of the objective evidence of intent – the applicable agreements; the delivery of the compositions for use in the sound recordings with the expectation the same would be sold; Plaintiffs' continuous *and still continuing* acceptance of royalty payments for the use they say they did not authorize; and their attempt in a parallel lawsuit to secure even higher royalties on the sale of sound recordings whose distribution is plainly authorized under the Agreements – manifests an objective (indeed, unmistakable) intent to license the uses challenged here. Plaintiffs' copyright claim fails as a matter of law, and the Court should grant summary judgment in Aftermath's and Apple's favor on that claim.

## IV.   CONCLUSION

For the foregoing reasons, Aftermath and Apple respectfully request that the Court grant summary judgment in their favor.

s/Daniel D. Quick
Daniel D. Quick (P48109)
Dickinson Wright PLLC
38525 Woodward Avenue, Suite 2000
Bloomfield Hills, MI 48304
(248) 433-7200
dquick@dickinsonwright.com

Attorneys for Defendants

Kelly M. Klaus
Munger, Tolles & Olson LLP
355 South Grand Avenue Suite 3500
Los Angeles, CA 90071-1560
(213) 683-9238
kelly.klaus@mto.com

Attorneys for Defendants

---

very argument and lost: "Lulirama's argument that it revoked any implied license that might have arisen by filing the present lawsuit is tantamount to an argument that it had a unilateral right of rescission without notice – an argument entirely inconsistent with the existence of a contract between the parties. If Lulirama had the ability to terminate the license at will, then no contract could exist because Lulirama's obligation under the contract would be illusory." *Lulirama*, 128 F.3d at 882.

5640031.1

## CERTIFICATE OF SERVICE

I hereby certify that on *July 28*, 2008, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to the all counsel.

> s/Daniel D. Quick
> Daniel D. Quick (P48109)
> Dickinson Wright PLLC
> 38525 Woodward Avenue
> Suite 2000
> Bloomfield Hills, MI 48304
>  (248) 433-7200
> dquick@dickinsonwright.com