**UNITED STATES DISTRICT COURT**
**IN THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**EIGHT MILE STYLE, LLC, and MARTIN**
**AFFILIATED, LLC,**

        **Plaintiffs,**

                              **Case No. 2:07-cv-13164**

**vs.**                              **Hon. Anna Diggs Taylor**
                                         **Magistrate Judge Donald A. Scheer**

**APPLE COMPUTER, INC. and**
**AFTERMATH RECORDS d/b/a**
**AFTERMATH ENTERTAINMENT**

        **Defendant.**

| | |
|---|---|
| Howard Hertz, Esq. (P26653) | Richard S. Busch  (TN BPR#14594) |
| Jay G. Yasso, Esq.  (P45484) | King & Ballow |
| Hertz Schram PC | 1100 Union Street Plaza |
| 1760 S. Telegraph Rd., Suite 300 | 315 Union Street |
| Bloomfield Hills, MI 48302 | Nashville, TN 37201 |
| (248) 335-5000 | (615) 259-3456 |
| hhertz@hertzschram.com | rbusch@kingballow.com |
| jyasso@hertzschram.com | Attorneys for Plaintiffs |
| Attorneys for Plaintiffs | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## CONCISE STATEMENT OF ISSUES PRESENTED

Whether defendants' motion for summary judgment should be denied on the grounds that:

1. The "Mechanical Royalty" paragraph of the 1998 and 2003 Recording Agreements grant Aftermath neither a mechanical nor a DPD license

2. Clauses such as the "Mechanical Royalty" paragraph are inapplicable to DPDs as a matter of fact, law and industry practice.

3. Plaintiffs did not grant an implied license to defendants, having not "delivered" the compositions to defendants, never having intended to grant such licenses, and having been unaware that defendants were issuing unauthorized licenses.

4. The third party agreements and purported licenses produced by defendants do not apply to DPDs, do not purport to license plaintiffs' share of any compositions, or have no effect because the signatory parties involved had no authority to grant mechanical or DPD licenses for the compositions

Plaintiffs' answer: Yes

# INDEX OF AUTHORITIES

## <u>CASES:</u>

*Allman Bros. v. Sony BMG Music Ent.,*
06 CV 3252, 2008 U.S. Dist. LEXIS 47612 (S.D.N.Y. June 17, 2008)

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)

*Bridgeport Music, Inc. v. Dimension Films*,
410 F.3d 792 (6th Cir. 2005)

*Brobeck, Phleger & Harrison v. Telex Corp.*,
602 F.2d 866 (9th Cir. 1979),
Cert. denied, 444 U.S. 981, 62 L. Ed. 2d 407, 100 S. Ct. 483 (1979)

*Cherry River Music Co. v. Simitar Entm't, Inc.*,
38 F. Supp. 2d 310 (S.D.N.Y. 1999)

*Celotex Corp. v. Catrett*,
477 U.S. 317, 323 (1986)

*Effects Assocs., Inc. v. Cohen*,
908 F.2d 555 (9th Cir. 1990)

*Encore Ent. LLC v. Kiddesigns, Inc.*,
3:03-1129,
2005 U.S. Dist. LEXIS 44386 (M.D. Tenn. 2005)

*I.A.E., Inc. v. Shaver*,
74 F.3d 768 (7th Cir. 1996)

*John G. Danielson, Inc. v. Winchester-Conant Props., Inc.*,
322 F.3d 26 (1st Cir. 2003)

*Johnson v. Jones*,
149 F.3d 494 (6th Cir. 1998)

*Kentucky Lottery Corp. v. Casey*,
862 S.W.2d 888 (Ky. 1993)

*Little Ceasar Enters., Inc. v. OPPCO*,
219 F.3d 547 (6th Cir. 2000)

*Lulirama Ltd., Inc. v. Axcess Broad. Serv.*,
128 F.3d 872 (5th Cir. 1997)

*Lytle v. Clopton*,
149 Tenn. 655 (Tenn. 1923)

*Matsushita Electric Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)

*McGough v. Univ. of San Francisco*,
214 Cal. App. 3d 1577 (Cal. Ct. App. 1989)

*Miller v. Glenn Miller Prods.*,
318 F. Supp. 2d 923 (C.D. Cal. 2004)

*Morris v. Alcan Foil Prods.*,
No. 95-5673,
1996 U.S. App. LEXIS 27775 (6th Cir. Oct. 23, 1996)

*Pacific Gas and Electric Co. v. G.W. Thomas Drayage & Rigging Co.,*
69 Cal. 2d 33 (1968)

*Reinhardt v. Walmart*,
No. 07 Civ. 8233 (SAS),
2008 U.S. Dist. LEXIS 32119 (S.D.N.Y. Apr. 18, 2008)

*Rodgers & Hammerstein Org. v. UMG Recordings, Inc*.,
00 Civ. 9322,
2001 U.S. Dist. LEXIS 16111 (S.D.N.Y. Sept. 26, 2001)

*Scipio v. Sony Music Entm't*,
173 Fed. Appx. 385 (6th Cir. 2006)

*Shawnee Sanitary Milk Co. v. Fulkerson's Garage and Machine Shop*,
258 Ky. 639, 79 S.W.2d 229 (Ky. 1935)

*SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharms., Inc.*,
211 F.3d 21 (3d Cir. 2000)

*Union Bank v. Winnebago Indus., Inc.*,
528 F.2d 95 (9th Cir. 1975).

*United Cal. Bank v. THC Financial Corp.*,
557 F.2d 1351 (9th Cir. 1977)

*U.S. v. ASCAP*,
485 F.Supp.2d 438 (S.D.N.Y. 2007

*United States v. King Features Entertainment, Inc.*,
843 F.2d 394 (9th Cir. Cal. 1988)

*United States Cellular Inv. Co. of L.A., Inc. v. GTE Mobilnet, Inc.*,
281 F.3d 929 (9th Cir. 2002)


**<u>STATUTES:</u>**

17 U.S.C. § 102(a)(2)

17 U.S.C. § 102(a)(2),(7)

17 U.S.C. § 106

17 U.S.C. § 115(a)

17 U.S.C. § 115(a)(1)

17 U.S.C. § 115(b)(1)

17 U.S.C. § 115 (c)(3)(A)

17 U.S.C. § 115(c)(3)(B)

17 U.S.C. § 115 (c)(3)(E)

17 U.S.C. § 115(c)(3)(E)(i)

**<u>FEDERAL RULES:</u>**

Fed. R. Civ. P. 37(c)

Fed. R. Civ. P. 56(c)

**OTHER AUTHORITIES:**

Cal. Civ. Code § 1654

Faber, 8 *Entertainment Industry Contracts*, para 159-140, Form 159-3 at 159-140.39, para 8 (2007)

Faber, 9 *Entertainment Industry Contracts* para. 168-01 at 168-3 (2007)

1 *Nimmer on Copyright* § 6.10[C]

2 *Nimmer on Copyright* § 8.04[C] (2007)

Passman, Donald S., *All You Need to Know About the Music Business* (6th ed. 2006)

Plaintiffs Eight Mile Style LLC ("Eight Mile") and Martin Affiliated, LLC ("Martin") (collectively "plaintiffs") submit this Memorandum in Opposition to the Motion for Summary Judgment of defendants Aftermath Records[1] ("Aftermath" or "UMG") and Apple, Inc. ("Apple") (collectively, "defendants").  As shown below, defendants' motion should be denied.

## INTRODUCTION

Defendants originally filed a motion for summary judgment on May 5, 2008 (Doc. No. 34), contending that a "Mechanical Royalties" paragraph in 1998 and 2003 recording agreements (the "Agreements") between Aftermath, Marshall Mathers III (p/k/a "Eminem"), and F.B.T. Productions, Inc. ("F.B.T."),[2] either gave Aftermath what is known as a "mechanical license" to allow it to make plaintiffs' compositions available to Apple for digital downloads ("digital phonorecord deliveries" or "DPDs"), or, alternatively, that Aftermath had an implied license to do so.

On July 16, 2008, defendants filed a second motion for summary judgment (Doc. No.53), this time claiming that certain recording agreements with third parties and other documents, ***not produced by defendants as part of initial disclosures or at all during discovery although absolutely requested and within their possession,***[3] supposedly licensed their share of plaintiffs' musical compositions for digital download, and contending that such licenses supposedly defeat plaintiffs' infringement claims.  (*See* Doc. No. 53, Mem. at 1-2.)   By this Court's Order, defendants filed a revised Motion incorporating the points made in both motions.  (*See* Doc. No. 65.)

Defendants' motion fails as a matter of law.  First, the "Mechanical Royalties" paragraph in the Agreements do not grant Aftermath a "mechanical license," much less a "DPD license," and such

---

[1]   Aftermath is a joint venture of Universal-affiliated companies, Interscope Records, a California partnership and UMG Recordings, Inc. and A.R.Y., Inc.
[2]   F.B.T. is a sister company to plaintiffs herein and is only a party to the 1998 Agreement.
[3]   Plaintiffs are filing concurrently herewith a motion to exclude these late-produced documents.

clauses in recording agreements are inapplicable to DPDs as a matter of fact, law and industry practice.   As described in detail below, recognizing this fact, Aftermath repeatedly asked the principal of plaintiffs, Joel Martin, to enter into DPD licenses.   Mr. Martin refused, with the exception of a single license for one specific song, "Lose Yourself," containing certain negotiated terms, including the right to terminate the license after two years, which plaintiffs have now done.  If the "Mechanical Royalties" provision granted defendants a license or applied to DPDs at all, Aftermath would not have sent proposed DPD licenses to plaintiffs, or entered into a specific DPD license with plaintiffs with a termination clause.

Second, plaintiffs did not grant an "implied license" to defendants.  Plaintiffs not only did not "deliver" compositions to Aftermath, but repeatedly objected to licensing musical compositions for digital uses.  Nonetheless, Aftermath made plaintiffs' compositions available to Apple, and Apple accounted to Aftermath.  Aftermath, in turn, camouflaged the accountings it provided plaintiffs.  For example, as discussed below, Aftermath provided a single check to plaintiffs for each accounting period in which it combined amounts for the authorized sale of the compositions on physical product with what amounted to proportionally minimal monies for DPDs, and did not identify the digital revenue as DPD revenue.  Defendants' contention that plaintiffs' actions in cashing the single check accompanying each accounting statement amounted to an "implied license" fails as a matter of law.

Finally, the 1,629 pages of third party documents defendants produced after the close of discovery, mentioned above, to the extent considered, are not licenses, do not apply to DPDs, do not purport to license plaintiffs' share of any compositions, or have no effect because, as defendants know full well, the artist, co-writer, producer or other third parties involved had no authority to grant mechanical or DPD licenses for the compositions.

**STATEMENT OF FACTS**

**A. Background**

F.B.T. is the production company that discovered Eminem and entered into an Exclusive Artist Recording Agreement with him on November 28, 1995. (Martin Decl. ¶ 2, Ex. 1, 1995 Agreement.) At the time, Joel Martin, the principal of Martin and managing agent of Eight Mile, was the managing agent of F.B.T., which had an interest in Eminem's master sound recordings embodying plaintiffs' compositions. (*Id.* ¶¶ 1-2.)

Pursuant to its agreements with Eminem and other writers involved with the compositions at issue herein, Eight Mile and Martin were assigned copyright ownership interests in the compositions, and were granted exclusive administration of the copyrights in those compositions, meaning plaintiffs have ***the exclusive right to license their interest in the compositions***, and the interests for whom they administer. ("Eminem Compositions")[4] (*Id.* ¶¶ 2, 7-13, Exs. 1, 6-15; Doc. No. 1, Compl. Ex. A.);[5] *see also* 17 U.S.C. § 106 (enumerated exclusive rights of copyright owner).)[6] Eminem does not control any of the Eminem Compositions, and has no right to license any of the Eminem Compositions. (Martin Decl. ¶ 2.)

**B. The Aftermath/F.B.T./Eminem Recording Agreement**

On March 9, 1998, F.B.T. and Aftermath entered into a written *short form* agreement

---

[4]   Eminem wrote or co-wrote all of the Eminem Compositions except "Many Men" co-written by Luis Resto, who assigned the composition and his administration rights to plaintiffs. (Doc. No. 1-3, Compl. Ex.A at 8-9; Martin Decl. ¶ 14, Ex. 17 )

[5]   A sound recording is the work that results from the fixation of a series of musical sounds, *i.e.,* a recording of a musical composition.  17 U.S.C. § 101 (definition of sound recording).  A musical composition is comprised of rhythm, harmony and melody, which may be accompanied by lyrics. *See Northern Music Corp. v. King Record Distributing Co.*, 105 F. Supp. 393, 400 (S.D.N.Y. 1952); *see also* 17 U.S.C. § 102(a)(2) (2000) (naming "musical works, including any accompanying words," as among the general subject matter of federal copyright).

[6]   The copyright in the master recording is separate from the copyright in a musical composition.  *Bridgeport Music, Inc. v. Dimension Films*, 410 F.3d 792, 796 n.3 (6th Cir. 2005) citing 17 U.S.C. § 102(a)(2),(7).  Thus a party wanting to sell or exploit one of Eminem's songs must obtain a license to exploit the master recording from the sound recording copyright owner, and also must obtain a separate license to exploit the composition from the composition copyright owner.  (Sullivan Decl. Ex. 1, ¶ IV; *see* 17 U.S.C. § 106 (exclusive rights in copyrighted works).

3

whereby F.B.T. agreed to furnish to Aftermath the recording services of Eminem.  ("1998 Agreement")  (Martin Decl. ¶ 3, Ex. 2.)  Eminem executed a Letter of Inducement approving the 1998 agreement.  (*Id.* ¶ 4, Ex. 3; Busch Decl.[7] ¶ 2, Ex. 1, Paterno Dep. 138:17-140:2.)  In addition to other agreements not relevant herein,[8] on July 2, 2003, Eminem and Aftermath entered into a new *short form* agreement (the "2003 Agreement"), affirming all prior agreements.  (Martin Decl. ¶ 5, Ex. 4, ¶ 26.)  Mr. Martin signed the 2003 Agreement solely as an income recipient.  (*Id.* at 24.)  The Agreements were jointly drafted by Aftermath's attorneys and by attorneys for UMG.  (Ex. 2, Rogell Dep. 26:18-27:3, 27:11-28:3; 28:14-29:15; Ex. 1, Paterno Dep. 83:5-86:4-12; Ex. 3, Nieves 17:10-18:9.)  By the Agreements, Aftermath became the copyright owner of Eminem's master sound recordings only; plaintiffs retained ownership and control of the Eminem Compositions.  (Martin Decl. ¶¶ 3, 5; Ex. 2, 4, ¶¶ 8.; *see also* attachments to Doc. No. 1, Complaint.)

## C. The Mechanical Royalty Paragraphs

The 1998 Agreement contains a section entitled "Mechanical Royalties," which provides:

> All Controlled Compositions (i.e., songs written or controlled, directly or indirectly, in whole or in part, by F.B.T., Artist, any affiliated company of F.B.T., Artist, any producer or any affiliated company of any producer) *will be* licensed to Aftermath and its distributors/licensees and Aftermath and its distributors'/licensees' Canadian licensee for the U.S. and Canada, respectively, *at a rate equal to 75% (the "Controlled Rate") of the minimum statutory rate* (*i.e.*, without regard to the so-called "long-song formula").

(*Id*., Ex. 2 ¶ 6) (emphasis added).  The paragraph is not itself a "mechanical license" of

---

[7]   Unless otherwise noted, all exhibits are attached to the declaration of Richard Busch and are cited hereinafter by exhibit number only.

[8]   On September 27, 2000, F.B.T., Eminem and Aftermath entered into a novation of the 1998 Agreement whereby F.B.T. assigned all of its rights under the 1998 Agreement to Eminem, Eminem assumed all of F.B.T's rights and obligations to Aftermath, and Aftermath assumed F.B.T.'s obligations to Eminem so that Aftermath would have a direct relationship with Eminem.  (Martin Decl. ¶ 6, Ex. 5.)  As of September 27, 2000, F.B.T.'s sole interest in Eminem's master sound recordings was that of a royalty recipient.  (*Id.* at ¶¶1, 7(f).)  Also, pursuant to the novation, F.B.T. directed Aftermath to pay to Joel Martin a percentage of the monies otherwise payable to F.B.T.  (*Id.* at ¶ 13.)

controlled compositions, but, as its language makes clear, simply sets a reduced mechanical royalty rate at which controlled compositions **will be** licensed in the future to Aftermath and its distributors/licensees.[9]  In some recording contracts, including recording agreements drafted by Aftermath and other Universal affiliates, discussed below, similar paragraphs sometimes state that controlled compositions[10] "are hereby licensed" to the label (Sullivan Decl., Ex. 1 ¶ X, XII), but Aftermath's agreement does not do so in this case.[11]  (Martin Decl., ¶¶ 3, 5, Exs. 2, 4, ¶¶ 6.)

By its plain language, the only effect of the Mechanical Royalties paragraph is that it: (1) prospectively caps the mechanical royalty rate Aftermath will be required to pay on controlled compositions to 75% of the *minimum* statutory rate in effect at some time in the future;[12] (2) caps the total number of compositions on each album for which Aftermath will pay any "mechanicals," (3) permanently fixes the reduced rate as of the yet unknown date of the delivery of the masters, thereby avoiding subsequent rate increases, and (4) provides that no mechanical

---

[9]     Non-affiliated third party distributors/licensees are required to secure mechanical licenses directly from the publisher.  (Ex. 5, Ostroff Dep. 115:13-21; Ex. 3, Nieves Dep. 113:23-114:15, 25-115:2; *see* Ex. 1, Paterno Dep. 118:24-119:12; Abrams Decl. ¶¶ 4, 5.)

[10]    Controlled compositions are defined in the 2003 Agreement as compositions written or controlled, directly or indirectly, in whole or in part, by Eminem or any of his affiliated companies or any producer or any affiliated company of any producer.  (Martin Decl., Ex. 4, ¶ 6.)  The 1998 Agreement included F.B.T. and any of its affiliated companies within the definition (*Id.*, Ex. 2, ¶ 6), but these parties were deleted in the 2003 Agreement.  Eight Mile, Joel Martin and Martin Affiliated are not included within the definition of controlled composition in either agreement, and plaintiffs signed neither agreement.  (Martin Decl., Exs. 2, 4, ¶¶ 6.)  Joel Martin is a third party beneficiary only, while F.B.T. became a passive income participant in 2003.  (*Id.*, Ex. 2, ¶ 13Ex. 4 at ¶ 12(a),(e).)

[11]    The 1998 and 2003 Agreements were jointly drafted by attorneys for Aftermath and for Interscope/UMG.  (Ex. 2, Rogell Dep. 25:18-26:3, 11- 27:3; 27:14-28:15; Ex. 1, Paterno Dep. 83:5-86:4-12; Ex. 3, Nieves 17:10-18:9.)  Aftermath's "controlled composition clauses" were drafted by Aftermath for its exclusive benefit.  (*See generally* Ex. 18, Passman at 4; *see also* Sullivan Decl. Ex. 1, ¶ X.)  Any ambiguity must be construed against Aftermath.  Cal. Civ. Code § 1654.  The agreements are subject to California law.  (Martin Decl. Ex. 2 at ¶ 21, Ex. 4 at ¶ 22.)

[12]    For example, in 1998, the statutory mechanical rate for each composition was 7.1 cents or 1.45 cents per minute of playing time or fraction thereof, *whichever amount is larger*.  37 C.F.R. 255.3 (i).  Any composition over 5 minutes is paid at the per-minute rate while songs less than 5 minutes are paid at the "minimum rate" of 7.1 cents.  *Id.*  The most current statutory rate of 9.1 cents or 1.75 per minute expired December 31, 2007.  *Id.* at (m).

royalties will be paid on records that do not bear record royalties.[13] (*Id.*, Exs. 2, 4 at ¶¶ 6.) These are all concepts that apply only to sales of physical product.[14] (Sullivan Decl., Ex. 1 ¶ X.)

Furthermore, the prospective licensing language in the Mechanical Royalties paragraph contains none of the material terms of a self-executing license, *i.e.*, effective date, the actual mechanical rate, duration, identification of label's product by record number and configuration, accounting periods or payment due dates, (*See* Ex. 6, Martin Dep. 320:15-17, 23-322:11; Sullivan Decl. Ex. 1, ¶¶ VI, XII), and there is no specific reference that "'*in exchange*' Aftermath will pay the Controlled Rate fixed by contract" as defendants submit.  (Doc. No. 66, Mem. at 20 (emphasis added).)  (Martin Decl., Exs. 2, 4, ¶¶ 6; Ex. 6, Martin Dep. 319:24-320:5; 322:6-11.) Mr. Martin explained that, as it relates to *physical product*, the Mechanical Royalty paragraph simply constitutes an agreement to agree.  (Ex. 6, Martin Dep. 326:5-25; 331:20-332:8; 334:11-335:16.)  Mr. Martin's understanding is that the Mechanical Royalty paragraph *does not* apply to DPDs at all.  (Martin Decl. ¶ 28.)

Finally, labels often license their master sound recordings to third parties who in turn reproduce and release those recordings, for example, on a compilation album.  (Abrams Decl., Ex. 1, ¶¶ 4, 5.)  In those instances, the composition copyright owners, even if subject to a controlled composition clause with the licensing label, have the right to negotiate and enter into

---

[13]  A Section 115 compulsory license requires payment of a mechanical royalty for every record "made and distributed" as opposed to royalties only being paid for each record *sold*, *i.e.*, royalty-bearing record, as provided in the 1998 and 2003 Agreements.  (17 U.S.C. § 115 (a)(1); Sullivan Decl., Ex. 1, ¶ VI; Martin Decl., Ex. 2, 4, ¶¶ 6.)

[14]  The "Mechanical Royalties" paragraph merely fixes the reduced mechanical royalty rate Aftermath is willing to pay for songs written and recorded by Eminem for Aftermath.  Between them, Eminem may agree to cap Aftermath's financial responsibility, and to absorb the cost of excess mechanical royalties, if any, but the provision does not, and cannot, authorize Eminem to license any work he does not own and control, including plaintiffs'.  The most Eminem can do is request that plaintiffs license their works at reduced rates so the burden for the excess mechanical royalties does not fall squarely upon him.  (Sullivan Decl. Ex. 1, ¶ X; Ex. 18, Passman.)  The same is true in other third party agreements where the artists, producers or others do not own or control the composition copyrights. (*See id.*)

mechanical licenses directly with the third party that reproduces and distributes those master recordings, and such third party cannot reproduce the compositions until such license is in place. (*Id*., Ex. 1, ¶ 4.)  Aftermath's 30(b)(6) witnesses confirmed this point.  (Ex. 5, Ostroff Dep. 115:13-21; Ex. 3, Nieves Dep. 113:23-114:15, 25-115:2.)[15]  Apple is Aftermath's licensee for DPDs -- since Apple reproduces and distributes[16] the master sound recordings Aftermath provides to it (Ex. 7, Cue Dep. 51:16-22; 53:8-54:16; 82:14-83:5).  Thus, plaintiffs have the right to enter into a DPD license directly with Apple.[17]  (Sullivan Decl. Ex. 1, ¶ IX.)

**D. The "Mechanical Royalties" Paragraph Does Not Apply To DPDs**

### 1. Section 115 makes clear that controlled composition clauses are inapplicable to DPDs

In 1998, DPD commerce did not exist as it now exists, notwithstanding the passage of the 1995 Digital Performance Rights in Sound Recordings Act ("Digital Rights Act").  (Ex. 4, Hoffman Dep. 192:10-16; Ex. 8, Jobs Dep. 13:13-23; Ex. 5, Ostroff Dep. 116:13-23; Ex. 1, Paterno Dep. 46:4-8, 14-17; *see also, infra* at 8 (quoting 66 F.R. 4099-14103, Vol. 66 No. 47 (Mar. 9, 2001).)  Apple did not launch its iTunes Store until 2003 (Ex. 7, Cue Dep. 22:15-18,

---

[15]  Both 30(b)(6) witnesses testified that they did not know whether the "distributor/licensee" language in the Mechanical Royalties provision related only to affiliated licensees, or also included unaffiliated licensees, but were clear that unaffiliated licensees would, in any event, have to obtain a mechanical license directly from a publisher. (Ex. 3, Nieves Dep. 113:13-16, 21-22; Ex. 5, Ostroff Dep. 116:24 - 117:21; Abrams Decl. Ex 1, ¶¶ 4-5.)

[16]  Delivery of a music file to a purchaser via a download constitutes a mechanical reproduction of the copyrighted work in the form of a DPD.  *U.S. v. ASCAP*, 485 F.Supp.2d 438, 446-47 (S.D.N.Y. 2007).  "Downloading of a music file is more accurately characterized as a method of reproducing that file." (citations omitted).  *Id.* at 443-44.  *See also id.* at 441-42 (describing the process of digital downloading).

[17]   While defendants submit that "Whether Apple is a distributor or a licensee is not relevant. . ." and compare Apple to physical retailers Best Buy and Wal-Mart, there is no comparison between these parties.  Best Buy and Wal-Mart, like all other retailers, purchase CDs at wholesale from the label's distributor, title passes to them, and they then resell the product to the consumer.  (*See* Ex. 17, Eisler Dep. 64:1-10.)  No license is required for a retailer as there is no reproduction and distribution, but an outright purchase from the label's distributor.  The "first sale doctrine" provides that an owner of a particular phonorecord lawfully made is entitled to sell or otherwise dispose of the possession of it *without the copyright owner's consent*.  17 U.S.C. § 109.  On the other hand, DPDs by Apple constitute a reproduction (and distribution) of the master sound recordings containing plaintiffs' works which Apple licenses from Aftermath.  *See, ASCAP*, 485 F.Supp.2d at 443-44.  In addition, unlike with Best Buy and Wal-Mart, who purchase CDs from Aftermath, Apple purchases nothing, and title to the master recordings does not pass to it.  The UMG/Apple relationship is thus a license relationship, and cannot constitute a seller/buyer relationship as a matter of law.  (*See* Abrams Decl. ¶ 4, U.C.C. 2-106(1).)

23:10-12, 76:7-12.)  Plaintiffs had not even heard of iTunes when the 2003 Agreement between Eminem and Aftermath was executed.  (Ex. 6, Martin Dep. 259:21-23.)

When the 1995 Digital Rights Act was passed, Section 115 of the Copyright Act was amended to provide that while DPDs were subject to compulsory licensing at the statutory rate, any contract made after June 22, 1995 could not reduce the mechanical rate on DPDs.  17 U.S.C. § 115(c)(3)(E)(i).  In other words, Aftermath's prospective controlled composition clauses in the 1998 and 2003 Agreements that permanently fixed ¾ and/or minimum rates and caps on the number of compositions upon which mechanical royalties would be paid once a mechanical license was issued were made inapplicable to DPDs by Congress.  *Id.*

Indeed, it was the specific intent of the Senate in amending Section 115 to address digital transmissions that controlled composition clauses (similar to the Mechanical Royalties paragraphs herein), did not govern DPDs, explaining Section 115(c)(3)(E)(i) as follows:

> There is a situation in which the provisions of voluntarily negotiated license agreements should not be given effect in lieu of any mechanical royalty rates determined by the Librarian of Congress. For some time, music publishers have expressed concerns about so-called 'controlled composition' clauses in recording contracts. Generally speaking, controlled composition clauses are provisions whereby a recording artist who is the author of a non-dramatic musical work agrees to reduce the mechanical royalty rate payable when a record company makes and distributes phonorecords which include recordings of such artist's compositions. Subject to the exceptions set forth in subparagraph (E)(ii), **the second sentence of subparagraph (E)(i) is intended to make these controlled composition clauses inapplicable to digital phonorecord deliveries.**

(Ex. 22, Pub. L. No. 104-39, 109 Stat. 336, Legislative. history, S. Rpt. 104-208 at 41. )

On October 9, 2001, the Recording Industry Association of America, Inc. ("RIAA"), a trade group representing the major, multinational record companies, the National Music Publishers' Association Inc. ("NMPA"), and The Harry Fox Agency, Inc. ("HFA"), the largest

U.S. licensing agency for music publishers, negotiated an interim "Industry Agreement" for licensing DPDs. On December 6, 2001, they filed a Joint Statement and Agreement addressing licensing of limited downloads and on demand streaming but without agreeing to rates. *See* 66 FR 64783, Vol. 66, No. 241 (Dec. 14, 2001). The Copyright Office sought further public comment (*id.*), but it was later "set aside to focus efforts on possible legislative solutions to licensing music in a digital environment." (*See* Ex. 20, Scope of Section 115 License.) This "Industry Agreement" was applicable only to labels and publishers members of signatories RIAA, NMPA and HFA. (Ex. 21, Joint Statement.) Plaintiffs are not, and never have been, affiliated members of any of these groups. (Martin Decl. ¶ 17.)

Not only did Congress legislate in 1995 that controlled composition clauses are inapplicable to DPDs (17 U.S.C. § 115(c)(3)(E)(i)), but, in light of all of the above, it is industry practice to this day that DPD licenses are negotiated and executed separately from mechanical licenses granted for physical product. (Sullivan Decl. ¶ 5, Ex. 1, ¶¶ VI-IX.) Accordingly, a label wishing to exploit compositions via DPD must either obtain a compulsory license *before* the composition is released and abide by all of the statutory formalities, or privately negotiate a specific DPD license with the owner of the underlying musical composition. (*Id.* at Ex. 1, ¶¶ VI, IX ; *see also* 17 U.S.C. § 115(c)(3)(B).)

Here, recognizing all of this, as shown below, Aftermath attempted to negotiate private DPD licenses with plaintiffs (Martin Decl. ¶ 18; *see also* Sullivan Decl., Ex. 1, ¶¶ V, VI, XIII), and defendants are foreclosed from securing compulsory DPD licenses for any of the Eminem Compositions. 17 U.S.C. § 115(b)(1), (b)(2); *see also* Sullivan Decl., Ex. 1, ¶ VI.

### 2. Aftermath Seeks Digital Licenses from Plaintiffs

In October 2002, after the RIAA, NMPA and HFA announced their agreement, UMG's copyright department wrote a letter to Eight Mile requesting and "hoping" that Eight Mile would license its compositions for permanent download. (Ex. 9, Blair Dep. 32:12-33:8; Ex. 10, Douglas Dep. 24:17-25:6; Ex. 11, Gary Dep. Ex. 48 at 8M-0015.)  Such a "hope" and request would be unnecessary if the Mechanical Royalty paragraph of the 1998 Agreement covered DPDs.

It is UMG's practice to send out license requests to a music publisher where UMG believes the recording agreement and controlled composition clause does not contain a self-executing license.  (Ex. 12, Ferrante Dep. 65:4-65:16.)  Where UMG believes the controlled composition clause to be self-executing, UMG's practice is merely to send an "advice letter," informing the publisher its composition is being released on an album, advising the publisher of the album's release date and the rate being paid.  (*Id*. at 64:19-65:3.)  UMG sent multiple license requests to Eight Mile for its compositions in both physical and digital formats, but UMG and Aftermath never once sent an advice letter to Eight Mile.  (Ex. 12, Ferrante Dep. 66:2-7; Ex. 13, Martin II 472:22-473:19; Martin Decl. ¶ 20.)

### 3.  Plaintiffs deny UMG's requests but negotiate a single DPD license

Eight Mile declined to execute the proposed DPD license accompanying the October 2002 letter, but instead offered to license a single Eminem composition, "Lose Yourself," for DPD as long as certain conditions were met. (Martin Decl. ¶ 19; Martin Dep. 299: 21-301:2; *see also* Ex. 14, Levinsohn Dep. 251:5-252:8, 259:2-261:5, Exs. 205, 225.)  Eight Mile did so because a DPD was "very, very new" and it "didn't know what accountings would look like, [d]idn't know who was going to be selling it, [d]idn't know anything."  (Ex. 6, Martin Dep. 300:6-301:2.)  In 2002, Apple's iTunes did not even exist. (*Id*.)  Eight Mile and UMG negotiated

a jointly prepared DPD license reflecting: (1) a two-year term (not a perpetual one); (2) the payment of a full statutory rate subject to statutory increases or industry convention (not a reduced rate); (3) quarterly (not semi-annual) accountings and payment; and (4) Eight Mile's right to terminate the license after two years or at upon any breach of the license's terms. (Martin Decl. ¶ 19; Ex. 14, Levinsohn Dep. 251:5-252:8, 259:2-261:5, Exs. 205, 225; Ex. 11, Gary Dep., Ex. 48 at 8M0016-0018.)

Eight Mile signed the single, proposed DPD license and sent it to Pat Blair, head of UMG's copyright department.  (Martin Decl. ¶ 19; Ex. 11, Gary Dep., Ex. 48 at 8M0016-0018.) Mr. Martin spoke with Ms. Blair at that time and thereafter, and other UMG copyright department employees, Chad Gary, Todd Douglas and Tim Hernandez, communicating his objections to any other of plaintiffs' compositions being sublicensed to digital download companies as DPDs.  (Ex. 6, Martin Dep. 298:13-300:5; Ex. 15, Van Hagen Dep., 34:24-35:8; 35:13-15; 38:7-25; 42: 2-20; 43:7-14,20-44:6; Ex. 9, Blair Dep. 38:9-22; 47:3-24; 49:6-10; 67:2-68:4; Ex. 11, Gary Dep. 87:5-10; 36:15-19; 37:24-38:19; 39:17-22; 41:13-19; Hernandez Decl. ¶ 3)  Ms. Blair confirmed she, Chad Gary of UMG's copyright department and UMG counsel Rand Hoffman were aware of his objections.  (Ex. 9, Blair Dep. 38:9-22, 48:4-49-12, 58:7-10, 67:2-68:4.) UMG never countersigned and returned the "Lose Yourself" license to Eight Mile. (*See* Ex. 6, Martin Dep., 362:22-363:4, 363:15-364:16; Ex. 14, Levinsohn Dep. 254:2-10.)

Thereafter, UMG peppered plaintiffs with license requests for both physical configurations and for DPDs, sending DPD requests with the same terms as the "Lose Yourself" license (*e.g.*, two year term, right of termination, etc.).  (Ex. 13, Martin II 472:22-473:19, Ex. 222 at 8M819, 810-818; *see* Ex. 11, Gary Dep., Ex. 48 at 8M016-17.)  Plaintiffs did not execute

or return any of those proposed licenses or any other license that would have authorized the Eminem Compositions' exploitation as DPDs.  (Ex. 13, Martin II 440:9-14, 440:22-441:6; 471:10-473:19; Ex. 10, Douglas Dep. 45:12-46:4; 59:7-60:2; 61:7-18.)   When UMG sent proposed mechanical licenses that would have authorized both physical and DPD exploitation, plaintiffs not only did not execute UMG's licenses, but issued their own licenses to UMG that "remove[d] references on the license itself to digital configurations."  (Ex. 6, Martin Dep. 376:15-377:22; Ex. 11, Gary Ex. 52, 53; Ex. 13, Martin II 440:9-14, 440:22-441:16, 471:10-473:19, 476:10-477:19.)   UMG acknowledged the licenses did not encompass digital configurations by countersigning plaintiffs' licenses, covering only physical configurations. There was a clear understanding with UMG that, with two exceptions mentioned herein ("Lose Yourself," and a separate mastertone agreement) plaintiffs would not agree to license any of the Eminem Compositions for digital distribution. (Ex. 13, Martin II 412:9-25, 413:19-414:16, 460:7-461:12, 461:23-462:2, 469:25-470:15; *see* Ex. 14, Levinsohn Dep. 247:17-248:9, 251:5-252:2, 260:11-261:18, 267:9-22, 262:7-11, 265:6-17, 273:23-274:18; Hernandez Decl. ¶ 3.)

**E.  Aftermath Licenses Plaintiffs' Compositions to Apple Without Express or Implied Licenses**

In 2002, UMG and Apple entered into an agreement whereby UMG licensed its master sound recordings to Apple for reproduction, distribution and sale by Apple, and purported also to sublicense to Apple the reproduction and distribution rights with respect to the compositions embodied in those master recordings.  (Ex. 8, Jobs Dep., Ex. 85; Jobs Dep. Ex. 81, ¶ 44; Jobs Dep., Ex. 82 ("Since Apple does not own or control any music itself, it must license the rights to distribute music from others, primarily the big four music companies: Universal, Sony BMG, Warner and EMI."); Ex. 83 ("[Apple] licenses music from big four music companies").  While

Aftermath vehemently denies this and attempts to portray Apple as nothing more than a retailer,[18] Apple must have a license to reproduce and distribute the master sound recordings and compositions provided to it by UMG.[19]  The "Grant of Rights" in the UMG-Apple Agreement provides by its terms that Apple has a license from UMG to do just that, particularly since title to the product does not pass to Apple.  (Ex. 8, Jobs Dep., Ex. 85, ¶ 1; Abrams Decl. Ex. 1, ¶ 6.)  Also, the most senior official of Apple's iTunes, Eddy Cue, testified in early 2008 before the Copyright Royalty Board in the Section 115 Rate Proceeding that Apple sublicenses the musical compositions embodied in master sound recordings from UMG and other record labels.  (*See* Ex. 8, Jobs Dep., Ex. 81, ¶ 44, 20:22-21:13; *see also* Ex. 7, Cue Dep. 24:11-22, 158:20-160:24, 160:20-161:17, 162:7-19, 163:8-16, 164:18-22.)

Once iTunes launched, Apple neither accounted to nor paid plaintiffs directly (Ex. 7, Cue Dep. 159:12-24, 168:23-169:9; *see* Ex. 8, Jobs Dep., Ex. 85, ¶ 2( c)(ii)), as an unaffiliated licensee of UMG would do if it licensed a master from UMG and entered into a direct DPD license with plaintiffs. (*See supra* at 7, n.17; Abrams Decl. Ex. 1, ¶¶4, 5.)  Instead, Apple accounted to and paid royalties for plaintiffs' compositions directly to UMG.  (Ex. 7, Cue Dep. 113:16-20, 149:12-24, 151:10-152:9; 159:12-24, 168:23-169:9; *see* Ex. 8, Jobs Dep., Ex. 85, ¶ 2(c)(ii).)  The royalty statements UMG provided plaintiffs beginning in 2003 did not (1) identify any particular composition for which DPD revenue was being paid or (2) identify any specific revenue directly related to DPDs.  (*See, e.g.*, Martin Decl. ¶ 21-22, Exs. 18-19.)  Instead, UMG's royalty statements identified certain revenue initially without any configuration type, and then

---

[18]   In 2004, UMG was criticized by industry attorneys, including Aftermath's attorney Paterno, for its unilateral practice of recharacterizing licenses for DPDs as physical sales thereby significantly reducing royalty payments to artists and others. (Ex. 4, Hoffman Dep., Ex. 64.)  UMG ignored the attorneys' letter. (*Id.* at 34:3-5; 35:15-18.)

[19]   *See* 17 U.S.C. § 106(1)(3)(rights to reproduce and distribute are exclusive to copyright owner); *see also U.S. v. ASCAP*, 485 F.Supp. 438, 443-44 (S.D.N.Y. 2007).

"Other" and later as "ID."  Some of the later royalty statements contained a 1-page "Glossary" that defined "ID" as "digital track," although UMG did not identify what form of "digital" income was being reported (*e.g.*, ringtones, mastertones, streaming, mobile, or limited or permanent downloads).  (Ex. 16, Harrington Dep. at 53:1-11; 54:3-55:24; Ex. 6, Martin Dep. 302:3-303:18, 305:9-306:15; Ex. 15, Van Hagen Dep. 48:24-50:6.)  Plaintiffs had no knowledge that the royalty payments they received contained monies for DPDs they specifically had refused to authorize.  (Ex. 6, Martin Dep. 293:5-21; 297:16-298:5; 303:8-304:17; Martin Decl. ¶ 22.) UMG admits there was no way for plaintiffs to determine looking at their royalty statements what iTunes reported for DPD revenue of plaintiffs' compositions in any given period or even if any of the monies related to DPDs at all.  (Ex. 17, Eisler Dep. 60:15-24; Ex. 16, Harrington Dep. 27:4-10;  61:10-16;  *e.g.*,  58:13-17;  59:8-23;  63:5-64:3.)   A single check accompanied each statement and included amounts for sale of authorized physical product, and a small amount for the items identified as "Other" or "ID." (*See*, *e.g.*, Martin Decl. ¶¶ 21-22, Exs. 18-19.)

In light of the "Lose Yourself" DPD license and a separate test 2005 Mastertone License (Martin Decl. ¶ 23, Ex. 21; Ex. 6, Martin Dep. 382:25-383:3; Ex. 13, Martin II 488:3-22; 489:24-490:18), plaintiffs expected to receive some digital income.  (*See* Ex. 14, Levinsohn Dep. 293:23-25, 294:11-17; Ex. 6, Martin Dep. 306:16-307:13; 308:3-7; Martin Decl. ¶ 24.)  It was only after plaintiffs' 2006 audit that plaintiffs first learned that "Other," or "ID," included DPDs of other Eminem Compositions for which plaintiffs steadfastly refused to grant DPD licenses. (Martin Decl. ¶ 24; Martin Dep. 302:3-303:18, 305:9-306:15.)

**F.**    **The "Lose Yourself" License**

Although negotiated, executed and sent to UMG by Mr. Martin, UMG/Aftermath did not

ever execute or return to plaintiffs a signed copy of the "Lose Yourself" license, and to this day defendants have not produced an executed copy of such license. (Martin Decl. ¶ 19; *see* Doc. No. 66, Mem. at 16, 25-26.)  Even in this litigation, during discovery, defendants would not say who, if anyone, approved the "Lose Yourself" license or whether it was in effect.  (*See*, *e.g.*, Ex. 28, Objections; Ex. 4, Hoffman Dep. 208:11-15; Ex. 9, Blair Dep. 51:18-24; Ex. 11, Gary Dep. 131:8-132:9.)  It was not until July 3, 2008, that defendants, by letter, stated that some unknown person at UMG approved the "Lose Yourself" license, and that UMG believed it to be effective. (Ex. 27, Letter.) Without conceding its effectiveness in the absence of UMG's countersignature and return thereof, on August 11, 2008, plaintiffs terminated in writing the "Lose Yourself" DPD license.  (Martin Decl. ¶ 25, Ex. 22.)

**G.  Third Party Documents**

Defendants produced over 1600 pages of documents after discovery closed, claiming they are third party documents authorizing the use of certain Eminem Compositions as DPDs.  As discussed in the motion to exclude filed herewith, plaintiffs had no opportunity to conduct discovery as to these documents, and they should not be considered.  Nonetheless, on their face, it is apparent these documents do not insulate defendants from liability, and are ineffective licenses for many reasons:  (1) many documents do not purport to authorize or license for DPDs (Sullivan Decl. ¶ 3); (2) the purported licensor has no authority to license the compositions having apparently assigned their administration rights exclusively to third party publishers (Sullivan Decl. ¶ 4; Martin Decl. ¶ 15); (3) the agreements are ineffective as a matter of law to grant DPD licenses; (4) purported "licenses" state "Note: This is a summary of information and is not a license;" (5) purported "licenses," even if otherwise valid, state they are only licensing

the share in the composition owned by that entity (*see*, *e.g.*, Sullivan Decl., Ex. 2 (*e.g.*, Bat Future Music "license" for "Encore" is for a 12.5% share, HFA "license" for "Just Lose It" is for a 49% share)); and (6) non-exclusive licenses are not assignable absent agreement of all co-owners, which defendants do not have , making it impossible to assign any otherwise valid license to Apple. (Sullivan Decl. ¶¶ 3, 8, Ex. 1, ¶¶ X, XI.)   Attached to Patrick Sullivan's Declaration as Exhibit 2 is a chart identifying the song titles allegedly implicated by these third party "licenses" and a brief analysis of their failings.  (*Id.* ¶¶ 3, 8, Ex. 2.)  Also attached as Exhibit 3 to Mr. Sullivan's Declaration is a chart briefly summarizing the other third party recording agreements upon which defendants purport to rely.  (Sullivan Decl. ¶ 4, Ex. 3.)

## ARGUMENT

## DEFENDANTS' MOTION SHOULD BE DENIED

There are numerous disputed issues of material fact, including: (1) whether the Mechanical Royalties provision constitutes a license, and whether it has any application at all to DPDs; (2) whether plaintiffs have the right to enter into a direct license with Aftermath's unaffiliated licensees, as defendants' own witnesses testified a publisher does when a master recording is licensed to a third party for physical product release; (3) in that same regard, whether Apple is an unaffiliated licensee of Aftermath; (4) whether cashing a single check accompanying a royalty statement gives rise to an implied license when it includes authorized sales, unauthorized sales are camouflaged, plaintiffs did not deliver the compositions to defendants and have repeatedly objected to the unauthorized exploitation of their works; (5) whether the "Lose Yourself" license was effective since it was never countersigned or returned by defendants, and to the extent it was effective, whether defendants are liable for infringement

for the continued exploitation of "Lose Yourself" upon its termination; and (6) to the extent considered by this Court, whether the late produced documents are effective third party licenses absolving defendants of liability for infringement as to certain compositions.

## I.   The Summary Judgment Standard

Summary judgment is only proper if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must construe the evidence produced in the light most favorable to plaintiffs, as the non-moving party, drawing all reasonable inferences in their favor. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## II.   Defendants Do Not Have DPD Licenses From Plaintiffs

 In a contract interpretation case such as this, the language of the contract should be interpreted most strongly against the party who caused the uncertainty to exist. Cal. Civ. Code § 1654.[20] Even if an agreement is clear and unambiguous on its face, which these agreements are not, the "trial judge must consider relevant extrinsic evidence that can prove a meaning to which the language of the contract is reasonably susceptible." *United States v. King Features Entertainment, Inc.*, 843 F.2d 394, 398 (9th Cir. Cal. 1988).

Also, "California law recognizes that the words of a written instrument often lack a clear meaning apart from the context in which the words were written" and thus permits courts to "consider any extrinsic evidence offered by the parties." *Miller*, 318 F. Supp. 2d at 934. A court

---

[20] The 1998 and 2003 Agreements provide that they are "subject to California law." (Martin Decl., Ex. 2 at ¶ 21, Ex. 4 at ¶ 22.)

may allow extrinsic evidence such as "testimony regarding the circumstances in which a contract was written, *the subsequent conduct of the parties*, and the common usage of particular terms in a given industry." *Id.*; *see Pacific Gas*, 69 Cal.2d at 38-39; *United Cal. Bank v. THC Financial Corp.*, 557 F.2d 1351, 1360 (9th Cir. 1977).

### A.  The "Mechanical Royalties" Paragraph Is Not a DPD License

### 1. The "Mechanical Royalties" Paragraph is Not a License at All

Defendants first claim that the "Mechanical Royalties" provisions in the 1998 and 2003 Agreements provide them a "mechanical license" to exploit the Eminem Compositions as DPDs. (Doc. No. 66, Mem. at  5).[21]  They are wrong.

By its plain language, the "Mechanical Royalties" provision is not a license of any kind, only provides that controlled compositions "will be" licensed in the future at a reduced rate, and contains none of the other terms that would be expected to be within a mechanical license. (Sullivan Decl. see ¶ 8, Ex. 1, ¶ VI.)  If it were otherwise, or if Aftermath believed it to be otherwise, defendants would not have (i) sent dozens of license requests and proposed licenses to plaintiffs for both physical and DPD product; (ii) entered into numerous mechanical licenses, accepting plaintiffs' drafts, covering physical goods only; (iii) negotiated a DPD license for "Lose Yourself" or agreed to a two year term with a right to terminate thereafter; (iv) sent DPD license requests for each composition, many with the same restrictions as provided in the "Lose

---

[21] Defendants also point to the language in the Agreements by which Eminem permits any and all exploitation of the "master recordings." (Doc. 66, Mem. at 4.)  While this grant permits Aftermath to exploit the sound recordings of Eminem's performances in the manner of their choosing, as Aftermath well knows, Eminem cannot grant any rights to plaintiffs' separate composition copyrights. (*See* Martin Decl. ¶¶ 2, 14.)  For this, Aftermath needs mechanical or DPD licenses from plaintiffs, which they repeatedly tried to obtain.  Likewise, plaintiffs are not, as defendants claim, taking a position in this action inconsistent with the California F.B.T. action, since that action involves the failure of defendants to pay artist royalties appropriately for licenses of the Eminem *master recordings*, which defendants have the right to license, while this action involves the failure of defendants to obtain from plaintiffs DPD licenses for the musical compositions.

Yourself" license, or (v) belatedly attempted to obtain a compulsory license for "Lose Yourself" after plaintiffs terminated the DPD license, as discussed *supra* at 15.

### a. The Mechanical Royalties Paragraph is Not a DPD License (Copyright Act and Industry Practice)

Furthermore, the amendments to Section 115, as well as industry practice, show that controlled composition clauses do not grant DPD licenses. *See supra* at 7-9. Labels either must obtain a Section 115 compulsory DPD license or privately negotiate a DPD license with the copyright owner, its agent or administrator of the composition, and cannot rely on controlled composition clauses. 17 U.S.C. § 115(a), (c)(3)(B); Sullivan Decl. Ex. 1, ¶¶ V, VI, XIII.)

Furthermore, the Digital Rights Act created a DPD license as a separate counterpart to the mechanical license. (Ex. 23, Farber, 9 *Entertainment Industry Contracts* ¶ 168-01 at 168-3 (2007).) While the two types of licenses are similar, "each applies only to its inherent method of delivery." *Id.* A "mechanical" license authorizes the mechanical reproduction and distribution of physical configurations while a DPD license authorizes the reproduction and delivery of an ephemeral copy of the sound recording by means of a digital transmission. (Sullivan ¶ 5, Ex. 1, ¶¶ VI, VII.) DPDs are not covered in a standard mechanical license unless the license expressly provides that it does. *Id.* Thus, while defendants contort 17 U.S.C. § 115 (c)(3)(E), bootstrapping DPD licenses into what it claims is a mechanical license for physical configurations, namely the "Mechanical Royalties" paragraph, (*See* Doc. No. 66, Mem. at 17, n13.), that paragraph makes no reference to the distinctly different DPD. *Supra* at 7-9. Industry practice recognizes these requirements, and requires that parties controlling master recordings obtain DPD licenses, even if they have an artist agreement with a controlled composition clause. (Abrams Decl., Ex. 1, ¶ 4; Sullivan Decl., Ex. 1, ¶ VII.)

### b. The Farm Club Case

Aftermath/UMG made an analogous, disingenuous argument in the "Farm Club" case, *Rodgers & Hammerstein Org. v. UMG Recordings, Inc*., 00 Civ. 9322, 2001 U.S. Dist. LEXIS 16111, (S.D.N.Y. Sept. 26, 2001), which the court flatly rejected as defying "common sense." *Id.* at *16.  There, UMG secured privately negotiated licenses from HFA for plaintiffs' compositions in physical configurations only, but also reproduced those compositions digitally through their Internet music service, Farm Club.  *Id.* at * 8.  When sued for infringement, UMG argued that HFA had no right to limit the license to a physical configuration where Section 115 "automatically" confers a license for all configurations [when a Notice of Intent to obtain a compulsory license is timely served.]  *Id.* at *11.  The court flatly rejected that contention, holding that UMG negotiated a private license, not the alternative Section 115 compulsory license, and thus was bound by the terms of the license it negotiated, which did not specify the digital streaming format.  *Id.* at *13-*16; *see also Encore Ent. LLC v. Kiddesigns, Inc.*, 3:03-1129, 2005 U.S. Dist. LEXIS 44386, *23 - *26 (M.D. Tenn. 2005).  Here, citing 17 U.S.C. § 115(c)(3)(A), defendants speciously submit that the "license obtained includes the right of the licensee to distribute or authorize the distribution" as a DPD. (Doc. No. 66, Mem. at n17.) Defendants, however, omit the operative word "compulsory" before the word "license" and as in *Farm Club*, intentionally ignore that 17 U.S.C. § 115 (c)(3)(A) is expressly applicable *only* to a Section 115 *compulsory* license; Aftermath has no compulsory licenses for plaintiffs' works. Just as the Farm Club court found that UMG's failure to mention digital exploitation in their

negotiated license prevented digital exploitation, Aftermath, too, must live with the imprecise language they drafted in their privately negotiated agreements.[22]

### 2.  Plaintiffs Have The Right To License To Unaffiliated Licensees

In addition, Aftermath's own 30(b)(6) witnesses admit that the Mechanical Royalties paragraph does *not* affect the obligations of unaffiliated licenses to obtain licenses for the compositions directly from plaintiffs.  *See supra* 7.   Apple is Aftermath's unaffiliated licensee, both according to the grant of rights within the UMG/Apple Agreement, and based upon Apple's admissions in sworn testimony that it purports to sublicense musical compositions from its label partners, including UMG.  (Abrams Decl., Ex. 1, Ex. 8, Jobs Dep., Ex. 85 at 1; Jobs. Dep. Ex. 81, ¶ 44; Jobs Dep., Ex. 82.)  Plaintiffs have the right to license their works directly to Apple just like it would any other third party who licensed master recordings from Aftermath/UMG, and the reproduction and distribution of plaintiffs' compositions without such licenses is infringement. (Ex. 5, Ostroff Dep. 115:13-21; Ex. 3, Nieves Dep. 113:23-114:15, 25-115:2; *see* Ex. 1, Paterno Dep. 118:24-119:12; Abrams Decl., Ex. 1, ¶¶ 4, 5;  Sullivan Decl, Ex. 1, ¶ X, XI.)

The cases relied on by defendants are readily distinguishable.  While defendants claim that *Reinhardt v. Walmart*, No. 07 Civ. 8233 (SAS), 2008 U.S. Dist. LEXIS 32119 (S.D.N.Y. Apr. 18, 2008) is dispositive because a composition copyright owner's infringement claim[23] was dismissed against Apple, the case is not remotely on point.  For more than 20 years, the songwriter authorized his publisher, Taco Tunes, to license to label Ramone Productions the

---

[22] Defendants are in a worse position in this action as to their license defense than UMG was in the *Rodgers & Hammerstein* case because here, the "Mechanical Royalties" paragraph is not even a license for physical configurations, much less one for DPDs.  Expert in drafting recording agreements, Aftermath consciously chose not to modify the language in the new 2003 Agreement it drafted even though they could have.  They chose not to add a royalty provision specifically applicable to DPDs despite their practice in 2003 of including such a provision in all new recording artist contracts.  (Ex. 2, Rogell Dep. 115:7-117:11; 122:7-17; 123:18-21; 164:11-18; 165:8-11; Ex. 1, Paterno Dep. 183:16-184:24; 186:21-187:2, 188:23-4, 13-25; 191:25-8; Ex. 3, Nieves Dep. 24:9-14; 18:13-19:18.)

[23]   Reinhardt was not found to be the owner of the composition copyrights. (*See* Ex. 23, Defts. Mem. at 9, n. 2.)

21

compositions he wrote. *Reinhardt,* 2008 U.S. Dist. LEXIS 32119 at \*1-\*2. Unlike the present action, it was undisputed that Taco Tunes, a signatory to the recording agreement, expressly licensed the *specific* compositions at issue, authorizing the defendants to "electronically distribute and duplicate 'non-physical digital copies'" *Id.* at \*1. Also, Reinhardt did not dispute that the recording contract granted the label the limited right to create sound recordings embodying the *specific* compositions. *Id.*, citing n.10, ¶ 19. In this case, to the contrary, plaintiffs never licensed the Eminem Compositions to defendants as DPDs, objected to such exploitation, and the "Mechanical Royalties" paragraphs in this case are readily distinguishable from the one in *Reinhardt.* (*See* n.25.)

 *Allman Bros. v. Sony BMG Music Ent.*, 06 CV 3252, 2008 U.S. Dist. LEXIS 47612 (S.D.N.Y. June 17, 2008), is also irrelevant. *Allman Bros.* is a breach of contract action, which was dismissed because the plaintiffs did not allege the defendant label "leased" the master sound recordings thereby triggering a higher licensing royalty provision, and was based solely on contract provisions not involved in this case. *Id.* at \*5. The controlled composition clause in *Allman Bros.* "hereby" granted the label the right to produce each controlled composition on "phonograph records," and *defined* "Phonograph Records" to include "all forms of reproductions, now or hereafter known, manufactured or distributed primarily for home use" which the plaintiffs acknowledged included digital music files.[24] *Id.* at \*6. Here, the Mechanical Royalties provision does not mention phonograph records at all, and does not "hereby" grant Aftermath any self-executing license as to the controlled compositions, much less one for DPDs.

### B. Apple Has No DPD Licenses from Plaintiffs

---

[24] The Allman Brothers contract contains a "Licenses for Musical Compositions" paragraph stating, "You hereby grant to CBS an irrevocable licenses under copyright to reproduce each Controlled Composition on Phonograph Records[.]" Ex. 29, Doc. No. 9-3, Ex. A to Complaint in Case No. 1:06-cv-03252-GBD at 25.

Apple itself has not offered any facts or proposed any legal theory whereby Apple became a licensee of the Eminem Compositions. It is undisputed plaintiffs have granted no licenses to Apple. As discussed herein, non-exclusive licenses are personal, non-transferable, non-assignable rights, and Apple stands silent on this issue.

## III.   Disputed Fact Issues Exist Regarding "Lose Yourself"

Disputed fact issues exist regarding "Lose Yourself" and the "Lose Yourself" DPD license. *Supra* at 14-15. Specifically, Aftermath/UMG never returned an executed license to plaintiffs, and only, on July 3, 2008, finally said the license was approved and in effect. (Ex. 27, Letter; Martin Decl. ¶ 19.) Without admitting the license was effective, plaintiffs immediately terminated that license, and advised defendants that further exploitation of "Lose Yourself" constitutes infringement. Fact issues concerning the effectiveness of the license, the termination and whether continued exploitation in the absence of a license constitutes infringement all make summary judgment on this composition inappropriate. [25] (*See* Doc. No. 1, ¶ B.)

## IV.   The Third Party Documents Do Not Defeat Plaintiffs' Claims

The third-party documents relied upon by defendants were not produced during discovery or as part of Rule 26 disclosures, and should be excluded from consideration herein. Fed. R. Civ. P. 37(c), *see also supra* n.3**.** To the extent considered, however, they do not provide a defense to plaintiffs' claims.

---

[25]   In response to plaintiffs' termination letter, Aftermath/UMG sent a purported Notice of Intent to Obtain Compulsory License. (Martin Decl. ¶ 26, Ex. 23.) Such notice is ineffective because Aftermath/UMG already has distributed, and continues to distribute, "Lose Yourself" and thus is foreclosed from obtaining a compulsory license. It is "crystal clear" that Section 115 compulsory licenses are only available to a party who serves notice ***before*** any phonorecords, including DPDs are distributed. *King Records, Inc. v. Bennett*, 438 F.Supp. 2d 812, 856 (M.D. Tenn. 2006); 17 U.S.C. § 115(b)(1). Strict time limits must be observed for obtaining a compulsory license and the consequences of a lapse are severe. *Cherry River Music Co. v. Simitar*, 38 F. Supp.2d 310, 312 (S.D.N.Y. 1999). Defendants' late attempt to obtain a compulsory license for "Lose Yourself" is an admission that the Mechanical Royalties paragraph does not cover DPDs, since a compulsory or other license would not be required if it did.

**A. Plaintiffs Have The Exclusive Right To License 22 Compositions**

As explained fully above, through its agreements with Eminem and other writers, plaintiffs alone have the exclusive right to license 22 of the compositions at issue. (Martin Decl. ¶ 17, Ex. 14.). As to those compositions, therefore, the third party documents submitted by defendants are irrelevant.[26]

**B. The Third Party Agreements Also Do Not Grant Effective Licenses**

As discussed above, plaintiffs have had no opportunity whatsoever to conduct any discovery on the third party documents submitted by defendants. Nonetheless, on their face, they are defective and do not constitute DPD licenses for a variety of reasons.

First, as discussed *supra* at 7-9, controlled composition clauses are generally inapplicable to DPDs, and there is no evidence in this record that the parties to these agreements actually control any of the compositions at issue. In fact, many of the agreements relied upon by defendants are with producers, artists or others who either have no right to license the compositions or assign any right they had to their third party publishers, agents or administrators. (Martin Decl. ¶ 14, Ex. 7.) In other words, just as with Eminem, none of these third party producers, artists, production companies, or labels (*e.g.*, G-Unit Records, Lloyd Banks, Angry Blonde Productions, etc.) has any ownership or administration rights in the Eminem

---

[26]    Copyright vests *initially* in the author(s) of a work. 17 U.S.C. § 201(a). Once an author assigns his copyright to a music publisher (*see id.* at § 201(d)), as Eminem and his co-authors have, by virtue of that transfer of ownership and/or exclusive administration rights, the author no longer owns and/or controls the copyright and can exercise none of the exclusive rights reserved to a copyright owner. (Sullivan Decl. ¶ 4; *see* Martin Decl. ¶¶ 2, 7-13, Exs. 1, 6-15; *see also* Doc. No. 1, Compl. Ex. A; *see* Doc. No. 53-4, Schedule 1 identifying claimants.) The same is true for all of Eminem's co-authors who have transferred their copyright or administration rights to publishers. *See* Doc. No. 66-3, Ex. 1b, "Mechanical Licenses" (identifying **publisher owners or administrators** from whom Aftermath claims to have obtained licenses; none are granted by authors.)

24

Compositions, regardless of the controlled composition[27] clauses.  (*Supra* at n.24; *see* Sullivan Decl. ¶ 8; Martin Decl. ¶  15.)

Second, non-exclusive licenses are not assignable. *See in re Golden Books Family Ent., Inc.*, 269 B.R. 300, 309 (Del. 2001).  Thus, even if the language in the controlled composition clauses were valid licenses, and even if the licenses applied to DPDs, the licenses were not validly assigned to Aftermath, or to Apple, and are irrelevant to plaintiffs' claims.

Third, several of the purported licenses only purport to license the share of the assignor. (*See* Sullivan Decl. Ex. 2.)  Because Aftermath was fully aware of plaintiffs' objections to the use of its share of the compositions prior to exploitation, these purported licenses of only a share of the compositions do not insulate defendants from liability for infringement.  *See* 1 *Nimmer on Copyright* § 6.10[C].  *See also* Sullivan Decl. ¶ 3, Exs. 2 and 3.

### C.        The First Use Doctrine

Lastly, under the First Use doctrine, the first use of a copyrighted work requires permission from all of the copyright holders for exploitation to be lawful.   "The first time a composition is distributed to the public on an album, that distribution **must be authorized by the copyright holder**, since reproduction and distribution are exclusive rights of the copyright holder." 17 U.S.C. § 106; *see also* 2 *Nimmer on Copyright* § 8.04[C] (2007).  "**Unless and until a copyright owner opens the work to compulsory exploitation**, the copyright owner's rights in such musical work **remain exclusive**, *i.e.*, not subject to the compulsory license."  *Id.* citing 17 U.S.C. § 115(a)(1) and *Cherry River Music Co. v. Simitar Entm't, Inc.*, 38 F. Supp. 2d 310, 312 (S.D.N.Y. 1999)) (emphasis added).  A copyright owner has the exclusive right to license the first

---

[27]        Defendants submit an obsolete exhibit which imprecisely suggests controlled composition clauses are licenses by copyright proprietors.  (*See* Busch Decl., ¶ 25, Ex. 26.)

public release of the musical composition in a sound recording. *Id.* at § 8.04[C]. Until that public distribution, each copyright owner retains exclusive rights to the composition. *Id.*, Sullivan Decl. ¶ 3, Ex. 1, ¶¶ V. Fifty-five of the Eminem Compositions are "first use" works, meaning they were simultaneously released to the public for the first time in both physical configurations and DPDs. (Martin Decl. ¶ 27, Ex. 25.) To do this without infringing the copyrights, defendants are required to have a license from **all** parties who owned or controlled such compositions. (Sullivan Decl., ¶ 3; Ex. 1, ¶¶ V.)

**V. Plaintiffs did not impliedly license their compositions to defendants**

**A. No implied license exists**

An implied license may arise where "(1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes the particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute his work." *Lulirama Ltd., Inc. v. Axcess Broad. Serv.*, 128 F.3d 872, 879 (5th Cir. 1997). "[I]mplied licenses are found only in narrow circumstances." *John G. Danielson, Inc. v. Winchester-Conant Props., Inc.*, 322 F.3d 26, 40 (1st Cir. 2003) (citing *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 558 (9th Cir. 1990)). As the Sixth Circuit has stated, the most important element of an implied license is a finding that "the copyright owners intended that their copyrighted works be used in the manner in which they were eventually used." *Johnson v. Jones*, 149 F.3d 494, 501-02 (6th Cir. 1998). "Without intent, there can be no license." *Id.*

None of the three elements of an implied license exist in this case. First, defendants did not "request" the creation of compositions by either Eminem or plaintiffs. The Agreements neither contemplate nor compel the creation of any compositions, rather they provide for the

26

creation and delivery of *sound recordings*.  (Martin Decl., Exs. 2, 4 ¶¶ 2; *see also* Doc. No. 66, Mem. at 25 ("The Agreements provide…that Eminem and F.B.T. will create, record, and deliver *sound recordings* embodying musical compositions…") (emphasis added).)  Furthermore, as to elements 2 and 3, plaintiffs expressly refused to authorize the reproduction and distribution of their compositions as DPDs, and refused to license any of their works for digital distribution (except "Lose Yourself") (*See* Martin Decl. ¶¶ 18-20; Hernandez Decl. ¶ 3.)

The cases relied upon by defendants contain none of these facts.  *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555 (9th Cir. 1990) (single work prepared and delivered), *Danielson*, 322 F.3d 26, (same), *I.A.E., Inc. v. Shaver*, 74 F.3d 768 (7th Cir. 1996) (same), and *Johnson v. Jones*, 149 F.3d 494 (same).  Unlike the present case, each requesting party consulted with the other regarding the work to be done, delivered the work, but complained about money owed or other non-performance.  *Effects*, 908 F.2d at 558-59; *Danielson*, 322 F.3d at 32, 41-42; *Shaver*, 74 F.3d at 771; *Johnson*, 149 F.3d at 497-498.)  None of these cases involve a refusal of delivery, refused to sign licenses, and continuing objections.

## B. Cashing a mechanical royalty check is not evidence of intent to grant DPD licenses

Moreover, as explained above, UMG included one check with each royalty statement. The act of cashing a check, when it includes small amounts of unauthorized income together with large sums of money from authorized uses, with no identification of the inclusion of royalties from unauthorized uses, is not the knowing acceptance of monies sufficient to form the basis of an implied license.  Indeed, this matter points to Aftermath's duplicity rather than plaintiffs' intent or knowledge, since a finding of an implied license under these circumstances would effectively allow an infringer to avoid liability by ignoring objections and refusals to

execute licenses by surreptitiously remitting revenue from unauthorized sources.

In effect, defendants argue a species of accord and satisfaction, under which a disputed debt may be satisfied upon acceptance of a check indicating payment in full. *See Scipio v. Sony Music Entm't*, 173 Fed. Appx. 385, 394 (6th Cir. 2006) (citing *Lytle v. Clopton*, 149 Tenn. 655, 663-64, (Tenn. 1923) (quoting 1 Corpus Juris, 529)). The creditor (here, by analogy, plaintiffs) must have accepted the check "with the intention that it operate as a satisfaction." *Id.* For the reasons shown herein, plaintiffs acceptance of a single check containing mostly royalties for authorized uses, but also containing small and hidden royalties for unauthorized uses, cannot operate as a satisfaction of a claim.

## CONCLUSION

Defendants' Motion for Summary Judgment should be denied.

DATED: August 28, 2008

| /s/ Richard S. Busch | /s/ Howard Hertz |
|---|---|
| Richard S. Busch (TN Bar No. 014594) | Howard Hertz, Esq. (P26653) |
| 1100 Union Street Plaza | Hertz Schram PC |
| 315  Union Street | 1760 S. Telegraph Rd., Suite 300 |
| Nashville, TN 37201 | Bloomfield Hills, MS 48302 |
|  (615) 259-3456 |  (248) 335-5000 |
| rbusch@kingballow.com | hhertz@hertzschram.com |

Attorneys for plaintiffs

28

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing document was served via the Court's Electronic Filing System:

| Counsel | On behalf of |
|---|---|
| Daniel D. Quick, Esq.<br>Dickinson Wright PLLC<br>38525 Woodward Ave<br>Suite 2000<br>Bloomfield Hills, MI 48304<br>(t): (248) 433-7200<br>(e): dquick@dickinsonwright.com<br><br>Kelly M. Klaus, Esq.<br>Munger, Tolles & Olson LLP<br>355 South Grand Ave<br>Suite 3500<br>Los Angeles, CA 90071-1560<br>(t): (213) 683-9238<br>(e): kelly.klaus@mto.com | Apple Computer, Inc. and Aftermath Records d/b/a Aftermath Entertainment |

this 28th day of August 2008.

s/ Richard S. Busch