**DECLARATION OF RICHARD S. BUSCH IN OPPOSITION TO MOTION FOR
SUMMARY JUDGMENT OF DEFENDANTS APPLE COMPUTER, INC. AND
AFTERMATH RECORDS d/b/a/ AFTERMATH ENTERTAINMENT**

# EXHIBIT 6

Case No. 2:07-cv-13164:  Eight Mile Style, LLC, et al. v. Apple Computer Inc., et al.

CERTIFIED COPY

1

2    UNITED STATES DISTRICT COURT
       CENTRAL DISTRICT OF CALIFORNIA

3    ---------------------------x
       F.B.T. PRODUCTIONS, LLC,  )

4    and Em2M, LLC,         )
                 Plaintiffs,)

5           v.        )Case No. CV 07-03314
       AFTERMATH RECORDS doing  )PSG (MANx)

6    business as AFTERMATH    )
       ENTERTAINMENT; INTERSCOPE )

7    RECORDS; UMG RECORDINGS,  )
       INC.; and ARY, INC.,    )

8               Defendants.)
       ---------------------------x

9    UNITED STATES DISTRICT COURT
       FOR THE EASTERN DISTRICT OF MICHIGAN

10   SOUTHERN DIVISION
       ---------------------------x

11   EIGHT MILE STYLE, LLC and  )
       MARTIN AFFILIATED, LLC,   )

12            Plaintiffs,)
           vs.       )Case No. 2:07-cv-13164

13   APPLE COMPUTER, INC. and  )Hon. Anna Diggs Taylor
       AFTERMATH RECORDS d/b/a   )

14   AFTERMATH ENTERTAINMENT,   )
             Defendants.)

15   ---------------------------x

16               May 14, 2008

17               10:06 a.m.

18

19          Deposition of JOEL MARTIN, held at the

20   law offices of Jenner & Block, 919 Third Avenue,

21   New York, New York, pursuant to notice and

22   agreement, before Donald R. DePew, an RPR, CRR and

23   Notary Public within and for the State of

24   New York.

25

www.merrillcorp.com/law   20750 Ventura Blvd, Suite 205
Woodland Hills, CA 91364

1          Joel Martin

16:28:25   2          (Witness looks at document.)

16:28:27   3     A.    I don't know.

16:28:31   4     Q.    Do you believe that digital downloads

16:28:32   5   are manufactured or sold primarily for use on or

16:28:37   6   in means of transportation?

16:28:41   7          MR. BUSCH:   The same objections as I've

16:28:43   8          just said a moment ago, lack of foundation,

16:28:46   9          speculation, vague and ambiguous.

16:28:48   10    A.    Well, I'm not sure what means of

16:28:50   11  transportation means here, so I can't answer that

16:28:53   12  question.

16:28:53   13    Q.    All right.   Let's go back to the 2003

16:28:56   14  agreement between F.B.T. and Aftermath, which is

16:28:58   15  Exhibit 10.

16:29:08   16          At the time that this agreement was

16:29:10   17  negotiated and documented you were aware that

16:29:13   18  music was being distributed through the Internet,

16:29:18   19  correct?

16:29:20   20    A.    Yes.

16:29:21   21    Q.    Had you heard of Apple's iTunes Store

16:29:27   22  by July 2003?

16:29:29   23    A.    I don't believe so.

16:29:31   24    Q.    Were you aware that permanent downloads

16:29:34   25  were being offered by some on-line retailers?

259

1          Joel Martin

17:08:17    2    that was sent to it by Aftermath, or Interscope,

17:08:19    3    or Universal for mechanical royalties?

17:08:23    4          A.    I don't believe so.

17:08:29    5          Q.    Did you ever ask Universal or

17:08:32    6    Interscope to issue a new check because you

17:08:34    7    thought that the check that had been sent

17:08:36    8    improperly calculated the mechanical royalties

17:08:39    9    that were due?

17:08:48    10         A.    I had no basis to be able to ask or

17:08:53    11    determine that anything was improper, other than

17:08:56    12    what I would have heard from my accountant or the

17:09:00    13    auditor, Gary Cohen.

17:09:02    14         Q.    Well, starting sometime in 2004 you

17:09:04    15    knew that Universal was paying you mechanical

17:09:07    16    royalties based upon digital distribution of

17:09:11    17    Eminem recordings, correct?

17:09:15    18         A.    We had information on the statements

17:09:20    19    relating to something called digital tracks.  It

17:09:24    20    referenced a digital track, but we weren't exactly

17:09:27    21    sure what that meant.

17:09:28    22         Q.    Well, did you ever tell Universal that

17:09:31    23    they had to issue you a new track.

17:09:34    24              MR. BUSCH:  New track?

17:09:36    25              MR. POMERANTZ:  I'll take that back.

293

|          | 1  | Joel Martin |
|----------|----|-------------|
| 17:11:42 | 2  | MR. BUSCH:  I don't think it's |
| 17:11:43 | 3  | necessarily neutral, but if -- my point is, |
| 17:11:46 | 4  | is that -- it's fine to answer the question. |
| 17:11:48 | 5  | I just don't -- I just want there to be an |
| 17:11:50 | 6  | agreement that by answering that question |
| 17:11:51 | 7  | we're not agreeing it's -- you're not |
| 17:11:53 | 8  | agreeing it's a license, I'm not agreeing |
| 17:11:55 | 9  | it's -- |
| 17:11:55 | 10 | MR. POMERANTZ:  We're wasting time. |
| 17:11:59 | 11 | Q.   Were you aware that Eminem recordings |
| 17:12:01 | 12 | were available by way of permanent downloads back |
| 17:12:04 | 13 | in 2004? |
| 17:12:05 | 14 | MR. BUSCH:  That's better. |
| 17:12:07 | 15 | A.   Yes. |
| 17:12:11 | 16 | Q.   At any time in 2004 or 2005 did you |
| 17:12:14 | 17 | tell Universal that they had to recut the check to |
| 17:12:17 | 18 | Eight Mile for mechanical royalties because they |
| 17:12:21 | 19 | included payments for permanent downloads and you |
| 17:12:24 | 20 | hadn't licensed the compositions for permanent |
| 17:12:28 | 21 | downloads? |
| 17:12:28 | 22 | MR. BUSCH:  Objection, asked and |
| 17:12:29 | 23 | answered. |
| 17:12:29 | 24 | He said that all he saw was a digital |
| 17:12:31 | 25 | track. |

297

1                    Joel Martin

17:12:32    2         A.    We had no idea that permanent downloads

17:12:34    3    were necessarily included by virtue of the

17:12:36    4    statement that we received from the UMG copyright

17:12:39    5    department.

17:12:39    6         Q.    Well, you knew permanent downloads were

17:12:41    7    out in the marketplace, didn't you?

17:12:42    8         A.    So?

17:12:43    9         Q.    And you knew that there were Eminem

17:12:45   10    recordings, right?

17:12:45   11         A.    What does that have to do with whether

17:12:47   12    or not we knew what we were being paid for?

17:12:47   13         Q.    Well, did you pick up the phone and

17:12:49   14    call Universal and say what the heck are those

17:12:51   15    downloads doing out there, I haven't licensed the

17:12:54   16    compositions for permanent downloads?

17:12:56   17         A.    Did we pick the phone up and ask?

17:12:58   18         Q.    Yes.

17:12:59   19         A.    We put them on notice that we weren't

17:13:00   20    licensing digital tracks --

17:13:01   21         Q.    How did you put them on notice?

17:13:01   22         A.    -- for permanent downloads.

17:13:01   23               We told them.

17:13:06   24         Q.    Who told them?

17:13:08   25         A.    I did, my assistant told them.

298

1          Joel Martin

17:13:10   2      Q.    Who did you tell?

17:13:11   3      A.    People in the UMG copyright department

17:13:13   4    that were issuing -- or requesting that we

17:13:15   5    consider issuing licenses for digital.

17:13:19   6      Q.    Which people?

17:13:20   7      A.    It would have been several people.

17:13:21   8    It would have been Chad Gary, Todd Douglas,

17:13:25   9    Pat Blair, Tim Hernandez --

17:13:27  10      Q.    Who do you --

17:13:28  11      A.    -- people in the copyright department.

17:13:30  12      Q.    I'm sorry.  Who do you recall

17:13:32  13    telling --

17:13:32  14          MR. BUSCH:  He just answered the

17:13:34  15      question.

17:13:35  16      Q.    Those are names --

17:13:36  17      A.    Those were people in particular.

17:13:37  18      Q.    You had conversations directly with

17:13:39  19    each of those four?

17:13:40  20      A.    Yes, I did.

17:13:40  21      Q.    And you told them that you weren't

17:13:41  22    going to license the Eminem compositions for

17:13:44  23    permanent downloads?

17:13:45  24      A.    I wouldn't characterize it as that we

17:13:48  25    wouldn't, no, not that we weren't.  But subject to

299

1                          Joel Martin

17:13:52    2    the terms and conditions that were contained in a

17:13:57    3    mechanical license that we've been using, we would

17:14:00    4    not be using those terms and conditions.  Yes, I

17:14:03    5    did.

17:14:03    6         Q.    So did you tell Universal that you were

17:14:06    7    willing to license the Eminem compositions for

17:14:10    8    permanent downloads if they agreed to certain

17:14:13    9    terms and conditions?

17:14:14   10         A.    On a test basis we -- there was an

17:14:17   11    agreement to see what happened initially with one

17:14:23   12    or two compositions.

17:14:24   13         Q.    And did you tell Universal that with

17:14:27   14    the exception of those one or two compositions you

17:14:30   15    refused to license Eminem compositions for

17:14:33   16    purposes of permanent downloads?

17:14:35   17         A.    I didn't tell them I refused, no.

17:14:37   18         Q.    What did you tell them?

17:14:38   19         A.    I told them that we would see what

17:14:40   20    happens in a test case with the few compositions

17:14:44   21    that we had agreed to license at that time.

17:14:47   22    Because we didn't know what accountings would look

17:14:50   23    like, we didn't know who was going to be selling

17:14:52   24    it.  We didn't know anything.  I mean, it was

17:14:54   25    very, very new.  As -- I don't even believe there

300

1              Joel Martin

17:14:57   2   was iTunes out there.

17:14:59   3            You know, I remember something about

17:15:01   4   Pressplay or some other digital initiatives that

17:15:05   5   Universal was involved with directly.  But there

17:15:08   6   was no mention of so many of the things that had

17:15:13   7   happened soon after we agreed to discuss and talk

17:15:19   8   about terms and conditions of licenses for

17:15:23   9   permanent digital downloads.

17:15:25   10        Q.    When did you agree to those test

17:15:26   11   licenses?

17:15:27   12        A.    Excuse me?

17:15:28   13        Q.    When did you agree to those test

17:15:28   14   licenses?

17:15:29   15        A.    When?

17:15:29   16        Q.    Yeah.  What year?

17:15:31   17            MR. BUSCH:  Just note my objection.

17:15:32   18            We produced the one agreement that I

17:15:34   19        believe is signed.

17:15:35   20        A.    Yeah, I don't know.  I'd have to take a

17:15:36   21   look at the date.

17:15:37   22        Q.    2003?

17:15:38   23            MR. BUSCH:  Objection.

17:15:38   24            We produced a document.

17:15:39   25            Don't speculate.  Whatever date --

301

                          1                    Joel Martin

17:15:41    2          A.    I don't know.

17:15:42    3          Q.    Well, certainly from the date you

17:15:44    4     signed that license going forward --

17:15:46    5          A.    Correct.

17:15:46    6          Q.    -- you knew that your royalty

17:15:48    7     statements were going to reflect some payments for

17:15:51    8     permanent downloads, right?

17:15:52    9          A.    Absolutely not.

17:15:53   10          Q.    Why not?

17:15:53   11          A.    Because it wasn't designated on the

17:15:55   12     statement.  I didn't know what it was including.

17:15:57   13          Q.    But wouldn't the license --

17:15:58   14          A.    That was the whole purpose of issuing a

17:16:00   15     license and a basis to find out how we were being

17:16:03   16     accounted to.

17:16:04   17          Q.    That license required Universal to make

17:16:06   18     payments to you for mechanical royalties, correct?

17:16:09   19          A.    To make payments to us?

17:16:11   20          Q.    To Eight Mile, right.

17:16:13   21          A.    That we would be receiving payments?

17:16:17   22          Q.    Yes.

17:16:19   23          A.    That's correct.

17:16:19   24          Q.    And you expected those payments to be

17:16:21   25     on some sort of a royalty statement, correct?

                                                                   302

1               Joel Martin

17:16:25    2       A.    But of what nature?

17:16:26    3             What nature?

17:16:27    4       Q.    Did you expect them to be on a royalty

17:16:29    5    statement?

17:16:30    6       A.    I expected them to at least minimally

17:16:31    7    be defined as to what it was.

17:16:34    8       Q.    So are you saying that in 2004 you

17:16:35    9    didn't know that when you cashed the checks you

17:16:40   10    were cashing checks that were paying you monies

17:16:42   11    for permanent download mechanical royalties?

17:16:45   12       A.    Not necessarily, no.

17:16:46   13       Q.    What does not necessarily mean?

17:16:49   14       A.    Not necessarily.

17:16:49   15       Q.    What does that mean?

17:16:50   16       A.    I had no way, by way of the statement,

17:16:53   17    to determine whether or not it was a permanent

17:16:56   18    download on the UMG royalty statements, no way.

17:16:59   19       Q.    Okay.  So are you -- I just want to be

17:17:01   20    clear, you're saying that when you cashed checks

17:17:04   21    in 2004, and 2005, and 2006 that were sent to you

17:17:10   22    for mechanical royalties you did not know that any

17:17:12   23    of those monies were being paid to you for

17:17:16   24    permanent downloads?

17:17:16   25             MR. BUSCH:  Objection, asked and

303

1                      Joel Martin

17:18:21    2        evidence.

17:18:23    3              Don't speculate.

17:18:24    4        A.    I can't recall exactly the time.  I

17:18:27    5    can't recall.

17:18:28    6        Q.    Did you -- I'm just going to try and

17:18:32    7    find as close as we can get to it, you know, and

17:18:33    8    obviously your recollection is what it is.

17:18:36    9              Do you recall knowing at any time in

17:18:38    10   2004 that you had received a payment for

17:18:42    11   mechanical royalties relating to an Eminem

17:18:45    12   composition that was for the sale or license of a

17:18:50    13   permanent download?

17:18:51    14       A.    No.

17:18:51    15             MR. BUSCH:  Asked and answered.

17:18:53    16       Q.    How about 2005?

17:18:54    17       A.    I don't believe so.

17:18:55    18       Q.    How about 2006?

17:18:56    19       A.    Possibly.

17:19:00    20       Q.    Do you recall what led you to learn

17:19:05    21   that some of the mechanical royalty payments that

17:19:07    22   you were receiving related to permanent downloads?

17:19:10    23       A.    Yes.

17:19:11    24       Q.    What caused you --

17:19:12    25       A.    Advice from Gary Cohen, the auditor.

305

Joel Martin

17:19:17    2    Q.    So until Gary Cohen told you that part

17:19:19    3    of your mechanical royalty payments were for

17:19:22    4    permanent downloads, you didn't know that?

17:19:23    5    A.    Not necessarily.

17:19:23    6    Q.    What does that mean?

17:19:25    7          Does that mean, no, or maybe so, but

17:19:27    8    you're not sure?

17:19:31    9    A.    Because of the dates involved I can't

17:19:33    10    recollect exactly whether or not at some point we

17:19:36    11    started seeing something on a statement that for

17:19:38    12    the first time referred to permanent download, or

17:19:42    13    whether or not it was Gary Cohen that actually

17:19:44    14    advised us where to look on the statement that

17:19:46    15    reflected digital income.  I can't recall.

17:19:49    16    Q.    And once you learned for the first time

17:19:51    17    that some portion of the payments that you were

17:19:54    18    receiving were for permanent downloads --

17:19:58    19    A.    Yes.

17:19:58    20    Q.    -- did you tell anyone at Universal

17:20:00    21    that they should stop paying that money to you

17:20:02    22    because you had not licensed the compositions for

17:20:06    23    permanent download purposes?

17:20:08    24    A.    Not specifically, no.

17:20:10    25    Q.    Why not?

306

1                    Joel Martin

17:20:12    2      A.    Well, I'm not exactly sure what I was

17:20:14    3   supposed to tell them, that $28,000 out of a

17:20:17    4   $4 million check that we couldn't exactly

17:20:20    5   determine again what it was for.  There was no way

17:20:22    6   for us to segregate out mastertone income from

17:20:25    7   download income from -- we didn't have the ability

17:20:30    8   ourselves to be able to determine what needed to

17:20:32    9   be segregated and how we could do that.

17:20:37    10            And if you're asking me would I hold up

17:20:39    11   a $4 million check for a $28,000 digital payment

17:20:42    12   that I couldn't ascertain as to what it was for

17:20:45    13   specifically, no, I would not do that.

17:20:47    14      Q.    That wasn't my question, Mr. Martin.

17:20:49    15   My question was not what you could do.

17:20:51    16            My question was, why didn't you ask

17:20:53    17   Universal to stop paying you monies for mechanical

17:20:57    18   royalties related to permanent downloads because

17:21:00    19   you hadn't licensed those compositions for that

17:21:04    20   purpose?

17:21:05    21      A.    Listen, in some cases it's quite

17:21:07    22   possible that certain compositions were licensed

17:21:10    23   by other publishers.  For example, our

17:21:13    24   co-publisher Famous, might have been in the

17:21:16    25   position where they actually licensed for digital

307

1                   Joel Martin

17:21:17  2   downloads.  We had no way of verifying that.

17:21:22  3      Q.    But the bottom line is you never asked

17:21:25  4   Universal to stop paying you for mechanical

17:21:28  5   royalties for permanent downloads, correct?

17:21:32  6      A.    Based on a minute percentage of a huge

17:21:35  7   check, no.

17:21:37  8      Q.    Have you ever offered to refund any

17:21:40  9   monies that Universal has paid to Eight Mile for

17:21:46  10  mechanical royalties related to permanent

17:21:49  11  downloads?

17:21:50  12     A.    Me personally?

17:21:52  13         I don't believe so.

17:21:53  14     Q.    Are you aware of anybody making such an

17:21:57  15  offer to Universal on behalf of Eight Mile?

17:22:00  16     A.    To refund?

17:22:01  17     Q.    Yes.

17:22:02  18     A.    I don't know.

17:22:02  19     Q.    You're not aware of it?

17:22:03  20     A.    I'm not aware of it.

17:22:14  21     Q.    Can you go back to the 1998 agreement,

17:22:17  22  please, Exhibit 5, and turn to page 4.

17:22:51  23     A.    What page?

17:22:52  24     Q.    Let's go to the 2000 -- page 4.

17:23:00  25     A.    Okay.

308

1                        Joel Martin

17:33:06    2    mechanical royalty?

17:33:08    3                    MR. BUSCH:  Object to form, it calls

17:33:10    4            for a legal conclusion.

17:33:12    5            A.    I don't know.

17:33:14    6            Q.    Has anyone ever told you that a

17:33:16    7    permanent download involves a mechanical royalty?

17:33:20    8                    MR. BUSCH:  At what point in time,

17:33:20    9            because there have been determinations, as

17:33:23   10            you know, about things of that nature?

17:33:25   11                    And are you asking about conversations

17:33:29   12            he may have had with his attorney?

17:33:31   13                    Because if you are, then I would

17:33:32   14            instruct you not to answer on the grounds of

17:33:34   15            attorney-client privilege.

17:33:35   16            Q.    Has anyone other than your own attorney

17:33:38   17    told you that mechanical royalties apply to

17:33:40   18    digital downloads?

17:33:42   19                    MR. BUSCH:  Objection, it assumes facts

17:33:44   20            not in evidence as well, lack of foundation.

17:33:46   21            A.    No one has told me specifically that it

17:33:51   22    absolutely applies as it relates to mechanical

17:34:00   23    licenses.

17:34:02   24            Q.    Do you think that paragraph 6(a) grants

17:34:07   25    Aftermath a license for all controlled

                                                                    319

1                        Joel Martin

17:34:10   2    compositions?

17:34:11   3              MR. BUSCH:   Object to form.

17:34:13   4        A.    What it basically says is that we will

17:34:15   5    agree to agree to license compositions.

17:34:20   6        Q.    What does it mean to agree to agree?

17:34:23   7        A.    Well, generally speaking, we do agree

17:34:25   8    to agree.   I mean, for ten years I've been

17:34:27   9    licensing compositions to Aftermath and we've

17:34:33   10   agreed to agree on terms and conditions that are

17:34:35   11   appropriate to this provision.

17:34:38   12        Q.    What language in this -- strike that.

17:34:42   13             I just want to make sure we have a

17:34:44   14   clear answer.

17:34:45   15             Do you think that the language of 6(a)

17:34:47   16   grants Aftermath a license for all controlled

17:34:49   17   compositions?

17:34:50   18             MR. BUSCH:   For digital uses as well?

17:34:53   19             MR. POMERANTZ:   Yes.

17:34:54   20             MR. BUSCH:   Object to form.

17:34:55   21        A.    Maybe.

17:34:58   22             I'm sorry.   Repeat the question again.

17:35:00   23             Did you say grants?

17:35:02   24        Q.    Yes.

17:35:03   25        A.    No, it doesn't grant.

320

1                    Joel Martin

17:35:05    2      Q.    What does it do?

17:35:06    3      A.    It says that we will agree to agree

17:35:09    4   with respect to licensing and that we will license

17:35:15    5   based on that agreement.

17:35:18    6      Q.    What language in paragraph 6(a) do you

17:35:21    7   think says that you will agree to agree?

17:35:27    8      A.    Well, the fact that we will license

17:35:29    9   basically doesn't contain any other terms and

17:35:33   10   conditions that we would feel appropriate to apply

17:35:36   11   to this paragraph.  And we would have to agree,

17:35:40   12   which we have done consistently, to issue

17:35:44   13   licenses.

17:35:45   14      Q.    Is your position on the -- whether it

17:35:48   15   grants a license or just has an agreement to

17:35:51   16   agree, is it based on the three words will be

17:35:54   17   licensed?

17:35:56   18          MR. BUSCH:  Object to form.

17:35:57   19      A.    It's based on the fact that it says it

17:35:59   20   will be licensed.  And there's no terms and

17:36:02   21   conditions that apply specifically to mechanical

17:36:05   22   licensing provisions that we would be in agreement

17:36:09   23   with.

17:36:09   24      Q.    What terms and conditions are you

17:36:11   25   referring to?

321

1          Joel Martin

17:36:11   2        A.     Oh, payment, how we're getting paid,

17:36:15   3   rates, formats, term, a variety of things.   The

17:36:23   4   same things that we've agreed to, for example, in

17:36:25   5   the mastertone agreement.

17:36:28   6        Q.     Do you believe that the wording of

17:36:32   7   paragraph 6(a) means that Aftermath had to come

17:36:36   8   and ask someone for a mechanical license before it

17:36:39   9   could use one of the Eminem compositions on a

17:36:43  10   compact disc for a download?

17:36:45  11        A.     Absolutely.

17:36:46  12        Q.     Who did they have to come to ask?

17:36:50  13        A.     Eight Miles Style in this instance

17:36:52  14   where we controlled a portion of the composition.

17:36:54  15        Q.     Is Eight Miles Style a party to this

17:36:58  16   agreement?

17:37:06  17        A.     Well, it says all controlled

17:37:09  18   compositions controlled directly or indirectly in

17:37:12  19   part by F.B.T. or any affiliated company of F.B.T.

17:37:16  20            Okay.   So I -- this agreement isn't

17:37:18  21   with Eight Mile Style, but Eight Mile Style

17:37:22  22   acquired the rights to the compositions by virtue

17:37:30  23   of an agreement with F.B.T.

17:37:33  24        Q.     So do you believe that Aftermath had to

17:37:34  25   go to Eight Miles Style to get a mechanical

322

1               Joel Martin

17:48:18    2    objected as it related to terms and conditions

17:48:21    3    being included in a license that was appropriate

17:48:25    4    for the use.

17:48:28    5        Q.    But if Aftermath asked for a license

17:48:29    6    could Eight Mile say no?

17:48:32    7             MR. BUSCH:  The same objection,

17:48:34    8        overbroad, and it's vague and ambiguous.

17:48:37    9        A.    If Aftermath asked for a license and

17:48:42   10    decided to do things or not include things in the

17:48:46   11    agreement, terms and conditions that weren't

17:48:48   12    appropriate, we would not be agreeing on the terms

17:48:53   13    and conditions of the license.  And in that event

17:48:59   14    we would have to try to agree.

17:49:04   15        Q.    Well, does will be licensed as used in

17:49:07   16    6(a) require Eight Mile to sign a license

17:49:11   17    agreement when Aftermath asks?

17:49:13   18             MR. BUSCH:  Object to form.

17:49:14   19        A.    I think under normal certain -- normal

17:49:18   20    circumstances as it relates to physical product, I

17:49:21   21    think, of course, yes, it does, as long as terms

17:49:23   22    and conditions are met pursuant to -- and I would

17:49:27   23    say licensing terms and conditions that are

17:49:31   24    consistent with what we've agreed to in the past

17:49:35   25    historically.

326

1                    Joel Martin

17:52:28    2        on that.

17:52:29    3            You said you'd bet me, what do you want

17:52:30    4        to bet?

17:52:30    5            MR. POMERANTZ:  I don't want to impugn

17:52:32    6        Mr. Levinsohn's credibility.  I would say

17:52:34    7        that you're coaching the witness on the

17:52:36    8        record --

17:52:36    9            MR. BUSCH:  I am not doing that.

17:52:36    10            MR. POMERANTZ:  -- which is grossly

17:52:37    11        improper.

17:52:37    12            MR. BUSCH:  I am absolutely not.

17:52:39    13        A.    Would you repeat the question, please.

17:52:40    14        Q.    Yes.

17:52:41    15            What is the difference between will be

17:52:43    16        licensed and might be licensed?

17:52:45    17            MR. BUSCH:  Objection to form.

17:52:46    18        A.    I don't know.  I know what will be

17:52:48    19        licensed means here in this --

17:52:49    20        Q.    Will be licensed means you have to

17:52:51    21        license it, right?

17:52:52    22            MR. BUSCH:  Object to form, you're

17:52:52    23        mischaracterizing his testimony.

17:52:52    24        A.    Well --

17:52:53    25            MR. BUSCH:  Hold on.

331

1                    Joel Martin

17:52:53    2          You're arguing with him.  He's answered

17:52:56    3      these questions for the last ten minutes and

17:52:58    4      now you're just arguing with him.

17:53:00    5          A.   Will be licensed means that we will

17:53:03    6      license.  Again, we have agreed to agree that

17:53:09    7      there would be terms and conditions contained in

17:53:12    8      the license as it relates to issuing the license.

17:53:17    9          Q.   If Aftermath sends Eight Mile a

17:53:19   10      mechanical license that has in it terms that are

17:53:22   11      totally consistent with paragraph 6(a), can

17:53:26   12      Eight Mile refuse to sign that license?

17:53:29   13              MR. BUSCH:  Object to form.

17:53:30   14          A.   What do you mean by totally consistent?

17:53:32   15          Q.   Well, you can read.  There's a rate in

17:53:34   16      paragraph 6(a).

17:53:36   17              MR. BUSCH:  That applies to what?

17:53:37   18              MR. POMERANTZ:  That applies -- it says

17:53:38   19      what it says.  It applies.

17:53:40   20              MR. BUSCH:  Object to form.

17:53:41   21          Q.   If Eight Mile receives a license from

17:53:44   22      Aftermath that is fully consistent with the terms

17:53:48   23      of paragraph 6(a), can Eight Mile refuse to sign

17:53:53   24      that license?

17:53:54   25          A.   Well, for example, if they do it on

332

                              1                    Joel Martin

17:53:56    2    behalf of Virgin Records?

17:53:58    3                    I believe that we will issue the

17:54:00    4    license to Virgin Records, it doesn't necessarily

17:54:03    5    have to be Aftermath, but we will license.

17:54:05    6        Q.    My question had nothing to do with

17:54:07    7    Virgin Records.

17:54:08    8        A.    Your question has to do with whether or

17:54:10    9    not we will license --

17:54:14   10                    MR. BUSCH:  And to whom.

17:54:16   11        A.    Exactly, to whom is the question.

17:54:18   12        Q.    Okay.  I'm going to ask you now to

17:54:20   13    Aftermath.

17:54:20   14                    If Aftermath sends a mechanical license

17:54:23   15    to Eight Mile for Eight Mile to sign and it

17:54:27   16    provides for a mechanical license to Aftermath and

17:54:31   17    its distributors and licensees that is fully

17:54:35   18    consistent with the terms of paragraph 6(a) of the

17:54:38   19    contract, can Eight Mile refuse to sign that

17:54:43   20    agreement?

17:54:43   21                    MR. BUSCH:  Hold on.

17:54:44   22                    Objection, an incomplete hypothetical,

17:54:49   23              contains facts not in evidence.  Object to

17:54:52   24              form.

17:54:59   25        A.    As it relates to terms and conditions

                                                                    333

                          1                   Joel Martin

17:55:01          2    that are typical in licensing agreements with

17:55:05          3    either third parties or to Aftermath, I think in

17:55:11          4    instances, for example, where it says that we

17:55:14          5    don't get paid, you know, I don't believe that's

17:55:17          6    appropriate.

17:55:17          7         Q.    Okay.  Well, again you've changed my

17:55:19          8    question, because paragraph 6(a) involves the

17:55:22          9    payment of a specified rate.  So don't change my

17:55:25         10    question.

17:55:25         11         My question to you is that you get a

17:55:28         12    mechanical license from Aftermath.

17:55:30         13         A.    Yeah.

17:55:30         14         Q.    It provides for a mechanical license to

17:55:32         15    Aftermath and its distributors and licensees that

17:55:35         16    is fully consistent with the terms of 6(a), can

17:55:41         17    Eight Mile refuse to sign that license?

17:55:43         18         MR. BUSCH:  Objection --

17:55:44         19         A.    There's no --

17:55:45         20         MR. BUSCH:  Hold on.  Hold on.

17:55:46         21         Objection.

17:55:46         22         I don't understand the question.  You

17:55:47         23    added in a term from the mechanic -- from the

17:55:51         24    controlled composition clause about

17:55:52         25    distributors/licensees in the middle of a

                                                                   334

1                        Joel Martin

17:55:54    2        question.

17:55:54    3              Therefore it's vague and ambiguous and

17:55:56    4        I don't understand it.   Object to form.

17:55:58    5        A.      Again, if it doesn't contain material

17:56:01    6        terms and conditions that would be acceptable,

17:56:03    7        like are there accountings provided, when do we

17:56:05    8        get accountings, when do we get paid, do we have

17:56:09    9        audit provisions, what rights do we have with

17:56:11   10        respect to the documents to go back and look, and

17:56:13   11        so on and so forth.

17:56:14   12              If certain key elements were missing, I

17:56:17   13        think that we are not agreeing with respect to the

17:56:20   14        license exactly -- maybe it's just a timing issue

17:56:26   15        when we agree, but we certainly have the

17:56:28   16        obligation to agree to agree.

17:56:33   17        Q.      So is it your testimony that if, for

17:56:36   18        example, Aftermath sends a mechanical license to

17:56:39   19        Eight Mile that has an audit provision in it that

17:56:41   20        is not acceptable to Eight Mile, that Eight Mile

17:56:43   21        can refuse to sign that mechanical license?

17:56:48   22        A.      Well, there have been conditions where

17:56:50   23        they've sent audit provisions that weren't

17:56:53   24        acceptable and they've changed them.

17:56:55   25        Q.      Okay.   But my question to you is, can

335

1          Joel Martin

18:27:19   2      Q.    When did you conclude that the test

18:27:21   3  wasn't working to your satisfaction?

18:27:30   4      A.    Well, despite our insistence that

18:27:33   5  third parties enter into agreements with us, the

18:27:42   6  agreements that were being sent to us to sign

18:27:46   7  contained provisions that were even less favorable

18:27:50   8  than what we had agreed in this instance to

18:27:53   9  execute.

18:27:57  10      Q.    By the way, going back to Exhibit 48 --

18:28:00  11      A.    Yeah.

18:28:00  12      Q.    -- the digital permanent download

18:28:04  13  license that you signed.

18:28:05  14      A.    Yes.

18:28:05  15      Q.    I notice that this version doesn't have

18:28:08  16  any signature on it by Universal, do you see that?

18:28:11  17      A.    Yes, I do.

18:28:11  18      Q.    Do you believe that when you signed

18:28:13  19  this agreement you were giving permission to

18:28:17  20  Universal to use the composition for purposes of

18:28:20  21  permanent downloads?

18:28:25  22      A.    At the time we issued this license in

18:28:28  23  good faith.

18:28:30  24      Q.    And you were granting that permission

18:28:31  25  for this particular composition, correct?

362

1                Joel Martin

18:28:33    2         A.    At the time we issued this license in

18:28:36    3    good faith, meaning that we expected, of course,

18:28:41    4    this to be counter-executed and sent back.

18:28:44    5         Q.    But at the time you signed it did

18:28:47    6    you -- were you intending in good faith to give

18:28:50    7    your permission for Universal to use this

18:28:54    8    composition for purposes of permanent downloads?

18:28:56    9              MR. BUSCH:  Objection.

18:28:57   10              He's answered the question.

18:28:59   11              MR. POMERANTZ:  I just didn't get it.

18:29:00   12              MR. BUSCH:  You did.  He said that he

18:29:01   13         was expecting to be countersigned and

18:29:04   14         returned.

18:29:05   15         Q.    Okay.  So did you --

18:29:05   16              You weren't giving your permission

18:29:07   17    then?

18:29:07   18         A.    Our permission?

18:29:09   19         Q.    Yeah.

18:29:09   20         A.    Well, our permission based on an

18:29:11   21    agreement to execute the agreement, of course.

18:29:15   22         Q.    So at some point did you call up

18:29:16   23    Universal and say, hey, where's the

18:29:19   24    countersignature?

18:29:19   25         A.    No.

363

Joel Martin

18:29:20    Q.    At some point did you say, hey, you

18:29:21    don't have permission because I didn't get a

18:29:23    countersignature?

18:29:25    A.    We didn't realize that we didn't have a

18:29:27    countersignature on this particular agreement.

18:29:30    Q.    Until when?

18:29:31    A.    Until we prepared -- started to file

18:29:34    the lawsuit.

18:29:36    Q.    And then once you saw that you didn't

18:29:38    have a countersignature, did you think that you

18:29:39    never gave your permission?

18:29:41    A.    That's correct.

18:29:42    Q.    Because you didn't get a

18:29:43    countersignature?

18:29:44    A.    That's correct.

18:29:45    Q.    So your signature by itself didn't

18:29:47    indicate permission on your behalf?

18:29:49    MR. BUSCH:  Are you saying that

18:29:50    Universal agreed to all those terms, is that

18:29:52    what you're saying?

18:29:53    MR. POMERANTZ:  No.

18:29:54    You can ask questions of the witness

18:29:55    when you're done.  You can't ask questions of

18:29:57    me.

364

C E R T I F I C A T E

STATE OF NEW YORK   )

                    : ss.

COUNTY OF NEW YORK )


        I, DONALD R. DePEW, a Registered

Professional Reporter, Certified Realtime Reporter

and Notary Public within and for the State of

New York, do hereby certify:

        That JOEL MARTIN, the witness whose

deposition is hereinbefore set forth, was duly

sworn by me and that such deposition is a true

record of the testimony given by the witness.

        I further certify that I am not related

to any of the parties to this action by blood or

marriage, and that I am in no way interested in

the outcome of this matter.

        IN WITNESS WHEREOF, I have hereunto set

my hand this 19th day of May, 2008.


                    DONALD R. DePEW, RPR, CRR