UNITED STATES DISTRICT COURT
IN THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**EIGHT MILE STYLE, LLC, and MARTIN AFFILIATED, LLC,**

      Plaintiffs,

vs.

**APPLE COMPUTER, INC. and AFTERMATH RECORDS d/b/a AFTERMATH ENTERTAINMENT**

      **Defendant.**

Case No. 2:07-cv-13164
Hon. Anna Diggs Taylor
Magistrate Judge Donald A. Scheer

| | |
|---|---|
| Howard Hertz, Esq. (P26653) | Richard S. Busch  (TN BPR#14594) |
| Jay G. Yasso, Esq.  (P45484) | King & Ballow |
| Hertz Schram PC | 1100 Union Street Plaza |
| 1760 S. Telegraph Rd., Suite 300 | 315 Union Street |
| Bloomfield Hills, MI 48302 | Nashville, TN 37201 |
| (248) 335-5000 | (615) 259-3456 |
| hhertz@hertzschram.com | rbusch@kingballow.com |
| jyasso@hertzschram.com | Attorneys for Plaintiffs |
| Attorneys for Plaintiffs | |

## PLAINTIFFS' STATEMENT OF MATERIAL FACTS

Pursuant to Rule 56(e)(2) of the Federal Rules of Civil Procedure, plaintiffs Eight Mile Style LLC ("Eight Mile") and Martin Affiliated, LLC ("Martin") (collectively "plaintiffs") submit their Statement of Material Facts in response to the Motion for Summary Judgment of defendants Apple, Inc. and Aftermath Records (collectively, "defendants").

### STATEMENT OF FACTS

1.    F.B.T. is the production company that discovered Eminem and entered into an Exclusive Artist Recording Agreement with him on November 28, 1995.  At the time, Joel Martin, the principal of Martin and managing agent of Eight Mile, was the managing agent of

F.B.T.  (Martin Decl. ¶ 2, Ex. 1, 1995 Agreement.)

2. Eight Mile and Martin were assigned copyright ownership interests in the compositions, and were granted exclusive administration of the copyrights in those compositions.  Exclusive administration rights give the administrator the exclusive right to license their interest in the compositions, and the interests for whom they administer.  (*Id.* ¶¶ 2, 7-13, Exs. 1, 6-15; Doc. No. 1, Compl. Ex. A.; 17 U.S.C. § 106.)

3. An author who has assigned his or her administration rights in future compositions exclusively to a third party publisher has no right to license such future compositions.  (Sullivan Decl. ¶ 4; Martin Decl. ¶ 15)

4. Non-exclusive licenses are not assignable absent agreement of all co-owners.  *In re Golden Books Family Ent., Inc.*, 269 B.R. 300, 309 (Del. 2001).

5. Eminem wrote or co-wrote all of the Eminem Compositions except "Many Men," co-written by Luis Resto, who assigned the composition and his administration rights to plaintiffs.  (Doc. No. 1-3, Compl. Ex.A at 8-9; Martin Decl. ¶ 14, Ex. 17.)

6. Eminem does not control any of the Eminem Compositions, and has no right to license any of the Eminem Compositions.  (Martin Decl. ¶ 2.)

7.     On March 9, 1998, F.B.T. and Aftermath entered into a written *short form* agreement whereby F.B.T. agreed to furnish to Aftermath the recording services of Eminem. (the "1998 Agreement") (Martin Decl. ¶ 3, Ex. 2.)

8.     Eminem executed a Letter of Inducement approving the 1998 agreement. (*Id.* ¶ 4, Ex. 3; Busch Decl.[1] ¶ 2, Ex. 1, Paterno Dep. 138:17-140:2.)

9.     On July 2, 2003, Eminem and Aftermath entered into a new *short form* agreement (the "2003 Agreement"), affirming all prior agreements. (Martin Decl. ¶ 5, Ex. 4, ¶ 26.)

10.    The 1998 and 2003 Agreements (collectively, the "Agreements") were jointly drafted by Aftermath's attorneys and by attorneys for UMG. (Ex. 2, Rogell Dep. 26:18-27:3, 27:11-28:3; 28:14-29:15; Ex. 1, Paterno Dep. 83:5-86:4-12; Ex. 3, Nieves 17:10-18:9.)

11.    Pursuant to the Agreements, Aftermath became the copyright owner of Eminem's master sound recordings only; plaintiffs retained ownership and control of the Eminem Compositions. (Martin Decl. ¶¶ 3, 5; Ex. 2, 4, ¶¶ 8; *see also* attachments to Doc. No. 1, Complaint.)

12.    The "Mechanical Royalties" paragraph of the Agreements is not itself a "mechanical license" of controlled compositions, instead simply setting a reduced mechanical

---

[1] Unless otherwise noted, all exhibits are attached to the declaration of Richard Busch and are cited hereinafter by exhibit number only.

3

royalty rate at which controlled compositions will be licensed in the future to Aftermath and its distributors/licensees. In some recording contracts, including recording agreements drafted by Aftermath and other Universal affiliates, discussed below, similar paragraphs sometimes state that controlled compositions "are hereby licensed" to the label. (Sullivan Decl., Ex. 1 ¶ X, XII).

13.     The Agreements are subject to California law. (Martin Decl. Ex. 2 at ¶ 21, Ex. 4 at ¶ 22.)

14.     The Mechanical Royalties paragraph: (1) prospectively caps the mechanical royalty rate Aftermath will be required to pay on controlled compositions to 75% of the *minimum* statutory rate in effect at some time in the future; (2) caps the total number of compositions on each album for which Aftermath will pay any "mechanicals," (3) permanently fixes the reduced rate as of the yet unknown date of the delivery of the masters, thereby avoiding subsequent rate increases, and (4) provides that no mechanical royalties will be paid on records that do not bear record royalties. (*Id*., Exs. 2, 4 at ¶¶ 6.)

15.     The Mechanical Royalties paragraph does not contain the terms of a self-executing license such as effective date, the actual mechanical rate, duration, identification of label's product by record number and configuration, accounting periods or payment due dates. (*See* Ex. 6, Martin Dep. 320:15-17, 23-322:11; Sullivan Decl. Ex. 1, ¶¶ VI, XII).

16.     The Mechanical Royalties paragraph does not specifically state Aftermath will

4

pay the Controlled Rate "in exchange" for something.  (Martin Decl., Exs. 2, 4, ¶¶ 6; Ex. 6, Martin Dep. 319:24-320:5; 322:6-11.)

17. Mr. Martin's understanding is that the Mechanical Royalty paragraph *does not* apply to DPDs at all.  (Martin Decl. ¶ 28.)

18. Both Ms. Nieves and Mr. Ostroff testified that they did not know whether the "distributor/licensee" language in the Mechanical Royalties provision related only to affiliated licensees, or also included unaffiliated licensees, and that unaffiliated licenses would have to obtain a mechanical license directly from a publisher.  (Ex. 3, Nieves Dep. 113:13-16, 21-22; Ex. 5, Ostroff Dep. 116:24 - 117:21.)

19. Delivery of a music file to a purchaser via a download constitutes a mechanical reproduction of the copyrighted work in the form of a DPD.  *U.S. v. ASCAP*, 485 F.Supp.2d 438, 443-44, 446-47 (S.D.N.Y. 2007).

20. Apple reproduces and distributes the master sound recordings Aftermath provides to it.  (*Id.*, Ex. 7, Cue Dep. 51:16-22; 53:8-54:16; 82:14-83:5.)

21. Apple is Aftermath's licensee for DPDs because it reproduces and distributes the master sound recordings Aftermath provides to it.  (*Id.*)

22.     Thus, plaintiffs have the right to enter into a DPD license directly with Apple. (Sullivan Decl. Ex. 1, ¶ IX.)

23.     In 1998, DPD commerce did not exist as it now exists.  (Ex. 4, Hoffman Dep. 192:10-16; Ex. 8, Jobs Dep. 13:13-23; Ex. 5, Ostroff Dep. 116:13-23; Ex. 1, Paterno Dep. 46:4-8, 14-17.)

24.     Apple did not launch its iTunes Store until 2003 (Ex. 7, Cue Dep. 22:15-18, 23:10-12, 76:7-12.)

25.     Plaintiffs had not heard of iTunes when the 2003 Agreement was executed.  (Ex. 6, Martin Dep. 259:21-23.)

26.     The 1995 Digital Rights Act amended Section 115 of the Copyright Act was to provide that while DPDs were subject to compulsory licensing at the statutory rate, any contract made after June 22, 1995 could not reduce the mechanical rate on DPDs.  17 U.S.C. § 115(c)(3)(E)(i).

27.     In amending Section 115, the Senate intended that controlled composition clauses would not govern DPDs. (Ex. 22, Pub. L. No. 104-39, 109 Stat. 336, S. Rpt. 104-208 at 41. )

28.     On October 9, 2001, the Recording Industry Association of America, Inc.

("RIAA"), the National Music Publishers' Association Inc. ("NMPA"), and The Harry Fox Agency, Inc. ("HFA") negotiated an interim "Industry Agreement" for licensing DPDs. On December 6, 2001, these entities filed a Joint Statement and Agreement addressing licensing of limited downloads and on demand streaming but without agreeing to rates. *See* 66 FR 64783, Vol. 66, No. 241 (Dec. 14, 2001).

29. This "Industry Agreement" was applicable only to labels and publishers members of signatories RIAA, NMPA and HFA. (Ex. 21, Joint Statement.)

30. Plaintiffs are not, and never have been, affiliated members of the RIAA, the NMPA or the HFA. (Martin Decl. ¶ 17.)

31. It is current industry practice that DPD licenses are negotiated and executed separately from mechanical licenses granted for physical product. (Sullivan Decl. ¶ 5, Ex. 1, ¶¶ VI-IX.)

32. A label wishing to exploit compositions via DPD must either obtain a compulsory license before the composition is released and abide by all of the statutory formalities, or privately negotiate a specific DPD license with the owner of the underlying musical composition. (*Id.* at Ex. 1, ¶¶ VI, IX; *see also* 17 U.S.C. § 115(c)(3)(B).)

33. Aftermath attempted to negotiate private DPD licenses for some or all of the

Eminem Compositions with plaintiffs. (Martin Decl. ¶ 18; *see also* Sullivan Decl., Ex. 1, ¶¶ V, VI, XIII.).

34.     In October 2002, UMG's copyright department wrote a letter to Eight Mile requesting and "hoping" that Eight Mile would license its compositions for permanent download. (Ex. 9, Blair Dep. 32:12-33:8; Ex. 10, Douglas Dep. 24:17-25:6; Ex. 11, Gary Dep. Ex. 48 at 8M-0015.)

35.     It is UMG's practice to send license requests to a music publisher where UMG believes the recording agreement and controlled composition clause does not contain a self-executing license; where UMG believes the controlled composition clause to be self-executing, UMG's practice is merely to send an "advice letter," informing the publisher its composition is being released on an album, advising the publisher of the album's release date and the rate being paid. (Ex. 12, Ferrante Dep. 64:19-65:3, 65:4-65:16.)

36.     UMG sent license requests to Eight Mile for the Eminem Compositions in both physical and digital formats, but never sent any advice letters to Eight Mile. (Ex. 12, Ferrante Dep. 66:2-7; Ex. 13, Martin II 472:22-473:19; Martin Decl. ¶ 20.)

37.     Eight Mile declined to execute the proposed DPD license accompanying the October 2002 letter, but instead offered to license a single Eminem composition, "Lose Yourself," for DPD as long as certain conditions were met. (Martin Decl. ¶ 19; Martin Dep. 299:

8

21-301:2; *see also* Ex. 14, Levinsohn Dep. 251:5-252:8, 259:2-261:5, Exs. 205, 225.)

38.     Eight Mile and UMG negotiated a jointly prepared DPD license for "Lose Yourself" reflecting: (1) a two-year term (not a perpetual one); (2) the payment of a full statutory rate subject to statutory increases or industry convention (not a reduced rate); (3) quarterly (not semi-annual) accountings and payment; and (4) Eight Mile's right to terminate the license after two years or at upon any breach of the license's terms.  (Martin Decl. ¶ 19; Ex. 14, Levinsohn Dep. 251:5-252:8, 259:2-261:5, Exs. 205, 225; Ex. 11, Gary Dep., Ex. 48 at 8M0016-0018.)

39.     Eight Mile signed the single, proposed DPD license and sent it to Pat Blair, head of UMG's copyright department.  UMG never countersigned and returned the "Lose Yourself" license to Eight Mile.  (*See* Ex. 6, Martin Dep., 362:22-363:4, 363:15-364:16; Ex. 14, Levinsohn Dep. 254:2-10; (Martin Decl. ¶ 19; Ex. 11, Gary Dep., Ex. 48 at 8M0016-0018.)

40.     Without conceding its effectiveness, on August 11, 2008, plaintiffs terminated in writing the "Lose Yourself" DPD license.  (Martin Decl. ¶ 25, Ex. 22.)

41.     Mr. Martin spoke with Ms. Blair and other UMG copyright department employees, Chad Gary, Todd Douglas and Tim Hernandez, both at the time he signed the "Lose Yourself" DPD license, and thereafter, and communicated his objections to any other of plaintiffs' compositions being sublicensed to digital download companies as DPDs.  (Ex. 6, Martin Dep. 298:13-300:5; Ex. 15, Van Hagen Dep., 34:24-35:8; 35:13-15; 38:7-25; 42: 2-20;

9

43:7-14,20-44:6; Ex. 9, Blair Dep. 38:9-22; 47:3-24; 49:6-10; 67:2-68:4; Ex. 11, Gary Dep. 87:5-10; 36:15-19; 37:24-38:19; 39:17-22; 41:13-19; Hernandez Decl. ¶ 3)

42. After Eight Mile signed the "Lose Yourself" license, UMG continued to send plaintiffs license requests for both physical configurations and for DPDs, sending DPD requests with the same terms as the "Lose Yourself" license. Plaintiffs did not execute or return any of those proposed licenses or any other license that would have authorized the Eminem Compositions' exploitation as DPDs. (Ex. 13, Martin II 440:9-14, 440:22-441:6; 471:10-473:19; Ex. 222 at 8M819, 810-818; *see* Ex. 11, Gary Dep., Ex. 48 at 8M016-17; Douglas Dep. 45:12-46:4; 59:7-60:2; 61:7-18.)

43. When UMG sent proposed mechanical licenses that would have authorized both physical and DPD exploitation, plaintiffs issued their own licenses to UMG that removed references on the license itself to digital configurations. UMG countersigned and accepted plaintiffs' licenses. (Ex. 6, Martin Dep. 376:15-377:22; Ex. 11, Gary Ex. 52, 53; Ex. 13, Martin II 440:9-14, 440:22-441:16, 471:10-473:19, 476:10-477:19.)

44. There was a clear understanding between plaintiffs and UMG that, with two exceptions mentioned herein ("Lose Yourself," and a separate mastertone agreement) plaintiffs would not agree to license any of the Eminem Compositions for digital distribution. (Ex. 13, Martin II 412:9-25, 413:19-414:16, 460:7-461:12, 461:23-462:2, 469:25-470:15; *see* Ex. 14, Levinsohn Dep. 247:17-248:9, 251:5-252:2, 260:11-261:18, 267:9-22, 262:7-11, 265:6-17,

273:23-274:18; Hernandez Decl. ¶ 3.)

45.     In 2002, UMG and Apple entered into an agreement whereby UMG licensed its master sound recordings to Apple for reproduction, distribution and sale by Apple, and purported also to sublicense to Apple the reproduction and distribution rights with respect to the compositions embodied in those master recordings. (Ex. 8, Jobs Dep., Ex. 81 ¶ 44, Ex. 82, Ex. 83, Ex. 85.)

46.     The "Grant of Rights" in the UMG-Apple Agreement provides by its terms that Apple has a license from UMG to reproduce and distribute the master sound recordings and compositions provided to it by UMG. (Ex. 8, Jobs Dep., Ex. 85, ¶ 1; Abrams Decl. Ex. 1, ¶ 6.)

47.     The most senior official of Apple's iTunes, Eddy Cue, testified in early 2008 before the Copyright Royalty Board in the Section 115 Rate Proceeding that Apple sublicenses the musical compositions embodied in master sound recordings from UMG and other record labels. (*See* Ex. 8, Jobs Dep., Ex. 81, ¶ 44, 20:22-21:13; *see also* Ex. 7, Cue Dep. 24:11-22, 158:20-160:24, 160:20-161:17, 162:7-19, 163:8-16, 164:18-22.)

48.     After iTunes launched, Apple neither accounted to nor paid plaintiffs directly, but rather accounted to and paid royalties for plaintiffs' compositions directly to UMG (Ex. 7, Cue Dep. 113:16-20, 149:12-24, 151:10-152:9, 159:12-24, 168:23-169:9; *see* Ex. 8, Jobs Dep., Ex. 85, ¶ 2( c)(ii)).

49. The royalty statements UMG provided plaintiffs beginning in 2003 did not identify any particular composition for which DPD revenue was being paid or identify any specific revenue directly related to DPDs.  (Martin Decl. ¶ 21-22, Exs. 18-19.)

50. UMG's royalty statements identified certain revenue as "Other" and "ID."  Some royalty statements contained a 1-page "Glossary" that defined "ID" as "digital track."  The royalty statements did not identify what form of "digital" income was being reported (*e.g.*, ringtones, mastertones, streaming, mobile, or limited or permanent downloads).  (Ex. 16, Harrington Dep. at 53:1-11; 54:3-55:24; Ex. 6, Martin Dep. 302:3-303:18, 305:9-306:15; Ex. 15, Van Hagen Dep. 48:24-50:6.)

51. Plaintiffs had no knowledge that the royalty payments they received contained monies for DPDs they specifically had refused to authorize, and UMG admits there was no way for plaintiffs to determine looking at their royalty statements what iTunes reported for DPD revenue of plaintiffs' compositions in any given period or even if any of the monies related to DPDs at all.  (Ex. 6, Martin Dep. 293:5-21; 297:16-298:5; 303:8-304:17; Martin Decl. ¶ 22; Ex. 17, Eisler Dep. 60:15-24; Ex. 16, Harrington Dep. 27:4-10; 61:10-16; *e.g.*, 58:13-17; 59:8-23; 63:5-64:3.)

52. A single check accompanied each royalty statement and included amounts for sale of authorized physical product, and a small amount for the items identified as "Other" or "ID."

(*See*, *e.g.*, Martin Decl. ¶¶ 21-22, Exs. 18-19.)

53. It was only after plaintiffs' 2006 audit that plaintiffs first learned that "Other," or "ID," included DPDs of other Eminem Compositions that plaintiffs had refused to grant DPD licenses for.  (Martin Decl. ¶ 24; Martin Dep. 302:3-303:18, 305:9-306:15.)

54. Defendants produced over 1600 pages of documents after discovery closed, much of which they cite in their motion as authorizing the use of certain Eminem Compositions as DPDs.  (Doc. No. 66, Mem. at 6-8, 16-22.)

55. Many of these documents do not purport to authorize or license for DPDs. (Sullivan Decl. ¶ 3)

56. Many of the "licenses" cited by defendants state they are only licensing the share in the composition owned by that entity.  (*See*, *e.g.*, Sullivan Decl., Ex. 2 (*e.g.*, Bat Future Music "license" for "Encore" is for a 12.5% share, HFA "license" for "Just Lose It" is for a 49% share)).

 DATED:  August 28, 2008              \_\_\_/s/ Richard S. Busch_____

                  Richard S. Busch
                  (TN Bar No. 014594)
                  1100 Union Street Plaza
                  315  Union Street
                  Nashville, TN 37201
                  (615) 259-3456

rbusch@kingballow.com

__/s/ Howard Hertz_____
Howard Hertz, Esq. (P26653)
Jay G. Yasso, Esq.  (P45484)
Hertz Schram PC
1760 S. Telegraph Rd., Suite 300
Bloomfield Hills, MS 48302
(t):  (248) 335-5000
(e):  hhertz@hertzschram.com
(e):  jyasso@hertzschram.com

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing document was served via the Court's Electronic Filing System:

| Counsel | On behalf of |
|---|---|
| Daniel D. Quick, Esq.<br>Dickinson Wright PLLC<br>38525 Woodward Ave<br>Suite 2000<br>Bloomfield Hills, MI 48304<br>(t): (248) 433-7200<br>(e): dquick@dickinsonwright.com<br><br>Kelly M. Klaus, Esq.<br>Munger, Tolles & Olson LLP<br>355 South Grand Ave<br>Suite 3500<br>Los Angeles, CA  90071-1560<br>(t): (213) 683-9238<br>(e): kelly.klaus@mto.com | Apple Computer, Inc. and Aftermath Records d/b/a Aftermath Entertainment |

this 28th  day of August 2008.

s/ Richard S. Busch