UNITED STATES DISTRICT COURT
IN THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EIGHT MILE STYLE, LLC and
MARTIN AFFILIATED, LLC,

    Plaintiffs

vs.

APPLE COMPUTER, INC. and
AFTERMATH RECORDS d/b/a
AFTERMATH ENTERTAINMENT,

    Defendants.

_____/

Case No. 2:07-CV-13164
Honorable Anna Diggs Taylor
Magistrate Judge Donald A. Scheer

**DEFENDANT AFTERMATH RECORDS AND APPLE INC.'S RESPONSES TO PLAINTIFFS' "STATEMENT OF MATERIAL FACTS"**

Daniel D. Quick
Dickinson Wright PLLC
38525 Woodward Avenue
Suite 2000
Bloomfield Hills, MI 48304
(248) 433-7200
dquick@dickinsonwright.com
P48109

Kelly M. Klaus
Munger, Tolles & Olson LLP
355 South Grand Avenue
Suite 3500
Los Angeles, CA 90071-1560
(213) 683-9238
kelly.klaus@mto.com

Attorneys for Defendant

6145160.1

Defendants Aftermath Records and Apple Inc. submit the below specific responses and objections to Plaintiffs' Statement of Material Facts, submitted in opposition to Defendants' Revised Motion for Summary Judgment. Defendants are separately filing a motion to strike Plaintiffs' statement as an effort to circumvent the Court's order limiting the number of pages available to Plaintiffs in their Opposition. To the extent the Court considers Plaintiffs' submission, it should also consider Defendants' responses.

### A.   SPECIFIC RESPONSES AND OBJECTIONS TO PLAINTIFFS' STATEMENT OF MATERIAL FACTS

| Plaintiffs' Statement | Defendants' Response |
|---|---|
| 1.   F.B.T. is the production company that discovered Eminem and entered into an Exclusive Artist Recording Agreement with him on November 28, 1995. At the time, Joel Martin, the principal of Martin and managing agent of Eight Mile, was the managing agent of F.B.T. (Martin Decl. ¶ 2, Ex. 1, 1995 Agreement.) | Undisputed, with the qualification that Eight Mile Style, LLC did not exist as an entity until April 19, 2000. Martin Decl. ¶ 7, Ex. 6, Eight Mile Style Operating Agreement. |
| 2.   Eight Mile and Martin were assigned copyright ownership interests in the compositions, and were granted exclusive administration of the copyrights in those compositions. Exclusive administration rights give the administrator the exclusive right to license their interest in the compositions, and the interests for whom they administer. (Id. ¶¶ 2, 7-13, Exs. 1, 6-15; Doc. No. 1, Compl. Ex. A.; 17 U.S.C. § 106.) | Disputed, but immaterial. Eight Mile and Martin were granted exclusive administration solely with respect to the copyright interests they were assigned, not for all of the copyright interests in the compositions. *See* Martin Decl. ¶ 14, Exs. 16 & 17, (identifying other ownership interests in the compositions). Further, after Defendants filed their Revised Motion (and after the discovery period ended), Plaintiffs produced a heavily redacted agreement which disclosed that in 2007 they assigned all of their administration rights to another publishing administrator, Music Resources, Inc. LeMoine Decl. Ex. Q. Therefore, Plaintiffs are not the |

| **Plaintiffs' Statement** | **Defendants' Response** |
|---|---|
| | "exclusive administrator," even as to their own copyright interests. Although Defendants reserve their right to challenge whether Eight Mile or Martin Affiliated retains standing to bring their claims in this lawsuit, Defendants do not rely upon Plaintiffs' apparent transfer of exclusive administration rights to Music Resources, Inc. in the Revised Motion, so this dispute is immaterial here. |
| 3. An author who has assigned his or her administration rights in future compositions exclusively to a third party publisher has no right to license such future compositions. (Sullivan Decl. ¶ 4; Martin Decl. ¶ 15) | Disputed legal conclusion, but immaterial. The extent to which an author retains rights depends on the specific provisions of the particular administration agreement. This is immaterial to the rights granted in the 1998 and 2003 Agreements, which Plaintiffs (who claim to be the exclusive administrators) agreed and accepted. This is also immaterial to the Co-Author Agreements, because Plaintiffs have presented no evidence that those co-authors exclusively assigned any rights. Finally, this is immaterial to the Eminem agreements, because even if Eminem assigned his rights exclusively to a third-party publisher, any grant of rights from him is still valid to a non-exclusive licensee who takes the rights without notice of the exclusive agreement. 17 U.S.C. § 205(e). |
| 4. Non-exclusive licenses are not assignable absent agreement of all co-owners. *In re Golden Books Family Ent., Inc.*, 269 B.R. 300, 309 (Del. 2001). | Disputed legal conclusion, not a fact, but immaterial in any event. Defendants have not assigned any licenses in this matter. *See* LeMoine Decl. Ex. K (chart responding to Sullivan Decl., Ex. C-3). |
| 5. Eminem wrote or co-wrote all of the Eminem Compositions except "Many Men," co-written by Luis Resto, who assigned the composition and his | Undisputed in the Revised Motion. The fact that Eminem co-wrote all of the Eminem Compositions except "Many Men," and that "Many Men" is co- |

| **Plaintiffs' Statement** | **Defendants' Response** |
|---|---|
| administration rights to plaintiffs. (Doc. No. 1-3, Compl. Ex. A at 8-9; Martin Decl. ¶ 14, Ex. 17.) | authored by an artist Plaintiffs claim to "control," renders the Compositions "Controlled Compositions" as that term is defined in the Agreements. *See* Ex. 9a (Hoffman Decl. Exs. A & D at ¶ 6) |
| 6. Eminem does not control any of the Eminem Compositions, and has no right to license any of the Eminem Compositions. (Martin Decl. ¶ 2.) | Disputed, but immaterial. Whatever rights Eminem may have transferred, Plaintiffs have presented no evidence that Aftermath had notice of any such transfer. 17 U.S.C. § 205(e). Plus, Plaintiffs agreed and accepted both of the Agreements, so they are bound by those terms even if, as they claim, they hold Eminem's copyright interests. |
| 7. On March 9, 1998, F.B.T. and Aftermath entered into a written *short form* agreement whereby F.B.T. agreed to furnish to Aftermath the recording services of Eminem. (the "1998 Agreement") (Martin Decl. ¶ 3, Ex. 2.) | Undisputed. |
| 8. Eminem executed a Letter of Inducement approving the 1998 agreement. (*Id.* ¶ 4, Ex. 3; Busch Decl. ¶ 2, Ex. 1, Paterno Dep. 138:17-140:2.) | Undisputed. |
| 9. On July 2, 2003, Eminem and Aftermath entered into a new *short form* agreement (the "2003 Agreement"), affirming all prior agreements. (Martin Decl. ¶ 5, Ex. 4, ¶ 26.) | Undisputed, with the qualification that principals of Plaintiffs also signed the 2003 Agreement to acknowledge their agreement and acceptance of its terms. Ex. 9a (Hoffman Decl. Ex. D). |
| 10. The 1998 and 2003 Agreements (collectively, the "Agreements") were jointly drafted by Aftermath's attorneys and by attorneys for UMG. (Ex. 2, Rogell Dep. 26:18-27:3, 27:11-28:3; 28:14-29:15; Ex. 1, Paterno Dep. 83:5-86:4-12; Ex. 3, Nieves 17:10-18:9.) | Disputed, but immaterial. Eminem and F.B.T. were both represented in the course of the negotiations, and thus had a role in the drafting of the Agreements. |
| 11. Pursuant to the Agreements, | Disputed legal conclusion, not a fact. In |

6145160.1

3

| **Plaintiffs' Statement** | **Defendants' Response** |
|---|---|
| Aftermath became the copyright owner of Eminem's master sound recordings only; plaintiffs retained ownership and control of the Eminem Compositions. (Martin Decl. ¶¶ 3, 5; Ex. 2, 4, ¶¶ 8; *see also* attachments to Doc. No. 1, Complaint.) | the Agreements, Plaintiffs simultaneously licensed their retained rights in the compositions, in the "Mechanical Royalties" or controlled composition clause. *See* Ex. 9a (Hoffman Decl. Exs. A & D at ¶ 6). |
| 12.  The "Mechanical Royalties" paragraph of the Agreements is not itself a "mechanical license" of controlled compositions, instead simply setting a reduced mechanical royalty rate at which controlled compositions will be licensed in the future to Aftermath and its distributors/licensees.  In some recording contracts, including recording agreements drafted by Aftermath and other Universal affiliates, discussed below, similar paragraphs sometimes state that controlled compositions "are hereby licensed" to the label.  (Sullivan Decl., Ex. 1 ¶ X, XII). | Disputed, but immaterial, legal conclusion, not a fact.  Even under this reading of the Agreements, which Defendants contest, Plaintiffs still may not refuse to license.  *See* Ex. 9a ( Hoffman Decl. Exs. A & D at ¶ 6). |
| 13.  The Agreements are subject to California law.  (Martin Decl. Ex. 2 at ¶ 21, Ex. 4 at ¶ 22.) | Undisputed. |
| 14.  The Mechanical Royalties paragraph: (1) prospectively caps the mechanical royalty rate Aftermath will be required to pay on controlled compositions to 75% of the *minimum* statutory rate in effect at some time in the future; (2) caps the total number of compositions on each album for which Aftermath will pay any "mechanicals," (3) permanently fixes the reduced rate as of the yet unknown date of the delivery of the masters, thereby avoiding subsequent rate increases, and (4) provides that no mechanical royalties will be paid on records that do not bear | Disputed, but immaterial.   The controlled composition clauses grant rights in addition to fixing rates.  This is the rate provided in the 1998 Agreement. *See* Ex. 9a (Hoffman Decl. Exs. A & D at ¶ 6).  The rate provided in the 2003 Agreement is different. *Id*. at Ex. D at ¶ 6.  Regardless, Plaintiffs have been paid for permanent downloads at the full statutory rate, a fact that they do not dispute. |

6145160.1

4

| **Plaintiffs' Statement** | **Defendants' Response** |
|---|---|
| record royalties.  (*Id*., Exs. 2, 4 at ¶¶ 6.) | |
| 15.     The Mechanical Royalties paragraph does not contain the terms of a self-executing license such as effective date, the actual mechanical rate, duration, identification of label's product by record number and configuration, accounting periods or payment due dates.  (*See* Ex. 6, Martin Dep. 320:15-17, 23-322:11; Sullivan Decl. Ex. 1, ¶¶ VI, XII). | Undisputed, but immaterial, as to whether each and every term listed is contained within the license.  The controlled composition clauses grant rights in addition to fixing rates.  Disputed as to the legal conclusion that such terms are required for the license to be "self-executing," or for any other reason.  Plaintiffs' expert conceded that these terms were not required for a license to be valid.  LeMoine Decl., Ex. A (Tr. of Sullivan Depo., 6:13-11:8) |
| 16.     The Mechanical Royalties paragraph does not specifically state Aftermath will pay the Controlled Rate "in exchange" for something.  (Martin Decl., Exs. 2, 4, ¶¶ 6; Ex. 6, Martin Dep. 319:24-320:5; 322:6-11.) | Undisputed, but immaterial, to the extent Plaintiffs point is that the words "in exchange" do not appear in the provision.  The provision need not specifically state that the rates are paid "in exchange" for the distribution of the Compositions.  The provision sets a rate for the license of the Compositions to Aftermath and its "distributors/licensees," which obviously contemplates distribution.  *See* Ex. 9a (Hoffman Decl. Exs. A & D at ¶ 6). |
| 17.     Mr. Martin's understanding is that the Mechanical Royalty paragraph does not apply to DPDs at all.  (Martin Decl. ¶ 28.) | Disputed, but immaterial.  Mr. Martin's understanding is irrelevant under California law because it was unexpressed at the time of contracting.  *Oakland-Alameda County Coliseum, Inc. v. Oakland Raiders, Ltd*., 197 Cal. App. 3d 1049, 1058 (1988); *Blumenfeld v. R.H. Macy & Co.*, 94 Cal. App. 3d 38, 46 (1979).  Further, Mr. Martin may not create a fact issue by submitting an affidavit to contradict his own deposition testimony, in which he testified that the provision applied to digital uses.  Ex. 8b, Tr. of Martin Depo., 320:15 - 322:23; *Sparks v. Wal-Mart Stores, Inc.*, 361 F. |

6145160.1

5

| **Plaintiffs' Statement** | **Defendants' Response** |
|---|---|
| | Supp. 2d 664, 669-70 (E.D. Mich. 2005). |
| 18.     Both Ms. Nieves and Mr. Ostroff testified that they did not know whether the "distributor/licensee" language in the Mechanical Royalties provision related only to affiliated licensees, or also included unaffiliated licensees, and that unaffiliated licenses would have to obtain a mechanical license directly from a publisher.  (Ex. 3, Nieves Dep. 113:13-16, 21-22; Ex. 5, Ostroff Dep. 116:24 - 117:21.) | Disputed, but immaterial.  Ms. Nieves and Mr. Ostroff did not testify that unaffiliated licensees would have to obtain their own mechanical licenses.  They were asked about compilation records released by other record companies, not what the term "distributors/licensees" means in the Agreements.

Also, this is a disputed legal conclusion.  The testimony referenced relates to entirely separate agreements between record companies putting out compilation albums and Aftermath.  The terms of those agreements have no relevance to what the term "distributors/licensees" means in the Agreements. |
| 19.     Delivery of a music file to a purchaser via a download constitutes a mechanical reproduction of the copyrighted work in the form of a DPD.  *U.S. v. ASCAP*, 485 F.Supp.2d 438, 443-44, 446-47 (S.D.N.Y. 2007). | Disputed legal conclusion, not a fact. |
| 20.     Apple reproduces and distributes the master sound recordings Aftermath provides to it.  (*Id*., Ex. 7, Cue Dep. 51:16-22; 53:8-54:16; 82:14-83:5.) | Disputed but immaterial.  Apple resells permanent downloads embodying compositions that Aftermath has the right to distribute and to authorize others to distribute. . |
| 21.     Apple is Aftermath's licensee for DPDs because it reproduces and distributes the master sound recordings Aftermath provides to it.  (*Id*.) | Disputed, but immaterial.  Whether Apple is a licensee or a distributor or designee does not matter, because <u>all</u> are encompassed within the scope of licenses granted to Aftermath or the releasing record label in the applicable controlled composition clause.  *See* Ex. 9a (Hoffman Decl. Exs. A & D at ¶ 6). |

6145160.1

| **Plaintiffs' Statement** | **Defendants' Response** |
|---|---|
| | (providing for license to Aftermath and its "distributors/licensees"); LeMoine Decl. Ex K (chart of Co-Author Agreements responding to Sullivan Decl., Ex. C-3).  Further, as Plaintiffs' expert concedes, licensee status would not change the fact that the law does not require Apple to obtain a separate license.  *See* Sullivan Decl., Ex. C-1 at 14-15; 17 U.S.C. § 115. |
| 22.     Thus, plaintiffs have the right to enter into a DPD license directly with Apple.  (Sullivan Decl. Ex. 1, ¶ IX.) | Disputed legal conclusion.  Plaintiffs expert concedes that Plaintiffs do not have this right.  Sullivan Decl., Ex. C-1 at 14-15.  Further, as Plaintiffs' expert concedes, even if Apple were a "licensee" of Aftermath, such licensee status would not change the fact that the law does not require Apple to obtain a separate license.  *Id.* at 14-15; 17 U.S.C. § 115. |
| 23.     In 1998, DPD commerce did not exist as it now exists.  (Ex. 4, Hoffman Dep. 192:10-16; Ex. 8, Jobs Dep. 13:13-23; Ex. 5, Ostroff Dep. 116:13-23; Ex. 1, Paterno Dep. 46:4- 8, 14-17.) | Disputed, but immaterial.  The Agreements grant Aftermath the right to exploit the sound recordings and the compositions embodied within them "in any and all media now known or hereinafter developed."  Whether or how a particular means of exploitation existed at the time of contracting is immaterial, since exploitation in any future media is encompassed within the Agreements.  Ex. 9a (Hoffman Decl. Exs. A & D at ¶ 8).*see also Reinhardt v. Wal-Mart Stores, Inc.*, 547 F. Supp. 2d 346, 354-55 (S.D.N.Y. 2008); (Ex. 11b at *5), *Allman Brothers v. Sony BMG Music Entertainment,* 2008 WL 2477465 at *5 n.3 (June 18, 2008). (Ex. 10b at *3). |
| 24.     Apple did not launch its iTunes Store until 2003 (Ex. 7, Cue Dep. 22:15- | Undisputed, but immaterial.  The Agreements grant Aftermath the right to exploit the sound recordings and the |

| **Plaintiffs' Statement** | **Defendants' Response** |
|---|---|
| 18, 23:10-12, 76:7-12.) | compositions embodied within them "in any and all media now known or hereinafter developed." Whether or how a particular means of exploitation existed at the time of contracting is immaterial, since exploitation in any future media is encompassed within the Agreements. Ex. 9a (Hoffman Decl. Exs. A & D at ¶ 8), *see also Reinhardt v. Wal-Mart Stores, Inc.*, 547 F. Supp. 2d 346, 354-55 (S.D.N.Y. 2008) (Ex. 11b at *5); *Allman Brothers v. Sony BMG Music Entertainment,* 2008 WL 2477465 at *5 n.3 (June 18, 2008) (Ex. 10b at *3). |
| 25.     Plaintiffs had not heard of iTunes when the 2003 Agreement was executed. (Ex. 6, Martin Dep. 259:21-23.) | Disputed, but immaterial. The Agreements grant Aftermath the right to exploit the sound recordings and the compositions embodied within them "in any and all media now known or hereinafter developed." Whether or how a particular means of exploitation existed at the time of contracting is immaterial, since exploitation in any future media is encompassed within the Agreements. Ex. 9a (Hoffman Decl. Exs. A & D at ¶ 8), *see also Reinhardt v. Wal-Mart Stores, Inc.*, 547 F. Supp. 2d 346, 354-55 (S.D.N.Y. 2008) (Ex. 11b at *5); *Allman Brothers v. Sony BMG Music Entertainment,* 2008 WL 2477465 at *5 n.3 (June 18, 2008) (Ex. 10b at *3). |
| 26.     The 1995 Digital Rights Act amended Section 115 of the Copyright Act was to provide that while DPDs were subject to compulsory licensing at the statutory rate, any contract made after June 22, 1995 could not reduce the mechanical rate on DPDs. 17 U.S.C. § 115(c)(3)(E)(i). | Disputed, but immaterial, legal conclusion. Certain post-June 22, 1995 negotiated rates may continue in force, but that is irrelevant here. Plaintiffs have consistently been paid the full statutory rate for DPD exploitation, and they do not contend otherwise. |
| 27.     In amending Section 115, the | Disputed legal conclusion, not a fact. |

6145160.1

8

| **Plaintiffs' Statement** | **Defendants' Response** |
|---|---|
| Senate intended that controlled composition clauses would not govern DPDs. (Ex. 22, Pub. L. No. 104-39, 109 Stat. 336, S. Rpt. 104-208 at 41.) | The statute's text supplies the best evidence of what the legislature intended. The Senate Report Plaintiffs rely on here is clear that only the <u>rates</u> set by controlled composition clauses are affected by the amendment, in that the statutory rate would be paid "in lieu of" a contrary rate set in a controlled composition clause. Opp. Ex. B-22, Pub. L. No. 104-39, 109 Stat. 336, S. Rpt. 104-208 at 42. Nothing in the amendments to Section 115 invalidates the grant of rights in a controlled composition clause. |
| 28.     On October 9, 2001, the Recording Industry Association of America, Inc. ("RIAA"), the National Music Publishers' Association Inc. ("NMPA"), and The Harry Fox Agency, Inc. ("HFA") negotiated an interim "Industry Agreement" for licensing DPDs. On December 6, 2001, these entities filed a Joint Statement and Agreement addressing licensing of limited downloads and on demand streaming but without agreeing to rates. *See* 66 FR 64783, Vol. 66, No. 241 (Dec. 14, 2001). | Disputed, but immaterial. The agreement encompasses more digital uses than described by Plaintiffs. |
| 29.     This "Industry Agreement" was applicable only to labels and publishers members of signatories RIAA, NMPA and HFA. (Ex. 21, Joint Statement.) | Undisputed. |
| 30.     Plaintiffs are not, and never have been, affiliated members of the RIAA, the NMPA or the HFA. (Martin Decl. ¶ 17.) | Undisputed, but immaterial. Plaintiffs have licensed their interests in the Compositions for digital uses through the Agreements, regardless of whether they are parties to this "Industry Agreement." |
| 31.     It is current industry practice that DPD licenses are negotiated and | Disputed, but immaterial. The contracts and licenses at issue here speak for |

6145160.1

9

| Plaintiffs' Statement | Defendants' Response |
|---|---|
| executed separately from mechanical licenses granted for physical product. (Sullivan Decl. ¶ 5, Ex. 1, ¶¶ VI-IX.) | themselves. "Industry practice" does not define what the copyright law requires, the copyright law does. Nothing in Section 115 requires a separate license for DPDs and physical product. Indeed, the implementing regulations provide that DPDs are treated the same as physical "phonorecords" for purposes of Section 115. 37 CFR 201.18(a)(6). |
| 32. A label wishing to exploit compositions via DPD must either obtain a compulsory license before the composition is released and abide by all of the statutory formalities, or privately negotiate a specific DPD license with the owner of the underlying musical composition. (*Id.* at Ex. 1, ¶¶ VI, IX; *see also* 17 U.S.C. § 115(c)(3)(B).) | Disputed legal conclusion, not a fact. A label may exploit compositions through a compulsory license or a privately negotiated license (including a recording agreement containing a controlled composition clause), but there is no requirement in the copyright law that the license be a "specific DPD license," or that the license specify which configurations it covers. The terms of the license, negotiated or compulsory, control. See *Rodgers & Hammerstein Org. v. UMG Recordings, Inc.,* 2001 WL 1135811 (S.D.N.Y. Sept. 26, 2001) (holding that the terms of a privately negotiated license may vary the terms of a compulsory license, and, when it does, the terms of the private license control). |
| 33. Aftermath attempted to negotiate private DPD licenses for some or all of the Eminem Compositions with plaintiffs. (Martin Decl. ¶ 18; *see also* Sullivan Decl., Ex. 1, ¶¶ V, VI, XIII.). | Undisputed, but immaterial, as to the fact that certain license agreements were exchanged. Disputed as to the legal conclusion to be drawn about the meaning of the grant of rights in the Agreements from this extrinsic evidence. The exchange of licenses is extrinsic evidence that cannot convert the plain contractual language "will be licensed" into its precise opposite. *See BMW of North America, Inc. v. New Motor Vehicle Bd.,* 162 Cal. App. 3d 980, 991 |

6145160.1

10

| **Plaintiffs' Statement** | **Defendants' Response** |
|---|---|
|  | n.4 (1984).  UMG contends that it sent licenses to confirm terms and to preserve relationships with publishers who desired separate licenses, not because it had any particular "belief" as to what rights it already held.  While UMG does not dispute the exchange of licenses, it does dispute the inference to be drawn from that exchange.  Under California law, onflicting inferences do not create a question of fact.  *Wolf v. Walt Disney*, 162 Cal. App. 4th 1107, 1134 (2008). |
| 34.     In October 2002, UMG's copyright department wrote a letter to Eight Mile requesting and "hoping" that Eight Mile would license its compositions for permanent download.  (Ex. 9, Blair Dep. 32:12-33:8; Ex. 10, Douglas Dep. 24:17-25:6; Ex. 11, Gary Dep. Ex. 48 at 8M-0015.) | Undisputed, and immaterial, that the letter was sent, but disputed as to Plaintiffs' characterization.  The letter speaks for itself. |
| 35.     It is UMG's practice to send license requests to a music publisher where UMG believes the recording agreement and controlled composition clause does not contain a self-executing license; where UMG believes the controlled composition clause to be self-executing, UMG's practice is merely to send an "advice letter," informing the publisher its composition is being released on an album, advising the publisher of the album's release date and the rate being paid.  (Ex. 12, Ferrante Dep. 64:19-65:3, 65:4-65:16.) | Disputed as to the legal conclusion to be drawn about the meaning of the grant of rights in the Agreements from this extrinsic evidence.  The exchange of licenses is extrinsic evidence that cannot convert the plain contractual language "will be licensed" into its precise opposite.  *See BMW of North America, Inc. v. New Motor Vehicle Bd.*, 162 Cal. App. 3d 980, 991 n.4 (1984).  UMG contends that it sent licenses to confirm terms and to preserve relationships with publishers who desired separate licenses, not because it had any particular "belief" as to what rights it already held.  While UMG does not dispute the exchange of licenses, it does dispute the inference to be drawn from that exchange.  Under California law, onflicting inferences do not create a question of fact.  *Wolf v.* |

| **Plaintiffs' Statement** | **Defendants' Response** |
|---|---|
| | *Walt Disney Co.*, 162 Cal. App. 4th 1107, 1134 (2008). |
| 36.  UMG sent license requests to Eight Mile for the Eminem Compositions in both physical and digital formats, but never sent any advice letters to Eight Mile. (Ex. 12, Ferrante Dep. 66:2-7; Ex. 13, Martin II 472:22-473:19; Martin Decl. ¶ 20.) | Disputed as to the legal conclusion to be drawn about the meaning of the grant of rights in the Agreements from this extrinsic evidence. The exchange of licenses is extrinsic evidence that cannot convert the plain contractual language "will be licensed" into its precise opposite. *See BMW of North America, Inc. v. New Motor Vehicle Bd.,* 162 Cal. App. 3d 980, 991 n.4 (1984). UMG contends that it sent licenses to confirm terms and to preserve relationships with publishers who desired separate licenses, not because it had any particular "belief" as to what rights it already held. While UMG does not dispute the exchange of licenses, it does dispute the inference to be drawn from that exchange. Under California law, conflicting inferences do not create a question of fact. *Wolf v. Walt Disney Co.*, 162 Cal. App. 4th 1107, 1134 (2008). |
| 37.  Eight Mile declined to execute the proposed DPD license accompanying the October 2002 letter, but instead offered to license a single Eminem composition, "Lose Yourself," for DPD as long as certain conditions were met. (Martin Decl. ¶ 19; Martin Dep. 299: 21-301:2; *see also* Ex. 14, Levinsohn Dep. 251:5-252:8, 259:2-261:5, Exs. 205, 225.) | Disputed, but immaterial as to whether Eight Mile executed licenses covering DPDs. UMG believes that Eight Mile has executed many such licenses, but because Eight Mile contests those licenses' validity, UMG has not relied on any of those licenses in this Revised Motion.<br><br>Undisputed as to whether Eight Mile licensed "Lose Yourself." |
| 38.  Eight Mile and UMG negotiated a jointly prepared DPD license for "Lose Yourself" reflecting: (1) a two-year term (not a perpetual one); (2) the payment of a full statutory rate subject to statutory | Undisputed as to whether Eight Mile licensed "Lose Yourself." Disputed, but immaterial, as to the precise operative terms of the "Lose Yourself" license. |

| **Plaintiffs' Statement** | **Defendants' Response** |
|---|---|
| increases or industry convention (not a reduced rate); (3) quarterly (not semi-annual) accountings and payment; and (4) Eight Mile's right to terminate the license after two years or at upon any breach of the license's terms.  (Martin Decl. ¶ 19; Ex. 14, Levinsohn Dep. 251:5-252:8, 259:2-261:5, Exs. 205, 225; Ex. 11, Gary Dep., Ex. 48 at 8M0016-0018.) | |
| 39.     Eight Mile signed the single, proposed DPD license and sent it to Pat Blair, head of UMG's copyright department.  UMG never countersigned and returned the "Lose Yourself" license to Eight Mile.  (*See* Ex. 6, Martin Dep., 362:22-363:4, 363:15-364:16; Ex. 14, Levinsohn Dep. 254:2-10; (Martin Decl. ¶ 19; Ex. 11, Gary Dep., Ex. 48 at 8M0016-0018.) | Disputed, but immaterial, as to whether the license was ever countersigned or returned.  Plaintiffs do not deny that they signed a license for the composition "Lose Yourself" and sent it to UMG.  UMG has confirmed that the license is effective, so the facts related to countersignature or return are immaterial. |
| 40.     Without conceding its effectiveness, on August 11, 2008, plaintiffs terminated in writing the "Lose Yourself" DPD license.  (Martin Decl. ¶ 25, Ex. 22.) | Undisputed as to the fact that Plaintiffs purported to terminate the license.  Disputed, but immaterial, as to the legal effect of that termination.  Even if the termination had any legal effect—which Defendants do not concede—Defendants have availed themselves of the statutory compulsory license for the digital distribution of "Lose Yourself." |
| 41.     Mr. Martin spoke with Ms. Blair and other UMG copyright department employees, Chad Gary, Todd Douglas and Tim Hernandez, both at the time he signed the "Lose Yourself" DPD license, and thereafter, and communicated his objections to any other of plaintiffs' compositions being sublicensed to digital download companies as DPDs.  (Ex. 6, Martin Dep. 298:13-300:5; Ex. 15, Van Hagen Dep., 34:24-35:8; 35:13-15; 38:7- | Disputed, but immaterial.  Martin's purported objections do not change the rights provided in the Agreements, the clear language of which provides that the Compositions "will be licensed" to Aftermath and its distributors and licensees. |

| **Plaintiffs' Statement** | **Defendants' Response** |
|---|---|
| 25; 42: 2-20; 43:7-14, 20-44:6; Ex. 9, Blair Dep. 38:9-22; 47:3-24; 49:6-10; 67:2-68:4; Ex. 11, Gary Dep. 87:5-10; 36:15-19; 37:24-38:19; 39:17-22; 41:13-19; Hernandez Decl. ¶ 3) | |
| 42.     After Eight Mile signed the "Lose Yourself" license, UMG continued to send plaintiffs license requests for both physical configurations and for DPDs, sending DPD requests with the same terms as the "Lose Yourself" license.  Plaintiffs did not execute or return any of those proposed licenses or any other license that would have authorized the Eminem Compositions' exploitation as DPDs.  (Ex. 13, Martin II 440:9-14, 440:22-441:6; 471:10-473:19; Ex. 222 at 8M819, 810-818; *see* Ex. 11, Gary Dep., Ex. 48 at 8M016-17; Douglas Dep. 45:12-46:4; 59:7-60:2; 61:7-18.) | Disputed, but immaterial as to whether Eight Mile executed any of the licenses UMG sent.  UMG believes that Eight Mile has executed many such licenses, but because Eight Mile contests those licenses' validity, UMG has not relied on any of those licenses in this Revised Motion.<br><br>Disputed, but immaterial.  Martin's purported objections do not change the rights provided in the Agreements, the clear language of which provides that the Compositions "will be licensed" to Aftermath and its distributors and licensees. |
| 43.     When UMG sent proposed mechanical licenses that would have authorized both physical and DPD exploitation, plaintiffs issued their own licenses to UMG that removed references on the license itself to digital configurations.  UMG countersigned and accepted plaintiffs' licenses.  (Ex. 6, Martin Dep. 376:15-377:22; Ex. 11, Gary Ex. 52, 53; Ex. 13, Martin II 440:9-14, 440:22-441:16, 471:10-473:19, 476:10-477:19.) | Disputed, but immaterial as to whether Eight Mile executed any of the licenses UMG sent.  UMG believes that Eight Mile has executed many such licenses, but because Eight Mile contests those licenses' validity, UMG has not relied on any of those licenses in this Revised Motion.<br><br>Disputed, but immaterial.  Martin's purported objections do not change the rights provided in the Agreements, the clear language of which provides that the Compositions "will be licensed" to Aftermath and its distributors and licensees. |
| 44.     There was a clear understanding between plaintiffs and UMG that, with two exceptions mentioned herein ("Lose | Disputed, but immaterial.  Martin's purported objections do not change the rights provided in the Agreements, the |

6145160.1

14

| **Plaintiffs' Statement** | **Defendants' Response** |
|---|---|
| Yourself," and a separate mastertone agreement) plaintiffs would not agree to license any of the Eminem Compositions for digital distribution.  (Ex. 13, Martin II 412:9-25, 413:19-414:16, 460:7-461:12, 461:23-462:2, 469:25-470:15; *see* Ex. 14, Levinsohn Dep. 247:17-248:9, 251:5-252:2, 260:11-261:18, 267:9-22, 262:7-11, 265:6-17, 273:23-274:18; Hernandez Decl. ¶ 3.) | clear language of which provides that the Compositions "will be licensed" to Aftermath and its distributors and licensees. |
| 45.    In 2002, UMG and Apple entered into an agreement whereby UMG licensed its master sound recordings to Apple for reproduction, distribution and sale by Apple, and purported also to sublicense to Apple the reproduction and distribution rights with respect to the compositions embodied in those master recordings.  (Ex. 8, Jobs Dep., Ex. 81 ¶ 44, Ex. 82, Ex. 83, Ex. 85.) | Disputed, but immaterial.  The UMG-Apple Agreement is a wholesaler-retailer agreement.  Apple resells copies of sound recordings in permanent download form.  Whether Apple is a licensee or distributor or designee is immaterial in this case, because whatever Apple's status, its conduct is within the scope of licenses granted to the applicable record label. |
| 46.    The "Grant of Rights" in the UMG-Apple Agreement provides by its terms that Apple has a license from UMG to reproduce and distribute the master sound recordings and compositions provided to it by UMG.  (Ex. 8, Jobs Dep., Ex. 85, ¶ 1; Abrams Decl. Ex. 1, ¶ 6.) | Disputed, but immaterial.  The UMG-Apple Agreement is a wholesaler-retailer agreement.  Apple resells copies of sound recordings in permanent download form.  Whether Apple is a licensee or distributor or designee is immaterial in this case, because whatever Apple's status, its conduct is within the scope of licenses granted to the applicable record label. |
| 47.    The most senior official of Apple's iTunes, Eddy Cue, testified in early 2008 before the Copyright Royalty Board in the Section 115 Rate Proceeding that Apple sublicenses the musical compositions embodied in master sound recordings from UMG and other record labels.  (*See* Ex. 8, Jobs Dep., Ex. 81, ¶ 44, 20:22-21:13; *see also* Ex. 7, Cue Dep. 24:11-22, 158:20- | Disputed, but immaterial, as to the legal conclusion to be drawn from Mr. Cue's testimony before the Copyright Royalty Board.  Whether Apple "sublicenses the musical compositions" or not is immaterial in this case, because whatever its status, its conduct is within the scope of licenses granted to the applicable record label. |

6145160.1

15

| **Plaintiffs' Statement** | **Defendants' Response** |
|---|---|
| 160:24, 160:20-161:17, 162:7-19, 163:8-16, 164:18-22.) | |
| 48.     After iTunes launched, Apple neither accounted to nor paid plaintiffs directly, but rather accounted to and paid royalties for plaintiffs' compositions directly to UMG (Ex. 7, Cue Dep. 113:16-20, 149:12-24, 151:10-152:9, 159:12-24, 168:23-169:9; *see* Ex. 8, Jobs Dep., Ex. 85, ¶ 2( c)(ii)). | Disputed, but immaterial  Apple purchases downloads from UMG for resale to the end-user, and does not pay "royalties" for Plaintiffs' compositions to UMG.  Rather, UMG pays publishers, including Plaintiffs, mechanical royalties for the use of compositions embodied in the sound recordings sold by Apple. |
| 49.     The royalty statements UMG provided plaintiffs beginning in 2003 did not identify any particular composition for which DPD revenue was being paid or identify any specific revenue directly related to DPDs. (Martin Decl. ¶ 21-22, Exs. 18-19.) | Disputed, but immaterial.  Whatever the publishing royalty statements provided, the artist royalty statements Plaintiffs received as the affiliated LLC "F.B.T. Productions, Inc." clearly set out that the sound recordings were being exploited via permanent download.  LeMoine Decl. Ex. O.  This dispute is immaterial because Plaintiffs concede that they knew by 2006 that they were receiving publishing royalties for the digital exploitation of sound recordings embodying the compositions and continued to accept such royalty payments. |
| 50.     UMG's royalty statements identified certain revenue as "Other" and "ID."  Some royalty statements contained a 1-page "Glossary" that defined "ID" as "digital track."  The royalty statements did not identify what form of "digital" income was being reported (*e.g.*, ringtones, mastertones, streaming, mobile, or limited or permanent downloads). (Ex. 16, Harrington Dep. at 53:1-11; 54:3-55:24; Ex. 6, Martin Dep. 302:3-303:18, 305:9-306:15; Ex. 15, Van Hagen Dep. 48:24-50:6.) | Disputed, but immaterial.  Whatever the publishing royalty statements provided, the artist royalty statements Plaintiffs received as the affiliated LLC "F.B.T. Productions, Inc." clearly set out that the sound recordings were being exploited via permanent download.  LeMoine Decl. Ex. O.  This dispute is immaterial because Plaintiffs concede that they knew by 2006 that they were receiving publishing royalties for the digital exploitation of sound recordings embodying the compositions and continued to accept such royalty |

6145160.1

| **Plaintiffs' Statement** | **Defendants' Response** |
|---|---|
| | payments. |
| 51.     Plaintiffs had no knowledge that the royalty payments they received contained monies for DPDs they specifically had refused to authorize, and UMG admits there was no way for plaintiffs to determine looking at their royalty statements what iTunes reported for DPD revenue of plaintiffs' compositions in any given period or even if any of the monies related to DPDs at all. (Ex. 6, Martin Dep. 293:5-21; 297:16-298:5; 303:8-304:17; Martin Decl. ¶ 22; Ex. 17, Eisler Dep. 60:15-24; Ex. 16, Harrington Dep. 27:4-10; 61:10-16; *e.g.*, 58:13-17; 59:8-23; 63:5-64:3.) | Disputed, but immaterial. Whatever the publishing royalty statements provided, the artist royalty statements Plaintiffs received as the affiliated LLC "F.B.T. Productions, Inc." clearly set out that the sound recordings were being exploited via permanent download. LeMoine Decl. Ex. O. This dispute is immaterial because Plaintiffs concede that they knew by 2006 that they were receiving publishing royalties for the digital exploitation of sound recordings embodying the compositions and continued to accept such royalty payments. |
| 52.     A single check accompanied each royalty statement and included amounts for sale of authorized physical product, and a small amount for the items identified as "Other" or "ID." (*See, e.g.*, Martin Decl. ¶¶ 21-22, Exs. 18-19.) | Disputed, but immaterial, as to the relative amounts included in royalty checks. |
| 53.     It was only after plaintiffs' 2006 audit that plaintiffs first learned that "Other," or "ID," included DPDs of other Eminem Compositions that plaintiffs had refused to grant DPD licenses for. (Martin Decl. ¶ 24; Martin Dep. 302:3-303:18, 305:9-306:15.) | Disputed, but immaterial. Even if Plaintiffs first learned of the exploitation in 2006, they still failed to object to the receipt of royalties for the use they claim is infringing until they filed this lawsuit more than a year later and continue to accept such royalty payments. |
| 54.     Defendants produced over 1600 pages of documents after discovery closed, much of which they cite in their motion as authorizing the use of certain Eminem Compositions as DPDs. (Doc. No. 66, Mem. at 6-8, 16-22.) | Disputed, to the extent Plaintiffs claim Defendants production of these documents was in any way improper. The production of these documents was pursuant to a Court order, as described in Defendants' Opposition to Plaintiffs' Motion to Exclude "Late Produced" Documents. *See* Def's Opp. To Pl's Mot. to Exclude, Docket No. 86 (filed |

6145160.1

17

| **Plaintiffs' Statement** | **Defendants' Response** |
|---|---|
| | September 19, 2008). |
| 55.   Many of these documents do not purport to authorize or license for DPDs. (Sullivan Decl. ¶ 3) | Disputed legal conclusion.  This statement does not refer to a particular document.  Defendants' responses to this particular claim in the Sullivan Declaration as to each license submitted are set out in summary charts.  LeMoine Decl. Exs. J & K. |
| 56.   Many of the "licenses" cited by defendants state they are only licensing the share in the composition owned by that entity.  (*See, e.g.*, Sullivan Decl., Ex. 2 (*e.g.*, Bat Future Music "license" for "Encore" is for a 12.5% share, HFA "license" for "Just Lose It" is for a 49% share)). | Disputed legal conclusion, in that the licenses do not purport to license only the specified percentage share.  In any event, this is immaterial to the effect of the license from co-owners, from whom a license for their share is sufficient to license the whole.  *See Tang v. Putruss*, 521 F. Supp. 2d 600, 604 (E.D. Mich. 2007) |

s/Daniel D. Quick
Daniel D. Quick
Dickinson Wright PLLC
38525 Woodward Avenue
Suite 2000
Bloomfield Hills, MI 48304
(248) 433-7200
dquick@dickinsonwright.com
P48109
Attorneys for Defendants

s/Kelly M. Klaus
Munger, Tolles & Olson LLP
355 South Grand Avenue
Suite 3500
Los Angeles, CA 90071-1560
(213) 683-9238
kelly.klaus@mto.com
Attorneys for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on October 15, 2008, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to the all counsel.

> s/Kelly M. Klaus
> Munger, Tolles & Olson LLP
> 355 South Grand Avenue
> Suite 3500
> Los Angeles, CA 90071-1560
> (213) 683-9238
> kelly.klaus@mto.com
> Attorneys for Defendants

6145160.1