1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


EIGHT MILE STYLE, LLC and
MARTIN AFFILIATED, LLC,

      Plaintiffs,

-V-                          Case Number:
                              07-13164

APPLE COMPUTER, INC., and
AFTERMATH RECORDS d/b/a
AFTERMATH ENTERTAINMENT,

      Defendants,

_____/



MOTIONS
BEFORE THE HONORABLE ANNA DIGGS TAYLOR
UNITED STATES DISTRICT JUDGE
U. S. Courthouse & Federal Building
231 West Lafayette Boulevard West
Detroit, Michigan  48226
THURSDAY, DECEMBER 4TH, 2008


APPEARANCES:


For the Plaintiffs:          Richard S. Busch, Esq.

For the Defendants:          Kelly M. Klaus, Esq.
                           Daniel D. Quick, Esq.

Court Reporter:              Joan L. Morgan, CSR
                           Official Court Reporter


Proceedings recorded by mechanical stenography.
Transcript produced by computer-assisted
transcription.

**MOTIONS**                                                                    2
**THURSDAY, DECEMBER 4TH, 2008**

1          Detroit, Michigan

2          Thursday, December 4th, 2008

3                          -- --- --

4          **THE CLERK:** Eight Mile Style, LLC, et. al, versus

5     Apple Computer, Inc, et al., case number 07-13164.

6          **THE COURT:** The first will be defendants' motion

7     for summary judgment.

8          **MR. KLAUS:** Good morning, your Honor.

9          **THE COURT:** Good morning.

10         **MR. KLAUS:** My name is Kelly Klaus.  I represent

11    the defendants along with Mr. Quick in the matter.

12              And I think it's important the Court knows there

13    are three motions that are on the calendar for today.  One

14    is our defendants' motion for --

15         **THE COURT:** For summary judgment which we're

16    hearing now.

17         **MR. KLAUS:** And the motion has three components to

18    it.  One is that the uses of the compositions in question

19    have been expressly authorized through control -- what are

20    called controlled composition clauses in two artist

21    recording agreements --

22         **THE COURT:** Wait a minute.

23              Tell them to move down the hall.

24         **MR. KLAUS:** Thank you, your Honor.

25              The first argument is that the uses in question

**JOAN L. MORGAN, OFFICIAL COURT REPORTER 313 964-5489**

MOTIONS                                                    3
THURSDAY, DECEMBER 4TH, 2008

1    have been authorized through what are called controlled

2    composition clauses in artist recording agreements relating

3    to Mr. Mathers who is professionally known as "Eminem."

4           The second argument is that even if the uses were

5    not expressly licensed they've been impliedly licensed as a

6    matter of law by virtue of the fact that the objective

7    manifestation of the defendants in the case, people with

8    the authority to grant licenses have been to grant them.

9    As evidenced most notably by their continuing up through

10   the pendency of this lawsuit as recently as several months

11   ago acceptance and retention of money for the very uses

12   that they challenge.

13          The third argument is an express licence argument

14   that is based on a set of other agreements, other

15   agreements involving Mr. Mathers, involving other co-

16   authors, involving various publishing entities.

17          That third argument is the only one of the three

18   arguments that is effected by the other two motions that

19   are on the calendar today, plaintiffs' motion to exclude

20   and our motion to strike the declarations that have been

21   filed by Mr. Sullivan.

22          Let me start with the express license argument.

23   Your Honor, if I may, I have a -- I know there's been a lot

24   of paper on these motions.  I prepared a set of binders --

25          THE COURT: Well, I can't -- this is a motion for

JOAN L. MORGAN, OFFICIAL COURT REPORTER 313 964-5489

1   summary judgment.  We cannot work with a set of binders.

2   Just make the argument, please.

3        **MR. KLAUS:** Okay.  The binders only contain

4   evidence that's already been submitted in the record, but

5   if I can go through the individual pieces of evidence.

6        The first one, your Honor, Exhibit 9a which is

7   the 1998 artist record agreement involving Eminem.  And

8   this agreement in paragraph 6, and there's also a

9   comparable provision in the 2003 agreement which was also

10  filed as part of the motion for summary judgment states,

11  "All controlled compositions, i.e., songs written or

12  controlled directly or indirectly in whole or in part by

13  F.B.T. artist, any affiliated company of F.B.T. artist, any

14  producer or any affiliated company of any producer will be

15  licensed to Aftermath and its distributors/licensees at a

16  rate equal to," and then it lists the control break, and

17  the balance of the provision deals with a complicated

18  formula that's not relevant to this case about how the

19  royalty rate is to be calculated.

20       The entire argument of the plaintiffs in this

21  case, the entire argument, is that the language that says

22  "will be licensed" can be construed to mean will not be

23  licensed because that is the position unequivocally that's

24  been taken by the plaintiffs in this case in response to

25  this motion is that they have the right not to license for

1    digital uses. It is our position, your Honor, that is

2    not -- the contract is not in any sense reasonably

3    susceptible to that interpretation.  There is no amount of

4    extrinsic evidence and the plaintiffs have cited a lot of

5    extrinsic evidence, testimony of people, exchanges of

6    license agreements, but there is no extrinsic evidence by

7    which the phrase "will be licensed" can be construed to

8    mean exactly the opposite, will not be licensed, can't be

9    done.

10             Under California law which applies to these

11   agreements pursuant to paragraph 21, the law says, if

12   extrinsic evidence is contrary to the plain language, it

13   can't be admitted, the plain language has to govern.

14   That's <u>BMW v New Motor Vehicle Board</u> case which we cite in

15   our papers.

16             So either -- it says either defendant Aftermath

17   has a license for the challenged use or they have to give

18   us a license, but what they can't do is not give us a

19   license.  There's no circumstance under which that is a

20   reasonable construction of the phrase "will be licensed."

21             Now, plaintiffs advance in opposition to this

22   argument, four arguments.  I want to turn to each one.

23             The first one is that they say this provision,

24   the controlled composition clause, does not apply to

25   digital uses.  That is a not a determination of the

**JOAN L. MORGAN, OFFICIAL COURT REPORTER 313 964-5489**

MOTIONS                                                        6
THURSDAY, DECEMBER 4TH, 2008

1    contract or a reading of that that is reasonably -- to

2    which it is reasonably susceptible.  The same agreement has

3    an ownership provision which is paragraph 8 which deals

4    with the ownership and exploitation of the sound recordings

5    that embody the compositions that are delivered pursuant to

6    the agreement.

7            That section says, Aftermath has the exclusive

8    right to exploit and license or assign exploitations to

9    masters or any derivatives of the masters.  Aftermath can

10   exploit them in any manner in records, or any other media

11   or use, and can add to, edit, alter or delete from or re-

12   mix the masters at our sole election.  Aftermath and its

13   distributors/licensees shall have the exclusive right to

14   exploit such masters, and this is the key language, your

15   Honor, "in any and all forms of media now known and

16   hereinafter developed," meaning that the agreement was not

17   frozen in time as to the technology that existed in 1998.

18   Finally, it says that exploitation can take place in any

19   form.

20           This is a question that can be answered in terms

21   of whether this contract and this language is reasonably

22   susceptible to construction whereby the compositions -- the

23   controlled composition clauses can modify the digital uses,

24   can and should be answered as a matter of law.

25           The only federal court that has addressed this

JOAN L. MORGAN, OFFICIAL COURT REPORTER 313 964-5489

1    issue has agreed that language like this is not reasonably

2    susceptible. The case I would direct your Honor's attention

3    to is the <u>Reinhardt v Wal-Mart</u> case, 547 F. Supp. 2d 346.

4    It's included in what is Exhibit F to plaintiffs'

5    opposition. There is a copy of the <u>Reinhardt</u> case that is

6    printed out from Lexus.  In that case like this one, you

7    have plaintiff who claimed to own the composition right who

8    says that the record company which was called Ramone's

9    Production, something called Taco Tunes which is the name

10   of the entity that did the distributions for it. Said that

11   company had exceeded the scope of the license which the

12   plaintiff had granted by allowing Apple, which is the

13   defendant in this case to do exactly what it's doing with

14   the recordings that embody the Eminem compositions, namely,

15   to distribute them in the form of permanent download.

16          In that case the language which is cited at page

17   354 of the Court's opinion says that there is authorization

18   to the record production company to manufacture, advertise,

19   sell, distribute or dispose of the masters and phono

20   records in any and all fields of use by any method now or

21   hereafter known.  The same language you find in paragraph 8

22   of the Eminem agreements.

23          In that case what the district court said is, and

24   this is on page 355 of the opinion, "it is not reasonable

25   to construe the phrase all forms now or hereafter known to

1    exclude defendant's alleged digital download form which now

2    constitutes a form of reproduction."  The unambiguous

3    language forecloses other interpretations and the need to

4    consider extrinsic evidence."

5         The second argument that the plaintiffs make in

6    terms of why the controlled composition clause does not

7    apply allows them to say "will be licensed" can mean will

8    not be licensed is that they say there is a requirement of

9    law that a licensed authorizing what's called a digital

10   phono record delivery or a DPD which you've seen a

11   reference to in the papers, they say there is a requirement

12   that be in a separate license, that because the language of

13   paragraph 6 is captioned "mechanical royalty" you need a

14   separate license that is labeled DPD, digital phono record

15   delivery.

16        The problem with that, your Honor, is there's no

17   requirement, there's no such requirement. The statute which

18   deals with compulsory licensing and which creates the term

19   digital phono record delivery is Section 115 of the

20   Copyright Act, Section 115D, Title 17, doesn't say that a

21   DPD license has to be a separate license.  The implementing

22   regulations which we've also cited which are Section

23   201.18(a)(6) say explicitly DPDs for purposes of that

24   section are treated as a type of phono record

25   configuration.  It's just another form in which the

JOAN L. MORGAN, OFFICIAL COURT REPORTER 313 964-5489

MOTIONS                                                     9
THURSDAY, DECEMBER 4TH, 2008

1    reproduction is made of a recording that embodies a

2    composition.

3              They say that there is an industry practice that

4    somehow says that always is the case that a DPD license has

5    to be separate and apart from the mechanical license.

6    First of all, the extrinsic evidence that they try to say

7    is industry practice could not vary the language of the

8    agreement which is in paragraph 8 which is exactly what the

9    court in Reinhardt says, you don't look to the extrinsic

10   evidence because there's no circumstances for which it's

11   reasonably susceptible to say that this agreement doesn't

12   cover digital uses.

13             But the more important -- the only thing that

14   they say is evidence of industry practice is a particular

15   license form that's used by one particular publishing

16   agency which is called The Harry Fox Agency.  They cite a

17   case, the Rodgers v Hammerstein  case referred to in their

18   papers as the "Farm Club" case because that was the name of

19   the digital service.  And they say that case, Rodgers &

20   Hammerstein holds the DPD license has to be a separate

21   license.  Nothing in the case says that, your Honor.  The

22   cases concern exclusively with construing the particular

23   language that was used by The Harry Box Agency.

24             The third argument is they say that Congress had

25   made a judgment that controlled composition clauses

JOAN L. MORGAN, OFFICIAL COURT REPORTER 313 964-5489

**MOTIONS**                                                    10
**THURSDAY, DECEMBER 4ᵀᴴ, 2008**

1    can't --such as you find in the Eminem's recording

2    agreements, can't apply to digital phono record delivery.

3    That's just wrong.  The statue doesn't say it.  There's no

4    case that says it.  There's no legislative history that

5    says it.

6            What they say instead is they cite an embedded

7    provision of Section 115 which is admittedly a complicated

8    and dense statute but which says that with respect to

9    digital phono record delivery in the case where they are

10   covered by a controlled composition -- it says where you

11   have a controlled composition clause -- remember one of the

12   things I said earlier was that part of what the -- what the

13   controlled composition clause does is, it says "will be

14   licensed" and then it goes on to provide a lengthy formula

15   about the rate.  And what the controlled composition clause

16   has done in addition to granting the right to use the

17   composition that's on the sound recording that the record

18   company is paying is they say there is a rate that is fixed

19   by statute for composition.  This is the so-called

20   compulsory or the mechanical rate.  It's established

21   through a whole proceeding in Washington with the Copyright

22   Royalty Board that comes up with the rate.

23           What controlled composition clauses do is they

24   say for purposes of our agreement we'll get the right to

25   use them and we'll pay you at some percentage that is less

MOTIONS                                                    11
THURSDAY, DECEMBER 4TH, 2008

1    than the statutory rate.  That's where most of the

2    negotiation is in the text cited in record industries how

3    far off that's going to be.

4            And what Congress said in Section 115(c)(3)(E)(I)

5    was that with respect to agreements that have controlled

6    composition clauses the rates that were fixed, so-called

7    statutory rates, would be applied, and the key language is

8    "in lieu of" the rates that are found in those provisions.

9            It doesn't say those provisions are ineffective.

10   It doesn't say the rights granted pursuant to those

11   provisions can't apply to digital phono record deliveries.

12   It says that the rate that is fixed which is called the

13   statutory rate will be applied in lieu of that.  That's all

14   the legislative history says that they cite.  And there is

15   no case that ever held and there would be an unreasonable

16   construction of the statue to say that it wipes away

17   controlled composition clauses in the case of digital phono

18   record delivery.

19           The very fact that Congress said we recognize

20   that there will be controlled composition clauses that

21   apply to digital phono record deliveries indicates that

22   Congress did not intend to create those clauses.

23           Four, the final argument as to why the controlled

24   composition provision doesn't apply.  If they say that the

25   language which is Aftermath and its distributors/licensees,

JOAN L. MORGAN, OFFICIAL COURT REPORTER 313 964-5489

1    they say that distributors/licensees have to mean the

2    distributor/licensee is affiliated.  And the problem is

3    there's nothing in the contract, there's nothing in any

4    practice, there's nothing in any statute, there's nothing

5    in any case that says this language has to be read to mean

6    that the distributor or licensee has to be affiliated.

7         What they've done is they've said in their papers

8    that Universal witnesses, Universal is the principal owner

9    of the Aftermath Record Company.  What they said is that

10   Universal witnesses conceded at their depositions that when

11   a distributor or a licensee is unaffiliated with the

12   company they have to go and get their own license and the

13   mechanical.  That's not what the witnesses said.

14        What the witnesses said is that in one

15   circumstance which is where the record company takes one

16   song that it has and said to somebody else we're going to

17   give you what's a license for a compilation album meaning

18   we are Universal, we have this collection of recordings.

19   You overhear, let's say, you don't own these recordings but

20   what you would like to do if you would like to put out an

21   album that is not an album, an Eminem album, but let's say

22   the greatest hip hop hits of the year 2002, and you want to

23   borrow one from me, and you want to borrow one from

24   somebody else, you want to borrow one from somebody, and

25   it's going to be your album and you're going to put it out.

1    In that case of the compilation licensee, it is indeed the

2    practice that the compilation licensee is required to clear

3    mechanical, is required to pay the publishers for the right

4    to use the composition.  There's very good reason for that.

5    It's their product.  It's the other record company's

6    product and the one record company doesn't want to deal

7    with having to find the publishers and pay them.  That

8    doesn't mean that -- it doesn't mean that the language

9    could be construed to say that all cases if the

10   distributor/licensee is not affiliated or owned by you,

11   there's requirement that they have to go out and deal with

12   the owner of the composition rights exclusively.  Nothing.

13   No case says that.  Indeed, the <u>Reinhardt</u> case stands for

14   exactly the opposite proposition.

15           In sum, your Honor, we think that it is clear

16   that the language of the implied license -- the language of

17   the controlled composition clauses clears an express

18   license.  There's nothing -- the contract is not reasonably

19   susceptible for contrary interpretation.  And we think that

20   covers -- that should entitle the defendants to summary

21   judgment on the entire case.

22           The second argument -- unless the Court has any

23   questions on the controlled composition clause.

24           **THE COURT:** Go ahead.

25           **MR. KLAUS:** Second argument which is the implied

1    license argument which is -- the cases are clear that even

2    if a license has not been created by a writing, a license

3    can be created by conduct.  It can be created by a work

4    being turned over to the defendant with the intent that the

5    defendant distributed it, and some objective manifestation

6    of that.  And what the cases -- and there are several cases

7    which we've cited in our papers.  There's the <u>Effects</u>

8    <u>Associates</u> case from the Ninth Circuit.  There's the <u>I.A.E.</u>

9    case from the Seventh Circuit.  There's the <u>Johnson v Jones</u>

10   case from the Sixth Circuit.

11          What those cases say is that the number one

12   factor in terms of determining whether or not the plaintiff

13   implied a license, is not when the plaintiff comes into

14   court and says I never intended for that to be done, I

15   never wanted them to do that because that sort of

16   subjective manifestation is always subject to after the

17   fact revision.  What the cases say is the single most

18   important factor is the objective manifestation by taking

19   money and by keeping it.  And here, there is no doubt

20   that's exactly what's happened with respect to all the

21   challenged uses.

22          As of the end of the fourth quarter of 2007 as is

23   set forth in the Linda LeMoine declaration filed with the

24   motion, we know that more $640,000 has been paid to the

25   plaintiffs for the digital uses.

1          We now have what we've resubmitted as Exhibit P

2     of Ms. LeMoine's declaration in the replied brief in

3     support of the motion.  The most recent royalty check that

4     they have covering exactly the uses that they didn't intend

5     to cover.  That check is dated August 6ht, 2008.

6          The only response that they have on the implied

7     license argument, your Honor, is it was too difficult for

8     us to understand or read the royalty statement to know what

9     was being covered, and it was too difficult for us to go

10    and figure out what money we should have had to give back

11    to you.  But the reality is, your Honor, they've never once

12    said including as recently as August of this year, they've

13    never once said that what you should do is -- they never

14    said, we don't approve of the digital uses, we know you're

15    making them, cut us a new check, leave those out.  They've

16    never said it.  They took the money and under the case law,

17    your Honor, we think that clearly creates a license.

18         Third argument, your Honor, which is the other

19    agreements that are in the case.  I will touch on those

20    briefly.  They are summarized in a chart that we have

21    submitted along with our motions.  That is Exhibit 22H to

22    the reply brief that was filed on October 15, Ms. LeMoine's

23    declaration. It goes through one by one, composition by

24    composition.  I point the Court to what agreements, perhaps

25    the license of the 1998, the 2003, the sound track

1    agreement for the movie "Eight Mile" which covers the

2    compositions, an agreement between a company that's called

3    Shade Records which is owned by Mr. Mathers and his lawyer

4    Mr. Rosenberg, and that distributes his work through

5    Interscope Records and Aftermath also related to the

6    defendants.

7         It also points where the mechanical licenses are.

8    Then the chart was updated, your Honor -- the chart was

9    updated on the mechanical licenses to make clear that there

10   are -- there are mechanical licenses that covered some of

11   these compositions that have been granted by a company

12   called Ensign or Famous Music which we found out had the

13   right to do that when the plaintiffs produced to us on

14   August 28th, a copy of an agreement which showed that they

15   had what's called a co-publishing agreement with Ensign and

16   therefore the mechanical licenses that we have from Ensign

17   were covered.

18        I don't want to go through that.  The only point

19   that I will make about the -- something I want to make

20   about these agreements, two-fold.  One is there is no

21   dispute that the language of the -- a number of these have

22   their own controlled composition clauses.  The plaintiffs

23   do not have the argument that they try to make with respect

24   to the Eminem agreements of 1998 and 2003 that talk about

25   the language which said "will be licensed."  And so "will

JOAN L. MORGAN, OFFICIAL COURT REPORTER 313 964-5489

1    be licensed" means there has to be a license in the future.

2    What they say is they are hereby licenced.  They don't have

3    that argument, number one.

4            Number two, they say that the other authors have

5    no right to distribute -- the other authors have no right

6    to grant any of these licenses because they're subject to

7    their own publishing agreements which create restrictions.

8            But there are two problems with that.  First of

9    all, there is no evidence of what those other agreements

10   are with respect to the other co-authors.

11           What you have instead is Mr. Martin who is the

12   principal of Martin Affiliated, and he's the manager of

13   Eight Mile Style, the main representative of the plaintiffs

14   in this case, says in paragraph 15 of his declaration in

15   opposition to the summary judgment motion, your Honor, he

16   says, "I am familiar with the fact that states that these

17   co-authors have agreements with other companies, but I'm

18   confident that those agreements contain restrictions."

19   Doesn't say that he knows, doesn't say that they've seen

20   any of those agreements with the other publishers.  There's

21   no evidence that they do.

22           But the second and more important point, your

23   Honor, is that there's no evidence that the defendant,

24   Aftermath Records, which obtained the licenses from these

25   other co-authors, had any notice that there was a

1    restriction on the part of any of these other entities to

2    grant the licenses.

3           The law is clear, we've got the citations in our

4    brief, and without the notice they're like any other party

5    that can rely on somebody who said -- as Eminem in the 1998

6    agreement and the 2003, that he has the right to grant the

7    licenses.

8           Those are the -- I believe those are the points

9    with respect to the three arguments that are in the motion,

10   your Honor.  I'm happy to -- I understand there's a lot of

11   paper.  I'm happy to address any questions that you may

12   have.

13          **THE COURT:** What about all the other claims in the

14   complaint, tortious interference?

15          **MR. KLAUS:** Oh, I'm sorry.  The --

16          **THE COURT:** Consumer Protection Act, all of that.

17          **MR. KLAUS:** I think our papers were not clear on

18   that, and I apologize, your Honor.  We filed a stipulation

19   I believe in April or May where plaintiffs dismissed the

20   other claims.  So they're not in -- there's -- I'm sorry it

21   wasn't clear.  There's only the --

22          **THE COURT:** The only claim is copyright

23   infringement.

24          **MR. KLAUS:** That's correct, your Honor.

25          **THE COURT:** Okay.

         **JOAN L. MORGAN, OFFICIAL COURT REPORTER 313 964-5489**

MOTIONS                                              19
THURSDAY, DECEMBER 4TH, 2008

1        **MR. KLAUS:** It made -- striking those other claims

2    out it made writing the motion somewhat easier.

3        **THE COURT:** Good.

4        You'll have rebuttal.

5        **MR. KLAUS:** Thank you, very much, your Honor.

6        **MR. BUSCH:** Good morning, your Honor.

7        Richard Busch, on behalf of the plaintiffs.

8        Your Honor, Mr. Klaus' argument arises from one

9    very flawed premise, and the flawed premise from which it

10   arises is that Aftermath and Apple had a license by virtue

11   of the mechanical royalties section in the 1998 and 2003

12   agreement. That is the premise upon which his argument is

13   based, and that premise because of its flaw destroys his

14   entire argument.

15       I just want to briefly address the point -- or

16   some of the points that Mr. Klaus made and then I will

17   respond to the other points in the summary judgment motion.

18       First, Mr. Klaus begins by saying that this

19   agreement in 1998 and 2003 between F.B.T. which is an owner

20   of the master recordings and Aftermath which has in it what

21   he calls a controlled composition clause but which in

22   effect the mechanical royalties section states all

23   controlled compositions will be licensed to Aftermath and

24   its distributors like these at a certain rate.  It is not a

25   license by its own terms.  It simply provides for a reduced

1 rate when eventually a license may be signed.  But for

2 purposes of copyright infringement one has to remember

3 this: You have to have the license from a publisher in

4 order to reproduce a musical composition.

5    Mr. Klaus says that we are reading that language

6 to say just the contrary, that we will not license the

7 composition.  That is absolutely false and a

8 misrepresentation of our argument in this case.

9    With respect to physical products, we have always

10 negotiated the terms of separate licenses with Aftermath

11 and entered into those agreements.  They are separate

12 agreements.  You cannot, you cannot simply say, well, we

13 think you have an obligation to enter into a license so

14 we're going to commit copyright infringement. You can't do

15 it.  You have to have the license, and we always enter into

16 a license when negotiated with respect to the compositions

17 that are at issue in this case.

18    But Mr. Klaus said something else in his argument

19 on his express license point, he says either Aftermath has

20 the license or -- this is a quote, "they have a right to a

21 license."  But even if Aftermath believed they had a right

22 to a license with respect to composition, that does not

23 transform itself into a license that gives them a right to

24 exploit musical composition.  It just doesn't do it, and

25 that's a fundamental flaw in his argument.

JOAN L. MORGAN, OFFICIAL COURT REPORTER 313 964-5489

MOTIONS                                                     21
THURSDAY, DECEMBER 4TH, 2008

1          He also says that the -- and this is every

2     important -- he also says the agreement -- now remember the

3     agreement that he's referencing, the 1998 and the 2003

4     agreement, is between -- and this is very important, it's

5     not between the plaintiffs in this case and Aftermath, it

6     is between separate parties.  It's between a company called

7     F.B.T. Productions that own the master recordings and

8     Eminem and Aftermath.

9          There are two separate rights in copyright.  This

10    is very important.  There is a right to master recordings,

11    there's a copyright to master recordings, and there is a

12    separate copyright in a musical composition.

13         The second point on the exploitation or this

14    supposed express license that they claim the 1998 and 2003

15    agreement gives them is the language about the right to

16    exploit master recordings.  Those are not compositions,

17    master recordings.  He says, well, under the agreement

18    F.B.T. gave them the right to exploit master recordings in

19    all forms of media now known hereinafter created.  That's

20    correct.  We're not disputing that.  But you know what the

21    problem is, and the problem with his entire argument is

22    he's trying to take a contract that was drafted in a way

23    that does not provide them the right they're claiming

24    herein and they are trying to say, well, we didn't draft it

25    right, we don't have the right but we're going to try to

JOAN L. MORGAN, OFFICIAL COURT REPORTER 313 964-5489

1    fanagle them and put a square peg into a round hole.

2            If you look at the mechanical royalties section

3    which is the right -- which is the section that we're

4    talking about here, there is no reference to record -- the

5    right to exploit records or master recordings, the

6    compositions in records or master recordings as that term

7    is defined in the master recordings section.  In other

8    words, there's no tying the two together.  So you have to

9    have the right to exploit the master recordings, but when

10   you go back to the mechanical royalty section and you look

11   at what it says, there's -- they could have said, you

12   hereby license to us the musical compositions to exploit in

13   records as that term is defined later.  They could have

14   said that.

15           In fact, in the other, quote, unquote, third-part

16   agreement that they entered into and they submitted to this

17   Court, they did that.  They know how to draft a contract

18   that does what they want it to do.  They just didn't do it

19   here.  And they have to live with the contract as it's

20   drafted here.

21           The other point -- well, that's -- well, the

22   other point that he made -- well, those are two points on

23   the direct license.  So I want to go back now for a second

24   and I want to go through -- and rather than continue to

25   address his points, I want to go back to points that I now

JOAN L. MORGAN, OFFICIAL COURT REPORTER 313 964-5489

1     want to make with respect to the first issue in the case

2     which is: Does the 1998 or 2003 agreement that's referenced

3     in this case, does that grant an express license?

4              Before I do, your Honor, I think it's important

5     to say what this case is about.  The plaintiffs in this

6     case are Eight Mile Style and Martin Affiliated.  They are

7     Detroit publishers and they are responsible for accounting

8     to their writers, Eminem, Marshall Mathers, Louie Resto,

9     and the Bass Brothers, Mark and Jeff Bass.  They have a

10    duty, they have an obligation to writers to ensure they are

11    being accounted to accurately from third parties, and that

12    there's transparency in the accounting.  That is what this

13    case is all about, your Honor, that's what this case is all

14    about.

15             A few fundamentals along those lines. The

16    Copyright Act gives a music publisher the exclusive right

17    to license his compositions for the manufacture and

18    distribution of records. They have the exclusive right to

19    do so.  A party reproducing product, that's Apple.

20    Remember, Apple's the defendant in this case.  Aftermath

21    intervened.  Apple was the party that was sued.  A party

22    reproducing product must have a valid license from a music

23    publisher in order to lawfully reproduce a musical

24    composition.  They have to have it.  If they don't have

25    that license or it's not valid, they are liable for

1    copyright infringement.

2            Because it's the party reproducing and

3    manufacturing composition, that maintained the sale

4    records, Apple, I-Tunes, the biggest reproducer of musical

5    compositions today, in the world, by virtue of their I-Tune

6    store, they keep all accounting records.  They know the

7    sales.  And then it's the same way, for example, with the

8    parties who are releasing records.  That's why we get

9    licenses for the party that's reproducing records, the

10   party that's reproducing because they are the ones that are

11   the keeping the accounting records and in order to know

12   whether their accounting records are accurate, you have to

13   have a direct relationship with them, and that's why in the

14   industry you enter into those licenses directly with those

15   parties.

16           So the only way a music publisher can have

17   transparency in accounting and an account -- and fulfills

18   its duty to its writers is to have a direct license with

19   the party reproducing the compositions which would give

20   them audit and accounting rights.

21           This is what Eight Mile was entitled to and is

22   seeking in this action.  There is no -- and you can't, you

23   cannot say or Aftermath cannot say that they could take

24   some language from an agreement that's not a license and

25   somehow extrapolate that it is.  You can't do it.  And

JOAN L. MORGAN, OFFICIAL COURT REPORTER 313 964-5489

1   because Apple -- they don't have a license, Apple is liable

2   for infringement, and if they want to cure it, they need to

3   get a license from Eight Mile.

4          Okay, your Honor, some points on the express

5   license as a matter of the law on this issue.  This

6   contract was governed by California law, the 1998 and 2003

7   agreement.  And what the law in California says is that a

8   trial court must provisionally receive any proper extrinsic

9   evidence which is relevant to show whether the contract is

10  reasonably susceptible of a particular meaning.  It's

11  reversible error to refuse to do so based on the court's

12  conclusion that the language in the contract is clear and

13  unambiguous on its face.  That's Morrey v Vannucci, 64 Cal.

14  App.4th 904. In determining what the meaning of the

15  language is the court is look at the subsequent conduct of

16  the parties.

17         First of all, in our view directly contrary to

18  Mr. Klaus' view, the language of the agreement is, in fact,

19  clear.  There is no license.  You cannot read language to

20  say that F.B.T. and its affiliated real license to

21  Aftermath and its distributors/licensees as a license

22  itself.  All they're saying is that we will license to

23  Aftermath and its distributors/licensees at a certain rate,

24  at a reduced rate.  I'm going to get to that in a minute

25  when I get to the point about why it doesn't apply to

MOTIONS                                           26
THURSDAY, DECEMBER 4TH, 2008

1    digital downloads, and we'll get to that in a minute.  But

2    you cannot take that language and say that's a license,

3    it's just not.  It doesn't have any of the indicia of a

4    license, it doesn't say it's a license, it doesn't have any

5    audit rights, it doesn't have any accounting rights, it

6    doesn't have any payment terms, it has nothing that you

7    would find in a license. So we believe it's clear that it's

8    not a license.  That's point number one.

9            It's not self-effectuating.  It doesn't have --

10   Mr. Klaus points out they submitted to this Court after

11   discovery closed thousands of pages of agreements,

12   recording agreements.  Those recording agreements say in

13   what they would call controlled composition clause that the

14   compositions are quote, unquote, hereby licensed.  And in

15   many cases say for digital.

16           They know how to draft it right. They didn't

17   draft it right here such as they want and they have to live

18   with their contract that they drafted.

19           As I said, it omits material terms in a license,

20   audit rights, accounting rights, things of that nature, and

21   they contemplate the parties will thereafter do something,

22   but it's not a license.

23           Now, even though we think it's clear that it's

24   not a license the extrinsic evidence is overwhelming in

25   this case that the parties both understood that you had to

JOAN L. MORGAN, OFFICIAL COURT REPORTER 313 964-5489

MOTIONS                                                                27
THURSDAY, DECEMBER 4TH, 2008

1    negotiate a separate license for digital downloads.  And it
2    may be putting the cart before the horse, your Honor, but I
3    do want to say one thing.
4             Mr. Klaus, again, misrepresents our argument when
5    it comes to digital downloads, okay.  When it comes to
6    digital downloads, what the law says is you cannot have
7    reduced rates, you cannot have caps.  The caps are what
8    record companies will do is say you might release 12 songs
9    on an album, we're only to pay for nine or ten, okay,
10   that's what a cap is.  And the Copyright Act says you can't
11   have reduced rates and you can't have caps.
12            Why do we say it doesn't apply to digital
13   downloads to this contract, this contract report, because
14   it's not a license -- because it's not a license by its own
15   terms and because the only purpose of it to do two things:
16   reduce the rate and put on caps.  Since you can't have
17   reduced rates and caps, it's toothless.  That mechanical
18   royalties section is absolutely toothless and cannot apply
19   to permanent downloads, period.  It would be -- it's a
20   educational exercise perhaps to say what if it did this,
21   and what if it did that, and what if the language was
22   different were to apply to digital downloads, but guess
23   what, it doesn't.  And you have to live with the contract
24   you have, and so this mechanical royalties section is
25   absolutely ineffective as it applies to permanent

1     downloads.

2              But -- let's talk about the extrinsic evidence to

3     make it clear that even Aftermath knows that to be the

4     case.  First, in 2001, Aftermath sent a letter to Eight

5     Mile -- or Universal does to Eight Mile and to others

6     saying they're going to start making songs available for

7     digital downloads and they quote, unquote, hope that Eight

8     Mile will sign a license.  There would be no need for a

9     hope of them signing a license if, in fact, the permanent

10    downloads were covered by the mechanical royalties section.

11             Secondly, and perhaps even more importantly, is

12    what happened in 2002.  The song, "Lose Yourself" is one of

13    Eminem's biggest songs.  It was featured prominently in the

14    "Eight Mile" movie.  The defendants contacted Mr. Martin

15    and asked to enter into a permanent download license for

16    the song "Lose Yourself."

17             Now, if they had the right, if they had the right

18    under the mechanical royalties section to make it available

19    without a license, why would they have contacted Mr. Martin

20    to do so?  But even more importantly, the two sides

21    negotiated terms.  One of the terms was a two-year term.

22    If you had a right to enter into a -- make "Lose Yourself"

23    available for permanent downloads under this mechanical

24    royalties section, why would you enter into a digital

25    download license with a two-year term?  It makes no sense.

JOAN L. MORGAN, OFFICIAL COURT REPORTER 313 964-5489

1    There were many other terms that were negotiated.  There

2    was no reason to do so if, in fact, you had that right.

3              Thereafter -- and let me back up one second.  Mr.

4    Martin agreed to the "Lose Yourself" license.  It was never

5    returned executed by the defendants, but Mr. Martin agreed

6    to the terms.  He thought there was an agreement on the

7    terms.  He thought there was an agreement on the terms, and

8    believed he was being paid for "Lose Yourself" thereafter.

9              So -- and in this case by the way, Universal to

10   the every end of discovery never admitted there was an

11   agreement, but ultimately at the end of discovery claims

12   that there was.

13             Thereafter, Universal sent multiple requests for

14   digital download licenses with the same terms that had been

15   negotiated on "Lose Yourself" license for digital

16   downloads, Mr. Martin said, no, I'm not doing it, "Lose

17   Yourself" was a one-time thing we negotiated.  We

18   specifically said it would be a trial because digital

19   downloads were new, he didn't know about accounting, he

20   didn't know whether it would satisfy the need for

21   transparency, he didn't know any of those things we

22   negotiated.  The "Lose Yourself" license was very early in

23   the permanent download process, and the people from

24   Universal who were involved in those negotiations all said

25   they understood that this was a trial or at least Patricia

1    Blair said -- who was the person who negotiated it, she

2    remembered that there was a discussion, it was a trial

3    matter, and everyone said, Tim Hernandez submitted an

4    affidavit.  He was in the department at the time.  Chad

5    Gary, still in the department.  Pat Blair was deposed.

6    They all said that they knew that Mr. Martin back then

7    objected to any of these compositions being exploited for

8    permanent downloads.  They were all aware of his

9    objections.  It was only "Lose Yourself" that was

10   negotiated on a trial basis and everyone back then knew of

11   the objections.  This was not a concocted after the fact

12   objection.  All the way back in 2002-2003 -- we submitted

13   Tim Hernandez's declaration.  Tim Hernandez was in the

14   legal -- the business and legal affairs department at

15   Universal at the time.  We submitted his declaration in

16   this case that everyone in the department was aware of

17   those objections.  Ms. Blair testified that people were

18   aware of the objections, okay.  So this is not a concocted

19   after the fact thing.  These objections were well known and

20   Mr. Martin testified on making the objections over and over

21   and over again.

22          Next point, two people have testified in this

23   case about this.  Universal has a practice where they have

24   a mechanical royalty or controlled composition clause in

25   their contract.  If it's ambiguous and they don't think

1    that it might give rights that -- if they're not sure

2    whether rights are granted or not they will send out

3    requests for licenses.  If they feel confident that a

4    controlled composition or mechanical rights clause gives

5    them certain rights, they will send out an advice letter.

6        Mr. Leo Ferrante testified to that in his deposition

7    that he understood that to the be practice.  He was with

8    Universal's copyright department.  And between the time of

9    our summary judgment filing and today, Peter Paterno who

10   was their expert, testified that he understood that to be

11   the practice, too.  Well, guess what?  We never once got an

12   advice letter from Universal.  They sent requests for

13   licenses because they know that the mechanical royalties

14   section is not a self-effectuated controlled composition

15   clause for either physical or for digital.

16         Next point on this extrinsic evidence, Universal

17   sent licenses to -- license requests to Eight Mile and Mr.

18   Martin for both physical and digital requests.  We put this

19   in our papers.  They would not have done so had they

20   thought that even for physical that the mechanical

21   royalties section would self-effectuate.  Mr. Martin sent

22   back his own licenses only for physical.  He took out the

23   reference to digital every single time.  Again, consistent

24   with all of his objections he had been making since 2002,

25   about not making these songs available for digital

1    download.

2            Lastly on extrinsic evidence, and I think most

3    damning to Universal, so "Lose Yourself" -- and the one

4    negotiated digital download with respect to "Lose

5    Yourself."  Universal never returned it, never executed it

6    and returned it.  In this litigation we asked them did you

7    approve this, was this approved back in 2002, was this a

8    license for digital download that had been agreed to by

9    Universal?  We got -- we couldn't get a straight answer.

10           At the very end of discovery -- it might have

11   been after discovery closed, I finally got a letter from

12   Mr. Klaus saying Universal will stipulate that they did

13   negotiate and agreed to the terms for "Lose Yourself"

14   license back in 2002.

15           What did we do?  We -- because it was a two-year

16   term, with a right to terminate, the plaintiffs terminated

17   the license, terminated it for "Lose Yourself."

18           What did Universal do in response?  Did they say,

19   well, you know what, we don't need a license we have the

20   mechanical royalties section.  No.  They sent out, and this

21   is in our papers, they sent out a notice of compulsory

22   licensing meaning that they were going to exercise from the

23   Copyright Act imposing the right to enter into a compulsory

24   license for "Lose Yourself."

25           Now, we don't need to get into it right now

1    whether that compulsory license is or was not effected, but

2    it certainly is an admission by Universal that they know

3    that they can't rely on the mechanical royalties section

4    and that they would have to have a separate license since

5    they terminated the "Lose Yourself" license once they

6    admitted that it was effective.  The fact that they went

7    ahead and issued compulsory licenses certainly is an

8    admission that they know that mechanical royalties section

9    does them no good, no good.

10         So, your Honor, this is a summary judgment and

11    there only has to be a genuine issue of material fact for

12    the Court to deny summary judgment.  The language of the

13    agreement we think actually favors us, but even if it's

14    ambiguous all of the extrinsic evidence in the case

15    supports the notion that everyone understood that that

16    mechanical royalties section is not an express license.

17         Now, I want to address one other thing in that

18    regard before I get to the next point that's important

19    which is this notion of the language of Aftermath and its

20    distributors/licensees that F.B.T. and its affiliates will

21    license to Aftermath and its distributors/licensees, and

22    I'll get to that issue in a second.

23         Mr. Klaus interprets it one way.  He says --

24    first of all, he misinterprets it to be a license.  But

25    there is a very interesting way one can interpret that

1    also.  The interesting way one can interpret it is to say

2    that under that agreement that the parties recognize that

3    F.B.T.'s affiliates have the right to enter into a license

4    later with Aftermath's licensee.  And since Apple is

5    Aftermath's licensee, purported licensee, we should have

6    the right to enter into a license separately with Apple.

7    So that's a separate issue but it's certainly another way

8    that one can interpret that language.

9          The next point which I've covered -- oh, I want

10   to also address the Reinhardt case since Mr. Klaus

11   mentioned that case.  The Reinhardt case is completely

12   distinguishable and not on point because, again, you have

13   to live with the contract we have in this case.  And in the

14   Reinhardt case the songwriter authorized his publisher to

15   license a song to issue and the publisher granted a license

16   to the defendants for "to electronically distribute and

17   duplicate non-physical digital copies."  That was

18   specifically the grant of right in that contract.

19         Here, when it comes to a composition, there is no

20   similar language as it relates to musical compositions. I

21   wanted to make that point as well.

22         Okay, with regard to the mechanical royalties

23   provision not applying to digitals which Mr. Klaus -- this

24   is our next point.  I believe I addressed that a few

25   moments ago by saying that our point there -- our primary

1    point there is that because this language in this contract

2    says that we will license for a reduced rate and for

3    certain caps, and because as a matter of law you can't do

4    that for digital, there's no application for digital in

5    this contract.  It would be as I said an academic exercise

6    to go through and say well what if this, and what if the

7    language said this, and what if the language said that.  It

8    just doesn't say it here.

9              And we do submit the custom and practice in the

10   industry through Mr. Sullivan that all these record labels

11   in fact do license compositions for digital downloads

12   separately.

13             Okay, let's see here.  Let's go to the implied

14   license, I think that's the next argument that Mr. Klaus

15   raised.  The Sixth Circuit has made it very clear that

16   there are several elements to find an implied license.

17   There must be a request for the creation, a creation and

18   delivery and an intent that the license be copied and

19   distributed in the manner in which it was distributed.  The

20   Sixth Circuit has said and this is from the Johnson v Jones

21   case, the most important element of an implied license is a

22   finding that the "copyright owners intended that their

23   copyrighted works be used in the manner in which they were

24   eventually used.  Without intent, there can be no license."

25             Well, here, your Honor, as I said all of the

1      evidence -- there is uncontradicted evidence in this record

2      that Joel Martin for Eight Mile objected and objected and

3      objected and objected and that from 2002 onward he made it

4      very clear he did not want his composition licensed for

5      digital download because there was no transparency in the

6      accounting, because he couldn't be sure that -- using the

7      account directly and he wanted a direct relationship with

8      Apple.

9              And, in fact, the party from Universal said that

10     the one license, "Lose Yourself" license that was entered

11     into, this lawyer said she remembered there was something

12     about it being a trial license to see how things went.  So

13     there were objections and Mr. Martin has testified to the

14     objections, people from staff who have dealings with

15     Universal testified in this case about the objections, and

16     Tim Hernandez said it was well known so there was no

17     consent to any of this.

18             Now, let's get to the main point that Mr. Klaus

19     makes.  The main point that Mr. Klaus makes in connection

20     with this argument is that Eight Mile cashed checks, okay.

21     True, Eight Mile did cash checks.  But -- and this is the

22     important but -- several things.  One, Universal sends one

23     check as part of its accounting.  It contains 95 percent if

24     not more of physical product sales, 95 percent if not more.

25             Secondly, remember what -- I mentioned this,

MOTIONS                                    37
THURSDAY, DECEMBER 4TH, 2008

1    there was a digital agreement entered into for Master
2    Tones, which is when your phone rings and it might play a
3    song  or something, or two seconds of a song.  In 2004, I
4    believe there was an agreement entered into between Eight
5    Mile and Universal for Master Tones.  And then there was
6    the "Lose Yourself" license that Eight Mile expected to be
7    receiving money for.  So when Eight Mile gets these
8    statements all it says is "other," list "other."  Doesn't
9    break it out by phone and Universal -- as far as Eight Mile
10   is concerned they believe that what they're getting is
11   money for the physical product as well as for the "Lose
12   Yourself," as well as for the Master Tone.  There is no
13   knowing acceptance of money with respect to these other
14   compositions and Universal lists on their accounting sheet
15   "other," and "digital."  So the digital could be for the
16   Master Tones, could be songs for license for Master Tones.
17   It doesn't break it down by permanent download.  It doesn't
18   say -- it certainly doesn't say Apple.  It doesn't say
19   permanent download.  It says "other" and it says "digital."
20   And because Universal and Eight Mile entered into an
21   agreement, entered into it again for Master Tones, the
22   digital would fall under Master Tones, and 95 percent of it
23   was physical.
24           And so the point is this:  Knowing the objections
25   of Eight Mile, knowing they objected to their songs being

JOAN L. MORGAN, OFFICIAL COURT REPORTER 313 964-5489

1    licensed for permanent download, knowing they wanted a

2    direct relationship with Apple, an unscrupulous defendant

3    who knew that they would be perhaps guilty of copyright

4    infringement could not -- I'm not suggesting that Universal

5    is unscrupulous in this regard, but if they wanted to

6    simply camlouflage money with other money, send one check

7    to a publisher who has the duty to account to his writers

8    and pay writers who are hungry, who need money, who expect

9    to get paid, and say, oh, you cashed that check.  We didn't

10   tell you that there were permanent download sales for this

11   song or that song or this song, we just put it as  "other"

12   or "digital" so you didn't know, but now you've ended up

13   with an implied license.  There certainly is a question of

14   fact on this issue.

15           Okay, the "Farm Club" case I think, your Honor,

16   is particularly instructive in this case because the

17   relevance to the "Farm Club" case is that Universal tried

18   to do the same thing they're trying to do here.  They're

19   trying to take a license that doesn't provide certain

20   rights.  In the "Farm Club" case, they tried to take a

21   license that didn't provide certain rights and use it for

22   digital and the court said, no, you've got -- licenses are

23   narrowly construed and you've got to live with what the

24   language says.

25           Here, there's not even a license.  There's not

1    even a license, but the same theory applies.  They have to

2    live with the language in the agreement that they drafted,

3    and as the drafter all inferences are against them.

4            I'd like to talk I guess lastly about the

5    plaintiffs' motion to -- well, it's not our motion to

6    exclude late-produced documents, it's the late-produced

7    documents, the third-party agreements that Mr. Klaus made

8    reference to in the last part of his argument.

9            He made reference to a chart they supplied.

10   First of all, it's really -- it's unbelievable quite

11   frankly.  Mr. Klaus says we have these third-party

12   recording agreements, these third-party documents, and

13   while plaintiffs say that these artists might not have had

14   the rights to grant licenses, there's no evidence of it.

15   And he says well they might, Universal might not have --

16   they might have known -- he said they might have known, or

17   they should have known that these artists didn't have any

18   right, there's no evidence of it.

19           Every one of these documents were produced after

20   the close of discovery, every one of them.  And so -- and

21   many of them, many of them produced with their summary

22   judgment motion for the first time.  So certainly

23   plaintiffs should not be prejudiced by the fact that

24   documents just produced, there's no evidence to rebut -- or

25   to discuss whether, in fact, these artists did or did not

1    have certain rights, or what Universal's knowledge was, we

2    would need to take the depositions of all those people.  We

3    would need document requests.  We would need their

4    agreements with their administrators.  We would need to

5    depose different people from Universal.  They say, well,

6    you could have just asked for a Universal deposition.  It

7    wouldn't have been just one person.  We would have had to

8    depose individuals, their administrators.  We would need

9    documents.  There would be no way to address that point.

10   But even with all that said, the agreements themselves as

11   set forth in our chart that we submited show that with

12   respect to many of the songs there's no license for

13   digital.  So we have in Exhibit 2, the Patrick Sullivan's

14   declaration, we have broken down by sections the different

15   documents that were produced.  The first section is

16   purported license agreements that make no mention of DPDs.

17   And licenses are narrowly construed that if there's no

18   mention of a DPD as an exploitation they don't have digital

19   download license.

20          Section 2 of Exhibit 2 has certain documents from

21   the Harry Fox Agency, certain licenses, certain

22   percentages. And then we have a --

23          **THE COURT:** I have Exhibit 2.

24          **MR. BUSCH:** Okay.  Anyway, the document -- you

25   have it there.  Those are -- well, that that's argument.

**MOTIONS**                                                                 41
**THURSDAY, DECEMBER 4TH, 2008**

1          I think that's all that I have, your Honor,

2     unless your Honor has any questions.

3          **THE COURT:** No questions.

4          Rebuttal?

5          **MR. KLAUS:** Thank you, your Honor. I will try to

6     be brief.

7          First, I want to start with the implied license

8     argument that -- Mr. Busch said we get one check, how are

9     we to know if there's income that there's for permanent

10    downloads that are being made other than for "Lose

11    Yourself."  Well, that argument is based on statements that

12    were said in 2002, 2003.  It doesn't explain why a year

13    after filing the lawsuit, they're still getting the check

14    that includes the money for it and they're still cashing

15    it.  And, again, it's not that they're saying -- it's not

16    that they're saying it's a hassle to go through for them

17    and say, well, I figured it out that this particular line

18    doesn't count for it so I'm going to have to cut a check

19    and send it back to you.  They could say, send me a check

20    that doesn't include those uses.  I don't want to take your

21    money for it, and they've never asked for it.  What the

22    evidence shows is that they continued to deposit the check.

23         I would also like to point out, Mr. Busch said

24    how are we to know, how are we to know because it said

25    "other"?  Well, the statements that were said in 2002 and

**JOAN L. MORGAN, OFFICIAL COURT REPORTER 313 964-5489**

1    2003 did say "other."  The more recent statements over the

2    last couple of years as indicated in the exhibit to Ms.

3    LeMoine's declaration, first of all, there's no mistake

4    whether it's "Lose Yourself" or some other composition,

5    they list all the compositions, they break them out

6    individually, and they say in "sales type" they don't say

7    "other" they say DNLD, download.  And at the same time

8    by -- I would also point out there's an exhibit that was

9    submitted by Mr. Busch on behalf of the same plaintiffs in

10   the F.B.T. and Em2M capacity which shows artist royalty

11   statements, the payments for the sound recording as oppose

12   to the composition, sent to exactly the same person, Mr.

13   Martin, at exactly the same address, for exactly the same

14   compositions that say permanent download.  It's just not

15   plausible for them to say they didn't know they weren't

16   getting them.  And the bottom line is it doesn't matter

17   because they've been on notice of this at least since

18   they've filed their lawsuit, and they still cashed the

19   check.

20          And what was important in the Johnson v Jones

21   case, your Honor, was there was no payment of money.

22   Didn't take any money, didn't deposit it in the bank.

23          And the other case, Effects Associates, what it

24   stands for is the proposition that the best evidence of the

25   objective intent is if somebody takes the money and cashes

1     it at the bank.

2             Let me respond to a couple of other points.  Mr.

3     Busch said I mischaracterized his argument in terms of

4     saying will, will not.  What he said is they came to us and

5     we always agreed to give them something that was physical.

6     What I said was his argument is "will" can mean will not in

7     the case of digital and he didn't deny that, he didn't deny

8     that.  That is the essence of their argument.  All the

9     extrinsic evidence about agreements that are being sent to

10    Mr. Martin and licenses, their argument depends on the fact

11    that it is within their right under the contract not to

12    grant a license, that "will" can mean we will not for those

13    uses.

14        There was a reference to -- there was a reference by

15    Mr. Busch, the statement that the 1998 agreement involved a

16    different company, F.B.T.  I think the suggestion was that

17    doesn't bind Eight Mile.  That's not true.  It's F.B.T. or

18    its affiliates.  In fact, Mr. Martin at his deposition,

19    this was Exhibit 8(b), pages 320 to 322, even said, I

20    understand this has to apply to us because of the -- it

21    applies to us because of the affiliated language.  And what

22    he said was I always -- and he says it again in his

23    declaration in this case, the last paragraph of his

24    declaration, he said at least with respect to physical, I

25    always understood that this imposed an obligation to us to

1     agree to agree.

2            Mr. Busch said this case is about transparency,

3     and that we want better -- we want better audit rights, we

4     want a greater visibility into what Apple did.  If that's

5     the case, and "will be licensed" means that there has to be

6     a license in the future, he could have asked for it because

7     he said these additional terms that I want.  What he's not

8     free to say is I'm not going to grant the license for that

9     kind of use.

10           Now, he then says that the -- he says that I

11    misrepresented the <u>Reinhardt</u> case.  This is the case from

12    the Southern District of New York because in this case the

13    provision that I cited about now known or known technology

14    that -- the distribution know known or hereafter known

15    applies only to the sound recording rights.  And he says it

16    doesn't apply to composition rights and, therefore, we've

17    got you, you should have made it clear, you should have

18    made it clear.

19           Well, in fact, your Honor, the language that was

20    discussed in the <u>Reinhardt</u> case with respect to now or

21    hereafter known and I'm looking at page 354 of the Court's

22    opinion, the language about now known or hereafter known in

23    that case dealt with records, phonograph records for master

24    recordings.  It was the same type of provision that you

25    have at issue here.

1          He also, by the way, said that there's a critical

2     difference in the <u>Reinhardt</u> case because he said that the

3     publisher -- what he's trying to say is the person who

4     stands in the position of Mr. Martin and the Eight Mile

5     Style plaintiffs that person has granted the license for

6     digital uses, or that the license said that it was -- it

7     was electronically distributed duplicated non-physical

8     digital copies.  He said that wasn't here, you should have

9     had it in the 1998 and 2003 agreement.  He's wrong.  That

10    is not the language.  The party that was the analogous to

11    Mr. Martin was the plaintiff, Mr. Reinhardt who had the

12    composition right.

13         What he says -- and there's a very good reason

14    why his agreement didn't say anything about digital copies

15    because the band he was engaged with, the Ramones, they

16    made music in the early '80s.  That was before we even had

17    distribution.  It's not covered there.

18         The language that he was quoting is the language

19    that is from the record companies -- the record companies'

20    agreements with the digital provider.  It's just not

21    applicable.

22         Most of Mr. Busch's argument in terms of the law

23    and contract interpretation is you've got to look at the --

24    the Court has to receive extrinsic evidence.  The question

25    isn't whether the Court has to receive the extrinsic

1    evidence, the principle of California law is that one thing

2    that is clear the extrinsic evidence cannot be introduced

3    to be the exact opposite of what the agreement says.  If

4    the agreement is not reasonably susceptible to that

5    agreement you don't consider the extrinsic evidence.

6    That's the Reinhardt case.  That's the BMW case that we've

7    cited.

8           He then says that I misrepresented his position

9    on Section 115 about -- when I said their argument is that

10   under Section 115 by virtue of the -- provided different

11   royalty rates that DPDs are inapplicable to it.  In fact,

12   it's the heading of the argument in his brief that by

13   virtue of Section 115, controlled composition clauses or

14   the mechanical royalties provisions is inapplicable to

15   DPDs.  What it said was because there's a different rate

16   that provision is rendered absolute.  But sometimes there

17   are two things that the controlled composition clause says.

18   It really says the rate and the rate will be different by

19   virtue of 115, but it also says will be licensed.

20          I don't want to go through all of the points.  I

21   will say a couple of things.  Number one, the Blair

22   deposition excerpts that he cited in Exhibit 10 did not say

23   that she understood that this was a test.  The deposition

24   excerpt of Mr. Ferrante that Mr. Busch introduced where he

25   said Mr. Ferrante said if there was any ambiguity in the

1    agreement, not whether there was an advice letter, the

2    deposition expert cuts off where it says did they not send

3    an advice letter in the case of Eight Mile Style because

4    they knew about objections, didn't reproduce the answer,

5    the reason is that Mr. Busch didn't ask --withdrew the

6    followup question.

7            The third thing is -- he says the most damning

8    evidence here is "Lose Yourself" in the fact that they

9    wanted information about whether the license was effective

10   and we supposedly waited until the end of discovery to tell

11   them.  What we looked for -- when we did look, we looked to

12   see whether there was anywhere in Universal's files a

13   signed copy of the "Lose Yourself" agreement that Mr.

14   Martin sent back.  We didn't find one, and when we couldn't

15   find one, and we knew for certain we couldn't find one, we

16   told them that.

17           Now, he says we then -- he says -- he says, Mr.

18   Martin terminated that agreement and the most damning

19   evidence of Universal's position that it knew that it

20   needed some separate license, that it obtained a compulsory

21   license.  Not so.

22           What we said in a letter that is attached as an

23   exhibit, a reply declaration, is that the question of our

24   rights to "Lose Yourself" will be determined by the Court.

25   We think that what you've done in terms of trying to

1    terminate this is simply a -- it came after we filed our

2    summary judgment motion, that this was something that was

3    done to try to give you better evidence in the case.   We

4    said we didn't want to be distracted by it so there was no

5    doubt that we had the right, we were doing that.   It simply

6    cannot be the case.   If Mr. Martin believed as he said he

7    did in his deposition, that he had intended to grant the

8    license, that he intended it to be effective, it would have

9    been and it could have been terminated.   He didn't need us

10   to say anything about whether it was terminated.   He could

11   have said for the last year of discovery.   He could have

12   said I don't know whether you think it's effective, but

13   just so there's no doubt I'm terminating it now, and he

14   didn't.

15          On the affiliated versus unaffiliated

16   distributor/licensee point, your Honor, Mr. Busch said it's

17   interesting we could construe the language potentially to

18   mean maybe we should have the right, maybe under some

19   circumstances we could have the right to deal with it.

20          The problem is there's no reasonable construction

21   which the language is susceptible for them saying that they

22   have to have that direct relationship.   There's nothing

23   that says they have to.   In fact, your Honor, if you look

24   at the expert report that's submitted by their expert

25   witness on industry practice and custom, Mr. Sullivan, Mr.

1    Sullivan's declaration at Exhibit -- it's Exhibit 1 of his

2    expert report, page 14 of that expert report what he says

3    there are publishers who would like that but nobody

4    actually does it, the law doesn't require it, the law

5    doesn't require that there be a direct relationship.

6    Publishers would like to change that.  And Mr. Sullivan

7    talks about a statute that Congress had considered adopting

8    but it didn't pass during the last session and it's back

9    again that would create more of a direct relationship

10   between the licensees.  He says it doesn't exist in the

11   industry, it can't be the case, but it's something that's

12   not required and confused by their own expert, is actually

13   a requirement.

14          I'll get to -- the third-party agreement, mainly

15   what Mr. Busch said was that the documents were produced

16   after the close of discovery and he would have had to go

17   out and depose the world, but we said he could take one

18   deposition.  That's not what happened.

19          We set forth -- and we'll get to this when we

20   deal with the motion to exclude.  There was a motion that

21   was directed to this and there's a Court order.  Mr. Busch

22   never once said to us, I would need to depose anyone.  What

23   he said was, I'm going to move, I'm going to move, I'm

24   going move to strike all of these.

25          If the Court has any further questions --

1          **THE COURT:** No other questions.

2          Has everybody said all they have to say about

3     this summary judgment?

4          **MR. BUSCH:** I think so, your Honor.

5          **THE COURT:** I think the summary judgment must be

6     denied in this case.  We're going to have to try it anyway;

7     is that right?

8          **MR. BUSCH:** Yes, your Honor.

9          **MR. KLAUS:** I'm sorry, your Honor?

10         **THE COURT:** And there are a number of questions of

11    fact remaining so it will be denied.

12         **MR. KLAUS:** One question just to make sure we're

13    clear, you said the case would have to be tried anyway

14    regardless of the summary judgment motion, and I didn't --

15         **THE COURT:** No?

16         **MR. KLAUS:** I think if the summary judgment motion

17    is granted as to the copyright claim that deposes of the

18    case.

19         **THE COURT:** No, I said definitely no.  It has to

20    be tried, I'm afraid.  There are a number of questions of

21    disputed fact here.

22         All right.  The motion for striking --

23         **MR. KLAUS:** The motion to strike the declaration

24    of Patrick Sullivan.

MOTIONS                                                          51
THURSDAY, DECEMBER 4TH, 2008

1          **MR. BUSCH:** You're going to hear the defense

2     motion to strike --

3          **THE COURT:** Go ahead, and make it fast.

4          **MR. KLAUS:** Yes, your Honor.

5          In terms of this motion, it may be moot if the

6     Court is denying it, but to the extent the Court's denial

7     would be based on Mr. Sullivan's declaration and the chart

8     that was attached as Exhibit 2, our argument is that it's

9     undisputed that the attorney wrote the entire thing.  He

10    admitted he didn't change a word.  The email trail shows

11    that it was done by the attorney saying we need you to

12    respond to these other agreements.  And in deposition, he

13    said he admitted that he didn't know what some of the

14    things in the chart actually meant.

15         **THE COURT:** But you filed a response; didn't you?

16         **MR. KLAUS:** I'm sorry?  We did, indeed, submit a

17    response if it's treated as legal argument.  Our point,

18    your Honor, was that it was a -- the Court was clear and

19    there was more than 28 pages of briefing, the Court had

20    denied it, and we tried to get our brief done within that

21    space and time.

22         **THE COURT:** All right.  Thank you.

23         Response?

24         **MR. BUSCH:** Very briefly.  I'll try 30 seconds or

25    less.

**JOAN L. MORGAN, OFFICIAL COURT REPORTER 313 964-5489**

1          Response is that Mr. Sullivan drafted his expert

2     report.  The uncontradicted evidence is that he reviewed

3     these agreements as part of the preparation for the expert

4     report.  My office did working with him draft a report,

5     sent it to him for review and everything else, and he

6     confirmed it.  And there's no law that says you should

7     strike it under the circumstances.  At most, there are some

8     gray issues, and that's basically it, your Honor.

9          **THE COURT:** Any rebuttal?

10          **MR. KLAUS:** The only rebuttal point is, your

11     Honor, in his deposition he said he didn't know what they

12     meant.  It wasn't the case of the attorney helping the

13     expert, it was the case of something being done.

14          **THE COURT:** It will be received, it is received

15     and the motion's denied.

16          Now, we have --

17          **MR. BUSCH:** Plaintiffs' Motion to Exclude Late-

18     Produced Documents.

19          **THE COURT:** Thank you.

20          Let's go.

21          **MR. BUSCH:** I apologize.

22          Your Honor, our brief sets forth the chronology

23     in this case, but just very briefly.  The defendants in

24     this case did not deem it fit to serve Rule 26 disclosures

25     on us.  We served document requests and interrogatories in

MOTIONS                                                          53
THURSDAY, DECEMBER 4TH, 2008

1    discovery that certainly asked for production --

2            THE COURT: Were you prejudiced?

3            MR. BUSCH: Yes.

4            THE COURT: How?

5            MR. BUSCH: Prejudiced this way, all of these

6    documents were produced after the close of discovery.

7    We've had absolutely no ability to challenge any of these

8    licenses or do any of those things you would need to do --

9            THE COURT: Would you like more discovery?

10           MR. BUSCH: On that issue?  Yes.

11           THE COURT: Well, you may have it.

12           The motion -- well, go ahead, respond to the

13   motion.

14           MR. KLAUS: The -- two quick points, your Honor.

15   In terms of -- this was done -- there were, indeed,

16   discovery requests, as there is in every case.  The day of

17   our hearing before the magistrate judge in the case we came

18   to an agreement about how these would be entered.  It turns

19   out that the discovery cutoff -- it was known that there

20   would be additional documents.  This is the first time I've

21   heard Mr. Busch say that he would actually like additional

22   discovery.

23           I would point out just one other thing, your

24   Honor, because -- we're not the only party that produced

25   the documents after the close of discovery.  There were

JOAN L. MORGAN, OFFICIAL COURT REPORTER 313 964-5489

1    documents that were produced by the plaintiffs --

2              THE COURT: So do you need discovery?

3              MR. KLAUS: Yes, yes, we do.

4              THE COURT: All right.  Everybody may have

5    discovery for a month, right now, the month following this.

6              MR. KLAUS: I think we have a joint request in

7    terms of a timetable for discovery, your Honor, which is we

8    are both involved in the Los Angeles case, F.B.T.  That

9    case is scheduled -- the trial there is scheduled to start

10   February the 3$^{rd,a}$ and we are -- both of us are in the

11   unhappy situation right now of dealing with motions and

12   pretrial filings and the like.

13             THE COURT: I'm sure.

14             MR. KLAUS: And I think that the problem for the

15   next month is --

16             THE COURT: All right.  Do you need the month

17   after that?

18             MR. KLAUS: I think the reality --

19             MR. BUSCH: April 1st.

20             MR. KLAUS: I think that --

21             THE COURT: April?

22             MR. BUSCH: Our trial starts February 3rd and

23   we're going to be in trial for probably two weeks.  So once

24   we conclude that, 30 days after -- March 15th or so --

1          **MR. KLAUS:** March 1st.

2          **THE COURT:** All right. Discovery until April 1st.

3     You'll have to see the clerk as that will move back all

4     your dates.

5          **MR. KLAUS:** I understand that.  Thank you.

6          **MR. BUSCH:** If I may have some followup -- some

7     clarification, that's only on this issue -- on these two

8     issues that relate to these documents.

9          **THE COURT:** Only on this issue.

10          **MR. BUSCH:** Thank you.

11          **THE COURT:** Of the alleged late --

12          **MR. KLAUS:** And just so I'm clear, it works both

13     ways.

14          **THE COURT:** Yes.

15          And now we have --

16          **MR. KLAUS:** The defendants' motion to bifurcate

17     the case.

18          In terms of the motion to bifurcate, I don't

19     think we knew that was going to be on the calendar today.

20     I think -- as part of that with respect to awaiting the

21     summary judgment motion is now moot, the issue as to

22     whether we should await a liability determination at trial

23     before conducting what would be extensive and burdensome

24     discovery I think we're making -- it's going to be a bench

25     trial in the case and, therefore, what we submit is that it

**JOAN L. MORGAN, OFFICIAL COURT REPORTER 313 964-5489**

1      would be much more efficient and less expensive and I think

2      frankly it would be impossible for us to get the damages

3      discovery done in the 30-day time frame we talked about

4      following the other trial.

5              THE COURT: Thirty days?  It takes to April to get

6      one point.

7              All right.  Response.

8              MR. BUSCH: We vehmently disagree.  We think it

9      would be much more expensive for us if we have to go

10     through a trial and then -- it's not lengthy -- the only

11     thing we need to know is what their profits are.  It's not

12     going to take that much.  We would ask -- the bifurcation

13     is disfavored, that we should try everything in one case.

14     We don't want two trials on this, one trial.  The testimony

15     on damages will be probably short and sweet, and the

16     discovery will be I don't think that expensive or that

17     extensive so we're going to have to April 1st to do on the

18     late produced-documents.  You know, as I'm thinking about

19     it why don't we just work that into it as well?

20             THE COURT: Work what?

21             MR. BUSCH: Damage discovery and have that --

22             THE COURT: That has not been done?

23             MR. BUSCH: No, we've been --

24             MR. KLAUS: Damage discovery has not been done

25     because it's not -- Mr. Busch is not being candid.  It is

1    not a simple matter when he says damages discovery because

2    he understands from other cases that he's had with

3    Universal that the process of --

4              **THE COURT:** But we don't care about other cases.

5    We have only this one, and this one you assumed this motion

6    would be granted; is that right?

7              **MR. KLAUS:** I did not assume that this motion

8    would be granted.  The motion with respect to -- there's a

9    part of it which is damages discovery before summary

10   judgment, but there's also damages discovery for the trial,

11   your Honor.

12             And, again, in terms of bifurcation, there's not

13   a question of the same fact finder being confused or having

14   to wait.  The damages discovery will be burdensome and

15   expensive, and could entirely be mooted.  We just heard

16   from Mr. Busch --

17             **THE COURT:** Completely different witnesses?

18             **MR. KLAUS:** In terms of the damages discovery?

19   Yes.  The people who would be testifying to damages would

20   be an internal finance person at Universal who would

21   testify to the accounting issues.  There probably would be

22   an expert witness.  They have an auditor who is there

23   expert witness on the damages issue in connection with the

24   Los Angeles case.  I assume he would be their expert.  It

25   would be completely different witnesses on completely

1    different issues with respect to damages.

2           **MR. BUSCH:** Your Honor, just like in any case, we

3    would have probably somebody from -- one person from

4    Universal who would be deposed.

5           **THE COURT:** Completely different witnesses but not

6    completely different.

7           **MR. BUSCH:** Correct.  Someone from Universal.

8    Somebody from Apple, and maybe an expert.   A document

9    request, we're looking for a profit and loss statement.

10          I mean, this happens in every case, we can

11   probably do it over the course of a couple of days in one

12   trip, in a couple of depositions.  It's not that

13   burdensome.  And it would allow for one trial and not the

14   prospect which would be overwhelming to have a trial --

15   ramp up for trial, have a trial, and if we win, then have

16   to go through -- do the discovery all at once.

17          **MR. KLAUS:** Your Honor, the reason that he's

18   saying the depositions wouldn't be so difficult is the

19   discovery burden on this will fall entirely on us.  As the

20   declarations made clear, because the profit and loss

21   statements were not kept on an individual basis, it would

22   take an enormous amount of time to complete them.  It's

23   entirely a hundred percent different witnesses and that

24   expense and second trial on damages could be moot if the

25   disputed fact questions are resolved in our favor at the

1    trial, your Honor.

2            **THE COURT:** I will deny this motion.  It really is

3    unconscionable that you have not done discovery already on

4    that issue among all the others, but the motion is denied.

5    We'll try it altogether.

6            **MR. BUSCH:** So, your Honor, just to understand

7    your Honor's orders, I want to make care, we can do

8    discovery up through the date of --

9            **THE COURT:** Damages discovery and --

10           **MR. BUSCH:** Thank you.

11           **MR. KLAUS:** Your Honor, if I could, and I regret

12   asking, but we said that the April 1st would give us the

13   time to do the discovery on the other issues in light of

14   the F.B.T. trial.

15           **THE COURT:** April 1st will have to do.

16           **MR. BUSCH:** Thank you, your Honor.

17           **THE CLERK:**  The orders, the motion for summary

18   judgment, plaintiff --

19           **MR. BUSCH:** We'll draft them all.

20           **THE CLERK:**  Prepare an order on that.

21           **MR. BUSCH:** We'll draft all the orders.

22           **THE CLERK:** What you can do on the motion to

23   exclude late-produced documents, put the thing in there

24   about the discovery.

25           **MR. BUSCH:** Okay.

**JOAN L. MORGAN, OFFICIAL COURT REPORTER 313 964-5489**

MOTIONS                                                      60
THURSDAY, DECEMBER 4TH, 2008

1        **THE COURT:** Court is in recess.

2        (Proceedings concluded, 11:25 a.m.)

3                     -- --- --

4                    <u>CERTIFICATE</u>

5

6        I, JOAN L. MORGAN, Official Court Reporter for

7    the United States District Court for the Eastern District

8    of Michigan, appointed pursuant to the provisions of Title

9    28, United States Code, Section 753, do hereby certify that

10   the foregoing proceedings were had in the within entitled

11   and number cause of the date hereinbefore set forth, and I

12   do hereby certify that the foregoing transcript has been

13   prepared by me or under my direction.

14

15

16

17                    **S:/JOAN L. MORGAN, CSR**

18                    Official Court Reporter

19                    Detroit, Michigan  48226

20

21   January 7th, 2009

22

23

24

25

**JOAN L. MORGAN, OFFICIAL COURT REPORTER 313 964-5489**