UNITED STATES DISTRICT COURT
IN THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EIGHT MILE STYLE, LLC and
MARTIN AFFILIATED, LLC,

    Plaintiffs

vs.

APPLE COMPUTER, INC. and
AFTERMATH RECORDS d/b/a
AFTERMATH ENTERTAINMENT,

    Defendants.

_____/

Case No. 2:07-CV-13164
Honorable Anna Diggs Taylor
Magistrate Judge Donald A. Scheer

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION *IN LIMINE* NO. 1

Daniel D. Quick (P48109)
Dickinson Wright PLLC
38525 Woodward Avenue
Suite 2000
Bloomfield Hills, MI 48304
(248) 433-7200
dquick@dickinsonwright.com

Glenn D. Pomerantz
Kelly M. Klaus
Melinda E. LeMoine
Munger, Tolles & Olson LLP
355 South Grand Avenue, Suite 3500
Los Angeles, CA 90071-1560
(213) 683-9100
glenn.pomerantz@mto.com; kelly.klaus@mto.com;
melinda.lemoine@mto.com

Attorneys for Defendants

8833816.1

# CONCISE STATEMENT OF ISSUES PRESENTED

Whether the Court should rule as a matter of law that a Controlled Composition clause may not grant a license to distribute records in the form of digital phonorecord deliveries (DPDs), where Plaintiffs cannot cite to any actual statutory text for that argument, and the legislative history that they selectively quote refers only to the minimum rate to be included while specifically acknowledging that artists *grant* licenses through "Controlled Composition Clauses"?

Defendants' answer: No.

# CONTROLLING AUTHORITIES

**Cases**

*Thompson v. North American Stainless*, LP, 567 F.3d 804 (6th Cir. 2009)

**Statutes**

17 U.S.C. 115

# BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION IN LIMINE NO. 1

## I. INTRODUCTION

Controlled Composition clauses in agreements between artists and recording companies typically do two things: (1) grant a license in compositions and (2) set certain royalty payment terms. Plaintiffs' Motion *in Limine* No. 1 asks this Court to rule that Section 115 of the Copyright Law renders Controlled Composition clauses entirely inapplicable to records distributed in permanent download form as a matter of law, eliminating both the grant of a license and the royalty payment terms. The statutory provision Plaintiffs cite—but do not quote—makes crystal clear that the provision only affects the royalty payment term, and not the grant of a license. Here is what that provision actually says:

> License agreements voluntarily negotiated at any time between one or more copyright owners of non-dramatic musical works and one or more persons entitled to obtain a compulsory license . . . shall be given effect in lieu of any determination by the Librarian of Congress and Copyright Royalty Judges. Subject to clause (ii), ***the royalty rates determined [in this section] shall be given effect as to digital phonorecord deliveries in lieu of any contrary royalty rates specified in a contract pursuant to which a recording artist who is the author of a nondramatic musical work grants a license. . . to a person desiring to fix in a tangible medium of expression a sound recording embodying the musical work.***

17 U.S.C. § 115(c)(3)(E)(i) (emphasis added). Nowhere in this language does it say that the license granted in a Controlled Composition clause—a fundamental part of the consideration that a record company receives under the contract—has been eviscerated.

Even the legislative history, which Plaintiffs selectively quote, does not support their bold claim. Indeed, the *very next sentence* following the block-quoted section included in Plaintiffs' Motion *acknowledges* that Controlled Composition clauses *grant licenses*, and does not say that the provision was intended to terminate these licenses for downloads. Plaintiffs' Motion, along with its misleading excerpts from legislative history, should be rejected.

1

## II. ARGUMENT

### A. Controlled Composition Clauses -- Including those in Eminem and Aftermath's Recording Agreements -- Grant Rights *and* Set Rates

Eminem, Plaintiffs' affiliated company, and Aftermath are parties to several recording agreements (the "Agreements"), all of which contemplate that Eminem would record music and Aftermath would distribute that music in records. In the Agreements, Aftermath committed to pay Eminem and Plaintiffs' affiliated companies millions and millions of dollars. In return, Aftermath obtained the "exclusive rights to exploit all such" Eminem recordings "in any and all forms of media now known and hereinafter developed." 1998 and 2003 Agreements, ¶ 8. For Aftermath to be able to do that, it had to ensure that it had two things. First, it needed the copyright in the sound recordings. Second, it needed the right to include Eminem's compositions in those sound recordings. Without both of those rights, Aftermath could not distribute the records contemplated by the Agreements and thus would have no obligation to pay Eminem and Plaintiffs anything.

The Agreements give Aftermath both of those essential rights. First, the Agreements provide that Aftermath owns "all master recordings recorded by" Eminem, including the copyrights in those recordings. 1998 and 2003 Agreements, ¶ 8. Second, while copyright in the compositions is reserved to their owners, the Agreements contain a Controlled Composition clause that states that compositions "will be licensed" -- not might be licensed or may be licensed -- "to Aftermath and its distributors/licensees" at a particular rate, which gave Aftermath the right to include those compositions in the records it distributes. 1998 and 2003 Agreements, ¶ 6. The Controlled Composition clauses in the Agreements are no different from those commonly found in recording agreements: they both (1) grant a license for compositions and (2) set certain royalty payment terms.

### B. Section 115 Affirms and Acknowledges Controlled Composition Clauses for Records Sold in Permanent Download Form, Subject to A Minimum Rate Requirement

Contrary to Plaintiffs' characterization, Section 115 actually *affirmatively acknowledges* the rights of recording artists and record labels to enter into recording agreements containing Controlled Composition provisions. 17 U.S.C. 115(c)(E) The 1995 Digital Performance Rights in Sound Recordings Act (DPRA) amended Section 115 to apply a particular statutory *rate* for those exploitations. But far from invalidating all Controlled Composition clauses with respect to permanent download configurations, the DPRA actually *reaffirmed* the validity of voluntary licenses entered into between composition copyright-holders and anyone who wants to make records that include compositions. 17 U.S.C. 115(c)(E)

Section 115(c)(3)(E), the specific subsection that Plaintiffs claim invalidates Controlled Composition clauses, actually begins with the default rule that "[l]icense agreements voluntarily negotiated" between composition copyright-holders and entities seeking to make records "*shall be given effect. . .*" In other words, the section specifically *validates* voluntarily negotiated licenses between composition copyright-holders and record companies, like Controlled Composition clauses. If Congress intended to *invalidate* voluntarily negotiated licenses entirely, as Plaintiffs claim, it would have said precisely the opposite.

The subsection then sets a minimum *rate* that applies to permanent downloads:

> the royalty rates determined [in this section] shall be given effect as to digital phonorecord deliveries ***in lieu of any contrary royalty rates specified in a contract pursuant to which a recording artist who is the author of a nondramatic musical work grants a license. . . to a person desiring to fix in a tangible medium of expression a sound recording embodying the musical work.***

17 U.S.C. § 115(c)(3)(E)(i). This provision simply provides that, for "digital phonorecord deliveries" (which include permanent downloads), a minimum rate will apply "in lieu of any contrary royalty rates" set in a Controlled Composition clause. While substituting a minimum rate for any "contrary royalty rates" in a Controlled Composition clause, the provision

3

simultaneously *acknowledges* that Controlled Composition clauses are contracts "pursuant to which a recording artist *grants a license*" in musical works for use in records. *Id.*

If Congress intended to invalidate voluntary, contractual grants of licenses in compositions like Controlled Composition clauses for permanent download configurations as Plaintiffs claim, then presumably Congress would have said so explicitly. Instead, the statute explicitly acknowledges that voluntary licenses "shall be given effect" and that a particular rate shall apply in contracts "pursuant to which a recording artist grants a license" in compositions. To support their novel interpretation, Plaintiffs must resort to sources outside the statute.

### C. Plaintiffs Ignore the Statutory Text and Instead Selectively Quote the Legislative History

Plaintiffs' Motion does not quote the statutory text *at all*, ignoring a cardinal rule of statutory construction. *See Thompson v. North American Stainless*, LP, 567 F.3d 804, 807 (6th Cir. 2009)(en banc) (questions of statutory interpretation must begin with the statutory text). Instead, Plaintiffs selectively quote a small portion of a 65-page Senate Report out of context, stating that "the second sentence of subparagraph (E)(i) is intended to make these controlled composition clauses inapplicable to digital phonorecord deliveries." Mot. at 4. Plaintiffs insist that this snippet from a Senate Report means that Controlled Composition clauses do not apply to permanent downloads *at all*. What Plaintiffs fail to acknowledge is that the portions immediately before and immediately after the section they quote make clear that the only thing "inapplicable" is any rate below the statutory minimum, not the grant of rights. Ex. 1 at 41-42.

The Senate Report's discussion of Section 115(c)(3)(E) begins by explicitly stating: "The Committee *does not intend* to prevent negotiation of voluntary license agreements, for either physical phonorecords or digital phonorecord deliveries. . ." with limited exceptions. Ex. 1 at 41. Then follows the portion Plaintiffs quote, which ends:

> Subject to the exceptions set forth in subparagraph (E)(ii), the
> second sentence of subparagraph (E)(i) is intended to make these

4

controlled composition clauses inapplicable to digital phonorecord
deliveries.

*Id*. The *very next sentence* clarifies that what is inapplicable is the *rate*, not the grant of license, tracking the statutory text:

> Specifically, unless the requirements of one or both of the exceptions of subparagraph (E)(ii) are satisfied, **the royalty rates determined through negotiation or arbitration pursuant to subparagraph (C) or (D) are to be given effect in lieu of any contrary rates** specified in a contract pursuant to which a recording artist who is the author of a nondramatic musical work grants a mechanical license in that work to a record company.

*Id*. Plaintiffs do not acknowledging that in fact *the very next sentence* of the Senate Report clarifies their quoted portion. When read in context, the selected phrase on which Plaintiffs rely cannot mean what they claim.

More recent authority bears this out. In 2004, the head of the Copyright Office described the impact of the DPRA on Controlled Composition clauses in prepared remarks before a Subcommittee of the House Judiciary Committee, stating: "In general, the DPRA provides that privately negotiated contracts . . . between a recording company and a recording artist who is the author of a musical work cannot include a rate . . . below that established for the compulsory license." Ex. 2 at 9. The statement says nothing about the DPRA wholly invalidating such Controlled Composition clauses for digital configurations, as Plaintiffs here suggest.

### III. CONCLUSION

Plaintiffs' Motion should be denied. Neither the statutory text nor the legislative history requires or supports a ruling that Controlled Composition clauses like those in the Agreements here are wholly invalid as a matter of law.

| | |
|---|---|
| s/Daniel D. Quick<br>Daniel D. Quick P48109<br>Dickinson Wright PLLC<br>38525 Woodward Avenue, Suite 2000<br>Bloomfield Hills, MI 48304<br>(248) 433-7200<br>dquick@dickinsonwright.com<br>Attorneys for Defendants | s/Melinda E. LeMoine<br>Munger, Tolles & Olson LLP<br>355 South Grand Avenue Suite 3500<br>Los Angeles, CA 90071-1560<br>(213) 683-9171<br>melinda.lemoine@mto.com<br>Attorneys for Defendants |

# CERTIFICATE OF SERVICE

I hereby certify that on September 17, 2009, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to the all counsel.

s/Melinda E. Lemoine
Melinda E. LeMoine
Munger, Tolles & Olson LLP
355 South Grand Avenue, Suite 3500
Los Angeles, CA 90071-1560
(213) 683-9100
melinda.lemoine@mto.com

Attorneys for Defendants
