*Eight Mile Style, LLC et al. v. Apple Computer Inc., et al.*
**Case No. 2:07-CV-13164**

## **EXHIBIT 1**

**Senate Report No. 104-128,**
**dated August 4, 1995**

5005843.1

Dockets.Justia.com

# Calendar No. 165

| 104TH CONGRESS 1st Session | SENATE | REPORT 104–128 |
|---|---|---|

## DIGITAL PERFORMANCE RIGHT IN SOUND RECORDINGS ACT OF 1995

———

AUGUST 4 (legislative day, JULY 10), 1995.—Ordered to be printed

———

Mr. HATCH, from the Committee on the Judiciary,
submitted the following

# REPORT

[To accompany S. 227]

The Committee on the Judiciary, to which was referred the bill (S. 227) to provide an exclusive right to perform sound recordings publicly by means of digital transmissions, having considered the same, reports favorably thereon, with an amendment in the nature of a substitute, and recommends that the bill, as amended, do pass.

## CONTENTS

| | | Page |
|---|---|---|
| I. | Purpose | 10 |
| II. | Legislative history | 10 |
| III. | Discussion | 13 |
| IV. | Vote of the committee | 17 |
| V. | Section-by-section analysis | 18 |
| VI. | Cost estimate | 45 |
| VII. | Regulatory impact statement | 47 |
| VIII. | Changes in existing law | 47 |

The amendment is as follows:
Strike all after the enacting clause and insert the following:

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Digital Performance Right in Sound Recordings Act of 1995".

**SEC. 2. EXCLUSIVE RIGHTS IN COPYRIGHTED WORKS.**

Section 106 of title 17, United States Code, is amended—

(1) in paragraph (4) by striking "and" after the semicolon;
(2) in paragraph (5) by striking the period and inserting "; and"; and
(3) by adding at the end the following:
"(6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.".

**SEC. 3. SCOPE OF EXCLUSIVE RIGHTS IN SOUND RECORDINGS.**

Section 114 of title 17, United States Code, is amended—

(1) in subsection (a) by striking "and (3)" and inserting "(3) and (6)";

(2) in subsection (b) in the first sentence by striking "phonorecords, or of copies of motion pictures and other audiovisual works," and inserting "phonorecords or copies";

(3) by striking subsection (d) and inserting:

"(d) LIMITATIONS ON EXCLUSIVE RIGHT.—Notwithstanding the provisions of section 106(6)—

"(1) EXEMPT TRANSMISSIONS AND RETRANSMISSIONS.—The performance of a sound recording publicly by means of a digital audio transmission or retransmission, other than as a part of an interactive service, is not an infringement of section 106(6) if the performance is part of—

"(A) a nonsubscription transmission, such as a nonsubscription broadcast transmission;

"(B) a retransmission of a nonsubscription broadcast transmission: *Provided*, That, in the case of a retransmission of a radio station's broadcast transmission—

"(i) the radio station's broadcast transmission is not willfully or repeatedly retransmitted more than a radius of 150 miles from the site of the radio broadcast transmitter, however—

"(I) the 150 mile limitation under this clause shall not apply when a nonsubscription broadcast transmission by a radio station licensed by the Federal Communications Commission is retransmitted on a nonsubscription basis by a terrestrial broadcast station, terrestrial translator, or terrestrial repeater licensed by the Federal Communications Commission; and

"(II) in the case of a subscription retransmission of a nonsubscription broadcast retransmission covered by subclause (I), the 150 mile radius shall be measured from the transmitter site of such broadcast retransmitter;

"(ii) the retransmission is of radio station broadcast transmissions that are—

"(I) obtained by the retransmitter over the air;

"(II) not electronically processed by the retransmitter to deliver separate and discrete signals; and

"(III) retransmitted only within the local communities served by the retransmitter;

"(iii) the radio station's broadcast transmission was being retransmitted to cable systems (as defined in section 111(f)) by a satellite carrier on January 1, 1995, and that retransmission was being retransmitted by cable systems as a separate and discrete signal, and the satellite carrier obtains the radio station's broadcast transmission in an analog format: *Provided*, That the broadcast transmission being retransmitted may embody the programming of no more than one radio station; or

"(iv) the radio station's broadcast transmission is made by a noncommercial educational broadcast station funded on or after January 1, 1995, under section 396(k) of the Communications Act of 1934 (47 U.S.C. 396(k)), consists solely of noncommercial educational and cultural radio programs, and the retransmission, whether or not simultaneous, is a nonsubscription terrestrial broadcast retransmission; or

"(C) a transmission or retransmission that comes within any of the following categories:

"(i) a prior or simultaneous transmission or retransmission incidental to an exempt transmission or retransmission, such as a feed received by and then retransmitted by an exempt transmitter: *Provided*, That such incidental transmissions or retransmissions do not include any subscription transmission or retransmission directly for reception by members of the public;

"(ii) a transmission or retransmission within a business establishment, confined to its premises or the immediately surrounding vicinity;

"(iii) a retransmission by any retransmitter, including a multichannel video programming distributor as defined in section 522(12) of the Communications Act of 1934 (47 U.S.C. 522(12)), of a transmission by a transmitter licensed to publicly perform the sound recording as a part of that transmission, if the retransmission is simultaneous with the licensed transmission and authorized by the transmitter; or

"(iv) a transmission or retransmission to a business establishment for use in the ordinary course of its business: *Provided*, That the business recipient does not retransmit the transmission outside of its premises or the immediately surrounding vicinity, and that the transmission does not exceed the sound recording performance complement. Nothing in this clause shall limit the scope of the exemption in clause (ii).

"(2) SUBSCRIPTION TRANSMISSIONS.—In the case of a subscription transmission not exempt under subsection (d)(1), the performance of a sound recording publicly by means of a digital audio transmission shall be subject to statutory licensing, in accordance with subsection (f) of this section, if—

"(A) the transmission is not part of an interactive service;

"(B) the transmission does not exceed the sound recording performance complement;

"(C) the transmitting entity does not cause to be published by means of an advance program schedule or prior announcement the titles of the specific sound recordings or phonorecords embodying such sound recordings to be transmitted;

"(D) except in the case of transmission to a business establishment, the transmitting entity does not automatically and intentionally cause any device receiving the transmission to switch from one program channel to another; and

"(E) except as provided in section 1002(e) of this title, the transmission of the sound recording is accompanied by the information encoded in that sound recording, if any, by or under the authority of the copyright owner of that sound recording, that identifies the title of the sound recording, the featured recording artist who performs on the sound recording, and related information, including information concerning the underlying musical work and its writer.

"(3) LICENSES FOR TRANSMISSIONS BY INTERACTIVE SERVICES.—

"(A) No interactive service shall be granted an exclusive license under section 106(6) for the performance of a sound recording publicly by means of digital audio transmission for a period in excess of 12 months, except that with respect to an exclusive license granted to an interactive service by a licensor that holds the copyright to 1,000 or fewer sound recordings, the period of such license shall not exceed 24 months: *Provided, however*, That the grantee of such exclusive license shall be ineligible to receive another exclusive license for the performance of that sound recording for a period of 13 months from the expiration of the prior exclusive license.

"(B) The limitation set forth in subparagraph (A) of this paragraph shall not apply if—

"(i) the licensor has granted and there remain in effect licenses under section 106(6) for the public performance of sound recordings by means of digital audio transmission by at least 5 different interactive services: *Provided, however*, That each such license must be for a minimum of 10 percent of the copyrighted sound recordings owned by the licensor that have been licensed on an exclusive basis to interactive services, but in no event less than 50 sound recordings; or

"(ii) the exclusive license is granted to perform publicly up to 45 seconds of a sound recording and the sole purpose of the performance is to promote the distribution or performance of that sound recording.

"(C) Notwithstanding the grant of an exclusive or nonexclusive license of the right of public performance under section 106(6), an interactive service may not publicly perform a sound recording unless a license has been granted for the public performance of any copyrighted musical work contained in the sound recording, *Provided*, That such license to publicly perform the copyrighted musical work may be granted either by a performing rights society representing the copyright owner or by the copyright owner.

"(D) The performance of a sound recording by means of a digital audio retransmission is not an infringement of section 106(6) if—

"(i) the retransmission is of a transmission by an interactive service licensed to publicly perform the sound recording to a particular member of the public as part of that transmission; and

"(ii) the retransmission is simultaneous with the licensed transmission, authorized by the transmitter, and limited to that particular member of the public intended by the interactive service to be the recipient of the transmission.

"(E) For the purposes of this paragraph—

"(i) a 'licensor' shall include the licensing entity and any other entity under any material degree of common ownership, management, or control that owns copyrights in sound recordings; and

"(ii) a 'performing rights society' is an association or corporation that licenses the public performance of nondramatic musical works on behalf of the copyright owner, such as the American Society of Composers, Authors and Publishers, Broadcast Music, Inc., and SESAC, Inc.

"(4) RIGHTS NOT OTHERWISE LIMITED.—

"(A) Except as expressly provided in this section, this section does not limit or impair the exclusive right to perform a sound recording publicly by means of a digital audio transmission under section 106(6).

"(B) Nothing in this section annuls or limits in any way—

"(i) the exclusive right to publicly perform a musical work, including by means of a digital audio transmission, under section 106(4);

"(ii) the exclusive rights to reproduce and distribute a sound recording or the musical work embodied therein under sections 106(1) and 106(3); or

"(iii) any other rights under any other clause of section 106, or remedies available under this title, as such rights or remedies exist either before or after the date of enactment of the Digital Performance Right in Sound Recordings Act of 1995.

"(C) Any limitations in this section on the exclusive right under section 106(6) apply only to the exclusive right under section 106(6) and not to any other exclusive rights under section 106. Nothing in this section shall be construed to annul, limit, impair or otherwise affect in any way the ability of the owner of a copyright in a sound recording to exercise the rights under sections 106(1), 106(2) and 106(3), or to obtain the remedies available under this title pursuant to such rights, as such rights and remedies exist either before or after the date of enactment of the Digital Performance Right in Sound Recordings Act of 1995."; and

(4) by adding after subsection (d) the following:

"(e) AUTHORITY FOR NEGOTIATIONS.—

"(1) Notwithstanding any provision of the antitrust laws, in negotiating statutory licenses in accordance with subsection (f), any copyright owners of sound recordings and any entities performing sound recordings affected by this section may negotiate and agree upon the royalty rates and license terms and conditions for the performance of such sound recordings and the proportionate division of fees paid among copyright owners, and may designate common agents on a nonexclusive basis to negotiate, agree to, pay, or receive payments.

"(2) For licenses granted under section 106(6), other than statutory licenses, such as for performances by interactive services or performances that exceed the sound recording performance complement—

"(A) copyright owners of sound recordings affected by this section may designate common agents to act on their behalf to grant licenses and receive and remit royalty payments, *Provided,* That each copyright owner shall establish the royalty rates and material license terms and conditions unilaterally, that is, not in agreement, combination, or concert with other copyright owners of sound recordings; and

"(B) entities performing sound recordings affected by this section may designate common agents to act on their behalf to obtain licenses and collect and pay royalty fees, *Provided,* That each entity performing sound recordings shall determine the royalty rates and material license terms and conditions unilaterally, that is, not in agreement, combination, or concert with other entities performing sound recordings.

"(f) LICENSES FOR NONEXEMPT SUBSCRIPTION TRANSMISSIONS.—

"(1) No later than 30 days after the enactment of the Digital Performance Right in Sound Recordings Act of 1995, the Librarian of Congress shall cause notice to be published in the Federal Register of the initiation of voluntary negotiation proceedings for the purpose of determining reasonable terms and rates of royalty payments for the activities specified by subsection (d)(2) of this section during the period beginning on the effective date of such Act and ending on December 31, 2000. Such terms and rates shall distinguish among the different types of digital audio transmission services then in operation. Any copyright owners of sound recordings or any entities performing sound recordings affected by this section may submit to the Librarian of Congress licenses covering such activities with respect to such sound recordings. The parties to each negotiation proceeding shall bear their own costs.

"(2) In the absence of license agreements negotiated under paragraph (1), the Librarian of Congress shall, pursuant to chapter 8, convene a copyright arbitration royalty panel to determine and publish in the Federal Register a schedule of rates and terms which, subject to paragraph (3), shall be binding on all copyright owners of sound recordings and entities performing sound recordings. In establishing such rates and terms the copyright arbitration royalty panel may consider the rates for comparable types of digital audio transmission services and comparable circumstances under voluntary license agreements negotiated as provided in paragraph (1). The parties to the proceeding shall bear the entire cost of the proceeding in such manner and proportion as the arbitration panels shall direct. The Librarian of Congress shall also establish requirements by which copyright owners may receive reasonable notice of the use of their sound recordings under this section, and under which records of such use shall be kept by entities performing sound recordings.

"(3) License agreements voluntarily negotiated at any time between one or more copyright owners of sound recordings and one or more entities performing sound recordings shall be given effect in lieu of any determination by a copyright arbitration royalty panel or decision by the Librarian of Congress.

"(4) The procedures specified in paragraphs (1) and (2) shall be repeated and concluded, in accordance with regulations that the Librarian of Congress shall prescribe—

"(A) within a 6-month period each time that a petition is filed by any copyright owners of sound recordings or any entities performing sound recordings affected by this section indicating that a new type of digital audio transmission service on which sound recordings are performed is or is about to become operational, and

"(B) between June 30 and December 31, 2000 and at 5-year intervals thereafter.

"(5)(A) Any person who wishes to perform a sound recording publicly by means of a nonexempt subscription transmission under this subsection may do so without infringing the exclusive right of the copyright owner of the sound recording—

"(i) by complying with such notice requirements as the Register of Copyrights shall prescribe by regulation and by paying royalty fees in accordance with this subsection; or

"(ii) if such royalty fees have not been set, by agreeing to pay such royalty fees as shall be determined in accordance with this subsection.

"(B) Any royalty payments in arrears shall be made on or before the twentieth day of the month next succeeding the month in which the royalty fees are set.

"(g) PROCEEDS FROM LICENSING OF SUBSCRIPTION TRANSMISSIONS.—

"(1) Except in the case of a subscription transmission licensed in accordance with subsection (f) of this section—

"(A) a featured recording artist who performs on a sound recording that has been licensed for a subscription transmission shall be entitled to receive payments from the copyright owner of the sound recording in accordance with the terms of the artist's contract; and

"(B) a nonfeatured recording artist who performs on a sound recording that has been licensed for a subscription transmission shall be entitled to receive payments from the copyright owner of the sound recording in accordance with the terms of the nonfeatured recording artist's applicable contract or other applicable agreement.

"(2) The copyright owner of the exclusive right under section 106(6) of this title to publicly perform a sound recording by means of a digital audio transmission shall allocate to recording artists in the following manner its receipts from the statutory licensing of subscription transmission performances of the sound recording in accordance with subsection (f) of this section:

"(A) 2½ percent of the receipts shall be deposited in an escrow account managed by an independent administrator jointly appointed by copyright owners of sound recordings and the American Federation of Musicians (or any successor entity) to be distributed to nonfeatured musicians (whether or not members of the American Federation of Musicians) who have performed on sound recordings.

"(B) 2½ percent of the receipts shall be deposited in an escrow account managed by an independent administrator jointly appointed by copyright owners of sound recordings and the American Federation of Television and Radio Artists (or any successor entity) to be distributed to nonfeatured vo-

calists (whether or not members of the American Federation of Television and Radio Artists) who have performed on sound recordings.

"(C) 45 percent of the receipts shall be allocated, on a per sound recording basis, to the recording artist or artists featured on such sound recording (or the persons conveying rights in the artists' performance in the sound recordings.

"(h) LICENSING TO AFFILIATES.—

"(1) If the copyright owner of a sound recording licenses an affiliated entity the right to publicly perform a sound recording by means of a digital audio transmission under section 106(6), the copyright owner shall make the licensed sound recording available under section 106(6) on no less favorable terms and conditions to all bona fide entities that offer similar services, except that, if there are material differences in the scope of the requested license with respect to the type of service, the particular sound recordings licensed, the frequency of use, the number of subscribers served, or the duration, then the copyright owner may establish different terms and conditions for such other services.

"(2) The limitation set forth in paragraph (1) of this subsection shall not apply in the case where the copyright owner of a sound recording licenses—

"(A) an interactive service; or

"(B) an entity to perform publicly up to 45 seconds of the sound recording and the sole purpose of the performance is to promote the distribution or performance of that sound recording.

"(i) NO EFFECT ON ROYALTIES FOR UNDERLYING WORKS.—License fees payable for the public performance of sound recordings under clause (6) of section 106 shall not be taken into account in any administrative, judicial, or other governmental proceeding to set or adjust the royalties payable to copyright owners of musical works for the public performance of their works. It is the intent of Congress that royalties payable to copyright owners of musical works for the public performance of their works shall not be diminished in any respect as a result of the rights granted by section 106(6).

"(j) DEFINITIONS.—As used in this section, the following terms have the following meanings:

"(1) An 'affiliated entity' is an entity engaging in digital audio transmissions covered by section 106(6), other than an interactive service, in which the licensor has any direct or indirect partnership or any ownership interest amounting to 5 percent or more of the outstanding voting or non-voting stock.

"(2) A 'broadcast transmission' is a transmission made by a broadcast station licensed as such by the Federal Communications Commission.

"(3) A 'digital audio transmission' is a digital transmission as defined in section 101, that embodies the transmission of a sound recording. This term does not include the transmission of any audiovisual work.

"(4) An 'interactive service' is one that enables a member of the public to receive, on request, a transmission of a particular sound recording chosen by or on behalf of the recipient. The ability of individuals to request that particular sound recordings be performed for reception by the public at large does not make a service interactive. If an entity offers both interactive and non-interactive services (either concurrently or at different times), the non-interactive component shall not be treated as part of an interactive service.

"(5) A 'nonsubscription transmission', 'nonsubscription retransmission', or a 'nonsubscription broadcast transmission' is any transmission or retransmission that is not a subscription transmission or retransmission.

"(6) A 'retransmission' includes any further simultaneous retransmission of the same transmission. Nothing in this definition shall be construed to exempt a transmission that fails to satisfy a separate element required to qualify for an exemption under section 114(d)(1).

"(7) The 'sound recording performance complement' is the transmission during any 3-hour period, on a particular channel used by a transmitting entity, of no more than—

"(A) 3 different selections of sound recordings from any one phonorecord lawfully distributed for public performance or sale in the United States, if no more than 2 such selections are transmitted consecutively; or

"(B) 4 different selections of sound recordings

"(i) by the same featured recording artist; or

"(ii) from any set or compilation of phonorecords lawfully distributed together as a unit for public performance or sale in the United States, if no more than three such selections are transmitted consecutively:

*Provided,* That the transmission of selections in excess of the numerical limits provided for in clauses (A) and (B) from multiple phonorecords shall nonetheless

qualify as a sound recording performance complement if the programming of the multiple phonorecords was not willfully intended to avoid the numerical limitations prescribed in such clauses.

"(8) A 'subscription transmission' is a transmission that is controlled and limited to particular recipients, and for which consideration is required to be paid or otherwise given by or on behalf of the recipient to receive the transmission or a package of transmissions including the transmission.".

**SEC. 4. MECHANICAL ROYALTIES IN DIGITAL PHONORECORD DELIVERIES.**

Section 115 of title 17, United States Code, is amended—

    (1) in subsection (a)(1)—

        (A) in the first sentence by striking out "any other person" and inserting in lieu thereof "any other person, including those who make phonorecords or digital phonorecord deliveries by means of a digital audio transmission,"; and

        (B) in the second sentence by inserting before the period ", including by means of a digital phonorecord delivery";

    (2) in subsection (c)(2) in the second sentence by inserting "and other than as provided in paragraph (3)," after "For this purpose,";

    (3) by redesignating paragraphs (3), (4), and (5) of subsection (c) as paragraphs (4), (5), and (6), respectively, and by inserting after paragraph (2) the following new paragraph:

"(3)(A) A compulsory license under this section includes the right of the compulsory licensee to distribute or authorize the distribution of a phonorecord of a nondramatic musical work by means of a digital transmission which constitutes a digital phonorecord delivery, regardless of whether the digital transmission is also a public performance of the sound recording under section 106(6) of this title or of any nondramatic musical work embodied therein under section 106(4) of this title. For every digital phonorecord delivery by or under the authority of the compulsory licensee—

        "(i) on or before December 31, 1997, the royalty payable by the compulsory licensee shall be the royalty prescribed under paragraph (2) and chapter 8 of this title; and

        "(ii) on or after January 1, 1998, the royalty payable by the compulsory licensee shall be the royalty prescribed under subparagraphs (B) through (F) and chapter 8 of this title.

"(B) Notwithstanding any provision of the antitrust laws, for the purpose of this subparagraph, any copyright owners of nondramatic musical works and any persons entitled to obtain a compulsory license under subsection (a)(1) may negotiate and agree upon the terms and rates of royalty payments under this paragraph and the proportionate division of fees paid among copyright owners, and may designate common agents to negotiate, agree to, pay or receive such royalty payments. Such authority to negotiate the terms and rates of royalty payments includes, but is not limited to, the authority to negotiate the year during which the royalty rates prescribed under subparagraphs (B) through (F) and chapter 8 of this title shall next be determined.

"(C) During the period of June 30, 1996, through December 31, 1996, Librarian of Congress shall cause notice to be published in the Federal Register of the initiation of voluntary negotiation proceedings for the purpose of determining reasonable terms and rates of royalty payments for the activities specified by subparagraph (A) during the period beginning January 1, 1998, and ending on December 31, 2007, or such earlier date (regarding digital transmissions) as the parties may agree. Such terms and rates shall distinguish between (i) digital phonorecord deliveries where the reproduction or distribution of a phonorecord is incidental to the transmission which constitutes the digital phonorecord delivery, and (ii) digital phonorecord deliveries in general. Any copyright owners of nondramatic musical works and any persons entitled to obtain a compulsory license under subsection (a)(1) may submit to the Librarian of Congress licenses covering such activities. The parties to each negotiation proceeding shall bear their own costs.

"(D) In the absence of license agreements negotiated under subparagraph (C), the Librarian of Congress shall, pursuant to chapter 8, convene a copyright arbitration royalty panel to determine and publish in the Federal Register a schedule of rates and terms which, subject to subparagraph (E), shall be binding on all copyright owners of nondramatic musical works and persons entitled to obtain a compulsory license under subsection (a)(1) during the period beginning January 1, 1998, and ending on December 31, 2007, or such earlier date (regarding digital transmissions) as may be determined pursuant to subparagraph

(C) or chapter 8. Such terms and rates shall distinguish between (i) digital phonorecord deliveries where the reproduction or distribution of a phonorecord is incidental to the transmission which constitutes the digital phonorecord delivery, and (ii) digital phonorecord deliveries in general. In addition to the objectives set forth in section 801(b)(1), in establishing such rates and terms, the copyright arbitration royalty panel may consider rates under voluntary license agreements negotiated as provided in subparagraph (C). The royalty rates payable for a compulsory license for a digital phonorecord delivery under this section shall be established de novo and no precedential effect shall be given to the amount of the royalty payable by a compulsory licensee for digital phonorecord deliveries on or before December 31, 1997. The parties to the proceeding shall bear the entire cost thereof in such manner and proportion as the arbitration panels shall direct. The Librarian of Congress shall also establish requirements by which copyright owners may receive reasonable notice of the use of their works under this section, and under which records of such use shall be kept and made available by persons making digital phonorecord deliveries.

‘‘(E)(i) License agreements voluntarily negotiated at any time between one or more copyright owners of nondramatic musical works and one or more persons entitled to obtain a compulsory license under subsection (a)(1) shall be given effect in lieu of any determination by the Librarian of Congress. Subject to clause (ii), the royalty rates determined pursuant to subparagraph (C) or (D) shall be given effect in lieu of any contrary royalty rates specified in a contract pursuant to which a recording artist who is the author of a nondramatic musical work grants a license under that person’s exclusive rights in the musical work under section 106(1) or (3) to a person desiring to fix in a tangible medium of expression a sound recording embodying the musical work.

‘‘(ii) Clause (i) shall not apply to—

‘‘(I) a contract entered into on or before June 22, 1995, and not modified thereafter for the purpose of reducing such rates or of increasing the number of musical works within the scope of the contract covered by the reduced rates, except if a contract entered into on or before June 22, 1995, is modified thereafter for the purpose of increasing the number of musical works within the scope of the contract, any contrary royalty rates specified in the contract shall be given effect in lieu of royalty rates determined pursuant to subparagraph (C) or (D) for the number of musical works within the scope of the contract as of June 22, 1995; and

‘‘(II) a contract entered into after the date that the sound recording is fixed in a tangible medium of expression substantially in a form intended for commercial release, if at the time the contract is entered into, the recording artist retains the right to grant licenses under sections 106(1) and 106(3).

‘‘(F) The procedures specified in subparagraphs (C) and (D) shall be repeated and concluded, in accordance with regulations that the Librarian of Congress shall prescribe, as provided in section 803(a)(3), except to the extent that different times for the repeating and concluding of such proceedings may be determined in accordance with subparagraph (C) or (D).

‘‘(G) Except as provided in section 1002(e) of this title, a digital phonorecord delivery licensed under this paragraph shall be accompanied by the information encoded in the sound recording, if any, by or under the authority of the copyright owner of that sound recording, that identifies the title of the sound recording, the featured recording artist who performs on the sound recording, and related information, including information concerning the underlying musical work and its writer.

‘‘(H)(i) A digital phonorecord delivery of a sound recording is actionable as an act of infringement under section 501, and is fully subject to the remedies provided by sections 502 through 506 and sections 509 and 510, unless—

‘‘(I) the digital phonorecord delivery has been authorized by the copyright owner of the sound recording; and

‘‘(II) the owner of the copyright in the sound recording or the entity making the digital phonorecord delivery has obtained a compulsory license under this section or has otherwise been authorized to distribute or authorize the distribution, by means of a digital phonorecord delivery, of each nondramatic musical work embodied in the sound recording.

‘‘(ii) Any cause of action under this subparagraph shall be in addition to those available to the owner of the copyright in the nondramatic musical work under subsection (c)(5) and section 106(4) and the owner of the copyright in the sound recording under section 106(6).

"(I) The liability of the copyright owner of a sound recording for infringement of the copyright in a musical work embodied in the sound recording shall be determined in accordance with applicable law, except that the owner of a copyright in a sound recording shall not be liable for a digital phonorecord delivery by a third party if the owner of the copyright in the sound recording does not license the distribution of a phonorecord of the musical work.

"(J) Nothing in section 1008 shall be construed to prevent the exercise of the rights and remedies allowed by this paragraph, paragraph (7), and chapter 5 in the event of a digital phonorecord delivery, except that no action alleging infringement of copyright may be brought under this title against a manufacturer, importer or distributor of a digital audio recording device, a digital audio recording medium, an analog recording device, or an analog recording medium, or against a consumer, based on the actions described in such section.

"(K) Nothing in this section annuls or limits (i) the exclusive right to publicly perform a sound recording or the musical work embodied therein, including by means of a digital transmission, under sections 106(4) and 106(6), (ii) except for compulsory licensing under the conditions specified by this section, the exclusive rights to reproduce and distribute the sound recording and the musical work embodied therein under sections 106(1) and 106(3), including by means of a digital phonorecord delivery, or (iii) any other rights under any other provision of section 106, or remedies available under this title, as such rights or remedies exist either before or after the date of enactment of the Digital Performance Right in Sound Recordings Act of 1995.

"(L) The provisions of this section concerning digital phonorecord deliveries shall not apply to any exempt transmissions or retransmissions under section 114(d)(1). The exemptions created in section 114(d)(1) do not expand or reduce the rights of copyright owners under section 106 (1) through (5) with respect to such transmissions and retransmissions."; and

"(5) by adding after subsection (c) the following:

"(d) DEFINITION.—As used in this section, the following term has the following meaning: A 'digital phonorecord delivery' is each individual delivery of a phonorecord by digital transmission of a sound recording which results in a specifically identifiable reproduction by or for any transmission recipient of a phonorecord of that sound recording, regardless of whether the digital transmission is also a public performance of the sound recording or any nondramatic musical work embodied therein. A digital phonorecord delivery does not result from a real-time, noninteractive subscription transmission of a sound recording where no reproduction of the sound recording or the musical work embodied therein is made from the inception of the transmission through to its receipt by the transmission recipient in order to make the sound recording audible.".

**SEC. 5. CONFORMING AMENDMENTS.**

(a) DEFINITIONS.—Section 101 of title 17, United States Code, is amended by inserting after the definition of "device", "machine", or "process" the following:

"A 'digital transmission' is a transmission in whole or in part in a digital or other non-analog format.".

(b) LIMITATIONS ON EXCLUSIVE RIGHTS: SECONDARY TRANSMISSIONS.—Section 111(c)(1) of title 17, United States Code, is amended in the first sentence by inserting "and section 114(d)" after "of this subsection".

(c) LIMITATIONS ON EXCLUSIVE RIGHTS: SECONDARY TRANSMISSIONS OF SUPERSTATIONS AND NETWORK STATIONS FOR PRIVATE HOME VIEWING.—

(1) Section 119(a)(1) of title 17, United States Code, is amended in the first sentence by inserting "and section 114(d)" after "of this subsection".

(2) Section 119(a)(2)(A) of title 17, United States Code, is amended in the first sentence by inserting "and section 114(d)" after "of this subsection".

(d) COPYRIGHT ARBITRATION ROYALTY PANELS.—

(1) Section 801(b)(1) of title 17, United States Code, is amended in the first and second sentences by striking "115" each place it appears and inserting "114, 115,".

(2) Section 802(c) of title 17, United States Code, is amended in the third sentence by striking "section 111, 116, or 119," and inserting "section 111, 114, 116, or 119, any person entitled to a compulsory license under section 114(d), any person entitled to a compulsory license under section 115.".

(3) Section 802(g) of title 17, United States Code, is amended in the third sentence by inserting "114," after "111,".

(4) Section 802(h)(2) of title 17, United States Code, is amended by inserting "114," after "111,".

**SEC. 6. EFFECTIVE DATE.**

This Act and the amendments made by this Act shall take effect 3 months after the date of enactment of this Act, except that the provisions of sections 114(e) and 114(f) of title 17, United States Code (as added by section 3 of this Act) shall take effect immediately upon the date of enactment of this Act.

## I. PURPOSE

The purpose of S. 227 is to ensure that performing artists, record companies and others whose livelihood depends upon effective copyright protection for sound recordings, will be protected as new technologies affect the ways in which their creative works are used. S. 227 does this by granting a limited right to copyright owners of sound recordings which are publicly performed by means of a digital transmission. In addition, the bill clarifies the application of the existing reproduction and distribution rights of musical work and sound recording copyright owners in the context of certain digital transmissions.

## II. LEGISLATIVE HISTORY

Sound recordings were first granted Federal copyright protection by amendment to the Copyright Act in 1971. The "Sound Recording Act of 1971"[1] (SRA) had a narrow purpose: to prevent phonorecord piracy due to advances in duplicating technology. Accordingly, to fulfill this specific objective, and to provide balance among the parties affected by the legislation, Congress did not grant sound recording copyright owners the full "bundle" of rights usually afforded by a copyright. Specifically, they were granted only reproduction, distribution, and adaptation rights; they were not granted the right of public performance,[2] on the presumption that the granted rights would suffice to protect against record piracy. The Federal courts quickly upheld the validity of the SRA against constitutional challenge,[3] and sound recording copyright owners began to enjoy limited copyright protection.

Congress did not include a sound recording performance right in the 1971 Sound Recording Act. In its subsequent deliberations over copyright reform that culminated in the Copyright Act of 1976, Congress heard extensive testimony from the Register of Copyrights and others favoring adoption of a broad performance right for sound recordings, and testimony from broadcasters and others opposing the adoption of such a right. The Senate's version of the 1976 Act expressly declined to create an exclusive performance right for sound recordings, while the House version called for a Copyright Office study on the issue. The 1976 Act adopted the House version mandating a Copyright Office study. In 1978, after holding hearings, researching the matter, and examining comments made by interested parties, the Copyright Office issued a report which unequivocally recommended that a performance right for

---

[1] Sound Recording Act of 1971, Public Law 92–140, 85 Stat. 391 (1971). This Act was amended and made permanent by Public Law 93–573, 88 Stat. 1873 (1974) (codified in the Copyright Act of 1976, 17 U.S.C. 102 (1990).

[2] 17 U.S.C. 114(a): "The exclusive rights of the owner of copyright in sound recordings are limited to the rights specified by clauses (1), (2), and (3) of section 106, and do not include any right of performance under § 106(4)."

[3] *Shaab* v. *Kleindienst*, 345 F. Supp. 589 (D.D.C. 1972); See also *Goldstein* v. *California*, 412 U.S. 546 (1973).

sound recordings be written into law.[4] In essence, the Register concluded that a sound recording performance right, applicable to all public performances, would be "entirely consonant with the basic principles of copyright law generally, and with those of the 1976 Copyright Act specifically."[5] The Register's findings included her recommendation and prediction that:

> Congress, in its deliberations on performance rights, should not be unmindful of the possibility that technological developments could well cause substantial changes in existing systems for public delivery of sound recordings. In that event, it is equally possible that a performance right would become the major source of income from, and incentive to, the creation of such works.[6]

Notwithstanding the Register's report, initial efforts to legislate a sound recording performance right were repeated, but unsuccessful.[7] It was difficult to craft a bill that adequately protected the interests of the parties affected by the legislation, while striking a necessary balance between economic incentives for recording artists and public access to recordings.

However, just as duplicating technology was the impetus behind the act which afforded sound recordings limited copyright protection in the first instance, digital technology gave new life to the performance rights initiative. In 1990, Senator Dennis DeConcini, chairman of the Senate Subcommittee on Patents, Copyrights, and Trademarks asked the Copyright Office for a report on the copyright implications of digital audio broadcasts and cable services.

In 1991, the Office issued its report.[8] First, addressing the future of sound recording, it concluded that "[d]igital represents such a technological advance in sound delivery that it is certain to be the audio transmission medium of the future."[9] Moreover, the Copyright Office again recommended, as it did in 1978, that the 1976 Copyright Act be amended to extend a public performance right to sound recordings.

By 1991, the technological changes which the Register predicted in 1978 had come to fruition. Accordingly, the Office indicated, in its 1991 report, that the amendment was overdue:

> Thirteen years have passed since the Copyright Office formally recommended to the Congress the enactment of a public performance right in sound recordings. Technological changes have occurred that facilitate transmission of sound recordings to huge audiences. Satellite and digital technologies make possible the celestial jukebox, music on demand, and pay-per-listen services. * * * Sound record-

---

[4] Register of Copyrights, Report on Performance Right in Sound Recordings, H.R. Doc. No. 15, 95th Cong., 2d sess. (1978).

[5] Id. at 177.

[6] Id. at 174.

[7] See, e.g., H.R. 6063, 95th Cong., 1st sess. (1977); H.R. 977, 96th Cong., 1st sess. (1980); S. 1552, 96th Cong., 1st sess. (1980); H.R. 1805, 97th Cong., 1st sess. (1981).

[8] Register of Copyright, Report on Copyright Implications of Digital Audio Transmission Services (October 1991).

[9] Id. at ii.

ing authors and proprietors are harmed by the lack of a performance right in their works.[10]

In the wake of the 1991 Copyright Office study on digital audio transmission services, the House of Representatives held an Oversight hearing during the first session of the 103d Congress regarding sound recording performance rights.[11] In the second session, Senators Orrin Hatch and Dianne Feinstein introduced S. 1421, which provided for an exclusive right to perform sound recordings publicly by means of digital transmissions.[12] A companion bill was introduced in the House of Representatives by Representative William Hughes.[13]

Neither the House of Representatives nor the Senate held hearings on the bills, but Representative Hughes, chairman of the House Judiciary Subcommittee on Courts and Intellectual Property, hosted "roundtable" discussions in an effort to forge a consensus on appropriate legislation. Several groups were represented at the discussions, including, among others: the broadcast industry, cable and satellite digital audio service providers, restaurant owners, and copyright owners of both sound recordings and musical works.

After extensive further discussions among the interested parties at the urging of the new chairman of the Judiciary Committee, Senator Hatch, and Senator Feinstein, those Senators introduced S. 227, in the 104th Congress, on January 13, 1995.[14] The Senate Judiciary Committee held hearings on the bill on March 9, 1995,[15] at which testimony was given by Bruce A. Lehman, Assistant Secretary of Commerce and Commissioner of Patents and Trademarks, on behalf of the Administration; Marybeth Peters, Register of Copyrights; Don Henley, an individual recording artist; and representatives from the Recording Industry Association of America (RIAA), the American Society of Composers, Authors and Publishers (ASCAP), Broadcast Music, Inc. (BMI), the National Music Publishers Association (NMPA), the American Federation of Musicians (AFM), International Cablecasting Technologies (ICT), and Mountain West Audio, a Muzak affiliate. In addition, the National Association of Broadcasters (NAB), the National Cable Television Association (NCTA) and Compuserve Inc. submitted written statements for the record.

On June 29, 1995, after further discussion and consultation, the Committee gave unanimous approval to an amendment in the nature of a substitute to S. 227 proposed by Chairman Hatch, and co-sponsored by Senators Feinstein, Thurmond, and Leahy.

Among the changes to the bill were revisions to certain competition-related provisions. In a letter to the Committee on June 20, the Department of Justice expressed competition concerns with cer-

---

[10] *Id.* at 154–155.
[11] Performers and Performance Rights in Sound Recordings: Hearing before the Subcommittee on Intellectual Property and Judicial Administration of the House Committee on the Judiciary, 103d Cong., 1st sess. (1993).
[12] S. 1421, 103d Cong., 1st sess. (1993).
[13] H.R. 2576, 103d Cong., 1st sess. (1993).
[14] S. 227, 104th Cong., 1st sess. (1995). Senators Alan Simpson, Mike DeWine, Trent Lott, and Max Baucus joined as cosponsors of the bill.
[15] The Digital Performance Right in Sound Recordings Act of 1995: Hearings before the Senate Committee on the Judiciary, 104th Cong., 1st sess. (1995).

tain provisions of the bill. In response, Senator Thurmond, chairman of the Antitrust Subcommittee, and Senator Leahy, Ranking Democrat on the Antitrust Sucommittee, proposed revisions to subsections 114 (e) and (h) of the Copyright Act, as added by this bill. Those revisions were incorporated into the amendment in the nature of a substitute proposed on June 29. The Department expressed satisfaction with the revisions in a letter dated July 21.

## III. Discussion

### BACKGROUND

As the foregoing discussion on the legislative history of this bill makes clear, the historic lack of a performance right for sound recordings under U.S. copyright law has been a source of controversy for decades. The first efforts to amend the copyright laws to provide protection for sound recordings date from the 1920's. Through much of the 1960's and 1970's, both Houses of Congress studied and debated the arguments for and against establishing a performance right in sound recordings. In the 103d Congress, this issue again came to the fore, again without resolution.

Although this issue is not a new one, the Committee believes that the time has come to act. The Committee is not alone in that judgment. Bruce A. Lehman, the Assistant Secretary of Commerce and Commissioner of Patents and Trademarks, expressed the Administration's agreement at the Committee's hearing on S. 227, stating that "[W]e believe that the time has come to bring protection for performers and producers of sound recordings into line with the protection afforded to the creators of other works." [16] Similarly, Register of Copyrights Marybeth Peters testified, "[J]ustice requires that performers and producers of sound recordings be accorded a public performance right. As a world leader in the creation of sound recordings, the United States, should no longer delay in giving its creators of sound recordings the minimum rights many countries give their performers and producers." [17]

Notwithstanding the views of the Copyright Office and the Patent and Trademark Office that it is appropriate to create a comprehensive performance right for sound recordings, the Committee has sought to address the concerns of record producers and performers regarding the effects that new digital technology and distribution systems might have on their core business without upsetting the longstanding business and contractual relationships among record producers and performers, music composers and publishers and broadcasters that have served all of these industries well for decades. Accordingly, the Committee has chosen to create a carefully crafted and narrow performance right, applicable only to certain digital transmissions of sound recordings.

### NEW DIGITAL TRANSMISSION TECHNOLOGIES

In a comparatively few years, compact discs (CD's), which embody digital recordings, have edged out analog recording media such as cassette tapes and vinyl records to become the dominant

---

[16] Statement of Bruce A. Lehman on S. 227 at 1 (Mar. 9, 1995).
[17] Statement of Marybeth Peters on S. 227 at 25 (Mar. 9, 1995).

physical medium for the distribution of copyrighted sound recordings. Consumers have embraced digital recordings because of their superior sound quality.

Even more recently, a small number of services have begun to make digital transmissions of recordings to subscribers. Trends within the music industry, as well as the telecommunications and information services industries, suggest that digital transmission of sound recordings is likely to become a very important outlet for the performance of recorded music in the near future. Some digital transmission services, such as so-called "celestial jukebox," "pay-per-listen" or "audio-on-demand" services, will be interactive services that enable a member of the public to receive, on request, a digital transmission of the particular recording that person wants to hear.

These new digital transmission technologies may permit consumers to enjoy performances of a broader range of higher-quality recordings than has ever before been possible. These new technologies also may lead to new systems for the electronic distribution of phonorecords with the authorization of the affected copyright owners. Such systems could increase the selection of recordings available to consumers, and make it more convenient for consumers to acquire authorized phonorecords.

However, in the absence of appropriate copyright protection in the digital environment, the creation of new sound recordings and musical works could be discouraged, ultimately denying the public some of the potential benefits of the new digital transmission technologies. The Committee believes that current copyright law is inadequate to address all of the issues raised by these new technologies dealing with the digital transmission of sound recordings and musical works and, thus, to protect the livelihoods of the recording artists, songwriters, record companies, music publishers and others who depend upon revenues derived from traditional record sales.

In particular, the Committee believes that recording artists and record companies cannot be effectively protected unless copyright law recognizes at least a limited performance right in sound recordings. Thus, S. 227 grants such a performance right, subject to various limitations intended to strike a balance among all of the interests affected thereby.

The Committee anticipates that the relevant technologies will continue to advance. The bill has been carefully drafted to accommodate foreseeable technological changes. However, to the extent that the language of the bill does not precisely anticipate particular technological changes, it is the Committee's intention that both the rights and the exemptions and limitations created by the bill be interpreted in order to achieve their intended purposes.

## S. 227 RESPONDS TO ISSUES RAISED BY NEW DIGITAL TRANSMISSION TECHNOLOGIES

An important rationale for enactment of this legislation is to address the potential impact on the prerecorded music industry of digital subscription and interactive services. The Committee, in reviewing the record before it and the goals of this legislation, recognizes that the sale of many sound recordings and the careers of

many performers have benefitted considerably from airplay and other promotional activities provided by both noncommercial and advertiser-supported, free over-the-air broadcasting. The Committee also recognizes that the radio industry has grown and prospered with the availability and use of prerecorded music. This legislation should do nothing to change or jeopardize the mutually beneficial economic relationship between the recording and traditional broadcasting industries.

This legislation is a narrowly crafted response to one of the concerns expressed by representatives of the music community, namely that certain types of subscription and interactive audio services might adversely affect sales of sound recordings and erode copyright owners' ability to control and be paid for use of their work. Subscription and interactive audio services can provide multichannel offerings of various music formats in CD-quality recordings, commercial free and 24 hours a day. Jerold Rubinstein, chairman of the Digital Music Express subscription audio service, testified before this Committee that even though he believes that certain digital subscription services effectively promote sales of sound recordings through the adoption of new identification technologies as well as by the exposure afforded to the performers and sound recordings, he also believes that sound recording copyright owners and recording artists deserve compensation for this use. The future holds the promise of pay-per-listen, audio-on-demand, or "dial-up" services for a particular recording or artist. The Committee believes that copyright owners of sound recordings should enjoy protection with respect to digital subscription, interactive and certain other such performances. By contrast, free over-the-air broadcasts are available without subscription, do not rely on interactive delivery, and provide a mix of entertainment and non-entertainment programming and other public interest activities to local communities to fulfill a condition of the broadcasters' license. The Committee has considered these factors in concluding not to include free over-the-air broadcast services in this legislation. The Committee, however, does not overlook the fact that other media, such as cable television, also undertake public interest activities, but notes that they provide subscription or interactive services which establish the basis for subjecting them to the requirements of this legislation.

The limited right created by this legislation reflects changed circumstances: the commercial exploitation of new technologies in ways that may change the way prerecorded music is distributed to the consuming public. It is the Committee's intent to provide copyright holders of sound recordings with the ability to control the distribution of their product by digital transmissions, without hampering the arrival of new technologies, and without imposing new and unreasonable burdens on radio and television broadcasters, which often promote, and appear to pose no threat to, the distribution of sound recordings.

### LIMITATIONS ON THE NEW PERFORMANCE RIGHT

In deciding to grant a new exclusive right to perform copyrighted sound recordings publicly by means of digital audio transmission, the Committee was mindful of the need to strike a balance among

all of the interests affected thereby. That balance is reflected in various limitations on the new performance right that are set forth in the bill's amendments to section 114 of title 17 and described in detail later in this report.

Two of the concerns that motivated certain of the limitations on exclusive rights are deserving of particular mention. First, concern was expressed that granting a performance right in sound recordings would make it economically infeasible for some transmitters to continue certain current uses of sound recordings. This concern is addressed by various limitations on the exclusive right:

S. 227 applies only to digital audio transmissions. Purely analog transmissions are not covered, and neither are digital transmissions of audiovisual works.

S. 227 contains a number of exemptions from the exclusive right that are directed toward specific uses of sound recordings. Probably most important, nonsubscription transmissions (i.e., transmissions not controlled or limited to particular recipients or for which no consideration is required to be paid), such as nonsubscription broadcast transmissions by radio and television stations, are exempted unless they are part of an interactive service.

Nonexempt, noninteractive subscription transmissions are eligible for statutory licensing.

Concern also was expressed that granting sound recording copyright owners an exclusive performance right could limit opportunities for the performance of musical works. That concern is addressed by the limitations described above and also by the provisions of new section 114(d)(3), which impose certain limitations on the granting of exclusive licenses under the new performance right in order not to hinder the growth of interactive services.

It is important to recognize that these limitations on the new performance right (other than the limitation on exclusive licensing of interactive services contained in new section 114(d)(3)) do not apply to interactive digital transmission services. Of all the new forms of digital transmission services, interactive services are most likely to have a significant impact on traditional record sales, and therefore pose the greatest threat to the livelihoods of those whose income depends upon revenues derived from traditional record sales. The Committee believes that sound recording copyright owners should have the exclusive right to control the performance of their works as part of an interactive service, and so has excluded interactive services from these limitations on the performance right.

The Committee was particularly concerned that this bill could be construed as affecting existing rights of musical work or sound recording copyright owners. The purpose of S. 227 is to recognize a new limited performance right in sound recordings. As set forth in the various savings clauses of new section 114(d)(4), the Committee has no intention to limit any existing right of a sound recording or musical work copyright owner. Indeed, to the extent, if any, that a limitation on the new right of public performance is inconsistent with the rights of a musical work or sound recording copyright owner under sections 106(1) through 106(5), the copyright owner may fully exercise its exclusive rights under sections 106(1)

through 106(5), and obtain the remedies provided by title 17 pursuant to such rights, notwithstanding any limitations on the new right of public performance. Of course, the limitations on exclusive rights contained in sections 107 through 113, in sections 116 through 120, and in the unamended portions of sections 114 and 115 are likewise unchanged by this bill.

MECHANICAL ROYALTIES IN DIGITAL PHONORECORD DELIVERIES

The Working Group on Intellectual Property Rights of the Information Infrastructure Task Force has preliminarily concluded that "[i]t is not clear under current law that a transmission can constitute a distribution of copies or phonorecords of a work."[18] Music copyright owners believe that current law gives them the ability to enforce their reproduction and distribution rights relating to digital transmissions, but recommend that these rights be clarified and confirmed in the digital environment. The Committee expresses no view on current law in this regard, but the Committee is concerned that even a perception of uncertainty raises questions concerning the respective rights and obligations of musical work copyright owners, record companies, and transmission services as to digital transmissions of recorded music.

In connection with efforts to develop a National Information Infrastructure or Global Information Infrastructure, the Committee may be called upon to consider legislation to address this uncertainty as to all types of copyrighted works. However, the Committee believes it appropriate in the context of this bill to address the rights of musical work and sound recording copyright owners as to certain types of digital transmissions described in the bill as "digital phonorecord deliveries." This is the purpose of section 4 of the bill, which is described in detail later in this report.

INTERNATIONAL ISSUES

The Committee is well aware of ongoing discussions and attempts at greater international harmonization of copyright and neighboring rights at the World Intellectual Property Organization (WIPO), in discussions within the G–7, and other forums. This legislation reflects a careful balancing of interests, reflecting the statutory and regulatory requirements imposed on U.S. broadcasters, recording interests, composers, and publishers, and the recognition of the potential impact of new technologies on the recording industry. The purpose and scope of this new right are clearly laid out in the bill and this report. The underlying rationale for creation of this limited right is grounded in the way the market for prerecorded music has developed, and the potential impact on that market posed by subscription and interactive services—but not by broadcasting and related transmissions.

IV. VOTE OF THE COMMITTEE

On June 29, 1995, with a quorum present, by a voice vote, the Committee on the Judiciary ordered the bill as an amendment in the nature of a substitute favorably reported.

---

[18] *A Preliminary Draft of The Report of the Working Group on Intellectual Property Rights,* Information Infrastructure Task Force at 120–21 (July 1994).

## V. Section-by-Section Analysis

### SECTION 1. SHORT TITLE

This section sets forth the title of the Act, the "Digital Performance Right in Sound Recordings Act of 1995."

### SECTION 2. EXCLUSIVE RIGHTS IN COPYRIGHTED WORKS

This section amends section 106 of title 17 to add a new paragraph (6) to provide an exclusive right to perform a copyrighted sound recording publicly by means of a digital audio transmission.

### SECTION 3. SCOPE OF EXCLUSIVE RIGHTS IN SOUND RECORDINGS

This section amends section 114(a) by adding a reference to new section 106(6) in the list of exclusive rights granted to the owner of a copyright in a sound recording.

This section also amends the language of section 114(b) relating to the tangible medium of expression in which sound recordings can be duplicated. Instead of referring only to phonorecords or "copies of motion pictures and other audiovisual works," the new language recognizes that sound recordings can be reproduced in copies of any kind. As multimedia technologies begin to blur the lines between different categories of works capable of being embodied in copies, the Committee deemed it important to confirm that, subject to the specific limitations in section 114(b), sound recordings enjoy the full scope of protection afforded by the reproduction right under section 106(1).

This section also strikes section 114(d) of title 17, an obsolete provision that directed the Register of Copyrights to submit a report on performance rights to Congress on January 3, 1978, and replaces it with new subsections (d) through (i), as described below.

*Section 114(d). Limitations on exclusive right*

*Section 114(d)(1). Exempt transmissions and retransmissions*

Section 114(d)(1) is designed to ensure that the new right provided to owners of copyright in sound recordings with respect to certain digital public performances of those recordings will not affect nonsubscription transmissions (such as radio or television broadcasts), most retransmissions of those transmissions, and certain other transmissions or retransmissions that the Committee believes should not be subject to the new right.

To take advantage of the section 114(d)(1) exemptions, a transmission or retransmission must not be part of an "interactive service" as defined in section 114(j)(4). The Committee anticipates that this requirement will not present any difficulty for the types of services covered by the section 114(d)(1) exemption. The term "interactive service" is intended to cover only services in which an individual can arrange for the transmission or retransmission of a specific sound recording to that person or another, individually.

Under section 114(d)(1), a transmission or retransmission will be exempt from the new right under section 106(6) if it falls into at least one of the following categories:

*Section 114(d)(1)(A) (nonsubscription transmissions)*

Under this provision, any transmission to members of the public that is neither a subscription transmission (as defined in section 114(j)(8)) nor part of an interactive service is exempt from the new digital performance right. The classic example of such an exempt transmission is a transmission to the general public by a free over-the-air broadcast station, such as a traditional radio or television station, and the Committee intends that such transmissions be exempt regardless of whether they are in a digital or nondigital format, in whole or in part.

*Section 114(d)(1)(B) (retransmissions of nonsubscription broadcast transmissions)*

In general, this provision exempts all retransmissions of nonsubscription broadcast transmissions, whether the retransmissions are offered on a subscription or a nonsubscription basis. Retransmissions of radio station broadcast transmissions, however, are exempt only if they are not part of an interactive service and fall within certain specified categories, which are discussed in detail below.

The Committee has created the section 114(d)(1)(B) exemption because it is aware that cable systems and other multichannel programming distributors often offer retransmissions of nonsubscription broadcast transmissions to their customers. At present, copyright liability for these retransmissions ordinarily is covered pursuant to sections 111 and 119 of the Act. The Committee intends, subject to the limitations discussed below concerning retransmissions of radio broadcasts, that all noninteractive retransmissions of noninteractive nonsubscription broadcast transmissions be exempt from the new digital sound recording performance right. These retransmissions will be exempt even if the cable system (or other retransmission service) limits the delivery of the retransmission to its customers and charges a fee to receive the retransmission. In other words, retransmissions of broadcast stations' signals will be exempt even if the retransmissions are themselves "subscription" retransmissions under the Act. A cable system's delivery of a retransmitted radio broadcast signal within 150 miles of the transmitter, for example, will be exempt under section 114(d)(1)(B)(i), even if the cable system charges a monthly fee to subscribers to receive the signal.

Retransmissions of the broadcast transmissions of radio stations are exempt pursuant to section 114(d)(1)(B) only if they fall within one of the categories listed in paragraphs 114(d)(1) (B)(i) through (B)(iv).

*Section 114(d)(1)(B)(i) (retransmission of radio signals within 150-mile radius of transmitter)*

Under this provision, retransmissions of a radio station within a 150-mile radius of the site of that station's transmitter are exempt, whether retransmitted on a subscription or a nonsubscription basis, provided that they are not part of an interactive service.

This provision does not, however, exempt the willful or repeated retransmission of a radio station's broadcast transmission more than a 150-mile radius from the radio station's transmitter. The

Committee recognizes that the 150-mile limit could serve as a dangerous trap for the uninitiated or inattentive. To ensure against that possibility, section 114(d)(1)(B)(i) provides that a retransmission beyond the 150-mile radius will fall outside the exemption only if the retransmission is willful or repeated. The Committee intends the phrase "willful or repeated" to be understood in the same way that phrase was used in section 111 of the Act, as explained in the House Report on the 1976 Act, H. Rept. 1476, 94th Cong., 2d sess. 93 (1976).

Pursuant to section 114(d)(1)(B)(i)(I), the 150-mile limitation does not apply when a nonsubscription broadcast transmission by an FCC-licensed station is retransmitted on a nonsubscription basis by an FCC-licensed terrestrial broadcast station, terrestrial translator, or terrestrial repeater. In other words, a radio station's broadcast transmission may be retransmitted by another FCC-licensed broadcast station (or translator or repeater) on a nonsubscription basis without regard to the 150-mile restriction.

Under section 114(d)(1)(B)(i)(II), when a retransmission covered by section 114(d)(1)(B)(i)(I) is itself retransmitted on a subscription basis, the 150-mile radius is measured from the transmitter site of the broadcast retransmitter (whether a station, translator, or repeater). This means that a cable system (or other subscription retransmitter) can, without incurring liability under section 106(6), retransmit a broadcast retransmission within 150 miles of the transmitter site of the station, translator, or repeater that is making the retransmission.

Section 106(6) is not intended to apply to the transmission of a local radio station's programming free of charge to local or long-distance callers who are put "on hold" during a telephone call with a business, nor is the bill intended to change current law as it applies to such performances of copyrighted musical works under section 106(4).

*Section 114(d)(1)(B)(ii) (all-band retransmissions of radio transmissions received over the air)*

This provision is intended to permit retransmitters (such as cable systems) to offer retransmissions to their local subscribers of all radio stations that the retransmitter is able to pick up using an over-the-air antenna. (These are sometimes called "all-band" retransmissions.) There are three requirements for this exemption: (1) the retransmitter (such as a cable system) must obtain the radio broadcast transmission over the air; (2) the broadcast transmission must not be electronically processed by the retransmitter as separate and discrete signals (as that term is used in 37 CFR 201.17(b)(4)); and (3) the transmissions must be retransmitted only within the local communities served by the retransmitter. Since some radio station broadcast transmissions can be picked up over the air beyond 150 miles, this provision is intended to ensure that the 150-mile limitation in section 114(d)(1)(B)(i) will not create unintended liability for all-band retransmissions.

*Section 114(d)(1)(B)(iii) (grandfathering)*

This provision exempts certain other retransmissions of radio broadcast transmissions, again without regard to the 150-mile limit

in section 114(d)(1)(B)(i)). The requirements for this exemption are as follows: (1) the radio station's transmission was being retransmitted by a satellite carrier on January 1, 1995 (as, for example, Chicago radio station WFMT); (2) that retransmission was being retransmitted by cable systems (as defined in section 111(f) of the Act) as a separate and discrete signal; (3) the satellite carrier receives the radio station's transmission in analog form; and (4) the broadcast transmission being retransmitted embodies the programming of no more than one radio station (i.e., the station must not be multiplexed).

### Section 114(d)(1)(B)(iv) (nonsubscription broadcast retransmissions of public radio station broadcast transmissions)

The Committee recognizes that noncommercial educational radio stations rely on a variety of types of broadcast retransmissions to deliver their programming to the public. This provision establishes an exemption for such retransmissions. Specifically, this provision exempts both simultaneous and nonsimultaneous retransmissions of broadcast transmissions originally made by federally funded noncommercial educational radio stations, provided that the retransmissions are carried out through nonsubscription terrestrial broadcasts. To qualify, the noncommercial educational radio station's broadcasts must consist of news, informational, cultural, public affairs, or other "educational and cultural" programming to the public. The 150-mile limitation of section 114(d)(1)(B)(i) does not apply to retransmissions that qualify for this exemption.

Many noncommercial educational stations also use intermediate nonbroadcast transmission links to broadcast their programming to the public, and those nonbroadcast transmissions or retransmissions may be exempt under other provisions of the bill.

### Section 114(d)(1)(C) (other exempt transmissions and retransmissions)

This provision exempts certain other categories of transmissions, without regard to whether they are subscription transmissions or nonsubscription transmissions. The categories exempted under this provision are as follows.

### Section 114(d)(1)(C)(i) (incidental transmissions and retransmissions)

In the course of arranging for the delivery of an exempt transmission or retransmission, many incidental transmissions or retransmissions may take place. For example, a radio or television station may receive a satellite feed from a network or from another station that provides programming to the station; a station or network may receive a "backhaul" transmission from a sports or news event at a remote location; or a station may deliver a clean feed of its broadcast transmission to a cable system to ensure that the cable system's retransmission will be of the highest technical quality. Among other things, section 114(d)(1)(C)(i) exempts transmissions of a broadcast station that both broadcasts its signal to the public and, either immediately or through intermediate terrestrial links, transmits or retransmits that signal by satellite to other broadcast stations for their simultaneous or subsequent broadcast

to the public. The Committee intends that all such incidental transmissions or retransmissions be exempt from the new digital performance right under section 106(6) regardless of whether they are made on a subscription or a nonsubscription basis, and regardless of whether some or all portions of a transmission or retransmission are in a digital format. Thus, section 114(d)(1)(C)(i) also exempts an incidental transmission, as described above, by a subscription digital transmission service to a cable system to the extent that the cable system is engaging in an exempt retransmission of that transmission to a business establishment pursuant to section 114(d)(1)(C)(iv). The Committee does not intend, however, for any subscription transmission or retransmission intended for reception directly by members of the public to fall within the category of exempt incidental transmissions. To qualify for this "incidental" exemption, transmissions and retransmissions must be made for the purpose of facilitating an exempt transmission or retransmission. Thus, a retransmission that is available for general reception by the public (for example, through the Internet), which is not being used to facilitate an exempt transmission or retransmission, would not qualify as an "incidental" retransmission under this section.

*Section 114(d)(1)(C)(ii) (transmissions and retransmissions by businesses on and around their premises)*

Businesses often utilize transmissions or retransmissions on or around their premises that include prerecorded musical works. This activity is sometimes called "storecasting." The Committee is aware that there has been extensive litigation over the scope of section 110(5) of the Act relating to the particular circumstances under which businesses are liable to the copyright owners of musical works when they utilize transmissions containing such works on and around their premises. To leave absolutely no doubt that the new section 106(6) right is not intended to create any comparable right in the owners of copyright in sound recordings regarding "storecasts," section 114(d)(1)(C)(ii) specifically provides that the new right does not reach transmissions or retransmissions on or around business premises. In particular, section 114(d)(1)(C)(ii) would permit a business to engage in transmissions (or retransmissions of any transmission) on its premises or the immediately surrounding vicinity without incurring liability to the copyright owners of sound recordings under section 106(6). This provision is not intended to change the rights of copyright owners of musical works regarding transmissions or retransmissions under existing law.

*Section 114(d)(1)(C)(iii) (authorized retransmissions of licensed transmissions)*

To simplify licensing practices, section 114(d)(1)(C)(iii) provides a "through to the listener" exemption intended to permit retransmitters, including cable systems, direct broadcast satellite (DBS) service providers and other multichannel video programming distributors (MVPD's) (as defined in the 1934 Communications Act, as amended), simultaneously to retransmit to the listener noninteractive music programming provided by a licensed source. To qualify for this exemption, the retransmission must be simulta-

neous with the transmission and authorized by the transmitter; and the original transmission must be licensed by the copyright owner of the sound recording. For purposes of this exemption, retransmissions are deemed to be "simultaneous" even if there is some momentary time delay resulting from the technology used for transmission or retransmission.

Thus, section 114(d)(1)(C)(iii) exempts retransmissions from liability for copyright infringement where a noninteractive music programmer transmitter has obtained a public performance copyright license from the copyright owner of the sound recording, and the retransmitter has not obtained such a license but is authorized by the music programmer transmitter to retransmit the sound recording. Retransmissions of this type are exempt under the provisions of this Act, as the sound recordings retransmitted are covered by the licenses that the music programmer transmitter obtains from the sound recording copyright owners.

### Section 114(d)(1)(C)(iv) (certain transmissions or retransmissions to business establishments)

This provision exempts from liability under new section 106(6) certain noninteractive transmissions and retransmissions made to business establishments for use in the ordinary course of their business, such as for background music played in offices, retail stores or restaurants.

To qualify, the transmission or retransmission must meet all of the following conditions: (a) the transmission or retransmission must be to a business establishment; (b) the transmission must be for use by the business establishment in the ordinary course of its business; (c) the business establishment must not retransmit the transmission outside its premises or the immediately surrounding vicinity; and (d) the transmission must not exceed the sound recording performance complement, as defined in section 114(j).

If a business establishment retransmits the transmission in a manner not otherwise exempted under subparagraph (C)(ii), without the authority or prior knowledge of or any inducement by any entity that transmitted the service to the business establishment, then only the retransmission by the business establishment is not exempt pursuant to subparagraph (C)(iv). Under such circumstances, the nonexempt status of such a retransmission would not affect the exempt status of the transmission to that business establishment.

If the same subscription transmission service programming is being transmitted to both business establishments and nonbusiness consumers, then only the transmission of that service to the business establishments would qualify for an exemption pursuant to subparagraph (C)(iv). As the bill makes clear, nothing in this exemption is intended to limit the breadth of the general exemption in section 114(d)(1)(C)(ii) for transmissions or retransmissions by business establishments on their premises, or any of the other exemptions in this section 114(d)(1).

Section 106(6) is not intended to apply to the transmission of a commercial background music service free of charge to local or long distance callers who are put "on hold" during a telephone call with a business, nor is the bill intended to change current law as it ap-

plies to such performances of copyrighted musical works under section 106(4).

*Section 114(d)(2). Subscription transmissions*

Subsection (d)(2) provides that certain subscription transmissions may be subject to statutory licensing if the transmissions conform to the criteria set forth in that section. "Subscription transmissions" are defined in subsection (j)(8) as transmissions limited to particular recipients for which consideration is required to be paid. Transmitters of noninteractive subscription transmissions that are not otherwise exempt under subsection (d)(1) may be eligible for a statutory license under subsection (f). A "statutory license" guarantees that every noninteractive subscription transmission service will receive a license to perform the sound recording by means of a digital transmission, provided that the transmission service pays the royalty and complies with the terms prescribed in accordance with subsection (f). The rates and terms will be set by industry or individual negotiation, or if necessary, by a copyright arbitration royalty panel convened pursuant to chapter 8 of the Copyright Act.

In order to qualify for a statutory license, a performance of a sound recording by digital audio transmission must meet five conditions, enumerated in subparagraphs (A) through (E):

First, as already noted, the transmission cannot be part of an "interactive service", as defined in subsection (j)(4). Interactive services, which allow listeners to receive sound recordings "on-demand", pose the greatest threat to traditional record sales, as to which sound recording copyright owners currently enjoy full exclusive rights. Thus, in order to provide a comparable ability to control distribution of their works, copyright owners of sound recordings must have the right to negotiate the terms of licenses granted to interactive services.

Second, subparagraph (B) requires that transmissions subject to the statutory license cannot exceed the sound recording performance complement defined in subsection (j)(7). The complement, more fully described below, contains limits on the number of selections a subscription transmission service can play from any one phonorecord or boxed set, or by the same featured recording artist pursuant to the statutory license. For purposes of this subparagraph, each channel of a multichannel service is a separate "transmission."

Third, subparagraph (C) states that the transmitting entity may not avail itself of the statutory license if it publishes an advance program schedule or makes prior announcements of the titles of specific sound recordings or phonorecords to be transmitted. This provision addresses the situation in which an entity informs its subscribers in advance as to when particular sound recordings will be performed. A preannouncement that does not use the title of the upcoming selection would still come within this limitation so long as it sufficiently identifies the selection through other information, such as the artist's name and the song's well-known current chart position. The limitation is not intended, however, to prevent a transmitting entity from advertising the names of illustrative

sound recordings or phonorecords that may, at some time, be performed by that entity under the statutory license.

Fourth, the transmitting entity cannot automatically and intentionally cause the receiver's equipment to switch from one channel to another. This limitation does not apply to transmissions made to a business establishment. This subparagraph is intended to remedy the situation in which a service licensed under the statutory license might intentionally attempt to evade the sound recording performance complement by switching a nonbusiness subscriber's receiver from one channel to another.

Finally, subparagraph (E) imposes as a condition of statutory licensing the obligation of a subscription entity to carry within its transmitted signal certain specified types of information, if that information has been encoded in the sound recording under the authority of the copyright owner of that sound recording. This provision does not obligate the copyright owner of the sound recording to encode such copyright management information in the work, nor does it limit the copyright owner's ability to select the types of information (e.g., artist, title) to be encoded. In addition, it is not intended to require a transmitting entity to generate or encode such information in its transmission if the information is not encoded in the sound recording. Moreover, the transmitting entity is not required to transmit information that may be encoded in the sound recording other than the information specified in this subparagraph and "related information" (i.e., information that is specifically related to the identification of the works being performed and upon which payments are to be made by the transmitting entity under this bill). Subparagraph (E) also makes clear that nothing in this section affects the provisions of section 1002(e).

*Section 114(d)(3). Licenses for transmissions by interactive services*

This provision places limits on the sound recording copyright owner's exclusive right to license interactive services. (No limitations are imposed where the sound recording copyright owner licenses an interactive service on a nonexclusive basis.) As described below, an "interactive service" includes on-line or other services that offer "pay-per-listen," "audio-on-demand," or "celestial jukebox" features, regardless of whether there is a charge to receive the service. The Committee is aware of concerns that the copyright owners of sound recordings might become "gatekeepers" and limit opportunities for public performances of the musical works embodied in the sound recordings. The Committee believes that the limits set forth in subsection (d)(3) appropriately resolve any such concerns.

Paragraph (3)(A) provides that the duration of an exclusive license granted to an interactive service for the public performance of a sound recording by means of digital audio transmission cannot exceed 12 months. In the case of a copyright owner that holds fewer than 1,000 copyrights in sound recordings, an exclusive license to an interactive service can last up to 24 months. In either case, after the license expires, that interactive service cannot receive another exclusive license for the same sound recording for a period of 13 months.

The sound recording copyright owner is not subject to these limitations in certain circumstances, as enumerated in paragraph (3)(B). Subparagraph (B)(i) provides that the limitations do not apply where the licensor has granted performance licenses to at least 5 different interactive services. Each license must be for a significant portion of that segment of the licensor's catalog of sound recordings that has been licensed to interactive services—specifically, at least 10 percent of the sound recordings that have been licensed to interactive services, but in no event less than 50 sound recordings. For example, a record company would not be subject to the limitations in paragraph (3)(A) if it has granted performance licenses for a total of 10,000 sound recordings to five different interactive services, and each service received a performance license for at least 1,000 sound recordings.

Subparagraph (B)(ii) provides that the limits on licenses to interactive services also do not apply where the performance license is granted for promotional purposes. The sole purpose of the license must be to promote the distribution or performance of the sound recording, and the license can only permit a public performance of up to 45 seconds. A qualifying public performance is merely exempted from the limitation on licensing found in paragraph (3)(A); subparagraph (B)(ii) does not provide an exemption from infringement liability for a transmission otherwise subject to liability.

Section 114(d)(3)(C) provides that, whether or not the owner of copyright in a sound recording has granted an exclusive or nonexclusive license to an interactive service, the service must nevertheless obtain a license from a performing rights society or from the copyright owner of the musical work contained in the sound recording. This provision does not affect any existing limitation under sections 107–113, sections 116–120, or the unamended portions of sections 114 and 115.

To simplify licensing practices, a "through to the listener" exemption is provided in paragraph (3)(D) for those entities that retransmit digital audio transmissions from an interactive service. These retransmissions must be of transmissions by an interactive service licensed to publicly perform the sound recording; the retransmission must be authorized by the interactive service; the retransmission must be simultaneous with the transmission; and it must be limited to the customer intended by the interactive service to receive the transmission.

The definition of "licensor" in subparagraph (3)(E)(i) makes clear that this term includes certain affiliates of the copyright owner in sound recordings that own sound recording copyrights—namely, affiliates under a material degree of common ownership, management or control. Thus, the number of sound recording copyrights held by such affiliates of a record company must be included in a calculation to determine whether that company has fewer than 1,000 sound recordings for the purpose of paragraph (3)(A), and to determine whether the record company has licensed a sufficient number of sound recordings to satisfy the requirements found in paragraph (3)(B)(i) regarding the inapplicability of the exclusive licensing limitations.

*Section 114(d)(4).   Rights not otherwise limited*

Under existing principles of copyright law, the transmission or other communication to the public of a musical work constitutes a public performance of that musical work. In addition, the digital transmission of a sound recording that results in the reproduction by or for the transmission recipient of a phonorecord of that sound recording implicates the exclusive rights to reproduce and distribute the sound recording and the musical work embodied therein. New technological uses of copyrighted sound recordings are arising which require an affirmation of existing copyright principles and application of those principles to the digital transmission of sound recordings, to encourage the creation of and protect rights in those sound recordings and the musical works they contain.

This subsection makes clear, in paragraph (4)(A), the Committee's intent that except as explicitly provided in section 114, nothing in that section limits the exclusive right to perform a sound recording publicly by means of a digital audio transmission. Paragraph (4)(B) also makes clear that section 114 does not in any way limit the exclusive right to publicly perform a musical work under section 106(4); the exclusive rights in sound recordings and musical works under sections 106(1) and 106(3); and any other rights and remedies available under title 17. Similarly, the bill does not affect any existing limitation under sections 107–113, sections 116–120, or the unamended portions of sections 114 and 115.

Paragraph (4)(C) ensures that where an activity implicates a sound recording copyright owner's rights under both section 106(6) and some other clause of section 106, the limitations contained in section 114 shall not be construed to limit or impair in any way any other rights the copyright owner may have, or any other exemptions to which users may be entitled, with respect to the particular activity. For example, where a digital audio transmission is a digital phonorecord delivery as well as a public performance of a sound recording, the fact that the public performance may be exempt from liability under section 114(d)(1) or subject to statutory licensing under section 114(f) does not in any way limit or impair the sound recording copyright owner's rights and remedies under section 106(3) against the transmitter for the distribution of a phonorecord of the sound recording. As another example, where an interactive digital audio transmission constitutes a distribution of a phonorecord as well as a public performance of a sound recording, the fact that the transmitting entity has obtained a license to perform the sound recording does not in any way limit or affect the entity's obligation to obtain a license to distribute phonorecords of the sound recording. Similarly, the bill does not affect any existing limitation under sections 107–113, sections 116–120, or the unamended portions of sections 114 and 115.

*Section 114(e).   Authority for negotiations*

This subsection clarifies the applicability of the antitrust laws to the use of common agents in negotiations and agreements relating to statutory licenses and other licenses.

Under subsection (e)(1), copyright owners of sound recordings and operators of digital services (which perform sound recordings affected by section 114) may collectively negotiate statutory li-

censes for the performance of sound recordings "notwithstanding any provision of the antitrust laws." This exemption from the antitrust laws extends to negotiations and agreements on royalty rates and license terms and conditions, the proportionate division of the royalties among copyright owners, and the designation of common agents on a nonexclusive basis to negotiate, agree to, pay, or receive royalty payments.

Subsection (e)(1) closely follows the language of existing antitrust exemptions in copyright law relating to the negotiation of statutory licenses, including 17 U.S.C. 116(b)(1) (jukebox licenses) and 17 U.S.C. 118(b) (noncommercial broadcasting). Like those provisions, subsection (e)(1) is important to help effectuate the related statutory license provision. But unlike those provisions, subsection (e)(1) provides that use of a common agent must be nonexclusive.

The requirement of nonexclusivity is intended to preserve the possibility of direct licensing negotiations between individual copyright owners and operators of digital services, rather than merely between their common agents. For example, nonexclusivity should help prevent copyright owners from using a common agent to demand supracompetitive rates, because such demands might be avoided by direct negotiations with individual copyright owners. In such negotiations an individual copyright owner would exercise independent judgment on whether to contract on particular terms.

A more limited exemption to the antitrust laws is created by subsection (e)(2), relating to licenses granted under section 106(6), other than statutory licenses, such as performances by interactive services or performances that exceed the sound recording performance complement. Under subsection (e)(2)(A), copyright owners may designate common agents to "grant licenses and receive and remit royalty payments," while under subsection (e)(2)(B), operators of digital services may designate common agents to "obtain licenses and collect and pay royalty fees," without violating the antitrust laws. Importantly, however, subsection (e)(2) does not permit either copyright owners or operators to jointly establish royalty rates or competitively important license terms and conditions.

The antitrust protections provided for common agents in subsection (e)(2) are important to facilitate the licensing of digital sound recording performances (other than through statutory licenses) by reducing transaction costs. While this use of common agents might be found lawful under existing law, the statutory exemption in subsection (e)(2) will ensure that the formation of beneficial and procompetitive arrangements to facilitate licensing of performances will not be deterred by concerns over the possible application of the antitrust laws. This is particularly important given that other provisions in the copyright law contain antitrust exemptions.

The exemption in subsection (e)(2) is narrowly tailored to make clear that it would be permissible to use common agents, such as a clearinghouse, to handle the logistics of licensing, payment of royalties, and transmitting royalties to copyright owners. Establishment of royalty rates and material license terms and conditions do not receive any antitrust protection, however, so any common agents or clearinghouse must conform to the antitrust laws in these areas. To comply with this limitation, the common agent or

clearinghouse could either relay information about rates and terms to and from the copyright owners and the operators of digital services, or simply put interested operators in touch with the appropriate copyright owners for direct negotiations.

*Section 114(f). Licenses for nonexempt subscription transmissions*

This provision requires the Librarian of Congress to cause notice to be published of voluntary negotiation proceedings. The purpose of these proceedings is to determine reasonable terms and royalty rates for transmissions that qualify for statutory licensing under section 114(d)(2). The subsection also contains other provisions concerning such proceedings.

The first such voluntary negotiation proceeding is to commence within 30 days after the enactment of this Act upon publication by the Librarian of Congress of a notice in the Federal Register. The purpose of that proceeding shall be to determine reasonable terms and royalty rates for public performances of sound recordings by means of nonexempt subscription transmissions that qualify, under section 114(d)(2), for a statutory license. The statutory license provided by this subsection covers only the performance of sound recordings under section 106(6), and not the reproduction or distribution of sound recordings under sections 106(1) or 106(3).

The terms and rates established will cover qualified transmissions made between the effective date of this Act and December 31, 2000. Paragraph (1) requires that terms and rates should be established separately for each different type of digital audio transmission service then in operation, but does not require or suggest that the terms and rates established must be different.

The voluntary negotiation proceeding may result in license agreements voluntarily negotiated among individual sound recording copyright owners and individual entities that perform or authorize the performance of sound recordings by means of digital transmissions. It is the Committee's intention that negotiations leading to any such agreements be covered by section 114(e) and that any such agreements shall be given effect in lieu of any determination by a copyright arbitration royalty panel or decision by the Librarian of Congress.

Beyond such individual license agreements, however, the Committee hopes that the voluntary negotiation proceeding will lead to an industrywide agreement concerning royalty terms and rates. If an agreement as to rates and terms is reached and there is no controversy as to these matters, it would make no sense to subject the interested parties to the needless expense of an arbitration proceeding conducted under paragraph (2). Thus, it is the Committee's intention that in such a case, as under the Copyright Office's current regulations concerning rate adjustment proceedings, the Librarian of Congress should notify the public of the proposed agreement in a notice-and-comment proceeding and, if no opposing comment is received from a party with a substantial interest and an intent to participate in an arbitration proceeding, the Librarian of Congress should adopt the rates embodied in the agreement without convening an arbitration panel. See 37 CFR 251.63(b); see also 59 Fed. Reg. 63,038 (1994).

As provided in paragraph (4), the procedures for negotiation and, if necessary, arbitration set forth in paragraphs (1) and (2) of this subsection are to be repeated within 6 months of the filing of a petition by copyright owners in sound recordings (or entities performing sound recordings affected by section 114) that indicates that a new type of digital audio transmission service is, or is about to become, operational. Such procedures or arbitration should apply only with respect to the new type of service or services described in the petition. In addition, the procedures will be repeated for all types of services between June 30 and December 31, 2000, and every 5 years thereafter.

Paragraph (2) provides that if a voluntary negotiation proceeding as described in paragraph (1) does not lead to the determination of the terms and royalty rates applicable to qualified digital performances of sound recordings, those terms and rates are to be determined by arbitration under this paragraph. The Committee notes that the paragraph specifically refers to chapter 8 of title 17, which concerns copyright royalty arbitration in general. Accordingly, arbitration under this subparagraph should be conducted under the same type of procedures that apply in other copyright royalty arbitrations.

The parties are expected to negotiate, or if necessary arbitrate, "terms" as well as rates. By terms, the Committee means generally such details as how payments are to be made, when, and other accounting matters (such as are prescribed in section 115). In addition, the Librarian is to establish related terms under section 114(f)(2). Should additional terms be necessary to effectively implement the statutory license, the parties may negotiate such provisions or the CARP's may prescribe them.

Terms and rates determined under paragraph (2), like terms and rates determined under paragraph (1), are to be effective for a 5-year period or until the date of the next effective rate adjustment. In determining terms and rates under paragraph (2), a copyright arbitration royalty panel is to consider the objectives set forth in section 801(b)(1), and the arbitrators may consider rates under voluntarily negotiated license agreements. Paragraph (2) specifically authorizes the Librarian of Congress to establish requirements by which copyright owners may receive reasonable notice of the use of their sound recordings under this section, and under which records of such use shall be kept by persons performing sound recordings.

Paragraph (5) sets forth the requirements with which an entity must comply in order to obtain a statutory license. The performing entity must provide notice of the performance as required by regulations prescribed by the Librarian of Congress and pay the established royalty fees. If the royalty fees have not been set at the time of performance, the performing entity must agree to pay the royalty fee to be determined under this subsection by the twentieth day of the month following the month in which the rates are set. This limited license to perform the sound recording until the rate is set applies only to performances for which the entity seeks a statutory license. The failure to pay royalty rates in arrears makes the performing entity subject to full liability for infringement of section 106(6) from the inception of the transmissions of sound recordings by that transmitter after the effective date of the Act, and

may disqualify the entity for a statutory license under paragraph (5)(A)(i).

*Section 114(g). Proceeds from licensing of subscription transmissions*

This subsection describes how royalties from the licensing of the digital performance right in a sound recording are distributed to the artists who performed on the sound recording.

Paragraph (1) of this subsection provides that payments to both featured and nonfeatured (or background) artists of royalties from the licensing of the digital performance of the sound recording will be determined by the applicable contract with, or collective bargaining agreement pertaining to, the artist, unless the performance of the sound recording is pursuant to a statutory license under subsection (f).

Where royalties are received from statutory licensing of a sound recording, then under paragraph (2), the sound recording copyright owner is required to allocate a total of 50 percent of the receipts as provided by subparagraphs (A), (B), and (C). Subparagraph (A) requires that 2½ percent of the receipts (as described more specifically below) are to be placed into an escrow account managed by an independent administrator appointed jointly by record companies and the American Federation of Musicians (AFM) (or any successor entity) and distributed to nonfeatured musicians (regardless of whether they are members of AFM or any successor entity) who have performed on sound recordings. Similarly, subparagraph (B) requires that 2½ percent of the receipts are to be placed into an escrow account managed by an independent administrator appointed jointly by record companies and the American Federation of Television and Radio Artists ("AFTRA") (or any successor entity) and distributed to nonfeatured vocalists (regardless of whether they are members of AFTRA or any successor entity) who have performed on sound recordings. Subparagraph (C) requires that 45 percent of the receipts are to be paid to the featured artist or artists (or the person(s) conveying rights in the performance of the featured artist(s) in the sound recording).

"Receipts" means the licensing fees received by the copyright owner of the sound recording. Thus, if a collecting society or other organization acts on behalf of the copyright owner of the sound recording in licensing and/or collecting royalties, "receipts" shall constitute the moneys the copyright owner receives from the collecting agency and, therefore, would exclude administrative fees either deducted by or paid to the collective.

*Section 114(h).   Licensing to affiliates*

In addition to the protections available under antitrust law, subsection (h) specifically is intended to ensure competitive licensing practices by a licensor that owns an interest in an "affiliated entity" as defined in subsection (j)(1). Subsection (h) makes clear that terms no less favorable than those granted to the affiliated entity also must be made available to other bona fide entities that offer services similar to those covered by the affiliate's performance license.

For example, a licensor that grants to an affiliated entity a performance license for a fixed term with separate and distinct rates for cable and satellite subscription transmission services would be required to offer no less favorable terms and conditions to an unrelated entity offering the same services. If, as another example, the license to the affiliated entity is limited only as to performances via cable, then an unrelated entity offering only satellite services cannot claim an entitlement to receive a performance license at the rate specified for cable services.

Nothing in this section is intended to prevent a licensor from establishing different rate structures, terms and conditions based on material differences in the license sought. But distinctions drawn among licensees should be applied rationally and consistently based on the nature, scope and duration of the requested license, and not based on arbitrary distinctions for monopolistic, discriminatory or other anticompetitive purposes. The factors identified in subsection (h), i.e., different types of services, the particular sound recordings licensed, the frequency of use of the sound recordings, the duration of the requested license and the number of subscribers served, are all relevant bases upon which a copyright owner may draw rational distinctions.

The term "no less favorable" indicates that the same terms and conditions can be offered, but this is not to say that the licensor should not offer lower rates or more beneficial terms and conditions if it deems it appropriate. For example, a licensor might in its business judgment offer an unrelated startup entity a more favorable rate for a shorter period of time. It is intended, however, that the potential licensee under such circumstances could reject the more favorable short-term license and instead request the terms and conditions granted to the affiliated licensed entity for similar services. In that event, the licensor must make a performance license available upon the same terms and conditions to the potential licensee, with respect to the same services proposed to be licensed, as described above.

The term "bona fide entities" is intended to make clear that the potential licensee must have a genuine intention and reasonable capability to provide the licensed services.

Paragraph (2) of this subsection makes clear that the obligations set forth in paragraph (1) are inapplicable where the affiliated entity is offering performances through an interactive service, or is granted a performance license for the sole purpose of promoting the sound recording. A public performance qualifying for the promotional exemption is merely exempted from the obligations of paragraph (1); paragraph (2)(B) does not provide an exemption for a transmission otherwise subject to liability where such a performance is unauthorized or unlicensed.

*Section 114(i). No effect on royalties for underlying works*

The Committee intends this provision to ensure that licensing fees paid under the new digital performance right shall not be taken into account in any administrative, judicial, or other governmental proceeding that sets or adjusts rates for the royalties to be paid for the public performance of musical works. The provision also makes clear Congress' intent that the new digital performance

right shall not diminish in any respect the royalties payable to copyright owners of musical works for the public performance of their works.

*Section 114(j). Definitions*

*Section 114(j)(1)—"affiliated entity"*

A digital transmission service is considered affiliated with a licensor when the licensor has any direct or indirect partnership or any ownership interest of more than 5 percent of the outstanding voting or nonvoting stock in the entity engaging in digital audio transmissions. An entity engaging in interactive services cannot be an affiliated entity under this definition; but to the extent that an entity is engaging in digital transmissions that are not interactive, it can qualify as an affiliated entity for that purpose alone.

*Section 114(j)(2)—"broadcast transmission"*

Transmissions made by a broadcast station licensed as such by the Federal Communications Commission come within this definition.

*Section 114(j)(3)—"digital audio transmission"*

This phrase means a transmission in a digital format (or any other nonanalog format that might currently exist or be developed in the future) that embodies the transmission of a sound recording. A transmission that is only partly in a digital or nonanalog format satisfies this definition. (See section 101 definition of "digital transmission.") A transmission of an audiovisual work does not come within this definition.

The Committee has amended the bill as originally introduced to make clear that the performance right recognized herein applies only to digital transmissions of sound recordings and that nothing in the bill creates any new copyright liability with respect to the transmission of a motion picture or other audiovisual work, whether digital or analog, whether subscription or nonsubscription, and whether interactive or noninteractive.

*Section 114(j)(4)—"interactive service"*

The phrase "interactive service" is defined, in part, as a service that "enables a member of the public to receive, on request, a transmission of a particular sound recording. * * *" This term is intended to reach, for example, a service that enables an individual to make a request (by telephone, e-mail, or otherwise) to a service that will send a digital transmission to that individual or another individual of the specific sound recording that had been requested by or on behalf of the recipient. Thus, it would include such services commonly referred to as "audio-on-demand," "pay-per-listen" or "celestial jukebox" services. The term also would apply to an on-line service that transmits recordings on demand, regardless of whether there is a charge for the service or for any transmission. But as the second sentence of the definition makes clear, the term "interactive service" is not intended to cover traditional practices engaged in by, for example, radio broadcast stations, through which individuals can ask the station to play a particular sound recording

as part of the service's general programming available for reception by members of the public at large.

If an entity offering a nonsubscription service (such as a radio or television station) chooses to offer an interactive service as a separate business, or only during certain hours of the day, that decision does not affect the exempt status of any component of the entity's business that does not offer an interactive service. In other words, each transmission should be judged on its own merits with regard to whether it qualifies as part of an "interactive" service. The third sentence of the definition of "interactive service" is intended to make this clear.

*Section 114(j)(5)—"nonsubscription transmission", "nonsubscription retransmission", "nonsubscription broadcast transmission"*

These terms include any transmission, retransmission or broadcast transmission that do not come within the definition of "subscription" transmission, retransmission or broadcast transmission.

*Section 114(j)(6)—"retransmission"*

As the definition of "retransmission" makes clear, that term includes any further simultaneous retransmission of the same transmission. That is, the term "retransmission" is intended to cover both an initial retransmission of a transmission (such as by a satellite carrier) and one or more simultaneous further transmissions by other parties (such as by a cable system). Thus, when the Act provides an exemption for a retransmission of a transmission in section 114(d)(1), it is intended to function, unless otherwise indicated, on a "through to the listener" basis. Of course, the fact that a further simultaneous transmission qualifies as a "retransmission" does not by itself mean that it is exempt under any particular paragraph of section 114(d)(1). To qualify for the 114(d)(1)(C)(ii) exemption, for example, a retransmission would need to be made by a business establishment on its premises or the immediately surrounding vicinity. The term "simultaneous" is used throughout this definition (and throughout this bill) to refer to retransmissions that are essentially simultaneous. Although there may be momentary time delays resulting from the technology used for retransmissions, such delays do not affect the status of the retransmissions as simultaneous.

*Section 114(j)(7)—"sound recording performance complement"*

The "sound recording performance complement" defines the metes and bounds of programming available to be transmitted under the statutory license grant in subsection (f). The definition is intended to encompass certain typical programming practices such as those used on broadcast radio. It does not extend to the performance of albums in their entirety, or the performance over a short period of time of a substantial number of different selections by a particular artist or from a particular phonorecord or compilation of phonorecords. Transmissions that exceed the limits of the complement are not eligible for a statutory license under subsection (f).

The definition provides that for a transmission to be within the complement, it must not include, on a particular channel in any

rolling 3-hour period, more than three selections from any one phonorecord, and no more than two of those selections can be transmitted consecutively. The transmission also must not include, on a particular channel in any rolling 3-hour period, more than four selections by the same featured artist or from any boxed set or compilation of phonorecords, and no more than three of those selections can be transmitted consecutively. Whether selections are consecutive is determined by the sequence of the sound recordings transmitted, regardless of whether some tones or other brief interlude is transmitted between the sound recordings.

To avoid imposing liability for programming that unintentionally may exceed the complement, the complement is limited to the performance of sound recordings "from" a particular phonorecord. Many phonorecords include sound recordings that also appear on other phonorecords or compilations, such as the "greatest hits" of a particular artist, decade or genre of music. Similarly, the same sound recordings may appear on separate compilations under the names of different featured artists. It is not the intention of this legislation to impose liability where selections that are performed from separate phonorecords also may be incorporated on a different phonorecord or compilation, or also may appear on a different phonorecord under the name of another featured artist, in the absence of an intention by the performing entity to knowingly circumvent the numerical limits of the complement. An example of such a case is where the transmitting entity plays within a 3-hour period one selection from each of four different phonorecords, which four selections also happen to be compiled on a soundtrack album. So long as the transmitting entity did not willfully intend to replicate selections from the soundtrack album, its transmission would be considered within the complement. However, where the transmitting entity willfully plays within a 3-hour period five selections of a single featured recording artist, regardless of whether they were played from several different phonorecords, and regardless of whether the transmitting entity knew that the transmission included more than three songs from a single album, the transmission does not come within the complement. The fact that the transmitting entity did not willfully intend to violate the numerical limits for a single phonorecord under paragraph (A) does not excuse the willful violation of the limit in paragraph (B)(i).

The complement is to be evaluated as of the time of "the programming of the multiple phonorecords," rather than at the time of transmission. This avoids imposing liability for programming that occurs such as a week or two in advance of transmission that unintentionally exceeds the complement. An example is where, between the time of the programming and transmission, a phonorecord or set or compilation of phonorecords is released that embodies selections previously programmed by the transmitting entity from multiple phonorecords.

Certain transmitting entities covered by this legislation may provide multiple channels of service and musical formats. The bill applies the complement to each particular channel separately and not to all channels in the aggregate.

The requirement of "different selections" permits the performance of the same selection in excess of the numerical limits. This

is intended to facilitate under the statutory license the programming of music formats that tend to repeat the same selections of music, such as "top 40" formats.

The term "featured recording artist" means the performing group or ensemble or, if not a group or ensemble, the individual performer, identified most prominently in print on, or otherwise in connection with, the phonorecord actually being performed. Except in the case of a sound recording consisting of a compilation of sound recordings by more than one performer or group or ensemble, there will ordinarily be only one "featured recording artist" per phonorecord. A vocalist or soloist performing along with a group or ensemble is not a "featured recording artist" unless that person is identified in connection with the phonorecord as the primary performer. For example, the Eagles would be the "featured recording artist" on a track from an Eagles album that does not feature Don Henley by name with equal prominence; but if the same sound recording were performed from "Don Henley's Greatest Hits," then Don Henley and not the Eagles would be the "featured recording artist." Where both the vocalist or soloist and the group or ensemble are identified as a single entity and with equal prominence (such as "Diana Ross and the Supremes"), both the individual and the group qualify as the "featured recording artist."

*Section 114(j)(8)—"subscription transmission"*

A "subscription transmission" is defined as a transmission of a sound recording in a digital format that is "controlled and limited to particular recipients," and for which consideration is required to be paid or given "by or on behalf of the recipient to receive the transmission or a package of transmissions including the transmission." It does not matter what the mechanism might be for the delivery of the transmission; thus, a digital transmission, whether delivered by cable, wire, satellite or terrestrial microwave, video dialtone, the Internet or any other digital transmission mechanism, could be a subscription transmission if the requirements cited above are satisfied. This definition obviously does not reach traditional over-the-air broadcast transmissions, which satisfy neither of these requirements. A typical transmission that would qualify as a "subscription transmission" under this definition is a cable system's transmission of a digital audio service, which is available only to the paying customers of the cable system. The payments required to satisfy the "consideration" requirement might consist, for example, of an "a la carte" fee for a specific audio service, or of a fee for an overall package of services that includes the digital audio service (e.g., a cable system's tier of services for a fee). The reference in the definition to payments "on behalf of" a recipient is intended to recognize that payments for a service may be made by one person on behalf of other people, such as a parent making payment for a child who lives away from home and receives the subscription service.

## SECTION 4. MECHANICAL ROYALTIES IN DIGITAL PHONORECORD DELIVERIES

This section amends section 115 of title 17 to clarify how the compulsory license for making and distributing phonorecords ap-

plies in the context of certain types of digital transmissions identified in the bill as "digital phonorecord deliveries."

Among other things, this section is intended to confirm and clarify the right of musical work and sound recording copyright owners to be protected against infringement when phonorecords embodying their works are delivered to consumers by means of transmissions rather than by means of phonorecord retail sales. The intention in extending the mechanical compulsory license to digital phonorecord deliveries is to maintain and reaffirm the mechanical rights of songwriters and music publishers as new technologies permit phonorecords to be delivered by wire or over the airwaves rather than by the traditional making and distribution of records, cassettes and CD's. The intention is not to substitute for or duplicate performance rights in musical works, but rather to maintain mechanical royalty income and performance rights income for writers and music publishers.

Changes to sections 115(a)(1) and 115(c)(2) make clear that the compulsory license for making and distributing phonorecords is not limited to the making and distribution of physical phonorecords, but that a compulsory license is also available for the making of digital phonorecord deliveries. The Committee intends that a compulsory license for digital phonorecord deliveries may be obtained, and the required mechanical royalties may be paid, either directly by a digital transmission service making a digital phonorecord delivery or by a record company authorizing a digital phonorecord delivery. Thus, the changes to section 115 are designed to minimize the burden on transmission services by placing record companies in a position to license not only their own rights, but also, if they choose to do so, the rights of writers and music publishers to authorize digital phonorecord deliveries; and by recognizing that transmission services themselves may obtain a compulsory license to make digital phonorecord deliveries.

As between a digital transmission service and a record company, allocation of the responsibility for paying mechanical royalties could be a subject of negotiation, but copyright owners of musical works would only be entitled to receive one mechanical royalty payment for each digital phonorecord delivery, not multiple payments. Of course, a digital transmission service would be liable for any infringing digital phonorecord delivery it made in the absence of a compulsory license or the authorization of the musical work copyright owner. (The liability of sound recording copyright owners in such a case is addressed in new section 115(c)(3)(I).)

Section 4 also redesignates subsections (c) (3), (4) and (5) as subsections (c) (4), (5) and (6) and inserts new subsections (c)(3) and (d), which are described in detail below.

*Section 115(c)(3)(A)*

This subparagraph specifically sets forth that a compulsory license includes the right of the compulsory licensee to make or authorize digital phonorecord deliveries and identifies the statutory rate for each digital phonorecord delivery made by or under the authority of the compulsory licensee. For all digital phonorecord deliveries made or authorized under a compulsory license on or before December 31, 1997, the royalty rate is to be the statutory rate then

in effect under section 115(c)(2) for the making and distribution of a physical phonorecord. For digital phonorecord deliveries made or authorized under a compulsory license on or after January 1, 1998, the statutory mechanical royalty rates for digital phonorecord deliveries shall be determined in accordance with subparagraphs (B) through (F); and the statutory mechanical royalty rate for making and distributing physical phonorecords shall be determined in accordance with chapter 8.

*Section 115(c)(3)(B)*

This subparagraph clarifies that collective negotiations and agreements relating to statutory licenses are not prohibited by the antitrust laws. This provision is nearly identical to the portion of subsection (4) which amends 17 U.S.C. 114 by adding subsection (e)(1), and is patterned on existing antitrust exemptions relating to the negotiations of statutory licenses, including 17 U.S.C. 116(b)(1) (jukebox licenses) and 17 U.S.C. 118(b) (noncommercial broadcasting). Like those provisions, subsection (c)(3)(B) is important to help effectuate the related statutory license provision.

This subparagraph authorizes musical work copyright owners, record companies, digital transmission services, and any other persons entitled to obtain a compulsory license collectively to negotiate and agree upon the terms and statutory royalty rates under subsection 115(c)(3) "notwithstanding any provision of the antitrust laws." This exemption from the antitrust laws extends to negotiations and agreements on terms and rates of royalty payments, the proportionate division of royalties among copyright owners, the designation of common agents to negotiate, agree to, pay, or receive royalty payments, and the year during which the royalty rates prescribed under subparagraphs (B) through (F) and chapter 8 of title 17 are to next be determined.

The latter authorization allows the affected parties to agree when rates and terms should next be determined, in addition to the 10-year period otherwise prescribed in section 803(a)(3). Given the rapid pace at which digital transmission technology is developing, and changes in the marketplace, the Committee recognizes that the statutory rate for digital phonorecord deliveries might need to be considered more than once every 10 years, and that the interested parties are in the best position to determine how frequently and when this should be done.

*Section 115(c)(3)(C)*

This subparagraph requires the Librarian of Congress to cause notice to be published of voluntary negotiation proceedings to determine reasonable terms and statutory royalty rates for the making of digital phonorecord deliveries under a compulsory license. The subparagraph also contains other provisions concerning such proceedings.

The Librarian is to publish notice of commencement of the first such voluntary negotiation proceeding in the Federal Register between June 30, 1996, and December 31, 1996. The Committee expects that the Librarian will publish this notice relatively early in the prescribed period. However, the exact date of the notice is of limited importance because subparagraph (B) authorizes negotia-

tions that can begin or end at any time, as determined by the parties. The purpose of the notice is simply to allow persons with a substantial interest who might not be represented by the parties engaged in negotiations to be aware that negotiations may be taking place that could lead to an industrywide agreement concerning mechanical royalty rates.

The purpose of the first voluntary negotiation proceeding shall be to determine reasonable terms and statutory royalty rates for the making of digital phonorecord deliveries under a compulsory license between January 1, 1998, and December 31, 2007, unless a different period is agreed to by the parties to the proceeding.

The subparagraph states that if any digital phonorecord delivery statutory mechanical royalty rates and terms are determined as a result of a voluntary negotiation proceeding, then such rates and terms shall distinguish between: (1) rates and terms for digital phonorecord deliveries where the reproduction or distribution of a phonorecord is "incidental" to the transmission which constitutes the digital phonorecord delivery, and (2) rates and terms for digital phonorecord deliveries in general. The Committee recognizes that there are likely to be different types of digital transmission systems that could result in the making of a digital phonorecord delivery. In the case of some of these transmission systems, delivering a phonorecord to a transmission recipient could be incidental to the purpose of a transmission. For example, if a transmission system was designed to allow transmission recipients to hear sound recordings substantially at the time of transmission, but the sound recording was transmitted in a high-speed burst of data and stored in a computer memory for prompt playback (such storage being technically the making of a phonorecord), and the transmission recipient could not retain the phonorecord for playback on subsequent occasions (or for any other purpose), delivering the phonorecord to the transmission recipient would be incidental to the transmission. If such a system allowed transmission recipients to retain phonorecords for playback on subsequent occasions, but transmission recipients did not do so, delivering the phonorecords to the transmission recipients could be incidental to the transmissions. On and after January 1, 1998, statutory mechanical royalty rates shall distinguish between "incidental" digital phonorecord deliveries that take into account the different purpose and effect of these transmissions and digital phonorecord deliveries in general.

The voluntary negotiation proceeding may result in license agreements voluntarily negotiated among individual musical work copyright owners and individual entities that make or authorize digital phonorecord deliveries. It is the Committee's intention that negotiations leading to any such agreements be covered by section 115(c)(3)(B) and that any such agreements have the effect set forth in section 115(c)(3)(E).

Beyond such individual license agreements, however, the Committee anticipates that the voluntary negotiation proceeding will lead to an industrywide agreement concerning mechanical royalty terms and rates and the year when terms and rates next will be determined.

The parties are expected to negotiate, or if necessary arbitrate, "terms" as well as rates. By "terms," the Committee means such details as how payments are to be made, when, and other accounting matters. While these details are for the most part already prescribed in section 115, and related details are to be established by the Librarian under section 115(c)(3)(D), the bill allows for additional such terms to be set by the parties or by CARP's in the event that the foregoing provisions or regulations are not readily applicable to the new digital transmission environment.

If an agreement as to rates and terms is reached and there is no controversy as to these matters, it would make no sense to subject the interested parties to the needless expense of an arbitration proceeding conducted under section 115(c)(3)(D). Thus, it is the Committee's intention that in such a case, as under the Copyright Office's current regulations concerning rate adjustment proceedings, the Librarian of Congress should notify the public of the proposed agreement in a notice-and-comment proceeding and, if no opposing comment is received from a party with a substantial interest and an intent to participate in an arbitration proceeding, the Librarian of Congress should adopt the rates embodied in the agreement, and any agreed-to year when the mechanical royalty rates for digital phonorecord deliveries next will be determined, without convening an arbitration panel. See 37 CFR 251.63(b); see also 59 Fed. Reg. 63,038 (1994).

As provided in section 115(c)(3)(F), the procedures for negotiation and, if necessary, arbitration set forth in this subparagraph and in section 115(c)(3)(D) are to be repeated every 10 years unless it is determined pursuant to this subparagraph or subparagraph (D) that rates and terms should next be determined in a different year. The Committee recognizes that it may be unusual to allow the interested parties to negotiate and agree to a year when the statutory mechanical royalty rates for digital phonorecord deliveries next will be determined. However, the Committee was concerned that rapidly changing technology might justify redetermining the terms and royalty rates applicable to digital phonorecord deliveries made under a compulsory license on a different schedule than once every 10 years. Thus, the Committee chose to give the interested parties flexibility in this area.

The Committee wishes to make clear that nothing in section 115(c)(3) is intended to affect the schedule prescribed in section 803(a)(3) for determining the mechanical royalty rate for the making and distribution of *physical* phonorecords. Proceedings to establish mechanical royalty rates for the making and distribution of physical phonorecords are expected to be conducted in 1997 and every 10 years thereafter, and are not subject to contrary agreement or arbitration.

*Section 115(c)(3)(D)*

If a voluntary negotiation proceeding as described in section 115(c)(3)(C) does not lead to the determination of the terms and statutory royalty rates applicable to digital phonorecord deliveries made under a compulsory license, those terms and rates are to be determined by arbitration under this subparagraph. The Committee notes that the subparagraph specifically refers to chapter 8 of

title 17, which concerns copyright royalty arbitration in general. Accordingly, arbitration under this subparagraph should be conducted under the same type of procedures that apply in other copyright royalty arbitrations.

Like terms and rates determined under section 115(c)(3)(C), terms and rates determined under this subparagraph are to distinguish between digital phonorecord deliveries where the reproduction or distribution of a phonorecord is incidental to the transmission which constitutes the digital phonorecord delivery, and digital phonorecord deliveries in general.

In determining terms and rates under this subparagraph, a copyright arbitration royalty panel is to consider the objectives set forth in section 801(b)(1), and the arbitrators may consider rates under voluntarily negotiated license agreements. However, the statutory mechanical royalty payable for digital phonorecord deliveries made on or before December 31, 1997, shall be given no precedential effect in determining the statutory mechanical royalty payable for digital phonorecord deliveries made on or after January 1, 1998. The Committee specifically chooses to remain neutral on the question whether the mechanical royalty rates for any category of digital phonorecord delivery made on or after January 1, 1998, should be the same as, lower than, or higher than the mechanical royalty rate for the making and distribution of physical phonorecords.

The subparagraph specifically authorizes the Librarian of Congress to establish requirements by which copyright owners may receive reasonable notice of the use of their works under this section, and under which records of such use shall be kept and made available by persons making digital phonorecord deliveries.

*Section 115(c)(3)(E)*

This subparagraph provides that in general, the provisions of voluntarily negotiated agreements for the licensing of nondramatic musical works shall be given effect in lieu of any statutory rates and terms determined by the Librarian of Congress. For example, the Committee understands that individual record companies and music publishers have negotiated license agreements for specific albums prescribing a royalty rate less than the statutory mechanical royalty rate. The Committee does not intend to prevent negotiation of voluntary license agreements, for either physical phonorecords or digital phonorecord deliveries, prescribing royalties at less than the statutory rates, except in the situation described below.

There is a situation in which the provisions of voluntarily negotiated license agreements should not be given effect in lieu of any mechanical royalty rates determined by the Librarian of Congress. For some time, music publishers have expressed concerns about so-called "controlled composition" clauses in recording contracts. Generally speaking, controlled composition clauses are provisions whereby a recording artist who is the author of a nondramatic musical work agrees to reduce the mechanical royalty rate payable when a record company makes and distributes phonorecords which include recordings of such artist's compositions. Subject to the exceptions set forth in subparagraph (E)(ii), the second sentence of subparagraph (E)(i) is intended to make these controlled composition clauses inapplicable to digital phonorecord deliveries.

Specifically, unless the requirements of one or both of the exceptions of subparagraph (E)(ii) are satisfied, the royalty rates determined through negotiation or arbitration pursuant to subparagraph (C) or (D) are to be given effect in lieu of any contrary rates specified in a contract pursuant to which a recording artist who is the author of a nondramatic musical work grants a mechanical license in that work to a record company.

Subparagraph (E)(ii) specifies two types of contracts where the negotiated royalty rates set forth in the contracts are to be given effect notwithstanding the second sentence of subparagraph (E)(i). The first of these is a "grandfather clause" giving effect to contracts and rates agreed to in a contract with a recording artist on or before June 22, 1995, except to the extent that they are modified after that date for the purpose of reducing the royalty prescribed therein to less than the statutory rates or to add new compositions at less than the statutory rates. Thus, if a recording contract entered into on or before June 22, 1995, was modified after that date to cover a larger number of musical works, the royalty rates specified in the contract would apply to the number of works within the scope of the contract as of June 22, 1995, and the statutory rates would apply to the number of works added thereafter. The Committee also notes that recording artist contracts entered into on or before June 22, 1995, and not modified thereafter, or modified thereafter to extend the date by which an artist must complete a recording, are examples of contracts to be given effect notwithstanding the second sentence of subparagraph (E)(i).

The second of the exceptions provided in subparagraph (E)(ii) is intended to allow a recording artist-author who chooses to act as his or her own music publisher to agree to accept mechanical royalties at less than the statutory rates, provided that the contract containing such lower rates is entered into after the sound recording has been fixed in a tangible medium of expression substantially in a form intended for commercial release.

It should be emphasized that subparagraph (E) applies only to the making of digital phonorecord deliveries and not to the making and distribution of *physical* phonorecords. Nothing in the bill is intended to interfere with the application of controlled composition clauses to the making and distribution of physical phonorecords or to digital phonorecord deliveries where the agreements are not covered by the terms of subsection (c)(3)(E).

*Section 115(c)(3)(F)*

This subparagraph provides that the procedures specified in subparagraphs (C) and (D) for negotiation or arbitration of mechanical compulsory license rates and terms for digital phonorecord deliveries are to be repeated every 10 years, as provided in section 803(a)(3), unless different years for repeating such proceedings are determined in accordance with subparagraphs (C) or (D). Nothing in section 115(c)(3) is intended to affect the schedule prescribed for determining the mechanical royalty rate for the making and distribution of physical phonorecords. Proceedings to establish mechanical royalty rates for the making and distribution of physical phonorecords are to be conducted in 1997 and every 10 years thereafter, and are not subject to contrary agreement or arbitration.

The reference in subparagraph (F) to the procedures specified in subparagraphs (C) and (D) is to the publication of notice, initiation of voluntary negotiations, and convening of CARP's if necessary. The reference is not to the dates within the year as described in subparagraph (C). Indeed, the Committee encourages the Librarian to publish a notice of initiation of voluntary negotiation proceedings as early in the year as practicable, to allow the maximum amount of time for voluntary negotiations, or if necessary arbitration.

*Section 115(c)(3)(G)*

This subparagraph imposes as a condition of compulsory licensing the obligation that digital phonorecord deliveries be accompanied by certain specified types of information, if that information has been encoded in the sound recording being transmitted under the sound recording copyright owner's authority. This provision does not obligate the copyright owner of the sound recording to encode copyright management information in the work. In addition, it is not intended to require a transmitting entity to generate or encode such information in its transmission if the information is not encoded in the sound recording. Moreover, the transmitting entity is not required to transmit information that may be encoded in the sound recording other than the information specified in this subparagraph and "related information" (i.e., information that is specifically related to the identification of the works being performed and upon which payments are to be made by the transmitting entity under this bill). The subparagraph also makes clear that nothing in this section affects the provisions of section 1002(e).

*Section 115(c)(3)(H)*

This subparagraph confirms that musical work copyright owners and sound recording copyright owners both have the same rights to be protected against infringement with respect to digital phonorecord deliveries as they have with respect to distributions of physical phonorecords of their respective works. Thus, subject to the limitations contained in existing law, a digital phonorecord delivery infringes the rights of the sound recording copyright owner unless authorized by the sound recording copyright owner (or his or her agent), and a digital phonorecord delivery infringes the rights of the musical work copyright owner unless covered by a compulsory license or authorized by the musical work copyright owner (or his or her agent). The subparagraph makes clear that any cause of action under this subparagraph is in addition to other remedies available under title 17.

*Section 115(c)(3)(I)*

This subparagraph clarifies the circumstances under which a sound recording copyright owner may be held liable for digital phonorecord deliveries by third parties. The changes to section 115 made by S. 227 are intended to allow record companies to license not only their own rights, but also, if they choose to do so, the rights of writers and music publishers to authorize digital phonorecord deliveries. If a record company grants a digital transmission service a license under both the record company's rights in a sound recording and the musical work copyright owner's rights, the record

company may be liable, to an extent determined in accordance with applicable law, for the applicable mechanical royalty for every digital phonorecord delivery made under the record company's authority. However, if a record company grants a license under its rights in a sound recording only, and does not grant a mechanical license under the copyright in the musical work embodied in the sound recording, it is the transmission service's responsibility to obtain a license under the musical work copyright, and the record company cannot be held liable for infringement of the copyright in the musical work by the record company's licensee.

*Section 115(c)(3)(J)*

This subparagraph makes clear that nothing in section 1008 shall be construed to prevent the exercise of the rights and remedies allowed by paragraphs (3) and (6) and chapter 5 in the event of a digital phonorecord delivery. However, no action alleging infringement of copyright may be brought under title 17 against a manufacturer, importer or distributor of a digital audio recording device, a digital audio recording medium, an analog recording device, or an analog recording medium, or against a consumer, based on the actions described in section 1008.

*Section 115(c)(3)(K)*

This subsection makes clear that section 115, as amended by the bill, is not intended to annul or limit any existing or future right or remedy of a sound recording copyright owner or musical work copyright owner, except to the extent that a musical work copyright owner's exclusive rights are limited by compulsory licensing under the conditions specified by section 115 as amended.

*Section 115(c)(3)(L)*

This subparagraph makes clear that the changes made to section 115 by the bill with regard to liability for digital phonorecord deliveries do not apply to transmissions or retransmissions that are exempt under section 114(d)(1). At the same time, the exemptions set forth in section 114(d)(1) are not intended either to enlarge or to diminish in any way the rights of copyright owners under existing law with respect to such transmissions or retransmissions.

*Section 115(d)*

This subsection defines the term "digital phonorecord delivery." A "digital phonorecord delivery" is each individual delivery of a phonorecord by digital transmission of a sound recording which results in a specifically identifiable reproduction by or for any transmission recipient of a phonorecord of that sound recording. The Committee notes that the phrase "specifically identifiable reproduction," as used in the definition, should be understood to mean a reproduction specifically identifiable to the transmission service. Of course, a transmission recipient making a reproduction from a transmission is able to identify that reproduction, but the mere fact that a transmission recipient can make and identify a reproduction should not in itself cause a transmission to be considered a digital phonorecord delivery.

The final sentence of this definition provides that a digital phonorecord delivery does not result from a real-time, noninteractive subscription transmission of a sound recording where no reproduction of the sound recording or the musical work embodied therein is made from the inception of the transmission through to its receipt by the transmission recipient in order to make the sound recording audible. For example, a transmission by a noninteractive subscription transmission service that transmits in real time a continuous program of music selections chosen by the transmitting entity, for which a consumer pays a flat monthly fee, would not be a "digital phonorecord delivery" so long as there was no reproduction at any point in the transmission in order to make the sound recording audible. Moreover, such a transmission would not be a "digital phonorecord delivery" even if subscribers, through actions taken on their own part, may record all or part of the programming from that service. The final sentence of the definition of "digital phonorecord delivery" is not intended to change current law with respect to rights under section 106, or the limitations on those rights under sections 107–113, sections 116–120, and the unamended portions of sections 114 and 115.

### SECTION 5. CONFORMING AMENDMENTS

This section makes certain technical amendments to other sections of title 17.

Among other things, it adds to section 101 a definition of "digital transmission," which is any transmission in whole or in part in a digital or other nonanalog format. Although the Committee is not presently aware of any nonanalog formats that are not digital, the Committee wants to make clear that all nonanalog formats now known or later developed are covered by the bill. For purposes of section 115, a transmission of a motion picture or other audiovisual work does not come within the definition of "digital transmission."

### SECTION 6. EFFECTIVE DATE

This section provides that new sections 114(e) and 114(f) of title 17, which concern negotiation of licenses under the new performance right, take effect immediately upon the date of enactment. The effective date of other provisions of the Act is 3 months after the date of enactment.

## VI. COST ESTIMATE

In accordance with paragraph 11(a), rule XXVI, of the Standing Rules of the Senate, the Committee offers the report of the Congressional Budget Office:

U.S. CONGRESS,
CONGRESSIONAL BUDGET OFFICE,
*Washington, DC, July 21, 1995.*

Hon. ORRIN G. HATCH,
*Chairman, Committee on the Judiciary,*
*U.S. Senate, Washington, DC.*

DEAR MR. CHAIRMAN: The Congressional Budget Office has prepared the enclosed cost estimate for S. 227, the Digital Performance Right in Sound Recordings Act of 1995.

Enacting S. 227 would affect direct spending and receipts. Therefore, pay-as-you-go procedures would apply to the bill.

If you wish further details on this estimate, we will be pleased to provide them.

Sincerely,

JUNE E. O'NEILL.

CONGRESSIONAL BUDGET OFFICE COST ESTIMATE

1. Bill number: S. 227.

2. Bill title: Digital Performance Right in Sound Recordings Act of 1995.

3. Bill status: As ordered reported by the Senate Committee on the Judiciary on June 29, 1995.

4. Bill purpose: S. 227 would create a system to ensure that recording artists and companies are compensated for public performances of their works by means of certain types of digital audio transmissions. The bill would require most subscription users of sound recordings to obtain a statutory license in order to broadcast these creative works, and would guarantee a license to subscription users so long as they pay royalties to the copyright owners.

The bill would require the Library of Congress to announce the initiation of voluntary negotiations between copyright owners and users of digital sound recordings. If the parties could not agree on a rate, the Librarian of Congress would convene a copyright arbitration panel to establish rates. The parties to the arbitration would bear the entire cost of the proceeding. S. 227 would require copyright owners to deposit a portion of their receipts from royalty payments into certain escrow accounts. An independent manager jointly appointed by the copyright owners and recording artists or their representatives would then distribute the proceeds to the designated recipients.

5. Estimated cost to the Federal Government: The Copyright Office within the Library of Congress currently administers several funds similar to the escrow accounts that would be established under S. 227. CBO expects that the Copyright Office would be asked to manage these escrow accounts as well. CBO estimates that the Copyright Office would incur no significant additional cost to manage these funds. If the Copyright Office or any other federal agency administers arbitration proceedings, no additional costs would be incurred because the bill requires the parties to the dispute to pay the costs of arbitration.

Because S. 227 would require certain parties to make payments to other parties as a result of the exercise of the sovereign power of the government, CBO believes that the payments into the escrow

accounts should be included in the federal budget as governmental receipts, and the payments from the escrow accounts should be included as direct spending.

CBO expects a lag of several months between the receipt of the royalties and the distribution to the recipients. Because of this lag, CBO estimates that the net payments to the accounts will exceed the net distributions by an amount less than $500,000 in the first year. In following years, CBO expects the net annual impact of such payments on the federal deficit to be close to zero because outlays from the escrow accounts would be roughly equal to the receipts.

The costs of this bill fall within budget function 370.

6. Comparison with spending under current law: There is no current system of royalty transfers for public performances covered by S. 227; hence, all receipts and spending under the bill would be new.

7. Pay-as-you-go considerations: Section 252 of the Balanced Budget and Emergency Deficit Control Act of 1985 sets up pay-as-you-go procedures for legislation affecting direct spending or receipts through 1998. Enacting S. 227 would affect both direct spending and receipts; therefore the bill would be subject to pay-as-you-go procedures. However, CBO estimates that the impact on both outlays and receipts would be less than $500,000 in each year. The following table summarizes the estimated pay-as-you-go impact of this bill.

[By fiscal year, in millions of dollars]

| | 1995— | 1996— | 1997— | 1998 |
|---|---|---|---|---|
| Change in outlays | 0 | 0 | 0 | 0 |
| Change in receipts | 0 | 0 | 0 | 0 |

8. Estimated cost to State and local governments: None.
9. Estimate comparison: None.
10. Previous CBO estimate: None.
11. Estimate prepared by: Rachel Forward.
12. Estimate approved by: Robert A. Sunshine, for Paul N. Van de Water, Assistant Director for Budget Analysis.

## VII. REGULATORY IMPACT STATEMENT

In compliance with paragraph 11(b)(1), rule XXVI of the Standing Rules of the Senate, it is hereby stated that the Committee finds that the bill will have no additional direct regulatory impact.

## VIII. CHANGES IN EXISTING LAW

In compliance with paragraph 12 of rule XXVI of the Standing Rules of the Senate, changes in existing law made by S. 227, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italic, and existing law in which no change is proposed is shown in roman):

# UNITED STATES CODE

\*　　\*　　\*　　\*　　\*　　\*　　\*

# TITLE 17. COPYRIGHTS

CHAPTER 1—SUBJECT MATTER AND SCOPE OF COPYRIGHT

\*      \*      \*      \*      \*      \*      \*

## § 101. Definitions

As used in this title, the following terms and their variant forms mean the following:

\*      \*      \*      \*      \*      \*      \*

A "device", "machine", or "process" is one now known or later developed.

*A "digital transmission" is a transmission in whole or in part in a digital or other non-analog format.*

\*      \*      \*      \*      \*      \*      \*

## § 106. Exclusive rights in copyrighted works

Subject to sections 107 through 118, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:

(1) to reproduce the copyrighted work in copies or phonorecords;

\*      \*      \*      \*      \*      \*      \*

(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly; 【and】

(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly【.】*; and*

*(6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.*

\*      \*      \*      \*      \*      \*      \*

## § 111. Limitations on exclusive rights: Secondary transmissions

(a) CERTAIN SECONDARY TRANSMISSIONS EXEMPTED.—The secondary transmission of a primary transmission embodying a performance or display of a work is not an infringement of copyright if—

\*      \*      \*      \*      \*      \*      \*

(c) SECONDARY TRANSMISSIONS BY CABLE SYSTEMS.—

(1) Subject to the provisions of clauses (2), (3), and (4) of this subsection *and section 114(d)*, secondary transmissions to the public by a cable system of a primary transmission made by a broadcast station licensed by the Federal Communications Commission or by an appropriate governmental authority of Canada or Mexico and embodying a performance or display of a work shall be subject to compulsory licensing upon compliance with the requirements of subsection (d) where the carriage of the signals comprising the secondary transmission is

permissible under the rules, regulations, or authorizations of the Federal Communications Commission.

\* \* \* \* \* \* \*

## § 114. Scope of exclusive rights in sound recordings

(a) The exclusive rights of the owner of copyright in a sound recording are limited to the rights specified by clauses (1), (2), ⟦and (3)⟧ *(3) and (6)* of section 106, and do not include any right of performance under section 106(4).

(b) The exclusive right of the owner of copyright in a sound recording under clause (1) of section 106 is limited to the right to duplicate the sound recording in the form of ⟦phonorecords, or of copies of motion pictures and other audiovisual works,⟧ *phonorecords or copies* that directly or indirectly recapture the actual sounds fixed in the recording. The exclusive right of the owner of copyright in a sound recording under clause (2) of section 106 is limited to the right to prepare a derivative work in which the actual sounds fixed in the sound recording are rearranged, remixed, or otherwise altered in sequence or quality. The exclusive rights of the owner of copyright in a sound recording under clauses (1) and (2) of section 106 do not extend to the making or duplication of another sound recording that consists entirely of an independent fixation of other sounds, even though such sounds imitate or simulate those in the copyrighted sound recording. The exclusive rights of the owner of copyright in a sound recording under clauses (1), (2), and (3) of section 106 do not apply to sound recordings included in educational television and radio programs (as defined in section 397 of title 47) distributed or transmitted by or through public broadcasting entities (as defined by section 118(g)): *Provided,* That copies or phonorecords of said programs are not commercially distributed by or through public broadcasting entities to the general public.

(c) This section does not limit or impair the exclusive right to perform publicly, by means of a phonorecord, any of the works specified by section 106(4).

⟦(d) On January 3, 1978, the Register of Copyrights, after consulting with representatives of owners of copyrighted materials, representatives of the broadcasting, recording, motion picture, entertainment industries, and arts organizations, representatives of organized labor and performers of copyrighted materials, shall submit to the Congress a report setting forth recommendations as to whether this section should be amended to provide for performers and copyright owners of copyrighted material any performance rights in such material. The report should describe the status of such rights in foreign countries, the views of major interested parties, and specific legislative or other recommendations, if any.⟧

*(d) LIMITATIONS ON EXCLUSIVE RIGHT.—Notwithstanding the provisions of section 106(6)—*

*(1) EXEMPT TRANSMISSIONS AND RETRANSMISSIONS.—The performance of a sound recording publicly by means of a digital audio transmission or retransmission, other than as a part of an interactive service, is not an infringement of section 106(6) if the performance is part of—*

(A) a nonsubscription transmission, such as a nonsubscription broadcast transmission;

(B) a retransmission of a nonsubscription broadcast transmission: *Provided*, *That*, in the case of a retransmission of a radio station's broadcast transmission—

(i) the radio station's broadcast transmission is not willfully or repeatedly retransmitted more than a radius of 150 miles from the site of the radio broadcast transmitter, however—

(I) the 150 mile limitation under this clause shall not apply when a nonsubscription broadcast transmission by a radio station licensed by the Federal Communications Commission is retransmitted on a nonsubscription basis by a terrestrial broadcast station, terrestrial translator, or terrestrial repeater licensed by the Federal Communications Commission; and

(II) in the case of a subscription retransmission of a nonsubscription broadcast retransmission covered by subclause (I), the 150 mile radius shall be measured from the transmitter site of such broadcast retransmitter;

(ii) the retransmission is of radio station broadcast transmissions that are—

(I) obtained by the retransmitter over the air;

(II) not electronically processed by the retransmitter to deliver separate and discrete signals; and

(III) retransmitted only within the local communities served by the retransmitter;

(iii) the radio station's broadcast transmission was being retransmitted to cable systems (as defined in section 111(f)) by a satellite carrier on January 1, 1995, and that retransmission was being retransmitted by cable systems as a separate and discrete signal, and the satellite carrier obtains the radio station's broadcast transmission in an analog format: *Provided*, *That* the broadcast transmission being retransmitted may embody the programming of no more than one radio station; or

(iv) the radio station's broadcast transmission is made by a noncommercial educational broadcast station funded on or after January 1, 1995, under section 396(k) of the Communications Act of 1934 (47 U.S.C. 396(k)), consists solely of noncommercial educational and cultural radio programs, and the retransmission, whether or not simultaneous, is a nonsubscription terrestrial broadcast retransmission; or

(C) a transmission or retransmission that comes within any of the following categories:

(i) a prior or simultaneous transmission or retransmission incidental to an exempt transmission or retransmission, such as a feed received by and then

*retransmitted by an exempt transmitter: Provided, That such incidental transmissions or retransmissions do not include any subscription transmission or retransmission directly for reception by members of the public;*

*(ii) a transmission or retransmission within a business establishment, confined to its premises or the immediately surrounding vicinity;*

*(iii) a retransmission by any retransmitter, including a multichannel video programming distributor as defined in section 522(12) of the Communications Act of 1934 (47 U.S.C. 522(12)), of a transmission by a transmitter licensed to publicly perform the sound recording as a part of that transmission, if the retransmission is simultaneous with the licensed transmission and authorized by the transmitter; or*

*(iv) a transmission or retransmission to a business establishment for use in the ordinary course of its business: Provided, That the business recipient does not retransmit the transmission outside of its premises or the immediately surrounding vicinity, and that the transmission does not exceed the sound recording performance complement. Nothing in this clause shall limit the scope of the exemption in clause (ii).*

*(2) SUBSCRIPTION TRANSMISSIONS.—In the case of a subscription transmission not exempt under subsection (d)(1), the performance of a sound recording publicly by means of a digital audio transmission shall be subject to statutory licensing, in accordance with subsection (f) of this section, if—*

*(A) the transmission is not part of an interactive service;*

*(B) the transmission does not exceed the sound recording performance complement;*

*(C) the transmitting entity does not cause to be published by means of an advance program schedule or prior announcement the titles of the specific sound recordings or phonorecords embodying such sound recordings to be transmitted;*

*(D) except in the case of transmission to a business establishment, the transmitting entity does not automatically and intentionally cause any device receiving the transmission to switch from one program channel to another; and*

*(E) except as provided in section 1002(e) of this title, the transmission of the sound recording is accompanied by the information encoded in that sound recording, if any, by or under the authority of the copyright owner of that sound recording, that identifies the title of the sound recording, the featured recording artist who performs on the sound recording, and related information, including information concerning the underlying musical work and its writer.*

*(3) LICENSES FOR TRANSMISSIONS BY INTERACTIVE SERVICES.—*

*(A) No interactive service shall be granted an exclusive license under section 106(6) for the performance of a sound*

recording publicly by means of digital audio transmission for a period in excess of 12 months, except that with respect to an exclusive license granted to an interactive service by a licensor that holds the copyright to 1,000 or fewer sound recordings, the period of such license shall not exceed 24 months: *Provided, however,* That the grantee of such exclusive license shall be ineligible to receive another exclusive license for the performance of that sound recording for a period of 13 months from the expiration of the prior exclusive license.

(B) The limitation set forth in subparagraph (A) of this paragraph shall not apply if—

(i) the licensor has granted and there remain in effect licenses under section 106(6) for the public performance of sound recordings by means of digital audio transmission by at least 5 different interactive services: *Provided, however,* That each such license must be for a minimum of 10 percent of the copyrighted sound recordings owned by the licensor that have been licensed on an exclusive basis to interactive services, but in no event less than 50 sound recordings; or

(ii) the exclusive license is granted to perform publicly up to 45 seconds of a sound recording and the sole purpose of the performance is to promote the distribution or performance of that sound recording.

(C) Notwithstanding the grant of an exclusive or nonexclusive license of the right of public performance under section 106(6), an interactive service may not publicly perform a sound recording unless a license has been granted for the public performance of any copyrighted musical work contained in the sound recording. *Provided,* That such license to publicly perform the copyrighted musical work may be granted either by a performing rights society representing the copyright owner or by the copyright owner.

(D) The performance of a sound recording by means of a digital audio retransmission is not an infringement of section 106(6) if—

(i) the retransmission is of a transmission by an interactive service licensed to publicly perform the sound recording to a particular member of the public as part of that transmission; and

(ii) the retransmission is simultaneous with the licensed transmission, authorized by the transmitter, and limited to that particular member of the public intended by the interactive service to be the recipient of the transmission.

(E) For the purposes of this paragraph—

(i) a "licensor" shall include the licensing entity and any other entity under any material degree of common ownership, management, or control that owns copyrights in sound recordings; and

(ii) a "performing rights society" is an association or corporation that licenses the public performance of nondramatic musical works on behalf of the copyright owner, such as the American Society of Composers, Authors and Publishers, Broadcast Music, Inc., and SESAC, Inc.

(4) RIGHTS NOT OTHERWISE LIMITED.—

(A) Except as expressly provided in this section, this section does not limit or impair the exclusive right to perform a sound recording publicly by means of a digital audio transmission under section 106(6).

(B) Nothing in this section annuls or limits in any way—

(i) the exclusive right to publicly perform a musical work, including by means of a digital audio transmission, under section 106(4);

(ii) the exclusive rights to reproduce and distribute a sound recording or the musical work embodied therein under sections 106(1) and 106(3); or

(iii) any other rights under any other clause of section 106, or remedies available under this title, as such rights or remedies exist either before or after the date of enactment of the Digital Performance Right in Sound Recordings Act of 1995.

(C) Any limitations in this section on the exclusive right under section 106(6) apply only to the exclusive right under section 106(6) and not to any other exclusive rights under section 106. Nothing in this section shall be construed to annul, limit, impair or otherwise affect in any way the ability of the owner of a copyright in a sound recording to exercise the rights under sections 106(1), 106(2) and 106(3), or to obtain the remedies available under this title pursuant to such rights, as such rights and remedies exist either before or after the date of enactment of the Digital Performance Right in Sound Recordings Act of 1995.

(e) AUTHORITY FOR NEGOTIATIONS.—

(1) Notwithstanding any provision of the antitrust laws, in negotiating statutory licenses in accordance with subsection (f), any copyright owners of sound recordings and any entities performing sound recordings affected by this section may negotiate and agree upon the royalty rates and license terms and conditions for the performance of such sound recordings and the proportionate division of fees paid among copyright owners, and may designate common agents on a nonexclusive basis to negotiate, agree to, pay, or receive payments.

(2) For licenses granted under section 106(6), other than statutory licenses, such as for performances by interactive services or performances that exceed the sound recording performance complement—

(A) copyright owners of sound recordings affected by this section may designate common agents to act on their behalf to grant licenses and receive and remit royalty payments, Provided, That each copyright owner shall establish the royalty rates and material license terms and conditions

unilaterally, that is, not in agreement, combination, or concert with other copyright owners of sound recordings; and

(B) entities performing sound recordings affected by this section may designate common agents to act on their behalf to obtain licenses and collect and pay royalty fees, *Provided,* That each entity performing sound recordings shall determine the royalty rates and material license terms and conditions unilaterally, that is, not in agreement, combination, or concert with other entities performing sound recordings.

(f) LICENSES FOR NONEXEMPT SUBSCRIPTION TRANSMISSIONS.—

(1) No later than 30 days after the enactment of the Digital Performance Right in Sound Recordings Act of 1995, the Librarian of Congress shall cause notice to be published in the Federal Register of the initiation of voluntary negotiation proceedings for the purpose of determining reasonable terms and rates of royalty payments for the activities specified by subsection (d)(2) of this section during the period beginning on the effective date of such Act and ending on December 31, 2000. Such terms and rates shall distinguish among the different types of digital audio transmission services then in operation. Any copyright owners of sound recordings or any entities performing sound recordings affected by this section may submit to the Librarian of Congress licenses covering such activities with respect to such sound recordings. The parties to each negotiation proceeding shall bear their own costs.

(2) In the absence of license agreements negotiated under paragraph (1), the Librarian of Congress shall, pursuant to chapter 8, convene a copyright arbitration royalty panel to determine and publish in the Federal Register a schedule of rates and terms which, subject to paragraph (3), shall be binding on all copyright owners of sound recordings and entities performing sound recordings. In establishing such rates and terms the copyright arbitration royalty panel may consider the rates for comparable types of digital audio transmission services and comparable circumstances under voluntary license agreements negotiated as provided in paragraph (1). The parties to the proceeding shall bear the entire cost of the proceeding in such manner and proportion as the arbitration panels shall direct. The Librarian of Congress shall also establish requirements by which copyright owners may receive reasonable notice of the use of their sound recordings under this section, and under which records of such use shall be kept by entities performing sound recordings.

(3) License agreements voluntarily negotiated at any time between one or more copyright owners of sound recordings and one or more entities performing sound recordings shall be given effect in lieu of any determination by a copyright arbitration royalty panel or decision by the Librarian of Congress.

(4) The procedures specified in paragraphs (1) and (2) shall be repeated and concluded, in accordance with regulations that the Librarian of Congress shall prescribe—

(A) within a 6-month period each time that a petition is filed by any copyright owners of sound recordings or any

entities performing sound recordings affected by this section indicating that a new type of digital audio transmission service on which sound recordings are performed is or is about to become operational, and

(B) between June 30 and December 31, 2000 and at 5-year intervals thereafter.

(5)(A) Any person who wishes to perform a sound recording publicly by means of a nonexempt subscription transmission under this subsection may do so without infringing the exclusive right of the copyright owner of the sound recording—

(i) by complying with such notice requirements as the Register of Copyrights shall prescribe by regulation and by paying royalty fees in accordance with this subsection; or

(ii) if such royalty fees have not been set, by agreeing to pay such royalty fees as shall be determined in accordance with this subsection.

(B) Any royalty payments in arrears shall be made on or before the twentieth day of the month next succeeding the month in which the royalty fees are set.

(g) PROCEEDS FROM LICENSING OF SUBSCRIPTION TRANSMISSIONS.—

(1) Except in the case of a subscription transmission licensed in accordance with subsection (f) of this section—

(A) a featured recording artist who performs on a sound recording that has been licensed for a subscription transmission shall be entitled to receive payments from the copyright owner of the sound recording in accordance with the terms of the artist's contract; and

(B) a nonfeatured recording artist who performs on a sound recording that has been licensed for a subscription transmission shall be entitled to receive payments from the copyright owner of the sound recording in accordance with the terms of the nonfeatured recording artist's applicable contract or other applicable agreement.

(2) The copyright owner of the exclusive right under section 106(6) of this title to publicly perform a sound recording by means of a digital audio transmission shall allocate to recording artists in the following manner its receipts from the statutory licensing of subscription transmission performances of the sound recording in accordance with subsection (f) of this section:

(A) 2½ percent of the receipts shall be deposited in an escrow account managed by an independent administrator jointly appointed by copyright owners of sound recordings and the American Federation of Musicians (or any successor entity) to be distributed to nonfeatured musicians (whether or not members of the American Federation of Musicians) who have performed on sound recordings.

(B) 2½ percent of the receipts shall be deposited in an escrow account managed by an independent administrator jointly appointed by copyright owners of sound recordings and the American Federation of Television and Radio Artists (or any successor entity) to be distributed to nonfeatured vocalists (whether or not members of the Amer-

ican Federation of Television and Radio Artists) who have performed on sound recordings.

(C) 45 percent of the receipts shall be allocated, on a per sound recording basis, to the recording artist or artists featured on such sound recording (or the persons conveying rights in the artists' performance in the sound recordings).

(h) LICENSING TO AFFILIATES.—

(1) If the copyright owner of a sound recording licenses an affiliated entity the right to publicly perform a sound recording by means of a digital audio transmission under section 106(6), the copyright owner shall make the licensed sound recording available under section 106(6) on no less favorable terms and conditions to all bona fide entities that offer similar services, except that, if there are material differences in the scope of the requested license with respect to the type of service, the particular sound recordings licensed, the frequency of use, the number of subscribers served, or the duration, then the copyright owner may establish different terms and conditions for such other services.

(2) The limitation set forth in paragraph (1) of this subsection shall not apply in the case where the copyright owner of a sound recording licenses—

(A) an interactive service; or

(B) an entity to perform publicly up to 45 seconds of the sound recording and the sole purpose of the performance is to promote the distribution or performance of that sound recording.

(i) NO EFFECT ON ROYALTIES FOR UNDERLYING WORKS.—License fees payable for the public performance of sound recordings under clause (6) of section 106 shall not be taken into account in any administrative, judicial, or other governmental proceeding to set or adjust the royalties payable to copyright owners of musical works for the public performance of their works. It is the intent of Congress that royalties payable to copyright owners of musical works for the public performance of their works shall not be diminished in any respect as a result of the rights granted by section 106(6).

(j) DEFINITIONS.—As used in this section, the following terms have the following meanings:

(1) An "affiliated entity" is an entity engaging in digital audio transmissions covered by section 106(6), other than an interactive service, in which the licensor has any direct or indirect partnership or any ownership interest amounting to 5 percent or more of the outstanding voting or non-voting stock.

(2) A "broadcast transmission" is a transmission made by a broadcast station licensed as such by the Federal Communications Commission.

(3) A "digital audio transmission" is a digital transmission as defined in section 101, that embodies the transmission of a sound recording. This term does not include the transmission of any audiovisual work.

(4) An "interactive service" is one that enables a member of the public to receive, on request, a transmission of a particular sound recording chosen by or on behalf of the recipient. The ability of individuals to request that particular sound record-

ings be performed for reception by the public at large does not make a service interactive. If an entity offers both interactive and non-interactive services (either concurrently or at different times), the non-interactive component shall not be treated as part of an interactive service.

(5) A "nonsubscription transmission", "nonsubscription retransmission", or a "nonsubscription broadcast transmission" is any transmission or retransmission that is not a subscription transmission or retransmission.

(6) A "retransmission" includes any further simultaneous retransmission of the same transmission. Nothing in this definition shall be construed to exempt a transmission that fails to satisfy a separate element required to qualify for an exemption under section 114(d)(1).

(7) The "sound recording performance complement" is the transmission during any 3-hour period, on a particular channel used by a transmitting entity, of no more than—

(A) 3 different selections of sound recordings from any one phonorecord lawfully distributed for public performance or sale in the United States, if no more than 2 such selections are transmitted consecutively; or

(B) 4 different selections of sound recordings

(i) by the same featured recording artist; or

(ii) from any set or compilation of phonorecords lawfully distributed together as a unit for public performance or sale in the United States,

if no more than three such selections are transmitted consecutively:

Provided, That the transmission of selections in excess of the numerical limits provided for in clauses (A) and (B) from multiple phonorecords shall nonetheless qualify as a sound recording performance complement if the programming of the multiple phonorecords was not willfully intended to avoid the numerical limitations prescribed in such clauses.

(8) A "subscription transmission" is a transmission that is controlled and limited to particular recipients, and for which consideration is required to be paid or otherwise given by or on behalf of the recipient to receive the transmission or a package of transmissions including the transmission.

## § 115. Scope of exclusive rights in nondramatic musical works: Compulsory license for making and distributing phonorecords

In the case of nondramatic musical works, the exclusive rights provided by clauses (1) and (3) of section 106, to make and to distribute phonorecords of such works, are subject to compulsory licensing under the conditions specified by this section.

(a) AVAILABILITY AND SCOPE OF COMPULSORY LICENSE.—

(1) When phonorecords of a nondramatic musical work have been distributed to the public in the United States under the authority of the copyright owner, [any other person] *any other person, including those who make phonorecords or digital phonorecord deliveries by means of a digital audio transmission,* may, by complying with the provisions of this section, obtain

a compulsory license to make and distribute phonorecords of the work. A person may obtain a compulsory license only if his or her primary purpose in making phonorecords is to distribute them to the public for private use, *including by means of a digital phonorecord delivery*. A person may not obtain a compulsory license for use of the work in the making of phonorecords duplicating a sound recording fixed by another, unless: (i) such sound recording was fixed lawfully; and (ii) the making of the phonorecords was authorized by the owner of copyright in the sound recording or, if the sound recording was fixed before February 15, 1972, by any person who fixed the sound recording pursuant to an express license from the owner of the copyright in the musical work or pursuant to a valid compulsory license for use of such work in a sound recording.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(c) ROYALTY PAYABLE UNDER COMPULSORY LICENSE.—

(1) To be entitled to receive royalties under a compulsory license, the copyright owner must be identified in the registration or other public records of the Copyright Office. The owner is entitled to royalties for phonorecords made and distributed after being so identified, but is not entitled to recover for any phonorecords previously made and distributed.

(2) Except as provided by clause (1), the royalty under a compulsory license shall be payable for every phonorecord made and distributed in accordance with the license. For this purpose, *and other than as provided in paragraph (3)*, a phonorecord is considered "distributed" if the person exercising the compulsory license has voluntarily and permanently parted with its possession. With respect to each work embodied in the phonorecord, the royalty shall be either two and three-fourths cents, or one-half of one cent per minute of playing time or fraction thereof, whichever amount is larger.

*(3)(A) A compulsory license under this section includes the right of the compulsory licensee to distribute or authorize the distribution of a phonorecord of a nondramatic musical work by means of a digital transmission which constitutes a digital phonorecord delivery, regardless of whether the digital transmission is also a public performance of the sound recording under section 106(6) of this title or of any nondramatic musical work embodied therein under section 106(4) of this title. For every digital phonorecord delivery by or under the authority of the compulsory licensee—*

*(i) on or before December 31, 1997, the royalty payable by the compulsory licensee shall be the royalty prescribed under paragraph (2) and chapter 8 of this title; and*

*(ii) on or after January 1, 1998, the royalty payable by the compulsory licensee shall be the royalty prescribed under subparagraphs (B) through (F) and chapter 8 of this title.*

*(B) Notwithstanding any provision of the antitrust laws, for the purpose of this subparagraph, any copyright owners of nondramatic musical works and any persons entitled to obtain a compulsory license under subsection (a)(1) may negotiate and agree upon the terms and rates of royalty payments under this*

paragraph and the proportionate division of fees paid among copyright owners, and may designate common agents to negotiate, agree to, pay or receive such royalty payments. Such authority to negotiate the terms and rates of royalty payments includes, but is not limited to, the authority to negotiate the year during which the royalty rates prescribed under subparagraphs (B) through (F) and chapter 8 of this title shall next be determined.

(C) During the period of June 30, 1996, through December 31, 1996, Librarian of Congress shall cause notice to be published in the Federal Register of the initiation of voluntary negotiation proceedings for the purpose of determining reasonable terms and rates of royalty payments for the activities specified by subparagraph (A) during the period beginning January 1, 1998, and ending on December 31, 2007, or such earlier date (regarding digital transmissions) as the parties may agree. Such terms and rates shall distinguish between (i) digital phonorecord deliveries where the reproduction or distribution of a phonorecord is incidental to the transmission which constitutes the digital phonorecord delivery, and (ii) digital phonorecord deliveries in general. Any copyright owners of nondramatic musical works and any persons entitled to obtain a compulsory license under subsection (a)(1) may submit to the Librarian of Congress licenses covering such activities. The parties to each negotiation proceeding shall bear their own costs.

(D) In the absence of license agreements negotiated under subparagraph (C), the Librarian of Congress shall, pursuant to chapter 8, convene a copyright arbitration royalty panel to determine and publish in the Federal Register a schedule of rates and terms which, subject to subparagraph (E), shall be binding on all copyright owners of nondramatic musical works and persons entitled to obtain a compulsory license under subsection (a)(1) during the period beginning January 1, 1998, and ending on December 31, 2007, or such earlier date (regarding digital transmissions) as may be determined pursuant to subparagraph (C) or chapter 8. Such terms and rates shall distinguish between (i) digital phonorecord deliveries where the reproduction or distribution of a phonorecord is incidental to the transmission which constitutes the digital phonorecord delivery, and (ii) digital phonorecord deliveries in general. In addition to the objectives set forth in section 801(b)(1), in establishing such rates and terms, the copyright arbitration royalty panel may consider rates under voluntary license agreements negotiated as provided in subparagraph (C). The royalty rates payable for a compulsory license for a digital phonorecord delivery under this section shall be established de novo and no precedential effect shall be given to the amount of the royalty payable by a compulsory licensee for digital phonorecord deliveries on or before December 31, 1997. The parties to the proceeding shall bear the entire cost thereof in such manner and proportion as the arbitration panels shall direct. The Librarian of Congress shall also establish requirements by which copyright owners may receive reasonable notice of the use of their works under this section,

and under which records of such use shall be kept and made available by persons making digital phonorecord deliveries.

*(E)(i)* License agreements voluntarily negotiated at any time between one or more copyright owners of nondramatic musical works and one or more persons entitled to obtain a compulsory license under subsection (a)(1) shall be given effect in lieu of any determination by the Librarian of Congress. Subject to clause (ii), the royalty rates determined pursuant to subparagraph (C) or (D) shall be given effect in lieu of any royalty rates specified in a contract pursuant to which a recording artist who is the author of a nondramatic musical work grants a license under that person's exclusive rights in the musical work under section 106 (1) or (3) to a person desiring to fix in a tangible medium of expression a sound recording embodying the musical work.

*(ii)* Clause (i) shall not apply to—

*(I)* a contract entered into on or before June 22, 1995, and not modified thereafter for the purpose of reducing such rates or of increasing the number of musical works within the scope of the contract covered by the reduced rates, except if a contract entered into on or before June 22, 1995, is modified thereafter for the purpose of increasing the number of musical works within the scope of the contract, any contrary royalty rates specified in the contract shall be given effect in lieu of royalty rates determined pursuant to subparagraph (C) or (D) for the number of musical works within the scope of the contract as of June 22, 1995; and

*(II)* a contract entered into after the date that the sound recording is fixed in a tangible medium of expression substantially in a form intended for commercial release, if at the time the contract is entered into, the recording artist retains the right to grant licenses under sections 106(1) and 106(3).

*(F)* The procedures specified in subparagraphs (C) and (D) shall be repeated and concluded, in accordance with regulations that the Librarian of Congress shall prescribe, as provided in section 803(a)(3), except to the extent that different times for the repeating and concluding of such proceedings may be determined in accordance with subparagraph (C) or (D).

*(G)* Except as provided in section 1002(e) of this title, a digital phonorecord delivery licensed under this paragraph shall be accompanied by the information encoded in the sound recording, if any, by or under the authority of the copyright owner of that sound recording, that identifies the title of the sound recording, the featured recording artist who performs on the sound recording, and related information, including information concerning the underlying musical work and its writer.

*(H)(i)* A digital phonorecord delivery of a sound recording is actionable as an act of infringement under section 501, and is fully subject to the remedies provided by sections 502 through 506 and sections 509 and 510, unless—

*(I)* the digital phonorecord delivery has been authorized by the copyright owner of the sound recording; and

(II) the owner of the copyright in the sound recording or the entity making the digital phonorecord delivery has obtained a compulsory license under this section or has otherwise been authorized to distribute or authorize the distribution, by means of a digital phonorecord delivery, of each nondramatic musical work embodied in the sound recording.

(ii) Any cause of action under this subparagraph shall be in addition to those available to the owner of the copyright in the nondramatic musical work under subsection (c)(5) and section 106(4) and the owner of the copyright in the sound recording under section 106(6).

(I) The liability of the copyright owner of a sound recording for infringement of the copyright in a musical work embodied in the sound recording shall be determined in accordance with applicable law, except that the owner of a copyright in a sound recording shall not be liable for a digital phonorecord delivery by a third party if the owner of the copyright in the sound recording does not license the distribution of a phonorecord of the musical work.

(J) Nothing in section 1008 shall be construed to prevent the exercise of the rights and remedies allowed by this paragraph, paragraph (7), and chapter 5 in the event of a digital phonorecord delivery, except that no action alleging infringement of copyright may be brought under this title against a manufacturer, importer or distributor of a digital audio recording device, a digital audio recording medium, an analog recording device, or an analog recording medium, or against a consumer, based on the actions described in such section.

(K) Nothing in this section annuls or limits (i) the exclusive right to publicly perform a sound recording or the musical work embodied therein, including by means of a digital transmission, under sections 106(4) and 106(6), (ii) except for compulsory licensing under the conditions specified by this section, the exclusive rights to reproduce and distribute the sound recording and the musical work embodied therein under sections 106(1) and 106(3), including by means of a digital phonorecord delivery, or (iii) any other rights under any other provision of section 106, or remedies available under this title, as such rights or remedies exist either before or after the date of enactment of the Digital Performance Right in Sound Recordings Act of 1995.

(L) The provisions of this section concerning digital phonorecord deliveries shall not apply to any exempt transmissions or retransmissions under section 114(d)(1). The exemptions created in section 114(d)(1) do not expand or reduce the rights of copyright owners under section 106 (1) through (5) with respect to such transmissions and retransmissions.

〔(3)〕 (4) A compulsory license under this section includes the right of the maker of a phonorecord of a nondramatic musical work under subsection (a)(1) to distribute or authorize distribution of such phonorecord by rental, lease, or lending (or by acts or practices in the nature of rental, lease, or lending). In addition to any royalty payable under clause (2) and chapter 8 of this title, a royalty shall be payable by the compulsory licensee

for every act of distribution of a phonorecord by or in the nature of rental, lease, or lending, by or under the authority of the compulsory licensee. With respect to each nondramatic musical work embodied in the phonorecord, the royalty shall be a proportion of the revenue received by the compulsory licensee from every such act of distribution of the phonorecord under this clause equal to the proportion of the revenue received by the compulsory licensee from distribution of the phonorecord under clause (2) that is payable by a compulsory licensee under that clause and under chapter 8. The Register of Copyrights shall issue regulations to carry out the purpose of this clause.

〔(4)〕 *(5)* Royalty payments shall be made on or before the twentieth day of each month and shall include all royalties for the month next preceding. Each monthly payment shall be made under oath and shall comply with requirements that the Register of Copyrights shall prescribe by regulation. The Register shall also prescribe regulations under with detailed cumulative annual statements of account, certified by a certified public accountant, shall be filed for every compulsory license under this section. The regulations covering both the monthly and the annual statements of account shall prescribe the form, content, and manner of certification with respect to the number of records made and the number of records distributed.

〔(5)〕 *(6)* If the copyright owner does not receive the monthly payment and the monthly and annual statements of account when due, the owner may give written notice to the licensee that, unless the default is remedied within thirty days from the date of the notice, the compulsory license will be automatically terminated. Such termination renders either the making or the distribution, or both, of all phonorecords for which the royalty has not been paid, actionable as acts of infringement under section 501 and fully subject to the remedies provided by sections 502 through 506 and 509.

*(d) DEFINITION.—As used in this section, the following term has the following meaning: A "digital phonorecord delivery" is each individual delivery of a phonorecord by digital transmission of a sound recording which results in a specifically identifiable reproduction by or for any transmission recipient of a phonorecord of that sound recording, regardless of whether the digital transmission is also a public performance of the sound recording or any nondramatic musical work embodied therein. A digital phonorecord delivery does not result from a real-time, noninteractive subscription transmission of a sound recording where no reproduction of the sound recording or the musical work embodied therein is made from the inception of the transmission through to its receipt by the transmission recipient in order to make the sound recording audible.*

\*       \*       \*       \*       \*       \*       \*

## §119. Limitations on exclusive rights: Secondary transmissions of superstations and network stations for private home viewing

(a) SECONDARY TRANSMISSIONS BY SATELLITE CARRIERS.—

(1) SUPERSTATIONS.—Subject to the provisions of paragraphs (3), (4), and (6) of this subsection *and section 114(d)*, secondary transmissions of a primary transmission made by a superstation and embodying a performance or display of a work shall be subject to statutory licensing under this section if the secondary transmission is made by a satellite carrier to the public for private home viewing, and the carrier makes a direct or indirect charge for each retransmission service to each household receiving the secondary transmission or to a distributor that has contracted with the carrier for direct or indirect delivery of the secondary transmission to the public for private home viewing.

(2) NETWORK STATIONS.—

(A) IN GENERAL.—Subject to the provisions of subparagraphs (B) and (C) of this paragraph and paragraphs (3), (4), (5), and (6) of this subsection *and section 114(d)*, secondary transmissions of programming contained in a primary transmission made by a network station and embodying a performance or display of a work shall be subject to statutory licensing under this section if the secondary transmission is made by a satellite carrier to the public for private home viewing, and the carrier makes a direct or indirect charge for such retransmission service to each subscriber receiving the secondary transmission.

\*    \*    \*    \*    \*    \*    \*

CHAPTER 8—COPYRIGHT ROYALTY TRIBUNAL

\*    \*    \*    \*    \*    \*    \*

## § 801. Copyright Royalty Tribunal: Establishment and purpose

(a) There is hereby created an independent Copyright Royalty Tribunal in the legislative branch.

(b) Subject to the provisions of this chapter, the purposes of the Tribunal shall be—

(1) to make determinations concerning the adjustment of reasonable copyright rates as provided in section 【115】 *114, 115,* and 116, and to make determinations as to reasonable terms and rates of royalty payments as provided in section 118. The rates applicable under sections 【115】 *114, 115,* and 116 shall be calculated to achieve the following objectives:

\*    \*    \*    \*    \*    \*    \*

## § 802. Membership and proceedings of copyright arbitration royalty panels

(a) COMPOSITION OF COPYRIGHT ARBITRATION ROYALTY PANELS.—A copyright arbitration royalty panel shall consist of 3 arbitrators selected by the Librarian of Congress pursuant to subsection (b).

\*    \*    \*    \*    \*    \*    \*

(c) ARBITRATION PROCEEDINGS.—Copyright arbitration royalty panels shall conduct arbitration proceedings, subject to subchapter II of chapter 5 of title 5, for the purpose of making their determina-

tions in carrying out the purposes set forth in section 801. The arbitration panels shall act on the basis of a fully documented written record, prior decisions of the Copyright Royalty Tribunal, prior copyright arbitration panel determinations, and rulings by the Librarian of Congress under section 801(c). Any copyright owner who claims to be entitled to royalties under ⟦section 111, 116, or 119,⟧ *section 111, 114, 116, or 119, any person entitled to a compulsory license under section 114(d), any person entitled to a compulsory license under section 115,* or any interested copyright party who claims to be entitled to royalties under section 1006, may submit relevant information and proposals to the arbitration panels in proceedings applicable to such copyright owner or interested copyright party, and any other person participating in arbitration proceedings may submit such relevant information and proposals to the arbitration panel conducting the proceedings. In ratemaking proceedings, the parties to the proceedings shall bear the entire cost thereof in such manner and proportion as the arbitration panels shall direct. In distribution proceedings, the parties shall bear the cost in direct proportion to their share of the distribution.

\*  \*  \*  \*  \*  \*  \*

(g) JUDICIAL REVIEW.—Any decision of the Librarian of Congress under subsection (f) with respect to a determination of an arbitration panel may be appealed, by any aggrieved party who would be bound by the determination, to the United States Court of Appeals for the District of Columbia Circuit, within 30 days after the publication of the decision in the Federal Register. If no appeal is brought within such 30-day period, the decision of the Librarian is final, and the royalty fee or determination with respect to the distribution of fees, as the case may be, shall take effect as set forth in the decision. The pendency of an appeal under this paragraph shall not relieve persons obligated to make royalty payments under sections 111, *114,* 115, 116, 118, 119, or 1003 who would be affected by the determination on appeal to deposit the statement of account and royalty fees specified in those sections. The court shall have jurisdiction to modify or vacate a decision of the Librarian only if it finds, on the basis of the record before the Librarian, that the Librarian acted in an arbitrary manner. If the court modifies the decision of the Librarian, the court shall have jurisdiction to enter its own determination with respect to the amount or distribution of royalty fees and costs, to order the repayment of any excess fees, and to order the payment of any underpaid fees, and the interest pertaining respectively thereto, in accordance with its final judgement. The court may further vacate the decision of the arbitration panel and remand the case to the Librarian for arbitration proceedings in accordance with subsection (c).

(h) ADMINISTRATIVE MATTERS.—

(1) * * *

(2) POSITIONS REQUIRED FOR ADMINISTRATION OF COMPULSORY LICENSING.—Section 307 of the Legislative Branch Appropriations Act, 1994, shall not apply to employee positions in the Library of Congress that are required to be filled in order to carry out section 111, *114,* 115, 116, 118, or 199 or chapter 10.

○