*Eight Mile Style, LLC et al. v. Apple Computer Inc., et al.*
Case No. 2:07-CV-13164

## EXHIBIT 2

Statement of Marybeth Peters before the
Subcomittee on Courts, the Internet and Intellectual Property
of the House Committee on the Judiciary,
dated March 11, 2004

STATEMENT OF MARYBETH PETERS
REGISTER OF COPYRIGHTS
Library of Congress
United States Copyright Office
101 Independence Avenue, S.E.
Washington, D.C.
(202) 707-8350

Before the

SUBCOMMITTEE ON COURTS,
THE INTERNET AND INTELLECTUAL PROPERTY
OF THE HOUSE COMMITTEE ON THE JUDICIARY

108th Congress, 2d Session
March 11, 2004

Mr. Chairman, Mr. Berman, and distinguished members of the Subcommittee, I appreciate the opportunity to appear before you to testify on the Section 115 compulsory license, which allows for the making and distribution of physical phonorecords and digital phonorecord deliveries. The compulsory license to allow for the use of nondramatic musical works has been with us for 95 years and has resulted in the creation of a multitude of new works for the pleasure and consumption of the public, and in the creation of a strong and vibrant music industry which continues to flourish to this day. Nevertheless, the means to create and provide music to the public has changed radically in the last decade, necessitating changes in the law to protect the rights of copyright owners while at the same time balancing the needs of the users in a digital world.

**Background**

1. *Mechanical Licensing under the 1909 Copyright Act*

    In 1909, Congress created the first compulsory license to allow anyone to make a

mechanical reproduction (known today as a phonorecord) of a musical composition[1] without the consent of the copyright owner provided that the person adhered to the provisions of the license. The impetus for this decision was the emergence of the player piano and the ambiguity surrounding the extent of the copyright owner's right to control the making of a copy of its work on a piano roll. The latter question was settled in part in 1908 when the Supreme Court held in White-Smith Publishing Co. v. Apollo Co.[2] that perforated piano rolls were not "copies" under the copyright statute in force at that time, but rather parts of devices which performed the work. During this period (1905-1909), copyright owners were seeking legislative changes which would grant them the exclusive right to authorize the mechanical reproduction of their works – a wish which Congress granted shortly thereafter. Although the focus at the time was on piano rolls, the mechanical reproduction right also applied to the nascent medium of phonograph records as well.

Congress, however, was concerned that the right to make mechanical reproductions of musical works might become a monopoly controlled by a single company. Therefore, it decided that rather than provide for an exclusive right to make mechanical reproductions, it would create a compulsory license in Section 1(e) of the 1909 Act which would allow any person to make "similar use" of the musical work upon payment of a royalty of two cents for "each such part manufactured." However, no one could take advantage of the license until the copyright owner had authorized the first mechanical reproduction of the work. Moreover, the initial license placed notice requirements on both the copyright owners and the

---

[1] The music industry construed the reference in Section 1(e) of the 1909 Act as referring only to a nondramatic musical composition as opposed to music contained in dramatico-musical compositions. *See* MELVILLE B. NIMMER, NIMMER ON COPYRIGHT, § 16.4 (1976). This interpretation was expressly incorporated into the law by Congress with the adoption of the 1976 Act. 17 U.S.C. §115(a)(1).

[2] 209 U.S. 1 (1908).

2

licensees.  Section 101(e).  The copyright owner had to file a notice of use with the Copyright

Office – indicating that the musical work had been mechanically reproduced – in order to

preserve his rights under the law, whereas the person who wished to use the license had to serve

the copyright owner with a notice of intention to use the license and file a copy of that notice

with the Copyright Office.  The license had the effect of capping the amount of money a

composer could receive for the mechanical reproduction of this work.  The two cent rate set in

1909 remained in effect until January 1, 1978, and acted as a ceiling for the rate in privately

negotiated licenses.

Such stringent requirements for use of the compulsory license did not foster wide

use of the license.  It is my understanding that the "mechanical" license as structured under the

1909 Copyright Act was infrequently used until the era of tape piracy in the late 1960s.  When

tape piracy was flourishing, the "pirates" inundated the Copyright Office with notices of

intention, many of which contained hundreds of song titles.  The music publishers refused to

accept such notices and any proffered royalty payments since they did not believe that

reproduction and duplication of an existing sound recording fell within the scope of the

compulsory license.  After this flood of filings passed, the use of the license appears to have

again became almost non-existent; up to this day, very few notices of intention are filed with the

Copyright Office.

2.    *The Mechanical License under the 1976 Copyright Act*

The music industry adapted to the new license and, by and large, sought its

retention, opposing the position of the Register of Copyrights in 1961 to sunset the license one

year after enactment of the omnibus revision of the copyright law.  Music publishers and

composers had grown accustomed to the license and were concerned that the elimination of the

3

license would cause unnecessary disruptions in the music industry.  Consequently, the argument shifted over time away from the question of whether to retain the license and, instead, the debate focused on reducing the burdens on copyright owners, clarifying ambiguous provisions, and setting an appropriate rate.  The House Judiciary Committee's approach reflected this trend and in its 1976 report on the bill revising the Copyright Act, it reiterated its earlier position "that a compulsory licensing system is still warranted as a condition for the rights of reproducing and distributing phonorecords of copyrighted music," but "that the present system is unfair and unnecessarily burdensome on copyright owners, and that the present statutory rate is too low." H. Rep. No. 94-1476, at 107 (1976), citing H. Rep. No. 83, at 66-67 (1967).

To that end, Congress adopted a number of new conditions and clarifications in Section 115 of the Copyright Act of 1976, including:

- The license becomes available only after a phonorecord has been distributed to the public in the United States with the authority of the copyright owner (§115(a)(1));

- The license is only available to someone whose primary intent is to distribute phonorecords to the public for private use (§115(a)(1));

- A licensee cannot duplicate a sound recording embodying the musical work without the authorization of the copyright owner of the sound recording (§115(a)(1));

- A musical work may be rearranged only "to the extent necessary to conform it to the style or manner of the interpretation of the performance involved," without "chang[ing] the basic melody or fundamental character of the work," (§115(a)(2));

- A licensee must still serve a Notice of Intention to obtain a compulsory license  on the copyright owner or, in the case where the public records of

4

the Copyright Office do not identify the copyright owner and include an address, the licensee must file the Notice of Intention with the Copyright Office (§115(b)(1));

• A licensee must serve the notice on the copyright owner "before or within thirty days after making, and before distributing any phonorecords of the work." Otherwise, the licensee loses the opportunity to make and distribute phonorecords pursuant to the compulsory license (§115(b)(1));

• A copyright owner is entitled to receive copyright royalty fees only on those phonorecords made[3] and distributed[4] after the copyright owner is identified in the registration or other public records of the Copyright Office (§115(c)(1));[5]

• The rate payable for each phonorecord made and distributed is adjusted by an independent body which, prior to 1993, was the Copyright Royalty Tribunal.[6]

• A compulsory license may be terminated for failure to pay monthly royalties if a user fails to make payment within 30 days of the receipt of a written notice from the copyright owner advising the user of the default (§115(c)(6)).

The Section 115 compulsory license worked well for the next two decades, but the

---

[3] Congress intended the term "made" "to be broader than 'manufactured' and to include within its scope every possible manufacturing or other process capable of reproducing a sound recording in phonorecords." H. Rep. No. 1476, at 110 (1976).

[4] For purposes of Section 115, "the concept of 'distribution' comprises any act by which the person exercising the compulsory license voluntarily relinquishes possession of a phonorecord (considered as a fungible unit), regardless of whether the distribution is to the public, passes title, constitutes a gift, or is sold, rented, leased, or loaned, unless it is actually returned and the transaction cancelled." Id.

[5] This provision replaced the earlier requirement in the 1909 law that a copyright owner must file a notice of use with the Copyright Office in order to be eligible to receive royalties generated under the compulsory license.

[6] In 1993, Congress passed the Copyright Royalty Tribunal Reform Act of 1993, Pub. L. 103-198, 107 Stat. 2304, which eliminated the Copyright Royalty Tribunal and replaced it with a system of *ad hoc* Copyright Arbitration Royalty Panels (CARPs) administered by the Librarian of Congress.

5

use of new digital technology to deliver music to the public required a second look at the license

to determine whether it continued to meet the needs of the music industry.   During the 1990s, it

became apparent that music services could offer options for the enjoyment of music in digital

formats either by providing the public an opportunity to hear any sound recording it wanted on-

demand or by delivering a digital version of the work directly to a consumer's computer.   In

either case, there was the possibility that the new offerings would obviate the need for

mechanical reproductions in the forms heretofore used to distribute musical works and sound

recordings in a physical format, e.g., vinyl records, cassette tapes and most recently audio

compact discs.   Moreover, it was clear that digital transmissions were substantially superior to

analog transmissions.   In an early study conducted by the Copyright Office, the Office noted two

significant improvements associated with digital transmissions: a superior sound quality and a

decreased susceptibility to interference from physical structures like tall buildings or tunnels.   *See*

Register of Copyrights, U.S. Copyright Office, Copyright Implications of Digital Audio

Transmission Services (1991).

       3.    *The Digital Performance Right in Sound Recordings Act of 1995*

         By 1995, Congress recognized that "digital transmission of sound recordings

[was] likely to become a very important outlet for the performance of recorded music." S. Rep.

No. 104-128, at 14 (1995).   Moreover, it realized that "[t]hese new technologies also may lead to

new systems for the electronic distribution of phonorecords with the authorization of the affected

copyright owners."   Id.   For these reasons, Congress made changes to Section 115 to meet the

challenges of providing music in a digital format when it enacted the Digital Performance Right

in Sound Recordings Act of 1995 ("DPRA"), Pub. L. 104-39, 109 Stat. 336, which also granted

copyright owners of sound recordings an exclusive right to perform their works publicly by

means of a digital audio transmission, 17 U.S.C. §106(6), subject to certain limitations. *See* 17

U.S.C. §114. The amendments to Section 115 clarified the reproduction and distribution rights of

music copyright owners and producers and distributors of sound recordings, especially with

respect to what the amended Section 115 termed "digital phonorecord deliveries." Specifically,

Congress wanted to reaffirm the mechanical rights of songwriters and music publishers in the

new world of digital technology. It is these latter amendments to Section 115 that are of

particular interest today.

      First, Congress expanded the scope of the compulsory license to include the

making and distribution of a digital phonorecord and, in doing so, adopted a new term of art, the

"digital phonorecord delivery" ("DPD"), to describe the process whereby a consumer receives a

phonorecord by means of a digital transmission, the delivery of which requires the payment of a

statutory royalty under Section 115. The precise definition of this new term reads as follows:

> A "digital phonorecord delivery" is each individual delivery of a
> phonorecord by digital transmission of a sound recording which
> results in a specifically identifiable reproduction by or for any
> transmission recipient of a phonorecord of that sound recording,
> regardless of whether the digital transmission is also a public
> performance of the sound recording or any nondramatic musical
> work embodied therein. A digital phonorecord delivery does not
> result from a real-time, nonintegrated subscription transmission of
> a sound recording where no reproduction of the sound recording or
> the musical work embodied therein is made from the inception of
> the transmission through to its receipt by the transmission recipient
> in order to make the sound recording audible.

17 U.S.C. §115(d). What is noteworthy about the definition is that it includes elements related to

the right of public performance and the rights of reproduction and distribution with respect to

7

both the musical work and the sound recording.  The statutory license, however, covers only the making of the phonorecord, and only with respect to the musical work.  The definition merely acknowledges that the public performance right and the reproduction and distribution rights may be implicated in the same act of transmission and that the public performance does not in and of itself implicate the reproduction and distribution rights associated with either the musical composition or the sound recording.  In fact, Congress included a provision to clarify that "nothing in this Section annuls or limits the exclusive right to publicly perform a sound recording or the musical work embodied therein, including by means of a digital transmission."  17 U.S.C. §115(c)(3)(K).

Another important distinction between traditional mechanical phonorecords and DPDs brought about by the DPRA is the expansion of the statutory license to include reproduction and transmission by means of a digital phonorecord delivery of a musical composition embodied in a sound recording owned by a third party, provided that the licensee obtains authorization from the copyright owner of the sound recording to deliver the DPD.[7] Thus, the license provides for more than the reproduction and distribution of one's own version of a performance of a musical composition by means of a DPD.  Under the expanded license, a service providing DPDs can in effect become a virtual record store if it is able to clear the rights

---

[7] "A digital phonorecord delivery of a sound recording is actionable as an act of infringement under section 501, and is fully subject to the remedies provided by sections 502 through 506 and section 509, unless–
    (I) the digital phonorecord delivery has been authorized by the copyright owner of the sound recording; and
    (II) the owner of the copyright in the sound recording or the entity making the digital phonorecord delivery has obtained a compulsory license under this section or has otherwise been authorized by the copyright owner of the musical work to distribute or authorize the distribution, by means of a digital phonorecord delivery, of each musical work embodied in the sound recording."
17 U.S.C. §115(c)(3)(H)(i).

to the sound recordings. More importantly, the DPRA allows a copyright owner of a sound recording to license the right to make DPDs of both the sound recording and the underlying musical work to third parties if it has obtained the right to make DPDs from the copyright owner of the musical work. See 17 U.S.C. §115(c)(3)(I), S. Rep. No. 104-128, at 43 (1995).

Apart from the extension of the compulsory license to cover the making of DPDs, Congress also addressed the common industry practice of incorporating controlled composition clauses into a songwriter/performer's recording contract, whereby a recording artist agrees to reduce the mechanical royalty rate payable when the record company makes and distributes phonorecords including songs written by the performer. In general, the DPRA provides that privately negotiated contracts entered into after June 22, 1995, between a recording company and a recording artist who is the author of the musical work cannot include a rate for the making and distribution of the musical work below that established for the compulsory license. There is one notable exception to this general rule. A recording artist-author who effectively is acting as her own music publisher may accept a royalty rate below the statutory rate if the contract is entered into after the sound recording has been fixed in a tangible medium of expression in a form intended for commercial release. 17 U.S.C. §115(c)(3)(E).

The amended license also extended the current process for establishing rates for the mechanical license to DPDs. Under the statutory structure, rates for the making and reproduction of the DPDs can be decided either through voluntary negotiations among the affected parties or, in the case where these parties are unable to agree upon a statutory rate, by a Copyright Arbitration Royalty Panel ("CARP"). Pursuant to Section 115(c)(3)(D), the CARP must establish rates and terms that "distinguish between digital phonorecord deliveries where the reproduction or distribution of the phonorecord is incidental to the transmission which

9

constitutes the digital phonorecord delivery, and digital phonorecord deliveries in general."

The difficult issue, however, is identifying those reproductions that are subject to compensation under the statutory license, a subject I will discuss in greater detail.

**Regulatory Responses**

1.  *Notices of Intention to Use and Statements of Account*

Section 115(b) requires that a person who wishes to use the compulsory license serve a notice of his or her intention to use a musical composition with the copyright owner before or within thirty days after making, and before distributing any phonorecords.  Regulations in place since the enactment of the 1976 Copyright Act followed the statutory scheme and required that a separate Notice of Intention be served for each nondramatic musical work embodied or intended to be embodied in phonorecords to be made under the compulsory license. Following the statutory scheme, the regulations provided that if the registration or other public records of the Copyright Office do not identify the copyright owner of a particular work and include that owner's address, the person wishing to use the compulsory license could file the Notice of Intention with the Copyright Office.  37 C.F.R. §201.18.  The regulations also implemented the statutory requirement that each licensee pay royalties, on a monthly basis, to each copyright owner whose musical works the licensee is using, and that each licensee serve monthly statements of account and an annual statement of account on each copyright owner.  37 C.F.R. §201.19.

The regulations governing this requirement were amended after the passage of the DPRA in order to accommodate the making of DPDs.  Initial amendments to the rules were promulgated on July 30, 1999, and addressed when a DPD is made, manufactured, or distributed for purposes of the Section 115 license such that the obligation to pay the royalty fee attaches.

10

The amended regulation provided that a DPD be treated as a phonorecord made and distributed on the date the phonorecord is digitally transmitted. The amended regulation also provided a mechanism for the delivery of a usable DPD where, in the first instance, the initial transmission failed or did not result in a complete and functional DPD. 64 FR 41286. (July 30, 1999). Because these rules were dealing with new concepts applicable to developing services in a nascent industry, the Office adopted the rules on an interim basis and left the door open to revisit the notice and recordkeeping requirements.

Two years later, the Office initiated a second rulemaking proceeding to address concerns of musical work copyright owners and users of the compulsory license, especially those developing new digital music services with the intention of developing extensive music libraries with hundreds of thousands of titles in order to offer these recordings to their subscribers for a fee. *See* 66 FR 45241 (August 28, 2001). Both sides wanted easier ways to meet the requirements for obtaining the license, including more convenient methods to effect service of the Notice of Intention to use the license on the copyright owners, a provision to allow use of a single notice to identify use of multiple works, a simplification of the elements of the notice, and a provision to make clear that a notice may be legally sufficient even if the notice contains minor errors.

We thought many of these suggestions were appropriate and perhaps long overdue. Thus, we are pleased to announce that the Office is publishing today in the Federal Register proposed amendments to the regulations governing the notice and recordkeeping requirements that are designed to increase the ease with which a person who intends to utilize the license may effect service on the copyright owner and provide the information required to identify the musical work. We are aware that many interested parties will not find the proposed

11

changes sufficient to create a seamless licensing regime.  However, the extent of any change we can make in the regulations is limited by the scope of the law and, as we explain in the current notice, a number of the changes proposed by the interested parties would require a change in the law.  Nevertheless, we believe the proposed amendments represent progress in meeting the needs of digital services seeking use of the license as a means to clear the rights to make and distribute a vast array of musical works in a DPD format, and they also offer improvements to the copyright owners who receive compensation under the Section 115 license.  Specifically, the new rules propose the following notable changes:

- A copyright owner may designate an authorized agent to accept the Notices of Intention and/or the royalty payments, although the rules do not require that a single agent perform both functions;

- In the case where the copyright owner uses an authorized agent to accept the notices, the rules would require the copyright owner to identify to whom statements of account and royalty payments shall be made;

- A person intending to use the compulsory licence may serve a Notice of Intention on the copyright owner or its agent at an address other than the last address listed in the public records of the Copyright Office if that person has more recent or accurate information than is contained in the Copyright Office records;

- A Notice of Intention may be submitted electronically to a copyright owner or its authorized agent in cases where the copyright owner or authorized agent has announced it will accept electronic submissions.

- Multiple works may be listed on a single Notice of Intention when the works are owned by the same copyright owner or, in the case where the notice will be served upon an authorized agent, the agent represents at least one of the copyright owners of each of the listed works;

12

- If a Notice of Intention includes more than 50 song titles, the proposed rules give the copyright owner or its agent a right to request and receive a digital file of the names of the copyrighted works in addition to the original paper copy of the Notice.

- A Notice of Intention may be submitted by an authorized agent of the person who seeks to obtain the license;

- Harmless errors that do not materially affect the adequacy of the information required to serve the purposes of the notice requirement shall not render a Notice of Intention invalid.

- In order to recover the Copyright Office's costs in processing Notices of Intention that are filed with the Office, the filing fee that has been required for the filing of a Notice of Intention with the Copyright Office when the identity and address of the copyright owner cannot be found in the registration or other public records of the Copyright Office will also be required when a Notice of Intention is filed with the Office after the Notice has been returned to the sender because the copyright owner is no longer located at the address identified in the Copyright Office records or has refused to accept delivery; and

- The fee charged for the filing of a Notice of Intention with the Copyright Office will be based upon the number of musical works identified in the Notice of Intention. We are studying the costs incurred by the Office in connection with such filings and I will submit to Congress new proposed fees that cover such costs. The resulting fee should be considerably lower per work than the current fee.[8]

I am hopeful that these proposed changes will facilitate the use of the license for both copyright owners and licensees, and I expect to adopt the proposed rules in final form after

---

[8] The fee for the filing of Notices of Intention may be changed only after a study has been made of the costs connected with the filing and indexing of the Notices. The fee adjustment must be submitted to Congress and may be instituted only if Congress has not enacted a law disapproving the fee within 120 days of its submission to Congress. 17 U.S.C. §708(a)(5), (b).

considering comments on the proposed rules and making any necessary modifications.  I believe that these changes represent the best that the Office can do under the current statute, but I recognize that it may be advisable to amend Section 115 to permit further changes in the procedure by which persons intending to use the compulsory license may provide notice of their intention.  I will discuss some possible amendments later in my testimony.

Moreover, these regulations only address the technical requirements for securing the compulsory license.  During the last rate adjustment proceeding, questions of a more substantive nature arose with respect to DPDs, requiring the Office to publish a Notice of Inquiry to consider the very scope of the Section 115 license.  I will now turn to a discussion of those issues.

2.    *Consideration of what constitutes an "incidental digital phonorecord delivery"*

In 1995 when Congress passed the DPRA, its intent was to extend the scope of the compulsory license to cover the making and distribution of a  phonorecord in a digital format – what Congress referred to as the making of a digital phonorecord delivery.   Since that time, what constitutes a "digital phonorecord delivery" has been a hotly debated topic.  Currently, the Copyright Office is in the midst of a rulemaking proceeding to examine this question, especially in light of the new types of services being offered in the marketplace, e.g. "on-demand streams" and "limited downloads."  *See* 66 FR 14099 (March 9, 2001).

The Office initiated this rulemaking proceeding in response to a petition from the Recording Industry Association of America ("RIAA"), asking that we conduct such a proceeding to resolve the question of which types of digital transmissions of recorded music constitute a general DPD and which types should be considered an incidental DPD.  RIAA made the request after it became apparent that industry representatives found it difficult, if not impossible, to

14

negotiate a rate for the incidental DPD category, as required by law, when no one knew which types of prerecorded music were to be included in this category.

Central to this inquiry are questions about two types of digital music services: "on-demand streams" and "limited downloads." For purposes of the inquiry, the music industry has defined an "on-demand stream" as an "on-demand, real-time transmission using streaming technology such as Real Audio, which permits users to listen to the music they want when they want and as it is transmitted to them," and a "limited download" as an "on-demand transmission of a time-limited or other use-limited (i.e., non-permanent) download to a local storage device (e.g., the hard drive of the user's computer), using technology that causes the downloaded file to be available for listening only either during a limited time (e.g., a time certain or a time tied to ongoing subscription payments) or for a limited number of times." The Office has received comments and replies to its initial notice of inquiry. I anticipate that we will conclude the proceeding this year after either holding a hearing or soliciting another round of comments from interested parties in order to get a fresh perspective on these complex and difficult questions in light of the current technology and business practices.

The perspective of music publishers appears to be clear. They have taken the position that both on-demand streams and limited downloads implicate their mechanical rights. Moreover, they maintain that copies made during the course of a digital stream or in the transmission of a DPD are for all practical purposes reproductions of phonorecords that are covered by the compulsory license. The recording industry supports this view, recognizing that while certain reproductions of a musical work are exempt under Section 112(a), other reproductions do not come within the scope of the exemption. For that reason, the recording industry has urged the Office to interpret the Section 115 license in such a way as to cover all

15

reproductions of a musical work necessary to operate such services; and, we are considering their arguments.  In the meantime, certain record companies and music publishers have worked out a marketplace solution.

a. <u>Marketplace solution</u>

In 2001, the RIAA, the National Music Publishers' Association, Inc. ("NMPA"), and the Harry Fox Agency, Inc. ("HFA") entered into an agreement concerning the mechanical licensing of musical works for new subscription services on the Internet.  Licenses issued under the RIAA/NMPA/HFA agreement are nonexclusive and cover all reproduction and distribution rights for delivery of on-demand streams and limited downloads and include the right to make server copies, buffer copies and other related copies used in the operation of a covered service. The license also provides at no additional cost for "On-Demand Streams of Promotional Excerpts," which are defined as a stream consisting of no more that thirty (30) seconds of playing time of the sound recording of a musical work or no more than the lesser of ten percent (10%) or sixty (60) seconds of playing time of a sound recording of a musical work longer than five minutes.

The industry approach to resolving the problems associated with mechanical licensing for digital music services is both innovative and comprehensive, resolving certain legal questions associated with temporary, buffer, cache and server copies of a musical work associated with digital phonorecord deliveries purportedly made under the Section 115 license, as well as the use of promotional clips. The Office welcomes the industry's initiative and creativity, and fully supports marketplace solutions to what really are commercial transactions between owners and users.

16

However, parties should not need to rely upon privately negotiated contracts exclusively to clear the rights needed to make full use of a statutory license, or need to craft an understanding of the legal limits of the compulsory license within the provisions of the private contract. The scope of the license and any limitations on its use should be clearly expressed in the law.

The 1995 amendments to Section 115, however, do not provide clear guidelines for use of the Section 115 license for the making of certain reproductions of a musical work needed to effectuate a digital transmission other than to acknowledge that a reproduction may be made during the course of a digital performance, and that such reproduction may be considered to be an incidental DPD.

But are they?  Section 115 does not provide a definition for incidental DPDs, so what constitutes an "incidental DPD" is not always clear.   While some temporary copies made in the course of a digital transmission, such as buffer copies made in the course of a download, may qualify, others – such as buffer copies made in the course of a transmission of a performance (e.g., streaming) – are more difficult to fit within the statutory definition.   In either case, it is clear that such copies need to comply with the statutory definition in order to be covered by the compulsory license.  In other words, the copies must result in an "individual delivery of a phonorecord which results in a *specifically identifiable reproduction* by or for any transmission recipient of a phonorecord of that sound recording." 17 U.S.C. §115(d) (emphasis added), Similar questions can be raised with respect to cache copies and intermediate server copies made in the course of (1) downloads and (2) streaming of performances.

17

Apparently because of such uncertainties, the RIAA/NMPA/HFA agreement includes a section entitled "Legal Framework for Agreement."   It contains two provisions that delineate how temporary copies made in order to provide either a limited download or an on-demand stream fit within the statutory framework of the Section 115 license.  Specifically, it provides that

> under current law the process of making On-Demand Streams through Covered Services (from the making of server reproductions to the transmission and local storage of the stream), viewed in its entirety, involves the making and distribution of a DPD, and further agree that such process in its entirety (i.e., inclusive of any server reproduction and any temporary or cached reproductions through to the transmission recipient of the On-Demand Stream) is subject to the compulsory licensing provisions of Section 115 of the Copyright Act;[and]
>
> that under current law the process of making Limited Downloads through Covered Services (from the making of server reproductions to the transmission and local storage of the Limited Download), viewed in its entirety, involves the making and distribution of a DPD, and further agree that such process in its entirety (i.e., inclusive of any server reproductions and any temporary or cached reproductions through to the transmission recipient of the Limited Download) is subject to the compulsory licensing provisions of Section 115 of the Copyright Act.

Paragraph 8.1(a) and (b), respectively, of the RIAA/NMPA/HFA Licensing Agreement (as submitted to the Copyright Office on December 6, 2001).

Of course, the parties' interpretation with respect to the scope of the Section 115 license is not binding on the Copyright Office or the courts. It merely represents their mutual understanding of the scope of the Section 115 license as a term of their privately negotiated

18

license, an understanding that I believe is not shared by everyone in the world of online music services. This is an issue that I will address in the rulemaking proceeding concerning digital phonorecord deliveries, and it is quite possible that I will reach a different interpretation as to what falls within the scope of the license, especially with respect to on-demand streams.

        The critical question to be decided is whether an on-demand stream results in reproductions that reasonably fit the statutory definition of a DPD, and creates a "phonorecord by digital transmission of a sound recording which results in a specifically identifiable reproduction by or for any transmission recipient," as required by law. Unless it does so, such reproductions cannot be reasonably considered as DPDs for purposes of Section 115, no matter what position private parties take within the four corners of their own agreement. What is more clear is that the delivery of a digital download, whether limited or otherwise, for use by the recipient appears to fit the statutory definition, since it must result in an identifiable reproduction in order for the recipient to listen to the work embodied in the phonorecord at his leisure.

        b.    <u>Possible legislative solutions</u>

        The Section 115 compulsory license was created to serve the needs of the phonograph record industry and has operated reasonably well in governing relationships between record companies and music publishers involving the making and distribution of traditional phonorecords. However, the attempt to adapt the mechanical license to enable online music services to clear the rights to make digital phonorecord deliveries of musical works has been less successful. With respect to problems involving the requirement that licensees give notice to copyright owners of their intention to use the compulsory license, I believe that I have exhausted the limits of my regulatory authority with the notice of proposed rulemaking published today. With respect to problems involving the scope and treatment of activities covered by the Section

115 compulsory license, I may soon be able to resolve some of the issues in the pending

rulemaking on incidental digital phonorecord deliveries, but it seems clear that legislation will be

necessary in order to create a truly workable solution to all of the problems that have been

identified.

At this point in time, I do not have any specific legislative recommendations, but I

would like to outline a number of possible options for legislative action.  I must emphasize that

these are not recommendations, but rather they constitute a list of options that should be explored

in the search for a comprehensive resolution of issues involving digital transmission of musical

works.  I certainly have some views as to which of these options are preferable, and in many

cases those views will be apparent as I describe the options.  I would be pleased to work with the

Subcommittee and with composers, music publishers, record companies, digital music services

and all interested parties in evaluating these and any other reasonable proposals.

The options that should be considered fall into two distinct categories:  (1) legal

questions concerning the scope of the Section 115 license, and (2) technical problems associated

with service of notice and payment of royalty fees under the Section 115 license.

Among the options that should be considered relating to the scope of the license are:

- **Elimination of the Section 115 statutory license.**  Although the predecessor to
  Section 115 served as a model for similar provisions in other countries, today all
  of those countries, except for the United States and Australia, have eliminated
  such compulsory licenses from their copyright laws.   A fundamental principle of
  copyright is that the author should have the exclusive right to exploit the market
  for his work, except where this would conflict with the public interest. A
  compulsory license limits an author's bargaining power. It deprives the author of
  determining with whom and on what terms he wishes to do business.  In fact, the
  Register of Copyrights' 1961 Report on the General Revision of the U.S.
  Copyright Law favored elimination of this compulsory license.

I believe that the time has come to again consider whether there is really a need for such a compulsory license. Since most of the world functions without such a license, why should one be needed in the United States?  Is a compulsory license the only or the most viable solution?  Should the United States follow the lead of many other countries and move to a system of collective administration in which a voluntary organization could be created (perhaps by a merger of the existing performing rights organizations and the Harry Fox Agency) to license all rights related to making musical works available to the public?  Should we follow the model of collective licenses in which, subject to certain conditions, an agreement made by a collective organization would also apply to the works of authors or publishers who are not members of the organization?  Will the creation of new digital rights management systems make such collective administration more feasible?

In fact, we already have a very successful model for collective administration of similar rights in the United States: performing rights organizations (ASCAP, BMI and SESAC) license the public performance of musical works – for which there is no statutory license – providing users with a means to obtain and pay for the necessary rights without difficulty.  A similar model ought to work for licensing of the rights of reproduction and distribution.

As a matter of principle, I believe that the Section 115 license should be repealed and that licensing of rights should be left to the marketplace, most likely by means of collective administration.   But I recognize that many parties with stakes in the current system will resist this proposal and that there would be many practical difficulties in implementing it.  The Copyright Office would be pleased to study the issue and prepare a report for you with recommendations, if appropriate.  Meanwhile, there are a number of other options for legislative action that merit consideration.

- **Clarification that all reproductions of a musical work made in the course of a digital phonorecord delivery are within the scope of the Section 115 compulsory license.**  This may well be something that I will be able to do in regulations issued in the pending rulemaking on incidental phonorecord deliveries, but if I conclude that it is beyond my power to reach that conclusion

21

under current law, consideration should be given to amending Section 115 to provide expressly that all reproductions that are incidental to the making of a digital phonorecord delivery, including buffer and cache copies and server copies,[9] are included within the scope of the Section 115 compulsory license. Consideration should also be given to clarifying that no compensation is due to the copyright owner for the making of such copies beyond the compensation due for the ultimate DPD.

- **Amendment of the law to provide that reproductions of musical works made in the course of a licensed public performance are either exempt from liability or subject to a statutory license**.  When a webcaster transmits a public performance of a sound recording of a musical composition, the webcaster must obtain a license from the copyright owner for the public performance of the musical work, typically obtained from a performing rights organazation such as ASCAP, BMI or SESAC.  At the same time, webcasters find themselves subject to demands from music publishers or their representatives for separate compensation for the reproductions of the musical work that are made in order to enable the transmission of the performance.  I have already expressed the view that there should be no liability for the making of buffer copies in the course of streaming a licensed public performance of a musical work.  See  U.S. Copyright Office, DMCA Section 104 Report 142-146 (2001); Statement of Marybeth Peters, The Register of Copyrights, before the Subcommittee on Courts, the Internet, and Intellectual Property, Committee on the Judiciary, Oversight Hearing on the Digital Millennium Copyright Act Section 104 Report, December 12-13, 2001.  I have also pointed out that it is inconsistent to provide broadcasters with an exemption in Section 112(a) for ephemeral recordings of their transmission programs but to subject webcasters to a statutory license for the functionally similar server copies that they must make in order to make licensed transmissions of performances.  DMCA Section 104 Report, U.S. Copyright Office 144 n. 434 (2001).  In this respect, the playing field between broadcasters and webcasters should be leveled, either by converting the Section 112(a) exemption into a statutory license or converting the Section 112(e) statutory license into an exemption.

---

[9]  Technically, these are phonorecords rather than copies.  See 17 U.S.C. §101 (definitions of "copies" and "phonorecords"), but terms such as "buffer copy" and "server copy" have entered common parlance.

I can also see no justification for providing a compulsory license which covers ephemeral reproductions of sound recordings needed to effectuate a digital transmission and not providing a similar license to cover intermediate copies of the musical works embodied in these same sound recordings, but that is what Section 112 does in its current form. Parallel treatment should be offered for both the sound recordings and the musical works embodied therein which are part of a digital audio transmission.

- **Expansion of the Section 115 DPD license to include both reproductions and performances of musical works in the course of either digital phonorecord deliveries or transmissions of performances,** *e.g.,* in the course of streaming on the Internet. As noted above, many of the problems faced by online music services arise out of the distinction between reproduction rights and performance rights, and the fact that demands are often made upon services to pay separately for the exercise of each of these rights whether the primary conduct is the delivery of a DPD or the transmission of a performance. Placing both uses under a single license requiring a single payment – a form of "one-stop shopping" for rights – might be a more rational and workable solution.

Among the options that have been proposed relating to service of notice and payment of royalty fees under the Section 115 license are suggestions by users who have expressed their frustration with the cumbersome process involved in securing the Section 115 license, including:

- **Adoption of a model similar to that of the Section 114 webcasting license, requiring services using the license to file only a single notice with the Copyright Office stating their intention to use the statutory license with respect to all musical works.** Section 115 currently requires the licensees to serve notices identifying each musical work for which they intend to make and distribute copies under the compulsory license. This system has worked fairly well and is sensible with respect to the traditional mechanical license, but do such requirements make sense for services offering DPDs of thousands of musical works? The current system does have the virtue of giving a copyright owner notice when one of its works is being used under the compulsory license.

23

Removing that requirement would mean that a copyright owner would find it much more difficult to ascertain whether a particular work owned by that copyright owner is being used by a particular licensee under the compulsory license. However, removing that requirement would avoid – or at least defer – the problems compulsory licensees currently have in identifying and locating copyright owners of particular works. The problems might be only deferred rather than avoided because the licensee would still have to identify and locate the copyright owner in order to pay royalties to the proper person – at least when the copyright owner has registered its claim in the musical work.

- **Establishment of a collective to receive and disburse royalties under the Section 115 license.** Again, Section 114 may provide a useful model. Royalties under the Section 114 statutory license, which are owed to copyright owners of sound recordings rather than of musical works, are paid to SoundExchange, an agent appointed through the CARP process to receive the royalties and then to disburse them to the copyright owners. Such a model might be worth emulating under the Section 115 license, especially if the requirement of serving notices of intention to use the compulsory license on copyright owners is abandoned. While such a scheme offers obvious benefits to licensees, copyright owners (and, in particular, those copyright owners who are readily identifiable under the current system) might find themselves receiving less in royalties than they receive under the current system, since administrative costs of the receiving and disbursing entity presumably would be deducted from the royalties and the allocation of royalties might result in some copyright owners receiving less than they would receive under the current system, which requires that each copyright owner be paid precisely (and directly) the amount of royalties derived from the use of that copyright owner's musical works.

- **Designation of a single entity, like the Copyright Office, upon which to serve notices and make royalty payments.** I am skeptical of the benefits of this approach, which would shift to the Copyright Office the burden of locating copyright owners and making payments to them. The administrative expense and burden would likely be considerable, and giving a government agency the responsibility to receive such finds, identify copyright owners and make the appropriate payments to each copyright owner is probably not the most efficient means of getting the royalties to the persons entitled to them.

24

- **Creation of a complete and up-to-date electronic database of all musical works registered with the Copyright Office.** I suspect that proponents of this solution have very little knowledge of the difficulty and expense that would be involved in creating an accurate and comprehensive list of owners of copyrights in all musical works. Determining who owns the copyright in a particular work is not always a simple matter. Someone reviewing the current Copyright Office records to determine ownership of a particular work would have to search both the registration records and the records of documents of transfer that are recorded with the Office. While basic information about post-1977 registrations and documents of transfer is available through the Office's online indexing system, in any case where ownership of all or some of the exclusive rights in a work have been transferred it would be necessary to review the copy of the actual document of transfer maintained at the Copyright Office (and not available online) to ascertain exactly what rights have been transferred to whom. Chain of title can often be complicated. Addresses of copyright owners are not available in the Office's online indexes. And the information in the Office's current registration and recordation systems could not easily be transformed into a database containing current copyright ownership information. Moreover, neither registration nor recordation of documents of transfer is required by law; therefore, there are many gaps in the Office's records. Where there is a record, it is not necessarily up to date. It is difficult to fathom how the Office could create an accurate, reliable and comprehensive database of current ownership of musical works. While the registration and recordation system works reasonably well when a person is seeking information on ownership of a particular work, such information must usually be interpreted by a lawyer (especially if there have been transfers of ownership). The system is not well-suited for the type of large-scale licensing of thousands of works in a single transaction that is desired by online music services.

- **Shifting the burden of obtaining the rights to the sound recording copyright owner.** Online music services generally transmit performances or DPDs of sound recordings that have already been released by record companies. The record company already will have obtained a license – either directly from the copyright owner of the musical work that has been recorded or by means of the section 115 statutory license – for use of the musical work. The record company

may well have already obtained a section 115 license to make DPDs of the musical work as well, and one would expect that this will increasingly be the case. Because record companies already have substantial incentives and presumably have greater ability to clear the rights to the musical works that they record, consideration should be given to permitting online music services – who must obtain the right to transmit phonorecords of the sound recording from the record company in any event – see 17 U.S.C. §115(c)(3)(H)(i) (quoted above in footnote 7) – to stand in the shoes of the record company as beneficiaries of the compulsory license for DPDs.  The online music company could make royalty payments to the record company for the DPDs of the musical works, and the record company (which might charge the online music company an administrative fee for the service) could pass the royalty on to the copyright owner of the musical work.  As noted above, Section 115(c)(3)(I) already appears to permit the record company to license the right to make DPDs of the musical compositions to other online music services.  Clarification of this provision and expansion to provide for funneling royalty payments through the record companies might lead to more workable arrangements.

- **Creation of a safe harbor for those who fail to exercise properly the license during a period of uncertainty arising from the administration of the license for the making of DPDs.**  Under current law, a person who wishes to use the Section 115 compulsory license must either serve the copyright owner with a Notice of Intention if he can identify and locate the copyright owner based on a search of Copyright Office records or file a Notice of Intention with the Copyright Office if he cannot so identify or locate the copyright owner.  While the expenses involved in this process may be considerable, it is hard for me to agree that there is uncertainty about how to comply with the license. On the other hand, currently Section 115 exacts a harsh penalty for those who fail to serve the Notice of Intention or make royalty payments in a timely fashion: they are forever barred from taking advantage of the compulsory license with respect to the particular musical work in question.  I have reservations about creating a "safe harbor" for the making of unauthorized DPDs during a time when a service has failed to comply with the requirements of the license, but I believe consideration should be given to affording a service the opportunity to cure its default and use the compulsory license prospectively, even if the service is liable for copyright

26

infringement for the unauthorized transmissions made prior to the service's compliance.

- **Extension of the period for effectuating service on the copyright owner or its agent beyond the 30 day window specified in the law.** There is merit in this proposal, especially in light of the current provision that absolves a licensee from making payments under the statutory license until after the copyright owner can be identified in the registration or other public records of the Copyright Office. Difficulties in ascertaining the identities and addresses of the copyright owners may also justify a more liberal approach. I could imagine a system that, for example, required a service to serve the copyright owner with a Notice of Intention within 30 days of the service's first use of the musical work or within one year of the time when the copyright owner is first identified in the records of the Copyright Office – whichever date is later – but with an obligation to make payments retroactive to the date on which the copyright owner was first identified in the Copyright Office records. Under such a system, services would only have to search the Office's records once a year in order to avoid liability for failing to have ascertained that a copyright owner's identity has become available in the Office's records.

- **Provision for payment of royalties on a quarterly basis rather than a monthly basis**. It is my understanding that most licenses *negotiated* with copyright owners under Section 115 (e.g., the licenses given by the Harry Fox Agency in lieu of actual statutory licenses) provide for quarterly payments rather than the monthly payments required under the compulsory license. It is also my understanding that one of the reasons for the statutory requirement of monthly payments, as well as some of the other statutory requirements, was a determination that use of the compulsory license should only be made as a last resort, and that licensees should be encouraged to obtain voluntary licenses directly from the copyright owners or their agents, who would offer more congenial terms. Users might find a requirement of quarterly payments rather than monthly payments to be beneficial, but copyright owners presumably would prefer to receive their payments more promptly; moreover, if a licensee defaults on payment, a quarterly payment cycle would be more disadvantageous to the copyright owner than a monthly cycle. Amending Section 115 to require quarterly payments might lead many more licensees to elect to obtain statutory licenses rather than deal directly with

27

publishers or their agents.  Consideration should be given to whether that would be desirable.

- **Provision for an offset of the costs associated with filing Notices with the Office in those cases where the copyright owner wrongfully refuses service.** In general, I believe that persons using a statutory license should bear the cost associated with obtaining the license.  However, if the copyright owner has wrongfully refused to accept service of a Notice of Intention, there is something to be said for the notion of shifting those additional costs incurred by the licensee as a result of the wrongful refusal.

In general, I do support the music industry's attempt to simplify the requirements for obtaining the compulsory license and its desire to create a seamless licensing regime under the law to allow for the making and distribution of phonorecords of sound recordings containing musical works.

However, the need for extensive revisions is difficult to assess.  Prior to the passage of the DPRA, each year the Copyright Office received fewer than twenty notices of intention from those seeking to obtain the Section 115 license.  Last year, two hundred and fourteen (214) notices were filed with the Office, representing a significant jump in the number of notices filed with the Office over the pre-1995 era.  Yet, the noted increase represents only 214 song titles, a mere drop in the bucket when considered against the thousands, if not hundreds of thousands, of song titles that are being offered today by subscription music services.   While we acknowledge that this observation may merely reflect the reluctance of users to use the license in its current form to clear large numbers of works, as well as the fact that users may file with the Office only when our records do not provide the identity and current address of the copyright owner, it may also represent the success of viable marketplace solutions.

Certainly we have heard few complaints about the operation of Section 115 in the

context of the traditional mechanical license.  To the extent that reform of the license is needed, it may be that the traditional mechanical license should be separated from the license for DPDs, and that two different regimes be created, each designed to meet the needs of both copyright owners and the persons using the two licenses.

    In any event, the critical issue centers on clarifying the scope of the compulsory license in the digital era.  I have outlined only a few possible approaches to reform of the Section 115 compulsory license.  While there is a clear need to correct some of the deficiencies in Section 115,  I believe that it is important for all the interested parties – copyright owners, record companies, online music services and others – to work together to evaluate various alternative solutions in the coming months.  I commend you, Mr. Chairman, for convening this hearing to discuss the problems associated with the use of the Section 115 license in a digital environment, and I look forward to working with you, members of the Subcommittee, and the industries represented at this table to find effective and efficient solutions to make the Section 115 compulsory license available and workable to all potential users and strike the proper balance between their needs and the rights of the copyright owners.