Eight Mile Style, LLC et al v. Apple Computer, Incorporated
Doc. 159 Att. 2

***Eight Mile Style, LLC et al. v. Apple Computer Inc., et al.***

**Case No. 2:07-CV-13164**

# EXHIBIT 1

## Excerpt of transcript pages from the Deposition of Peter Paterno taken on April 30, 2008

5005843.1

Dockets.Justia.com

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

F.B.T. PRODUCTIONS, LLC; AND EM2M, LLC,

PLAINTIFFS,

VS.

AFTERMATH RECORDS DOING BUSINESS AS AFTERMATH ENTERTAINMENT; INTERSCOPE RECORDS; UMG RECORDINGS, INC.; AND ARY, INC.,

DEFENDANTS.

CASE NO. CV 07-3314 PSG (MANX)

DEPOSITION OF PETER PATERNO, TAKEN ON BEHALF OF THE DEFENDANTS, AT 10250 CONSTELLATION BOULEVARD, 19TH FLOOR, CALIFORNIA, COMMENCING AT 2:15 P.M., WEDNESDAY, APRIL 30, 2008, BEFORE ALEJANDRIA BAKER, CSR NUMBER 11897.

524f13bb-f569-4003-a9a1-531f62296fbf

THE GENERAL INSTRUCTIONS THAT I ORDINARILY GIVE, BUT JUST FOR PURPOSES OF CLARITY OF THE RECORD, I JUST WANT TO GIVE A FEW VERY BASIC INSTRUCTIONS.

IN THIS DEPOSITION, I'LL BE ASKING YOU QUESTIONS, OBVIOUSLY. AND UNLESS YOU RECEIVE AN INSTRUCTION NOT TO ANSWER, YOU'LL ANSWER MY QUESTIONS.

IF YOU HAVE ANY QUESTIONS ABOUT THE VERBIAGE I USE OR DON'T UNDERSTAND IT, JUST TELL ME YOU DON'T UNDERSTAND IT, AND I'LL BE HAPPY TO REPHRASE IT. OKAY?

A. OKAY.

Q. AND IS THERE ANY REASON YOU CAN'T ANSWER MY QUESTIONS HONESTLY AND ACCURATELY TODAY? ARE YOU UNDER ANY MEDICATION OR TIRED THAT MIGHT AFFECT YOUR ABILITY TO ANSWER MY QUESTIONS HONESTLY AND ACCURATELY?

A. NO.

Q. OKAY. MR. PATERNO, WOULD YOU PLEASE DESCRIBE FOR ME YOUR EXPERIENCE AS A LAWYER IN THE MUSIC BUSINESS.

A. I STARTED DOING LEGAL WORK IN THE MUSIC BUSINESS IN 1978, AND DID IT CONTINUOUSLY UNTIL 1990. BETWEEN 1990 AND 1994, I RAN A RECORD COMPANY, AND THEN THEREAFTER, I RETURNED TO PRACTICE LAW. I'VE BEEN DOING MUSIC LAW SINCE THEN, UNTIL NOW.

Q. OKAY. YOU GRADUATED FROM LAW SCHOOL IN

14:19:11 WHAT YEAR?

14:19:12 A. 1976.

14:19:13 Q. OKAY. AND WHEN YOU SAY THAT YOU WERE IN
14:19:15 THE MUSIC BUSINESS FROM '78 TO 1990, WHO DID YOU WORK
14:19:22 FOR?

14:19:22 A. WELL, I WAS A LAWYER. I'VE ALWAYS BEEN
14:19:25 IN THE MUSIC BUSINESS.

14:19:26 Q. RIGHT.

14:19:26 A. I WAS A LAWYER, DOING PRIMARILY MUSIC
14:19:28 WORK AT THE TIME, FOR MANATT PHELPS.

14:19:31 Q. WHICH IS A LAW FIRM HERE IN LOS ANGELES?

14:19:33 A. YES.

14:19:34 Q. AND YOU WERE IN THEIR ENTERTAINMENT
14:19:36 DEPARTMENT OR MUSIC DEPARTMENT?

14:19:37 A. YES.

14:19:38 Q. OKAY. AND THEN YOU LEFT MANATT IN 1990;
14:19:41 IS THAT WHAT I UNDERSTAND?

14:19:43 A. YES. END OF 1989.

14:19:45 Q. OKAY. AND WHAT -- YOU SAID YOU WENT
14:19:46 THERE -- YOU LEFT TO RUN A MUSIC LABEL?

14:19:48 A. A RECORD COMPANY.

14:19:49 Q. RECORD COMPANY.

14:19:50 WHAT WAS THE RECORD COMPANY?

14:19:51 A. HOLLYWOOD RECORDS.

14:19:52 Q. OKAY. AND WHY DID YOU LEAVE HOLLYWOOD

14:19:57 RECORDS IN 1994?
14:20:00 A. BECAUSE THEY ASKED ME TO.
14:20:01 Q. OKAY. WHAT WAS YOUR POSITION AT
14:20:05 HOLLYWOOD RECORDS?
14:20:06 A. I WAS THE PRESIDENT.
14:20:12 Q. OKAY. AND WHEN YOU LEFT IN 1994, DID
14:20:17 YOU FORM YOUR OWN LAW FIRM AT THAT POINT IN TIME?
14:20:20 A. I SPENT A YEAR TRYING TO GET A REAL JOB.
14:20:23 AND WHEN THAT DIDN'T HAPPEN, I WENT TO -- I WENT INTO
14:20:27 BUSINESS WITH A COUPLE OF FRIENDS OF MINE, WHO ARE THE
14:20:35 PEOPLE I'M IN BUSINESS WITH TODAY.
14:20:36 Q. AND WHO ARE THOSE PEOPLE?
14:20:36 A. HOWARD KING AND KEITH HOLMES AND
14:20:37 JILL BERLINER.
14:20:38 Q. OKAY. AND YOUR LAW FIRM WAS FORMED AT
14:20:39 THAT POINT IN TIME?
14:20:41 A. YES.
14:20:41 Q. NOW, IN CONNECTION WITH YOUR LEGAL
14:20:42 PRACTICE, DO YOU REPRESENT ARTISTS?
14:20:45 A. MOSTLY.
14:20:46 Q. MOSTLY ARTISTS.
14:20:49 WHO ARE SOME OF THE BIGGER NAMED ARTISTS
14:20:51 THAT YOU REPRESENT?
14:20:53 MR. POMERANTZ: OVER THE COURSE OF HIS
14:20:54 CAREER?

524f13bb-f569-4003-a9a1-531f62296fbf

14:20:54 BY MR. BUSCH:

14:20:55 Q. YES. OVER THE COURSE OF YOUR CAREER,
14:20:57 WHO ARE SOME OF THE BIGGER NAMED ARTISTS THAT YOU'VE
14:21:00 REPRESENTED?

14:21:01 A. METALLICA, DR. DRE, GUNS N' ROSES, ALICE
14:21:04 IN CHAINS, BRIAN SETZER, PEARL JAM, METALLICA. THERE'S
14:21:11 A LOT MORE.

14:21:12 Q. BUT YOUR PRIMARY -- THE PRIMARY FOCUS OF
14:21:16 YOUR PRACTICE IS REPRESENTING ARTISTS?

14:21:18 A. PRIMARY, YES.

14:21:19 Q. OKAY. HAVE YOU SPOKEN WITH ANYONE
14:21:33 REGARDING YOUR DEPOSITION TODAY? DID YOU DO ANYTHING TO
14:21:36 PREPARE FOR YOUR DEPOSITION TODAY?

14:21:38 A. YES.

14:21:38 Q. WHAT DID YOU DO?

14:21:39 A. I MET WITH THESE GENTLEMEN.

14:21:44 MR. BUSCH: OKAY. AND SINCE YOU'RE
14:21:46 REPRESENTING HIM, I ASSUME YOU'LL BE ASSERTING THE
14:21:48 ATTORNEY-CLIENT PRIVILEGE CONCERNING YOUR COMMUNICATIONS
14:21:51 IN THE PREPARATION OF THE DEPOSITION?

14:21:54 MR. POMERANTZ: YES.

14:21:54 BY MR. BUSCH:

14:21:54 Q. DID YOU -- WELL, LET ME ASK YOU THIS.

14:21:54 HOW LONG DID YOU MEET WITH THE ATTORNEYS
14:21:56 FOR UNIVERSAL? DON'T DISCLOSE WHAT YOU DISCUSSED, JUST

524f13bb-f569-4003-a9a1-531f62296fbf

14:22:00 HOW -- HOW LONG DID YOU MEET WITH THEM TO PREPARE FOR
14:22:01 YOUR DEPOSITION?
14:22:02 A. ABOUT 45 MINUTES.
14:22:04 Q. OKAY. DID YOU REVIEW ANY DOCUMENTS?
14:22:08 A. YES.
14:22:08 Q. WHAT DOCUMENTS DID YOU REVIEW?
14:22:10 MR. POMERANTZ: I THINK YOU'RE ENTITLED
14:22:11 TO ASK HIM WHETHER ANY OF THEM REFRESHED HIS
14:22:13 RECOLLECTION. I WOULD LET HIM ANSWER -- ANSWER THAT
14:22:15 QUESTION.
14:22:15 SO IF YOU COULD RESTATE THE QUESTION.
14:22:17 BY MR. BUSCH:
14:22:17 Q. DID ANY OF THE DOCUMENTS THAT YOU
14:22:19 REVIEWED REFRESH YOUR RECOLLECTION IN ANY WAY?
14:22:24 A. NOT REALLY.
14:22:25 Q. NOT REALLY.
14:22:27 SO YOU HAD INDEPENDENT RECOLLECTION OF
14:22:29 THE EVENTS AND THE CONTRACTS OR WHATEVER YOU REVIEWED
14:22:32 WITHOUT EVER HAVING TO REVIEW THE DOCUMENTS?
14:22:36 A. I HAD SOME SKETCHY RECOLLECTIONS. IT
14:22:38 WAS A LONG TIME AGO.
14:22:39 Q. OKAY. HAVE YOU DISCUSSED THE CLAIMS
14:22:56 RAISED IN THESE LAWSUITS WITH ANY CURRENT OR FORMER
14:23:00 EMPLOYEES OF THE DEFENDANTS IN THE CASES, AFTERMATH
14:23:03 RECORDS OR UNIVERSAL RECORDS?

14:23:11 A. YEAH, PROBABLY. YES.

14:23:13 Q. WITH WHOM?

14:23:14 A. DAVID COHEN. AND POSSIBLY RAND HOFFMAN.

14:23:25 Q. OKAY. WHEN DID YOU DISCUSS THE ISSUES

14:23:30 RAISED IN THESE LAWSUITS WITH DAVID COHEN?

14:23:34 A. I DON'T KNOW.

14:23:36 Q. WHO IS DAVID COHEN?

14:23:37 A. HE'S THE GENERAL MANAGER OF INTERSCOPE

14:23:40 RECORDS.

14:23:42 Q. TELL ME WHAT YOU SAID TO HIM AND WHAT HE

14:23:43 SAID TO YOU IN CONNECTION WITH THAT CONVERSATION.

14:23:46 MR. POMERANTZ: LET ME INSTRUCT YOU,

14:23:47 MR. PATERNO. TO THE EXTENT THAT THOSE CONVERSATIONS ARE

14:23:49 PRIVILEGED, WITH YOU AS THE LAWYER AND THEM AS THE

14:23:52 CLIENT, EITHER AS A CO-OWNER OF AFTERMATH OR WHATEVER, I

14:23:56 WOULD INSTRUCT YOU NOT TO ANSWER IT.

14:23:58 OBVIOUSLY IF THEY'RE NOT PRIVILEGED,

14:23:59 THEN YOU CAN ANSWER THE QUESTION.

14:24:03 THE DEPONENT: I'M -- THERE'S -- THERE'S

14:24:07 NOTHING SUBSTANTIVE IN ANY CONVERSATION I HAD WITH

14:24:10 EITHER OF THEM.

14:24:11 BY MR. BUSCH:

14:24:11 Q. WHAT DO YOU MEAN BY THAT?

14:24:13 A. I MEAN, I DON'T REALLY REMEMBER THE

14:24:14 CONVERSATIONS, BUT IT WAS SOMETHING ALONG THE LINES OF

14:24:17 THAT -- "DO YOU KNOW WE'VE BEEN -- WE HAVE THIS LAWSUIT
14:24:20 WITH F.B.T.?"
14:24:22 AND I'D -- I'D -- I'D SAY, "YES," AND
14:24:23 THAT WAS ABOUT IT.
14:24:24 Q. BUT THERE WAS NO DISCUSSION OF THE
14:24:26 SUBSTANCE OR THE MERITS OF EITHER OF THE CASES?
14:24:30 A. I DON'T THINK SO.
14:24:31 Q. WHAT DO YOU UNDERSTAND THE ALLEGATIONS
14:24:33 IN THE F.B.T. CASE TO BE?
14:24:36 MR. POMERANTZ: YOU CAN ANSWER THAT AS
14:24:37 LONG AS IT'S NOT BASED ON ANY PRIVILEGED COMMUNICATIONS.
14:24:40 THE DEPONENT: I COULD BE WRONG. I KNOW
14:24:41 ONE OF THE CASES HAS TO DO WITH A CLAIM THAT DIGITAL
14:24:46 DOWNLOADS ARE LICENSES, BUT NOT SALES. THAT'S AS MUCH
14:24:51 AS I KNOW.
14:24:53 BY MR. BUSCH:
14:24:53 Q. AND WHAT ABOUT IN THE APPLE LAWSUIT, THE
14:24:55 LAWSUIT AGAINST APPLE?
14:24:57 A. I DON'T KNOW.
14:24:57 Q. OKAY. WHERE DID YOU GET YOUR
14:24:58 UNDERSTANDING THAT YOU JUST STATED AS FAR AS WHAT THE
14:25:02 ISSUE IS IN THE F.B.T. CASE?
14:25:04 A. TRADE MAGAZINES.
14:25:07 Q. NOT FROM ANY CONVERSATIONS WITH ANYBODY
14:25:10 ASSOCIATED WITH EITHER THE PLAINTIFFS OR THE DEFENDANTS?

524f13bb-f569-4003-a9a1-531f62296fbf

14:25:13 A. I DON'T KNOW. I MEAN, I MIGHT HAVE EVEN
14:25:14 READ THE COMPLAINT. I DON'T REMEMBER.
14:25:17 Q. OKAY. HAVE YOU SPOKEN TO ANYBODY
14:25:19 ASSOCIATED WITH THE PLAINTIFFS IN EITHER CASE ABOUT THE
14:25:22 ISSUES INVOLVED IN THESE CASES?
14:25:24 A. I DON'T THINK SO.
14:25:25 Q. OKAY. HAVE YOU DISCUSSED ANY OF THE
14:25:40 ISSUES INVOLVED IN THESE CASES WITH DR. DRE?
14:25:43 A. NO.
14:25:44 Q. OKAY. LET'S GO BACK FOR A SECOND, IF WE
14:26:06 COULD, TO YOUR POSITION AND ACTIVITIES AT HOLLYWOOD
14:26:13 RECORDS.
14:26:13 WHAT WAS YOUR DAY-TO-DAY JOB
14:26:14 RESPONSIBILITIES WHEN YOU WERE AT HOLLYWOOD RECORDS?
14:26:15 A. WELL, I RAN THE COMPANY, SO I WAS THE
14:26:18 CHIEF EXECUTIVE.
14:26:25 Q. AND WAS IT MICHAEL EISNER WHO TAPPED YOU
14:26:29 TO HEAD UP HOLLYWOOD RECORDS?
14:26:32 A. YES.
14:26:34 Q. OKAY. JUST GENERALLY IN YOUR ROLE AS
14:26:37 CHIEF EXECUTIVE, WHAT -- WHAT WERE YOU -- WERE YOU
14:26:40 RESPONSIBLE FOR SIGNING ARTISTS? WHAT WERE YOU
14:26:43 RESPONSIBLE FOR DOING? NEGOTIATING AGREEMENTS? JUST
14:26:45 GENERALLY, WHAT WERE YOUR DUTIES AND RESPONSIBILITIES?
14:26:47 A. MOSTLY MY RESPONSIBILITIES WERE

524f13bb-f569-4003-a9a1-531f62296fbf

14:26:49 OVERSEEING PEOPLE THAT SIGNED ARTISTS AND OVERSEEING
14:26:52 PEOPLE THAT MARKETED RECORDS OVERSEEING PEOPLE THAT
14:26:54 PROMOTED RECORDS. AND THAT WAS -- THAT'S KIND OF WHAT
14:26:57 YOU DO IN THAT JOB.

14:26:59 Q. OKAY. BUT --

14:26:59 A. YOU DON'T REALLY DO ANYTHING. YOU JUST
14:27:01 MEET WITH PEOPLE THAT DO THINGS.

14:27:03 Q. I UNDERSTAND.

14:27:04 AND YOUR EXPERTISE THAT ALLOWED YOU TO
14:27:08 HEAD UP THAT DEPARTMENT, WAS THAT OBTAINED THROUGH YOUR
14:27:11 EXPERIENCE AT MANATT.

14:27:14 A. I MEAN, PARTLY, I GUESS.

14:27:17 Q. WELL, WHEN YOU WERE AT MANATT, WHAT WERE
14:27:18 YOUR -- WERE YOU NEGOTIATING AGREEMENTS? WERE YOU
14:27:21 INVOLVED WITH SIGNING ARTISTS ON BEHALF OF CLIENTS?
14:27:23 WHAT WERE YOU -- WHAT WAS YOUR PRACTICE FOCUSED ON WHEN
14:27:26 YOU WERE AT MANATT?

14:27:27 A. MY PRACTICE WAS FOCUSED ON REPRESENTING
14:27:31 ARTISTS IN WHATEVER -- WELL, THAT WAS THE PRACTICE I
14:27:35 DEVELOPED. I STARTED OUT DOING A LOT OF WORK FOR RECORD
14:27:38 COMPANIES. I WAS -- MOST OF THE RECORD COMPANIES, WHEN
14:27:41 I STARTED OUT, DIDN'T HAVE IN-HOUSE LEGAL DEPARTMENTS,
14:27:43 AND SO THEY USED OUTSIDE COUNSEL.

14:27:47 AND WE WERE OUTSIDE COUNSEL FOR TWO OR
14:27:49 THREE MAJOR LABELS, AND I DID A LOT OF THE AGREEMENTS

524f13bb-f569-4003-a9a1-531f62296fbf

14:27:52 WHEN I STARTED OUT.

14:27:53 Q. AND HOW LONG DID THAT LAST BEFORE YOU
14:27:55 TRANSITIONED INTO REPRESENTING ARTISTS?

14:27:57 A. WELL, ONE OF THE COMPANIES FELL ON HARD
14:28:00 TIMES, AND ANOTHER ONE OF THE COMPANIES MOVED TO NEW
14:28:03 YORK, SO THEY MOVED A LOT OF THEIR BUSINESS TO NEW YORK
14:28:06 IN THE EARLY '80S. AND SO -- YOU KNOW. AND THE CLIENTS
14:28:09 I DEVELOPED WERE PRIMARILY ARTISTS.

14:28:11 Q. OKAY. AND WHO WERE THE -- WHO WERE THE
14:28:13 LABELS THAT FELL ON HARD TIMES IN THE 1980'S?

14:28:15 A. WELL, R.S.O. RECORDS. THEY HAD A BIG
14:28:22 SURGE WITH THE BEE GEES, AND THEN IT DIDN'T LAST
14:28:24 FOREVER. AND THEN WE ALSO DID WORK FOR ELECTRA/ASYLUM
14:28:28 RECORDS. THEY MOVED TO THE EAST COAST.

14:28:31 I STILL DID WORK FOR GEFFEN RECORDS
14:28:33 THROUGH MOST OF THE '80S.

14:28:35 Q. OKAY. GOING BACK, YOU SAID YOU
14:28:38 GRADUATED LAW SCHOOL, I BELIEVE, IN 1976 OR '77?

14:28:42 A. '76.

14:28:43 Q. DID YOU HAVE ANY EXPERIENCE IN THE
14:28:43 RECORD BUSINESS BEFORE YOU GRADUATED LAW SCHOOL?

14:28:46 A. NO.

14:28:47 Q. OKAY.

14:28:49 A. I BOUGHT RECORDS. DOES THAT COUNT?

14:28:51 Q. I GUESS WE ALL WOULD HAVE --

524f13bb-f569-4003-a9a1-531f62296fbf

A. YEAH.

Q. -- SOME EXPERIENCE, THEN.

A. NOBODY DOES THAT NOW, SO I GUESS NOBODY IS GETTING EXPERIENCE.

Q. IS ANDRE YOUNG YOUR CLIENT?

A. YES.

Q. OKAY. AND ANDRE YOUNG IS PROFESSIONALLY KNOWN AS DR. DRE?

A. YES.

Q. IS AFTERMATH YOUR CLIENT?

A. YES.

Q. IS INTERSCOPE YOUR CLIENT?

A. NO.

Q. AND IS U.M.G. YOUR CLIENT?

A. NO.

Q. OKAY. WHAT IS THE NATURE OF YOUR RELATIONSHIP WITH ANDRE YOUNG/DR. J -- DR. DRE? SORRY.

A. WHAT DO YOU MEAN, WHAT'S THE NATURE OF MY RELATIONSHIP?

Q. IS IT -- ARE YOU PARTNERS? IS HE SIMPLY A CLIENT OF YOURS? ARE YOU JOINT OWNERS OF ANYTHING?

(SPEAKING SIMULTANEOUSLY.)

THE DEPONENT: NO. I'M -- I'M -- I'M HIS LAWYER.

///

524f13bb-f569-4003-a9a1-531f62296fbf

14:30:00 BY MR. BUSCH:

14:30:00 Q. FOR WHAT ENTITIES? FOR HIM PERSONALLY OR FOR OTHER ENTITIES HE OWNS OR CONTROLS?

14:30:05 A. PRETTY MUCH EVERYTHING HE DOES.

14:30:07 Q. OKAY. AND SO WHAT ARE THE BUSINESSES THAT -- IN THE RECORD BUSINESS THAT ARE OWNED OR CONTROLLED BY DR. DRE?

14:30:16 A. HE OWNS THE PUBLISHING COMPANY.

14:30:19 Q. WHAT'S THE NAME OF THAT PUBLISHING COMPANY?

14:30:21 A. THERE'S A COUPLE. THERE'S NOTHIN' GOING ON BUT FUNK AND MUSIC, HARDWORKING BLACK FOLK MUSIC. I THINK THOSE ARE HIS TWO PRIMARY PUBLISHING COMPANIES.

14:30:34 HE OWNS AN INTEREST IN AFTERMATH RECORDS. AND THOSE ARE HIS PRIMARY BUSINESSES. THAT'S HOW HE MAKES MONEY.

14:30:44 Q. OKAY. WHAT IS ARY, A-R-Y, INC.?

14:31:10 A. ARY, INC.?

14:31:12 Q. YES.

14:31:12 A. IT'S A CORPORATE ENTITY OF DRE'S. I THINK THAT'S THE ENTITY -- IT'S WHOLLY OWNED BY DRE, AND I THINK THAT'S THE ENTITY THAT'S A PARTNER WITH INTERSCOPE AND AFTERMATH MUSIC -- I MEAN AFTERMATH ENTERTAINMENT.

14:31:32 Q. OKAY. DID YOU HAVE ANY INVOLVEMENT WITH

524f13bb-f569-4003-a9a1-531f62296fbf

14:31:36 THE FORMATION OF ARY?

14:31:41 A. PERSONALLY, NO.

14:31:42 Q. OKAY.

14:31:43 A. MY FIRM MIGHT HAVE FORMED IT, BUT I DON'T REMEMBER. IT WAS A LONG TIME AGO.

14:31:52 Q. ALL RIGHT. ARE YOU A BOARD MEMBER?

14:31:53 A. I DON'T THINK SO, BUT I MIGHT BE.

14:31:54 Q. YOU DON'T KNOW?

14:31:55 A. NO. I HAVE NO IDEA.

14:31:56 Q. ARE YOU AN INCORPORATOR OF THAT CORPORATION?

14:31:59 A. PERSONALLY, NO. SOMEBODY IN MY LAW FIRM MAY HAVE DONE IT.

14:32:03 Q. OKAY. WHAT IS THE NATURE OF YOUR ROLE WITH AFTERMATH RECORDS?

14:32:06 A. I'M THE LAWYER.

14:32:07 Q. OKAY. ARE YOU OUTSIDE COUNSEL? ARE YOU PAID AS AN EMPLOYEE, A LAWYER WHO'S AN EMPLOYEE OF THE COMPANY, OR ARE YOU JUST OUTSIDE COUNSEL?

14:32:19 A. OUTSIDE COUNSEL.

14:32:21 Q. HAS IT CHANGED OVER TIME?

14:32:22 A. NO.

14:32:23 Q. DO YOU NEGOTIATE ON BEHALF OF AFTERMATH RECORDS?

14:32:27 A. YES.

14:32:27 Q. OKAY. HAVE YOU EVER REPRESENTED AN ARTIST SIGNED TO AFTERMATH?
14:32:31
14:32:38 A. I DON'T THINK SO.
14:32:41 Q. OKAY. WHEN YOU SAY YOU NEGOTIATE ON BEHALF OF AFTERMATH RECORDS, WHAT TYPE OF AGREEMENTS DO YOU NEGOTIATE ON BEHALF OF AFTERMATH RECORDS?
14:32:45
14:32:48
14:32:52 A. PRIMARILY AGREEMENTS OF ARTISTS, ARTISTS SIGNED TO AFTERMATH.
14:32:55
14:32:57 Q. OKAY. HAS THAT ROLE EVER CHANGED, OR IS THAT PRIMARILY THE TYPE OF WORK YOU'VE DONE FOR AFTERMATH RECORDS?
14:33:00
14:33:04
14:33:05 A. THAT'S PRIMARILY WHAT WE DO. THEY HAVE EMPLOYMENT AGREEMENTS. WE DO THOSE FROM TIME TO TIME. BUT, YOU KNOW, PRIMARILY IT'S ARTIST AGREEMENTS OR AGREEMENTS WITH PRODUCERS. IT'S PRIMARILY WHAT WE DO.
14:33:07
14:33:10
14:33:13
14:33:16 Q. WHAT YEAR WAS AFTERMATH RECORDS FORMED?
14:33:19 A. I THINK 1996.
14:33:23 Q. OKAY.
14:33:24 A. I THINK IT'S AFTERMATH ENTERTAINMENT, BUT I -- IT'S HARD -- THAT MAY BE WRONG. IT SWITCHED BACK AND FORTH.
14:33:26
14:33:29
14:33:30 Q. I'LL JUST SAY AFTERMATH.
14:33:32 A. RIGHT.
14:33:32 Q. OKAY. FROM 1996 UNTIL TODAY, HAS THE NATURE OF THE NEGOTIATIONS, WHEN AN ARTIST IS SIGNED TO
14:33:37

524f13bb-f569-4003-a9a1-531f62296fbf

14:33:41 AFTERMATH, CHANGED? AND WHAT I MEAN BY THAT IS: HAVE
14:33:45 THE PEOPLE WHO'VE BEEN INVOLVED ON THE AFTERMATH SIDE
14:33:49 STAYED PRETTY MUCH CONSISTENT?
14:33:51 A. YES.
14:33:51 Q. OKAY. AND WHO HAVE THOSE PEOPLE BEEN?
14:33:54 A. ME, DRE, AND WHATEVER PERSON AT MY FIRM
14:34:05 HANDLES THE DRE ACCOUNT. THERE'S --
14:34:08 Q. WHAT DOES THAT MEAN?
14:34:09 A. WE STAFF -- WE TYPICALLY STAFF A
14:34:12 PARTICULAR CLIENT WITH A -- IF IT'S MY CLIENT, WITH ME,
14:34:16 SECOND IN COMMAND AND A PARALEGAL.
14:34:18 Q. OKAY. SO BASICALLY YOU'RE THE LEAD GUY.
14:34:21 YOU PUT AN ASSOCIATE ON IT, AND YOU HAVE A PARALEGAL IN
14:34:24 CONNECTION WITH EACH PROJECT? IS THAT WHAT YOU'RE
14:34:26 TELLING ME?
14:34:26 A. YES. BUT THEN, OF COURSE, THE
14:34:28 ASSOCIATES STAY THERE SO LONG THAT THEY ALL BECOME
14:34:31 PARTNERS AND -- UNECONOMICAL, BUT, YOU KNOW, THAT'S WHAT
14:34:35 WE DO.
14:34:35 Q. OKAY. I UNDERSTAND.
14:34:36 A. WE'RE A SMALL FIRM. WE DON'T HAVE THE
14:34:38 BIG LEVERAGE THAT YOU BIG FIRMS HAVE.
14:34:41 Q. WHAT IS THE NATURE OF AFTERMATH RECORDS
14:34:43 DOING BUSINESS AS AFTERMATH ENTERTAINMENT, DO YOU KNOW?
14:34:45 A. NO, I DON'T KNOW.

524f13bb-f569-4003-a9a1-531f62296fbf

STATE OF CALIFORNIA )
) SS.
COUNTY OF LOS ANGELES )

DEPONENT'S DECLARATION

I CERTIFY UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

EXECUTED AT ____________________ ON ________________.

____________________________
(SIGNATURE OF DEPONENT)

524f13bb-f569-4003-a9a1-531f62296fbf

STATE OF CALIFORNIA )
) SS.
COUNTY OF LOS ANGELES )

I, ALEJANDRIA BAKER, CERTIFIED SHORTHAND REPORTER, CERTIFICATE NUMBER 11897, FOR THE STATE OF CALIFORNIA, HEREBY CERTIFY:

THE FOREGOING PROCEEDINGS WERE TAKEN BEFORE ME AT THE TIME AND PLACE THEREIN SET FORTH, AT WHICH TIME THE DEPONENT WAS PLACED UNDER OATH BY ME;

THE TESTIMONY OF THE DEPONENT AND ALL OBJECTIONS MADE AT THE TIME OF THE EXAMINATION WERE RECORDED STENOGRAPHICALLY BY ME AND WERE THEREAFTER TRANSCRIBED;

THE FOREGOING TRANSCRIPT IS A TRUE AND CORRECT TRANSCRIPT OF MY SHORTHAND NOTES SO TAKEN;

I FURTHER CERTIFY THAT I AM NEITHER COUNSEL FOR NOR RELATED TO ANY PARTY TO SAID ACTION, NOR IN ANY WAY INTERESTED IN THE OUTCOME THEREOF.

IN WITNESS WHEREOF, I HAVE HEREUNTO SUBSCRIBED MY NAME THIS 12TH DAY OF MAY, 2008.

____________________________