*Eight Mile Style, LLC et al. v. Apple Computer Inc., et al.*
## Case No. 2:07-CV-13164

## EXHIBIT 1

**Agreement between the Recording Industry Association of America, Inc., National Music Publishers Association, Inc. and The Harry Fox Agency, Inc., dated October 5, 2001**

5005843.1

Dockets.Justia.com

# Agreement

This agreement (the "Agreement"), dated as of October 5, 2001 ("Effective Date"), is made by and between the Recording Industry Association of America, Inc. ("RIAA"), on the one hand, and National Music Publishers' Association, Inc. ("NMPA") and The Harry Fox Agency, Inc. ("HFA"), on the other (all of the foregoing collectively referred to as the "Parties").

WHEREAS, record companies desire to offer to consumers, or authorize others to provide to consumers, certain digital music services that provide On-Demand Streams and Limited Downloads (as defined below);

WHEREAS, music publishers desire to make their copyrighted musical works widely available to consumers by licensing such services;

WHEREAS, while the Parties have differed concerning certain legal and procedural questions implicated by the licensing of musical works for use in such services, record companies have always believed that musical work copyright owners should receive for the use of musical works in digital music services a fair royalty that reasonably reflects the value of the use of those works, irrespective of the particular rights of the copyright owner applicable to that use, and music publishers have always believed that their copyrighted works should be made available through such services for fair compensation;

WHEREAS, there has been litigation concerning the use of musical works in digital music services; the U.S. Copyright Office has issued a Notice of Inquiry whether to conduct a rulemaking concerning the legal status of On-Demand Streams and Limited Downloads; the U.S. Copyright Office has issued a report pursuant to Section 104 of the Digital Millennium Copyright Act addressing certain issues relating to streaming; and certain record companies may prefer to make business decisions concerning the launch of Covered Services (as defined below) with greater assurance concerning the legal status of such services;

WHEREAS, the Parties desire to avoid the uncertainty and expense of litigation concerning the use of copyrighted musical works by Covered Services, and to provide assurance to record companies and others seeking to offer such services to consumers;

WHEREAS, Section 115(c)(3) of the U.S. Copyright Act authorizes voluntary negotiations for determining royalty rates and terms under the mechanical compulsory license; and

WHEREAS, in settlement of their differences and to facilitate the expeditious and widespread launch of digital music services, the Parties have reached this Agreement with respect to terms pursuant to which RIAA member record companies may obtain licenses to make and authorize On-Demand Streams and Limited Downloads of musical works in Covered Services;

NOW, THEREFORE, pursuant to 17 U.S.C. § 115(c)(3), and in consideration of the mutual promises contained in this Agreement and for other good and valuable consideration, the

HFA000180

adequacy and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1. <u>Covered Services</u>. Any member of RIAA that seeks to use, or authorize the use of, a copyrighted musical work for which an HFA publisher-principal has the right to grant the rights that are the subject matter of this Agreement in connection with the operation of one or more Covered Services may obtain through HFA on behalf of such HFA publisher-principal a mechanical license ("License") to make On-Demand Streams and Limited Downloads of the work through Covered Services, through to the end user, including by making server and related reproductions of the work used in the operation of Covered Services.

1.1. "Covered Service" means a service that offers (but the offerings of which are not necessarily limited to) On-Demand Streams and/or Limited Downloads of sound recordings of musical works from servers located within the United States (including the territories and possessions thereof), where the basic charge to users for the service is a recurring subscription fee (in contrast to the basic charge being a per-download, per-play or per-song fee), including any use of such a service on a limited basis without charge to users in order to promote the subscription service.

1.2. "On-Demand Stream" means an on-demand, real-time digital transmission of a sound recording of a single musical work to allow a user to listen to a particular sound recording chosen by the user at a time chosen by the user, using streaming technology, which may include but is not limited to Real Audio or Windows Media Audio, that is configured by the provider of the Covered Service in a manner designed so that such transmission will not result in a substantially complete reproduction of a sound recording being made on a local storage device (*e.g.*, the hard drive of the user's computer or a portable device) so that such reproduction is available for listening other than at substantially the time of the transmission.

1.3. "Limited Download" means a digital transmission of a time-limited or other use-limited download of a sound recording of a single musical work to a local storage device (*e.g.*, the hard drive of the user's computer or a portable device), using technology designed to cause the downloaded file to be available for listening only either (1) during a limited time (*e.g.*, a time certain or a time tied to ongoing subscription payments) not to extend more than thirty (30) days beyond the expiration of the user's subscription, or (2) for a limited number of times not to exceed twelve (12) times after the expiration of the user's subscription.

1.4. Any member of RIAA that obtains a License hereunder is referred to herein as a "Participating RIAA Member." Any member of NMPA or HFA publisher-principal that grants a License and/or accepts a portion of an Advance Payment hereunder is referred to herein as a "Participating NMPA/HFA Publisher." The terms "Participating RIAA Member" and "Participating NMPA/HFA Publisher" are limited to such entities and their majority-owned subsidiaries.

1.5. Any digital music service that is majority owned by one or more RIAA members in the aggregate shall be entitled directly to obtain a License hereunder, and so shall be treated as a "member of RIAA" for purposes of Section 3.1. If such a service either obtains a License directly or is authorized under a License hereunder to make On-Demand Streams and/or

HFA000181

Limited Downloads through Covered Services, such service shall be treated as a "Participating RIAA Member" for all purposes of this Agreement.

## 2. Covered Deliveries.

2.1. A License with respect to a musical work includes all reproduction, distribution and DPD rights necessary for Covered Services to make On-Demand Streams and Limited Downloads of that work, from the making of server reproductions to the transmission and local storage of the On-Demand Streams or Limited Downloads. A License does not extend to other transmissions made by a Covered Service or to activities not encompassed by a mechanical license, including, without limitation, print or display rights, merchandising rights, adaptation (derivative work) rights except as provided in Section 115(a)(2) of the Copyright Act, rights to synchronize musical works with visual images resulting in audiovisual works, or karaoke rights, all of which rights are specifically reserved. The Parties agree that server reproductions made under a License to transmit On-Demand Streams or Limited Downloads may be used to make transmissions other than On-Demand Streams and Limited Downloads; provided that the foregoing is without prejudice to any applicable requirement, if any, that the Participating RIAA Member also obtain a license for such other transmissions made using such server reproductions. It is understood that this Agreement does not address or extend to any performance rights that may be implicated by the making of On-Demand Streams or Limited Downloads through Covered Services.

2.2. A License includes the right to make, and there shall be no separate payment or accounting for, On-Demand Streams of Promotional Excerpts (as defined below) of sound recordings of musical works licensed hereunder used for promotional purposes, provided that the applicable Participating RIAA Member shall be deemed likewise to authorize the relevant copyright owner or copyright owners of such musical work (or an organization of copyright owners designated by such copyright owners as their common agent) to make On-Demand Streams of Promotional Excerpts of that sound recording for the purpose of promoting that musical work without payment of any royalty. "Promotional Excerpt" is defined as a stream consisting of no more than thirty (30) seconds of playing time of the sound recording of a musical work, or in the case of sound recordings with a playing time of more than five minutes, a stream that is of no more than the lesser of ten percent (10%) or sixty (60) seconds of playing time of the sound recording of the musical work.

## 3. Licensing Process.

3.1. Commencing on the Effective Date, a member of RIAA may submit License requests in electronic form, either individually or batched, and either for On-Demand Streams and/or Limited Downloads alone or in combination with other configurations, substantially in accordance with Exhibit A. Promptly after the Effective Date, during the opt-out period described in Section 3.2, the Parties shall arrange discussions between appropriate personnel of HFA and of certain RIAA members concerning electronic licensing procedures, with the goal of refining and testing HFA's electronic licensing procedures so that they can be used readily for the issuance of mechanical licenses expeditiously following the completion of such opt-out period, and with the goal of enhancing such procedures so that they later can be used readily by RIAA members to request and obtain mechanical licenses for all configurations for which they

HFA000182

desire licenses in a single request. In addition, a member of RIAA may submit License requests by other means generally accepted by HFA, including but not limited to SirNet (for so long as it is available), HFA's new web-based licensing system (when it becomes available), and HFA's standard paper form (but only using paper forms for complex License requests (e.g., requests involving medleys or samples), in limited numbers during times when electronic licensing capabilities are unavailable, or at other times in numbers that are generally consistent with such RIAA member's past use of paper forms, and in any case in numbers that do not exceed what HFA can reasonably be expected to process under the circumstances). HFA may modify its license request and license forms from time to time, provided that it gives reasonable notice thereof to RIAA and Participating RIAA Members and such modifications do not unreasonably affect the ability of Participating RIAA Members to submit license requests and obtain licenses. License forms may be issued electronically or in paper form, but when a Licensee submits a License request in electronic form in accordance with this Section 3.1, HFA shall, promptly after processing the License request, return to such Licensee an electronic file substantially in accordance with Exhibit A, with (1) the addition of that information indicated in Exhibit A as being "output" fields, (2) the addition of information, other than individual publisher share information, to complete any blank optional fields in the request, to the extent that such information is available in HFA's databases and is matched to the request in the License issuance process, (3) the substitution of information concerning HFA publisher-principal names where such information in HFA's databases is different from that in the request, and (4) the aggregated share of Participating NMPA/HFA Publishers. If an RIAA member submits a License request in accordance with this Section 3.1 but the request contains insufficient information for HFA to find a match for the relevant work in its databases, HFA will work with such RIAA member to provide the information necessary to enable a License to be issued, and if such RIAA member resubmits such request with the necessary information and the License can be issued, the provisions of Section 3.4 shall apply from the date of the original request. The Parties acknowledge the importance to NMPA, HFA and music publishers of having License requests submitted promptly, and the importance to RIAA and record companies of having License forms issued promptly. The Parties shall cooperate in good faith to promote each of those goals.

3.2. The authority of HFA to license any individual musical work on behalf of its publisher-principals is subject to the approval of the relevant publisher-principal. HFA shall not require its publisher-principals to opt in to this Agreement either before or after commencing to issue Licenses, but HFA may establish an opt-out period before commencing to issue Licenses, provided that such period ends not later than six (6) weeks following the Effective Date. If an HFA publisher-principal at any time requests that HFA not issue Licenses on its behalf (either with respect to particular musical works or in general), HFA will honor that request; provided, however, that any such request shall not affect the validity or subsistence of a License issued prior to such request. During the opt-out period described in Section 3.2, HFA shall notify RIAA weekly of HFA publisher-principals that have notified HFA that they do not wish to make Licenses of their works available under this Agreement. Thereafter, through December 31, 2002, HFA shall notify RIAA quarterly of HFA publisher-principals that have notified HFA that they do not wish to make Licenses of their works available under this Agreement.

3.3. HFA shall issue mechanical licenses for DPD configurations (including but not limited to Licenses under this Agreement) with respect to a musical work in its entirety if one or more of its publisher-principals owns or controls a partial interest in such musical work, even if other co-owners of such musical work are not HFA publisher-principals, except that, pursuant

HFA000183

to Section 3.2, if all the HFA publisher-principals that own or control a partial interest in such work request that HFA not issue mechanical licenses on their behalf, HFA will not issue such licenses. In the case of a mechanical license issued as descibed in this Section 3.3, a Participating RIAA Member shall pay directly to each co-owner that is not an HFA publisher-principal (or such co-owner's authorized payee) such co-owner's share of the applicable royalty payments under Section 6.1.

3.4.  License forms issued by HFA pursuant to this Agreement shall be retroactive to the date of the License request made by the Participating RIAA Member on or after the Effective Date in accordance with Section 3.1.  To the extent that the Participating RIAA Member makes or authorizes On-Demand Streams and Limited Downloads of musical works pending the processing by HFA of license forms in response to proper License requests submitted on or after the Effective Date in accordance with Section 3.1, NMPA and HFA shall not directly or indirectly file, encourage, aid, support, finance, contribute to, promote, or participate in any claim, suit, action or proceeding asserting that such activities are infringing.

3.5.  Subject to Section 3.3, HFA shall also accept License requests to make On-Demand Streams and Limited Downloads through Covered Services of musical works as to which no HFA publisher-principal has any ownership interest or control, in whole or in part, and for which a License is not otherwise available under this Agreement.  In such a case, HFA shall use commercially reasonable efforts to secure the requested Licenses from the relevant non-HFA publisher-principals on the same terms as apply to HFA publisher-principals under this Agreement.  (Non-HFA publisher-principals who grant Licenses through this arrangement shall be referred to as "Participating Independent Publishers".)  In addition to any commission charged to the Participating Independent Publisher, HFA may charge the relevant Participating RIAA Member a one-time administrative fee of ninety-five dollars ($95) for each publisher that agrees to become a Participating Independent Publisher (it being understood that no such administrative fee shall be payable for any subsequent Licenses issued on behalf of that Participating Independent Publisher to any Participating RIAA Member), unless the Participating Independent Publisher also authorizes HFA to grant mechanical licenses other than Licenses under this Agreement, in which case no such fee shall apply.  The Advance Payment described in Article 4 may be applied to such administrative fee when payable by a Participating RIAA Member specified by RIAA, and HFA shall provide to RIAA or an independent accounting firm designated by RIAA sufficient information concerning liability for such administrative fee to allow reconciliation of the Advance Payments as described in Section 4.4.  When HFA arranges Licenses from Participating Independent Publishers pursuant to this Section 3.5, HFA shall collect and distribute mechanical royalties to such Participating Independent Publisher (or other authorized payees) unless the Participating RIAA Member requests to make such payments directly.

3.6.  It is understood that compilations of data supplied by HFA in electronic form pursuant to Section 3.1, except to the extent that they consist of data provided by the relevant Participating RIAA Member pursuant to Section 3.1, are proprietary in nature and shall not be used by the recipient Participating RIAA Member to engage in business activities in competition with HFA or for any purpose other than to request and administer licenses issued by HFA and/or other licenses such Participating RIAA Member acquires with respect to the same works or other works owned or controlled by the same copyright owners, and shall not be disclosed by the recipient Participating RIAA Member to any other party except insofar as it is reasonably

HFA000184

necessary to disclose specific data relating to particular works for the purpose of requesting or administering licenses issued by HFA and/or other licenses such Participating RIAA Member acquires with respect to the same works or other works owned or controlled by the same copyright owners.

3.7. Nothing in this Agreement, including but not limited to the availability of Licenses or the procedures for obtaining the same, shall preclude an RIAA member or digital music service from at any time serving or filing a notice of intention to obtain a compulsory license in accordance with applicable law or, other than in Article 8, imply that any notice of intention so served or filed is valid or invalid. Nothing in this Agreement shall preclude any digital music services from seeking, or HFA or any of its publisher-principals from granting, direct licenses to digital music services, including without limitation Covered Services, on whatever terms might be agreed upon between the relevant parties, and it is the intention of HFA to make such licenses widely available as described more fully in a press release to be issued by HFA. By taking Licenses pursuant to this Agreement, Participating RIAA Members will be able to facilitate on a prompt and widespread basis the availability of music over the Internet through Covered Services.

4. Advance Payment.

4.1. Within thirty (30) days after the Effective Date, RIAA, on behalf of Participating RIAA Members (including their licensees), shall pay to HFA a non-refundable advance royalty payment of one million dollars ($1,000,000) in the aggregate ("Advance Payment"). If, by the second anniversary of the Effective Date, there has then been no final non-appealable determination of royalty rates for On-Demand Streams and Limited Downloads through negotiation and/or a CARP proceeding, as the case may be, then, subject to Section 4.2, until such a determination, RIAA, on behalf of Participating RIAA Members (including their licensees), shall each month pay to HFA a supplementary Advance Payment of sixty-two thousand five-hundred dollars ($62,500) in the aggregate.

4.2. Effective at the second anniversary of the Effective Date or any time thereafter, RIAA may terminate this Agreement upon thirty (30) days advance written notice to NMPA and HFA. In the event RIAA does so, all Licenses previously issued under this Agreement shall terminate at the same time as this Agreement, without prejudice to the right of Participating RIAA Members thereafter to obtain new licenses under 17 U.S.C. § 115. Effective at the second anniversary of the Effective Date or any time thereafter, any Participating RIAA Member may opt out of this Agreement upon thirty (30) days advance written notice to each of the Parties. In the event a Participating RIAA Member does so, (1) the provisions of this Agreement thereafter shall not apply to such Participating RIAA Member except as provided in Article 7, and (2) all Licenses previously issued to such Participating RIAA Member under this Agreement shall terminate at such time, without prejudice to the right of such Participating RIAA Member thereafter to obtain new licenses under 17 U.S.C. § 115. In the case of termination by either RIAA or one or more Participating RIAA Members, (a) payments shall be due in accordance with Section 6.1 for activities under this Agreement prior to the termination of the relevant Licenses, (b) Advance Payments may be applied against such payments in accordance with Section 4.4, and (c) to the extent remaining, Advance Payments also may be applied to royalties due under new licenses for On-Demand Streams and Limited Downloads made through Covered Services, which licenses are issued by HFA at least one year after the

- 6 -

HFA000185

relevant date of termination to the Participating RIAA Members whose Licenses were terminated. In addition, in the event a Participating RIAA Member that is one of the five "major record companies" (as that term is commonly understood, including any successors thereto and the subsidiaries thereof) so opts out of this Agreement, RIAA's monthly supplementary Advance Payments under Section 4.1 thereafter shall be reduced proportionately, based on the number of major record companies at such time (e.g., if there are then five major record companies and one opts out, RIAA's monthly supplementary Advance Payments shall be reduced by twenty percent (20%)). In addition to the foregoing, if there is a decision of the U.S. Copyright Office or a court, or any new legislation, inconsistent with Section 8.1, with the result that mechanical royalties are not required to be paid for some or all On-Demand Streams and/or Limited Downloads made through Covered Services, then the amount of RIAA's monthly supplementary Advance Payments under Section 4.1 shall be reduced to take into account such decision or legislation, based on actual usage under this Agreement to date, with the exact amount of such reduction to be agreed upon by the Parties promptly after such decision or legislation; provided that if any such decision is appealed and finally reversed on appeal, the amount of RIAA's monthly supplementary Advance Payments under Section 4.1 shall be restored, and RIAA shall promptly pay to HFA the total amount by which the supplementary Advance Payment was reduced in the interim.

4.3. HFA shall deposit Advance Payments into an interest-bearing bank account (with such interest being treated as part of the Advance Payment). HFA shall be free to distribute the initial and supplementary Advance Payments to HFA publisher-principals in accordance with a reasonable and nondiscriminatory methodology based on market share, actual usage or a per musical work payment (which methodology HFA shall provide to RIAA), as well as to any Participating Independent Publishers pursuant to Section 3.5. Except insofar as it is recouped pursuant to Sections 4.4 and/or 4.5, the Advance Payment shall be nonrefundable.

4.4. Upon the final non-appealable determination of royalty rates for On-Demand Streams and Limited Downloads through negotiation and/or a CARP proceeding, as the case may be, the total amount of Advance Payments (including interest) shall be applied against undisputed amounts owed to HFA on behalf of its publisher-principals and Participating Independent Publishers by Participating RIAA Members under this Agreement. Such Advance Payments shall be applied to the accounts of individual Participating RIAA Members as specified by RIAA, or an independent accounting firm designated by RIAA, by written notice to HFA within 45 days after the date of such final non-appealable determination of royalty rates. If the Advance Payments are not fully recouped at such time, any remainder of the Advance Payments thereafter shall be applied against all undisputed amounts owed to HFA on behalf of its publisher-principals and Participating Independent Publishers by Participating RIAA Members identified by RIAA, under mechanical licenses issued by HFA for On-Demand Streams and Limited Downloads made through Covered Services (including but not limited to Licenses under this Agreement), until such amount is fully recouped, unless RIAA notifies HFA of a different allocation of the Advance Payments among the accounts of Participating RIAA Members from time to time. HFA shall provide to RIAA or an independent accounting firm designated by RIAA sufficient accounting information to allow payments between RIAA and Participating RIAA Members, or vice versa, as necessary for each Participating RIAA Member ultimately to have paid to RIAA a net amount equal to that portion of the Advance Payments recouped by royalties actually owed by such Participating RIAA Member hereunder.

HFA000186

4.5. At the request of HFA, with RIAA's written consent, which consent shall not be withheld unreasonably, Advance Payments may be applied to other undisputed amounts (*e.g.*, other mechanical royalties) owed by Participating RIAA Members to HFA on behalf of its publisher-principals.

5. Royalty. The royalty rate payable under a License shall be determined through negotiation and/or a CARP proceeding. The applicable rate will be structured as determined through negotiation or by the CARP, and may comprise separate royalty rate components for distinct uses of the musical work authorized by the License. The Parties shall meet to negotiate royalty rates in good faith, with the goal of concluding such negotiations promptly after the launch of Covered Services, and if an agreement is reached, jointly petition the U.S. Copyright Office for its adoption pursuant to 37 C.F.R. § 251.63(b). NMPA reserves its right to seek interest as a part of such royalty rate determination. RIAA reserves its right to seek to have such royalty rate determination reflect any payments under foreign copyrights in the case where On-Demand Streams or Limited Downloads are transmitted to users outside of the United States. Whether royalty rates are determined by negotiation or a CARP, and regardless of how royalty rate categories may be denominated, the Parties shall seek a determination of royalty rates such that it is clear which royalty rates are applicable to each of On-Demand Streams and Limited Downloads.

6. Accounting and Payment.

6.1. Beginning with the issuance of a License, a Participating RIAA Member will be required to account to HFA on a quarterly basis for activity under such License, 45 days after the close of each quarter, providing information comparable to that presently provided for physical products, and specifically including the number of On-Demand Streams and Limited Downloads of each work made during such quarter. Without limitation, quarterly reports shall include a breakdown of On-Demand Streams and Limited Downloads made by Covered Services under Licenses in the applicable quarter, by musical work and delivery method code (indicating On Demand-Streams and/or Limited Downloads), and including ISRC number if available, catalog number if available and HFA license number if available (in the same manner indicated by the Participating RIAA Member in its License request), and shall identify the specific Covered Services in which such On-Demand Streams and Limited Downloads were made. Each Participating RIAA Member shall preserve all usage and financial data that reasonably should be expected to be relevant, upon the determination of royalty rates, to the calculation of royalties hereunder and use commercially reasonable efforts to require that each Covered Service it has authorized hereunder to make On-Demand Streams and Limited Downloads does the same. Subject to Article 4 and Section 3.3, upon the final non-appealable determination of royalty rates for On-Demand Streams and Limited Downloads through negotiation and/or a CARP proceeding, each Participating RIAA Member shall make the applicable payment for all previous quarters then completed, from the launch of the applicable Covered Services to date, within 45 days, to be accompanied by a cumulative statement setting forth and aggregating the information provided in the previous quarterly reports supplied under this Agreement. Thereafter, on a quarterly basis, 45 days after the close of each quarter, each Participating RIAA Member shall account to HFA for activities and/or revenues realized on such activities during such quarter as determined through negotiation and/or by regulation, providing such information as is required by regulation, a CARP, and/or a negotiated rate agreement, and, subject to Article 4 and Section

HFA000187

3.3, pay royalties at the applicable rate. Notwithstanding the foregoing, NMPA reserves its right to seek more frequent access, including without limitation real-time access, to usage information.

6.2. At the request of HFA, a Participating RIAA Member shall accompany its quarterly reports with any available data in addition to that described in Section 6.1 concerning the numbers of On-Demand Streams and Limited Downloads made through Covered Services operated or authorized by such Participating RIAA Member (but not any personally identifying information), which data is regularly gathered or compiled by such Participating RIAA Member or provided to such Participating RIAA Member by its licensees with the right to disclose such data to HFA hereunder; provided that a Participating RIAA Member may provide any such data to HFA in whatever form it is available to such Participating RIAA Member in the ordinary course of its business and subject to any applicable confidentiality and other contractual use restrictions; and provided further that, before making any such request, HFA shall review with the Participating RIAA Member the types of such data the Participating RIAA Member has and can disclose to HFA, and the form in which such data is available, and HFA shall not request, and Participating RIAA Members shall not be required to provide, data that (given the volume and form of such data, the degree to which such data is reflected in quarterly reports, the data processing capabilities of HFA and the Participating RIAA Member, HFA's intentions to use such information, and other relevant factors) would not be commercially reasonable to provide. In addition, to the extent such information is available to a Participating RIAA Member and can be disclosed to HFA hereunder, at the request of HFA, a Participating RIAA Member shall accompany its quarterly reports with the total number of subscribers to and total number of subscriber months for each Covered Service operated or authorized by such Participating RIAA Member during the reporting period; provided that any such information relating to a Covered Service operated by a Participating RIAA Member shall be subject to an appropriate confidentiality restriction, and any such information provided to a Participating RIAA Member by a third party shall be subject to any applicable confidentiality and other contractual use restrictions. Notwithstanding the foregoing, to the extent that information requested by HFA under this Section 6.2 is subject to existing, proposed or future confidentiality restrictions that would preclude its disclosure to HFA, the relevant Participating RIAA Member shall in good faith seek the consent of the party that is the source of such information to disclose such information to HFA, subject to appropriate confidentiality restrictions.

7. Term. The term of this Agreement shall commence on the Effective Date and, subject to Sections 4.2 and 8.5, continue until the final non-appealable determination of royalty rates for each of On-Demand Streams and Limited Downloads through negotiation and/or a CARP proceeding. New Licenses shall continue to be issued pursuant to this Agreement for the duration of such term. Thereafter, RIAA member companies may request, and HFA shall issue, mechanical licenses covering On-Demand Streams and Limited Downloads at the applicable royalty rates in accordance with its customary practices for the issuance of licenses where there is an applicable statutory rate, which the Parties currently understand to include the means of application described in Section 3.1. Notwithstanding the foregoing, Licenses once issued under this arrangement shall remain in effect unless terminated for default in respect to payment (once royalty rates are determined) or accounting (either before or after royalty rates are determined) pursuant to 17 U.S.C. § 115(c)(6) (or other applicable provision of law, if any), it being understood that a License may not be terminated for such a default where the default is remedied as provided in 17 U.S.C. § 115(c)(6). In addition, the provisions of Sections 3.6, 4.2, 4.4 and

HFA000188

4.5, and of Articles 6 and 7, shall survive the expiration or termination of this Agreement or any License under this Agreement.

## 8. Legal Framework for Agreement.

8.1. Subject to the other provisions of this Article 8, in order to settle issues in dispute and avoid litigation, provide assurance to record companies seeking to launch digital music services and enable HFA's issuance of license forms for Covered Services hereunder:

      (a) The Parties agree that under current law the process of making On-Demand Streams through Covered Services (from the making of server reproductions to the transmission and local storage of the stream), viewed in its entirety, involves the making and distribution of a DPD, and further agree that such process in its entirety (i.e., inclusive of any server reproductions and any temporary or cached reproductions through to the transmission recipient of the On-Demand Stream) is subject to the compulsory licensing provisions of Section 115 of the Copyright Act. The Parties further agree that under current law the process of making streams that would qualify for a statutory license under Section 114(d)(2) of the Copyright Act does not involve the making or distribution of a DPD, and thus does not require a mechanical license. The foregoing does not express or imply any agreement that, and shall not be used to support any argument that, the process of making On-Demand Streams other than through Covered Services, or the process of making streams that would not qualify for a statutory license under Section 114(d)(2) of the Copyright Act (including, without limitation, because such streams are part of an "interactive service" (as that term is defined in Section 114(j)(7)) or exceed the "sound recording performance complement" (as that term is defined in Section 114(j)(13)) does or does not involve the making and distribution of a DPD, and the Parties expressly reserve all their rights with respect to that issue.

      (b) The Parties agree that under current law the process of making Limited Downloads through Covered Services (from the making of server reproductions to the transmission and local storage of the Limited Download), viewed in its entirety, involves the making and distribution of a DPD, and further agree that such process in its entirety (i.e., inclusive of any server reproductions and any temporary or cached reproductions through to the transmission recipient of the Limited Download) is subject to the compulsory licensing provisions of Section 115 of the Copyright Act.

      (c) The Parties agree that under current law a compulsory license to make On-Demand Streams and Limited Downloads through Covered Services (from the making of server reproductions to the transmission and local storage of the On-Demand Streams and Limited Downloads) is available under Section 115 of the Copyright Act.

8.2. Subject to Sections 8.3 and 8.5, for the term of this Agreement, no Party, no Participating RIAA Member and no Participating NMPA/HFA Publisher shall take a position contrary to or inconsistent with Section 8.1, or lend support or resources, financial or otherwise, to any other person or entity taking a contrary or inconsistent position, before the Copyright Office, a CARP, a court or any other government office or tribunal. Thereafter, no Party, no Participating RIAA Member and no Participating NMPA/HFA Publisher shall commence or lend support to any action in court to challenge the validity of the rates determined pursuant to

HFA000189

Article 5 on the ground that On-Demand Streams and Limited Downloads do not involve the making or distribution of DPDs. It is understood that, for purposes of this Section 8.2, a Participating RIAA Member or Participating NMPA/HFA Publisher shall not be deemed to lend financial support or resources to affiliated entities merely through intra-enterprise financial arrangements in the ordinary course of business.

8.3. Notwithstanding Sections 8.1 and 8.2, the Parties, Participating RIAA Members and Participating NMPA/HFA Publishers may at any time (1) raise and litigate (including, without limitation, before a CARP) the economic value of, and the appropriate royalty rates to be applied to, On-Demand Streams and Limited Downloads; (2) take or support any position they choose with respect to sound recordings (as distinguished from any musical works embodied therein) and the rights therein, including, without limitation, rights under Sections 106 and 114 of the Copyright Act, and (3) make or lend support to any arguments they choose to prosecute, or defend or counterclaim against, an infringement claim relating to activities before the Effective Date. Notwithstanding Sections 8.1 and 8.2, RIAA and Participating RIAA Members may at any time make or lend support to any arguments they choose to defend or counterclaim against an infringement claim relating to activities on or after the Effective Date, in the event that a License with respect to the relevant works is not available hereunder (it being understood that, subject to Section 8.4, NMPA, HFA and Participating NMPA/HFA Publishers may participate in the litigation of any such claim, so long as their doing so is consistent with Sections 8.1 and 8.2). The Parties agree that they will act in good faith not to induce, promote or encourage the litigation of an infringement claim relating to activities as described in the immediately preceding sentence.

8.4. To the extent that an action being litigated by RIAA and/or a Participating RIAA Member, other than that pending case in the Southern District of New York captioned *Rodgers & Hammerstein Organization v. UMG Recordings, Inc.*, involves the question of the validity of a notice of intention to obtain a compulsory license as described in Section 8.1(c) for a musical work for which a License is not available under this Agreement, neither NMPA nor HFA shall participate in or lend support to such action. The Parties agree that they will act in good faith not to induce, promote or encourage litigation concerning the validity of a notice of intention to obtain a compulsory license as described in Section 8.1(c).

8.5. To the extent that a final, non-appealable decision of the Copyright Office or a court, or any new legislation, is inconsistent with Section 8.1, this Agreement shall be inapplicable to the extent of the inconsistency as of the date thereof, but subject to Article 4, Participating RIAA Members shall not be entitled to a refund of any monies paid prior to such date.

8.6. This Agreement is entered into in settlement and compromise of certain disputes among the Parties and to clarify certain aspects of the licensing of On-Demand Streams and Limited Downloads. Nothing in this Article 8 shall be used by, or be enforceable by, a third party not a Party to this Agreement, other than a Participating RIAA Member or Participating NMPA/HFA Publisher, in any manner or in any context, including without limitation in any legal proceeding. This Agreement does not give rise to any third-party beneficiary rights in any party other than Participating RIAA Members and Participating NMPA/HFA Publishers. The agreements set forth in this Article 8 and the course of dealing hereunder shall be inadmissible, and shall not be used to support any argument of law, in any litigation or arbitration relating to

HFA000190

(1) activities before the Effective Date or (2) activities other than making and distributing On-Demand Streams and Limited Downloads through Covered Services, except making streams that would qualify for a statutory license under Section 114(d)(2) of the Copyright Act.

9. Copyright Office Proceedings.

9.1. RIAA and NMPA promptly shall file in the Copyright Office, in the Mechanical and Digital Phonorecord Delivery Compulsory License rulemaking proceeding (docket number 2000-7) (the "Proceeding"), an appropriate mutually agreeable document (the "Joint Statement") signed by representatives of both RIAA and NMPA and (1) explaining that they have entered into this Agreement to resolve certain differences between them and enable the expeditious launch of subscription music services; and (2) describing the material terms of this Agreement (including without limitation the agreement in Section 8.1). Unless the Parties agree otherwise, the Joint Statement shall not address the question of whether the Copyright Office should or should not proceed with the Proceeding, and none of the Parties shall use the existence of the Agreement to argue to the Copyright Office that the Office should or should not proceed with the Proceeding.

9.2. Either in the Joint Statement, in joint comments submitted in response to the Copyright Office's Notice of Proposed Rulemaking dated August 28, 2001, or in a separate petition signed by representatives of both Parties to be filed in the Copyright Office promptly after the Effective Date, RIAA and NMPA shall request that the Copyright Office amend 37 C.F.R. § 201.18 to facilitate the licensing process for digital music services by addressing in a mutually agreeable manner such procedural issues as:

      (a) Permitting combined notices of intention;

      (b) Permitting service of notices of intention on the copyright owner's agent, and designating HFA as agent for the receipt of such notices;

      (c) Eliminating the requirement that officer/director information be provided for publicly traded companies and their subsidiaries;

      (d) Permitting notices of intention to be signed by any authorized representative of the licensee;

      (e) Permitting mailing to a known correct address of the copyright owner; and

      (f) Permitting the service of notices of intention by regular mail.

10. Congress. As soon as practicable after the Effective Date, and before any relevant congressional hearings then scheduled, if possible, the Parties shall draft and submit a mutually agreeable letter to appropriate members of Congress describing this Agreement and the benefits thereof.

11. Memoranda of Understanding. Promptly after the Effective Date, HFA and RIAA shall commence good-faith negotiations to (1) revise and renew for an additional year the

HFA000191

Memorandum of Understanding dated September 21, 2000 (the "MOU") concerning interim licenses for DPDs, the revisions to address updated licensing procedures consistent with the licensing procedures to be implemented under this Agreement, and (2) enter into a second Memorandum of Understanding concerning certain licensing, payment and additional operational issues of mutual concern to HFA and RIAA members, which issues shall include:

        (a) record companies' payment to HFA of 100% of royalties due for a particular musical work regardless of whether HFA acts as an agent for all owners of such work;

        (b) record companies' provision of album label copy to HFA in order to facilitate the licensing process; and

        (c) what information concerning publisher names and shares appropriately should be provided by HFA to Participating RIAA Members, and the appropriate confidentiality protections therefor.

Pending completion of such negotiations, HFA will continue to issue "Interim DPD Licenses" as described in the MOU in accordance with the practice that has developed under the MOU.

12. <u>Economic Data</u>. In order to help the Parties better understand and evaluate emerging business models for digital music services, RIAA and NMPA shall jointly hire an independent accounting firm to collect from Participating RIAA Members on a confidential basis information concerning the economics of emerging subscription service business models and report composite information to RIAA and NMPA for the duration of this Agreement.

13. <u>Security</u>. If RIAA or any Participating RIAA Member learns of any substantial (in terms of number of musical works affected, number of copies or prevalence) circumvention of security measures used by Covered Services resulting in unauthorized copying or distribution of sound recordings of musical works by authorized or unauthorized users of Covered Services, RIAA and/or the Participating RIAA Member shall use commercially reasonable efforts promptly to notify HFA of such unauthorized activity; provided, however, that RIAA and Participating RIAA Members shall be liable for damages for breach of this Article 13 only if, and to the extent, that they themselves are liable for direct, contributory or vicarious copyright infringement under applicable U.S. law, and in such case such damages shall be only those payable for such infringement.

14. <u>Electronic Reporting</u>. The Parties agree to work together in good faith to implement means whereby accounting information relating to Licenses will be provided to HFA in electronic, machine-readable form.

15. <u>Publicity</u>. RIAA and NMPA will issue a joint press release announcing this arrangement. In their communications to their members concerning this Agreement, the Parties shall recommend that their members avail themselves of this Agreement. The Parties confirm that, subject to Section 8.6, this Agreement is not confidential.

**HFA000192**

16. Miscellaneous.

16.1. Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York (without giving effect to conflicts of law principles thereof).

16.2. Amendment. This Agreement may be modified or amended only by a writing signed by each of the Parties.

16.3. Entire Agreement. This Agreement expresses the entire understanding of the Parties and supersedes all prior and contemporaneous agreements and undertakings of the Parties with respect to the subject matter hereof.

16.4. No Effect on Other Agreements. Without limitation, this Agreement shall not terminate, supersede, limit or otherwise affect the enforceability of, or the rights of any of the respective parties to, any of the following agreements: (1) the Settlement Agreement dated as of October 17, 2000 between HFA, MPL Communications, Inc. and Peer International Corporation, on the one hand, and MP3.com, Inc., on the other, and any amendments thereto; (2) the Governing Agreement dated as of October 2000 between HFA, MPL Communications, Inc. and Peer International Corporation, on the one hand, and MP3.com, Inc., on the other, and any amendments thereto; (3) the Digital Phonorecord Delivery License dated January 15, 1999 between HFA and Emusic.com Inc., and any amendments thereto; and (4) the Amendment Agreement dated November 2000 between HFA and Emusic.com Inc., and any amendments thereto.

16.5. Counterparts. This Agreement may be executed in counterparts, including by means of facsimile, each of which shall be deemed to be an original, but which taken together shall constitute one agreement.

16.6. Headings. The titles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

Edward P. Murphy
President and CEO, NMPA

Hilary B. Rosen
President and CEO, RIAA

Gary Churgin
President and CEO, HFA

Cary Sherman
Senior Executive Vice President
and General Counsel, RIAA

HFA000193



# HFA/RIAA Electronic License Request
# & Output File Layout:  Field Explanations

| | Field | Type (Mandatory (M) Optional (O) Conditional (C)) | Explanation | Example |
|---|---|---|---|---|
| 1 | Manufacturer Number | M | Account number assigned by HFA to Licensee | M12345 |
| 2 | Transaction Date | M | Date electronic license request submitted to HFA | Format:  YYYYMMDD Example: 3/4/2001 Data Entered:  20010304 |
| 3 | Manufacturer Request Number | M | Unique identifying number (numerical only) assigned by Licensee for each work for which a license is requested | 12345678 |
| 4 | Label Name | M | The name of the record label that produced the applicable recording | Epic |
| 5 | ISRC Code | M | *International Standard Recording Code.* ISRC code assigned to the recording by the record label. | USSM19804780 |
| 6 | Playing Time - Minutes | M | The number of minutes in the duration of the applicable recording | Duration = 5 minutes and 52 seconds Data entered:  005 |
| 7 | Playing Time – Seconds | M | The number of seconds over the last full minute in the duration of the applicable recording | Duration = 5 minutes and 52 seconds Data entered: 52 |
| 8 | Artist | M | The name of the artist performing the applicable recording | John Lennon, Paul McCartney |
| 9 | Song Title | M | Title of work for which a License is requested | Yesterday |
| 10 | A/K/A Song Title | O | Other names by which the work is known | Over the Rainbow; Somewhere Over the Rainbow |
| 11 | ISWC Code | O | *International Standard Musical Work Code.* Code assigned to works by the network of ISO/ISWC Local or Regional agencies | Example: T-034.524.680-1 Data Entered: T0345246801 |
| 12 | HFA Song Code | O | Identifier assigned by HFA to identify a work uniquely | Example: P12345 |
| 13 | Songwriter(s) | C *Provide either: (a) Songwriter or (b) Publisher, Catalog #, Album Title and UPC* | Name of the composer(s) of the work. | Format:  [First Name] [Last Name], [First Name], etc Example:  Michael Ross, Tom Smith |

HFA000194

| 14 | Publisher Name | C<br>*Provide either:*<br>*(a)*<br>*Songwriter or*<br>*(b) Publisher, Catalog #, Album Title and UPC* | Name of publisher owning a share of the work. Additional publishers should be listed on separate lines using the same manufacturer's request number assigned to the work. | EMI Mills | |
|----|----|----|----|----|----|
| 15 | HFA Publisher Number | O | Identifier assigned by HFA to identify a publisher uniquely. | P12345 | |
| 16 | Publisher Share | O | Percent of song owned by publisher. | Example: 66.667%<br>Data Entered: 066.6670 | |
| 17 | Catalog Number | C<br>*Provide either:*<br>*(a)*<br>*Songwriter or*<br>*(b) Publisher, Catalog #, Album Title and UPC* | The catalog number of a prior physical product that has been previously licensed (where applicable.) | 12345-2 | |
| 18 | Album (physical product) Title | C<br>*Provide either:*<br>*(a)*<br>*Songwriter or*<br>*(b) Publisher, Catalog #, Album Title and UPC* | The title of a prior physical product that has been previously licensed (where applicable) | Parachute | |
| 19 | UPC Code | C<br>*Provide either:*<br>*(a)*<br>*Songwriter or*<br>*(b) Publisher, Catalog #, Album Title and UPC* | The UPC code of a prior physical product that has been previously licensed (where applicable). | 706301594728 | |
| 20 | Configuration Code | M | Code designating configuration type(s) applicable. Numerous options available; most relevant are in example column. | CV | Use in Covered Services under this Agreement (includes LT, LU and S below) |
| | | | | *LT* | *Time-Limited Digital Phonorecord Delivery* |
| | | | | *LU* | *Use Limited Digital Phonorecord Delivery* |
| | | | | *S* | *On-Demand Streaming (Single)* |
| | | | | SP | Digital Phonorecord Delivery (Single) |
| 21 | License Type | M | Classification of license type requested. Numerous options available; most relevant is in example column. | G | Digital |
| 22 | Server Fixation Date | M | The date the applicable recording was or is expected to be fixed to the server for distribution via streaming or downloading. | Format: YYYYMMDD<br>Example: 3/4/2001<br>Data Entered: 20010304 | |

HFA000195

| 23 | Rate Code | C<br>*(one of the rate fields from 23 – 26 must be completed)* | Code designating type of rate applicable. Numerous options available; most relevant are in example column. | T | Statutory rate to be determined under this Agreement |
|----|-----------|---|---|---|---|
|    |           |   |   | R | Under controlled composition clause in contract where controlled rate applies |
|    |           |   |   | S | Statutory (already determined) |
| 24 | Rate in Cents | C<br>*(one of the rate fields from 23 – 26 must be completed)* | Rate indicated as a penny rate. | .0755000 | |
| 25 | Rate in Percentage of Statutory | C<br>*(one of the rate fields from 23 – 26 must be completed)* | Rate indicated in percentage of statutory. | 075.00 | |
| 26 | Rate in Percentage of Minimum Statutory | C<br>*(one of the rate fields from 23 – 26 must be completed)* | Rate indicated in a percentage of minimum statutory. | 075.00 | |
| 27 | HFA License Number | Output | Number assigned by HFA for each license | 1010120001 | |
| 28 | HFA License Reject Code | Output | Code designating reason why request was not licensable as submitted. Numerous options available; most relevant are in example column. | 01 | NO MATCH FOUND (FOR OTHER THAN SPECIFICALLY LISTED REJECT CODES) |
|    |           |   |   | 02 | DUPLICATE LICENSE REQUEST (1ST PASS - PRELIMINARY SCAN; WITHIN THE CURRENT BATCH) |
|    |           |   |   | 03 | DUPLICATE LICENSE REQUEST (2ND PASS, ALREADY LICENSED, PART OF EDIT VALIDATION PROCESS) |
|    |           |   |   | 10 | SONG TITLE NOT FOUND |
|    |           |   |   | 11 | SONG TITLE MATCH ONLY, INSUFFICIENT FOR LICENSE |
|    |           |   |   | 12 | SONG TITLE AND ARTIST MATCH ONLY, INSUFFICIENT FOR LICENSE |
|    |           |   |   | 13 | SONG TITLE AND ALBUM MATCH ONLY, INSUFFICIENT FOR LICENSE |
|    |           |   |   | 14 | SONG TITLE AND CATALOG / UPC # MATCH ONLY, INSUFFICIENT FOR LICENSE |

HFA000196

| | | | | 21 | CONTROLLED RATE REQUEST COULD NOT BE MATCHED TO PREVIOUSLY |
|---|---|---|---|---|---|
| | | | | 81 | PUBLISHER NOT REPRESENTED BY HARRY FOX AGENCY |
| | | | | 82 | PUBLISHER UNKNOWN |
| | | | | 83 | PUBLISHER OPTED-OUT OF AGREEMENT |
| | | | | 91 | ORIGINAL VERSION OF SONG IS IN THE PUBLIC DOMAIN IN THE USA |
| | | | | 92 | PUBLISHER OWNERSHIP NOT YET VERIFIED |
| | | | | 93 | SONG PLACED ON HOLD FOR LICENSING BY PUBLISHER |
| | | | | 94 | SONG HAS RESTRICTIONS; REQUIRES PUBLISHER APPROVAL |
| | | | | 95 | OLD DERIVATIVE VERSION OF SONG, CURRENT PUBLISHER UNKNOWN |
| | | | | 96 | INVALID SONG CODE |
| 29 | HFA Flag for Amended Publisher Data | Output | Indicates that publisher information submitted by licensee differs on HFA database (for HFA represented publishers only) | Y | Flagged so that requestor can note that HFA publisher information differs from that submitted |

HFA000197



# HFA/RIAA Electronic License Request & Output File Layout

*Acceptable Data Formats:*
1. *MS Access database*
2. *MS Excel Spreadsheets (with proper headings)*
3. *Flat File (follow the file layout below)*

| | Description | Type | Length | Decimal | Input Option |
|---|---|---|---|---|---|
| 1 | Manufacturer Number | A | 6 | | M |
| 2 | Transaction Date | N | 8 | 0 | M |
| 3 | Manufacturer Request Number | N | 8 | 0 | M |
| 4 | Label Name | A | 15 | | M |
| 5 | ISRC Code | A | 15 | | M |
| 6 | Playing Time - Minutes | N | 3 | 0 | M |
| 7 | Playing Time - Seconds | N | 2 | 0 | M |
| 8 | Artist | A | 200 | | M |
| 9 | Song Title | A | 200 | | M |
| 10 | A/K/A Song Title | A | 200 | | O |
| 11 | ISWC Code | A | 11 | | O |
| 12 | HFA Song Code | A | 6 | | O |
| 13 | Song Writer(s) | A | 200 | | C* |
| 14 | Publisher Name | A | 60 | | C* |
| 15 | HFA Publisher Number | A | 6 | | O |
| 16 | Publisher Share | N | 7 | 4 | O |
| 17 | Catalog Number | A | 15 | | C* |
| 18 | Album (physical product) Title | A | 200 | | C* |
| 19 | UPC Code | A | 16 | | C* |
| 20 | Configuration Code | A | 2 | | M |
| 21 | License Type | A | 1 | | M |
| 22 | Server Fixation Date | N | 8 | 0 | M |
| 23 | Rate Code | A | 1 | | C** |
| 24 | Rate in Cents | N | 7 | 7 | C** |
| 25 | Rate in Percentage of Statutory | N | 5 | 2 | C** |
| 26 | Rate in Percentage of Minimum Statutory | N | 5 | 2 | C** |
| 27 | HFA License Number | N | 10 | | *Output* |
| 28 | HFA License Reject Code | A | 2 | | *Output* |
| 29 | HFA Flag for Amended Publisher Data | A | 1 | | *Output* |

**KEY:**

**TYPE:**
A = Alphanumeric Field
N = Numeric Field

**LENGTH:** For Alphanumeric fields, it is the maximum number of characters required.
For Numeric fields, it is the exact number of characters required

**DECIMAL:** Number of characters after decimal (for numeric fields only)

**INPUT OPTION:**
M = Mandatory
O = Optional
C* = Conditional --- As agreed, label must provide either: (a) Songwriter *or* (b) Publisher,
Catalog Number, Album Title and UPC. If (a) is provided, then (b) is not required; and vice versa.
C** = Conditional --- One of the rate code fields from 23-26 must be completed

HFA000198

| 14 | Publisher Name | C<br>*Provide either:*<br>*(a)*<br>*Songwriter or*<br>*(b) Publisher,*<br>*Catalog #,*<br>*Album Title*<br>*and UPC* | Name of publisher owning a share of the work. Additional publishers should be listed on separate lines using the same manufacturer's request number assigned to the work. | EMI Mills | |
|---|---|---|---|---|---|
| 15 | HFA Publisher Number | O | Identifier assigned by HFA to identify a publisher uniquely. | P12345 | |
| 16 | Publisher Share | O | Percent of song owned by publisher. | Example: 66.667%<br>Data Entered: 066.6670 | |
| 17 | Catalog Number | C<br>*Provide either:*<br>*(a)*<br>*Songwriter or*<br>*(b) Publisher,*<br>*Catalog #,*<br>*Album Title*<br>*and UPC* | The catalog number of a prior physical product that has been previously licensed (where applicable.) | 12345-2 | |
| 18 | Album (physical product) Title | C<br>*Provide either:*<br>*(a)*<br>*Songwriter or*<br>*(b) Publisher,*<br>*Catalog #,*<br>*Album Title*<br>*and UPC* | The title of a prior physical product that has been previously licensed (where applicable) | Parachute | |
| 19 | UPC Code | C<br>*Provide either:*<br>*(a)*<br>*Songwriter or*<br>*(b) Publisher,*<br>*Catalog #,*<br>*Album Title*<br>*and UPC* | The UPC code of a prior physical product that has been previously licensed (where applicable). | 706301594728 | |
| 20 | Configuration Code | M | Code designating configuration type(s) applicable. Numerous options available; most relevant are in example column. | **CV** | Use in Covered Services under this Agreement (includes LT, LU and S below) |
| | | | | *LT* | *Time-Limited Digital Phonorecord Delivery* |
| | | | | *LU* | *Use Limited Digital Phonorecord Delivery* |
| | | | | *S* | *On-Demand Streaming (Single)* |
| | | | | **SP** | Digital Phonorecord Delivery (Single) |
| 21 | License Type | M | Classification of license type requested. Numerous options available; most relevant is in example column. | **G** | Digital |
| 22 | Server Fixation Date | M | The date the applicable recording was or is expected to be fixed to the server for distribution via streaming or downloading. | Format: YYYYMMDD<br>Example: 3/4/2001<br>Data Entered: 20010304 | |

HFA000199