*Eight Mile Style, LLC et al. v. Apple Computer Inc., et al.*
Case No. 2:07-CV-13164

## <u>EXHIBIT 6</u>

**Joint Final Pretrial Order**

Dockets.Justia.com

UNITED STATES DISTRICT COURT
IN THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EIGHT MILE STYLE, LLC and
MARTIN AFFILIATED, LLC,

       Plaintiffs                               Case No. 2:07-CV-13164
                                           Honorable Anna Diggs Taylor
vs.                                        Magistrate Judge Donald A. Scheer

APPLE COMPUTER, INC. and
AFTERMATH RECORDS d/b/a
AFTERMATH ENTERTAINMENT,

       Defendants.

_____/

## JOINT FINAL PRETRIAL ORDER

                     At a session of said Court, held in the Federal
                     Courthouse in the City of Detroit, County of
                     Wayne, State of Michigan, on this _____

       Present: HONORABLE _____Anna Diggs Taylor_____
                                United States District Judge

       Pursuant to Civil Local Rule 16.2, Counsel for Plaintiffs Eight Mile Style, LLC and

Martin Affiliated, LLC and for Defendants Apple Inc. and Aftermath Records submit the

following proposed Joint Final Pretrial Order in the above-captioned matter.

## A.     **JURISDICTION**

       This Court has jurisdiction over Plaintiffs' claim of copyright infringement pursuant to 17

U.S.C. § 101 *et. seq.* and 28 U.S.C. §§ 1331 and  1338(a) and (b).

### B.   PLAINTIFFS' CLAIMS

Plaintiffs are the owners and administrators of the registered copyrights in certain compositions written, in whole or in part, by Marshall B. Mathers III p/k/a Eminem ("Eminem"), Jeff Bass, Mark Bass, Steve King, and Luis Resto.  Each of the above writers granted Plaintiffs their ownership and/or administration rights by written assignment.  This case involves 93[1] compositions owned and administered in whole or in part by Plaintiffs ("Plaintiffs' Compositions").

Defendant Apple is the largest licensee of musical compositions and sound recordings in the world, and operates iTunes, which reproduces and sells, among other things, sound recordings embodying each of the compositions at issue in this case in permanent download format.  Defendant Aftermath licenses to Apple the right to reproduce and sell the musical compositions involved herein, and has reproduced and provided the compositions to Apple for that purpose.  Aftermath has done so even though it not only does not have a digital phonorecord deliver ("DPD") license from Plaintiffs authorizing the reproduction of Plaintiffs' Compositions for digital download, but Plaintiffs specifically refused them such licenses in those cases where Aftermath sought a license.[2]

Apple does not, therefore, have a valid license authorizing the reproduction and sale of Plaintiffs' Compositions as permanent downloads, and Apple has, therefore, infringed Plaintiffs' Copyrights by reproducing and selling such compositions as permanent downloads.  Aftermath is also liable for direct, contributory, and vicarious infringement.  Aftermath and Apple were aware

---

[1] The parties are currently discussing whether all 93 compositions will remain part of this action, or whether the issues with respect to certain of the compositions can be resolved.

[2] Except in one instance – a limited license, with a specific term, now ended, covering the song, "Lose Yourself."

of Plaintiffs' objections to the sale of its compositions in digital format, but continued to infringe the rights of Plaintiffs by the actions more fully described herein.  As a result, these Defendants are liable for willful direct, contributory, and vicarious copyright infringement, and Plaintiffs are entitled to actual damages as well as Defendants' profits for each separate infringement, or, in the alternative, to the maximum statutory damages for willful copyright infringement of $150,000 per infringement.

a. **Statement of Facts**

1. **The Eminem Recording Agreements**

Aftermath's rights (or lack thereof) in Plaintiffs' Compositions are governed by its original 1998 recording agreement with F.B.T. Productions, LLC (Eminem's production company at the time) and its 2003 recording agreement with Eminem.  Briefly, Eminem was discovered in the early 1990s by F.B.T. Productions, a small Detroit production company owned by Mark and Jeff Bass.  In 1995, Eminem signed an exclusive recording agreement with F.B.T. (the "1995 Agreement").  Among other things, Eminem granted F.B.T. and its successors all of his ownership interests, including the copyrights, in musical compositions he wrote during the term of that agreement in exchange for royalties and other consideration.  In approximately 2000, F.B.T. granted all of its ownership and administration rights to a newly formed entity, Eight Mile Style, LLC.  A portion of Eight Mile Style's interests were later granted to Martin Affiliated, LLC.

In 1998, F.B.T. signed an agreement furnishing Eminem's services as a recording artist to Aftermath.  That agreement was later amended in 2000[3] and, in 2003, a new recording agreement

---

[3]  The 2000 Agreement is not relevant to this action.

was entered into between Eminem and Aftermath, which affirmed all prior agreements (the "2003 Agreement").  The 1998 and 2003 Agreements both give Aftermath full ownership, including copyright, of master sound recordings delivered under those agreements; however, Plaintiffs retained ownership, including copyright, of all musical compositions embodied in those sound recordings.  The 1998 and 2003 Agreements state that California law will govern their interpretation.

Neither the 1998 nor 2003 Agreements grant Aftermath or UMG licenses in Plaintiffs' Compositions.  Instead, a single section in both agreements, titled "Mechanical Royalties," addresses a procedure pursuant to which Aftermath may seek to obtain mechanical licenses from Plaintiffs at rates below the rates prescribed by statute.  In the 1998 Agreement, that section reads as follows:

> All Controlled Compositions (i.e., songs written or controlled, directly or indirectly, in whole or in part, by F.B.T., Artist, any affiliated company of F.B.T., Artist, any producer or any affiliated company of any producer) will be licensed to Aftermath and its distributors/licensees and Aftermath and its distributors'/licensees' Canadian licensee for the U.S. and Canada, respectively, at a rate equal to 75% (the "Controlled Rate") of the minimum statutory rate (*i.e.*, without regard to the so-called "long-song formula") which is in effect in the applicable country upon the date the earlier of the actual delivery date of such master or the date such master was supposed to be delivered in accordance with the agreement.

The "Mechanical Royalties" paragraph thus is not itself a self effectuating "mechanical license" of "Controlled Compositions," and does not purport to grant rights or permissions necessary under copyright law to reproduce and distribute musical compositions.  It merely sets a reduced royalty rate at which such mechanical licenses can be obtained by Aftermath "and its distributors/licensees," sometime in the future.  The wording of the above paragraph is in stark contrast with other recording agreements drafted by Aftermath, which either state that controlled

compositions "are hereby licensed" or that the artist in question "grants an irrevocable license" to the record label.[4]

The purpose of the "Mechanical Royalties" clause is to allow Aftermath a method through which to obtain mechanical licenses for compositions embodied in sound recordings delivered under the contract at a reduced rate (such a negotiated license would also be negotiated to include standard terms for audits and frequency of accounting, among other terms). . For example, the "Mechanical Royalties" provision in the Recording Agreements provide for the following reductions:

- A "Controlled Rate" of only 75% the minimum rate set by copyright law[5]

- The "long song formula," which provides for increased royalties for any song of more than five minutes in length, does not apply

- The "Controlled Rate" is fixed as of the earlier of the date the sound recording embodying the composition in question was delivered or scheduled to be delivered

- A "cap" providing that mechanical royalties for an LP would be paid as though it contained only 10, 11, or 12 compositions each, as opposed to the number actuall on the album - 20, on both *The Eminem Show* and *Encore*

---

[4] There was virtually no discussion of the "Mehcanical Royalties" section when the 1998 Agreement was negotiated, except concerning royalty rates and "caps" described herein. During negotiation of the 2003 Agreement, discussion of this provision was similarly limited to revising the royalty rate and other "caps."

[5] The 2003 Agreement provides for a "full" statutory rate, not 75%, but the other reductions are still present.

As discussed more fully below, at the time of entering into the 1998 Agreement, the legislative history of § 115 of the Copyright Act made clear that the provisions discussed above are prohibited from applying to permanent downloads.

**2. Defendants Seek Digital Licenses from Plaintiffs**

On October 9, 2001, the Recording Industry Association of America, Inc. ("RIAA"), a trade group representing the major, multinational record companies, the National Music Publishers' Association Inc. ("NMPA"), and The Harry Fox Agency, Inc. ("HFA"), the largest U.S. licensing agency for music publishers, negotiated an interim "Industry Agreement" which only pertained to the licensing of "On-Demand Streams" and "Limited Downloads." *See* Doc. No. 74, Ex. 20 at 12-30. That agreement only related to these formats – "limited downloads" and "streams," and not to permanent downloads. This "Industry Agreement" was applicable only to labels and publisher members of signatories RIAA, NMPA and HFA. *See* Doc. No. 74, Ex. 21, Joint Statement. Plaintiffs are not, and never have been, affiliated members of any of these groups.

Immediately after the RIAA, NMPA, and HFA announced their agreement, beginning in December 2001, UMG's copyright department wrote a letter to Eight Mile referring to the October 2001 "Industry Agreement" and stating that "NMPA and RIAA have agreed to the use of interim licenses to cover the use of musical works for 'Permanent Downloads." UMG further requested and "hoped" that Eight Mile would license its musical compositions to UMG, not just for "On-Demand Streams" and "Limited Downloads," but also for permanent digital downloads. Had Defendants believed the 1998 and 2003 Agreements granted them permanent digital

download licenses in Plaintiffs' compositions, they never would have written Plaintiffs to ask for such licenses.

Further, it is UMG's practice to send out "license requests" to a music publisher only where UMG believes the "controlled composition clause" in the recording agreement in question does not "specifically grant" a license. Where UMG does believe the controlled composition clause "was a license" or where they had an "agreement in place," UMG's practice is merely to send an "advice letter," informing the publisher its composition is being released on an album, advising the publisher of the album's release date and the rate being paid. Here, UMG's practice of sending license requests to Eight Mile for its compositions in both physical and digital formats also indicates UMG and Aftermath did not believe the "Mechanical Royalties" provisions granted them licenses. UMG never once sent an "advice letter" to Eight Mile.

### 3. Plaintiffs Negotiate a License for One Composition, which Defendants Never Execute

Plaintiffs finalized licenses with Aftermath/UMG for reproduction of their musical compositions on *physical* products, such as compact discs, but repeatedly declined to execute the proposed digital download licenses accompanying the letters beginning in December 2001. Eight Mile acted cautiously because digital configurations, including permanent downloads, were still very new and it did not know "what accountings would look like," "who was going to be selling it," or other relevant information Eight Mile wanted before issuing licenses for permanent downloads. At that time, iTunes did not exist and Plaintiffs understood that a UMG-owned or controlled company called PressPlay would be offering permanent downloads directly to consumers. Only later did it became apparent that UMG would instead be licensing

compositions to third parties such as Apple who, instead of accounting directly to Plaintiffs, would account to and pay UMG.

While Eight Mile did eventually agree to license a single Eminem composition, "Lose Yourself," for DPD, it did so only after ensuring that certain terms were in that agreement. Eight Mile and UMG negotiated a jointly prepared Digital download license reflecting: (1) a two-year term (not a perpetual term); (2) the payment of a full statutory rate subject to statutory increases or industry convention, not a reduced rate; (3) quarterly (not semi-annual) accountings and payment; and (4) Eight Mile's right to terminate the license after two years or at any time upon any breach of the license's terms. Again, had UMG believed they already had such a license, or that Plaintiffs were compelled to grant them licenses under the Recording Agreements, there would have been no reason for them to agree to these terms, which Defendants admit are less favorable than the terms they offer to must publishers. UMG representatives were unable to offer any reason they would agree to the above terms if they believed they already had a license, or had a right to obtain one under less onerous terms.

Eight Mile signed the single, proposed DPD license and sent it to Pat Blair, head of UMG's copyright department. Plaintiffs spoke with Ms. Patricia Blair, head of UMG's copyright department, at that time and thereafter, and other UMG copyright department employees, including Chad Gary, Todd Douglas and Tim Hernandez, communicating their objections to any other of plaintiffs' compositions being licensed or sublicensed to digital download companies. Ms. Blair confirmed she, Chad Gary, and Rand Hoffman (Interscope's head of business and legal affairs) were aware of Plaintiffs' objections. Although Plaintiffs sent

a signed copy of the license covering "Lose Yourself" to UMG on or about October 17, 2002, UMG never countersigned and returned the "Lose Yourself" license to Eight Mile.

Even during discovery in this litigation, defendants would not say who, if anyone, approved the "Lose Yourself" license or whether it was in effect.  It was not until July 3, 2008, that defendants, by letter, stated that some unknown person at UMG approved the "Lose Yourself" license, and that UMG believed it to be effective. Without conceding its effectiveness in the absence of UMG's countersignature and return thereof, on August 11, 2008, Plaintiffs terminated in writing the "Lose Yourself" DPD license.  Defendants sent Plaintiffs a "notice of intent to obtain compulsory license," but that license was invalid as a result of a number of procedural defects: for example only, the notice was served prior to the exploitation described therein and it purported to request a license on behalf of entities other than the requesting company without providing the identifying information or signatures of those other entities, as required by law.

**4. UMG and Apple Enter into an Agreement to Allow Apple to Offer UMG Songs as Permanent Downloads**

In December 2002, UMG Recordings, Inc. ("UMG") and Apple entered into an agreement whereby UMG licensed its master sound recordings to Apple for reproduction, distribution and sale by Apple, and purported also to sublicense to Apple the reproduction and distribution rights with respect to the musical compositions embodied in those master recordings. Courts have long recognized the existence of separate and distinct copyright ownership (and the suite of rights derived from copyright ownership, in a sound recording, as distinguished from a musical compositions.  *E.g.*, *Bridgeport Music, Inc. v. Dimension Films*, 410 F.3d 792, 800 (6th Cir. 2005).  Apple must have licenses to reproduce and distribute both the master sound

recordings and the underlying musical compositions provided to it by UMG,[6] and the UMG-Apple Agreements provide by their terms that Apple has a license from UMG to do just that. Apple officials have testified before the Copyright Royalty Board in the Section 115 Rate Proceeding that Apple sublicenses the musical compositions embodied in master sound recordings from UMG and other record labels. However, neither Apple nor UMG ever obtained valid DPD licenses from Plaintiffs.

Pursuant to their agreement with Apple, UMG receives a royalty for each song sold on iTunes, generally 70% of the price charged to end users - $0.70 for a $1.00 download, for example. Aftermath, through its distributor, provides Apple with two files for each song offered by Apple – one of the song itself, and a second containing "metadata," which includes identifying information such as the name of the song and the artist, and other information such as the date of release and the date Apple can begin selling the song to consumers. Apple then combines these two files into a single audio file that it reproduces on its internal servers and sends a copy to a third party vendor, Akamai, and Akamai reproduces the song on servers localed throughout the United States and around the world. Every time a user downloads a song, a new copy of that song is created on the user's computer. However, UMG retains the right to withdraw songs from Apple's service at any time, and Apple must destroy all copies of withdrawn songs and cease selling them to end-users. As discussed below, these activities make both Aftermath and Apple liable for direct, contributory, and vicarious copyright infringement.

Once iTunes launched, Apple neither accounted to nor paid Plaintiffs directly. Instead, Apple accounted and paid royalties for Plaintiffs' Compositions directly to UMG. The royalty

---

[6] *See* 17 U.S.C. § 106(1)(3)(rights to reproduce and distribute are exclusive to copyright owner); *see also U.S. v. ASCAP*, 485 F.Supp. 438, 443-44 (S.D.N.Y. 2007).

statements that UMG then provided Plaintiffs beginning in 2003 did not (1) identify any particular composition for which DPD revenue was being paid or (2) identify any specific revenue directly related to DPDs. While UMG's royalty statements generally identified other configurations by specific type (e.g., "CD" for compact discs, and "CS" for cassette tapes), revenue from digital exploitations was initially identified simply as "Other," and eventually as "ID." Some of the later royalty statements contained a 1-page "Glossary" that defined "ID" as "digital track," but UMG did not identify what form of "digital" income was being reported (*e.g.*, ringtones, mastertones, streaming, mobile, or limited or permanent downloads). A single check accompanied each statement and included amounts for sale of authorized physical product, and small amounts attributable to items identified as "Other" or "ID."

Plaintiffs did not know the royalty payments they received contained monies for digital downloads they specifically had refused to authorize, and UMG admits there was no way for plaintiffs to determine by looking at their royalty statements what iTunes, (or any number of UMG's other purported digital licenses) reported for permanent digital download revenue of Plaintiffs' Compositions in any given period or even if any of the monies related to permanent digital downloads at all. It was only after a 2006 audit of UMG's accounting of royalties for sound recordings that Plaintiffs first learned that "Other," or "ID" on the publisher royalty statements from UMG included permanent digital downloads of Eminem Compositions. Plaintiffs steadfastly insisted that they would only issue permanent digital downloads licenses directly to a third party licensee (Apple), as Plaintiffs believe is their right.

The reason is simple. UMG's method of accounting, which provided no transparency as to what entities were reproducing and distributing Plaintiffs' Compositions, and only a very

limited indication of what digital configurations Plaintiffs' Compositions were being exploited in, also allowed UMG to disguise the fact that it never paid *any* royalties for 8 compositions that were sold by iTunes in albums and as individual downloads, and for which iTunes paid UMG thousands of dollars. This utter failure to pay illustrates how, by purporting to grant DPD licenses to third parties such as Apple, UMG has acted to frustrate any attempt by Plaintiffs to serve as a fiduciary for their writers, precluding any meaningful audits for digital configurations and any attempt to enforce payment provisions that could enable Plaintiffs situations such as this, where UMG has collected royalties from Apple for downloads but willfully failed to pay Plaintiffs. Plaintiffs had no way of discovering this malfeasance until these facts were revealed in this case.

### 5. Plaintiffs Refuse Subsequent Requests from UMG for Digital Licenses

Over an extended period, UMG peppered Plaintiffs with license requests for permanent download licenses, sending such requests with a note that they had "utilized the same format and terms" as in the "Lose Yourself" license - *e.g.*, two year term, right of termination, quarterly accounting, etc. Plaintiffs did not execute or return any of those proposed licenses or any other license that would have authorized the Eminem Compositions' exploitation as DPDs, either refusing requests entirely or, if a single document asked for licenses covering both digital and physical configurations, issuing their own licenses to UMG that "remove[d] references on the license itself to digital configurations." UMG acknowledged the licenses did not encompass digital configurations by countersigning the licenses drafted by Plaintiffs that covered only physical configurations. The rates in the licenses issued by Plaintiffs conformed to the rates

described in the "Mechanical Royalties" provisions of the 1998 and 2003 Recording

Agreements.

### a. Defendants Belatedly Contend They Have Obtained Licenses from Co-Owners

Defendants first moved for summary judgment on May 5, 2008 based on the language of

the "Mechanical Royalties" provision in the 1998 and 2003 Agreements and a theory that

Plaintiffs had "impliedly" licensed their compositions for permanent download. Discovery in

this case originally closed on June 2, 2008, Doc. No. 46, but, beginning shortly after that date,

Defendants produced hundreds of pages of additional exhibits, consisting of recording

agreements with third parties and licenses for Plaintiffs' Compositions allegedly granted by third

parties, then immediately moved for summary judgment based on these documents on July 16,

2008. *See* Doc. No. 53.

Defendants produced these documents – thousands of pages, all told, only as an

afterthought, when they recognized the meritlessness of their argument that the Recording

Agreements granted them the licenses they needed, and their production of these documents

continued through, most recently, June 2009, when they produced an additional 3,000 pages of

such documents. Most of these documents are simply irrelevant and do not even purport to grant

licenses in digital configurations. Further, all of these documents do not provide them any

argument concering the songs 100% owned and administered by Plaintiffs, which are discussed

below.

### b. The Co-Author Recording Agreements

Some of the co-authors of Plaintiffs' Compositions are also musical artists signed to

recording agreements with Aftermath or other Universal-controlled entities: Curtis Jackson p/k/a

50 Cent, Lloyd Banks, Andre Rommell Young p/k/a Dr. Dre, the members of the musical group D-12, and Obie Trice. While these artists' recording agreements (the "Co-Author Agreements") vary in a number of ways, each of these recording agreements has a section titled "Licenses for Musical Compositions" that reads, in relevant part: "You and the Artist grant to Label and its Licensees and their designees an irrevocable license, under copyright, to reproduce each Controlled Composition…"[7] The Co-Author Agreements also contain some or all of the other rate restrictions that are present in the 1998 and 2003 Agreements – a reduction of the statutory rate otherwise required, a ten-song "cap," fixing the statutory rate on a certain date to avoid subsequent increases, etc.

### 6. Written Licenses

Defendants have also included on their exhibit list hundreds of documents they will contend are licenses for the compositions at issue from Plaintiffs' co-owners. Plaintiffs will move to exclude many of these documents as irrelevant and will show in their motion that most of these documents fail for one or more of the following reasons: they are incomplete, consisting, for example, of a fax cover page but no attachments; they do not purport to issue a license for a permanent download configuration; or they are unsigned, either by UMG or by the co-owner. The licenses that appear on Defendants' exhibit list are too numerous to address herein with any hope of precision and Plaintiffs will address them in full in a forthcoming motion *in limine*.

### 7. Summary of the Compositions at Issue and Defendants' Claimed Sources of Licenses

---

[7] The quoted text is from the 50 Cent recording agreement. The "Licenses for Musical Compositions" text in the other agreements is nearly identical, differing only by whether the agreement is directly with the artist, as opposed to an entity furnishing the artist's services, and by identifying the label in question.

Given the varied sources of "licenses" cited by Defendants, as described above, the 93 compositions can be considered in four categories based on the differing documents that will need to be analyzed to determine whether Defendants have any license allowing digital exploitation of any of the musical compositions involved in this action.

First are those compositions owned and administered 100% by Plaintiffs. For those compositions, the Court need only consider the language of the "Mechanical Royalties" provision in the 1998 and 2003 Recording agreements and the "license requests" that UMG sent Plaintiffs that were either declined or edited to remove reference to digital configurations.

Second are the compositions with one or more co-authors for which Defendants claim a license through a controlled composition clause in another recording agreement, a written license from a co-author, or both.

Third are compositions for which the Harry Fox Agency ("HFA") has allegedly issued a license. Several co-owners and/or administrators of Plaintiffs' Compositions, including but not limited to EMI, Ensign, and Music of Windswept, are HFA-represented publishers, and Defendants have produced documents purporting to demonstrate that HFA issued licenses in a permanent download configuration for those compositions.

Finally, "Lose Yourself" falls in a category of its own.

### a. Compositions Owned and Administered 100% by Plaintiffs

As described above, this category of compositions are those owned and administered 100% by Plaintiffs. Thus, in analyzing Defendants' claims that they have valid licenses for the compositions in this category in a permanent download format, the Court need not consider recording agreements other than the 1998 and 2003 Agreements or any licenses purportedly

granted by co-owners. The songs in this category are: 8 Mile, Curtains Close, Curtains Up, Em Calls Paul, Final Thought, Just Don't Give a Fuck, Love You More, Mockingbird, My 1st Single, Paul, Puke, Rabbit Run, Ricky Ticky Toc, Steve Berman, Steve's Coffee House, The Kiss, We As Americans, and Yellow Brick Road.

In addition, Defendants have never even attempted to obtain licenses for permanent downloads for eight of these compositions: Curtains Close, Curtains Up, Dude, Em Calls Paul, Final Thought, Paul, Steve Berman, and The Kiss. All of these compositions were sold by Apple in its iTunes Music Store not just as part of Eminem's albums but also jut like all other individual songs, and Apple in turn paid Universal $0.70 per downlaod but Universal has paid Plaintiffs absolutely nothing for those downloads, keeping the over $50,000 received from Apple for itself. Aftermath will claim that these songs are shorter compositions and that publishers sometimes grant licenses where they waive mechanical royalties when such compositions are sold in physical format as part of an entire album. Aftermath will claim that these songs fall under that category so it need not have either obtained a digital download license or paid mechanical royalties to Plaintiffs when they were reproduced and sold by Apple as individual tracks or as part of a digital download of an album. This is nonsense and represents the best illustration of why Plaintiffs should be entitled to enter into a direct licensing agreement with Apple. These songs are being sold individually by Apple just as all of the other tracks on the particular albums are being sold, and Apple is paying Aftermath mechanical royalties for such sales. There is absolutely no justification for Aftermath failing to pay Plaintiffs its mechanical royalties and for the failure to obtain the appropriate license from Plaintiffs. The conduct of the

Defendants in this regard makes them liable for copyright infringement, and there is no exception under the law for these musical compositions.

### b. Compositions With Co-Owners Not Administered by Plaintiffs

Compositions not owned and administered 100% by Eight Mile Style raise several issues in addition to those discussed above.

First, some of the compositions in this category were written in part by musical artists who themselves have recording agreements with Aftermath or another Universal-owned record label. This includes all songs co-authored by Dr. Dre, 50 Cent, the members of D12, Obie Trice, and Lloyd Banks: Business, My Dad's Gone Crazy, Say What You Say, Ass Like That, Big Weenie, Encore, Evil Deeds, Just Lose It, Mosh, Never Enough, Rain Man, Guilty Conscience, Role Model, The Real Slim Shady, Without Me, Love Me, Average Man, Cheers, Don't Come Down, Follow My Life, Got Some Teeth, Hands on You, Hoodrats, Lady, Never Forget Ya, Outro, Shit Hits the Fan, Spread Yo Shit, We All Die One Day, 40 Oz., 6 in the Morning, American Psycho 2, Bitch, Get My Gun, Git Up, How Come, Keep Talkin' Leave Day Boy Alone, Loyalty, My Band, GATman and Robbin, I'm Supposed to Die Tonight, Don't Push Me, High All the Time, Many Men (aka Death Wish), Patiently Waiting, On Fire, Til the End, and Warrior Part 2.

Second, for many of the above compositions, Aftermath (through its parent corporation UMG Recordings, Inc.) claims to have a valid permanent download license from one or more co-authors. As described above, Defendants waited until late June 2009 before producing three thousand additional pages of documents, much of which consists of 2-4 page "licenses," and most of which they have included on their exhibit list. However, Defendants are depending *only*

on the controlled composition clauses in the Eminem/F.B.T. recording agreements and the co-author recording agreements for the following compositions: 40 Oz., 6 in the Morning, 8 Miles & Running, American Psycho 2, Big Weenie, Bitch, Business, Evil Deeds, Get My Gun, Git Up, How Come, Leave Day Boy Alone, Like Toy Soldiers, Mosh, My Band, One Shot 2 Shot, Places to Go, Rain Man, Rap Game, Say Goodbye to Hollywood, Shit on You, and Spitshine.

The compositions for which Aftermath claims a valid written license *not* contained in a controlled composition clause are as follows: Ass Like That, Big Weenie, Encore, Evil Deeds, Just Lose It, Mosh, Never Enough, Rain Man, Spend Some Time, Average Man, Cheers, Don't Come Down, Follow My Life, Got Some Teeth, Hands on You, Hoodrats, Lady, Never Forget Ya, Outro, Shit Hits the Fan, Spread Yo Shit, We All Die One Day, Keep Talkin', Loyalty, GATman and Robbin', I'm Supposed to Die Tonight, Don't Push Me, High All the Time, Many Men (Wish Death), Patiently Waiting, On Fire, and Warrior Part 2. Thus, for the songs listed in this paragraph, Defendants argue that even if the "controlled composition clauses" in the recording agreements listed above do not give Universal the right to issue Apple licenses in a permanent download configuration, the written licenses they have would still insulate them from liability.

### c. Compositions Allegedly Licensed by the Harry Fox Agency

The third category of compositions are those allegedly licensed through the Harry Fox Agency by Ensign Music, allegedly on behalf of Eight Mile Style. These compositions are: Cleaning Out My Closet, Drips, Got Some Teeth, Guilty Conscience, Hailie's Song, Just Lose It, Many Men (Wish Death), My Dad's Gone Crazy, Patiently Waiting, Role Model, Say What You

Say, Sing For the Moment, Soldier, Square Dance, Superman, The, Real Slim Shady, Till I
Collapse, When the Music Stops, and Without Me.

### d. "Lose Yourself"

Finally, "Lose Yourself" falls in a category of its own, due to the unsigned license, <u>its</u>
subsequent termination, and the Defendants' attempt to obtain a compulsory license described
above. The issues concerning "Lose Yourself" are limited to whether Defendants have now
obtained a valid compulsory license for this composition.

### b. Legal Arguments

Defendants are liable for direct, contributory and vicarious copyright infringement. To
prove direct copyright infringement, Plaintiffs need only show two things: ownership and
copying. *Feist Publications, Inc. v. Rural Telepone Serv. Co.*, 499 U.S. 340, 361 (1991).
"Copying" consists of any violation of the six rights exclusive to a copyright owner:
reproduction, creation of derivative works, distribution, public performance, public display, and
performance by digital audio transmission. 17 U.S.C. § 106. Vicarious liability for copyright
infringement exists where a defendant has the right and ability to supervise the infringing
conduct and "an obvious and direct financial interest in the exploitation of the copyrighted
materials." *Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304, 307 (2d. Cir. 1963).
Contributory infringement is proven where a party has knowledge of an infringing activity and
induces, causes or materially contributes to the infringing conduct of another. *Gershwin Publ'g
Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971).

As described above, Eddy Cue, head of Apple's iTunes division, testified that Apple
receives two files from Aftermath for each song they sell, and Apple combines the two files,

reproduces them, and sells audio files containing those songs to users. Lacking a license to carry out these activities, Apple is liable for direct copyright infringement.

Aftermath provides Apple copies of Plaintiffs' Compositions without a license, not just contributing to, but actually enabling Apple's infringing conduct. Aftermath has a direct financial interest in Apple's activities because it receives a royalty from Apple every time a user downloads a composition. Furthermore, under their contract with Apple, Aftermath has the right and ability to "supervise" Apple because it can unilaterally remove any song from Apple's service without notice and cause Apple to cease its infringing conduct. Despite Plaintiffs' protests, Aftermath has not done so. As a result, Aftermath is liable for direct, contributory, and vicarious copyright infringement.

As the victims of copyright infringement, Plaintiffs are entitled to Defendants' actual damages and profits or, in the alternative, to statutory damages of up to $150,000 per infringement, plus attorneys' fees and costs.

The defenses Apple and Aftermath raise to these allegations are without merit.

As described above, Plaintiffs have divided the compositions into the four categories listed above, based on the varying arguments Defendants have raised. For the compositions under heading 1, the Court need consider only the 1998 and 2003 Recording Agreements and the various unsigned, edited, and/or rejected licenses exchanged by Plaintiffs and UMG. For the compositions under heading 2, the Court must consider not only the above items, but also the Co-Author Recording Agreements (whether they grant a valid license) and/or various licenses allegedly issued by co-authors. For the third category of documents, the Court needs only to review a small number of licenses allegedly issued by the Harry Fox Agency. Finally, to assess

whether the unsigned "Lose Yourself" license allows Defendants to escape liability for their use of that composition as a permanent download, the Court need only consider that license itself and its subsequent termination and Defendants' attempt to obtain a compulsory license.

### 1. The Recording Agreements do not grant a license

First, to determine whether Defendants have infringed the compositions for which they have not produced a written license covering permanent downloads, the Court must consider whether the recording agreements in question grant a valid license – only the 1998 and 2003 agreements for those compositions owned and administered wholly by Plaintiffs, and also the co-author recording agreements for compositions with additional owners.

### 2. Interpretation of the 1998 and 2003 Recording Agreements – Plain Language

California law is clear that a contracting party's undisclosed, subjective intent is irrelevant to, and therefore is inadmissible to prove, the objective meaning of that contract's terms. *See General Motors v. Superior Court*, 12 Cal. App. 4th 435, 442 (1993); *Berman v. Bromberg*, 56 Cal. App. 4th 936, 948 (1997); *Houghton v. Kerr Glass Manufacturing Corp.*, 261 Cal. App. 2d 530, 537 (1968). Because the subjective, unexpressed intent of a party is immaterial to a contract's meaning, that intent is "entirely inadmissible to show the meaning of the contract." *Ribiero v. Dotson*, 187 Cal. App. 2d 819, 821 (1960); *see also Oakland-Alameda County Coliseum, Inc. v. Oakland Raiders, Ltd.*, 197 Cal. App. 3d 1049, 1058 (1988). *Alex Robertson Co. v. Imperial Casualty & Indemnity Co.*, 8 Cal. App. 4th 338, 346 (1992) (evidence that purchaser of insurance policy intended third party to be additional insured was inadmissible because unexpressed).

Thus, any attempt to offer evidence as to the subjective intent of Aftermath or its attorneys in drafting and agreeing to the language of the "Mechanical Royalties" provision must fail, and the Recording Agreements will be interpreted according to their plain language, although relevant extrinsic evidence, including "the subsequent conduct of the parties, and the common usage of particular terms in a given industry" may be offered into evidence.  *Miller*, 318 F. Supp. 2d at 934; *see Pacific Gas*, 69 Cal.2d at 38-39; *United Cal. Bank v. THC Financial Corp.*, 557 F.2d 1351, 1360 (9th Cir. 1977).  Other typs of extrinsic evidence simply cannot vary or alter the terms of a written agreement.  *See, e.g., Amtower v. Photon Dynamics, Inc.*, 158 Cal.App.4th 1582, 1605 (2008); *Oakland-Alameda County Coliseum, Inc. v. Oakland Raiders, Ltd.*, 197 Cal. App. 3d 1049, 1058 (1988); *Palos Verdes Corp. v. Housing Authority*, 202 Cal.App.2d 827, 836 (1962).

By its plain language, the "Mechanical Royalties" provision simply memorializes certain (not all) of the terms upon which Aftermath may obtain a license at some point in the future and is not itself a license of any kind.  The provision literally only provides that controlled compositions "will be" licensed in the future at a reduced rate, containing none of the other terms that would be expected to be within a mechanical license.  If it were otherwise, or if Aftermath believed it to be otherwise, defendants would not have (i) sent dozens of license requests and proposed licenses to Plaintiffs for both physical and DPD product; (ii) entered into numerous mechanical licenses, accepting plaintiffs' drafts, covering physical goods, only; (iii) negotiated a digital download license for "Lose Yourself" or agreed to a two year term with a right to terminate thereafter; (iv) sent Plaintiffs digital download license requests for each composition, many with the same restrictions as provided in the "Lose Yourself" license, or (v) belatedly

attempted to obtain a compulsory license for "Lose Yourself" after plaintiffs terminated the digital download license, as discussed supra.

### 3. "Controlled Composition Clauses" are Inapplicable to Digital Phonorecord Deliveries

In 1998, DPD commerce did not exist as it now exists, notwithstanding the passage of the 1995 Digital Performance Rights in Sound Recordings Act ("Digital Rights Act"). 66 F.R. 4099-14103, Vol. 66 No. 47 (Mar. 9, 2001). Apple did not launch its iTunes Store until sometime in 2003, and when the 2003 Agreement was executed, Plaintiffs had not even heard of iTunes.

When the 1995 Digital Rights Act was passed, Section 115 of the Copyright Act was amended to provide that while DPDs were subject to compulsory licensing at the statutory rate, any contract made after June 22, 1995 could not reduce the mechanical rate on DPDs. 17 U.S.C. § 115(c)(3)(E)(i). In other words, Aftermath's prospective controlled composition clauses in the 1998 and 2003 Agreements that permanently fixed a 75% reduction in the statutory rate and caps on the number of compositions upon which mechanical royalties would be paid once a mechanical license was issued were made inapplicable to DPDs by Congress. *Id.*

Indeed, it was the specific intent of the Senate in amending Section 115 to address digital transmissions that controlled composition clauses (similar to the "Mechanical Royalties" paragraphs herein), did not govern DPDs, explaining the amended Section 115(c)(3)(E)(i) as follows:

> There is a situation in which the provisions of voluntarily negotiated license agreements should not be given effect in lieu of any mechanical royalty rates determined by the Librarian of Congress. For some time, music publishers have expressed concerns about so-called 'controlled composition' clauses in recording contracts. Generally speaking, controlled composition clauses are provisions whereby a recording artist who is the

author of a non-dramatic musical work agrees to reduce the mechanical royalty rate payable when a record company makes and distributes phonorecords which include recordings of such artist's compositions. Subject to the exceptions set forth in subparagraph (E)(ii), **the second sentence of subparagraph (E)(i) is intended to make these controlled composition clauses inapplicable to digital phonorecord deliveries.**

Pub. L. No. 104-39, 109 Stat. 336, S. Rep. 104-208 at 41.

Thus, Congress specifically stated that its intention in enacting the amendment discussed above was not just to ensure that a musical artist would receive the statutory minimum rate for DPDs but to make such clauses "*inapplicable*" to digital phonorecord deliveries. Thus, the "Mechanical Royalties" section (which only states that there will be a license at a reduced rate) is statutorily "inapplicable" to permanent downloads.

In addition, even if certain controlled compositions by their language might arguably apply to permanent downloads, there still exists another question: whether the artist had any right to grant a license. Where third parties have purported to grant licenses within their recording agreements to the underlying musical compositions, they may not have had the right to do so as a result of entering into administraton agreements with third parties. In such cases, only their administrators have the right to enter into digital download agreements under the terms of their agreements with the artists. In the cases where Defendants are relying on third party controlled compositon clauses, the Court must also determine whether those artists have the right to grant any licenses, and whether Defendants obtained licenses from their administrators, who are the parties having such right.

    **4.  Many of the Written Licenses Do Not Apply to Permanent Downloads on their Face**

The next category of songs involve those where Aftermath claims it actually has a license, separate from the controlled composition clause in a recording agreement, authorizing the licensing of the musical compositions for permanent download. As discussed below, however, many of these purported licenses have nothing to do with permanent downloads, and were dumped on Plaintiffs and the Court to confuse the issues.

Copyright licenses are construed narrowly and assumed to prohibit any use not authorized. *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1088 (9th Cir. 1989); *see also Hogan Sys. v. Cybresource Int'l., Inc.*, 158 F.3d 319, 324 (5th Cir. 1998) (noting that copyright licenses are to be given a narrow reading).

Most of the "licenses" Defendants have produced in this case, if they are even signed by the purported grantor, do not purport to grant licenses in permanent download configurations. Instead, they list "physical" configurations such as explicit CD, edited CD, vinyl, cassette, and so on. Under the case law outlined above, the Court cannot interpret licenses that list certain configurations as granting a license in configurations not listed. Limiting copyright licenses to the configurations listed is simply black-letter copyright law. *See, e.g., Rodgers & Hammerstein Org. v. UMG Recordings Inc.*, 2001 U.S. Dist. LEXIS 16111 at *15-*17 (S.D.N.Y. Sept. 25, 2001) (citing *Fred Ahlert Music Corp v. Warner/Chappell Music, Inc.*, 155 F.3d 17, 24 (2d Cir. 1998)); *see also Entm't v. KIDdesigns, Inc.*, 2005 U.S. Dist. LEXIS 44386 (M.D. Tenn. Sept. 14, 2005) (same).

Thus, the veritable plethora of licenses Defendants have produced authorizing Plaintiffs' Compositions to be reproduced on CDs, CDs with DVD inserts, cassette tapes, vinyls, etc., simply have no relevance to this case unless they also list permanent downloads as a

configuration being licensed. As mentioned above, Plaintiffs will move to exclude these irrelevant licenses. For the same reason, the licenses that Plaintiffs revised to remove references to permanent downloads cannot be construed as granting Defendants the licenses they were required to obtain for the exploitation at issue.

### 5. Harry Fox Licenses Only the Portion of Compositions they Administer

The final category of purported licenses are those issued by the Harry Fox Agency ("HFA") for certain compositions, but Harry Fox prominently states that it licenses compositions only on behalf of publishers it represents, and it does not represent Plaintiffs. HFA clearly states in multiple places on its website that if it does not represent all publishers of compositions, someone with a HFA license must still obtain a license from all additional publishers, and HFA's representative deposed in this case affirmed that this is their policy. HFA also only collects royalties on behalf of represented publishers, and it would be manifestly unfair to allow Aftermath (or any other potential licensee) to obtain a license for only a portion of a composition from HFA – which the licensee knows does not license the entire composition – and then pay royalties only to HFA, giving nothing to the non-HFA-represented publisher. Thus, the licenses Defendants purport to have obtained from HFA for less than 100% of the composition do not shield them from liability.

The Harry Fox Agency, the largest U.S. licensing agency for music publishers, explicitly notes this practice in multiple places on its website: someone wishing to exploit a composition needs to obtain a license not just from HFA for its represented publishers[8], but also must obtain

---

[8] As noted above, Plaintiffs are not represented by HFA.

direct licenses from all other publishers.  HFA confirmed in deposition in this case that this is its policy.

### 6.  Plaintiffs have Not Impliedly Licensed the Compositions

Defendants will also likely maintain that Plaintiffs granted them "implied" DPD licenses in the compositions.

An implied license may arise where "(1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes the particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute his work." *Lulirama Ltd., Inc. v. Axcess Broad. Serv.*, 128 F.3d 872, 879 (5th Cir. 1997).  "[I]mplied licenses are found only in narrow circumstances."  *John G. Danielson, Inc. v. Winchester-Conant Props., Inc.*, 322 F.3d 26, 40 (1st Cir. 2003) (citing *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 558 (9th Cir. 1990)).  As the Sixth Circuit has stated, the most important element of an implied license is a finding that "the copyright owners intended that their copyrighted works be used in the manner in which they were eventually used."  *Johnson v. Jones*, 149 F.3d 494, 501-02 (6th Cir. 1998).  "Without intent, there can be no license."  *Id.*

None of the three elements of an implied license exist in this case.  First, Defendants did not "request" the creation of musical compositions by either Eminem or Plaintiffs.  The Recording Agreements neither contemplate nor compel the creation of any compositions, rather they provide for the creation and delivery of *sound recordings*.  Furthermore, as to the second and third elements, Plaintiffs expressly *refused* to authorize the reproduction and distribution of their compositions as DPDs, and refused to license any of their works for digital distribution (except "Lose Yourself").

The cases Defendants cited in their summary judgment motion contain none of these facts, involving instead situations where a work was specifically created in fulfillment of a contract, delivered, and used precisely as intended under the contract. *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555 (9th Cir. 1990) (single work prepared and delivered), *Danielson*, 322 F.3d 26*,* (same), *I.A.E., Inc. v. Shaver*, 74 F.3d 768 (7th Cir. 1996) (same), and *Johnson v. Jones*, 149 F.3d 494 (same). Unlike here, in those prior cases finding implied licenses, each requesting party consulted with the other regarding the work to be done, delivered the work, but complained about money owed or other non-performance. *Effects*, 908 F.2d at 558-59; *Danielson*, 322 F.3d at 32, 41-42; *Shaver*, 74 F.3d at 771; *Johnson*, 149 F.3d at 497-498.) None of these cases involve a refusal of delivery, refusal to sign licenses, and continuing objections.

Defendants will also no doubt point to Plaintiffs' actions in cashing the checks that accompanied the quarterly publisher royalty statements they send to Plaintiffs as evidence of an implied license. However, as explained above, UMG included one check with each royalty statement. The act of cashing a check, when it includes small amounts of unauthorized income together with large sums of money from authorized uses, with no identification of the inclusion of royalties from unauthorized uses, is not the knowing acceptance of monies sufficient to form the basis of an implied license. Indeed, this matter points to Aftermath's duplicity rather than plaintiffs' intent or knowledge, since a finding of an implied license under these circumstances would effectively allow an infringer to avoid liability by ignoring objections and refusals to execute licenses by surreptitiously remitting revenue from unauthorized sources.

In effect, defendants argue a species of accord and satisfaction, under which a disputed debt may be satisfied upon acceptance of a check indicating payment in full. *See Scipio v. Sony*

*Music Entm't*, 173 Fed. Appx. 385, 394 (6th Cir. 2006) (citing *Lytle v. Clopton*, 149 Tenn. 655, 663-64, (Tenn. 1923) (quoting 1 Corpus Juris, 529)).  The creditor (here, by analogy, plaintiffs) must have accepted the check "with the intention that it operate as a satisfaction."  *Id.*  For the reasons shown herein, Plaintiffs' acceptance of a single check containing mostly royalties for authorized uses, but also containing small and hidden royalties for unauthorized uses, cannot operate as a satisfaction of a claim.

Furthermore, Defendants can in no way claim an implied license for the eight compositions that Apple has sold as permanent downloads and paid Aftermath royalties for such sales, but Aftermath has paid absolutely nothing to Plaintiffs.

## C.    DEFENDANTS' CLAIMS

Plaintiffs' infringement claim fails. All of the compositions at issue (the "Eminem Compositions") were licensed through Controlled Composition clauses in recording agreements, through separate mechanical licenses, or both.  Through these several licenses and Section 115 of the Copyright Act, Aftermath and other record labels may authorize Apple to reproduce and distribute records containing the Eminem Compositions through Apple's iTunes Store.  Even without these express grants of license, Plaintiffs' infringement claim would still fail.  At a minimum, Plaintiffs impliedly licensed the Eminem Compositions by delivering the compositions embodied in sound recordings that they knew would be distributed in all media now known or hereafter developed, and by accepting the proceeds of that distribution for years.

**The Eminem Recording Agreements' Controlled Composition Clause:**

Plaintiffs expressly licensed the Eminem Compositions for distribution in all configurations, including the permanent download form.  In recording agreements that Eminem, Aftermath and Plaintiffs' affiliate LLC entered into as of March 9, 1998 and July 2, 2003 (the "Eminem/Aftermath Agreements"), the parties agreed that Eminem would create master sound

recordings embodying compositions, and that Aftermath would own those masters.  The parties also agreed that Aftermath and its distributors and licensees would "have the exclusive right" to exploit the masters embodying the Eminem Compositions "in any and all forms of media now known or hereinafter developed." *See* Eminem/Aftermath Agreements, ¶ 8.

While Aftermath owns the copyright in the master sound recordings, the Eminem/Aftermath Agreements reserve ownership of the separate composition copyrights to their owners.  But the purpose of the recording agreements is to allow for the broad distribution of Eminem records, so Aftermath must ensure that it will be able to exploit its own rights in the sound recordings.  The Copyright Act recognizes and addresses the practical problem created when two separate copyrights are embodied in a single record.  To address that issue, the Copyright Act provides for compulsory licenses of compositions to be embodied in phonorecords, also called mechanical licenses. 17 U.S.C. § 115.  A mechanical license allows for the reproduction and distribution of records embodying compositions.

Recording agreements typically include a type of mechanical license, called a Controlled Composition clause.  The Eminem/Aftermath Agreements are no different.  In the Eminem/Aftermath Agreements, the Controlled Composition clause licenses all compositions written, co-written or controlled by Eminem or by Plaintiffs to Aftermath and its distributors and licensees.  *See* Eminem/Aftermath Agreements, ¶ 6 (all Controlled Compositions "will be licensed" to Aftermath and its distributors or licensees. . . ").  The definition of "Controlled Compositions" undisputedly includes all of the Eminem Compositions here.  Until this lawsuit, Plaintiffs never disputed that this Controlled Composition provision granted a license to embody the Eminem Compositions on records released in every configuration -- be it vinyl, cassette, compact disc, or any other form of media.  That only makes sense, given that Plaintiffs and Eminem have been paid millions of dollars for the distribution of records "in any form of media

now or hereinafter developed" that embody the Eminem Compositions, just as the Eminem/Aftermath Agreements provide.

Contradicting the contractual text, settled industry custom and practice, and their own performance under the agreements, Plaintiffs now contend that the Controlled Composition provision in the Eminem/Aftermath Agreements does *not* grant a license in the Eminem Compositions for records distributed in permanent download configuration. Because the Controlled Composition clause is written in the future tense, Plaintiffs claim that it only obligates them to issue a separate license in the future. The Controlled Composition clause, under Plaintiffs' theory, is essentially an "agreement to agree." Even under this reading, however, Plaintiffs still are obligated to license the Eminem Compositions. Because even under their own strained interpretation of the Eminem/Aftermath Agreements Plaintiffs are obligated to license the Eminem Compositions, they cannot sustain their infringement claim.

### Controlled Composition Clauses in Other Labels' Agreements with Eminem

In addition to the Eminem/Aftermath Agreements, Eminem entered into agreements with other labels authorizing the distribution of records embodying the Eminem Compositions. Those agreements include Controlled Composition provisions similar to the Controlled Composition provision in the Eminem/Aftermath Agreements. For example, Eminem entered into a recording agreement with Shady Records for the soundtrack to the movie "Eight Mile." ("Soundtrack Agreement"). Through the Soundtrack Agreement, Eminem "hereby license[d]" to Shady Records the compositions in masters included on that record. *See* Soundtrack Agreement, ¶ 6, 2.

Eminem also granted a license in compositions embodied in masters that he produced for Shady Records' artists. In an agreement among Shady Records, Interscope Records, Eminem, and Eminem's production company Angry Blonde, Eminem granted to Interscope and its designees "the irrevocable, non-exclusive right" to reproduce the compositions embodied in any

masters that he produced for Shady Records' artists.  *See* Amendment to First Look Agreement, ¶ 14 (adding ¶ 2(viii)).

**The Co-Writer Recording Agreements' Controlled Composition Clauses**

Several of the Eminem Compositions were co-written with other recording artists, including Dr. Dre, 50 Cent, D12, Obie Trice, and Lloyd Banks.  All of these recording artists are subject to their own recording agreements, each of which includes its own Controlled Composition provision.  The Eminem Compositions co-written with these co-writers thus were also licensed through the *co-writer's* Controlled Composition provisions.  With minor differences, those Controlled Composition provisions provide that the recording artists "grant an irrevocable license" in the compositions embodied on those co-writer's albums to the label, and to the label's licensees or designees.

**Individual Mechanical Licenses**

In addition to all of the above Controlled Composition provisions, Aftermath and other labels also executed separate, individual mechanical licenses for several of the Eminem Compositions.  These licenses provide explicitly that the particular composition has been licensed for distribution in permanent download format.

Many of these separate mechanical licenses were issued by co-writers.  Others were issued on behalf of Plaintiffs themselves.  For example, Plaintiff Eight Mile Style, LLC entered into a mechanical license specifically authorizing the distribution of records containing the composition "Lose Yourself" in permanent download format.[9]  Eight Mile Style also entered into co-publishing and/or administration agreements with Ensign Music Corp. ("Ensign").  On behalf of Plaintiff Eight Mile Style, Ensign (and its parent, Famous Music) issued mechanical licenses for several of the Eminem Compositions to be distributed in permanent download format.  Eight

---

[9] Although Plaintiff Eight Mile Style purported to terminate this mechanical license for "Lose Yourself" in August of 2008, Aftermath immediately availed itself of the compulsory license statute to obtain a license for that composition.

Mile Style also executed a separate mechanical license allowing Zomba Music to reproduce the composition "Lose Yourself" in a parody by Weird Al Yankovic entitled "Couch Potato."

*      *      *

The reproduction and distribution of Eminem records embodying the Eminem Compositions through Apple's iTunes Store is authorized by each and every one of these licenses, both by their express terms and by operation of law. Each of the Controlled Composition provisions in this case extend the rights in compositions beyond the distributing label to the labels' "distributors/licensees" or "licensees and designees." The Copyright Act also permits the holder of a mechanical license, like the licenses at issue here, "to distribute or *authorize the distribution of* a phonorecord" embodying a composition in the permanent download configuration. 17 U.S.C. § 115. Both as a contractual matter and as a matter of Copyright Law, Apple's right to distribute Eminem records embodying Eminem Compositions is encompassed within the licenses granted to Aftermath and the other record labels described above.

Finally, even if there were no express licenses, Plaintiffs impliedly licensed the Eminem Compositions to Aftermath and Apple by delivering the compositions embodied in sound recordings that they understood would be distributed in all media now or hereafter developed, and in accepting the proceeds from that distribution for years. The law does not permit a copyright owner to sue for infringement in those circumstances.

D.      **STIPULATION OF FACTS**

The parties are meeting and conferring with regard to potential stipulated facts and will submit such stipulations to the Court in advance of trial.

E.      **ISSUES OF FACT TO BE LITIGATED**

**Plaintiffs:**
    a.   Whether Plaintiffs are the owners of the copyrights involved in this action;

33

b.  Whether Apple copied or authorized the copying of plaintiffs' musical compositions, or otherwise took action that violated any of Plaintiffs' exclusive rights in the musical compositions;

c.  Whether Aftermath improperly copied Plaintiffs' Compositions, or authorized or otherwise materially contributed to the copying of Plaintiffs' Compositions in violation of Plaintiffs' exclusve rights;

d.  Whether Aftermath had the right and ability to supervise Apple's conduct, and a financial interest in Apple's activities;

e.  Whether Plantiffs were damaged by the activities of Apple and Aftermath, and if so, the amount of the damages, including possibly the appropriate amount of statutory damages

f.  Whether the activities of Apple and Aftermath were willful

g.  To the extent it is a factual issue, whether Defendants have a license or other valid defense that insulates them from liability for the claims of Plaintiffs.

**Defendants:**

In Defendants' view, there are no material facts in dispute, only legal questions of contract interpretation.  While some of the legal questions may overlap with fact issues, those fact issues that are material are beyond dispute.  To the extent Plaintiffs argue otherwise, the evidence will show that:

**1.**  One of the primary purposes of a recording agreement is to allow the record company to distribute records in any and all formats.  It is the custom and practice in the recording industry to include Controlled Composition clauses in artists' recording agreements so that the record company may distribute records embodying compositions by that recording artist.

2.    The parties to the Eminem/Aftermath Agreements understood and intended that the Eminem/Aftermath Agreements would permit Aftermath to distribute Eminem records, including the compositions written, co-written or controlled by Eminem or his affiliated companies or producers embodied in those records.

3.    The advent of digital distribution does not change the terms of the Eminem/Aftermath Agreements, which expect that distribution of records necessarily embodying the Eminem Compositions would take place "in any form of media now or hereafter known."

4.    Under ordinary industry custom and practice, Plaintiffs have already received a license on precisely the reasonable terms the law would imply.

5.    Plaintiffs have no evidence of any agreement between themselves or Eminem and any co-writers of the Eminem Compositions agreeing to only license their respective share of the Eminem Compositions.

6.    In 2001, the Recording Industry Association of America ("RIAA") agreed with the National Music Publisher's Association and the Harry Fox Agency that RIAA members could rely on one co-writer's license to authorize distribution of a whole composition for distribution in certain digital configurations, including permanent downloads.

7.    For a majority of the Eminem Compositions, Plaintiffs only own or administer a portion of the composition. To the extent Plaintiffs establish liability and damages become relevant, Plaintiffs should only recover actual damages or profits correlating to their percentage ownership of each composition.

8.    Apple had significant costs that should be deducted from any award of profits, in the event Plaintiffs prove liability and elect to obtain profits as damages.

9.    Aftermath had significant costs that should be offset, or at a minimum be deducted from, any damage award, in the event the Court rules that Aftermath's profits are at issue, Plaintiffs prove liability, and Plaintiffs elect to obtain profits as damages.

10.   In the event Plaintiffs establish liability and damages become relevant, Plaintiffs should not obtain any of Defendants' profits that are properly apportioned to factors other than the compositions alleged to have been infringed -- including but not limited to any profits properly apportioned to the sound recording, the artist's appeal, record labels' or Apple's marketing efforts, etc.

11. In the event Plaintiffs attempt to prove that the alleged infringement was "willful," the evidence will show that Defendants had a good faith belief that the licenses at issue in this action authorized the distribution of Eminem records embodying the Eminem Compositions through Apple's iTunes Store.

12. Plaintiffs have recently asserted a claim to mechanical royalties for certain "skits" that appear on Eminem and D12 albums. These "skits" are non-musical works, not compositions. The agreements Plaintiffs have produced with writers of the Eminem Compositions do not confer publishing rights for non-musical material, so Plaintiffs do not have the right to assert a claim of infringement for these non-musical works.

13. Aftermath or the applicable record label has paid Plaintiffs all necessary mechanical royalties for the exploitation of the Eminem Compositions in records sold in permanent download form based on the full statutory rate

## F.    ISSUES OF LAW TO BE LITIGATED

**Plaintiffs:**

c.  Whether Apple and Aftermath are liable for direct, contributory, or vicarious copyright infringement;

d.   What  extrinsic evidence, if any, is admissible to alter the explicit terms of a recording agreement;

e.  Whether the 1998 and 2003 Recording Agreements grant Defendants licenses for permanent downloads of Plaintiffs' Compositions;

f.  Whether the recording agreements between other recording artists and Aftermath or other Universal-owned or controlled record companies grant Defendants licenses for permanent downloads of some of Plaintiffs' Compositions;

g.  Whether the purported licenses produced by Aftermath are valid licenses for permanent downloads;

h.  Whether a permanent download license for a portion of a musical composition

insulates Defendants from copyright liability under the facts of this case;

i.  Whether Aftermath can obtain a digital download compulsory license following the termination of a negotiated license;

j.  Whether Plaintiffs are entitled to the declaratory relief they seek, including

   i.  An injunction preventing Apple and all persons or parties in concert or privity with from reproducing and distributing the Compositions without Eight Mile's and Martin's consent;

   ii.  A declaration that Apple's reproduction and distribution of plaintiffs' copyrighted works constitute acts of willful copyright infringement, and declare that Apple and all persons or parties in concert or privity with it may not reproduce or distribute the Compositions without the express written permission of plaintiffs;

   iii.  a temporary restraining order, preliminary injunction and permanent injunction against Aftermath preventing Aftermath and all persons or parties in concert or privity with it from purporting to authorize any third party to reproduce and distribute the Compositions without Eight Mile's and Martin's consent;

   iv.  a declaratory judgment that Aftermath's purported authorization of Apple's reproduction and distribution of plaintiffs' copyrighted works constitute acts of willful copyright infringement, and declare that Aftermath and all persons or parties in concert or privity with it may not purport to authorize the reproduction or distribution the Compositions

without the express written permission of plaintiffs

**<u>Defendants:</u>**

In Defendants' view, the trial will focus on the interpretation of the licenses that Defendants contend authorized the distribution that Plaintiffs here challenge. Defendants will present evidence and testimony to establish that:

1. The Controlled Composition clauses in the Eminem/Aftermath Agreements authorize the distribution of records that embody the Eminem Compositions through Apple's iTunes Store.

2. The Controlled Composition clauses in Eminem's agreements with other labels, including Shady Records and Interscope Records, authorize the distribution of records that embody the Eminem Compositions through Apple's iTunes Store.

3. The Controlled Composition clauses in recording agreements executed by the several recording artist co-writers of the Eminem Compositions— including 50 Cent, Dr. Dre, D12, Lloyd Banks and Obie Trice —authorize the distribution of records that embody the Eminem Compositions through Apple's iTunes Store.

4. Separate, individual mechanical licenses -- including those granted by co-writers or their publishing designees, those granted by Ensign or Famous on behalf of Eight Mile Style, and the individual license for "Lose Yourself" by Eight Mile Style -- all authorize the distribution of records that embody the Eminem Compositions through Apple's iTunes Store.

5. The contracts' language, settled rules of contractual interpretation, the Copyright Law, industry custom and practice, and the parties' past performance under the contracts favor Defendants' interpretation of the Eminem/Aftermath Agreements over Plaintiffs' interpretation.

6. Even if Plaintiffs' interpretation of the Controlled Composition clause in the Eminem/Aftermath Agreements were correct, Plaintiffs would still be obligated to grant a license and so cannot sue for infringement.

7. To the extent Plaintiffs contend that the Controlled Composition clause lacks terms, the law implies reasonable terms based on the parties' expectations as defined by custom and practice in the recording industry.

8.    All of the facts here—including Plaintiffs' acceptance of the proceeds from the distribution of Eminem records through iTunes, Plaintiffs' performance under the agreements, and Plaintiffs' contractually expressed understanding that Aftermath and the other labels would distribute the Eminem or other records "in all forms of media now or hereafter known" —create an implied license for the challenged distribution.

9.    Under settled copyright law, a non-exclusive license from a co-writer of a work, such as a composition, grants the right to distribute the whole work, subject to a duty to account to the other co-writers for any proceeds.

10.   Absent specific language to the contrary in the license itself, a license from one co-writer of a particular composition is sufficient to authorize distribution of the entire composition.

11.   Plaintiffs are not entitled to mechanical royalties from non-musical works, such as "skits."  The agreements Plaintiffs have produced with writers of the Eminem Compositions do not confer publishing rights for non-musical material, so Plaintiffs do not have the right to assert a claim of infringement for these non-musical works.

12.   Plaintiffs are precluded from suing for infringement on the grounds of waiver, estoppel, and/or laches.

13.   To the extent Plaintiffs recover any damages, Defendants are entitled to a set-off.

## G.    <u>EVIDENCE PROBLEMS LIKELY TO ARISE AT TRIAL</u>

### <u>Plaintiffs:</u>

Plaintiffs plan to file five motions *in limine* to exclude evidence Defendants have

indicated they plan to offer at trial:

First, Plaintiffs will file a motion to exclude the testimony of Stephen Marks, General

Counsel of the RIAA, who Defendants disclosed as a potential witness for the first time on

August 24, 2009.

Second, Plaintiffs will file a motion to exclude any testimony from Defendants' witnesses

as to their understanding of the meaning of the 1998 and 2003 Recording Agreements.  As

described above, California law strictly limits what constitutes relevant evidence when interpreting the meaning of a contract, and any attempt to offer evidence as to one party's unexpressed intent or unexpressed understanding of the meaning of a contract is forbidden. Plaintiffs will also ask the Court to exclude other purported extrinsic evidence that is not appropriate in this case.

Third, Plaintiffs will move to exclude the testimony of Defendants' purported expert witness Peter Paterno. Defendants identified Mr. Paterno as an expert on "controlled composition clauses" in recording agreements. The testimony of Mr. Paterno first shows he is no such expert. Furthermore, Defendants refused to have Mr. Paterno produce a written report because he is Aftermath's outside counsel. Mr. Paterno's deposition testimony, taken to ascertain the "expert" opinions he planned to offer, makes it clear that Mr. Paterno was named in an attempt to skirt California contract law, described above, which does not allow a witness to offer evidence as to his or her unexpressed understanding of provisions in a contract, since Mr. Paterno himself drafted the 1998 Recording Agreement that is at the heart of this action, but admits there were no discussions about it during the negotiations or thereafter.

Fourth, Plaintiffs will move the Court to rule as a matter of law that the Mechanical Royalties section in the 1998 and 2003 Recording Agreements do not apply to permanent downloads as a matter of law.

Fifth, Plaintiffs will move to exclude the licenses Defendants have included on their exhibit list that do not purport to authorize reproduction of the compositions in a digital download configuration. Licenses that apply only to physical configurations cannot be relevant to the question of whether Defendants obtained licenses for permanent downloads. Plaintiffs will

move to exclude, among other documents, the purported licenses Defendants first produced in

June, 2009.

### Defendants:

1. Plaintiffs should not be permitted to introduce any evidence of gross revenue or "profits" from Aftermath. There is no claim of infringement against Aftermath, so any evidence of Aftermath's gross revenue or "profits" is irrelevant and prejudicial. Aftermath's gross revenues or profits would be relevant only if this Court grants Plaintiffs' motion for leave to amend.

2. Plaintiffs should not be permitted to introduce any evidence of gross revenue or "profits" from any other record label for those compositions exploited by labels other than Aftermath, because no other label is a party to this action. Any evidence of other labels' gross revenues or profits is irrelevant, unreliable, and prejudicial.

3. As Defendants have argued in the pending motion to exclude, Plaintiffs should not be permitted to introduce any evidence relating to their claim of "indirect profits" from the sale of iPods, because such evidence is irrelevant, unreliable, and potentially prejudicial.

4. At deposition, Plaintiffs limited the testimony of their witness Mark Levinsohn, and represented that they would similarly limit Mr. Levinsohn's testimony at trial. Specifically, Plaintiffs' counsel represented in deposition that Mr. Levinsohn would only testify to "his conversations with Universal, and his negotiations for the Eight Mile license. And to the extent he had any conversation concerning those contracts with Universal and Eminem." Levinsohn Dep., 215:23-217:16. Plaintiffs would not permit Mr. Levinsohn to testify on anything other than those specific issues, asserting claims of privilege and work product to topics including Plaintiffs' practices, other music industry professionals' practices, or Mr. Levinsohn's own experience in the music industry. Mr. Levinsohn's trial testimony must therefore be limited to the narrow scope of issues he testified to in deposition, and that Plaintiffs' counsel represented his testimony would be limited to at trial.

5. Mike Boila and Tim Hernandez, witnesses on Plaintiffs' "may call" list, should be excluded as witnesses due to Plaintiffs' failure to disclose them in a timely manner during the discovery period.

**6.** The deposition of Maurice Russell, a third-party witness, was also limited because of claims of privilege. Defendants were not allowed to inquire into his basis of knowledge regarding his understanding of a key industry agreement. That testimony should be excluded because Defendants were precluded from cross-examining Russell adequately in light of the privilege claims.

**7.** Plaintiffs should not be permitted to introduce the testimony of Howard Abrams. Mr. Abrams is a law professor who has been designated to give testimony on the meaning of the contractual language in the Eminem/Aftermath Agreements' Controlled Composition clause. Mr. Abrams has no industry experience, and is opining purely as a copyright professor. As such, he is testifying only about what the law provides, which invades the exclusive province of the Court. *See United States v. Curtis*, 782 F.2d 593, 599 (6th Cir. 1986).

**8.** Plaintiffs should not be permitted to assert their belated claim regarding certain "skits" on Eminem and D12 albums, because they failed to assert it in a timely manner. Also, the agreements Plaintiffs have produced with writers of the Eminem Compositions do not confer publishing rights for non-musical material, so Plaintiffs do not have the right to assert a claim of infringement for these non-musical works.

## H.    WITNESSES

**Plaintiffs:**

Plaintiffs state they **will call** the following witnesses to testify at trial.

1. Joel Martin
2. Howard Abrams
3. Gary Cohen
4. Mark Levinsohn
5. Melissa Van Hagen
6. Eddie Cue (via deposition)

Plaintiffs **may call** the following witnesses to testify at trial. Plaintiffs will present the testimony of any witnesses outside the subpoena power of this court and not under Plaintiffs control or otherwise willing to appear voluntarily by deposition.

1. Punch Andrews
2. Pat Blair. Testimony will be presented live or via deposition.
3. Mike Boila
4. Todd Douglas. Testimony will be presented live or via deposition.

5. Fred Eisler.  Testimony will be presented live or via deposition.
6. Leo P. Ferrante.  Testimony will be presented live or via deposition.
7. Chad Gary.  Testimony will be presented live or via deposition.
8. James A. Harrington.  Testimony will be presented live or via deposition.
9. Tim Hernandez.
10. Rand Hoffman.  Testimony will be presented live or via deposition.
11. Tegan Kossowicz.  Testimony will be presented live or via deposition.
12. Steven Leung.  Testimony will be presented live or via deposition.
13. Marnie Nieves.  Testimony will be presented live or via deposition.
14. Cynthia Oliver.  Testimony will be presented live or via deposition.
15. Michael Ostroff.  Testimony will be presented live or via deposition.
16. Peter Paterno.  Testimony will be presented live or via deposition.
17. Lisa Rogell.  Testimony will be presented live or via deposition.
18. Patrick Sullivan.
19. Maurice Russell, The Harry Fox Agency.  Testimony will be presented via deposition, if called.
20. Michael Peterson, Kobalt Music Publishing America.  Testimony will be presented live or via deposition.
21. Ensign Music Corp (Sony/ATV).  Testimony will be presented live or via deposition.
22. Nancie Stern, Music Resources, Inc.   Testimony will be presented live or via deposition.
23. Universal Music Publishing/Rondor Music International.  Testimony will be presented live or via deposition.
24. All witnesses on Defendants' Witness List.  Testimony will be presented live or via deposition.
25. Witnesses not named herein, solely for impeachment purposes or as rebuttal witnesses.

**Defendants:**

### WITNESSES DEFENDANTS EXPECT TO CALL

1.  Rand Hoffman

2.  Peter Paterno

3.  Tegan Kossowicz

4.  Steven Leung

### WITNESSES DEFENDANTS MAY CALL IF THE NEED ARISES

1.  Charles Ciongioli

2.  Steve Berman

3.  John Hansen

4.      Steve Marks

5.      Eddy Cue

6.      Michael Ostroff

7.      Stan Ng

8.      Charles Lancaster

9.      Tamara Whiteside

10.     Todd Douglas

11.     Chad Gary

12.     Cynthia Oliver

13.     Marnie Nieves

14.     Any additional witnesses whose testimony is identified in the attached deposition designation tables at Ex. D.

15.     Defendants also may call, and reserve their right to call, any witness identified in Plaintiffs' trial witness disclosure.

I.      **EXHIBITS**

The parties jointly ask the Court by signing this Order to pre-admit the exhibits listed on the attached Exhibit A. The parties have also submitted separate exhibit lists with the opposing side's objections noted. Plaintiffs' Exhibits with Defendants' Objections noted are at Exhibit B, and Defendants' Exhibits with Plaintiffs' Objections noted are at Exhibit C.

J.      **DEPOSITIONS**

Attached as Exhibit D are Plaintiff's and Defendants' designations, objections, and counter-designations to the deposition testimony each side seeks to admit. The parties will prepare transcripts for the Court's review in the format the Court prefers, to be determined at the Final Pretrial Conference.

**K.**     **DAMAGES**

Defendants do not stipulate to any of Plaintiffs' damages.

Plaintiffs claim the following damages:

    a.   **Defendant Apple's Profits:**

Plaintiffs claim as damages a total of $2,577,710 of Apple's profits from the exploitation

of Plaintiffs' Compositions on iTunes, plus a share of Apple's profits from its sales of iPods,

because some portion of those sales can be attributed to the presence of Plaintiffs' Compositions

in Apple's iTunes store.  Plaintiffs' damages from Apple can be broken down by composition as

follows:

> 40 Oz: $6,368.24
> 6 in the Morning: $3,641.40
> 8 Mile: $43,257.95
> 8 Miles and Runnin': $2,557.66
> American Psycho 2: $4,928.12
> Ass Like That: $87,046.74
> Average Man: $1,848.35
> Big Weenie: $22,018.19
> Bitch: $4,032.39
> Business: $19,658.55
> Cheers: $1,786.82
> Cleanin' Out My Closet: $81,855.92
> Crazy In Love: $23,883.75
> Criminal: $10,137.01
> Curtains Close: $412.24
> Curtains Up: $354.47
> Don't Come Down: $1,945.42
> Don't Push Me: $13,782.33
> Drips: $7,080.43
> Dude: $75.62
> Em Calls Paul: $15,283.06
> Em Calls Paul Skit: $480.79
> Encore: $12,885.70
> Encore / Curtains Down: $18,189.46
> Encore / Curtains Up: $1,453.91
> Evil Deeds: $22,039.50

Fack:  $10,137.01
Final Thought: $15,527.08
Follow My Life: $1,366.43
GATman and Robbin: $19,196.15
Get My Gun: $4,316.84
Git Up: $5,874.42
Got Some Teeth: $7,634.73
Guilty Conscience: $6,684.54
Hailie's Song: $35,555.53
Hands On You: $1,735.41
High All the Time: $15,766.64
Hoodrats: $1,321.70
How Come: $33,353.04
I'm Supposed to Die Tonight: $18,613.55
In My Hood:  $9,435.69
Just Don't Give a Fuck: $2,347.90
Just Lose It: $95,589.17
Keep Talkin': $3,508.54
Lady: $2,397.45
Leave Dat Boy Alone: $3,122.84
Like Toy Soldiers: $133,045.64
Lose Yourself: $466,915.63
Love Me: $6,857.24
Love You More: $15,287.39
Loyalty: $3,249.64
Many Men (Wish Death): $46,777.47
Mockingbird: $185,739.37
Mosh: $43,969.01
My 1st Single: $18,427.87
My Band: $42,337.19
My Dad's Gone Crazy: $32,083.61
Never Enough: $22,521.44
Never Forget Ya: $1,350.58
On Fire: $20,392.53
One Shot 2 Shot: $23,325.10
Outro: $1,776.29
Patiently Waiting: $27,577.20
Paul: $15,283.06
Paul Skit: $300.59
Places to Go: $7,058.29
Puke: $32,837.25
Rabbit Run: $18,406.73
Rain Man: $22,662.52
Rap Game: $2,984.65

Ricky Ticky Toc: $15,286.88
Role Model: $1,904.33
Say Goodbye to Hollywood: $16,105.19
Say What U Say: $15,510.75
Shake That: $10,137.01
Shit Hits the Fan: $4,414.78
Shit On You: $1,448.92
Sing For the Moment: $60,877.19
Soldier: $24,301.28
Spend Some Time: $19,138.46
Spit Shine: $2,558.17
Spread Yo Shit: $1,242.51
Square Dance: $19,817.80
Steve Berman: $200.51
Steve's Coffee House: $114.32
Stimulate:$9,748.65
Superman: $73,779.59
The Kiss: $10,331.98
The Real Slim Shady: $11,671.40
Til The End: $3,474.27
Till I Collapse: $100,328.98
Warrior, Part 2: $10,311.41
We All Die One Day: $2,995.66
We As Americans: $15,287.65
When the Music Stops: $17,911.96
White America: $33,742.98
Without Me: $113,360.16
Yellow Brick Road: $17,915.51

    b. **Apple's iPod Profits**

Plaintiffs also claim as indirect damages a share of the profits Defendant Apple made from sales of iTunes, based on the theory that some portion of those sales are attributable to the presence of Plaintiffs' Compositions on Apple's iTunes service. Plaintiffs have calculated Apple's profit from the sales of iPods that could potentially be attributable to Plaintiffs' Compositions as approximately $16 million, but claim only a portion of this as damages.

    c. **Defendant Aftermath's Profits:**

Plaintiffs claim as damages $4,026,473 of Aftermath's profits from

Apple's exploitation of Plaintiffs' Compositions on iTunes.  Aftermath's

profits can be broken down by composition as follows:

40 Oz: $9,947.42
6 in the Morning: $5,687.99
8 Mile: $67,570.42
8 Miles and Runnin': $3,995.16
American Psycho 2: $7,697.89
Ass Like That: $135,970.03
Average Man: $2,887.19
Big Weenie: $34,393.17
Bitch: $6,298.74
Business: $30,707.32
Cheers: $2,791.06
Cleanin' Out My Closet: $127,861.79
Crazy In Love: $37,343.94
Criminal: $15,834.36
Curtains Close: $643.93
Curtains Up: $23,872.67
Curtains Up Skit: $553.69
Don't Come Down: $3,038.82
Don't Push Me: $21,528.47
Drips: $20,432.07
Dude: $118.13
Em Calls Paul: $23,872.67
Em Calls Paul Skit: $751.00
Encore: $20,127.91
Encore / Curtains Down: $28,412.57
Encore / Curtains Up: $2,271.06
Encore / Curtains Down: $23,872.67
Evil Deeds: $34,426.48
Fack:  $15,834.36
Final Thought: $24,253.84
Follow My Life: $2,134.40
GATman and Robbin: $29,985.05
Get My Gun: $6,743.05
Git Up: $9,176.05
Got Some Teeth: $11,925.71
Guilty Conscience: $10,441.49
Hailie's Song: $55,538.97
Hands On You: $2,710.77

High All the Time: $24,628.03
Hoodrats: $2,064.53
How Come: $52,098.63
I'm Supposed to Die Tonight: $29,075.03
In My Hood:  $14,738.89
Just Don't Give a Fuck: $3,667.50
Just Lose It: $150,875.64
Keep Talkin': $5,480.46
Lady: $3,744.90
Leave Dat Boy Alone: $4,877.99
Like Toy Soldiers: $$207,821.92
Lose Yourself: $729,338.45
Love Me: $10,851.83
Love You More: $23,879.44
Loyalty: $5,076.05
Many Men (Wish Death): $73,068.01
Mockingbird: $290,131.34
Mosh: $68,681.12
My 1st Single: $28,784.98
My Band: $66,132.17
My Dad's Gone Crazy: $50,115.71
My Toy Soldiers:  $14,738.89
Never Enough: $35,179.26
Never Forget Ya: $2,109.65
On Fire: $31,853.86
One Shot 2 Shot: $36,434.62
Outro: $2,774.63
Patiently Waiting: $43,076.53
Paul: 23,872.67
Paul Skit: $469.54
Places to Go: $11,025.30
Puke: $48,592.93
Rabbit Run: $28,751.97
Rain Man: $35,426.65
Rap Game: $4,670.57
Ricky Ticky Toc: $23,878.64
Role Model: $2,974.63
Say Goodbye to Hollywood: $25,156.86
Say What U Say: $24,228.32
Shake That: $15,834.36
Shit Hits the Fan: $6,896.03
Shit On You: $2,263.26
Sing For the Moment: $95,092.27
Soldier: $37,959.44

Spend Some Time: $28,894.94
Spit Shine: $3,995.96
Spread Yo Shit: $1,940.83
Square Dance: $30,956.08
Steve Berman: $313.21
Steve's Coffee House: $178.57
Stimulate:$15,227.72
Superman: $115,246.28
The Kiss: $16,138.90
The Real Slim Shady: $18,231.14
Til The End: $5,426.94
Till I Collapse: $156,717.35
Warrior, Part 2: $16,106.79
We All Die One Day: $4,679.33
We As Americans: $23,879.84
When I'm Gone: $15,834.36
When the Music Stops: $27,979.10
White America: $52,707.70
Without Me: $177,072.52
Yellow Brick Road: $27,984.64

    d. **Actual Damages:**

Plaintiffs claim "actual damages" of $52,541 stemming from eight compositions for which neither Apple nor Aftermath paid plaintiffs anything for mechanical royalties.

## L.     <u>TRIAL</u>

The trial shall be a non-jury trial.

If the motion for leave to amend is denied and the motion to exclude iPod profits is granted, Defendants anticipate that opening statements and all trial testimony could be completed within three to four trial days. The parties could then prepare post-trial briefs and present closings at a schedule directed by the Court.

If the motion for leave to amend is granted, Defendants will need additional time before trial begins to respond to the new complaint, take any necessary discovery from Plaintiffs, and prepare to defend against the newly asserted claims.

Plaintiffs estimate the trial will take 5 to 7 days in any event.

**M.**      <u>**SETTLEMENT**</u>

The parties have mediated this dispute three times before three different mediators, most recently on July 31 of this year in Los Angeles, California. Efforts thus far to resolve the dispute short of trial have not been successful. Plaintiffs do not request that the Court schedule a mediation to take place prior to trial commencing.


Dated: _____      _____

                                       UNITED STATES DISTRICT JUDGE

WE STIPULATE TO THE ENTRY OF THE ABOVE ORDER:

/s/ Daniel D. Quick
Daniel D. Quick (P48109)
Dickinson Wright PLLC
38525 Woodward Avenue
Suite 2000
Bloomfield Hills, MI 48304
 (248) 433-7200
dquick@dickinsonwright.com

Kelly M. Klaus
Munger, Tolles & Olson LLP
355 South Grand Avenue
Suite 3500
Los Angeles, CA 90071-1560
 (213) 683-9238
kelly.klaus@mto.com
Attorneys for Defendants

/s/ Howard Hertz
Howard Hertz (P26653)
Hertz Schram PC
1760 South Telegraph Road, Suite 300
Bloomfield Hills, MI 48302-0183
(248)335-5000
hhertz@hertzschram.com

Richard S. Busch
King & Ballow
1100 Union Street Plaza
315 Union Street
Nashville, TN 37201
(615) 726-5422
rbusch@kingballow.com