Eight Mile Style, LLC et al v. Apple Computer, Incorporated

Doc. 167 Att. 3

# EXHIBIT A

# TO

# DECLARATION OF MARC GUILFORD

Dockets.Justia.com

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

----------------------------x

F.B.T. PRODUCTIONS, LLC, and EM2M, LLC,
Plaintiffs,
v.
AFTERMATH RECORDS doing business as AFTERMATH ENTERTAINMENT; INTERSCOPE RECORDS; UMG RECORDINGS, INC., and ARY, INC.,
Defendants.

Case No. CV 07-03314 PSG (MANx)

----------------------------x

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

----------------------------x

EIGHT MILE STYLE, LLC and MARTIN AFFILIATED, LLC,
Plaintiffs,
vs.
APPLE COMPUTER, INC. and AFTERMATH RECORDS d/b/a AFTERMATH ENTERTAINMENT,
Defendants.

Case No. 2:07-cv-13164
Hon. Anna Diggs Taylor

----------------------------x

July 15, 2008
10:31 a.m.

Deposition of MARK A. LEVINSOHN, held at the law offices of Jenner & Block, 919 Third Avenue, New York, New York, pursuant to subpoena, before Donald R. DePew, an RPR, CRR and Notary Public within and for the State of New York.

12:31:55 calls for a legal opinion and it calls for a
12:31:57 legal conclusion.

12:32:01 A. It is generally a provision contained within a recording agreement that speaks to certain terms that the record company would like to have apply to the mechanical licenses that it obtains in order to manufacture and distribute the recordings by the artist who is being signed to the label pursuant to that recording agreement.

12:32:58 Q. Do controlled composition clauses typically grant a license to use the compositions in those recordings?

12:33:06 MR. BUSCH: Objection to form, lack of foundation, and it calls for a legal conclusion, and it is vague and ambiguous as well.

12:33:16 MR. POMERANTZ: Let me rephrase the question.

12:33:18 Q. Does a controlled composition clause typically grant a license for the compositions?

12:33:22 MR. BUSCH: The same objections.

12:33:26 A. In some cases, yes.

12:33:30 Q. Well, you said you have drafted hundreds of recording agreements, correct?

12:34:53 because in all of those cases the company that I represented also was acquiring the music publishing rights, ownership in the underlying musical compositions from the artist, and also separately from the cowriters or coproducers of that artist's recordings. And as such controlled the ownership and the administration of the publishing rights and would be the party to be able in those cases to grant those licenses.

12:35:55 Q. So in those situations why did you have a controlled composition clause in the recording agreement?

12:36:01 MR. BUSCH: Note my objection. It calls for a legal conclusion.

12:36:03 And with respect to all of these questions -- go ahead.

12:36:07 Just note my objection.

12:36:09 A. As I've said, the controlled compositions clause established a -- certain conditions and terms, particularly with regard to rates of mechanical royalties and caps on mechanical royalties.

12:36:40 Record companies in an attempt to mitigate the costs that they have, relative costs

Mark A. Levinsohn

MR. BUSCH: Again, note my objection. You're not distinguishing between physical and digital.

Your question is vague and ambiguous. It calls for a legal conclusion. I object to the form of the question.

A. Um...

MR. BUSCH: And it assumes facts not in evidence.

A. Without having agreements that I may have worked on in front of me it's difficult to tell you precisely what language I used. But I believe that the language that I would have used -- pardon me -- would say that the artist hereby licenses to the record company the right to mechanically reproduce the compositions written or composed by the writer. Obviously to the extent only that the writer involved is the artist and to the extent that the artist involved is not assigned to a publishing company who controls his or her publishing and would have the exclusive authority to grant such a license.

Q. As you sit here today, can you identify any recording agreements that you worked on for

any of your record company clients in which you believe that the artist granted a license through the controlled composition clause?

MR. BUSCH: The same objection, no definition of what type of license you are talking about, whether for digital or for physical. It's vague and ambiguous, it calls for a legal conclusion. I object to the form of the question.

A. No.

Q. Have you worked on any agreements within the last month?

A. No.

Q. Have you negotiated and drafted a recording agreement for any of your record company clients in which you believe that the record company agreed to share net receipts on a 50/50 basis for permanent downloads?

MR. BUSCH: Just note my objection. Object to form. It calls for a legal conclusion. It assumes facts not in evidence, namely that he's made that analysis. And it may also implicate attorney-client privilege to the extent this

the attorney work product privilege regarding his mental impressions with respect to any questions you ask about what provisions mean what.

So I'm just letting you know, Mr. Pomerantz, to shortcut this. And I'm happy to address this with the court later, if you so choose.

But our view of this is that he can testify about what he communicated to Universal. He's already testified about various things that he has said, and actions he has taken, and conversations he has had that are not privileged, and his activities in general.

But beyond that, when he gets to his mental opinions and conclusions, we are going to instruct him not to answer. And I ask you to move on.

Q. Could you get Exhibit 10 in front of you and turn to page 8.

I'm sorry -- yeah, page 8, I'm sorry.

Do you see paragraph 6, "Mechanical Royalties"?

A. Yes.

Q. And you see in the first sentence there it states, and I'll delete the parenthetical, "All Controlled Compositions will be licensed to Aftermath and its distributors/licensees," and then it goes on.

Do you see that?

A. Yes.

Q. Have you ever drafted a controlled composition clause which has the language will be licensed in it?

A. I don't believe so.

Q. Have you ever been involved in negotiating a controlled composition clause which has the language will be licensed in it?

A. I don't recall.

Q. Have you ever had a conversation with anyone at -- strike that.

Have you ever had any conversation with anyone that was involved in the drafting or negotiation of either the 1998 or 2003 agreement about what the phrase will be licensed was intended to mean?

A. To the extent Rand Hoffman may have

Mark A. Levinsohn

18:24:51 been involved in the negotiation or the drafting
18:24:53 of the 1998 or 2003 agreement, I can testify about
18:25:01 conversations that I had with Rand Hoffman.

18:25:06 Q. And you've already testified to that
18:25:08 conversation, correct?

18:25:12 A. It's been a long day and I -- you'll
18:25:15 know better than I do whether I have testified
18:25:18 about conversations with Rand Hoffman on the
18:25:22 mechanical royalties paragraph.

18:25:24 Q. Okay. Well, I want to make sure we
18:25:26 have a complete record so you don't come into
18:25:28 trial and say something different. So I'm going
18:25:30 to go back over it since you don't remember your
18:25:32 testimony. I do believe we've had some
18:25:35 questioning on it, but I may be wrong.

18:25:40 Did you have a conversation with
18:25:41 Mr. Hoffman about what the phrase will be licensed
18:25:45 means in the agreements between F.B.T. and
18:25:50 Aftermath?

18:25:53 A. The conversation that I had with
18:25:55 Mr. Hoffman concerned that Universal knew that
18:26:11 Joel believed that the mechanical royalties
18:26:15 paragraph did not cover digital reproductions and
18:26:24 that Joel objected to the digital distribution of

18:26:34 his song catalogue in the form of digital
18:26:42 downloads and other digital distribution.
18:26:47 And that with the exception of the
18:26:49 Lose Yourself license that he was willing to enter
18:26:54 into as an experiment, and with the exception of
18:26:59 the mastertones agreement that the paragraph 6,
18:27:05 "Mechanical Royalties" paragraph, did not cover
18:27:12 digital rights.
18:27:15 Q. And you testified that Mr. Hoffman
18:27:17 disagreed with you on that, correct?
18:27:18 A. Correct.
18:27:19 Oh, that's right. So then I -- you
18:27:22 remind me that I did testify about that.
18:27:27 Q. Did you explain to Mr. Hoffman why you
18:27:29 thought that the controlled composition clause in
18:27:34 the agreements did not apply to digital
18:27:40 distribution of the compositions?
18:27:44 MR. BUSCH: Just objection to the
18:27:45 extent you mischaracterized his testimony.
18:27:47 I believe Mr. Levinsohn said he was
18:27:51 communicating Joel's position to Mr. Hoffman.
18:27:55 Q. Did you explain to Mr. Hoffman why
18:27:57 Mr. Martin believed that the controlled
18:28:01 composition clause did not apply to the digital