UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


EIGHT MILE STYLE, LLC and
MARTIN AFFILIATED, LLC,

                    Plaintiffs

        v.                              CIVIL ACTION
                                        NO. 07-13164
APPLE COMPUTER, INC. and                Judge Anna Diggs Taylor
AFTERMATH  RECORDS, d/b/a
AFTERMATH ENTERTAINMENT,

                    Defendants.
_____/


BENCH TRIAL - VOLUME 4
BEFORE THE HONORABLE JUDGE ANNA DIGGS TAYLOR
United States District Judge
Theodore Levin U.S. Courthouse
231 West Lafayette Boulevard
Detroit, Michigan
SEPTEMBER 30, 2009


APPEARANCES:

Mr. Richard S. Busch, Esq.
Mr. Howard Hertz, Esq.            Mr. Glenn Pomerantz, Esq.
Mr. Marc Guilford, Esq.           Mr. Kelly Klaus, Esq.
King & Ballow                     Munger, Toles & Olsen, PLLC
1100 Union Street Plaza           355 South Grand Ave
315 Union Street                  Suite 3500
Nashville, TN 37201               Los Angeles, CA 90071

In behalf of Plaintiffs           In behalf of Defendants

                    -   -   -


     To obtain a copy of this official transcript, contact:
          Sheri Ward, Official Court Reporter, at
               www.transcriptorders.com

```
                    I   N   D   E   X

Witness/Proceeding                              Page


                E   X   H   I   B   I   T   S

Exhibit No.                        Offered    Received

None
```

1              Detroit, Michigan

2              Wednesday, September 30, 2009

3              9:00 a.m.

4                    —    —    —

5        (Call to Order of the Court.)

6              **MR. POMERANTZ:**  Your Honor, may we proceed?

7              **THE COURT:**  Yes, please go ahead.

8                    -    -    -

9              **CONTINUED CROSS-EXAMINATION**

10             (From Tuesday, September 29, 2009)

11     **BY MR. POMERANTZ:**

12     **Q.**    Good morning, Mr. Cohen.

13     **A.**    Good morning.

14     **Q.**    At the end of your questioning by Mr. Busch yesterday

15     you and he discussed a case that you testified to in the

16     federal court in the City of New York.  Do you remember

17     that?

18     **A.**    Yes.

19     **Q.**    And in that case the federal district judge determined

20     that your testimony was unreliable and didn't consider it,

21     correct?

22     **A.**    Yes.

23     **Q.**    Okay.  I just want to spend a moment and go over what

24     actually happened in that case.  That case is called

25     *Robinson v. Sanctuary*, correct?

1    **A.**   Yes.

2    **Q.**   And it's a published decision at 542 F.Supp.2d 284.

3    Are you aware of that?

4    **A.**   I wasn't aware.  I know it's published.  I wasn't aware

5    of the number.

6    **Q.**   All right.  Well, let me hand you a copy of the

7    decision, if I may, so that we can go over it together.

8         **MR. POMERANTZ:**  Your Honor, may I approach the

9    witness?

10        **THE COURT:**  Yes.

11   **BY MR. POMERANTZ:**

12   **Q.**   All right.  This is a copy of that decision.  Have you

13   read it before?

14   **A.**   No.

15   **Q.**   Now, in this case it was also a music industry case,

16   correct?

17   **A.**   Yes.

18   **Q.**   And a default judgment was entered in favor of the

19   plaintiff in that case, correct?

20   **A.**   That's my understanding.

21   **Q.**   And then the plaintiff, who received the default

22   judgment, needed to prove up its damages, correct?

23   **A.**   Yes.

24   **Q.**   And at trial on that issue of damages the plaintiff

25   only offered one witness, and that was you, correct?

1    **A.**    I don't know.

2    **Q.**    Well, that's what the judge said in his decision.  Were

3    you aware of that?

4    **A.**    No.

5    **Q.**    All right.  Well, turn -- I'm going to refer to the

6    pages in the upper right-hand corner of this printed

7    decision, and if you look at Page 6 and on the right-hand

8    column at the bottom of that carryover paragraph the last

9    sentence says, "In order to prove their damages, plaintiffs

10   rely on the testimony and opinion of their expert and only

11   witness, Gary Cohen, a royalty auditor;" do you see that?

12   **A.**    Yes.

13   **Q.**    Does that refresh your memory that when you were in

14   that courtroom you were the only witness that the plaintiff

15   was calling to prove up its damages?

16   **A.**    No, I don't remember how many people were in the

17   courtroom that day.

18   **Q.**    But have you no reason to think that the judge made an

19   error when he said you were the only witness?

20   **A.**    No.

21   **Q.**    Now, before you testified in that trial the lawyer for

22   the plaintiff had submitted some evidence to a magistrate

23   judge to prove up the damages, and the magistrate judge

24   proved that -- I'm sorry, and the magistrate judge decided

25   that that evidence was not sufficient, correct?

1    **A.**    I don't know.

2    **Q.**    All right.  If you could turn to Page 7, and if you see

3    on the second column there is a heading near the bottom that

4    says Cohen's opinion and testimony; do you see that?

5    **A.**    Number 14 the last paragraph?

6    **Q.**    You will see below the Paragraph Number 14 there is a

7    heading that says Cohen's opinion and testimony?

8    **A.**    Yes.

9    **Q.**    And do you in that first sentence it says that there

10   was evidence submitted to the magistrate judge which the

11   magistrate judge concluded was insufficient?

12   **A.**    Yes.

13   **Q.**    And so the plaintiffs then hired you to try to provide

14   sufficient evidence at a trial, correct?

15   **A.**    They hired me to try to create some damages numbers and

16   gave me documentation that was created by the plaintiff

17   itself.

18   **Q.**    And you then summarized and checked the information

19   that was provided to you by the plaintiffs, correct?

20   **A.**    As best I could.

21   **Q.**    And then you created your own opinions after you had

22   summarized and checked the plaintiff's information, correct?

23   **A.**    Based on the documents I was given.

24   **Q.**    So I'm correct then, correct?

25   **A.**    Yes.

1   **Q.**   All right.  And in your opinion that you offered in

2   that case you concluded that the defendants had earned

3   income related to the plaintiff's claim totaling

4   $34 million, correct?

5   **A.**   I don't recall the number.

6   **Q.**   If you could turn to Page 8 of the opinion and in the

7   first full paragraph on the left hand column starting with

8   despite his limited review; do you see that?

9   **A.**   Yes.

10   **Q.**   And then you see that the judge refers to certain

11   conclusions that you made regarding categories of sales?

12   **A.**   Yes.

13   **Q.**   And then do you see at the end of that paragraph that

14   he says that you concluded that there were $34 million of

15   earned income; do you see that?

16   **A.**   Yes.

17   **Q.**   Does that refresh your memory as to what your opinion

18   was in that case?

19   **A.**   Yes.

20   **Q.**   And then to come up with that $34 million figure you

21   used a certain methodology, correct?

22   **A.**   Yes, I used some methodology.

23   **Q.**   And the judge described your methodology in some detail

24   in his opinion, didn't he?

25   **A.**   I didn't read the opinion.

1    **Q.**   All right.  Well, if you look at Page 8 on the

2    left-hand column the second full paragraph where it says

3    Cohen's methodology can be summarized as follows; do you see

4    that?

5    **A.**   Yes.

6    **Q.**   And then the judge goes on for two or three paragraphs

7    and describes the methodology that you offered in that case,

8    correct?

9    **A.**   Yes.

10   **Q.**   All right.  And then the Court issued certain rulings

11   on that methodology, correct?

12   **A.**   Yes.

13   **Q.**   And what the judge said was that your opinion and

14   testimony was insufficiently reliable to support a

15   reasonable damages calculation, correct?

16   **A.**   Yes.

17   **Q.**   And the judge also said that there is no basis upon

18   which the Court could conclude that Cohen's methodology is

19   reliable, right?

20   **A.**   That's what it says.

21   **Q.**   And the judge went further.  He said that your estimate

22   is built upon one flawed assumption after another, correct?

23   **A.**   I assume it's in this document.

24   **Q.**   Well, let's make sure.  Let's look at on Page 9.

25   **A.**   Uh-huh.

1    **Q.**   In the right-hand column the first full paragraph, and

2    the judge said that:

3                "There is no basis upon which this Court

4                can reasonably conclude that Cohen's

5                methodology is reliable.  Cohen's

6                estimate is built upon one flawed

7                assumption after another."

8    You see that, don't you?

9    **A.**   Yes.

10   **Q.**   All right.

11   **A.**   It goes on to say:

12               "Despite plaintiffs' complaints of

13               discovery abuse, the record reflects

14               that defendants produced sufficient

15               documentation to permit plaintiffs to

16               test the reliability of Cohen's

17               assumptions."

18   **Q.**   Right.  You argued in that case that the reason why

19   your methodology wasn't very good was because that you

20   didn't have enough information, correct?

21   **A.**   That's what the attorney argued.  I don't think I

22   argued that at all.

23   **Q.**   And the judge rejected that, correct?

24   **A.**   Yes.

25   **Q.**   Now, this decision was handed down on March 25th, 2008,

1  correct?

2  **A.**   Yes.

3  **Q.**   It's a pretty big deal to a testifying expert to have a

4  federal judge reject your opinion and say it's unreliable,

5  isn't it?

6  **A.**   I don't know how to answer that.  I assume it's a big

7  deal.

8  **Q.**   Now -- and it's a pretty big deal to have a federal

9  judge say that you had offered a methodology in federal

10  court that has -- that is built on one flawed assumption

11  after another?  That's a pretty big deal, isn't it?

12  **A.**   That speaks for itself.

13  **Q.**   Well, for certainly someone who makes his living trying

14  to testify in court, it's a big deal when the judge says you

15  offered a methodology that is built on one flawed assumption

16  after another?

17  **A.**   I make my living through royalty audits.  I very rarely

18  testify in court.

19          **THE COURT:**  I can't hear.

20          **THE WITNESS:**  I very rarely testify in court.

21  This is the fourth or fifth time in a 25-year career.

22  **BY MR. POMERANTZ:**

23  **Q.**   But you understand, Mr. Cohen, when you walk into a

24  federal court and offer expert opinion testimony that your

25  testimony is supposed to be reliable, correct?

1   **A.**   I do the best work I can with the information provided

2   to me.

3   **Q.**   Now, less than two months after this decision was

4   issued I took your deposition in this case, correct?

5   **A.**   I don't recall the exact date of my deposition in this

6   case.

7   **Q.**   Well, if you look in your binder that I have in front

8   of you and if you look at the date of your first deposition.

9   Not that one, but the other binder, and near the back I put

10  the depositions.

11  **A.**   Yes.

12  **Q.**   You see that the first deposition was taken on

13  May 15th, 2008; do you see that?

14  **A.**   I'm not quite sure where the depositions are in this

15  binder.

16  **Q.**   Let me see if I can help you.  I'll just quickly find

17  it in my binder.  Do you see there's a tab two-thirds of the

18  way back that says 5-15-08 transcript?

19  **A.**   Yes.

20  **Q.**   And if you look at the first page of that exhibit, that

21  document, do you see that it says May 15th, 2008?

22  **A.**   Yes.

23  **Q.**   Does that refresh your memory that that's when you were

24  deposed in this case?

25  **A.**   Yes.

**Q.**   And that was less than two months after the federal
judge in New York handed down his decision in the *Robinson
v. Sanctuary* case, correct?

**A.**   Yes.

**Q.**   And in that deposition I asked you whether any judge
had ever found any of your methodologies to be unreliable;
do you remember that?

**A.**   Yes.

**Q.**   And do you remember what you said?

**A.**   I think I said no.

**Q.**   Well, let's see what you said.  Can we put up Page 65,
and if we could highlight Lines 12 through 14.

         I very specifically asked you, Mr. Cohen, has any
judge ever found any methodology that you have employed to
be unreliable, and your answer was not that I recall; do you
see that?

**A.**   Yes.

**Q.**   And that was less than two months after you were --
after the judge decided your testimony was unreliable,
correct?

**A.**   Yes.  I wasn't aware of this opinion and I had never
read it, nor had I been informed of it by the plaintiff's
attorney in that case.

**Q.**   You are saying that the lawyer who you worked with and
whose information you verified in your opinion didn't tell

1  you that the judge found that your opinion was unreliable?

2  **A.**   The lawyer never told me.

3  **Q.**   Your name is in this opinion dozens of times.  Are you

4  telling me that no one told you that a federal judge had

5  found that your opinion is unreliable?

6  **A.**   I think I just answered that.

7  **Q.**   Now, let's look at what you, what work you did in this

8  case specifically with respect to your opinions on iPod

9  profits, okay?

10 **A.**   Okay.

11 **Q.**   In the *Robinson v. Sanctuary* case that the New York

12 judge was handling, you only looked at information that the

13 plaintiff's lawyer had given to you, correct?

14 **A.**   And the plaintiff, yes.

15 **Q.**   And the plaintiff.  And in this case one of the things

16 that you relied on in connection with the iPod profits

17 opinions were articles that you received from plaintiff's

18 lawyer, correct?

19 **A.**   And a couple of articles that I looked up myself.

20 **Q.**   Okay.  So that was Mr. Guilford, back there, he sent

21 you some articles, correct?

22 **A.**   Correct.

23 **Q.**   And then you found one or two yourself, correct?

24 **A.**   I don't remember how many, but a couple at least.

25 **Q.**   Okay.  Well, in your deposition you said one; do you

1   remember that?

2   **A.**   No, but if you say so, I'll take it.

3   **Q.**   Okay.  So Mr. Guilford sent you some articles and you

4   found one or maybe two yourself, correct?

5   **A.**   Yes.

6   **Q.**   And that's the sum total of your investigation into

7   what connection there is, if any, between the sales of iPods

8   and the sales of downloads on iTunes, correct?

9   **A.**   As I stated before, the relationship exists.  What the

10   percentage relationship is is speculative and that's why I

11   do not pose a number of the exact amount of damages related

12   to that issue.  I simply raised the issue, as I stated

13   yesterday.

14   **Q.**   That was not all my question, Mr. Cohen, so let me go

15   back to --

16              **THE COURT:**  I can't hear you.

17              **MR. POMERANTZ:**  Do you want him to repeat that

18   answer or ask a new question?

19              **THE COURT:**  No.  Ask a new question.

20   **BY MR. POMERANTZ:**

21   **Q.**   Okay.  Mr. Cohen, my question is that the sum total of

22   your investigation into what connection, if any, there is

23   between the sales of iPods and the sales of downloads

24   through the iTunes store are the articles that Mr. Guilford

25   sent you and the one or two articles you found yourself,

1    correct?

2    **A.**   Yes.

3    **Q.**   And you didn't ask the attorneys to provide you with

4    any information beyond that, correct?

5    **A.**   I don't recall.

6    **Q.**   Well, didn't you say in your deposition that you didn't

7    ask them to provide you with any documents at all but they

8    just sent you a box of documents that they had chosen?

9    **A.**   We discussed the issue, and I did some research and

10   Mr. Guilford did some research and we came up with various

11   articles that I reviewed as part of my opinion.

12   **Q.**   Okay.  Well, let me go back to my question.  You did

13   not ask the plaintiffs' counsel to send you any information

14   whatsoever in connection with your expert report.  You just

15   received a box of documents that they chose to send you,

16   correct?

17   **A.**   You are talking about all of the issues in my expert

18   report.

19   **Q.**   Up through the one on August 10th.

20   **A.**   I believe I asked for digital copies of the documents

21   that were sent with relation to my report.  Otherwise, I

22   based my opinion on those documents that were sent to me.

23   **Q.**   So when you say digital copies, you wanted the

24   documents they had already sent you but in a different

25   format, correct?

1   **A.**   I wanted them in a digital format so that I could work

2   with them more easily.

3   **Q.**   And so you did not ask them for any specific piece of

4   information other than what they chose to send you, correct?

5   **A.**   I don't recall.

6   **Q.**   And so when you say in your direct testimony in

7   response to what Mr. Busch said, had asked you -- let me

8   start over again.

9          In your direct testimony Mr. Busch asked you about

10  information that Apple had or didn't have that you reviewed

11  or didn't review; do you remember that?

12  **A.**   Yes.

13  **Q.**   And you said on a number of occasions that you never

14  received certain documents; do you remember that?

15  **A.**   The only information I received with respect to the

16  Apple accountings were their profit and loss statements that

17  were subsequently revised and sales runs, monthly and total

18  sales run for the period in question.  I did not receive any

19  documents which would substantiate any of the numbers in

20  either of those reports.

21  **Q.**   But you never asked Mr. Busch for any of that

22  information, did you?

23  **A.**   I don't recall.

24  **Q.**   Well, you said that you didn't ask him for any

25  information whatsoever, you just received a box of documents

 1    that they chose to send to you, correct?

 2              **MR. BUSCH:**  Objection, Your Honor.  It assumes

 3    that Apple produced anything more than what Mr. Cohen

 4    received.

 5              **MR. POMERANTZ:**  Your Honor, he can cross-examine.

 6    He's just trying to lead the witness from the bench over

 7    here at counsel's evidence.

 8              **MR. BUSCH:**  It assumes facts not in evidence, sir.

 9              **THE COURT:**  Overruled.  Proceed, please.

10              **THE WITNESS:**  Could you repeat the question,

11    please.

12    **BY MR. POMERANTZ:**

13    **Q.**   Yes.  You never asked Mr. Busch or Mr. Guilford or any

14    of the plaintiffs' lawyers to send you any documents

15    whatsoever, correct?

16    **A.**   No, I was not involved in the discovery process of

17    requesting documents from the defendant.

18    **Q.**   All right.  Let's go back to the testimony you have

19    given about iPod profits, okay?  IPod profits are indirect

20    profits, correct?

21    **A.**   Indirect to iTunes profits?

22    **Q.**   Would you view iPod profits as indirect profits?

23    **A.**   With relation to what?

24    **Q.**   To the infringement that are being alleged in this

25    case.

1   **A.**   I would say that, that, that they are indirect in a

2   manner, yes.

3   **Q.**   And your testimony is that when it comes to costs

4   indirect costs should not be deductible, correct?

5   **A.**   Correct.

6   **Q.**   But your opinion is that when it comes to profits,

7   indirect profits should be obtained by the profits, correct?

8   **A.**   I testified that separately we should consider the iPod

9   profits as being impacted by the iTunes store, and what led

10  me to that line of reasoning was when Apple took the

11  position that the iTunes expenses should not be deducted,

12  and I raised this again as a consideration because damages

13  are sometimes statutory and other sources of indirect

14  income, I have been told, have to be considered in statutory

15  damages.

16  **Q.**   Well, do you have an opinion about whether indirect

17  costs are deductible or not?

18  **A.**   In the case of the Apple and Aftermath analysis, I did.

19  It is my opinion that indirect costs should not be

20  deductible.

21  **Q.**   And do you have an opinion about whether indirect

22  profits, like iPod profits, are appropriate or not?

23  **A.**   I think I just stated my opinion about whether they are

24  appropriate.

25  **Q.**   Are they appropriate or not?

1    **A.**   I believe so.

2    **Q.**   So indirect costs are not appropriate, but indirect

3    profits are appropriate; that's your testimony?

4    **A.**   Indirect costs with relationship to the Apple and

5    Aftermath calculations I did are not appropriate.  Indirect

6    profits with relation to the iPod profits as being related

7    to the iTunes store are appropriate.

8    **Q.**   Okay.  So let's stick with the indirect profits of

9    iPods.  Are the indirect costs that the iPod division of

10   Apple has incurred deductible?

11   **A.**   As I said yesterday, the costs that were raised by

12   Mr. Hanson in his report are appropriate.

13   **Q.**   Okay.  Let me go back to my question.  Are indirect

14   costs incurred to sell iPods deductible, yes or no?

15   **A.**   I looked at the analysis that Mr. Hanson did, and he

16   deducted certain costs and categories to get to a lower

17   number than I did on my estimate and he included costs.  I

18   did not analyze each of those costs to determine whether

19   they were indirect, direct, appropriate or inappropriate.

20   **Q.**   And if those costs were indirect costs, are they still

21   appropriate to deduct from the iPod revenue?

22   **A.**   I would have to see what they are and what the

23   relationship is.

24   **Q.**   Well, you saw it in Mr. Hanson's report, didn't you?

25   **A.**   I didn't read the report.  I read the summary.

1  **Q.**  What summary?

2  **A.**  He did an overview summary of his report.

3  **Q.**  How many pages was that?

4  **A.**  Two or three pages.

5  **Q.**  And how long was the whole report?

6  **A.**  I don't recall.

7  **Q.**  It was 22 pages, wasn't it?

8  **A.**  Yes.

9  **Q.**  So you chose to read the first two or three pages, but

10  you didn't have time to read the remaining 20 pages?

11  **A.**  Exactly.

12  **Q.**  When did you receive the report?

13  **A.**  Sometime last week.

14  **Q.**  And so in the last week you haven't had a chance to

15  read the 22 pages?

16  **A.**  No, I have not.

17  **Q.**  Now, you understand that for any iPod profits to be

18  recoverable in this case they have to be attributable to the

19  infringement of the Eight Mile Style compositions that are

20  at issue in this case, correct?

21  **A.**  I think that's a legal issue.

22  **Q.**  So you don't know one way or the other?

23  **A.**  I don't know.  I assume the relationship between iTunes

24  and iPods are the issue, but --

25  **Q.**  Well, is it fair to say, Mr. Cohen, that you don't know

1    how many consumers decided to buy an iPod because the Eminem

2    recordings were available on iTunes?

3    **A.**   I think that's -- would be highly speculative for me to

4    make that estimate, but I do feel that some consumers did

5    buy an iPod because the Eminem recordings were available, as

6    they bought iPods because all of the compositions in the

7    iTunes store were available.

8    **Q.**   Is it fair to say that you don't know a single person

9    who decided to buy an iPod because the Eminem recordings

10   were available through the iTunes store?

11   **A.**   I said that I felt there was some contribution.

12   **Q.**   Let me see if I could refresh your memory.  Could we

13   put on Page 108 of Mr. Cohen's deposition?  The August 12.

14   And let's look at the top, Lines 1 through 5.

15   "Q.   Can you identify for me a single consumer who decided

16   to buy an iPod because they knew that Eight Mile Style

17   recordings were available on iTunes?

18   "A.   No."

19          You recall you gave that testimony in your

20   deposition, correct?

21   **A.**   Yes, but I can't --

22   **Q.**   And you gave that under oath, correct?

23   **A.**   Yes, but I can't recall nor know any reason why a

24   person would buy an iPod for any particular reason except

25   for perhaps myself.

1    **Q.**   Well, you don't know of anyone who said because there

2    is a 99-cent Eminem download available through the iTunes

3    store I'm going to go spend $200 to buy an iPod?  You don't

4    know anybody who did that, do you?

5    **A.**   No.

6    **Q.**   And you can't -- I'm sorry.

7    **A.**   I would guess though that people did buy iPods because

8    there were millions of downloads available in the iTunes

9    store, some percentage of which --

10                  **THE COURT:**  What?

11                  **MR. POMERANTZ:**  There were millions of songs

12   available in the iTunes store, some of which were Eminem or

13   Eight Mile Style compositions.

14   **BY MR. POMERANTZ:**

15   **Q.**   Did you begin that answer with the words "you would

16   guess"?

17   **A.**   I think so.

18   **Q.**   Mr. Cohen, is it fair to say that you are unable to

19   testify in this Court that Apple would have sold even

20   one less iPod if there had been no Eight Mile Style

21   recordings available at the iTunes store?

22   **A.**   Would you repeat that, please?

23   **Q.**   Certainly.  Is it fair to say that you are unable to

24   testify in this Court that Apple would have sold even

25   one less iPod if there had been no Eight Mile Style

1    recordings available at the iTunes store?

2    **A.**    No, I think if they did not have songs on iTunes then

3    there would have been fewer, including the Eight Mile Style

4    compositions, there would have been fewer iPods sold.  So

5    otherwise you are in some way not grasping the fact that the

6    iTunes store contains Eight Mile Style compositions and the

7    iTunes store as a conglomerate affect iPod sales, which is

8    what my testimony is.

9    **Q.**    You read a whole bunch of articles -- strike that.

10            You read a number of articles for your iPod

11   testimony, correct?

12   **A.**    Yes.

13   **Q.**    They were furnished by Mr. Guilford, correct?

14   **A.**    Yes.

15   **Q.**    And one or two you found yourself?

16   **A.**    Yes.

17   **Q.**    And none of those articles said that anybody chose to

18   buy an iPod because the Eminem recordings were available

19   through the iTunes store, did they?

20   **A.**    Not that I recall.

21   **Q.**    Do you recall testifying in your deposition that you

22   don't know whether Apple would have sold one less iPod had

23   there been no Eight Mile Style recordings available on

24   iTunes?

25   **A.**    I don't recall.

1    **Q.**   You don't recall whether you said that or not?

2    **A.**   Correct.

3    **Q.**   Let's see if we can refresh your memory.  Could we put

4    up Page 112, please, and if we could highlight Lines 3

5    through 22.  All right.  I asked you the following question:

6    "Q.   Do you know whether Apple would have sold one less

7    iPod had there been no Eight Mile Style recordings available

8    on iTunes?"

9              You said:  I've answered that.

10             I said:  Well, what was your answer?

11             You said:  It's on the record.

12             I said:  Do you know?  Please answer.

13             Mr. Busch said:  Go ahead.

14             You said:  I don't know.

15             A little further down in your report on Page 6,

16   I'm sorry, there is the following paragraph near the bottom

17   and then you quote from your report where you say that the

18   portion of iPod profits from Eight Mile Style recordings is

19   indeterminate.

20       **MR. BUSCH:**  Your Honor, I would ask that

21   Mr. Pomerantz actually read Mr. Cohen's answer and not

22   summarize it.  He is mischaracterizing the answer on the

23   record.

24       **MR. POMERANTZ:**  Your Honor, I'm happy to read the

25   whole thing.

1          **THE COURT:**  Say the whole thing.

2          **MR. POMERANTZ:**  All right.

3     **BY MR. POMERANTZ:**

4     "Q.   Do you know whether Apple would have sold one less

5     iPod had there been no Eight Mile Style recordings available

6     on iTunes?

7     "A.   I've answered that.

8     "Q.   What was your answer?

9     "A.   It's on the record.

10    "Q.   Do you know?  Please answer.

11          "MR. BUSCH:  Go ahead, Gary.

12    "A.   I don't know.  If you could look a little further down

13    in your report on Page 6, I'm sorry there is the following

14    paragraph near the bottom.  'While there is clearly a

15    synergistic relationship between iPod sales and iTunes

16    sales, it is difficult to ascribe a percentage relationship.

17          'Accordingly, the portion of iPod profits

18    attributable to Eight Mile Style recordings is

19    indeterminate.'.

20          The next line looks like your answer, but I

21    believe it's actually my question.  "What did you mean when

22    you used the term indeterminate?"

23          And then to complete that since we have that

24    question out there, let's go to the -- keep going down and

25    pick up the -- Mr. Busch objected to the form and said the

1    complete report speaks for itself, and then your answer was:

2    "A.   It means I could not determine what percentage it is

3    given at this time although I have determined, I included in

4    my schedules what the maximum amount might be."

5           Do you see that.

6    **A.**   Yes.

7    **Q.**   And then you went into a discussion about what the

8    maximum amount was, correct?

9    **A.**   I don't recall what we discussed after that.

10   **Q.**   Well, do you remember testifying that, while you could

11   come up with a maximum amount, that's not the correct

12   amount?

13   **A.**   Yes.

14   **Q.**   And is it fair to say that your testimony in this case

15   is that any profit from sales of iPods that is attributable

16   to the compositions at issue in this case would be highly

17   speculative to determine?

18   **A.**   Yes., although I believe there is a number that could

19   be attributed.

20   **Q.**   A highly speculative number?

21   **A.**   Yes, but more than nothing.

22   **Q.**   By the way, Mr. Cohen, if Eminem recordings were not

23   available through the iTunes store, do you know how many

24   consumers would have instead obtained an Eminem CD and

25   ripped that CD to their computer hard drive so they could

1    transfer that recording to their iPod?

2    **A.**   No, I do not know.

3    **Q.**   Did you do anything to determine that?

4    **A.**   No.

5    **Q.**   Okay.  I just want to spend a little bit of time on the

6    methodology that you employed to try to analyze iPod

7    profits.  Remember, you had a demonstrative yesterday that

8    you went through on that?

9    **A.**   Yes.

10   **Q.**   Could we put up that demonstrative again?  I believe

11   it's demonstrative 4, not 3.  It's demonstrative 4.  Do you

12   have that?

13   **A.**   Yes, I do.

14   **Q.**   And it's a little hard to see.  Would you maybe just

15   pull up the part.  This is your iPod profit methodology,

16   correct?

17   **A.**   Yes.

18   **Q.**   And so the starting point of your methodology is that

19   $31.2 billion figure, correct?

20   **A.**   Yes.

21   **Q.**   And that's a revenue figure, correct?

22   **A.**   Yes.  That's taken from the 10K reports that Apple

23   files with the SEC.  I subsequently learned from

24   Mr. Hanson's report that approximately 50 percent of that

25   relates to overseas sales.

1    **Q.**   Well, when you put together your analysis, did you know

2    that that $31.2 billion number included sales of iPods

3    outside the United States?

4    **A.**   No.  It did not say so in the section of the 10K that I

5    looked at.

6    **Q.**   Are you a certified public accountant?

7    **A.**   I am.

8    **Q.**   And are you comfortable reading 10K statements that are

9    filed with the SEC?

10   **A.**   I read them from time to time.  I was looking for

11   select information.  I didn't read the whole 10K that Apple

12   filed.

13   **Q.**   Well, do you know what kind of a company has to file

14   10K's with the SEC?

15   **A.**   A public company.

16   **Q.**   And do you know that Apple, Inc. is the public company

17   that is filing the report with the SEC?

18   **A.**   Yes.

19   **Q.**   And you know that Apple, Inc. sells products outside

20   the United States and inside the United States, don't you?

21   **A.**   Yes.

22   **Q.**   And you chose to use a $31.2 billion figure even though

23   you knew that Apple sold products outside the United States,

24   correct?

25   **A.**   I used that portion of the 10K because it delineated

1    what Apple profits -- Apple revenues were from iPod sales.

2    I did not see in my scanning through the 10K any further

3    breakout of iPod sales between domestic and foreign, though

4    there may have been something in that report.  As I say, I

5    scanned it.

6    **Q.**   Well is it your testimony now that the appropriate

7    number -- strike that.  Is it your testimony now that the

8    appropriate revenue number should just be iPod sales revenue

9    within the United States?

10   **A.**   Yes, and I believe that number is about 14.7 billion as

11   per Mr. Hanson's report.

12   **Q.**   Did you do anything to verify that number in

13   Mr. Hanson's report?

14   **A.**   No, I did not have time.

15   **Q.**   So this was just a mistake?

16   **A.**   This was the best information at the time when I

17   created this schedule of possible maximum profits.

18   **Q.**   But it's not possible maximum profits since it includes

19   revenue from outside the United States, correct?

20   **A.**   At that time I believed it to be.

21   **Q.**   It's a mistake?

22   **A.**   A lower number should be revenue if we are just looking

23   at the United States because we are just looking at domestic

24   mechanical royalty.

25   **Q.**   Do you remember that the judge in New York also found

1    mistakes in your methodology in that case?

2    **A.**   I think you have referred to them already.

3    **Q.**   Well, I didn't refer to the fact that your methodology

4    double counted certain things, did I?

5    **A.**   I don't recall.

6    **Q.**   That the federal judge in New York found that your

7    calculations contained material errors, such as double

8    counting, correct?

9    **A.**   If you are reading from the report, then that's what it

10   says.

11   **Q.**   I'm reading from the judge's opinion.

12   **A.**   That's right.

13   **Q.**   And you have no reason to dispute that that's what the

14   opinion says?

15   **A.**   No.

16   **Q.**   Now, let's go to the very bottom of the chart, and

17   that's your way of trying to figure out what percentage of

18   profits should be assigned to Eight Mile's compositions,

19   correct?

20   **A.**   As an average, yes.

21   **Q.**   And so what you did is you took the number of downloads

22   that Apple -- I'm sorry, let me start over again.

23          You took the number of downloads that the iTunes

24   store had sold over a certain period of time and divided it

25   by the number of downloads that were Eight Mile Style

1   composition downloads, correct?

2            I think I actually got that reversed.

3   **A.**   You do have it reversed.

4   **Q.**   So let me say it over again.  What you did is you took

5   the number of downloads that were sold through the iTunes

6   store that had Eight Mile Style compositions and divided it

7   by the total number of downloads that the iTunes store sold

8   over the same period of time, correct?

9   **A.**   Yes.

10  **Q.**   But you know -- strike that.

11           And that led you to a percentage that is

12  .148 percent, correct?

13  **A.**   Yes.

14  **Q.**   A little more than one-tenth of 1 percent, correct?

15  **A.**   That's correct.

16  **Q.**   But you know that music on iPods is more than just

17  downloads purchased from the iTunes store, correct?

18  **A.**   You mean that the music people carry on their iPods is

19  not just from downloads.

20  **Q.**   Not just from downloads purchased from the iTunes

21  store.

22  **A.**   Yes.

23  **Q.**   In fact, yesterday we talked about the fact that less

24  than 10 percent of the music downloads on iPods is from the

25  iTunes store, correct?

1    **A.**   Yes, that's what Mr. Hanson refers to in his report.

2    **Q.**   And you have no reason to disagree with that, correct?

3    **A.**   He used an Apple-generated survey to come up with that

4    number.  Sitting here today, I have no reason to dispute

5    that.

6    **Q.**   And so you were in error in your disposition when you

7    said that well over 95 percent of music on iPods came from

8    the iTunes store, correct?

9    **A.**   Yes.

10   **Q.**   So if we wanted to determine the percentage of all

11   music on iPods that is comprised of Eight Mile Style

12   composition recordings purchased through the iTunes store,

13   you would have to multiply the number of downloads in the

14   denominator, the larger number, by 10, correct?

15   **A.**   That's one way of accounting for that, yes.  There are

16   other ways of approaching the same thing, but yes, that

17   would work.

18   **Q.**   And so if you wanted to know of all of the music on

19   iPods what percentage is comprised of recordings taking --

20   strike that -- recordings embodying the Eight Mile

21   compositions that were purchased from the iTunes stores,

22   that percentage would be 0.0148 percent, correct?

23   **A.**   Yes.

24   **Q.**   And so instead of a little over one-tenth of 1 percent,

25   it would be a little over one-one hundredth of 1 percent,

1    correct?

2    **A.**    Yes.

3    **Q.**    And that, those download figures only include music

4    downloads, correct?

5    **A.**    As far as I know, yes.

6    **Q.**    Well, in order for you to get that number of

7    6.356 billion downloads, you had to go find that number

8    someplace, correct?

9           **MR. BUSCH:**  Note my objection to the relevance of

10   the questions about songs on iPods as it relates to songs

11   other than downloaded from the iTunes store, which is part

12   of Mr. Cohen's analysis, Your Honor.

13          **THE COURT:**  Overruled.

14   **BY MR. POMERANTZ:**

15   **Q.**    Let me go back to my question.  Where did you get the

16   number 6.356 billion downloads?

17   **A.**    It was in some of their literature I reviewed.

18   **Q.**    Well, it was from a particular piece of literature

19   published by Blackfriars, Inc. correct?

20   **A.**    Yes.

21   **Q.**    And Blackfriars, Inc. reports that Apple sold through

22   its iTunes store more than 6.356 billion downloads of

23   content, correct?

24   **A.**    I don't recall the exact wording of the article.

25   **Q.**    Well, the 6.356 billion downloads only reflects music

1  downloads, correct?

2  **A.**   I -- if that's what the article said.  I don't recall

3  seeing it.

4  **Q.**   And people who buy iPods use their iPod for content

5  other than music, correct?

6  **A.**   Yes.  More so now, less so in the early days.  I think

7  it's been more recent, in the last couple of years that

8  there are video downloads.

9  **Q.**   So users of iPods use their iPod to watch TV shows,

10  correct?

11  **A.**   More so currently than in the earlier years covered by

12  this analysis.

13  **Q.**   So you could go on a bus here in Detroit and see

14  probably a younger person looking at their iPod with

15  headphones watching a TV show as they are going to work,

16  correct?

17  **A.**   Yes.

18  **Q.**   And iPods are also used to watch movies, correct?

19  **A.**   Yes.

20  **Q.**   And iPod users download movies through the iTunes

21  store, correct?

22  **A.**   I believe so.

23  **Q.**   In fact, you can even rent a movie through the iTunes

24  store and watch it on your iPod, correct?

25  **A.**   I don't know, but I imagine you could.

1    **Q.**   And so iTunes let's you have the movie for one-time

2    viewing, for example, correct?

3    **A.**   I never -- I didn't know it had that capacity.  If it

4    is, that's fairly recent.

5    **Q.**   And you know that there are hundreds of millions of TV

6    shows and movies and movie rentals that are downloaded

7    through the iTunes store, correct?

8    **A.**   I don't know the numbers.

9    **Q.**   Well, that information is available through

10   Blackfriars, Inc., isn't it?

11   **A.**   As I said, I do not, I am not -- I don't remember the

12   details of that article sitting here.  I have to review it.

13   **Q.**   Well, if you wanted to determine Eight Mile Style's

14   share of all downloads that are purchased through the iTunes

15   store, those downloads include movies and TV shows, don't

16   they?

17   **A.**   I was referring to music when I did my analysis.

18   **Q.**   Well, you are trying to show what causes someone to go

19   buy an iPod, correct?

20   **A.**   I think I stated that in my direct testimony there are

21   many reasons people buy an iPod:  To download photos, to

22   have a portable player, but also to have access to the

23   iTunes store, and there is some, as I call, indeterminate

24   synergy between the two.

25   **Q.**   And so if you are trying to figure out what percentage

1    Eight Mile Style's compositions have to all downloads that

2    iTunes purchasers want, you would have to include TV shows

3    and movies, wouldn't you?

4    **A.**   I didn't do so in my analysis.

5    **Q.**   But my question is you have to do so if what you wanted

6    to do was to determine Eight Mile Style's share of all

7    downloads that iTunes store purchasers acquire, correct?

8    **A.**   I think we talked about, about 5 to 10 percent of

9    people who have iPods purchase them to access the iTunes

10   store or purchase through the iTunes store, and I believe

11   I -- I think I may have referred to music.  I'm not sure.

12   So if you are going to reduce it by one-tenth, you have to

13   make sure that that does not include already video and TV

14   show downloads.  I can't really speak to that.

15   **Q.**   That's not what you are speaking to in this percentage.

16   What you were doing here was you --

17   **A.**   Well, we talked about how I got to my percentage, and

18   we corrected how many users -- from my deposition I said I

19   didn't know, but I guessed 95 and I had way overestimated,

20   but it was a guess at the moment.  We were provided with

21   further information from studies that Mr. Hanson referred to

22   with the percentage at around 10 percent, but that may

23   already include the video and TV analysis that you are

24   speaking of now.  You may be double deducting in what you

25   are proposing to further increase the denominator, increase

1   the denominator in the calculation.

2   **Q.**   I'm not proposing anything at this point.  I'm just

3   looking at the analysis that you did.  This is your

4   analysis, correct?

5   **A.**   Yes.

6   **Q.**   This is a methodology that you are proffering here in

7   court, correct?

8   **A.**   It's a maximum amount, and I think the testimony for it

9   we have already discussed, that this estimate is too high

10  and the maximum should be lower.

11  **Q.**   And in the line that we have highlighted at the bottom

12  what you say you are doing is looking at Eight Mile's share

13  of all downloads, correct?

14  **A.**   Yes, that's music downloads.

15  **Q.**   Now you say it's music downloads, correct?

16  **A.**   I just said that, yes.

17  **Q.**   Even though iPod purchasers use the iPod to watch TV

18  shows and movies, correct?

19  **A.**   Correct.

20  **Q.**   Now, iPod users also use the iPod for a whole bunch of

21  applications, correct?

22  **A.**   I think the iPod Touch which recently came out has

23  a lot of applications, but that's very recent and maybe even

24  after the analysis we have here.  I don't know when

25  applications really started to be used on the Touch.  Most

1    iPods, video iPods, earlier generations don't have that

2    capacity.

3    **Q.**    IPods, for whatever the applications that have been

4    available, iPod owners have used iPods for applications,

5    correct?

6    **A.**    When they have been available.  I don't know when they

7    were available so --

8    **Q.**    Well, we will have ample witnesses here, and they will

9    be able to tell us that.

10   **A.**    All right.

11   **Q.**    Do you know how many applications iPod owners have

12   purchased from Apple?

13   **A.**    No.

14   **Q.**    Would it surprise you to know that iPod owners have

15   purchased 2 billion applications from Apple?

16   **A.**    I have no way of knowing one way or the other.

17   **Q.**    You didn't consider those two billion applications in

18   any of the methodology that you have here, correct?

19   **A.**    No.

20   **Q.**    Let's look at a different line item now on your

21   analysis.  Can we go back up on the chart, Phil, a little

22   higher, and let's do the top part of the chart Item 1, and

23   let's now highlight the next line, the gross margin.

24   All right.

25           So an important part of your methodology is that

1  you reduce revenue by 70 percent, correct?

2  **A.**   Yes.

3  **Q.**   And that's because you determined that 30 percent is

4  Apple's gross margin on iPods, correct?

5  **A.**   Yes.

6  **Q.**   What is gross margin?

7  **A.**   It's the difference between the revenues and the net

8  profit after certain direct expenses.

9  **Q.**   So what you do is you take the revenue and you deduct

10 what you just referred to as direct expenses, correct?

11 **A.**   Certain expenses, yes, so that Apple makes a profit of

12 30 cents for every dollar in iPod sales they make, and that

13 was in the literature I read and Mr. Hanson's report.

14 **Q.**   And that is only a certain type of expenses that Apple

15 incurs in connection with the sale of iPods, correct?

16 **A.**   That's, those are certain expenses.  I'm not sure which

17 ones sitting here.

18 **Q.**   Well, is it the types of expenses that people in your

19 business would refer to as cost of sales?

20 **A.**   Yes.

21 **Q.**   So, for example, it might include the cost to

22 manufacture an iPod?

23 **A.**   I believe so, yes.

24 **Q.**   It might include the freight to ship iPods?

25 **A.**   It might.

1    **Q.**   But there's a lot of expenses that Apple incurs in
2    connection with the sale of iPods that it doesn't include,
3    correct?
4    **A.**   In the computation of gross margin?
5    **Q.**   No, that wasn't my question.
6    **A.**   I didn't understand your question then.
7    **Q.**   In fact, you are probably right so let me just go back
8    and make sure you and I are agreeing with each other on the
9    same thing.
10           The 30 percent figure does not take into account
11   any expenses Apple incurs in connection with the sale of
12   iPods other than cost of sales, correct?
13   **A.**   Yes.
14   **Q.**   And so one of the items of cost that it does not
15   include is research and development costs, correct?
16   **A.**   Correct.
17   **Q.**   And you know that Apple has spent millions and millions
18   and millions of dollars to develop and improve the iPod,
19   correct?
20   **A.**   Yes.
21   **Q.**   And Apple has often issued the next generation of iPod,
22   correct?
23   **A.**   Yes.
24   **Q.**   And you are aware that besides this traditional iPod
25   that I'm holding up right here there's other types of iPods

1   out there, right?

2   **A.**    Yes.

3   **Q.**    There's the Nano, correct?

4   **A.**    Yes.

5   **Q.**    The Shuffle?

6   **A.**    Yes.

7   **Q.**    And others.  And you believe that those research and

8   development costs should be deducted in your analysis,

9   correct?

10  **A.**    In my initial analysis I did not deduct them.  After

11  reviewing the outline of Mr. Hanson's report, I felt that

12  the deductions that he made, and I don't recall them sitting

13  here, were appropriate to get the revenue figure, the profit

14  figure from 9.4 billion to a lower number.

15  **Q.**    And is research and development costs a cost that

16  should have been deducted in your analysis?

17  **A.**    I agreed with the -- I saw no problems with the

18  analysis Mr. Hanson made.  If he included them, then I'm

19  fine with deducting them to get to a net profit number for

20  this purpose.

21  **Q.**    Did you just forget to deduct them when you were doing

22  this methodology?

23  **A.**    I didn't have the information available to me at the

24  time.

25  **Q.**    Are you saying that the Apple filings with the SEC

1  didn't reflect research and development costs?

2  **A.**   I took that 30 percent figure from articles.  I didn't

3  review the full financial statements of Apple.

4  **Q.**   You reviewed the 10K's that Apple filed with the SEC,

5  correct?

6  **A.**   For the purpose of coming up with a revenue figure for

7  iPods only.

8  **Q.**   Well, if you thought that research and development

9  costs were appropriate to deduct, why didn't you look at the

10  SEC reports to find out what the research and development

11  costs were?

12  **A.**   I thought that they may have been included in the gross

13  margin at the time all costs to get to a profit and that

14  they made 30 cents after all costs to get to the gross

15  margin.  I'm not quite sure what the elements of that

16  percentage were.

17  **Q.**   I thought you just said a couple of minutes ago that

18  you understood and people in your business understand that

19  gross margin only reflects cost of sales?

20  **A.**   Well, perhaps in this case it reflected other things.

21  30 percent was affirmed by Mr. Hanson, and it was also, it

22  was also in some of the other literature so perhaps it

23  didn't include research and development.

24  **Q.**   But you knew when you were using that 30 percent that

25  it didn't include research and development, didn't you?

1    **A.**   I took a percentage number from the literature, and I

2    didn't analyze the elements of that deduction.

3    **Q.**   Well, you knew that if you did include research and

4    development in this analysis, instead of a 30 percent

5    margin, you would have used a significantly lower margin,

6    wouldn't you?

7    **A.**   I didn't, I don't know that to be true.

8    **Q.**   Have you ever looked back at the SEC filings to see

9    what Apple spent on research and development?

10   **A.**   No.

11   **Q.**   Since you saw Mr. Hanson's report and pointed out these

12   important cost items that you didn't consider in this

13   analysis, did you do anything to verify whether those cost

14   items were correct or not?

15   **A.**   No.

16   **Q.**   Now, another cost that you did not include in your

17   30 percent figure is the cost that Apple spends to advertise

18   its iPods, correct?

19   **A.**   It may have been included in the gross margin analysis

20   or in the reduction of the revenue figure.  We have

21   discussed reducing the revenue figure in Mr. Hanson's report

22   to include items that you are speaking about.  So I have

23   stated that Mr. Hanson's net revenue figure of 2.1 billion

24   instead of 9.4 billion might be appropriate.

25   **Q.**   That 30 percent figure that you used in your

1   methodology does not include the costs of advertising the

2   iPod, does it?

3   **A.**   I don't know sitting here.

4   **Q.**   Well, advertising costs are not part of costs of sales,

5   correct?

6   **A.**   As I said, it may have been included in the reduced net

7   profit number that Mr. Hanson put forward.

8   **Q.**   That wasn't my question.  People in your accounting

9   business use the term cost of sales, correct?

10  **A.**   Yes.

11  **Q.**   And cost of sales does not include advertising

12  expenses, does it?

13  **A.**   Well, if we back up a little bit, perhaps the

14  30 percent figure is not just cost of sales.  Perhaps it

15  includes other items as well.  I don't know sitting here.

16  **Q.**   That's not my question.

17  **A.**   Okay.

18  **Q.**   Does advertising -- strike that.

19         Does cost of sales include advertising expenses to

20  people who are experienced accountants?

21  **A.**   Not typically, no.

22  **Q.**   You know that Apple spends a lot of money to advertise

23  the iPod, don't you?

24  **A.**   Yes.

25  **Q.**   You have seen billboards all over the place advertising

1    the iPod, correct?

2    **A.**    Yes.

3    **Q.**    TV commercials advertising the iPod, correct?

4    **A.**    Yes.

5    **Q.**    And your 30 percent figure here does not include any

6    advertising expense, does it?

7    **A.**    I said I'm not sure.  It may.

8    **Q.**    But it should, correct?

9    **A.**    I'm sorry?

10   **Q.**    For your methodology to be correct, advertising

11   expenses should be deducted from revenue, correct?

12   **A.**    Either in -- to determine iPod profits, I don't recall.

13   If it's the direct advertising of the iPod, yes.

14   **Q.**    And there are other costs incurred in the sale of iPods

15   besides cost of sales, research and development, and

16   advertising, correct?

17   **A.**    You would have to enumerate them for me, but I'm sure

18   there are.

19   **Q.**    Well, for example, there are expenses called selling,

20   general and administrative expenses, correct?

21   **A.**    Yes.  To get to the iPod profits, I'm sure there are

22   many expenses of the iPod division at Apple, which is I

23   think what these numbers relate to.

24   **Q.**    And one category of those expenses are something called

25   selling, general and administrative expenses, correct?

1    **A.**   Yes.

2    **Q.**   People in your business might refer to that at SG&A

3    expenses, correct?

4    **A.**   Yes.

5    **Q.**   And those should be deducted from revenue in order to

6    come up with a profit number, correct?

7    **A.**   Whether they are included in that 30 percent or not, I

8    don't know sitting here.

9    **Q.**   That wasn't my question.  SG&A expenses should be

10   deducted from revenue in order to come up with a profit

11   number, correct?

12   **A.**   Yes.

13   **Q.**   And your 30 percent doesn't take into account SG&A

14   expenses, does it?

15   **A.**   It may or may not.

16   **Q.**   You don't know?

17   **A.**   I don't know sitting here whether they do.  I would

18   have to review the literature I looked at in more detail.

19   **Q.**   Well, when you saw that 30 percent figure in some

20   article that you read, what did you do to determine whether

21   that number included all of the expenses you were supposed

22   to deduct?

23   **A.**   I didn't do anything.

24   **Q.**   And I take it another expense that you didn't consider

25   was the expenses that Apple incurs to pay taxes on the sale

1    of iPods, correct?

2    **A.**   I don't know how Apple does its taxes, but I imagine

3    they are worldwide, have a worldwide tax structure.

4    **Q.**   In order for you to determine the appropriate profit

5    that Apple earned on the sale of iPods, you would have to

6    deduct the taxes Apple had to pay for the revenue it

7    received from the sale of iPods, correct?

8    **A.**   If any taxes.

9    **Q.**   I'm sorry?

10   **A.**   I don't know if they paid taxes or not.

11   **Q.**   If they did, you would have to deduct it, right?

12   **A.**   Yes.

13   **Q.**   So if you included all of the expenses that you were

14   supposed to include in order to come up with a profit

15   figure, what would that margin percentage be?

16   **A.**   I think the other factors are accumulated in a

17   reduction of the profit figure from the 9.4 here to the

18   2.1 billion that Mr. Hanson referred to, but I believe he

19   may have accounted for all of those things.

20   **Q.**   I'm not asking you for what Mr. Hanson is going to say

21   when he testifies later on in this case.  I'm just asking

22   you for a number.  What percentage should be used in your

23   analysis in order to come up with the appropriate margin on

24   iPods?

25   **A.**   I don't know.

1    **Q.**   Now, you say that there are lots and lots of factors

2    that cause people to buy iPods, correct?

3    **A.**   Yes.

4    **Q.**   And in order to determine the appropriate amount of

5    profits that could possibly be attributable to the

6    Eight Mile Style compositions at issue in this case, you

7    would have to analyze all of those factors, correct?

8    **A.**   I would have to consider them, yes.

9    **Q.**   And you haven't done that, right?

10   **A.**   I think I have testified that there are other things

11   that I have considered, but not in this original analysis.

12   **Q.**   You haven't analyzed how any of the factors that

13   contribute to someone choosing to buy an iPod affects your

14   analysis in this case, correct?

15   **A.**   There are other factors and those have to be considered

16   when determining the synergy between the iTunes store and

17   sales of iPods, and I think I have stated that.

18   **Q.**   All you have said is that there are so many factors

19   that contribute to the sale of iPods that it's highly

20   speculative to know whether any one factor contributed a

21   certain amount, correct?

22   **A.**   Yes.  I said it's speculative to consider how each

23   factor attribute, is attributed, but that I believe that the

24   synergy is more than zero.

25   **Q.**   So let's just make sure we agree on what all of those

1  factors, at least some of those factors are that causes

2  someone to go out and buy an iPod.  Some people might go out

3  and buy an iPod because of its unique portable design,

4  correct?

5  **A.**   I can't speak to what are in people's minds when they

6  purchase an iPod.  If you would like, I could speculate.

7  **Q.**   You can't speak to what's in people's minds when they

8  purchase an iPod.  Isn't that what you are purporting to

9  testify to when you say that there are iPod profits?

10 **A.**   I said there may be various factors, but the iTunes

11 store being one and portability and the availability of a

12 nice screen or design would be others.

13 **Q.**   And the continuing stream of upgrades and improvements

14 to the iPod may be a reason for someone to go out and buy an

15 iPod, correct?

16 **A.**   If they like the features, that might be a reason.

17 **Q.**   So somebody might say I like the new features that the

18 iPod Touch has and go out and buy an iPod Touch, right?

19 **A.**   Yes.

20 **Q.**   Or if Apple creates a technology that they call the

21 Genius technology, someone might like that technology and go

22 out and buy an iPod, correct?

23 **A.**   It's my understanding that Genius technology is in the

24 iTunes store and not on the iPod.

25 **Q.**   Somebody might buy an iPod because the advertisement

1   they just saw motivates them to go buy an iPod, right?

2   **A.**   There could be three or four reasons why somebody might

3   buy an iPod.

4   **Q.**   Have you ever been to one of the Apple retail stores?

5   **A.**   Yes, I have.

6   **Q.**   And those are really attractive stores, correct?

7   **A.**   A lot of people seem to like it.

8   **Q.**   A buzz in the store and a lot of people, particularly

9   young people, go in there and hang out and try out the new

10  devices, correct?

11  **A.**   I don't know.

12  **Q.**   But those stores could contribute to the sale of iPods,

13  correct?

14  **A.**   Among many other factors.

15  **Q.**   And there is enormous press coverage that Apple has

16  received for the iPod, correct?

17  **A.**   I have seen advertisements.  I have seen press

18  coverage.

19  **Q.**   And the Apple brand is a very valuable brand, isn't it?

20  **A.**   It's well known, yes.

21  **Q.**   Apple is one of the most recognized brands in the

22  entire world, isn't it?

23  **A.**   I don't know.

24  **Q.**   Certainly some people might choose to buy an iPod

25  because they are attracted to the Apple brand, correct?

1    **A.**   As opposed to the actual product, I don't know if

2    that's true.

3    **Q.**   All right.  Let's put the iPod profits to one side, and

4    we have started -- yesterday we went through what profits

5    you thought were coming from the sale of downloads from the

6    iTunes store.  That was the first level.  Do you remember

7    that?

8    **A.**   Yes.

9    **Q.**   And then we just discussed your opinions with respect

10   to profits from the sale of iPods, correct?  That's the

11   second level of analysis?

12   **A.**   Yes.

13   **Q.**   So let's go to the third source of profits that you are

14   offering opinions on, and that's Aftermath's profits; do you

15   recall that?

16   **A.**   Yes.

17   **Q.**   And in your testimony when you were being questioned by

18   Mr. Busch you talked about certain expenses that Aftermath

19   deducted from revenue in its profit and loss statements that

20   you thought were not appropriate to deduct, correct?

21   **A.**   Yes.

22   **Q.**   And one of those costs that Aftermath deducted was a

23   cost that is described as a distribution figure, correct?

24   **A.**   Yes.

25   **Q.**   And you said that you did not think that that

1   particular item of cost is properly deductible, correct?

2   **A.**   Yes.

3   **Q.**   And the basis of your opinion on that particular cost

4   item is that you think that the cost to distribute

5   recordings in the download format are negligible to

6   Universal, correct?

7   **A.**   Yes.  They distribute a master and some meta data at

8   Apple, but they do not, because it's a virtual product they

9   do not keep inventory, they do not have warehousing costs.

10  They do not have to do any of those things that a

11  distributer of physical product does.

12  **Q.**   And you believe that Universal's costs to distribute

13  recordings in the digital format are negligible simply

14  because that's what you believe, right?

15  **A.**   I stated the reasons just now.

16  **Q.**   Well, let's see what you said in your deposition.  Can

17  we put up Page 146, please, and let's start out on Line 18

18  to the end of the page, and then we will have to go on to

19  the next page.  All right.

20  "Q.   What is the basis of your statement in this paragraph

21  that the distribution costs associated with digital products

22  are negligible?

23  "A.   I don't believe universal incurs distribution costs

24  beyond sending a digital file and some meta data to Apple.

25  "Q.   What is the basis of that testimony?"

1          Let's get the next page up here.

2     "Q.   What is the basis of that testimony?

3     "A.   That's my understanding.

4     "Q.   Based on what?

5     "A.   I can't answer that any further.

6     "Q.   Do you recall what it's based on?

7     "A.   No.  But I have been doing this a long time.  I

8     couldn't specifically tell you."

9          That's what you said in your deposition, correct?

10    **A.**   Yes.

11    **Q.**   And in fact you have been hired many times to do

12    various work related to the music industry, correct?

13    **A.**   Yes.

14    **Q.**   But in all of those engagements not once have you ever

15    been asked to look into the costs actually incurred by a

16    record company to distribute its recordings in digital

17    format, correct?

18    **A.**   No.

19    **Q.**   I am not correct?

20    **A.**   No, occasionally I have to work with profit and loss

21    statements of artists who have joint venture agreements with

22    a record company and then I have to deal with distribution

23    costs.

24    **Q.**   That's not what you said in your deposition, is it?

25    **A.**   I don't recall.

1    **Q.**   Let's see what you said in your deposition.  The same

2    page, let's go down to Lines 19 through 24.

3    "Q.   In your prior engagements in the music industry, have

4    you ever been asked to look into the costs that are actually

5    incurred by a record company to distribute its digital

6    product?

7    "A.   No."

8          That's what you said in your deposition, correct?

9    **A.**   Yes.  I don't know if I had any other discussions about

10   it during the deposition.  That's a small part of it.

11   **Q.**   Now, another expense that Aftermath and Universal incur

12   that you say is not properly deductible in your profits

13   analysis are expenses that Universal incurs and Aftermath

14   incurs to market the recordings containing the compositions

15   that are at issue in this case, correct?

16   **A.**   Yes.

17   **Q.**   And in your view no advertising or marketing expense is

18   deductible unless it specifically mentions the download

19   version of one of the compositions that's at issue in this

20   lawsuit, correct?

21   **A.**   That's a part of my testimony.

22   **Q.**   So you agree with that?

23   **A.**   I agree with that part of it, but that's not the whole

24   reason.

25   **Q.**   So if Aftermath puts out a commercial that says buy the

1   Eminem Show album at your local retailer, you would think

2   that that cost is not deductible in this case, correct?

3   **A.**   There are many factors to why I think the marketing

4   costs are not deductible.  Firstly, the timing of the cost

5   and the revenue is misstated; secondly, the costs are

6   indirect and I don't believe indirect costs should be

7   deducted; and also the costs of marketing that were included

8   in the report may have contained video production costs and

9   independent promotion costs that may have been deducted from

10  an artist's royalty.

11  **Q.**   Okay, but let me go back to my question.  If there's an

12  advertisement on TV during the time period that you think is

13  okay that says, "Buy the Eminem Show album at your local

14  retailer," you would think that that cost should not be

15  deducted from revenue in this case, correct?

16  **A.**   I think a direct advertisement would be appropriate.

17  **Q.**   Is that a direct advertisement?

18  **A.**   It sounds to me like it might be if it was during the

19  period, but I was not given enough information to break out

20  direct from indirect marketing and so had I to take the

21  position that all marketing costs are not appropriate.

22  **Q.**   But the advertisement I just described to you doesn't

23  specifically identify any of the Eminem compositions at

24  issue in this case.

25  **A.**   TV advertisement costs, particularly in both artists

1    agreements, result in a deduction of artists royalties, and

2    a record company recoups TV advertisement costs from the

3    artist and I believe that's also the case with Eminem.

4    **Q.**   That wasn't my question.  I just want to stick with

5    direct costs and indirect costs and what you think is

6    appropriate.  Assuming the record company incurred the cost

7    of the advertisement.

8    **A.**   Initially and then they recouped it from the artist.

9    **Q.**   No.  Assume they incurred the cost themself and never

10   recouped it.  Okay?  That's the assumption.

11   **A.**   That's not what's going on here.

12   **Q.**   We will have people testify.  I am asking you to assume

13   that the record company incurs a cost to advertise the new

14   Eminem Show, okay?

15   **A.**   Okay.

16   **Q.**   It costs $100.  Okay?  Times are tough in the TV

17   business.  Only $100 to advertise on NBC.  Okay?

18   **A.**   Okay.

19   **Q.**   It the says the Eminem Show album is available at your

20   local retailer.  It doesn't mention any Eight Mile Style

21   composition.  It doesn't mention the download format.  Is

22   that expense deductible in your analysis in this case?

23   **A.**   For the reason that I stated, it is not.

24   **Q.**   And what's that reason?

25   **A.**   The reason is it's partially recouped from the artist.

1    It is -- marketing generally is an indirect expense that you

2    cannot attribute to -- the dollars spent for marketing does

3    not necessarily result in one more sale.  I'm sure marketing

4    experts think it does, but it's hard to say what the

5    interaction is.  I excluded indirect costs from my analysis.

6    **Q.**   So even if consumers who saw that advertisement decided

7    I'm going to go buy that album and went to the iTunes store

8    and bought that album, you would still not deduct that

9    expense from your calculations, correct?

10   **A.**   I did not allow for marketing expenses because I wasn't

11   given that level of detail about how much was spent for a

12   particular advertisement or what the content of that

13   particular advertisement was.

14   **Q.**   But when those consumers went to the iTunes store and

15   bought the Eminem Show album, you included the revenue from

16   those sales in your revenue figures, correct?

17   **A.**   I included the revenue as received by Apple and

18   reported in the documents I was given.

19   **Q.**   But you did not include the expense of the

20   advertisement that drove those consumers to go buy that

21   album from the iTunes store, correct?

22   **A.**   Correct.

23   **Q.**   And it's your opinion that the overhead expenses that

24   Aftermath and Universal incurred in connection with this

25   sale of recordings that contain the Eight Mile Style

1    compositions is not a properly deductible expense, correct?

2    **A.**    Yes.

3    **Q.**    And that's because in your view that's an indirect

4    expense, correct?

5    **A.**    Yes, and I was not given enough detail about, or

6    underlying documentation, about how Universal arrived at the

7    expense.  I was given binders full of allocations, but no

8    source documentation.

9    **Q.**    Let's put aside Aftermath profits, okay?

10   **A.**    Okay.

11   **Q.**    And let's think about all three portions of your profit

12   analysis, the iTunes store profit, the iPod profit and the

13   Aftermath profit, okay?

14   **A.**    As opposed to actual damages?

15   **Q.**    Correct.  We are going to get to that later.  We are

16   going to take the profit numbers all together and your

17   analysis of profits all together, okay?  Are you with me?

18   **A.**    I'm listening.

19   **Q.**    All right.  When a consumer buys an Eminem recording

20   from the iTunes store, you understand that that consumer is

21   actually buying something that involves two different

22   copyrights, correct?

23   **A.**    Yes.

24   **Q.**    There's the composition, correct?

25   **A.**    Yes.

1  **Q.**   And then there's the particular artist's recording of

2  that composition, correct?

3  **A.**   Yes.

4  **Q.**   And if the consumer buys the download of the recording

5  through the iTunes store, they are actually getting the

6  composition and the recording of the composition, correct?

7  **A.**   Yes.

8  **Q.**   And you understand that the plaintiffs in this case

9  only own rights to the composition, correct?

10 **A.**   Yes.

11 **Q.**   And they have no rights whatsoever to the recording of

12 the composition; you understand that?

13 **A.**   Yes.

14 **Q.**   All right.   Now, suppose that there are two downloads

15 available for sale through the iTunes store, okay?

16 **A.**   Yes.

17 **Q.**   One is the composition "Lose Yourself" that is recorded

18 by Eminem, okay?

19 **A.**   Okay.

20 **Q.**   And the other is the composition "Lose Yourself"

21 recorded by me.   Okay?

22 **A.**   Okay.

23 **Q.**   Those two downloads have the same composition, correct?

24 **A.**   Correct.

25 **Q.**   But they have different people recording them, correct?

1   **A.**   According to your hypothetical.

2   **Q.**   And if a lot more consumers who go to the iTunes store

3   decide to buy the version of "Lose Yourself" that's recorded

4   by Eminem instead of the version of "Lose Yourself" that was

5   recorded by me, that's probably because of the person who

6   recorded it, correct?

7   **A.**   I don't know why people would buy one version as

8   opposed to another.

9   **Q.**   You don't know why a consumer would go to the iTunes

10  store and choose to buy the version of "Lose Yourself"

11  recorded by Eminem rather than the version recorded by me?

12  **A.**   I'm not an arbiter of people's tastes.

13  **Q.**   Have you ever heard me sing?

14  **A.**   I would like to.

15  **Q.**   Eminem is a famous recording artist, isn't he?

16  **A.**   Yes, he is.

17  **Q.**   He has a lot of fans, correct?

18  **A.**   Yes.

19  **Q.**   And so when a consumer goes there and they push in the

20  name "Lose Yourself" and they see "Lose Yourself" by Eminem

21  and "Lose Yourself" by Glenn Pomerantz, isn't it your best

22  guess that most of them are going to go buy "Lose Yourself"

23  by Eminem?

24  **A.**   It would be a guess.

25  **Q.**   My mom would buy "Lose Yourself" by Glenn Pomerantz and

1   everybody else would buy the Eminem version?

2   **A.**   You are asking me to speculate why people buy things.

3   I don't know.

4   **Q.**   That question would cause you to speculate?

5              Mr. Cohen, did you do anything in your analyses of

6   profits to try to apportion the profits between the

7   compositions that Eight Mile Style has an interest in and

8   the recordings of those compositions that Eight Mile Style

9   has no interest in?

10  **A.**   No.

11  **Q.**   Do you think it's fair for Eight Mile Style to share in

12  the profits from Eminem's recording of the compositions when

13  it has absolutely no interest in those recordings?

14  **A.**   I think that's a matter of law.

15  **Q.**   Those recordings of the compositions, the ones where

16  Eminem records the composition, those are owned by

17  Aftermath, correct?

18  **A.**   I think so.

19  **Q.**   They are not owned by Eight Mile Style, correct?

20  **A.**   Correct.

21  **Q.**   And the only profits that Eight Mile Style is entitled

22  to in this case are the profits that are attributable to the

23  compositions that they own, correct?

24  **A.**   The recordings of the compositions they own.

25  **Q.**   You believe in this case that Eight Mile Style is

1   entitled to profits from the recordings of those

2   compositions?

3   **A.**   I was advised that I should do my analysis on that

4   basis.

5   **Q.**   Who advised you of that?

6   **A.**   The plaintiffs' attorney.

7   **Q.**   Did plaintiffs' attorney ever ask you to try to figure

8   out what portion of those profits are attributable to the

9   compositions at issue in this case and what portion of those

10  profits are attributable to the recordings of those

11  compositions?

12  **A.**   I was advised for the purpose of my analysis they are

13  all attributable to the compositions in a copyright

14  infringement case.

15  **Q.**   So that's something you took from the lawyers in this

16  case?

17  **A.**   Yes.

18  **Q.**   And you made no effort to try to allocate the profits

19  in this case between the compositions and the recording of

20  the compositions?

21  **A.**   I was advised of how to proceed, and I did the analysis

22  on that basis.

23  **Q.**   Mr. Cohen, are you aware that for many of the

24  compositions at issue in this case Eight Mile Style does not

25  own 100 percent of the copyright?

1    **A.**   Yes.

2    **Q.**   You understand that Eight Mile Style owns only

3    50 percent of the copyright on some of the compositions at

4    issue?

5    **A.**   Yes.

6    **Q.**   And even though Eight Mile Style may only own

7    50 percent of a particular composition at issue, your

8    analysis assumes that Eight Mile Style is entitled to

9    100 percent of the profits in that composition, correct?

10   **A.**   Yes.

11   **Q.**   And you are using 100 percent of the profits in your

12   analysis because Mr. Busch told you to do that, correct?

13   **A.**   I was advised that in copyright infringement cases that

14   any copyright proprietor is entitled to 100 percent of the

15   profits on the sale of the downloads in this case.

16   **Q.**   Now, are you aware that Mr. Martin testified earlier in

17   this case that he thinks a songwriter can only license his

18   or her own percentage share of a composition?

19   **A.**   I don't know what Mr. Martin testified.  I wasn't here.

20   **Q.**   Are you aware that Mr. Martin testified that even if a

21   contract does not say that the artist is licensing only his

22   or her share of the composition in fact that's all he

23   really -- he or she really is licensing?

24   **A.**   I don't know what Mr. Martin said.  These are a matter

25   of law.  I was engaged to do certain financial analysis

1    based on assumptions I was given, and that's what I did.

2    **Q.**   Well, did you ever ask Mr. Busch why Eight Mile Style

3    can get 100 percent of all of the profits if Mr. Martin

4    thinks that a publisher can only license 50 percent of a

5    song?

6    **A.**   I didn't know what Mr. Martin said.  How could I ask

7    Mr. Busch about it?

8    **Q.**   Well, did you ask him why a publisher can get

9    100 percent of the profits if it can only license 50 percent

10   of a song?

11   **A.**   Because it was a matter of a law and I was given

12   parameters within which to do my analysis, and that's the

13   basis I used.  The rest will be decided here.

14   **Q.**   Well, has anyone ever told you that in fact a publisher

15   can license 100 percent of a song even if it only owns

16   50 percent of the composition?

17   **A.**   Again, this is a matter of law so the answer would be I

18   don't know.

19   **Q.**   Okay.  I want to go to that fourth element of your

20   analysis which you called actual damages, correct?

21   **A.**   Correct.

22   **Q.**   And you said that that relates to eight I think you

23   used the term short form compositions, correct?

24   **A.**   Eight compositions, yes.

25   **Q.**   Did you use short form compositions in your

1    terminology?

2    **A.**    I didn't use the word form but short compositions.

3    **Q.**    Short compositions.  And it's also fair to call those

4    eight short compositions skits, correct?

5    **A.**    Sure.

6    **Q.**    And I think I asked you this yesterday.  You haven't

7    listened to those skits, correct?

8    **A.**    Correct.

9    **Q.**    We played in court the skit called Paul, and that skit

10   is a recording by Paul Rosenberg, Eminem's manager, on

11   Eminem's message machine saying things about Michael Jackson

12   and a new gun.  Does that refresh your memory about what

13   these skits are?

14   **A.**    As I have said, I have never listened to them.

15   **Q.**    Now, in your first report in this case you did not say

16   anything about actual damages for the skits, correct?

17   **A.**    Correct.

18   **Q.**    And you didn't say anything about actual damages for

19   the skits in your July 6 report, correct?

20   **A.**    Three days later, yes.

21   **Q.**    And you didn't say anything in your August 10th report

22   about any actual damages on the skits, correct?

23   **A.**    Correct.

24   **Q.**    Now, the fact that Universal was not paying

25   Eight Mile Style any mechanical royalties for the skits was

1   not something that Universal hid from Eight Mile Style, was

2   it?

3   **A.**   I don't understand.  I don't know -- I don't know how

4   to answer that.

5   **Q.**   Sure.

6   **A.**   Did not pay it purposely you mean or --

7   **Q.**   No, that's not my question.  Let me go back.

8   **A.**   Okay.

9   **Q.**   You are aware that Universal told Eight Mile Style that

10   it was not paying mechanical royalties for the skits?

11        **MR. BUSCH:**  Objection, Your Honor.

12   Mischaracterizes his testimony.

13        **THE COURT:**  Overruled.

14        **THE WITNESS:**  Would you repeat the question?

15   **BY MR. POMERANTZ:**

16   **Q.**   Sure.  You are aware that Universal told Eight Mile

17   Style that it was not paying mechanical royalties on the

18   skits, correct?

19   **A.**   No, I'm not aware of that.

20   **Q.**   Okay.  Can we put up Exhibit 735, please, and highlight

21   the top third of the document if you could.  Just bring that

22   up a little further, right to there.  That's good.

23        All right.  This is a license instruction sheet

24   that Universal sent to Eight Mile Style, and you will see a

25   list of skits at the bottom part of this excerpt at the

1   statement that says no mechanical royalty obligation; do you

2   see that?

3   **A.**   Yes.

4   **Q.**   Have you ever seen this document before?

5   **A.**   Not that I recall.

6   **Q.**   Okay.  Well, you can take that down.  You have seen

7   royalty statements?

8   **A.**   Could you put that up, please, while we refer to it?

9   **Q.**   It's available if you need it again.  You have seen

10  royalty statements that Universal sent to Eight Mile Style

11  and to its sister company, FPT, correct?

12  **A.**   Yes.

13  **Q.**   And the royalty statements that Universal sends to FPT

14  are called artist royalty statements, correct?

15  **A.**   Or producer's statements yes.

16  **Q.**   And the royalty statements that Universal sends to

17  Eight Mile Style are called publishing royalty statements,

18  correct?

19  **A.**   Mechanical royalty statement, yes.

20  **Q.**   Either publishing or mechanical?

21  **A.**   Yes.

22  **Q.**   People in the industry refer to them both ways?

23  **A.**   Yes.

24  **Q.**   And in fact when those accounting statements are sent

25  to FPT and to Eight Mile Style, they both go to the same

1  office in Detroit, correct?

2  **A.**   I don't recall sitting here where they both go.  I

3  assume they do.

4  **Q.**   You understand that Mr. Martin runs both companies,

5  correct?

6  **A.**   Yes.

7  **Q.**   And you have audited for both Eight Mile Style and for

8  FPT, correct?

9  **A.**   Correct.

10  **Q.**   And in both of those audits you reported to Mr. Martin,

11  correct?

12  **A.**   Yes.

13  **Q.**   And so when you were doing your audits you would have

14  the artist royalty statements available to you and the

15  publisher's royalty statements available to you, correct?

16  **A.**   Yes.

17  **Q.**   And if you look at those royalty statements, you would

18  see the skits on the artist's royalty statement, correct?

19  **A.**   Yes.

20  **Q.**   And if you looked at the publishing royalty statement

21  you would not see the skits on the publishing royalty

22  statement, correct?

23  **A.**   Correct, and that's why there is a claim here.

24  **Q.**   And so you would know that Universal is paying you

25  artist royalties on the skits, but they are not paying you

1    mechanical royalties on the skits, correct?

2    **A.**   Yes, that's the nature of this claim here.

3    **Q.**   And none of that was hidden from FPT or Eight Mile

4    because you could see it right on the royalty statements,

5    correct?

6    **A.**   Well, royalty statements to FPT are hundreds of pages

7    long as are the mechanical royalty statements, so some

8    things that drop out are not readily apparent.

9    **Q.**   Well, you can just go to the iTunes store and see that

10   the skits are for sale, correct?

11   **A.**   I assume so.  I have never looked on the iTunes store

12   for those albums or skits.

13   **Q.**   No one is hiding the fact that the skits are being

14   sold, correct?

15   **A.**   Correct.

16   **Q.**   Your primary work is to be a music industry auditor,

17   correct?

18   **A.**   Correct.

19   **Q.**   And as an auditor in the music industry you view your

20   job as being an advocate for your client, correct?

21   **A.**   Yes.

22   **Q.**   And so when you are auditing for Eight Mile Style, your

23   job is to advocate Eight Mile Style's position, correct?

24   **A.**   Yes.

25   **Q.**   Just like Mr. Busch is hired in this case to advocate

1   Eight Mile Style's position in the courtroom, correct?

2   **A.**   Yes.

3          **MR. POMERANTZ:**  I don't have any further

4   questions, Your Honor.

5          **MR. BUSCH:**  I have a few.

6                      -   -   -

7                **REDIRECT EXAMINATION**

8   **BY MR. BUSCH:**

9   **Q.**   Okay.  Mr. Cohen, just a few preliminary things.

10  First, I'm going to start with some of the topics that

11  Mr. Pomerantz discussed with you and try and do it in the

12  order, in some ways the order in which he ended up.

13         The first, do you recall Mr. Pomerantz asking you

14  in his cross-examination of you whether you deducted certain

15  costs and information that you were, quote-unquote, supposed

16  to deduct?  I think he used that word supposed to deduct.

17  Do you recall him asking you questions about that?

18  **A.**   Yes.

19  **Q.**   And he went over it with respect to the iPod

20  information, then again with the Aftermath cost information

21  again asking you whether you did or did not in your analysis

22  with respect to the costs include items you are,

23  quote-unquote, supposed to include; do you recall his

24  questioning about that?

25  **A.**   You mean after Apple and Aftermath, not iPod.

1    **Q.**   Yes.  Do you know whether in a copyright infringement

2    case it's the plaintiff's burden to show gross revenue and

3    the defendant's burden to show deductible or appropriate

4    costs; do you know whether that's the case?

5           **MR. POMERANTZ:**  Objection, Your Honor, he's asking

6    the witness to testify to the law.  He objected when I tried

7    to do the same.

8           **MR. BUSCH:**  He asked the same questions.

9           **THE COURT:**  Sustained.

10   **BY MR. BUSCH:**

11   **Q.**  Well, do you know what the relevant burdens of the

12   parties are in a copyright infringement case are?

13          **MR. POMERANTZ:**  Your Honor, same objection.

14          **THE COURT:**  It's still a matter of law.

15          **MR. BUSCH:**  But he was asking him, Your Honor,

16   about why he didn't include certain things in his deductions

17   so I wanted to explore that a little bit.  He opened the

18   door to that.

19          **MR. POMERANTZ:**  Your Honor, he can certainly ask

20   him if he wants to why he did certain things.

21          **MR. BUSCH:**  Let me ask you the question a

22   different way.

23   **BY MR. BUSCH:**

24   **Q.**  Did I or did I not advise you, Mr. Cohen, in connection

25   with the preparation of your report what your task would be

1    as far as showing gross revenue?

2    **A.**   Gross revenue, yes.

3    **Q.**   Okay.  And do you recall counsel also advising you

4    whose burden it was as far as showing the costs that are

5    properly deductible from that revenue?

6    **A.**   Yes.

7    **Q.**   Okay.  And whose burden did counsel tell you it was?

8    **A.**   Counsel told me it was the defendant's burden.

9    **Q.**   Okay.

10              **THE COURT:**  It was whose?

11              **THE WITNESS:**  Defendant's burden.

12   **BY MR. BUSCH:**

13   **Q.**   Now, Mr. Pomerantz also asked you quite a bit about

14   your iPod profit analysis.

15   **A.**   Yes.

16   **Q.**   And he spent a long time going through the different

17   uses of iPods and going through your analysis; do you recall

18   that?

19   **A.**   Yes.

20   **Q.**   As part of your analysis or preparation for your expert

21   report did you review Eddy Cue's testimony?

22   **A.**   Yes, I did.

23   **Q.**   And do you recall who Eddy Cue is?

24   **A.**   Yes, I believe he works at Apple, if that's correct.

25   **Q.**   Do you recall whether he runs the iTunes store?

1    **A.**   Yes.

2    **Q.**   And do you recall what Mr. Cue said whether there

3    was -- whether the, whether Apple uses the iTunes store to

4    drive iPod sales?

5              **MR. POMERANTZ:**  Your Honor, he's leading.

6              **MR. BUSCH:**  Do you recall whether?

7              **THE COURT:**  That's a yes or no answer.  Leading.

8    **BY MR. BUSCH:**

9    **Q.**   Do you recall what Mr. Cue said in connection with the

10   synergy between --

11             **THE COURT:**  You are leading still.

12             **MR. BUSCH:**  I have to draw his attention to a

13   subject, Your Honor.

14             **THE COURT:**  No.

15             **MR. BUSCH:**  Okay.

16   **BY MR. BUSCH:**

17   **Q.**   Do you recall Mr. Cue's testimony?

18   **A.**   Yes.

19   **Q.**   Okay.  And with respect to the iPod and iTunes store,

20   what do you recall his testimony to be?

21   **A.**   He said they are linked.

22             **THE COURT:**  He said what?

23             **THE WITNESS:**  They are linked.

24   **BY MR. BUSCH:**

25   **Q.**   Do you recall whether -- do you recall the following

1    question and answer in Mr. Cue's testimony?

2         **MR. POMERANTZ:**  Your Honor, I'm not sure why he's

3    reading it.  There is no recollection that needs to be

4    refreshed.

5         **MR. BUSCH:**  It's an admission of a party,

6    Your Honor.  It's a statement by a party.  Mr. Cue is an

7    officer of Apple, and I'm reading it as an admission of

8    Apple.

9         **MR. POMERANTZ:**  Your Honor, we are going to be

10   playing Mr. Cue's deposition after Mr. Cohen gets off the

11   stand.

12        **THE COURT:**  He may read it.  Overruled.

13   **BY MR. BUSCH:**

14   **Q.**  Page 112:  "Would it be fair to say that the iTunes

15   store has been set up as a way for you to sell iPods and the

16   new iPhones?

17   "A.   No.

18   "Q.   Not at all?

19   "A.   It helps."

20        And then the question ends.  Do you recall that

21   answer by Mr. Cue?

22   **A.**   Yes.

23   **Q.**  Did that -- can you explain, sir, how that analysis,

24   how Mr. Cue's testimony went into your analysis in

25   connection with your iPod profit calculation?

1    **A.**   That there is some interrelationship between sales of

2    iPods and the iTunes store.

3    **Q.**   Okay.  Now, I want to just bring the Court back for a

4    second because Mr. Pomerantz spent a long time going over

5    every detail of your report and the numbers that you used,

6    and I want to bring the Court back for a second based upon

7    that cross-examination to the two reasons that you included

8    an iPod report in your calculation.  Could you explain to

9    the Court why you did that?

10   **A.**   Firstly, because I believe there is an

11   interrelationship between the iPod and the iTunes store, and

12   secondly, as a separate matter, that there may be statutory

13   damages in this case and other types of income other than

14   direct profits for the compositions that have to be

15   considered.

16   **Q.**   Let's focus on the first for a second, the first

17   reason, and your point about that there is some connection.

18   What in your review of the information and literature on

19   this subject -- do you recall reading from the literature

20   what occurred with iPod sales after the opening of the

21   iTunes store?

22   **A.**   Well, sure.  The iTunes store opened about two years

23   after the iPod was produced.  At that point in time sales

24   increased 400 percent in each of the next two years of

25   iPods.

1    **Q.**   Okay.  And was Eminem used in advertisements for both

2    iPods and iTunes?

3    **A.**   Yes.  There was a television advertisement that

4    featured an Eminem composition, I think, and there are also

5    other advertisements which featured other artists'

6    compositions that had the logo on the bottom saying iPod

7    plus iTunes.

8             **THE COURT:**  What?

9             **THE WITNESS:**  They would have the logo on the

10   bottom of the advertisement saying iPod plus iTunes after

11   showing some -- the one I have seen shows a silhouette

12   dancing around with iPod headphones clearly coming out of

13   his ears and it plays a song and at the bottom it says iPod

14   plus iTunes.

15   **BY MR. BUSCH:**

16   **Q.**   Now, to be fair here, Mr. Pomerantz, he asked you a lot

17   of questions and I'm just trying to go through them as I

18   took the notes, but the one thing he raised was the

19   2 billion applications for the iPhone; do you recall him

20   asking about that?

21   **A.**   Yes.

22   **Q.**   The relevant time period in this case when you did your

23   analysis was from 2003 to approximately 2008 or --

24   **A.**   April of 2009.

25   **Q.**   Okay.  For the vast majority of that time were there --

1    was there an iPhone?

2    **A.**   I don't remember when the iPhone came out, but I don't

3    think it came out until 2006 or '7.

4    **Q.**   Okay.  And do you know whether those 2 billion

5    applications that Mr. Pomerantz made reference to, when they

6    have occurred, whether they have occurred even after the

7    time or at least a portion of them have occurred even after

8    the time that the revenue in this case was cut off?

9    **A.**   I don't know when people downloaded the application.  I

10   think it's a more recent phenomena not available in the

11   early iPods at least until the iPhone came out and more

12   significantly recently the iPod Touch came out.

13          **THE COURT:**  Now, what did you say?

14          **THE WITNESS:**  I'm sorry.

15          **THE COURT:**  When you mumble to him, I can't hear.

16   I decide the case, remember?

17          **THE WITNESS:**  I know you are, and I'm sorry.  I

18   said the applications, all the apps, they call them, on

19   iPods came out more recent, when the iPhone came out, I

20   think it was around 2006, and have come into greater use

21   recently in the last year or so when the iPod Touch came in,

22   which is an iPhone without the telephone capability.

23   **BY MR. BUSCH:**

24   **Q.**   And just so the court understands, were you here, you

25   said, when Mr. Martin testify?

1    **A.**    No, I was not.

2    **Q.**    Okay.  Mr. Pomerantz asked you a lot of questions about

3    Mr. Martin's testimony; do you recall that?

4    **A.**    He asked me a couple, yes.

5    **Q.**    Do you know whether Mr. Martin brought this case

6    because of a concern for transparent accounting?

7         **MR. POMERANTZ:**  Objection, Your Honor.  He's

8    leading the witness and arguing his case.

9         **THE COURT:**  Sustained.

10   **BY MR. BUSCH:**

11   **Q.**    Do you know what the motivation of Mr. Martin was in

12   bringing in case?

13        **MR. POMERANTZ:**  Objection, Your Honor.  Lack of

14   foundation.  It's also irrelevant what his knowledge is of

15   what Mr. Martin's state of mind was.

16        **THE COURT:**  Sustained.

17   **BY MR. BUSCH:**

18   **Q.**    Did you have conversations with Mr. Martin about his

19   primary reason of bringing this case?

20   **A.**    A few.

21   **Q.**    And what did you understand Mr. Martin's primary reason

22   for bringing this case was?

23        **MR. POMERANTZ:**  It's hearsay, Your Honor.  It's

24   nothing he relied on in his report.  It's hearsay.

25        **THE COURT:**  Sustained.

1    **BY MR. BUSCH:**

2    **Q.**   Well, Mr. Cohen, that does bring me to the next topic

3    that I have.  In his cross-examination of you Mr. Pomerantz

4    asked you whether you had made a claim for actual damages

5    relating to any of the Eight Mile compositions other than

6    the shorter compositions or skits, as he referred to them.

7    Do you recall that line of questioning?

8    **A.**   Yes.

9    **Q.**   Why did you not make a claim for actual damages for the

10   compositions other than the shorter compositions?

11   **A.**   I did not have enough information from Apple on which

12   to base an actual claims situation.  There was no, no

13   transparency.  I don't know how Apple keeps its records.  It

14   didn't provide anything for me to look at or was not

15   provided to me to look at.  All I saw was a general P and L

16   and a sales report by composition, which I think we looked

17   at here, but I saw nothing underlying those reports.

18   **Q.**   Do you recall if we ever told you whether we supplied

19   to you whatever Apple supplied to us in the litigation?

20          **MR. POMERANTZ:**  Objection, Your Honor, he's

21   leading.

22   **BY MR. BUSCH:**

23   **Q.**   Did you have a conversation with Mr. Guilford --

24          **THE COURT:**  You are leading.

25          **MR. BUSCH:**  I'll rephrase it, Your Honor.

1    **BY MR. BUSCH:**

2    **Q.**   Did you have a conversation with Mr. Guilford about the

3    documents he was providing you?

4    **A.**   Yes.

5    **Q.**   And what did he say to you as far as the Apple

6    documents?

7    **A.**   I received what they -- he received.

8    **Q.**   Okay.  And with respect to Aftermath, same question.

9    Did you have a conversation with Mr. Guilford about what he

10   was providing you?

11   **A.**   He gave me three binders' worth of information, and he

12   said that was all he received from Aftermath.

13   **Q.**   Okay.  Now, in order to get behind the numbers that

14   Apple produced in this case and really determine if

15   Eight Mile received the full and accurate royalties to which

16   it was entitled, what would you need to do or have?

17   **A.**   I would need to look at Apple's accounting system for

18   sales of downloads to gain comfort with the integrity of

19   their system and to make sure that all downloads of all

20   compositions were actually being reported to Universal and

21   they weren't going to the wrong pocket, so to speak.

22   **Q.**   Why is that essential?

23   **A.**   For completeness.  To make sure that everything that

24   should have been reported was reported.  For example, let's

25   say there was an error in an I.D. number.  There were

1    downloads, but the system created some sort of error that it

2    might have been put into their expense account, which I was

3    never able to see, or some sales might have errantly been

4    sent somewhere else.  Let's say if they sort their payments

5    by title, if there was an errant drop of a vowel or a

6    consonant, it could have ended up in Apple's expense account

7    or paid to the wrong party.  So I don't know if the unit

8    sales reported on those reports from Apple to Aftermath were

9    correct.

10   **Q.**   Without access to Apple's books and records and without

11   the ability to review Apple's royalty systems and processes

12   that you just described, what are you left to do?

13   **A.**   I have to take the report that was given at its face

14   value.  So all I can do to create my report was rely on what

15   I was given, but I could not tell whether those reports or

16   basis had any errors that would have resulted in actual

17   damages.

18   **Q.**   And when doing audits outside this lawsuit, have you

19   every been provided with either basic source statements or

20   data that Apple has provided to Universal?

21        **MR. POMERANTZ:**  Objection, Your Honor, it's

22   leading and argumentive.

23        **THE COURT:**  Sustained.

24        **MR. BUSCH:**  Okay.

25

1    **BY MR. BUSCH:**

2    **Q.**    When doing audits outside of this lawsuit, what, if

3    anything, have you been provided by Universal with respect

4    to source statements or data?

5    **A.**    Typically in a record audit I would seek third-party

6    source statements.  For example, a record club statement

7    from Columbia House record club or BMG record club.  If

8    there is a license of a master to a third party, I would see

9    the source statements and the accountings from that third

10   party.  In a mechanical royalty audit, depending on the

11   license, I may have access to manufacturing records.

12   **Q.**    What about with respect to digital, has Universal ever

13   provided you with anything in that regard as far as source

14   statements?

15   **A.**    All I see in a records audit with respect to digital

16   income is a run of sales but no further backup because I

17   can't get at how Apple prepares that.  I see reports

18   prepared by Universal from data that Apple has sent them.

19   **Q.**    So you don't even see the Apple documents that Apple

20   sends Universal?

21   **A.**    I believe they electronically transmit their sales to

22   Universal.  There is no document to see, but on the other

23   hand, I have nothing to verify whether the sales reported by

24   Apple to Universal are complete.

25   **Q.**    Therefore, Mr. Cohen, when auditing a record company

1    with respect to permanent downloads made and distributed by

2    a third party such as Apple, can you conduct a meaningful

3    audit under the circumstances?

4            **MR. POMERANTZ:**  Objection, Your Honor, leading and

5    argumentive.

6            **THE COURT:**  You are leading.  Sustained.

7    **BY MR. BUSCH:**

8    **Q.**   Is there a way for you -- let me back up.  Can you

9    conduct a meaningful audit under these circumstances?

10           **MR. POMERANTZ:**  Still leading and argumentive.

11           **MR. BUSCH:**  Your Honor, I'm asking him can he do

12   something.  I'm not suggesting whether it's yes or no.  I'm

13   just --

14           **THE COURT:**  Sustained.

15           **MR. BUSCH:**  Okay.

16   **BY MR. BUSCH:**

17   **Q.**   What problem do you face as a result of not being

18   provided the information you have described?

19   **A.**   My audit has scope limitations, as accountants tend to

20   call them.  I cannot see everything that I need to see in

21   order to gain comfort that the sales records as reported by

22   Universal are complete.

23   **Q.**   Now, you do know that when Eight Mile sued Apple in

24   this case you did receive a sales report from Apple in this

25   case?

1  **A.**   Yes.

2  **Q.**   Okay.  If Apple or Universal gave you such a sales

3  report in the course of a routine audit rather than having

4  to sue here to obtain it, would that enable you to conduct a

5  meaningful audit with respect to Apple's reproduction of

6  Eight Mile's compositions?

7  **A.**   I would have the same problem, meaning that I do not

8  know what goes on in the generation of those sales reports

9  because I cannot look at Apple's books and records.

10  **Q.**   Okay.  Now, Mr. Cohen, you have testified that you

11  conducted publishing mechanical royalty audits on behalf of

12  music publishers other than Eight Mile; isn't that correct?

13  **A.**   Yes.

14  **Q.**   I would like to focus your attention to these

15  independent or privately owned music publishers such as

16  Eight Mile, okay?

17  **A.**   Okay.

18  **Q.**   And I believe that you testified that you conducted

19  such mechanical royalty audits for privately owned

20  independent music publisher such as Diane Warren's company;

21  is that correct?

22  **A.**   Yes.  It's called Real Songs.

23  **Q.**   Can you give me an example of another independent

24  company?

25  **A.**   I have done this for Hamstein Music, which is the music

1    publisher for ZZ Top, and others.

2    **Q.**   Now, do you know whether typically these independent

3    publishers enter into direct licenses?

4    **A.**   Yes, they do.

5    **Q.**   And what under those circumstances would a mechanical

6    license that said that the publisher was to be paid

7    royalties on all units made and distributed allow you to do

8    as an auditor?

9            **MR. POMERANTZ:**  Objection, Your Honor.  It's

10   leading and also lacks foundation.

11           **THE COURT:**  Overruled.

12           **MR. BUSCH:**  Thank you.

13           **THE WITNESS:**  I would look at the royalty

14   statements issued by the record company and I would look at

15   data underlying how those sales came about.  I would look at

16   manufacturing records because I'm looking for units made and

17   distributed, and I would have access to inventory records,

18   perhaps production records.  So I would see, I would see

19   everything that relates to the manufacture and then how --

20   and then the disposition of those units that were

21   manufactured.

22   **BY MR. BUSCH:**

23   **Q.**   And would that allow you to do an appropriate audit?

24   **A.**   That would be a complete audit, yes.

25   **Q.**   Okay.  And you were the auditor for Eight Mile; is that

1    correct?

2    **A.**    Yes.

3    **Q.**    Okay.  And you have done an audit of Universal for

4    publishing royalties, correct?

5    **A.**    Yes.

6    **Q.**    And were you able to see any of that type of

7    information as it related to permanent downloads by Apple in

8    that audit?

9    **A.**    No.

10       **MR. BUSCH:**  If you would put Exhibit 57 up on the

11   board.  It's been preadmitted, Your Honor.

12       One second, Your Honor.

13   **BY MR. BUSCH:**

14   **Q.**    Okay.  We're highlighting a portion of this document.

15   Do you recognize this document to be an Eight Mile Style-

16   Aftermath physical product mechanical license?

17       **MR. POMERANTZ:**  Your Honor, I have a couple of

18   objections here.  First, it's beyond the scope of my cross.

19   I had no questions of Mr. Cohen regarding these kinds of

20   licenses, and the particular portion he's highlighting is a

21   direct reference to the law so I'm not sure where he's

22   going, but in any event, I think it's beyond the scope of my

23   cross.

24       **MR. BUSCH:**  Your Honor, I will show why it's not.

25   This all goes to his point that he made at the very

1   beginning of his cross-examination that Mr. Cohen has not

2   done an analysis of actual damages, and it goes to

3   Mr. Cohen's reason why it was impossible for him to do

4   one based upon the information that Universal does or does

5   not supply.

6           **THE COURT:**  Overruled.

7           **MR. BUSCH:**  Thank you.

8           **THE COURT:**  It's 1:00 though.  We can stop now for

9   a half an hour.

10          **MR. BUSCH:**  A half an hour.  Thank you,

11  Your Honor.

12          **THE CLERK:**  All rise.  Court is in recess.

13      (Recess from 1:00 p.m. until 1:39 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25